1
2
3
4
5

MICHAEL J. HADDAD (State Bar No. 189114)
JULIA SHERWIN (State Bar No. 189268)
T. KENNEDY HELM (State Bar No. 282319)
MAYA SORENSEN (State Bar No. 250722)
HADDAD & SHERWIN LLP
505 Seventeenth Street
Oakland, California94612
Telephone: (510) 452-5500
Facsimile:  (510) 452-5510

6
7

Attorneys for Plaintiff James Neuroth

8

## UNITED STATES DISTRICT COURT

9

## NORTHERN DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JAMES NEUROTH, Individually and as Successor in
Interest of Decedent STEVEN KELLOGG NEUROTH,

               Plaintiff,

     vs.

MENDOCINO COUNTY, a public entity;
MENDOCINO COUNTY SHERIFF-CORONER
THOMAS D. ALLMAN, individually; CORRECTIONS
CAPTAIN TIM PEARCE; SERGEANT LORI KNAPP;
DEPUTY FRANK MASTERSON; DEPUTY CRAIG
BERNARDI; DEPUTY MICHAEL GRANT; DEPUTY
JEANETTE HOLUM; DEPUTY ROBERT PAGE;
DEPUTY CHRISTINE DE LOS SANTOS; CITY OF
WILLITS, a public entity; WILLITS POLICE CHIEF
GERARDO GONZALEZ; WILLITS POLICE
OFFICER KEVIN LEEF; WILLITS POLICE OFFICER
JEFF ANDRADE; CORRECTIONAL MEDICAL
GROUP COMPANIES, INC., a Delaware Corporation;
CALIFORNIA FORENSIC MEDICAL GROUP,
INCORPORATED, a California corporation; TAYLOR
FITHIAN, M.D.; BARBARA COTTON, R.N.;
ELAINE HUSTEDT; YVONNE MAXFIELD, R.N.;
CLAIRE TESKE, R.N.; JENNIFER L. CAUDILLO,
L.V.N., and COUNTY DEPUTIES DOES 9–20, and
DOES 23–35, individually, jointly, and severally,
Defendants.
_____

Case No. 3:15-CV-03226-RS (NJV)

**FOURTH AMENDED
COMPLAINT FOR
DAMAGESAND DEMAND FOR
JURY TRIAL**

Plaintiff, by and through his attorneys, HADDAD & SHERWIN LLP, for his Fourth Amended Complaint against Defendants, states as follows:

## JURISDICTION

1.      This is a civil rights wrongful death/survival action arising under 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution, and the laws and Constitution of the State of California.  Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343.  Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367, to hear and decide claims arising under state law.  The amount in controversy herein, excluding interest and costs, exceeds the minimum jurisdictional limit of this Court.

## INTRADISTRICT ASSIGNMENT

2.      A substantial part of the events and/or omissions complained of herein occurred in the County of Mendocino, California, and this action is properly assigned to the Oakland or San Francisco Division of the United States District Court for the Northern District of California.

## PARTIES AND PROCEDURE

3.      Plaintiff JAMES NEUROTH is the brother of Decedent STEVEN NEUROTH and a resident of the State of California.  Plaintiff JAMES NEUROTH brings these claims individually and as successor in interest for Decedent STEVEN NEUROTH pursuant to California Code of Civil Procedure §§ 377.10 et seq.  Decedent STEVEN NEUROTH had no children, and his parents are deceased, making his brother, Plaintiff JAMES NEUROTH, entitled to intestate succession as his next of kin.

4.      Plaintiff brings these claims pursuant to California Code of Civil Procedure §§ 377.20 et seq. and 377.60 et seq., which provide for survival and wrongful death actions.  Plaintiff also brings his claims individually and on behalf of Decedent STEVEN NEUROTH on the basis of 42 U.S.C. §§ 1983 and 1988, the United States Constitution, federal and state civil rights law, and California law.

5.      DefendantCOUNTY OF MENDOCINO ("COUNTY") is a public entity, duly organized and existing under the laws of the State of California.  Under its authority, the COUNTY operates the Mendocino County Sheriff's Office (MCSO).

6.      Defendant SHERIFF-CORONER THOMAS D. ALLMAN ("ALLMAN"), at all times mentioned herein, was employed by DefendantCOUNTY as Sheriff-Coroner for the COUNTY, and he was acting within the course and scope of that employment.  In that capacity, Defendant ALLMAN was a policy making official for the COUNTY OF MENDOCINO.  Further, Defendant ALLMAN was ultimately responsible for the provision of medical care to inmates at the jails, including assessing inmates for possible mental health needs, and all CFMG policies, procedures, and training related thereto.  He is being sued individually.

7.      Defendant CORRECTIONS CAPTAIN TIM PEARCE ("PEARCE"), at all times mentioned herein, was employed by Defendant COUNTY as Captain and Commander of the Corrections Division, including the jail, for the COUNTY, and he was acting within the course and scope of that employment.  In that capacity, Defendant PEARCE was a policy making official for the COUNTY OF MENDOCINO.  Further, Defendant PEARCE was responsible for the general management and control of the Corrections Division, with primary authority and responsibility for the operations, staff assignments, program development, personnel supervision and training, maintenance and auxiliary inmate services at the jail, subordinate only to the Sheriff and/or Undersheriff.

8.      Defendant SERGEANT LORI KNAPP ("KNAPP"), at all times mentioned herein, was employed by DefendantCOUNTY as a sergeant and supervisor at the jail, and was acting within the course and scope of that employment.

9.      Defendant DEPUTY FRANK MASTERSON ("MASTERSON"), at all times mentioned herein, was employed by DefendantCOUNTY as a corrections deputy at the jail, and was acting within the course and scope of that employment.

10.     Defendant DEPUTY CRAIG BERNARDI ("BERNARDI"), at all times mentioned herein, was employed by DefendantCOUNTY as a corrections deputy at the jail, and was acting within the course and scope of that employment.

11.     Defendant DEPUTY MICHAEL GRANT ("GRANT"), at all times mentioned herein, was employed by Defendant COUNTY as a corrections deputy at the jail, and was acting within the course and scope of that employment.

12.     Defendant DEPUTY JEANETTE HOLUM ("HOLUM"), at all times mentioned herein, was employed by DefendantCOUNTY as a corrections deputy at the jail, and was acting within the course and scope of that employment.

13.     Defendant DEPUTY ROBERT PAGE ("PAGE"), at all times mentioned herein, was employed by Defendant COUNTY as a corrections deputy at the jail, and was acting within the course and scope of that employment.

14.     Defendant DEPUTY CHRISTINE DE LOS SANTOS ("DE LOS SANTOS"), at all times mentioned herein, was employed by DefendantCOUNTY as a corrections deputy at the jail, and was acting within the course and scope of that employment.

15.     DefendantCITY OF WILLITS ("CITY") is a public entity, duly organized and existing under the laws of the State of California.  Under its authority, the CITY operates the Willits Police Department.

16.     Defendant WILLITS POLICE CHIEF GERARDO GONZALEZ ("GONZALEZ"), at all times mentioned herein, was employed by Defendant CITY OF WILLITS as Chief of Police, and he was acting within the course and scope of that employment.  In that capacity, Defendant GONZALEZ was a policy making official for the CITY OF WILLITS, ultimately responsible for all training, supervision, policies, customs, and procedures of the Willits Police Department, and specifically for the supervision of Defendants LEEF and ANDRADE and for the ratification of their misconduct in this matter.

17.     Defendant WILLITS POLICE OFFICER JEFF ANDRADE ("ANDRADE"), at all times mentioned herein, was employed by Defendant CITY OF WILLITS as a police officer, and was acting within the course and scope of that employment.DefendantsMENDOCINOCOUNTY, CITY OF WILLITS, and OFFICER KEVIN LEEF intentionally concealed the extent and nature of ANDRADE'S involvement in STEVEN NEUROTH'S death, and ANDRADE'S mistreatment of STEVEN NEUROTH while he was in psychiatric crisis.  Plaintiff only discovered ANDRADE'S

misconduct and the extent of ANDRADE'S involvement after deposing Defendant LEEF in this matter during a partial discovery stay in the course of settlement conference proceedings.

18.     Defendant WILLITS POLICE OFFICER KEVIN LEEF ("LEEF"), at all times mentioned herein, was employed by Defendant CITY OF WILLITS as a police officer, and was acting within the course and scope of that employment. Defendants MENDOCINO COUNTY, CITY OF WILLITS, and OFFICER KEVIN LEEF intentionally concealed the extent and nature of LEEF'S involvement in STEVEN NEUROTH'S death, and LEEF'S abusive and torturous mistreatment of STEVEN NEUROTH while he was in psychiatric crisis.  Plaintiff only discovered LEEF'S misconduct and the extent of LEEF'S involvement after the COUNTY produced disclosures in this matter on or about March 31, 2016.

19.     Defendant COUNTY DEPUTIES DOES 9–20 were each at all times herein mentioned deputy sheriffs employed by Defendant COUNTY, and each was acting within the course and scope of that employment.

20.     In engaging in the conduct described herein, Defendant COUNTY DEPUTIES DOES 9–20 acted under the color of law and in the course and scope of their employment with the COUNTY.

21.     Defendant CORRECTIONAL MEDICAL GROUP COMPANIES, INC. ("CMGC"), was, at all times herein mentioned, a Delaware corporation licensed to do business in California. According to the sworn deposition testimony of Defendant TAYLOR FITHIAN, M.D. in this matter, Defendant CMGC has owned approximately 80 percent of Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC. ("CFMG") since 2012, and has been responsible for the medical and mental health care provided to MENDOCINO COUNTY inmates since that time. Defendant CMGC owns, controls, manages, instructs, and fully operates Defendant CFMG, including controlling all policies, procedures, supervision, compensation, and training of CFMG employees at the MENDOCINO COUNTY jail.  Defendant CMGC pays the salaries of CFMG employees, issues CMGC policies, procedures, medical records and forms that are required to be used in CFMG facilities, including the MENDOCINO COUNTY jail, and employs and supervises all medical personnel at the MENDOCINO COUNTY jail.

22.     Defendant CMGC, through its ownership and control of Defendant CFMG, provided medical and nursing care to prisoners and detainees in Mendocino County jails, pursuant to contract with the COUNTY OF MENDOCINO.

23.     According to the sworn deposition testimony of Defendants TAYLOR FITHIAN, M.D., and CLAIRE TESKE, R.N., in this matter, CMGC and CFMG had the following officers, directors, and/or managing agents responsible for unlawful policies, procedures, supervision, and training in this matter, including but not limited to the unlawful order that CMGC/CFMG licensed vocational nurses work alone, unsupervised, and outside their legal scope of practice as discussed below:  CMGC and CFMG's Chief Executive Officer LOUIS E. "KIP" HALLMAN, III; CMGC's and CFMG's Chief Medical Officer and CFMG's President, RAYMOND HERR, M.D.; Defendant CFMG's Co-Founder and former Director of Operations and Defendant CMGC's current "Executive Advisor," ELAINE HUSTEDT; Defendant BARBARA COTTON, R.N.; Defendant CMGC's/CFMG's Director of Operations, YVONNE MAXFIELD, R.N.; and Defendant CMGC's/CFMG's Program Manager for the MENDOCINO COUNTY jail, CLAIRE TESKE, R.N..  On information and belief, all of these Defendants are responsible for making and enforcing policies, procedures, and training, and supervision of employees related to the medical care of prisoners and detainees in Defendant COUNTY OF MENDOCINO's jails, including assessing inmates for mental health and emergency medical needs.

24.     On information and belief, CFMG, CMGC and their joint employees and agents DefendantsTAYLOR FITHIAN, M.D., ELAINE HUSTEDT, and YVONNE MAXFIELD, R.N., are responsible for making and enforcing policies, procedures, and training related to the medical care of prisoners and detainees in Defendant COUNTY OF MENDOCINO's jails, including assessing inmates for mental health and emergency medical needs.

25.     Defendant CALIFORNIA FORENSIC MEDICAL GROUP, INC. ("CFMG"), was at all times herein mentioned, a California corporation licensed to do business in California. Defendant CFMG provided medical and nursing care to prisoners and detainees in Mendocino County jails, pursuant to contract with the COUNTY OF MENDOCINO.  On information and belief, CMGC/CFMG and their employees and agents Defendant TAYLOR FITHIAN, M.D., are responsible for making and enforcing policies, procedures, and training related to the medical care

of prisoners and detainees in Defendant COUNTY OF MENDOCINO's jails, including assessing

inmates for mental health and emergency medical needs.

26.     Defendants CMGC and CFMG had and have one joint Chief Medical Officer and

President, Raymond Herr, M.D.("HERR") who was at all times herein mentioned a physician

licensed to practice medicine in the State of California, an employee and/or agent of both

Defendants CMGC and CFMG, working as the Chief Medical Officer and President responsible for

overseeing and providing medical care to prisoners and detainees in the MENDOCINO COUNTY

jails, and he was acting within the course and scope of that employment.  In that capacity, Dr. Herr

was a policy making official for CMGC and CFMG. On information and belief, Dr. Herr is nowis

ultimately responsible for CMGC's and CFMG's provision of medical care to inmates at the jails,

including assessing inmates for possible mental health and emergency medical needs, and all

CMGC and CFMG policies, procedures, and training related thereto.

27.     Defendant TAYLOR FITHIAN, M.D.("FITHIAN") was at all times herein

mentioned a physician licensed to practice medicine in the State of California, an employee and/or

agent of both DefendantsCMGC and CFMG, working as these Defendants' Medical Director and

Chief of Behavioral Health Services nationally, and also as the medical director of Defendant

COUNTY's jails responsible for overseeing and providing medical care to prisoners and detainees,

and he was acting within the course and scope of that employment.  In that capacity, Defendant

FITHIAN was a policy making official for CMGC and CFMG. On information and belief,

Defendant FITHIAN was ultimately responsible for CMGC's and CFMG's provision of medical

care to inmates at the jails, including assessing inmates for possible mental health and emergency

medical needs, and all CMGC and CFMG policies, procedures, and training related thereto.

According to Defendant FITHIAN's sworn testimony in this matter, he became the Chief of

Behavioral Health Services for both CMGC and CFMG in 2015, and remains in that position.

28.     Defendantss CMGC and CFMG have one joint Chief Executive Officer (Louis E.

"Kip" Hallman), responsible for overseeing and providing medical care to prisoners and detainees

nationally and in the MENDOCINO COUNTY jails, and he was acting within the course and scope

of that employment.  In that capacity, Hallman was a policy making official for CMGC and CFMG.

On information and belief, Hallmanis one of the people ultimately responsible for CMGC's and

CFMG's provision of medical care to inmates at the jails, including assessing inmates for possible mental health and emergency medical needs, and all CMGC and CFMG policies, procedures, and training related thereto.

29.     Defendant YVONNE MAXFIELD, R.N. ("MAXFIELD") was at all times herein mentioned a Registered Nurse licensed to practice nursing in the State of California, an employee and/or agent of both Defendants CMGC and CFMG, working as the Director of Operations for both entities, responsible for overseeing and providing medical care to prisoners and detainees in the MENDOCINO COUNTY jails, and she was acting within the course and scope of that employment. In that capacity, Defendant MAXFIELDwas a policy making official for CMGC and CFMG. On information and belief, Defendant MAXFIELDis responsible for CMGC's and CFMG's provision of medical care to inmates at the jails, including assessing inmates for possible mental health and emergency medical needs, and all CMGC and CFMG policies, procedures, and training related thereto.

30.     Defendant CLAIRE TESKE, R.N. ("TESKE") was at all times herein mentioned a Registered Nurse licensed to practice nursing in the State of California, an employee and/or agent of both Defendants CMGC and CFMG, working as the CMGC and CFMG Program Manager responsible for overseeing and providing medical care to prisoners and detainees in the MENDOCINO COUNTY jails, and she was acting within the course and scope of that employment. In that capacity, Defendant TESKE was a managerial and supervisory official for CMGC and CFMG. On information and belief, Defendant TESKE is responsible for CMGC's and CFMG's provision of medical care to inmates at the jails, including assessing inmates for possible mental health and emergency medical needs, and all CMGC and CFMG policies, procedures, and training related thereto.  Defendant TESKE testified that CMGC pays her salary, and further CMGC issues policies, procedures, supervision, and training to CFMG/CMGC employees, on CMGC forms to be used at the MENDOCINO COUNTY jail.  According to the deposition testimony of Defendant FITHIAN in this matter, Defendant TESKE was one of the people responsible for making sure that LVN's only practice within their legal scope of practice.  Defendant TESKE was Defendant CAUDILLO's supervisor, and assigned her shifts working alone and unsupervised for years.

31.     Defendant ELAINE HUSTEDT ("HUSTEDT") was at all times herein mentioned one of the three co-founders of Defendant CFMG, who remained with both CMGC and CFMG after the sale of the majority controlling interest in CFMG to CMGC.  According to the sworn testimony of Defendant FITHIAN in this matter, Defendant HUSTEDT was responsible for CMGC's and CFMG's policies, procedures, and training concerning the provision of medical services to jail inmates and detainees, including but not limited to the decision to allow and order Licensed Vocational Nurses (LVN's) to perform the work of Registered Nurses (RN's) outside their legal scope of practice in violation of California law and generally accepted nursing standards, and requiring LVN's – including Defendant JENNIFER CAUDILLO L.V.N. – to work unsupervised and alone and without direct supervision by a Registered Nurse or physician, again in violation of California law and generally accepted nursing standards.  According to Defendant FITHIAN's sworn testimony, Defendant HUSTEDT was responsible for overseeing the provision of medical care to prisoners and detainees in the MENDOCINO COUNTY jails, and she was acting within the course and scope of that employment.  In that capacity, Defendant HUSTEDT was a policy making official for CMGC and CFMG. On information and belief, Defendant HUSTEDTwas responsible for CMGC's and CFMG's provision of medical care to inmates at the jails, including assessing inmates for possible mental health and emergency medical needs, and all CMGC and CFMG policies, procedures, and training related thereto.

32.     Defendant BARBARA COTTON, R.N. ("COTTON") was at all times herein mentioned one of the employees and/or agents of both Defendants CMGC and CFMG, who was responsible for CMGC's/CFMG's policies, procedures, and training concerning the provision of medical services to jail inmates and detainees, including but not limited to the decision to allow and order Licensed Vocational Nurses (LVN's) to perform the work of Registered Nurses (RN's) outside their legal scope of practice in violation of California law and generally accepted nursing standards, and requiring LVN's – including Defendant JENNIFER CAUDILLO L.V.N. – to work unsupervised and alone and without direct supervision by a Registered Nurse or physician, again in violation of California law and generally accepted nursing standards.  According to Defendant FITHIAN's sworn testimony, Defendant COTTON, on behalf of CMGC and/or CFMG, was responsible for CMGC's and/or CFMG's decisions to allow, order, and instruct LVN's to work

outside their legal scope of practice, in violation of California law and generally accepted nursing practices and procedures, and advised Defendant FITHIAN that this illegal scheme was lawful and appropriate.

33.     Defendant JENNIFER CAUDILLO, L.V.N. ("CAUDILLO") was at all times herein mentioned employed by DefendantsCMGC and CFMG as a licensed vocational nurse in Defendant COUNTY OF MENDOCINO's jails, and was acting within the course and scope of that employment.  On information and belief, Defendant CAUDILLO performed the intake medical and mental health assessment on Decedent when he was booked into jail, and failed to follow appropriate protocols for assessing, monitoring, and treating Decedent STEVEN NEUROTH, including failing to summon medical care for Decedent STEVEN NEUROTH despite his exhibiting symptoms consistent with having a medical and/or mental health emergency requiring immediate transfer to a hospital for inpatient emergency and psychiatric treatment.

34.     Plaintiff is ignorant of the true names and capacities of Defendant DOES 9-20, 32-35 ("REMAINING DEFENDANT DOES")and therefore sues these Defendants by such fictitious names.  Plaintiff is informed and believes and thereon alleges that each Defendant so named is responsible in some manner for the injuries and damages sustained by Plaintiff as set forth herein. Plaintiff will amend his complaint to state the names and capacities of REMAINING DOE DEFENDANTS when they have been ascertained.

35.     Plaintiff is informed and believes and thereon alleges that each of the Defendants was at all material times an agent, servant, employee, partner, joint venturer, co-conspirator, and/or alter ego of the remaining Defendants, and in doing the things herein alleged, was acting within the course and scope of that relationship.  Plaintiff is further informed and believes and thereon alleges that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter specifically alleged.  At all material times, each Defendant was jointly engaged in tortious activity and an integral participant in the conduct described herein, resulting in the deprivation of Plaintiff's and Decedent's constitutional rights and other harm.

36.     The acts and omissions of all DEFENDANTS as set forth herein, except for Defendants CITY OF WILLITS, CHIEF GONZALEZ, and OFFICERSLEEF and ANDRADE

(collectively, "WILLITS DEFENDANTS"), were at all material times pursuant to the actual customs, policies, practices and procedures of the COUNTY, the Mendocino County Sheriff's Office and/or CMGC/CFMG.  The acts and omissions of Defendant WILLITS POLICE OFFICERS KEVIN LEEF and JEFF ANDRADE and CHIEF GONZALEZ were at all material times pursuant to the actual customs, policies, practices and procedures of the CITY OF WILLITS and the Willits Police Department.

37.     At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of the State of California and either Mendocino County or the City of Willits.

38.     Plaintiff timely and properly filed a tort claim pursuant to California Government Code sections 910 et seq., and this action is timely filed within all applicable statutes of limitation.

39.     This complaint may be pled in the alternative pursuant to Federal Rule of Civil Procedure 8(d).

### GENERAL ALLEGATIONS

40.     Plaintiff realleges each and every paragraph in this complaint as if fully set forth here.

41.     STEVEN NEUROTH was a mentally ill man, having been diagnosed with paranoid schizophrenia, schizo-affective disorder, and depression.  When STEVEN NEUROTH died, he was fifty-five years old; he was about 5'9" tall, and he weighed about 156 lbs.

42.     On or about June 10, 2014, at approximately 10:00 p.m., Defendant Willits Police Officers ANDRADE and LEEF contacted STEVEN NEUROTH in public.  At all material times, due to informed decisions made by Defendant WILLITS POLICE CHIEF GONZALEZ, Defendants were the only two patrol officers on duty for the entire City of Willits, and were working without any supervision whatsoever – per standard Willits Police Department protocol, no supervisors were on duty.  Also, at that time, Defendant GONZALEZ and the Willits Police Department did not equip officers with video recorders, however officers were equipped with audio recorders that officers were permitted to activate, or not activate, entirely at the officer's discretion.

43.     When Defendants LEEF and ADRADE contacted STEVEN NEUROTH on or about June 10, 2014, at approximately 10:00 p.m., STEVEN NEUROTH was in a psychiatric crisis, paranoid and delusional, was running in traffic, and told the officers that an unknown person was after him, and that all the traffic in Willits was going to hurt him.  STEVEN NEUROTH was acting in a manner such that he was a danger to himself or others, and on information and belief, Defendants LEEF and ANDRADE observed STEVEN NEUROTH's behavior and came to the conclusion that he was a danger to himself or others due to a mental disorder.

44.     Plaintiff is informed and believes and thereon alleges Defendant Officer LEEF believed that taking a person who is "5150" (in psychiatric crisis and either unable to care for himself or a danger to himself or others pursuant to Welfare and Institutions Code § 5150) to jail is always preferable to taking them to a hospital for emergency psychiatric care, and further he would rather take STEVEN NEUROTH to the MENDOCINO COUNTY jail than sit at a hospital with STEVEN NEUROTH.  Plaintiff is informed and believes and thereon alleges that Defendant COUNTY's refusal to provide any psychiatric inpatient acute care anywhere within the COUNTY creates a disincentive for law enforcement officers within the COUNTY to take people suffering from psychiatric emergencies to a hospital for needed treatment, as the officers must transport the person several miles outside the COUNTY and wait with him or her until admission.  Defendant COUNTY'S deliberate indifference and reckless disregard for the wellbeing of mentally ill patients within the COUNTY causes mentally ill persons in psychiatric crisis to be taken to MENDOCINO COUNTY jail, instead of to a hospital where they can receive emergency and necessary psychiatric treatment.

45.     On information and belief, in order to avoid Defendant LEEF having to take STEVEN NEUROTH to the hospital for needed care and treatment – in violation of generally accepted law enforcement standards and written policies of the Willits Police Department – Defendants LEEF and ANDRADE agreed that they would write him up as being in a drug-induced psychotic state.  Defendants LEEF and ANDRADE did so even though they did not have the training or ability to discern between drug intoxication and mental illness, and they made no attempt

1    even to conduct rudimentary sobriety tests on STEVEN NEUROTH.  Defendants LEEF and

2    ANDRADE discussed having a family member come to pick up STEVEN NEUROTH, and

3    STEVEN told them to call his brother, Plaintiff JAMES NEUROTH.  DefendantsLEEF and

4    ANDRADEinstead arrested STEVEN NEUROTH on suspicion that he was under the influence of a

5    controlled substance in violation of California Health & Safety Code § 11550(a).

6           46.     STEVEN NEUROTH'S mental disorder and serious psychiatric needs were obvious

7    and apparent to Defendants LEEF and ANDRADE, and his need for immediate hospitalization was

8    both obvious and required by written Willits Police Department policies.  According to the

9    Defendant officers' report(s), STEVEN NEUROTH was "extremely paranoid," "believed someone

10   was out to 'kill him,'" and "was going through a psychosis state."  Once STEVEN NEUROTH was

11   in Defendant LEEF's patrol car, he told LEEF and ANDRADE that there were "snakes" on the

12   patrol car's floor, and "started to scream."

13          47.     On information and belief, when Defendant LEEF was transporting STEVEN

14   NEUROTH, Defendant LEEF intentionally provoked, agitated, and terrorized STEVEN

15   NEUROTH, including by repeatedly yelling, "snakes!" and causing STEVEN NEUROTH's mental

16   disturbance and paranoia to further escalate.

17          48.     Defendant Officer LEEF transported STEVEN NEUROTH to the Mendocino

18   County jail, as he and his partner ANDRADE agreed he would do, where STEVEN NEUROTH

19   was booked and held as a pretrial detainee, even though Defendants LEEF and ANDRADE knew

20   that generally accepted law enforcement standards and Willits Police Department policy required

21   LEEF to take STEVEN NEUROTH to a hospital.  At the time of booking at the jail, STEVEN

22   NEUROTH did not have any apparent physical injuries.  On information and belief, Defendant

23   LEEF did not inform jail staff that STEVEN NEUROTH's paranoid, aggravated, and disoriented

24   mental condition was due in part to LEEF's intentional provocation and mental torture of STEVEN

25   NEUROTH before bringing him to the jail.  Defendant LEEF's emotional abuse and intentional

26   provocation of STEVEN NEUROTH made it much more difficult for STEVEN NEUROTH to

27   understand or follow lawful directions.

28

49.     On information and belief, Defendants LEEF and ANDRADE knew or must have known that STEVEN NEUROTH was in need of emergency psychiatric care, known as a "5150 hold," because STEVEN NEUROTH was a danger to himself due to his mental disorder and impairment.  Because the COUNTY closed its psychiatric health facility in 1999 as described in more detail herein, and as Defendant SHERIFF ALLMAN has been quoted, "In Mendocino County, since there is no inpatient psychiatric facility where this 72-hour holding can occur, this assessment, called a 5150, often means a trip to the county jail," Defendants LEEF and ANDRADE chose to transport and book STEVEN NEUROTH for a minor crime at the jail, rather than take STEVEN NEUROTH to an appropriate hospital as required for his serious psychiatric needs.

50.     Defendants LEEF and ANDRADE's arrest of STEVEN NEUROTH was without probable cause or other legal authority.  At the time they decided to arrest STEVEN NEUROTH, (who was already detained in their custody) for being in an alleged drug-induced psychosis, Defendants LEEF and ANDRADE were not competent to discern, and made no effort to investigate or discern, whether STEVEN NEUROTH's obvious mental disorder was caused by drug intoxication, or mental illness, or both.  At the time of STEVEN NEUROTH's arrest, Defendants LEEF and ANDRADE knew that STEVEN NEUROTH had no drugs on his person, no marks on his body indicating drug use, no odor of drugs or other intoxicants, had denied any recent drug use, and Defendants lacked any objective, particular facts to cause a reasonable officer to believe that STEVEN NEUROTH's mental disorder was due to drug intoxication rather than mental illness or some other cause.  As described above, Defendants LEEF and ANDRADE conspired and agreed to arrest STEVEN NEUROTH so that LEEF would not take him to a hospital as STEVEN NEUROTH obviously needed and as Willits Police Department policies required.

51.     At the time of this incident, Willits Police Department Policy 418 provided that if an officer has probable cause to believe that a person is a danger to himself or others due to a mental disorder, the officer "shall transport that person to the designated facility for evaluation and commitment."  Even if the person is believed to have committed a crime, Policy 418.4 provided that "[w]hen practical, any person charged with a crime who also appears to be mentally ill shall be

1   booked at the Willits Police Department before being transported" to an appropriate medical

2   facility.  Defendants LEEF and ANDRADE clearly violated these Willits Police Department

3   policies, as well as generally accepted law enforcement standards, when they conspired to and did

4   arrest STEVEN NEUROTH without probable cause for drug intoxication in order to avoid taking

5   STEVEN NEUROTH to an appropriate hospital for his obvious mental disorder.  Jail was no place

6   for STEVEN NEUROTH.

7         52.     When Defendant LEEF arrived at the MENDOCINO COUNTY jail with STEVEN

8   NEUROTH, he told Defendant JENNIFER CAUDILLO, L.V.N., that Steven Neuroth had been

9   running in traffic, was almost hit by a car, was about as "high" as LEEF had ever seen, was

10  hallucinating that there were snakes in the back of LEEF's patrol car, and STEVEN was afraid of

11  the snakes.  Defendant LEEF told Defendant CAUDILLO to "Walk up there [to STEVEN] and go

12  'Snakes!'  Funniest thing you'll ever see."  According to the sworn deposition testimony of

13  Defendants LEEF and CAUDILLO, Defendant CAUDILLO told Defendant LEEF that LEEF

14  should have just let STEVEN NEUROTH get hit by a car.

15        53.     At about 11:40 p.m. on the day of STEVEN NEUROTH'S arrest, Defendant

16  JENNIFER CAUDILLO, L.V.N. performed the jail's intake medical and mental health assessment

17  on STEVEN NEUROTH.  As a matter of California law, as a Licensed Vocational Nurse,

18  Defendant CAUDILLO was not competent and was not permitted by her license to conduct an

19  intake medical or mental health assessment on an inmate, including STEVEN NEUROTH.

20  According to the Coroner's Investigator's Report, Defendant CAUDILLO took STEVEN

21  NEUROTH's vital signs.  Defendant CAUDILLO noted that STEVEN NEUROTH's heart beat was

22  129 beats per minute, which indicated that he was suffering from tachycardia, given that a healthy

23  adult heart normally beats 60–100 times per minute.  Defendant CAUDILLO further noted both that

24  STEVEN NEUROTH's blood pressure was elevated at 151/92, whereas normal blood pressure is

25  120/80, and that his respiration rate was 18 breaths per minute.  Defendant FITHIAN admitted at

26  deposition that STEVEN NEUROTH's vital signs as taken by Defendant CAUDILLO were

27  elevated.  Defendant CAUDILLO also noted that STEVEN NEUROTH was "very paranoid."

28

Defendant CAUDILLO and any other Defendant involved in STEVEN NEUROTH's intake had actual knowledge that STEVEN NEUROTH was in extreme medical and psychiatric distress and in need of emergency medical/psychiatric care, and she/they decided not to provide or request such necessary care for STEVEN NEUROTH, and she/they decided not to secure, or request, such necessary treatment for STEVEN NEUROTH in a hospital.

54.     Defendant JENNIFER CAUDILLO, L.V.N. was the only CMGC or CFMG employee present at the MENDOCINO COUNTY jail when STEVEN NEUROTH was brought there.  According to Defendant JENNIFER CAUDILLO's sworn deposition testimony in this matter, Defendants CMGC, CFMG, and their managerial agents including Defendants FITHIAN, HUSTEDT, MAXFIELD and TESKE allowed and required Defendant CAUDILLO to do the following things, among others, independently and outside her legal scope of practice, in blatant violation of California law:

      a.  Use Nursing Protocols for intake and examining patients that only Registered Nurses are legally allowed to use;

      b.  Always work the night shift at MENDOCINO COUNTY jail from 7:00 p.m. until 7:00 a.m., without any direct Registered Nurse or physician supervision;

      c.  Work alone, doing "any kind of treatment," and handling "any emergencies that come up in the middle of the night;"

      d.  Work completely by herself, including at the time STEVEN NEUROTH was brought to MENDOCINO COUNTY jail;

      e.  Handle all intake medical and mental health assessments alone;

      f.  Decide whether or not a patient should see a physician or Registered Nurse, and how quickly the patient should see the physician or RN;

      g.  Decide whether or not a patient should be seen on sick call, and how quickly the patient should be seen on sick call;

      h.  Assess patients who have been assaulted;

      i.  Decide whether or not a patient needs oxygen;

j.   When a patient has a seizure, decide whether or not it was really a seizure;

k.   Decide whether or not a patient should go to the hospital for medical clearance before being admitted to the jail;

l.   Decide whether or not a patient is at risk of going into alcohol or opiate withdrawal;

m.   Decide whether or not a patient should go to the Emergency Room;

n.   Decide whether or not a patient should see a dentist;

o.   Decide whether or not the patient's physical presentation is normal or abnormal;

p.   Decide whether or not a patient should see a mental health care provider;

q.   Decide whether or not a patient is at risk of suicide;

r.   Complete the Nursing Assessment on Psychiatric and Suicidal Inmates, which only a Registered Nurse may legally complete;

s.   Determine the patient's level of consciousness, and whether the patient is at risk of harming himself;

t.   Conduct the comprehensive 14-day health appraisal that is mandated by California law, and which only a Registered Nurse may legally complete;

u.   Train new nurses, including training Registered Nurses in intake patient triage;

v.   Audit patient charts and medication records by herself;

w.   Always work with little or no supervision and make her own independent judgments.

55.   Despite allowing Defendant CAUDILLO to work alone and unsupervised and outside her legal scope of practice, CMGC, CFMG, their employees and agents have not evaluated Defendant CAUDILLO's performance since December 2008.

56.   According to the sworn deposition testimony of Defendants FITHIAN and TESKE, Defendants HUSTEDT, COTTON, TESKE and MAXFIELD were responsible for CMGC/CFMG's unlawful policies and practices allowing LVN's to work outside their legal scope of practice and without supervision, and for requiring Defendant CAUDILLO to work outside her legal scope of

practice for years.  Defendants FITHIAN, HUSTEDT, MAXFIELD, and TESKE have continued

Defendants CMGC/CFMG's unlawful policies and practices, allowing LVN's to work outside their

legal scope of practice and without supervision, to the present time  On September 26, 2016, six

days after Defendant FITHIAN's deposition in this matter, Raymond Herr, M.D. issued a CMGC

policy memorandum on CMGC letterhead to CMGC and CFMG employees, including Defendant

TESKE, admitting that Licensed Vocational Nurses are not legally permitted to perform patient

assessments, but planning to continue allowing LVN's to do such work when a Registered Nurse is

not on-site, such as when STEVEN NEUROTH was killed. Dr. Herr did not instruct CMGC/CFMG

managers to cease assigning LVN's to work independently and outside their scope of practice, and

did not change CMGC's/CFMG's LVN unlawful staffing patterns and practices, and Defendants'

unlawful practices allowing LVN's to conduct independent patient assessments continue to the

present time.

57.     Defendants CAUDILLO, LEEF, ANDRADE, KNAPP, MASTERSON,

BERNARDI, GRANT, HOLUM, PAGE, DE LOS SANTOS, and the remaining DOE

DEFENDANTS knew and/or must have known that STEVEN NEUROTH had serious medical and

psychiatric needs requiring emergency treatment, care, and hospitalization, and that with deliberate

indifference to such needs, these Defendants, and/or remaining DOES caused STEVEN NEUROTH

to be deprived of such necessary, life-saving medical and psychiatric care.

58.     At approximately 11:30 p.m. on June 10, 2014, while jail and CFMG staff had actual

knowledge that STEVEN NEUROTH was apparently psychotic, paranoid, and suffering from

serious medical/psychiatric needs, Defendants were deliberately indifferent to those serious

medical/psychiatric needs, and denied STEVEN NEUROTH necessary medical and/or psychiatric

care, including necessary emergency care.  Defendants were deliberately indifferent to STEVEN

NEUROTH's safety and medical/psychiatric needs in their jail placement, assessment, and custody

decisions.  On information and belief, due to such deliberate indifference, STEVEN NEUROTH's

medical/psychiatric condition deteriorated, and on information and belief, STEVEN NEUROTH

1  became unable to care for himself or to understand and follow the commands and directives of jail

2  personnel.

3         59.     When STEVEN NEUROTH allegedly acted paranoid and was briefly uncooperative

4  but not aggressive or threatening in any way, Defendants LEEF, KNAPP, MASTERSON,

5  BERNARDI, GRANT, HOLUM, PAGE, and DE LOS SANTOS used a high level of injurious

6  force against STEVEN NEUROTH that was sufficient to cause his death.  On information and

7  belief, such injurious force was used against STEVEN NEUROTH in the Sobering Cell and then

8  continued after he was carried out in handcuffs and leg restraint shackles and placed in Safety Cell

9  No. 2.On information and belief, among other uses of force, Defendants MASTERSON and

10  BERNARDIparticipated in slamming STEVEN NEUROTH to the floor of the Sobering Cell while

11  he was still handcuffed.  In the Sobering Cell, Defendants MASTERSON and BERNARDI, were

12  quickly joined by Defendants LEEF, KNAPP, GRANT, and HOLUM, who integrally participated

13  in the uses of force against STEVEN NEUROTH, including painful control holds, improper

14  restraint impairing STEVEN NEUROTH'S ability to breathe, and other significant force.  In the

15  Sobering Cell and Safety Cell No. 2, Defendants LEEF, KNAPP, MASTERSON, BERNARDI,

16  GRANT, HOLUM, PAGE, and DE LOS SANTOS integrally participated in the use of very high

17  levels of force against STEVEN NEUROTH over more than sixteen minutes, including multiple

18  closed fist strikes, control holds, multiple and simultaneous pain compliance holds including "figure

19  4" leg restraints and wrist locks, and very substantial compression to STEVEN NEUROTH's neck

20  and back impairing his respiration.  On information and belief, at one point while Defendants were

21  applying great concerted force on STEVEN NEUROTH's legs and joints with a "figure 4" pain

22  compliance hold, a female Defendant threatened to the effect, "Your leg is going to break if you

23  move it."  Defendant KNAPP also threatened STEVEN NEUROTH with her Taser.  Most of this

24  concerted force against STEVEN NEUROTH was done while he was already fully restrained in

25  both handcuffs and leg shackles.  Before and during the time that Defendants used and permitted the

26  use of such extreme and unnecessary force, STEVEN NEUROTH was repeatedly pleading with

27  Defendants not to hurt him or kill him with statements such as, "I'm not a bad guy," "Please don't

28

hurt me, please don't hurt me, please don't hurt me," "God help me," "Please don't let me die," and "Please don't kill me, please don't kill me."  Defendants killed STEVEN NEUROTH, whoever posed an immediate threat to anyone to justify the high level of injurious force used and permitted against him in the jail.

60.     Defendant CAUDILLO stood by during Defendants' prolonged and excessive force and prone restraint of STEVEN NEUROTH, never contacting her supervisor or ordering the jail Defendants and Defendant LEEF to cease their abuse of STEVEN NEUROTH for STEVEN's safety.

61.     On information and belief, while Defendants were subjecting STEVEN NEUROTH to excessive force in the safety cell, Defendant LEEF realized that he had inadvertently activated, or left on, his audio recorder, and upon that realization, Defendant LEEF turned off his audio recorder.

62.     Additionally, on information and belief, Defendants LEEF, KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM, PAGE, and DE LOS SANTOS  subjected STEVEN NEUROTH to improper and excessive restraint, leading to restraint associated asphyxia (or positional asphyxia) and death.  During this entire incident over sixteen minutes, after Defendants slammed STEVEN NEUROTH to the floor, Defendants LEEF, KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM, PAGE, and DE LOS SANTOS improperly restrained STEVEN NEUROTH in a prone, face down position, contrary to generally accepted law enforcement and corrections standards (*see, Drummond v. City of Anaheim*, 343 F.3d 1052, 1056-57 (9th Cir. 2003), *cert. den.* 542 U.S. 918 (2004)), in violation of Defendants' own training, and in violation of MCSO's written policies and procedures. Section 1058 of Title 15 of the California Code of Regulations provides that restraints should not be used as a substitute for treatment.  On information and belief, for several minutes, with our without Defendant PAGE involved, Defendants KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM, and DE LOS SANTOS used their combined weight to press STEVEN NEUROTH to the floor while he was laying prone, on his stomach.  Defendants KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM, PAGE, and Fu continued to apply great pressure to STEVEN NEUROTH's back until he became silent, motionless and limp, then Defendants left

1   STEVEN NEUROTH face down with his hands still resting on his own lower back, released from

2   handcuffs.  Defendants exited the cell to get their stories straight to prepare to write their reports.

3   STEVEN NEUROTH never moved again from that prone position, his hands still resting, limp, on

4   his own back, in which Defendants left him prone on the floor of the Safety Cell.

5          63.     Plaintiff is informed and believes and thereon alleges that asphyxiation of individuals

6   during restraint is well documented and generally accepted such that reasonable law enforcement

7   agencies as a matter of routine train their peace officer personnel in avoiding asphyxiation of

8   individuals during restraint.  On information and belief, Defendants LEEF, KNAPP,

9   MASTERSON, BERNARDI, GRANT, HOLUM, PAGE, and DE LOS SANTOS, and possibly

10  remaining DOE Defendants, violated such generally accepted standards and training, among other

11  ways, by restraining and leaving STEVEN NEUROTH restrained in a prone position, lying face

12  down, and/or otherwise impairing STEVEN NEUROTH's respiration by their use of pressure and

13  improper restraints.

14         64.     Defendants CFMG, CMGC, CITY OF WILLITS and MENDOCINO COUNTY

15  never provided training concerning restraint asphyxia, positional asphyxia, or the dangers of prone

16  restraint to Defendants CAUDILLO, LEEF, KNAPP, MASTERSON, BERNARDI, GRANT,

17  HOLUM, PAGE, or DE LOS SANTOS before STEVEN NEUROTH'S death.

18         65.     According to the official Mendocino County autopsy, injuries that DEFENDANTS

19  caused to STEVEN NEUROTH in the jail included:

20      •   Blunt force injuries (contusions, abrasions, avulsions), widespread;

21      •   Fracture, essentially non-displaced, of the left fifth rib at the costochondral junction;

22      •   General visceral passive hyperemia (organ injuries);

23      •   Petechiae, epicardial, focal; and other serious physical injuries.

24  STEVEN NEUROTH did not have these injuries when he entered the Mendocino County Jail.  Due

25  to DEFENDANTS' deliberate indifference to his serious medical/psychiatric needs, and the

26  excessive and unreasonable force used by LEEF, KNAPP, MASTERSON, BERNARDI, GRANT,

27

28

HOLUM, PAGE, and DE LOS SANTOS, STEVEN NEUROTH suffered severe injuries, and died on June 11, 2014, at approximately 12:46 a.m.

66.     In addition to the foregoing evidence of the use of unjustified, injurious force on STEVEN NEUROTH, Defendants LEEF, KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM, PAGE, and DE LOS SANTOS, and possibly remaining DOE Defendants,also caused further trauma to STEVEN NEUROTH as noted in the autopsy performed by the COUNTY's Officeof the Sheriff-Coroner, Defendant THOMAS D. ALLMAN, on or about June 12, 2014, all evidence of their use of a very high degree of unnecessary force on STEVEN NEUROTH:

- Head and Front Torso
  - 1" x 0.75" contusion covering the right zygoma (cheekbone);
  - 2" irregular area of slight contusions on the right lateral clavicular line in the skin overlying the lateral pectoralis muscle;
  - 0.25" slight abrasion on the mid right rib cage;
  - 0.5" contusion overlying the right anterior superior iliac spine (pelvis);
  - 0.75" contusion in a contralateral position to the right anterior superior iliac spine;
  - 1.5" faint contusion on the abdominal wall;
  - 1.25" contusion lateral to the left mid clavicular line over the inferior most rib cage;
  - 0.5" rounded contusion slightly above and to the side of the 1.25" contusion described immediately above;
  - 0.75" rounded contusion slightly above and to the side of the 1.25" contusion described above;
- Back and Buttocks
  - 1.375" diagonally oriented linear abrasion near the right mid scapular line at the inferior extent of the rib cage;
  - 1.5" contusion near the right mid scapular line at the inferior extent of the rib

1    cage;

2    o   0.5" contusion in the skin overlying the mid right scapula;

3    o   0.25" contusion in the skin of the inferior lateral aspect of the right buttock;

4    • <u>Right Upper Extremity</u>

5    o   1.75" contusion in the proximal portion of the distal third of the right arm;

6    o   1" vertical linear abrasion in the proximal portion of the distal third of the

7        right arm;

8    o   0.5" faint contusion in the ventrolateral mid portion of the right forearm;

9    o   1.75" contusion, bearing a 0.5" abrasion and a milder 0.75" abrasion on the

10       ventrolateral aspect of the right distal most forearm;

11   o   0.5" minimal abrasion just distal to the junction of approximately the middle

12       and distal thirds of the right forearm ventrolaterally;

13   o   2" x 0.75" contusion with a 0.5" horizontal mild abrasion and a 0.125"

14       punctate abrasion on the right hand, overlying the proximal second

15       metacarpal and extending to the wrist;

16   o   1" region of irregular punctate abrasions between the right second and third

17       metacarpals just proximal to the metacarpophalangeal joints;

18   o   0.75" contusion (lying adjacent to the previously described contusion) on the

19       dorsolateral aspect of the right forearm at the junction of the middle and

20       distal thirds;

21   o   0.5" abrasion near the head of the right radius dorsomedially

22   o   1.25" area containing three irregular abrasions near the head of the right

23       radius dorsomedially;

24   o   1" contusion with dorsally situated abrasions of up to 0.125" on the medial

25       aspect of the right wrist at the base of the thenar eminence;

26   o   0.5" abrasion of the dorsal/dorsomedial aspect in the proximal portion of the

27       proximal third of the right arm;

28

- o  0.375" faint contusion on the medial aspect of the right elbow.
- • Left Upper Extremity
  - o  0.375" and 0.25" minimal abrasions on the medial aspect of the proximal most portion of the left arm;
  - o  0.375" region of abrasions just proximal to the olecranon, on the distal most portion of the dorsum of the left arm;
  - o  2" irregular contusion with abrasion, one linear and 1.25" long, on the dorsal aspect of the proximal most left arm;
  - o  1" mild contusion on the anterior aspect of the left arm in the mid portion of the distal third;
  - o  2.25" contusion, with a slight abrasion, on the lateral aspect of the proximal portion of the distal third of the left forearm, curling about the radius.
  - o  0.75" contiguous region of contusion, with mild abrasions, immediately distal to the 2.25" contusion described immediately above;
  - o  1" irregular contusion, slightly abraded, on the lateral aspect of the left wrist near the head of the radius;
  - o  0.2" by up to 0.75" contusion on the dorsum of the left wrist joint;
  - o  0.5" contusion, with slight abrasion, between the proximal-most portions of the proximal phalanges of the left third and fourth fingers.
- • Right Lower Extremity
  - o  0.625" irregular region of abrasion on the medial aspect of the right knee;
  - o  0.75" region of linear contusion in the distal portion of the distal third of the medial aspect of the right leg;
  - o  1.25" contusion, with mild avulsion of the epidermis not associated with bleeding, overlying the right medial malleolus;
  - o  0.5" irregular abrasion on the anterolateral aspect of the proximal most right leg;

- Left Lower Extremity
  - 0.25" area of very minimal punctate abrasions and mild contusions beginning on the medial aspect of the left knee and extending distally for about 3".
  - 1" slightly diagonal linear abrasion immediately dorsal to the region immediately described;
  - 1.75" region of contusion, with a 0.5" abrasion with minimal avulsions, on the anterior aspect of the left leg in the mid distal third;
  - 0.75" contusion on the superior aspect of the left hallux
- Internal
  - 50 mm region of petechiae in the epicardium of the posterior aspect of the heart.

67.     Defendants LEEF, KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM, PAGE, and DE LOS SANTOS, and possibly remaining DOE Defendants, grossly violated the generally accepted training and standards for proper and safe restraint of a person, and for use of force, in their misconduct against STEVEN NEUROTH.  Plaintiff also alleges that the extreme physical injuries to STEVEN NEUROTH—especially the injuries to Decedent's torso and neck—are all evidence of an extremely high degree of force, of improper restraint, and of wanton and willful violations of STEVEN NEUROTH's and Plaintiff's Constitutional rights.

68.     Defendants LEEF, KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM, PAGE, and DE LOS SANTOS, and possibly remaining DOE Defendants, on information and belief, were present and integral participants in their joint conduct to severely beat, punch, choke, improperly restrain, contort, threaten, and brutalize STEVEN NEUROTH.  On information and belief, Defendants' uses of unnecessary and excessive force against STEVEN NEUROTH lasted over sixteen minutes before he died.  Each Defendant deputy/officer used, or caused the use of, extreme and/or deadly force against STEVEN NEUROTH, causing severe injuries and deadly trauma to him, including but not limited to as described above.  On information and belief, at the time Defendants used such force and restraints on STEVEN NEUROTH, as described herein,

1   STEVEN NEUROTH never struck or kicked any deputy/officer, and did not pose an immediate

2   threat to any person. Decedent STEVEN NEUROTH was severely mentally ill, suffering from

3   psychosis, was weak and thin, and was vastly outnumbered by deputies.Further, STEVEN

4   NEUROTH had been arrested for a non-serious, non-violent crime, and Defendants failed to use

5   available less-forceful alternatives to the force and restraints used.

6         69.    Defendants LEEF, KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM,

7   PAGE, and DE LOS SANTOS, and possibly remaining DOE Defendants, on information and

8   belief, were integral participants in brutalizing, beating, striking, choking, threatening, applying

9   excessive control holds, and unreasonably restraining Decedent STEVEN NEUROTH, and under

10  federal law and generally accepted law enforcement standards and training, each was responsible

11  for the totality of force used in his/her presence.  Further, each of these Defendant deputies/officers

12  failed to intervene to stop, prevent, or report the use of excessive and unreasonable force and

13  restraint by other deputies/officers, in violation of the law and generally accepted law enforcement

14  standards and training.

15        70.    The type and amount of force Defendants LEEF, KNAPP, MASTERSON,

16  BERNARDI, GRANT, HOLUM, PAGE, and DE LOS SANTOS, and possibly remaining DOE

17  Defendants, used against STEVEN NEUROTH as described herein, including multiple blows to

18  STEVEN NEUROTH's body, improper control holds, crushing force applied to his back, neck, and

19  head, and restriction of STEVEN NEUROTH's airways, neck, and back areas, amounted to the use

20  of deadly force under the circumstances.  The use of deadly force was not justified or lawful under

21  the circumstances.

22        71.    Alternatively, or concurrently, Defendants LEEF, KNAPP, MASTERSON,

23  BERNARDI, GRANT, HOLUM, PAGE, and DE LOS SANTOS', and possibly remaining DOE

24  Defendants', own excessive, unreasonable, reckless, and provocative actions created a risk of harm

25  to STEVEN NEUROTH, created the situation in which Defendants used extreme and otherwise

26  unnecessary force, and caused an escalation of events leading to STEVEN NEUROTH's death.

27

28

72.     Defendants LEEF, KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM, PAGE, and DE LOS SANTOS', and possibly remaining DOE Defendants' unreasonable restraint and use of excessive force against STEVEN NEUROTH was done at least in part because of STEVEN NEUROTH's untreated serious medical needs and/or psychiatric condition and disability.

73.     Following Defendants LEEF, KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM, PAGE, and DE LOS SANTOS', and possibly remaining DOE Defendants' use of extreme and deadly force against STEVEN NEUROTH, he was transferred to Ukiah Valley Medical Center where he died, after cardiac arrest, at about 12:46 a.m. on June 11, 2014.

74.     During and after their uses of excessive force and violation of STEVEN NEUROTH's rights, Defendants LEEF, KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM, PAGE, and DE LOS SANTOS, and possibly remaining DOE Defendants, violated their duty to intervene to stop such violations of STEVEN NEUROTH'S rights, and they engaged in a code of silence to cover up such violations of rights.  The Ninth Circuit has explained that a law enforcement "code of silence"has been described as consisting of a single rule: "an officer does not provide adverse information against a fellow officer." *Blair v. City of Pomona,* 223 F.3d 1074, 1081 (9th Cir.2000) (taking judicial notice of the *Report of the Independent Commission on the Los Angeles Police Department* 168 (1991) (the Christopher Commission Report)).Defendants LEEF, KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM, PAGE, and DE LOS SANTOS, and possibly remaining DOE Defendants, failed to report their own and other officers' uses of force both in their written reports and when interviewed in official investigations of this incident. Further, Defendants' official accounts of this incident, and the uses of force deployed or observed, fail to account for the severe and widespread physical injuries and trauma found on STEVEN NEUROTH's body.

75.     On behalf of the MCSO, Defendants SERGEANT KNAPP and CORRECTIONS CAPTAIN PEARCE officially approved Defendant Deputy DE LOS SANTOS' refusal to be interviewed by investigators for the District Attorney and/or the MCSO concerning her involvement and observations in this incident, and Defendants KNAPP and PEARCE officially approved

1    Defendant DE LOS SANTOS' intentional destruction of her own official written report concerning

2    this incident that she wrote within hours of STEVEN NEUROTH's death.  Defendants' failure to

3    intervene and report misconduct in this incident, involving no less than seven deputies and a police

4    officer, with the explicit approval of supervisors including SERGEANT KNAPP, and the jail

5    commander, CORRECTIONS CAPTAIN PEARCE, is strong evidence of a widespread custom

6    within the Mendocino County Jail of a code of silence.

7            76.     Defendants' conduct herein, including but not limited to their decision(s) to deny

8    Decedent necessary medical care; failure to provide competent medical care and treatment; failure

9    to provide him access and delivery to a hospital for the care and treatment for his life-threatening

10   medical emergency; failure to provide any inpatient psychiatric treatment facility within the entire

11   county; the manner in which they treated and incarcerated him, and their other acts and omissions

12   under these circumstances, were contrary to generally accepted reasonable jail and medical

13   procedures and standards, failed to comply with the appropriate standard of care, and contributed to

14   the wrongful death of STEVEN NEUROTH.

15           77.     Plaintiff is informed and believes and thereon alleges that Defendants COUNTY,

16   ALLMAN, CMGC, CFMG, FITHIAN, HUSTEDT, MAXFIELD, and TESKE failed to have a

17   qualified and competent medical and/or mental health professional conduct intake medical and

18   mental health evaluations on inmate patients, with deliberate indifference to the inmate patients'

19   serious medical and mental health needs.Furthermore, Plaintiff is informed and believes and thereon

20   alleges that Defendants COUNTY, ALLMAN, CMGC, CFMG, FITHIAN, HUSTEDT,

21   MAXFIELD, and TESKE allowed and required, and continue to allow and require, un-credentialed

22   staff, including Licensed Vocational Nurses, to perform intake medical assessments and/or mental

23   health assessments on patients without any appropriate clinical supervision by a Registered Nurse,

24   physician, or otherwise properly licensed and credentialed health care provider, in violation of

25   California law and generally accepted state and national standards.  Plaintiff is informed and

26   believes and thereon alleges that Defendants COUNTY, ALLMAN, CMGC, CFMG, FITHIAN,

27   HUSTEDT, MAXFIELD, and TESKE allow and require LVN's to perform extensive nursing

28

functions, including those discussed at ¶ 54 above, in blatant violation of California law and generally accepted state and national standards for nursing care.  Plaintiff is informed and believes and thereon alleges that COUNTY, ALLMAN, CMGC, CFMG, FITHIAN, HUSTEDT, MAXFIELD, and TESKEallowed and required, and continue to allow and require, un-credentialed staff to perform medical and mental health assessments because it costs significantly less money than paying for properly licensed staff to do the work.

78.     CMGC is the majority owner of, and controls, CFMG, including being responsible for all CMGC/CFMG policies, procedures, training and supervision in MENDOCINO COUNTY jails.  CMGC pays CFMG, supervises, and assigns CFMG employees, issues CMGC policies to CFMG facilities, and otherwise controls all medical and mental health care at CFMG facilities, including the MENDOCINO COUNTY jail.  CMGC and CFMG are for-profit corporations, and CFMG states it is the largest private provider of correctional healthcare in the State of California, stating on its website that it currently has contracts covering 27 counties with 65 facilities that have an average daily population of 16,000 inmates.  CMGC's and CFMG's contract alone with MENDOCINO COUNTY has brought them several million dollars in profits.  CMGC and CFMG hold themselves out as offering a complete health care delivery system for MENDOCINO COUNTY inmates that complies with California law, while knowingly violating the law governing patient assessments and allowing incompetent and uncredentialed people to do medical and mental health assessments on patients beyond their legal scope of practice.

79.     CMGC and CFMG share officers, directors, and managing agents, including Hallman, Herr, and Defendants FITHIAN, HUSTEDT, and MAXFIELD.  CMGC provides and controls policies, procedures, supervision, and training at all correctional facilities CFMG services.

80.     CMGC and CFMG hold themselves and their officers, directors, and managing agents out as experts in the field of correctional healthcare.  Yet, CFMG has been criticized for its inadequate health care provided to inmates throughout the State of California.  A January 17, 2015, article in the *Sacramento Bee* entitled, "California for-Profit Company Faces Allegations of Inadequate Inmate Care," reported that CFMG's population-adjusted rate of deaths in custody is 50% higher than non-CFMG counties.

81.     Plaintiff is informed and believes and thereon alleges that CMGC and CFMG must pay for emergency and inpatient hospital treatment for MENDOCINO COUNTY jail inmates, creating a disincentive for CMGC and CFMG to refer jail inmates such as STEVEN NEUROTH off-site for necessary, emergency inpatient hospitalization or psychiatric treatment.

82.     Plaintiff is further informed and believes and thereon alleges that CMGC and CFMG allow uncredentialed Licensed Vocational Nurses (LVN's) to perform the work of Registered Nurses (RN's) and higher level care providers, in order to save money, since CMGC and CFMG pay LVN's significantly less than they pay RN's.   CMGC/CFMG only provides the MENDOCINO COUNTY jail one Registered Nurse, Monday through Friday from 8:00 a.m. until 4:00 p.m., and one RN Manager Monday through Friday from 7:00 a.m. until 3:00 p.m., and the rest of the time may provide uncredentialed LVN's working outside their scope of practice, to care for the serious medical needs of patients in the Mendocino County Jail.   CMGC and CFMG allow and require LVN's – including Defendant CAUDILLO – to work alone and unsupervised in the jail, without the legally required direct supervision by a Registered Nurse or physician.  According to the testimony of Defendant TESKE, both CMGC and CFMG still require LVN's to work alone and unsupervised between the hours of 11:00 p.m. and 7:00 a.m. nightly, in blatant violation of California law and regulations.

83.     The California Nurse Practice Act, Cal. Bus. & Prof. Code §2732 provides, "No person shall engage in the practice of nursing, as defined in Section 2725,without holding a license which is in an active status issued under this chapter except as otherwiseprovided in this act." The licensed referred to is that for a Registered Nurse. *Id.*

84.     Cal. Bus. & Prof. Code § 2795 provides that it is unlawful for any person "to practice or tooffer to practice nursing in this state unless the person holds a license in an active status." Cal. Bus. & Prof. Code § 2799 provides that violation of the provisions of the chapter is a misdemeanor.

Cal. Bus. & Prof. Code § 2725(b) defines the practice of nursing:

> The practice of nursing within the meaning of this chapter means those functions, including basic health care, that help people cope with difficulties in daily living that are associated with their actual or potential health or illness problems or the treatment thereof, and that require a substantial amount of scientific knowledge or technical skill, including all of the following:

(1) Direct and indirect patient care services that ensure the safety, comfort, personal hygiene, and protection of patients, and the performance of disease prevention and restorative measures

(2) Direct and indirect patient care services, including, but not limited to, the administration of medications and therapeutic agents, necessary to implement a treatment, disease prevention, or rehabilitative regimen ordered by and within the scope of licensure of a physician, dentist, podiatrist, or clinical psychologist, as defined by Section 1316.5 of the Health and Safety Code.

(3) The performance of skin tests, immunization techniques, and the withdrawal of human blood from veins and arteries.

(4) Observation of signs and symptoms of illness, reactions to treatment, general behavior, or general physical condition, and *(A) determination of whether the signs, symptoms, reactions, behavior, or general appearance exhibit abnormal characteristics, and (B) implementation,* based on observed abnormalities, *of appropriate reporting, or referral, or standardized procedures, or changes in treatment regimen in accordance with standardized procedures, or the initiation of emergency procedures.*

Cal. Bus. & Prof. Code § 2725(b)(emphasis added).

85.     In contrast, 16 Cal. Code Regs. § 2518.5(a) sets forth thescope of a LVN's practice:

The licensed vocational nurse performs services requiring technical and manual skills which include the following:

(a) Uses and practices basic assessment (data collection), participates in planning, executes interventions in accordance with the care plan or treatment plan, and contributes to evaluation of individualized interventions related to the care plan or treatment plan.

16 CCR § 2518.5 (emphasis added).

86.     The California Medical Board's IMQ Health Care Accreditation Standards state that even *Registered Nurses* who are involved in a jail's mental health program act under the supervision of a physician and "must have evidence of advanced post-graduate training in mental health."  The IMQ Standards note:  "Mental health programs that rely solely on psychiatric technicians, registered nurses without special university education qualifications or national certification, and non-licensed staff to provide on-site evaluation and counseling services do not meet this essential accreditation standard."

87.     Yet, CFMG and CFMG allow and require unsupervised LVN's to provide independent mental health assessments without any appropriate clinical supervision. CMGC/CFMG's staffing pattern only provides for one unsupervised psychiatric RN, licensed clinical social worker, or marriage and family therapist Monday through Friday from 8:00 a.m. to

4:00 p.m., and otherwise has no licensed mental health clinicians on site at the Mendocino County Jail.  CMGC/CFMG will only provide up to 8 hours per week, *in toto,* of remote "telepsychiatry" for all 290 of the Mendocino County jail inmates' psychiatric needs combined, and only one medical director/physician for a total of 8 hours per week.  Otherwise, uncredentialed, unsupervised, and unqualified health care workers are left alone to care for inmates in the jail.  Defendant MENDOCINO COUNTY deliberately contracted for this unqualified and incompetent care of its jail inmates, with deliberate indifference on the part of the COUNTY, ALLMAN, CMGC, CFMG, FITHIAN, HUSTEDT, MAXFIELD, and TESKEto the serious medical and mental health needs of inmates, including STEVEN NEUROTH.

88.	According to the sworn deposition testimony of Defendant TESKE, CMGC and CFMG's Program Manager in MENDOCINO COUNTY, 80 percent of jail inmates in MENDOCINO COUNTY have a dual mental health diagnosis of a serious mental illness, such as Schizophrenia or Bipolar Disorder, and a substance abuse problem.  Yet, the COUNTY and CMGC, CFMG, and their managing agents contracted for inadequate mental health assessment and care for jail inmates.

89.	Furthermore, Defendant COUNTY does not even have an inpatient psychiatric facility in which to house mentally ill, gravely disabled people in a psychiatric crisis, like STEVEN NEUROTH.  Defendant COUNTY failed to accommodate STEVEN NEUROTH'S mental illness and disability, by deliberately indifferently failing to provide for appropriate inpatient psychiatric treatment for its residents, including STEVEN NEUROTH.

90.	A January 29, 2016, article in the *Independent Coast Observer* ["ICO"] entitled, "Sheriff Spearheads Initiative to Fund Mental Health Center," noted that Defendant COUNTY closed its psychiatric health facility in 1999 and contracted with other counties such as Yolo County and Solano County for 72-hour inpatient psychiatric holds pursuant to Cal. Welf. & Inst. Code § 5150.  However, Defendant ALLMAN acknowledged that being housed 100 miles from home and family is not beneficial to the patient.  (ICO, 1/29/16, p. 12).

91.	Moreover, law enforcement officers in MENDOCINO COUNTY must sit with the mentally ill patient in a hospital emergency room, sometimes for hours, to wait for the patient to be evaluated and then transported to Yolo or Solano County, which creates a disincentive for officers

to choose to admit a patient pursuant to § 5150, and incentivizes arresting them for minor crimes related to their mental illness so they can be taken to jail instead.

92.     In a December 4, 2015, article entitled "'Jail No Place for Mentally Ill' Says Mendocino County Sheriff," the ICO noted, "According to Allman, because there's no in-patient mental health facility in Mendocino County, the county jail has become the de facto place to put people who are mentally ill and need to be dealt with in a crisis situation. …In Mendocino County, since there is no inpatient psychiatric facility where this 72-hour holding can occur, this assessment, called a 5150, often means a trip to the county jail."  (ICO, 12/4/15, pp. 1, 8).

93.     According to the National Institute of Mental Health, 18% of all adults in the United States have had at least one mental illness in 2014, the year STEVEN NEUROTH was killed. (http://www.nimh.nih.gov/health/statistics/prevalence/any-mental-illness-ami-among-us-adults.shtml).  According to the United States Department of Justice, Bureau of Justice Statistics' 2006 report entitled "Mental Health Problems of Prison and Jail Inmates," 64.2% of inmates in local jail populations have at least one mental health problem. (http://www.bjs.gov/content/pub/pdf/mhppji.pdf, p. 3, Table 2).  According to Defendant TESKE, 80% of MENDOCINO COUNTY jail inmates have dual diagnoses of both serious mental illness plus substance abuse.

94.     Defendant ALLMAN acknowledges that "We really, truly don't want mental health patients in our jail[.]  Jail isn't the place for them in Mendocino County."  (ICO, 12/4/15, p. 8). Defendant ALLMAN also acknowledges, "Without a shadow of a doubt, mental health is the number one public safety issue in Mendocino County."  (ICO, 11/27/15, p. 1).  Despite these facts, Defendant COUNTY fails to provide for the serious medical and mental health needs of its residents, causing the jailing of mentally ill, nonviolent people in psychiatric crisis -- like STEVEN NEUROTH – with deliberate indifference to their serious medical needs.  Defendant COUNTY then contracts with CMGC and CFMG for inadequate assessment and care for the mentally ill taken to its jails, including allowing un-credentialed Licensed Vocational Nurses to perform the work of Registered Nurses and Psychiatric Registered Nurses, in violation of California law and regulations.

95.     STEVEN NEUROTH's death was the proximate result of all Defendants' deliberately indifferent failure to summon and/or provide care and treatment for STEVEN

NEUROTH's serious medical/psychiatric needs, and the unreasonable seizure and restraint, use of excessive force, and Defendants' conduct without a legitimate law enforcement purpose.

96.     Alternatively or concurrently, STEVEN NEUROTH's death was the proximate result of Defendant LEEF and ANDRADE's deliberate choice not to use proper tactics and procedures for handling and obtaining obviously necessary medical/psychiatric care for STEVEN NEUROTH, and their intentional torment and escalation of STEVEN NEUROTH's mental disorder including paranoia, as ratified and approved by Defendants CHIEF GONZALEZ and CITY.

97.     Alternatively or concurrently, STEVEN NEUROTH's death was the proximate result of Defendant COUNTY's, ALLMAN's, and PEARCE's failure to reasonably train and require their Deputy Sheriffs to use only proper and reasonable force when necessary under the circumstances, failure to implement and enforce generally accepted, lawful policies and procedures at the jail, and allowing and/or ratifying excessive and unreasonable force and restraint, permitting and fostering a code of silence at the jail, and deliberate indifference to the serious medical/psychiatric needs of inmates.  These substantial failures reflect Defendant COUNTY's policies implicitly or directly ratifying and/or authorizing the deliberate indifference to serious medical needs and the use of excessive and unreasonable force and restraint by its deputy sheriffs, and the failure to reasonably train, instruct, monitor, supervise, investigate, and discipline deputy sheriffs employed by Defendants COUNTY,ALLMAN, and PEARCE in the use of force and inmates' medical needs.

98.     Alternatively or concurrently, Decedent's death was the proximate result of Defendants CMGC, CFMG, FITHIAN, HUSTEDT, MAXFIELD, and TESKE's failure to reasonably staff, train, supervise, and equip their medical and mental healthcare staff in the proper and reasonable care of mentally ill, and/or emotionally disturbed inmates; failure to implement and enforce generally accepted, lawful policies and procedures at the jail; deliberate choices to permit and require uncredentialed staff to work outside of their legal scope of practice; and deliberate indifference to the serious medical/psychiatric needs of inmates.  These substantial failures reflect Defendants CMGC's and CFMG's policies implicitly ratifying and/or authorizing the deliberate indifference to serious medical needs by their medical and mental healthcare staff and the failure to

1   reasonably train, instruct, monitor, supervise, investigate, and discipline medical and mental

2   healthcare staff employed by Defendants CMGC and CFMG in the handling of mentally ill, and/or

3   emotionally disturbed inmates.

4        99.    At all material times, and alternatively, the actions and omissions of each Defendant

5   were intentional, wanton, and/or willful, conscience-shocking, reckless, malicious, deliberately

6   indifferent to Decedent's and Plaintiff's rights, done with actual malice, grossly negligent, negligent,

7   and objectively unreasonable.

8        100.   As a direct and proximate result of each Defendant's acts and/or omissions as set

9   forth above, to the extent permitted and pled by the various legal claims set forth below, Plaintiff

10   sustained the following injuries and damages, past and future, among others:

11            a.    Wrongful death of STEVEN NEUROTH, pursuant to Cal. Code of Civ. Proc.

12                § 377.60 et. seq.;

13            b.    Loss of support and familial relationships, including loss of love,
                 companionship, comfort, affection, society, services, solace, and moral

14                support, pursuant to Cal. Code of Civ. Proc. § 377.60 et. seq.;

15            c.    STEVEN NEUROTH's Hospital and medical expenses, pursuant to Cal.

16                Code of Civ. Proc. § 377.20 et. seq.;

17            d.    STEVEN NEUROTH's Coroner's fees, funeral and burial expenses, pursuant
                 to Cal. Code of Civ. Proc. § 377.20 et. seq.;

18

19            e.    Violation of STEVEN NEUROTH's constitutional rights, pursuant to Cal.
                 Code of Civ. Proc. § 377.20 et. seq. and federal civil rights law;

20

21            f.    STEVEN NEUROTH's loss of life, pursuant to federal civil rights law;

22            g.    STEVEN NEUROTH's conscious pain, suffering, and disfigurement,
                 pursuant to federal civil rights law;

23

24            h.    All damages and penalties recoverable under 42 U.S.C. §§ 1983 and 1988,
                 and as otherwise allowed under California and United States statutes, codes,
                 and common law.

25

26   **FIRST CAUSE OF ACTION**

27   **(42 U.S.C. § 1983) – Survival Claim**

28

**AGAINST DEFENDANTSLEEF, ANDRADE, KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM, PAGE, DE LOS SANTOS, CAUDILLO, AND REMAINING DOES**

101.    Plaintiff realleges each and every paragraph in this complaint as if fully set forth here.

102.    Plaintiff brings the claims in this cause of action as survival claims permissible under federal and California law, including Cal. Code of Civ. Proc. Section 377.20 et. seq.

103.    By the actions and omissions described above, Defendants LEEF, KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM, PAGE, DE LOS SANTOS, CAUDILLO, AND REMAINING DOES violated 42 U.S.C. § 1983, depriving DecedentSTEVEN NEUROTH, through Plaintiff herein, of the following clearly established and well-settled constitutional rights protected by the Fourth and Fourteenth Amendments to the United States Constitution:

a.    Decedent's right to be free from excessive and unreasonable force and restraint in the course of seizure and as a pretrial detainee, as secured by the Fourth and/or Fourteenth Amendments; and

b.    Decedent's right to be free from deliberate indifference to STEVEN NEUROTH's serious medical needs while in custody as a pretrial detainee as secured by the Fourth and/or Fourteenth Amendments.

104.    Additionally, by the actions and omissions leading up to STEVEN NEUROTH'S admission into the jail described above, Defendants LEEF and ANDRADE violated 42 U.S.C. § 1983, depriving DecedentSTEVEN NEUROTH, through Plaintiff herein, of the following clearly established and well-settled constitutional rights protected by the Fourth and Fourteenth Amendments to the United States Constitution:

a.    Decedent's right to be free from unreasonable seizure and unlawful arrest without probable cause, as secured by the Fourth Amendment;

b.    Decedent's right to be free from arrest because of his mental illness and disability, and right to equal protection of the law, as secured by the Fourteenth Amendment; and

c.   Decedent's right to be free from deliberate indifference to STEVEN NEUROTH's serious medical needs while in custody as a detainee and/or arrestee as secured by the Fourth and/or Fourteenth Amendments.

105.   Defendants subjected Decedent to their wrongful conduct, depriving Decedent of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Decedent and others would be violated by their acts and/or omissions.

106.   As a direct and proximate result of Defendants' acts and/or omissions as set forth above, Decedent, through Plaintiff herein, sustained injuries and damages as set forth above at ¶ 100.

107.   The conduct of Defendants entitles Plaintiff to punitive damages and penalties allowable under 42 U.S.C. § 1983 and as provided by law.  Plaintiff does not seek punitive damages against Defendants COUNTY or CITY.

108.   Plaintiff is also entitled to reasonable costs and attorneys' fees under 42 U.S.C. § 1988, and other applicable United States and California codes and laws.

**SECOND CAUSE OF ACTION**
**(*Monell* - 42 U.S.C. § 1983) – Survival Claim**
**AGAINST DEFENDANTS COUNTY, CITY, CMGC, AND CFMG**

109.   Plaintiff realleges each and every paragraph in this complaint as if fully set forth here.

110.   Plaintiff brings the claims in this cause of action as survival claims permissible under federal and California law, including Cal. Code of Civ. Proc. Section 377.20 et. seq.

111.   The unconstitutional actions and/or omissions of Defendants LEEF, KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM, PAGE, DE LOS SANTOS, CAUDILLO, and REMAINING DOES,as well as other officers employed by or acting on behalf of the Defendants COUNTY and/or CMGC/CFMG, on information and belief, were pursuant to the following

customs, policies, practices, and/or procedures of Defendants COUNTY, CITY, CMGC, and/or

CFMG, stated in the alternative, which were directed, encouraged, allowed, and/or ratified by

policymaking officers for Defendant COUNTY and its Sheriff's Office, Defendant CITY and its

police chief, Defendant CMGC, and/or Defendant CFMG:

a.  To deny inmates access to appropriate, competent, and necessary care for serious medical and psychiatric needs, including but not limited to failing to provide any inpatient psychiatric facilities within the entire County of Mendocino, and requiring mentally ill County residents in crisis to be taken to jail instead of providing for their serious psychiatric needs;

b.  To allow, encourage, and require Licensed Vocational Nurses to perform intake medical and mental health assessments without clinical supervision by a Registered Nurse or physician, and otherwise to contract for inadequate and incompetent medical and mental health care for jail inmates;

c.  To allow, encourage, and require Licensed Vocational Nurses to work outside their legal scope of practice and without appropriate supervision;

d.  To allow, encourage, and require unlicensed, incompetent, inadequately trained and/or inadequately supervised staff to assess inmates' medical and psychiatric condition, needs, and treatment, including to decide whether or not to provide inmates with necessary emergency care and hospitalization;

e.  To use or tolerate the use of excessive and/or unjustified force, including deputies' failures to intervene in excessive force and violations of rights by other deputies, and improper prone restraint of inmates increasing the risk of injury and death by restraint associated asphyxia;

f.  To use or tolerate the use of unlawful deadly force;

g.  To engage in or tolerate unreasonable seizures and restraints;

h.  To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning seizures and the use of control holds and restraint techniques, including avoiding asphyxiation of subjects being restrained by deputy sheriffs and avoiding blows and uses of force to a subject's head and/or neck during altercations absent justification;

i.  To fail to use appropriate and generally accepted law enforcement procedures for handling mentally ill and/or emotionally disturbed persons;

j.  To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning handling mentally ill and/or emotionally disturbed persons;

k.     To fail to use appropriate and generally accepted jail procedures for handling and housing mentally ill and/or emotionally disturbed persons, including, but not limited to, the standards of the National Commission on Correctional Health Care Standards for Health Services in Jails, and Title 15 of the California Code of Regulations;

l.     To cover up violations of constitutional rights by any or all of the following:

    i.     By failing to properly investigate and/or evaluate complaints or incidents of excessive and unreasonable force, unlawful seizures, and/or handling of mentally ill and/or emotionally disturbed persons;

    ii.    By ignoring and/or failing to properly and adequately investigate and/or investigate and discipline unconstitutional or unlawful law enforcement activity; and

    iii.   By allowing, tolerating, and/or encouraging law enforcement officers to: fail to file complete and accurate reports; file false reports; make false statements; intimidate, bias and/or "coach" witnesses to give false information and/or to attempt to bolster officers' stories; and/or obstruct or interfere with investigations of unconstitutional or unlawful law enforcement conduct by withholding and/or concealing material information;

m.    To allow, tolerate, and/or encourage a "code of silence" among law enforcement officers and sheriff's office personnel, whereby an officer or member of the sheriff's office does not provide adverse information against a fellow officer or member of the MCSO;

n.     To use or tolerate inadequate, deficient, and improper procedures for handling, investigating, and reviewing complaints of officer misconduct, including claims made under California Government Code §§ 910 et seq.

o.     To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in this Complaint and in subparagraphs (a) through (n) above, with deliberate indifference to the rights and safety of Decedent, of Plaintiff and the public, and in the face of an obvious need for such policies, procedures, and training programs.

112.   The unconstitutional actions and/or omissions of Defendants LEEF and ANDRADEas well as other officers employed by or acting on behalf of the Defendant CITY, on information and belief, were pursuant to the following customs, policies, practices, and/or

procedures of Defendant CITY, stated in the alternative, which were directed, encouraged, allowed, and/or ratified by policymaking officers for Defendant CITY and its and its police department, including Defendant CHIEF GONZALEZ:

a. To fail to properly and adequately train, supervise, and monitor patrol officers, including by intentionally and regularly staffing only two patrol officers per evening and night shift without any formal supervision and without any required monitoring or recording of officers' activities on duty;

b. To fail to use appropriate and generally accepted law enforcement procedures for handling mentally ill and/or emotionally disturbed persons;

c. To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning handling mentally ill and/or emotionally disturbed persons, including failing to require and enforce Policy 408 requiring hospitalization of individuals who fit the criteria of Cal. W&I § 5150;

d. To cover up violations of constitutional rights by any or all of the following:

  i. By failing to properly investigate and/or evaluate complaints or incidents of excessive and unreasonable force, unlawful seizures, and/or handling of mentally ill and/or emotionally disturbed persons;

  ii. By ignoring and/or failing to properly and adequately investigate and/or investigate and discipline unconstitutional or unlawful law enforcement activity; and

  iii. By allowing, tolerating, and/or encouraging law enforcement officers to: fail to file complete and accurate reports; file false reports; make false statements; intimidate, bias and/or "coach" witnesses to give false information and/or to attempt to bolster officers' stories; and/or obstruct or interfere with investigations of unconstitutional or unlawful law enforcement conduct by withholding and/or concealing material information;

e. To allow, tolerate, and/or encourage a "code of silence" among law enforcement officers whereby an officer does not provide adverse information against a fellow law enforcement officer;

f. To use or tolerate inadequate, deficient, and improper procedures for handling, investigating, and reviewing complaints of officer misconduct, including claims made under California Government Code §§ 910 et seq.

g. To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional

conduct, customs, and procedures described in this Complaint and in subparagraphs (a) through (f) above, with deliberate indifference to the rights and safety of Decedent, of Plaintiff and the public, and in the face of an obvious need for such policies, procedures, and training programs.

113.    Defendants CITY, COUNTY, CMGC, and CFMG, through their employees and agents, and through their policy-making supervisors, GONZALEZ, ALLMAN, PEARCE, FITHIAN, HUSTEDT, MAXFIELD, TESKE, and remaining DOES, failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline DefendantsLEEF, ANDRADE, KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM, PAGE, DE LOS SANTOS, CAUDILLO, AND REMAINING DOES, and other CITY, COUNTY, Sheriff's Office, CMGC, and CFMG personnel, with deliberate indifference to Plaintiff's, Decedent's, and others' constitutional rights, which were thereby violated as described above.

114.    The unconstitutional actions and/or omissions of Defendants KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM, PAGE, DE LOS SANTOS, CAUDILLO, AND REMAINING DOES, and other Sheriff's Office personnel, as described above, were approved, tolerated, and/or ratified by policymaking officers for the COUNTY and its Sheriff's Office, including Defendants ALLMAN and PEARCE, and by CMGC, CFMG, FITHIAN, HUSTEDT, MAXFIELD, and TESKE.  Plaintiff is informed and believes and thereon alleges that the details of this incident have been revealed to the authorized policymakers within the COUNTY, the Mendocino County Sheriff's Office, CMGC, and CFMG, and that such policymakers have direct knowledge of the fact that the death of STEVEN NEUROTH was not justified, but represented unconstitutional uses of unreasonable, excessive and deadly force, and deliberate indifference to serious medical needs.  Notwithstanding this knowledge, the authorized policymakers within the COUNTY, its Sheriff's Office, CMGC, and CFMG have approved of the conduct and decisions of Defendants KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM, PAGE, DE LOS SANTOS, CAUDILLO, AND REMAINING DOES in this matter, and have made a deliberate choice to

1   endorse such conduct and decisions, and the basis for them, that resulted in the death of STEVEN

2   NEUROTH.  By so doing, the authorized policymakers within the COUNTY and its Sheriff's

3   Office, CMGC and CFMG have shown affirmative agreement with the individual Defendants'

4   actions and have ratified the unconstitutional acts of the individual Defendants.  Furthermore,

5   Plaintiff is informed and believes, and thereupon alleges, that DEFENDANTS ALLMAN,

6   PEARCE,  FITHIAN, HUSTEDT, MAXFIELD, TESKE, and other policy-making officers for the

7   COUNTY, CMGC, and CFMG were and are aware of a pattern of misconduct and injury caused by

8   COUNTY law enforcement officers and CMGC/CFMG employees similar to the conduct of

9   Defendants described herein, but failed to discipline culpable law enforcement officers and

10  employees and failed to institute new procedures and policy within the COUNTY, and

11  CMGC/CFMG.

13          115.     The unconstitutional actions and/or omissions of Defendants LEEF and ANDRADE,

14  as described above, were approved, tolerated, and/or ratified by policymaking officers for the CITY

15  and its police department, including Defendant CHIEF GONZALEZ.  Plaintiff is informed and

16  believes and thereon alleges that the details of this incident have been revealed to the authorized

17  policymakers within the Willits Police Department, and that such policymakers including CHIEF

18  GONZALEZ have direct knowledge of the fact that the death of STEVEN NEUROTH was not

19  justified, but represented unconstitutional uses of unreasonable, excessive and deadly force, and

20  deliberate indifference to serious medical needs.  In fact, on information and belief, CHIEF

21  GONZALEZ listened to the actual audio recordings inadvertently made by Defendant LEEF where,

22  on information and belief, Defendants LEEF and ANDRADE were recorded agreeing to arrest

23  STEVEN NEUROTH rather than take him for necessary medical/psychiatric treatment, and LEEF

24  was recorded terrorizing and escalating STEVEN NEUROTH by repeatedly yelling "Snakes!" then

25  laughing and bragging about that to jail personnel.  Further, Defendant GONZALEZ's investigation

must have revealed that Defendants LEEF and ANDRADE violated both generally accepted law enforcement standards and Willits' Police Department policies by conspiring to avoid transporting, and refusing to transport, STEVEN NEUROTH to an appropriate medical facility rather than the jail. Notwithstanding this knowledge, CHIEF GONZALEZ and other authorized policymakers within the CITY have approved of the conduct and decisions of Defendants LEEF and ANDRADEin this matter, and have made a deliberate choice to endorse such conduct and decisions, and the basis for them, that resulted in the death of STEVEN NEUROTH. By so doing, CHIEF GONZALEZ and other authorized policymakers within the CITY have shown affirmative agreement with the individual Defendants' actions and have ratified the unconstitutional acts of the individual Defendants.

116.   The aforementioned customs, policies, practices, and procedures; the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; and the unconstitutional orders, approvals, ratification, and toleration of wrongful conduct of Defendants CITY, COUNTY, CMGC, and CFMG were a moving force and/or a proximate cause of the deprivations of Decedent's clearly established and well-settled constitutional rights in violation of 42 U.S.C. § 1983, as more fully set forth above at ¶¶ 103 and 104.

117.   Defendants subjected Decedent to their wrongful conduct, depriving Decedent of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Decedent, Plaintiff and others would be violated by their acts and/or omissions.

118.   As a direct and proximate result of the unconstitutional actions, omissions, customs, policies, practices, and procedures of Defendants CITY, COUNTY, CMGC, and CFMG, as described above, Decedent and Plaintiff sustained serious and permanent injuries and Plaintiffis entitled to damages, penalties, costs, and attorneys' fees against Defendants CITY, COUNTY,

1   CMCG, and CFMG as set forth above in ¶¶ 105-108, including punitive damages against

2   Defendants CMGC and CFMG.

3

4                              **THIRD CAUSE OF ACTION**
                    **(Supervisory Liability - 42 U.S.C. § 1983) – Survival Claim**
5        **AGAINST DEFENDANTS GONZALEZ, ALLMAN, PEARCE, , FITHIAN, HUSTEDT,**
                                  **MAXFIELD, TESKE**
6                              **AND REMAINING DOES**

7           119.    Plaintiff realleges each and every paragraph in this complaint as if fully set forth

8   here.

9           120.    Plaintiff brings the claims in this cause of action as survival claims permissible under

10  federal and California law, including Cal. Code of Civ. Proc. Section 377.20 et. seq.

11

12          121.    At all material times, Defendants GONZALEZ, ALLMAN, PEARCE, FITHIAN,

13  HUSTEDT, MAXFIELD, TESKE and REMAINING DOES, had the duty and responsibility to

14  constitutionallyhire, train, instruct, monitor, supervise, evaluate, investigate, and discipline the other

15  Defendants in this matter, as well as all employees and agents of the Willits Police Department,

16  Mendocino County Sheriff's Office, CMGC, and/or CFMG.

17          122.    Defendants GONZALEZ, ALLMAN, PEARCE, CMGC, CFMG, FITHIAN,

18  HUSTEDT, MAXFIELD, TESKE and REMAINING DOES failed to properly hire, train, instruct,

19  monitor, supervise, evaluate, investigate, and discipline Defendants LEEF, ANDRADE, KNAPP,

20  MASTERSON, BERNARDI, GRANT, HOLUM, PAGE, DE LOS SANTOS, CAUDILLO, AND

21  REMAINING DOES, and other CITY, COUNTY, Sheriff's Office, CMGC, and CFMG personnel,

22  with deliberate indifference to Plaintiff's, Decedent's, and others' constitutional rights, which were

23  thereby violated as described above.

24          123.    The unconstitutional customs, policies, practices, and/or procedures of Defendants

25  CITY, COUNTY, CMGC, and/or CFMG, stated in the Second Cause of Action herein, were

26

27  directed, encouraged, allowed, and/or ratified by policymaking officers for Defendant CITY and its

28

police department, Defendant COUNTY and its Sheriff's Office, Defendant CMGC, and/or

Defendant CFMG, including Defendants GONZALEZ, ALLMAN, PEARCE,  FITHIAN,

HUSTEDT, MAXFIELD, TESKE, and REMAINING DOES, with deliberate indifference to

Plaintiff's, Decedent's, and others' constitutional rights, which were thereby violated as described

above.

124.    The unconstitutional actions and/or omissions of Defendants LEEF, ANDRADE,

KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM, PAGE, DE LOS

SANTOS,CAUDILLO, AND REMAINING DOES, and other Police and Sheriff's Office

personnel, as described above, were approved, tolerated, and/or ratified by policymaking officers

for the CITY and its police department including Defendant GONZALEZ, COUNTY and its

Sheriff's Office including Defendants ALLMAN and PEARCE, and by CMGC, CFMG,

HALLMAN, FITHIAN, HUSTEDT, MAXFIELD, and TESKE.  Plaintiff is informed and believes

and thereon alleges that the details of this incident have been revealed to Defendants GONZALEZ,

ALLMAN, PEARCE, FITHIAN, HUSTEDT, MAXFIELD, and TESKE, and that such Defendant-

policymakers have direct knowledge of the fact that the death of STEVEN NEUROTH was not

justified, but represented an unconstitutional seizure anduse of unreasonable, excessive and deadly

force, and deliberate indifference to serious medical needs, and as set forth in the "ratification"

paragraphs in the Second Cause of Action, ¶¶ 114-115 above.  Notwithstanding this knowledge, on

information and belief, Defendants ALLMAN, PEARCE, FITHIAN, HUSTEDT, MAXFIELD, and

TESKEhave approved and ratified of the conduct and decisions of Defendants LEEF, ANDRADE,

KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM, PAGE, DE LOS SANTOS,

CAUDILLO, AND REMAINING DOES in this matter, and have made a deliberate choice to

endorse such conduct and decisions, and the basis for them, that resulted in the death of STEVEN

NEUROTH.  By so doing, Defendants GONZALEZ, ALLMAN, PEARCE, FITHIAN, HUSTEDT,

1  MAXFIELD, and TESKE have shown affirmative agreement with the individual Defendants'

2  actions and have ratified the unconstitutional acts of the individual Defendants.  Furthermore,

3  Plaintiff is informed and believes, and thereupon alleges, that Defendants GONZALEZ, ALLMAN,

4  PEARCE, FITHIAN, HUSTEDT, MAXFIELD, TESKE and other policy-making officers for the

5  CITY, COUNTY, CMGC and CFMG were and are aware of a pattern of misconduct and injury,

6  and a code of silence, caused by CITY and COUNTY law enforcement officers and CMGC/CFMG

7  employees similar to the conduct of Defendants described herein, but failed to discipline culpable

8  law enforcement officers and employees and failed to institute new procedures and policy within

9  the CITY, COUNTY, CMGC, and CFMG.

10

11      125.    The aforementioned customs, policies, practices, and procedures; the failures to

12  properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and

13  discipline; and the unconstitutional orders, approvals, ratification, and toleration of wrongful

14  conduct of Defendants GONZALEZ, CITY, COUNTY, ALLMAN, PEARCE, CMGC, CFMG,

15  FITHIAN, HUSTEDT, MAXFIELD, TESKEand REMAINING DOES were a moving force and/or

16  a proximate cause of the deprivations of Decedent's clearly established and well-settled

17  constitutional rights in violation of 42 U.S.C. § 1983, as more fully set forth above at ¶¶ 103 and

18  104.

19

20      126.    Defendants subjected Decedent to their wrongful conduct, depriving Decedent of

21  rights described herein, knowingly, maliciously, and with conscious and reckless disregard for

22  whether the rights and safety of Decedent, Plaintiff and others would be violated by their acts and/or

23  omissions.

24

25      127.    As a direct and proximate result of the unconstitutional actions, omissions, customs,

26  policies, practices, and procedures of Defendants GONZALEZ, ALLMAN, PEARCE, FITHIAN,

27  HUSTEDT, MAXFIELD, TESKE, and REMAINING DOES as described above, Plaintiff sustained

28

1   serious and permanent injuries and is entitled to damages, penalties, costs, and attorneys' fees as set

2   forth above in ¶¶ 105-108.

3

4                    **FOURTH CAUSE OF ACTION**
                **(Violation of Civil Code § 52.1) – Survival Claim**
5   **AGAINST DEFENDANTS LEEF, ANDRADE, KNAPP, MASTERSON, BERNARDI,**
    **GRANT, HOLUM, PAGE, DE LOS SANTOS, CAUDILLO, AND REMAINING DOES,**
6         **ALLMAN, PEARCE, FITHIAN, HUSTEDT, MAXFIELD, TESKE,**
                       **CITY, CMGC, AND CFMG**
7

8        128.   Plaintiff realleges each and every paragraph in this complaint as if fully set forth

9   here.

10       129.   Plaintiff brings the claims in this cause of action as survival claims permissible under

11  California law, including Cal. Code of Civ. Proc. Section 377.20 et. seq.

12       130.   By their acts, omissions, customs, and policies, DEFENDANTS LEEF, ANDRADE,

13  KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM, PAGE, DE LOS SANTOS,

14  CAUDILLO, and REMAINING DOES, ALLMAN, PEARCE, FITHIAN, HUSTEDT,

15  MAXFIELD, TESKE, CMGC,, and CFMG, each Defendant acting in concert/conspiracy, as

16  described above, and by threat, intimidation, and/or coercion, interfered with, attempted to interfere

17  with, and violated STEVEN NEUROTH'S rights under California Civil Code § 52.1 and under the

18  United States Constitution and California Constitution as follows:

19

20            a.   The right to be free from an unreasonable and unlawful arrest as secured by
                   the Fourth Amendment to the United States Constitution and by the
21                 California Constitution, Article 1, §13 [by Defendants LEEF and ANDRADE
                   only];
22

23            b.   The right to be free from arrest because of STEVEN NEUROTH'S mental
                   illness and disability, and right to equal protection of the law, as secured by
24                 the Fourteenth Amendment to the United States Constitution and by the
                   California Constitution, Article 1, §7 [by Defendants LEEF and ANDRADE
25                 only];

26            c.   The right to be free from excessive and unreasonable force and restraint in
27                 the course of a seizure as secured by the Fourth and/or Fourteenth

28

1    Amendments to the United States Constitution and by the California
     Constitution, Article 1, §§ 7 and 13;

2

     d.    The right to be free from deliberate indifference to STEVEN NEUROTH's
3          serious medical needs while in custody as a pretrial detainee as secured by
           the Fourth and/or Fourteenth Amendmentsto the United States Constitution
4          and by California Constitution, Article 1, §§ 7 and 13;

5

     e.    The right to enjoy and defend life and liberty; acquire, possess, and protect
6          property; and pursue and obtain safety, happiness, and privacy, as secured by
           the California Constitution, Article 1, § 1;

7

     f.    The right to protection from bodily restraint, harm, or personal insult, as
8          secured by California Civil Code § 43; and

9

     g     The right to medical care as required by California Government Code §845.6.
10

11   131.  Separate from, and above and beyond, Defendants' attempted interference,

12   interference with, and violation of STEVEN NEUROTH'S rights as described above, Defendants

13   violated Decedent's rights by the following conduct constituting threat, intimidation, or coercion:

14   a.    With deliberate indifference to STEVEN NEUROTH's serious medical
           needs, suffering, and risk of grave harm including death, depriving STEVEN
15         NEUROTH of necessary, life-saving care for his medical and/or psychiatric
           needs;
16

17   b.    Defendants LEEF and ANDRADE subjecting STEVEN NEUROTH to an
           unreasonable seizure and unlawful arrest for the purpose of depriving him of
18         his right to treatment for his serious medical and psychiatric needs;

19   c.    Defendants LEEF and ANDRADE arresting STEVEN NEUROTH because
           of his mental illness and disability;
20

21   d.    Threatening STEVEN NEUROTH with violence in the absence of any threat
           presented by Mr. NEUROTH, or any justification whatsoever;
22

23   e.    Using deliberately reckless and provocative tactics on STEVEN NEUROTH
           in violation of generally accepted law enforcement training and standards,
24         and in violation of STEVEN NEUROTH's rights;

25   f.    Threatening violence against STEVEN NEUROTH, with the apparent ability
           to carry out such threats, in violation of Civ. Code § 52.1(j);
26

27   g.    Causing STEVEN NEUROTH to be subjected to multiple blows, strikes,
           painful joint control holds, choking, crushing, and other injurious force
28         without justification;

h.  Restraining STEVEN NEUROTH in a manner well-known to impair and obstruct his ability to breathe;

i.  Causing STEVEN NEUROTH to be subjected to violence, and threat of violence, because of his disability(ies) and medical/psychiatric condition;

j.  Violating STEVEN NEUROTH's rights to be free from excessive force and deliberate indifference to his serious medical needs;

k.  Violating multiple rights of STEVEN NEUROTH such that the multiple violations were threatening, intimidating, or coercive;

l.  Requiring mentally ill psychiatric patients in crisis to go to jail instead of allowing them to receive necessary emergency medical and psychiatric care;

m.  Deliberately providing inadequate and incompetent medical and mental health care to Mendocino County jail detainees and inmates;

n.  Instituting and maintaining the unconstitutional customs, policies, and practices described herein, when it was obvious that in doing so, individuals such as STEVEN NEUROTH would be subjected to violence, threat, intimidation, and coercion, as Decedent was here.

132.  The threat, intimidation, and coercion described herein were not necessary or inherent to Defendants' violation of Decedent's rights, or to any legitimate and lawful jail or law enforcement activity.

133.  Further, all of Defendants' violations of duties and rights, and coercive conduct, described herein were volitional acts; none was accidental or merely negligent.

134.  Defendant CITY is vicariously liable for the violation of rights by its employees and agents pursuant to Cal. Gov. Code § 815.2.

135.  As a direct and proximate result of Defendants' violation of California Civil Code § 52.1 and of Decedent's rights under the United States and California Constitutions, Plaintiff(as successor in interest for Decedent) sustained injuries and damages, and against each and every Defendant is entitled to relief as set forth above at ¶¶ 105-108, including punitive damages against

all individual Defendants, CMGC and CFMG,and all damages allowed by California Civil Code §§ 52 and 52.1 and California law, not limited to costs attorneys' fees, and civil penalties.

**FIFTH CAUSE OF ACTION**
**(Negligence) – Survival and Wrongful Death Claims**
**AGAINST DEFENDANTSLEEF, ANDRADE, KNAPP, MASTERSON, BERNARDI,**
**GRANT, HOLUM, PAGE, DE LOS SANTOS, AND REMAINING DOES**

136.    Plaintiff realleges each and every paragraph in this complaint as if fully set forth here.

137.    Plaintiff brings the claims in this cause of action as survival claims permissible under California law, including Cal. Code of Civ. Proc. Section 377.20 et. seq., and as wrongful death claims permissible under California law, including Cal. Code of Civ. Proc. Section 377.60 et. seq.

138.    At all times, Defendants LEEF, ANDRADE, KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM, PAGE, DE LOS SANTOS, and REMAINING DOESowed Plaintiffand Decedent the duty to act with due care in the execution and enforcement of any right, law, or legal obligation.

139.    At all times, these Defendants owed Plaintiff and Decedent the duty to act with reasonable care.

140.    These general duties of reasonable care and due care owed to Plaintiffand Decedent by these Defendants include but are not limited to the following specific obligations:

   a.    To summon, or transport STEVEN NEUROTH to, necessary and appropriate medical care for STEVEN NEUROTH;

   b.    To refrain from subjecting STEVEN NEUROTH to an unreasonable seizure and arrest;

   c.    To refrain from using excessive and/or unreasonable force against STEVEN NEUROTH;

   d.    To refrain from unreasonably creating the situation where force, including but not limited to deadly force, is used;

1

e.      To refrain from unreasonably creating danger or increasing STEVEN
        NEUROTH's risk of harm;

2

3

f.      To use generally accepted law enforcement procedures and tactics, including
        restraint procedures, that are reasonable and appropriate for STEVEN
        NEUROTH's status as a mentally ill and/or emotionally disturbed person
        with serious medical needs;

4

5

g.      To refrain from abusing their authority granted them by law;

6

7

h.      To refrain from violating Plaintiff's rights as guaranteed by the United States
        and California Constitutions, as set forth above, and as otherwise protected
        by law.

8

9        141.    Defendants LEEF, ANDRADE, KNAPP, MASTERSON, BERNARDI, GRANT,

10   HOLUM, PAGE, DE LOS SANTOS, and REMAINING DOES, through their acts and omissions,

11   breached each and every one of the aforementioned duties owed to Plaintiff and Decedent.

12       142.    As a direct and proximate result of these Defendants' negligence, Plaintiff and

13   Decedent sustained injuries and damages, and against each and every Defendant named in this

14   cause of action in their individual capacities are entitled to relief as set forth above at ¶¶ 105-108,

15

16   including punitive damages against such individual Defendants.

17   **SIXTH CAUSE OF ACTION**
**(Assault and Battery) – Survival and Wrongful Death Claims**
18   **AGAINST DEFENDANTS LEEF, KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM,
PAGE, DE LOS SANTOS, AND REMAINING DOES**

19

20       143.    Plaintiff realleges each and every paragraph in this complaint as if fully set forth

21   here.

22       144.    Plaintiff brings the claims in this cause of action as survival claims permissible under

23   California law, including Cal. Code of Civ. Proc. Section 377.20 et. seq., and as wrongful death

24   claims permissible under California law, including Cal. Code of Civ. Proc. Section 377.60 et. seq.

25       145.    Defendants LEEF, KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM,

26   PAGE, DE LOS SANTOS, and REMAINING DOES, placed STEVEN NEUROTH in immediate

27

28   fear of death and severe bodily harm, and killed him by beating, battering, choking, crushing him,

1  and impairing his ability to breathe, without just provocation or cause, constituting assault and

2  battery.

3      146.    Defendants' conduct was neither privileged nor justified under statute or common

4  law.

5      147.    As a direct and proximate result of these Defendants' assault and battery of STEVEN

6  NEUROTH, Plaintiff and Decedent sustained injuries and damages and are entitled to relief as asset

7  forth above at ¶¶ 105-108, including punitive damages against Defendants LEEF, KNAPP,

8  MASTERSON, BERNARDI, GRANT, HOLUM, PAGE, DE LOS SANTOS, and REMAINING

9  DOES, in their individual capacities.

10

11                          **SEVENTH CAUSE OF ACTION**

12  **(Violation of California Government Code § 845.6) – Survival and Wrongful Death Claims
AGAINST DEFENDANTSLEEF, KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM,
PAGE, DE LOS SANTOS, AND REMAINING DOES,and COUNTY**

13

14      148.    Plaintiff realleges each and every paragraph in this complaint as if fully set forth

15  here.

16      149.    Plaintiff brings the claims in this cause of action as survival claims permissible under

17  California law, including Cal. Code of Civ. Proc. Section 377.20 et. seq., and as wrongful death

18  claims permissible under California law, including Cal. Code of Civ. Proc. Section 377.60 et. seq.

19

20      150.    Defendants LEEF, KNAPP, MASTERSON, BERNARDI, GRANT, HOLUM,

21  PAGE, DE LOS SANTOS, and REMAINING DOESknew or had reason to know that STEVEN

22  NEUROTH was in need of immediate medical care and treatment, including being transferred for

23  emergency inpatient hospitalization, and each failed to take reasonable action to summon immediate

24  medical care and treatment.  Each such individual defendant, employed by and acting within the

25  course and scope of his/her employment with Defendant COUNTY, knowing and/or having reason

26  to know of STEVEN NEUROTH's need for immediate medical care and treatment, failed to take

27

28

reasonable action to summon such care and treatment in violation of California Government Code §

845.6.

151.    Defendant COUNTY is vicariously liable for the violations of state law and conduct

of its officers, deputies, employees, and agents, including individual named defendants, under

California Government Code sections 815.2 and 845.6.

152.    As legal cause of the aforementioned acts of theseDEFENDANTS, Plaintiff and

Decedent were injured as set forth above, and their losses entitle Plaintiff to all damages allowable

under California law.  Plaintiff (individually and as Successor in Interest for Decedent) sustained

serious and permanent injuries and is entitled to damages, penalties, costs, and attorney fees under

California law as set forth in ¶¶ 105-108, above, including punitive damages against these

individual Defendants.

**EIGHTH CAUSE OF ACTION**
**(Intentional Infliction of Emotional Distress) – Survival Claim**
**AGAINST DEFENDANTS LEEF and CITY OF WILLITS**

153.    Plaintiff realleges each and every paragraph in this complaint as if fully set forth

here.

154.    Plaintiff brings the claims in this cause of action as survival claims permissible under

California law, including Cal. Code of Civ. Proc. Section 377.20 et. seq.,

155.    Before STEVEN NEUROTH was booked into the jail, Defendant LEEF

intentionally caused STEVEN NEUROTH to suffer severe emotional distress by Defendant LEEF's

extreme and outrageous conduct, including but not limited to abusing his authority, taking

advantage of STEVEN NEUROTH's mental and psychological disabilities, impairments, and

vulnerabilities, such as repeatedly yelling "Snakes!" while STEVEN NEUROTH was handcuffed

and locked in his police car and under the paranoid belief that there were deadly snakes in the car.

In this conduct, Defendant LEEF found pleasure in tormenting and terrorizing STEVEN

NEUROTH, apparently enjoying STEVEN NEUROTH's screams of fright and panic that Defendant LEEF deliberately caused, over and over again.  On information and belief, while Defendant LEEF was yelling, "snakes!" to deliberately terrorize STEVEN NEUROTH, Defendant LEEF laughed and bragged to another member of his police department to the effect: "I yelled and he freaked out.  Yelled.  Because he was starting to get a little kicky back there.  So what I like to do is say snakes very loud and he jumps and it freaks him.  It's pretty funny."  Defendant LEEF did so while STEVEN NEUROTH was in his custody and care, after Defendant LEEF already had determined that STEVEN NEUROTH was in a psychotic state and unable to care for himself. Further, by this intentional, extreme, and outrageous conduct, Defendant LEEF caused STEVEN NEUROTH to further decompensate, becoming more paranoid, more fearful, more disoriented, and more at risk of being subjected to unnecessary force in the jail.

156.    Defendant CITY OF WILLITS is vicariously liable for Defendant LEEF's torturous and tortious conduct pursuant to California Government Code § 815.2.

157.    As legal cause of the aforementioned acts of Defendants LEEF and CITY OF WILLITS, Decedent suffered severe emotional distress, and as Decedent's Successor in Interest, Plaintiff is entitled to all damages allowable under California law as set forth in ¶¶ 105-108, above, and punitive damages against Defendant LEEF in his individual capacity.

**NINTH CAUSE OF ACTION**
**(False Arrest and Imprisonment) – Survival and Wrongful Death Claims**
**AGAINST DEFENDANTS LEEF, ANDRADE, and CITY OF WILLITS**

158.    Plaintiff realleges each and every paragraph in this complaint as if fully set forth here.

159.    At no time during the events described above, and at all other pertinent times, did Defendants LEEF and ANDRADE have a warrant for the arrest of STEVEN NEUROTH, nor did

1  Defendants have any facts or information that constituted probable cause that STEVEN NEUROTH

2  had committed or was about to commit a crime.

3       160.    Defendants LEEF and ANDRADE intentionally and unlawfully exercised force to

4  restrain, detain, and confine STEVEN NEUROTH, putting restraint on Plaintiff's freedom of

5  movement, and compelled STEVEN NEUROTH to remain and/or move against his will.

6  Defendants authorized, directed, and assisted in procuring, without process, STEVEN NEUROTH's

7  unlawful arrest.

8

9       161.    Defendants' unlawful arrest of STEVEN NEUROTH was intended to, and did,

10  deprive STEVEN NEUROTH of obviously necessary medical/psychiatric care, and ultimately was

11  a cause of his death.

12       161.    As a direct and proximate result of Defendants' acts and/or omissions as set forth

13  above, Plaintiff sustained injuries and damages and is entitled to relief as set forth at paragraphs

14  105-108, above.

15

16                              **RELIEF REQUESTED**

17       WHEREFORE, Plaintiff respectfully requests the following relief against each and every

18  Defendant herein, jointly and severally:

19            a.   Compensatory and exemplary damages in an amount according to proof and
20                 which is fair, just, and reasonable;

21            b.   Punitive damages under 42 U.S.C. § 1983 and California law in an amount
22                 according to proof and which is fair, just, and reasonable;

23            c.   All other damages, penalties, costs, interest, and attorneys' fees as allowed by
                   42 U.S.C. §§ 1983 and 1988; California Code of Civil Procedure §§ 377.20 et
24                 seq., 377.60 et seq., and 1021.5; California Civil Code §§ 52 et seq., 52.1;
                   and as otherwise may be allowed by California and/or federal law;

25            d.   Such further relief, according to proof, that this Court deems appropriate and
26                 lawful.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### JURY DEMAND

Plaintiff hereby demands a jury trial in this action.

Dated:  April 21, 2017                    HADDAD & SHERWIN LLP


/s/ *Michael J. Haddad*
_____
MICHAEL J. HADDAD
Attorneys for Plaintiff