1  Anne L. Keck, SBN 136315

2  KECK LAW OFFICES
   418 B Street, Suite 206

3  Santa Rosa, California 95401
   Telephone: (707) 595-4185

4  Facsimile: (707) 657-7715
   Email: akeck@public-law.org

5  Attorneys for Defendants the

6  County of Mendocino and
   Mendocino County Sheriff-

7  Coroner Thomas Allman,
   Capt. Timothy Pearce, Lorrie Knapp,

8  Frank Masterson, Craig Bernardi,
   Michael Grant, Jeanette Holum,

9  Robert Page, & Christine De Los Santos

John W. Patton, Jr., *Pro Hac Vice*
Stephen R. Niemeyer, SBN 203162
Kathleen M. Kunkle, SBN 222800
Kathryn R. Vaughan, *Pro Hac Vice*
PATTON & RYAN LLC
330 North Wabash Ave., Suite 3800
Chicago, Illinois 60611
Telephone: (312) 261-5160
Facsimile: (312) 261-5161
Emails: jpatton@pattonryan.com
          sniemeyer@pattonryan.com
          kkunckle@pattonryan.com
          kvaughan@pattonryan.com

10              UNITED STATES DISTRICT COURT

11           NORTHERN DISTRICT OF CALIFORNIA

12  JAMES NEUROTH, *et al.*,

13          Plaintiffs,

14      v.

15  MENDOCINO COUNTY, *et al.*,

16          Defendants.

Case No. 3:15-CV-03226-RS

**DEFENDANTS' JOINT MOTION TO
EXCLUDE REPORTS AND TESTIMONY OF
PLAINTIFF'S REBUTTAL EXPERTS DRS.
BADEN AND WOHLGELERNTER FOR
VIOLATING THE CASE MANAGEMENT
SCHEDULING ORDER AND FRCP RULE 26;
DECLARATION OF ANNE L. KECK**

17

18  Date: TBA
    Time: TBA
    Courtroom: TBA

19

20  Complaint Filed:  July 10, 2015
    Trial Date:         January 7, 2019

21

22      This motion is brought jointly by County Defendants,[1] CFMG Defendants,[2] and CMGC

23  Defendants[3] (collectively, "Defendants" herein) solely to exclude the rebuttal reports of, and related

24  _____

25  [1] "County Defendants" include Defendants the County of Mendocino, Mendocino County Sheriff
    Thomas Allman, Sheriff's Captain Timothy Pearce, and current/former Sheriff's Deputies Lorrie

26  Knapp, Frank Masterson, Craig Bernardi, Michael Grant, Jeanette Holum, Robert Page, and
    Christine De Los Santos.

27  [2] "CFMG Defendants" include Defendants California Forensic Medical Group, Inc. and Jennifer
    Caudillo, LVN.

28  [3] "CMGC Defendants" include Defendants Correctional Medical Group Companies, Inc., Dr. Taylor
    Fithian, Elaine Hustedt, and Claire Teske, RN.

testimony by, Plaintiff's expert witnesses Dr. Michael Baden and Dr. Daniel Wohlgelernter on the

grounds that their designation as rebuttal experts and disclosure of their rebuttal reports were

untimely pursuant to the Court's Case Management Scheduling Order entered on December 13,

2017 (Dkt. No. 232), and that such untimely discovery is both substantially unjustified and

prejudicial to Defendants pursuant to FRCP Rule 37(c)(1).[4] If the Court declines to exclude such

rebuttal reports and related testimony, Defendants also seek alternative relief, as set forth below.

---

[4] All other grounds to exclude these and other experts' reports and their related testimony are
expressly reserved.

1

**TABLE OF CONTENTS**

2  I.      PROCEDURAL BACKGROUND…………………………………………..………1

3  II.     LEGAL DISCUSSION……………………………………………………..……...5

4        A.     The Late Disclosure of Plaintiff's Rebuttal Experts Requires Their Exclusion………5

5        B.     Plaintiff's Late Disclosures Were Not Substantially Justified………………….…...6

6        C.     Plaintiff's Late Disclosures Are Prejudicial to Defendants…………………………8

7  III.    CONCLUSION…………………………………………………………………...11

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Continental Lab. Prods., Inc. v. Medax Int'l, Inc.*
   195 F.R.D. 675 (S.D. Cal. 2000) (quoting *Finley v. Marathon Oil co.*, 75 F.3d 1225, 1230 (7th
4
   Cir. 1996)) ........................................................................................................................... 6

5

*Luke v. Family Care & Urgent Med. Clinics*
   323 F. App'x 496 (9th Cir. 2009) ........................................................................................ 9
6

*Plumley v. Mockett*
7
   836 F. Supp. 2d 1053 (C.D. Cal. 2010) ............................................................................ 11

8

*R & R Sails, Inc. v. Ins. Co. of Pennsylvania*
   673 F.3d 1240 (9th Cir. 2012) ............................................................................................. 6
9

*Truckstop.Net, L.L.C. v. Sprint Commc'ns Co., L.P.*
10
   537 F. Supp. 2d 1126 (D. Idaho 2008) ............................................................................... 9

11

*Yeti by Molly Ltd. v. Deckers Outdoor Corp.*
   259 F.3d 1101 (9th Cir.2001) ......................................................................................... 5, 6
12

13

**Statutes and Rules**

14

FCRP Rule 26(a)(2)(D)(ii) ..................................................................................................... 7

15

FRCP 26(a)(2)(B). .................................................................................................................. 5

16

FRCP 37(c)(1). ....................................................................................................................... 5

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      PROCEDURAL BACKGROUND**

The allegations in this case revolve around the death of the Plaintiff's brother, Steven Neuroth, while in custody at the Mendocino County jail. The allegations in the case are hotly contested, and the parties are currently engaged in a rather extraordinary number of expert witness depositions (likely to total more than 22) regarding the vast breadth of issues Plaintiff raises in the case. Hence, while this is not a particularly complex case, its management has become unwieldy. In such circumstances, Defendants turn to the Court for assistance in managing the case.

In its Case Management Scheduling Order entered on September 28, 2017 (Dkt. No. 209), this Court set various due dates, including setting November 30, 2017, as the last day for the parties to designate experts in accordance with Federal Rule of Civil Procedure ("FRPC") Rule 26(a)(2). Pursuant to that order, the parties timely designated the following retained expert witnesses and disclosed their Rule 26 reports, on November 30th:

Plaintiff's Disclosed Retained Experts[5]

1.      Michael M. Baden, M.D. – Forensic Pathology

2.      Grant Fredericks – Forensic Video Analysis

3.      Michael D. Freeman, Med.Dr., Ph.D., M.P.H., F.A.A.F.S. – Forensic Medicine & Epidemiology

4.      Richard Hayward, Ph.D. – Clinical, Correctional, and Forensic Psychology

5.      Larissa J. Mooney, M.D. – Addiction Medicine and Psychiatry

6.      Denise Panosky, D.N.P., R.N., C.N.E., F.C.N.S. – Clinical and Forensic Nursing and Correctional Nursing

7.      John Ryan – Law Enforcement Practices, Procedures & Administration

8.      Todd Randall Wilcox, M.D., M.B.A., F.A.C.C.P. – Medicine and Correctional Medicine

9.      Erich J. Speckin, Forensic Document Analysis and Forensic Chemistry (Plaintiff's expert disclosures did not contain a written report of Mr. Speckinn; such report was provided on or about December 29, 2017, pursuant to stipulation and order)

---

[5] A copy of Plaintiff's expert witness disclosure, *sans* expert reports, is attached to the Declaration of Anne L. Keck ("Keck Dec.") as Exhibit A.

CFMG Defendants' Disclosed Retained Experts[6]

1.    Robert Bux, M.D., medical doctor who is board certified in forensic pathology, clinical pathology, and anatomical pathology

2.    Terry Fillman, Certified Correctional Health Professional

CMGC Defendants' Disclosed Retained Experts[7]

1.    Neal Benowitz, M.D., clinician in cardiovascular medicine, medical toxicology, and clinical pharmacology.

2.    Kimberly Pearson, R.N., correctional nursing care expert

County Defendants' Disclosed Retained Experts[8]

1.    John G. Peters, Jr., Ph.D., CLS, CTC, expert in law enforcement issues

2.    David Kan, M.D., D.F.A.S.A.M., expert in addiction psychiatry and psychopharmacology

3.    Joseph Hartmann, M.D., cardiologist

Unfortunately, on December 13, 2017, Dr. Hartmann informed County Defendants that he was required to withdraw from the case due to medical reasons. On that date, County Defendants informed all parties of this fact via email, and stated that they would not present Dr. Hartmann or his written report in this matter.

In their disclosure, County Defendants also designated Dr. Jay Chapman as their primary cause-of-death un-retained expert, as he was the forensic pathologist who conducted the autopsy of the decedent and determined that his death was due to "methamphetamine toxicity associated with violent struggle." [Keck Dec., Exh. D, p. 3; Exh. L, p. 64.] During his deposition taken by Plaintiff on August 29, 2017, Dr. Chapman provided expert testimony regarding cardiology issues, including but not limited to why methamphetamine was the primary factor which caused Plaintiff's sudden cardiac arrest. [Keck Dec., Exh. L, pp. 50-1, 63-4, 132-136.] In addition, Dr. Chapman also testified that he rejected restraint asphyxia as a cause of death, and cited to restraint asphyxia studies conducted by Drs. Chan, Vilke, and their colleagues. [*Id.*, at p.142-145.] Plaintiff had the opportunity to question Dr. Chapman more thoroughly on his cardiology opinions underlying his

---

[6] A copy of CFMG Defendants' expert witness disclosure is attached to the Keck Dec. as Exhibit B.
[7] A copy of CMGC Defendants' expert witness disclosure is attached to the Keck Dec. as Exhibit C.
[8] A copy of County Defendants' expert witness disclosure is attached to the Keck Dec. as Exhibit D.

1   cause of death determination, but did not do so.

2          Because the deadlines in this case became unworkable after the disclosure of experts, the

3   parties negotiated a stipulation for new trial and pretrial dates. (Dkt. No. 231.) The Court approved

4   that stipulation and entered a revised Case Management Scheduling Order on December 13, 2017

5   (Dkt. No. 232, the "Scheduling Order"), moving the trial date to January 7, 2019. [Keck Dec., Exh.

6   E.] In addition, the Scheduling Order set January 16, 2018,[9] as the date by which the parties must

7   have designated all supplemental/rebuttal expert witnesses under Rule 26(a), and March 15, 2018, as

8   the last day to complete discovery of expert witnesses.[10]

9          In addition, due to the withdrawal of Dr. Hartmann, the stipulated Scheduling Order provided

10  County Defendants through January 22, 2018, to designate any replacement medical expert witness

11  for Dr. Hartmann, and gave Plaintiff through February 19, 2018, to designate a rebuttal expert to that

12  replacement expert. (Scheduling Order, Keck Dec. Exh. E, at p. 6.)

13         Thereafter, in Plaintiff's Supplemental/Rebuttal Expert Disclosures served on January 12,

14  2018, Plaintiff disclosed only one rebuttal expert and report: Dr. Mooney, an addiction specialist

15  (who was also disclosed as an initial expert). [Keck Dec., Exh. F.] Plaintiff's Supplemental/Rebuttal

16  Disclosure stated that Plaintiff reserved the right "to provide any expert opinions and Rule 26 reports

17  in rebuttal to the County's cardiology expert(s) by February 19, 2018." [*Id.*, at p. 3.]

18         Because two of Plaintiff's expert witnesses supported Plaintiff's theory that the decedent

19  died of restraint asphyxia (contrary to the findings and conclusions of Dr. Chapman), County

20  Defendants designated a restraint asphyxia expert, Dr. Gary Vilke, to rebut that theory.[11] Dr. Vilke is

21  a board-certified emergency department physician and is one of the few people in the country who

22  has conducted research related to Plaintiff's theory of restraint asphyxia. [Keck Dec., Exh. H, pp. 3-

23  4.] As Dr. Vilke stated in his report, he was retained by County Defendants in this case "to consider

24  
_____
25  [9] The actual date set in the Scheduling Order was January 15, 2018, but because that date was a legal holiday (Martin Luther King Jr. Day), the expert witness disclosure date was extended to January 16, 2018, pursuant to FRCP Rule 6(a)(1)(C).
26  [10] In light of the sheer number of designated experts, the discovery cut-off date also appears to have been too optimistic, as at least three expert depositions must be held after the March 15th cut-off date.
27  [11] *See* County Defendants' Disclosure of Supplemental/Rebuttal Expert Witnesses served on January 16, 2018, and the accompanying report of Dr. Gary Vilke. [Keck Dec., Exhs. F, G.]
28

and render an expert opinion on whether the restraining process was contributory of Mr. Steven

Neuroth's death." [*Id.*, at p. 1.]

Further, in County Defendants' Disclosure of Supplemental/Rebuttal Expert Witnesses, they

informed all parties that they declined to designate a replacement cardiologist for Dr. Hartmann

(since Plaintiff had not designated a cardiologist), and expressly stated as follows:

> Further, pursuant to the scheduling Order entered on December 13, 2017 (Dkt. No. 232), the Court permitted County Defendants through January 22, 2018, to designate a replacement medical expert witness for Dr. Joseph Hartmann, a cardiologist, who was compelled to withdraw from the case due to medical reasons. However, County Defendants decline to designate an expert to replace Dr. Hartmann as an expert in this case.

[Keck Dec., Exh. G, at pp. 1-2.]

After the January 16th due date for disclosing supplemental/rebuttal experts had passed,

Plaintiff surprisingly released a new rebuttal report by Dr. Baden the day before his deposition:

Plaintiff sent this new report, dated December 14, 2017, to all counsel via email at 3:43 p.m. on

February 5, 2018, and Dr. Baden's deposition was noticed to start on February 6, 2018, at 10:00 a.m.

[Keck Dec., Exh. I.] In that email, Plaintiff stated that the report was "an early courtesy copy of [Dr.

Baden's] rebuttal report to Defendants' cardiology opinions." [*Id*.] Plaintiff attempted to justify this

late disclosure by stating that the "rebuttal reports on cardiology" were not due for two more weeks.

[*Id*.] Dr. Baden's 3-sentence rebuttal report solely addressed Dr. Hartmann's opinion, which had

been withdrawn on December 13, 2017 – a day before Dr. Baden wrote his report. No mention of

Dr. Baden's December 14th rebuttal report was included in Plaintiff's January 12th Supplemental/

Rebuttal Expert Disclosures. [Keck Dec., Exh. F.] Dr. Baden's new rebuttal opinion was later

referenced in a brand-new "Plaintiff's Rebuttal Expert Disclosures" served on February 19, 2018,

which "discloses the cardiology expert rebuttal report, to the County Defendants' cardiology

opinions." [Keck Dec., Exh. J, the "New Disclosure."]

Plaintiff's New Disclosure also disclosed a new expert to the case, Dr. Daniel Wohlgelernter,

and included his written report. [*Id*., and Exh. K.] Dr. Wohlgelernter's report expressly rebuts the

opinions of County Defendants' withdrawn cardiology expert Dr. Joseph Hartmann, County

Defendants' compression asphyxia rebuttal expert Dr. Gary Vilke, and CFMG Defendants'

1  pathology expert Dr. Robert Bux.

2      Defendants believe that Plaintiff's actions in designating Drs. Baden and Wohlgelernter as

3  "rebuttal" experts *34 days after* the deadline to disclose supplemental/rebuttal experts per the

4  Scheduling Order are unjustifiable and prejudicial to the Defendants. Defendants also believe that

5  Plaintiff's actions smack of gamesmanship and intentional manipulation aimed at placing the

6  Defendants at a discovery and trial disadvantage, contrary to the purpose and intent of Rule 26(a).

7                    **II.    LEGAL DISCUSSION**

8      **A.    The Late Disclosure of Plaintiff's Rebuttal Experts Requires Their Exclusion**

9      Designation of expert witnesses and disclosure of their written reports and related

10 information is governed by FRCP Rule 26(a)(2). Rule 26(a)(2)(B) requires the parties to disclose the

11 identity of each retained expert witness, which disclosure must be accompanied by a written report

12 "prepared and signed by the witness." FRCP 26(a)(2)(B). The timing of such disclosures is

13 discussed in Rule 26(a)(2)(D), which in relevant part provides that "[a] party must make these

14 disclosures at the times and in the sequence that the court orders." FRCP Rule 26(a)(2)(D). In the

15 instant case, the Court set the times and sequence of the disclosure of experts and their reports in the

16 Scheduling Order, which is controlling herein.

17     FRCP Rule 37(c) sets forth the consequences for failing to comply with a Court order

18 regarding the timing and sequence of disclosing expert witnesses. Pursuant to Rule 37(c)(1), "[i]f a

19 party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is

20 not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a

21 trial, unless the failure was substantially justified or is harmless." FRCP 37(c)(1).[12] Hence, "Rule

22 37(c)(1) gives teeth" to the expert witness disclosure requirements by automatically excluding any

23 evidence not properly disclosed under Rule 26(a). *Yeti*, 259 F.3d at 1106.

24     Rule 37(c)(1)'s two exceptions provide that witness testimony will not be excluded if the

25 actions of offending party were "substantially justified" or "harmless." FRCP 37(c)(1). The burdens

26 _____

27 [12] The Rule 37(c)(1) also provides courts with additional and/or alternative sanctions they may impose, including but not limited to dismissing the action in whole or in part. FRCP 37(c)(1). District Courts have "particularly wide latitude" to issue sanctions under Rule 37(c)(1). *Yeti by*

28 *Molly Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101, 1105-06 (9th Cir.2001).

1   of proving both substantial justification and lack of harm fall squarely on the party facing sanctions.

2   *Yeti*, 259 F.3d at 1107; *R & R Sails, Inc. v. Ins. Co. of Pennsylvania*, 673 F.3d 1240, 1246 (9th Cir.

3   2012). "Generally '[t]he sanction of exclusion is ... automatic and mandatory unless the party to be

4   sanctioned can show that its violation of Rule 26(a) was either justified or harmless.'" *Continental*

5   *Lab. Prods., Inc. v. Medax Int'l, Inc.*, 195 F.R.D. 675, 676 (S.D. Cal. 2000) (quoting *Finley v.*

6   *Marathon Oil co.*, 75 F.3d 1225, 1230 (7th Cir. 1996)).

7          There is no question but that Plaintiff disclosed both Drs. Baden and Wohlgelernter *34 days*

8   *past* the last date to designate supplemental/rebuttal expert witnesses pursuant to the Scheduling

9   Order, which render them subject to the automatic exclusion provisions of Rule 37(c)(1). The only

10  matters to be considered before issuing such a sanction are whether (1) Plaintiff is substantially

11  justified in delaying those disclosures based on the terms of the Scheduling Order allowing Plaintiff

12  to name a rebuttal expert to County Defendants' replacement cardiologist, and (2) whether

13  Plaintiff's untimely disclosure is "harmless." These issues are discussed below.

14          **B.      Plaintiff's Late Disclosures Were Not Substantially Justified**

15          Plaintiff's designation of his two "rebuttal" experts after expiration of the January 16th due

16  date for disclosing supplemental/rebuttal experts is unjustifiable due primarily to the fact that the

17  County Defendants declined to name a replacement cardiologist for Dr. Hartmann. Specifically,

18  Plaintiff was provided with the right to name a new cardiology rebuttal witnesses *only if* the County

19  Defendants named a cardiologist to replace Dr. Hartmann (who was withdrawn on December 13,

20  2017). County Defendants chose not to name a replacement for Dr. Hartmann, which precluded

21  Plaintiff from naming a rebuttal to that replacement cardiologist *because no such replacement*

22  *cardiologist exists*. Plaintiff recognized this fact in his initial Supplemental/Rebuttal Disclosure,

23  which stated that Plaintiff reserved the right "to provide any expert opinions and Rule 26 reports in

24  rebuttal to the <u>County's cardiology expert(s)</u> by February 19, 2018." [Keck Dec., Exh. F, p. 3

25  (emphasis added).] Simply put, Plaintiff has no right to rebut an expert who was never named.

26          In addition, while Drs. Baden and Wohlgelernter both expressly rebut Dr. Hartmann's expert

27  report, County Defendants withdrew Dr. Hartmann and his report effective December 13, 2017.

28

---

1    Plaintiff does not have the right to rebut an expert report which has been withdrawn. *See* FCRP Rule

2    26(a)(2)(D)(ii) (Expert rebuttal evidence is permissible "solely to contradict or rebut evidence on the

3    same subject matter identified by another party…."). Under such a circumstance, Plaintiff's action in

4    naming not one, but two experts to rebut the withdrawn opinion of Dr. Hartmann (34 days after the

5    date to disclose supplemental/ rebuttal experts had passed) is unjustifiable.

6         Moreover, while County Defendants declined to name a cardiologist as yet another expert in

7    this case, forensic pathologist Dr. Chapman provided cardiology opinions underlying his

8    determination of the decedent's cause of death (though the opinions expressed at his deposition were

9    limited by the scope of the attorneys' interrogation). [Keck Dec., Exh. L.] Dr. Chapman's deposition

10   was taken more than 3 months prior to the due date for disclosing initial expert witnesses, and more

11   than 4 months prior to the due date for disclosing supplemental/rebuttal experts. Plaintiff's delay in

12   disclosing the "rebuttal" reports of Drs. Baden and Wohlgelernter therefore cannot be justified by

13   arguing that the County Defendants had not previously presented cardiology opinions in this case.

14        Further, with respect to Dr. Baden's designation as a "rebuttal" witness, Plaintiff's actions in

15   delaying the disclosure of his new report cannot be justified. Plaintiff had received Dr. Baden's

16   rebuttal report (which solely rebutted Dr. Hartmann's withdrawn opinion) on December 14 or 15,

17   2017, which was well before the January 16, 2018 due date for disclosing supplemental/ rebuttal

18   expert witnesses per the Scheduling Order. [Keck Dec., ¶ 9.] Yet, Plaintiff held on to that report

19   until 3:34pm on February 5, 2018, the day before Dr. Baden's deposition, before emailing it to

20   counsel. [Keck Dec., Exh. I.] The designation of Dr. Baden as a rebuttal expert was made even later,

21   on February 19, 2018. [Keck Dec., Exh. J.] Plaintiff's disclosure of Dr. Baden's rebuttal report

22   increased the scope of his testimony, increased the scope of his February 6th deposition, and the

23   delay in such disclosure (about 18 hours before his deposition) precluded Defendants from properly

24   preparing to question him on that increased scope of his opinion.[13]

25        With respect to Dr. Wohlgelernter's designation as a rebuttal witness, Plaintiff delayed until

26

27   ───────────────
     [13] It is also apparent that Dr. Baden's 3-sentence rebuttal report fails to comply with the
28   requirements of Rule 26(a)(2)(B), as it does not disclose the "basis and reasons" for the opinions
     expressed therein.

───────────────

1    February 19, 2018, to name him and disclose his rebuttal report – which was *34 days past* the date

2    set in the Scheduling Order to disclose supplemental/rebuttal experts. Plaintiff's delay in disclosing

3    Dr. Wohlgelernter's rebuttal report is unjustifiable for the reasons discussed above as well as the

4    following two additional reasons. First, Dr. Wohlgelernter unaccountably rebuts the opinion of Dr.

5    Robert Bux, who is a pathologist rather than a cardiologist, and whose report was released on

6    November 30, 2017; any rebuttal to Dr. Bux's opinions must have been disclosed on or before

7    January 16, 2018, per the Scheduling Order. Second, Dr. Wohlgelernter presents a "sur-rebuttal"

8    report to Dr. Vilke, who is the County's rebuttal expert in response to Plaintiff's two cause-of-death

9    experts (Drs. Baden and Freeman); nothing in Rule 26(a) or the Scheduling Order gives any party

10   the right to designate a sur-rebuttal expert in response to a report submitted by a rebuttal expert.

11          Other factors demonstrating lack of substantial justification for Plaintiff's untimely

12   disclosure of the two rebuttal expert witnesses are included in the discussion below.

13          **C.     Plaintiff's Late Disclosures Are Prejudicial to Defendants**

14          Plaintiff's late disclosures of the "rebuttal" reports of Drs. Baden and Wohlgelernter are

15   prejudicial to all Defendants for three reasons. First, Dr. Wohlgelernter's report discusses a brand

16   new theory not previously disclosed by Plaintiff's other expert witnesses: that compression asphyxia

17   was the only reasonable cause of death based on the decedent's heart rate at some point. [Keck Dec.,

18   Exh. K.] As such, Dr. Wohlgelernter's opinion is not truly a rebuttal opinion at all, but rather a direct

19   opinion that should have been disclosed no later than November 30, 2017, per the Scheduling Order.

20   Accordingly, it is properly excluded based on its tardiness as well as its identification of factors not

21   previously raised by Plaintiff. *See Luke v. Family Care & Urgent Med. Clinics*, 323 F. App'x 496,

22   498–99 (9th Cir. 2009) (Plaintiff's expert declarations were properly excluded as untimely and also

23   due to the fact that they presented a new theory as to a key element of Plaintiffs' medical negligence

24   claim.). Presentation of this new expert opinion is prejudicial to Defendants because they do not

25   have the ability to rebut such opinion, as all of the applicable deadlines have passed. *See*

26   *Truckstop.Net, L.L.C. v. Sprint Commc'ns Co., L.P.*, 537 F. Supp. 2d 1126, 1133 (D. Idaho 2008)

27   (An expert opinion intended to rebut *testimony not presented* is actually a "direct opinion," which

28

1    unfairly precludes the opposing part from obtaining expert rebuttal testimony.)

2          Second, Plaintiff's intentional delay in disclosing these rebuttal witnesses has prevented

3    Defendants from obtaining full discovery about those opinions due to the fact that several key expert

4    witness depositions have already been completed. Indeed, Dr. Wohlgelernter was not disclosed as an

5    expert witness in this case, nor his report produced, until *after* the depositions of Plaintiff's cause-of-

6    death experts Dr. Freeman (deposed January 26, 2018) and Dr. Baden (deposed February 6, 2018).

7    None of the Defendants were able to question these medical experts proffered by the Plaintiff on the

8    new theory of restraint asphyxia presented by Dr. Wohlgelernter. Further, Plaintiff did not disclose

9    him as an expert witness until *after* the depositions of both CFMG and CMGC Defendants' experts

10   Dr. Bux (deposed January 24, 2018) and Dr. Benowitz (deposed January 25, 2018). Such a

11   circumstance prevented the other defendants in this case from questioning these experts about the

12   opinions contained in Dr. Wohlgelernter's report – which is particularly concerning since some of

13   those opinions were intended to directly refute Dr. Bux's initial report. Moreover, Dr. Baden's

14   rebuttal report was not provided (via email) until about 18 hours before his deposition. Such a late

15   disclosure prevented Defendants from fully preparing for his deposition, as there was insufficient

16   time to contact consulting experts to determine appropriate lines of questioning to demonstrate the

17   lack of viability of his opinions.

18         Third, Plaintiff's late disclosure of the rebuttal reports of Drs. Baden and Wohlgelernter

19   comes in the context of a heavy schedule of expert depositions: the parties have already taken 16

20   expert witness depositions in this case, with about 6 more to go.  At least 3 of those depositions will

21   have to be held after the expert witness discovery cut-off date of March 15, 2018, due to the

22   unavailability of the witness, counsel, or both. Plaintiff's new designation of Dr. Wohlgelernter will

23   require at least one more deposition (for a grand total of 23 expert depositions), which may not occur

24   until well after the discovery cut-off date expires. Further, the costs to Defendants to pay for

25   Plaintiff's expert witness fees for the depositions have been staggering: Dr. Baden's deposition fee

26   alone was $8,500! Timing of additional discovery necessitated by Plaintiff's New Disclosure of

27   rebuttal experts, and the incumbent extraordinary expense, demonstrates prejudice to Defendants.

28

1    While it is true that courts sometimes allow late disclosures of expert witnesses if additional

2    discovery will ameliorate prejudice to the opposing party, such a remedy is contraindicated in this

3    case because it would involve: (1) allowing Defendants to name supplemental/rebuttal experts to

4    rebut the opinions in Dr. Wohlgelernter's report; (2) setting the depositions of Dr. Wohlgelernter as

5    well as the supplemental/rebuttal experts well after the expert witness discovery cut-off date has

6    expired; and (3) allowing follow-up depositions of expert witnesses whose depositions have already

7    been completed. All of these circumstances would require the Court to modify *every single*

8    *prospective pretrial date* set in the Scheduling Order (but not the trial date).

9    Defendants urge the Court to decline this option, as it encourages the gamesmanship in

10   which Plaintiff has engaged in this case, creates a seemingly never-ending cycle of expert

11   designations and depositions, further increases the skyrocketing costs to all parties, and requires

12   pushing out all of the pretrial dates by an estimated 2-3 months. Because County Defendants chose

13   not to name a replacement cardiologist for Dr. Hartmann (who has withdrawn from the case),

14   Defendants believe that Plaintiff did not have the right or ability to name a brand new rebuttal

15   expert, let alone rebut the reports of an expert who has withdrawn from the case (Dr. Hartmann), a

16   defense rebuttal compression asphyxia expert (Dr. Vilke), or an expert forensic pathologist who was

17   initially designated on November 30, 2017 (Dr. Bux), and that these actions prejudice Defendants.

18   Allowing even more discovery on the new issues raised in Dr. Wohlgelernter's report will be time

19   consuming and costly, and is thus prejudicial to all parties. *See Plumley v. Mockett*, 836 F. Supp. 2d

20   1053, 1062 (C.D. Cal. 2010) (addressing Rule 26(a)(2)(e)) (Rule 26 "does not give license to

21   sandbag one's opponent with claims and issues" which should have been included in the initial

22   expert disclosures; to rule otherwise would be to create a system where there is "no finality to expert

23   reports …. [quotation marks and citation omitted]").

24                            **III.    CONCLUSION**

25   Defendants request the Court to exclude the rebuttal reports of Dr. Michael Baden and Dr.

26   Daniel Wohlgelernter disclosed by Plaintiff, preclude Dr. Baden from testifying on the subject of his

27   rebuttal report, and preclude Dr. Wohlgelernter from testifying completely, pursuant to FRCP Rules

28

1  26(a)(2)(D)(ii) and 37(c)(1). Should this Court determine that the sanction requirements of Rule

2  37(c)(1) are not met for this relief, then Defendants alternatively request entry of an order: (1)

3  allowing Defendants to name supplemental/rebuttal experts to rebut the opinions in Dr.

4  Wohlgelernter's report; (2) allowing Defendants to depose Dr. Wohlgelernter and conduct follow-up

5  depositions of expert witnesses whose depositions have been completed regarding the substance of

6  Dr. Wohlgelernter's opinions; (3) requiring Plaintiff to pay all costs, expert fees, and attorney's fees

7  associated with the re-deposing of expert witnesses whose depositions have already been completed;

8  and (4) modifying all prospective pre-trial dates contained in the Scheduling Order, though leaving

9  in place the trial date of January 7, 2019, and such other and further relief as this Court deems just

10  and proper.

11                                                 Respectfully Submitted,

12                                                 Keck Law Offices

13  Dated: March 7, 2018                    By:    /s/  *Anne L. Keck*

14                                                   Anne L. Keck
                                                  Attorneys for County Defendants

15

16                                                 Law Offices of Jerome M. Varanini

17  Dated: March 7, 2018                    By*:*    */s/ Jerome M. Varanini*
                                                    Jerome M. Varanini

18                                               Attorneys for CFMG Defendants

19                                               Bertling Law Group, Inc.

20  Dated: March 7, 2018                    By:    */s/ Peter G. Bertling*
                                                  Peter G. Bertling

21                                               Attorneys for CMGC Defendants

22

23

24

25

26

27

28

1

**DECLARATION OF ANNE L. KECK**

2    I, Anne L. Keck, hereby declare as follows:

3        1.       I am an attorney licensed to practice law in the State of California and before this

4 Court. I am a counsel of record for the County Defendants in this action, and present this declaration

5 in support of the foregoing motion. The matters set forth below are true and correct based on my

6 own personal knowledge, unless otherwise indicated, and if called to testify in this action I could and

7 would competently testify thereto.

8        2.       True and correct copies of the following documents are attached as exhibits hereto, as

9 referenced below:

10      **Exhibit A:**      Plaintiff's Expert Disclosures, served on November 30, 2017 (without
11                                accompanying expert reports)

12      **Exhibit B:**      Defendant Jennifer Caudillo, LVN and California Forensic Medical Group,
Inc. Expert Witness Disclosure, served on November 30, 2017 (without
13                                accompanying expert reports)

14      **Exhibit C:**      Defendants Elaine Hustedt, Clair Teske, R.N., and Correctional Medical
Group Companies' Expert Witness Disclosure [FRCP Rule 26(a)(2)], served
15                                on November 30, 2017 (without accompanying expert reports)

16      **Exhibit D:**      County Defendants' Disclosure of Expert Witnesses, FRCP Rule 26(a)(2),
served on November 30, 2017 (without accompanying expert reports)

17      **Exhibit E:**      Order on Joint Stipulation to Modify Case Management Scheduling Order and
18                                Other Dates, entered December 13, 2017, Docket No. 232

19      **Exhibit F:**      Plaintiff's Supplemental/Rebuttal Expert Disclosures, served on January 12,
2018 (without accompanying expert report)

20      **Exhibit G:**      County Defendants' Disclosure of Supplemental/Rebuttal Expert Witnesses,
FRCP Rule 26(a)(2), served on January 16, 2018 (without accompanying
21                                expert reports)

22      **Exhibit H:**      Expert Report of County Defendants' designated rebuttal expert Dr. Gary M.
Vilke, dated January 15, 2018 (without curriculum vitae and other
23                                accompanying information required by FRCP Rule 26(a)(2)(B))

24      **Exhibit I:**      Email from Julia Sherwin to Defendants' counsel dated February 5, 2017,
time-stamped at 3:43 p.m., and the enclosure to that email consisting of a
25                                proffered expert rebuttal report of Dr. Michael M. Baden dated December 14,
26                                2017

27      **Exhibit J:**      Plaintiff's Rebuttal Expert Disclosures served on February 19, 2018 (without
accompanying expert report)

28

1

**Exhibit K:**   Expert Report of Plaintiff's expert Dr. Daniel Wohlgelernter, dated February 18, 2018, which accompanied the disclosure served on February 19, 2018 (without curriculum vitae and other accompanying information required by FRCP Rule 26(a)(2)(B))

2

3

**Exhibit L:**   Excerpts from the deposition of Dr. Jay Chapman taken on August 29, 2017

4        3.        In their initial disclosure of expert witnesses dated November 30, 2017, County

5   Defendants had disclosed Dr. Joseph Hartmann, a nationally-known cardiologist, as a retained

6   expert in this case. Unfortunately, on December 13, 2017, Dr. Hartmann informed me that he was

7   required to withdraw from the case due to medical reasons which were so significant that he would

8   not be able to participate in this case any longer. On that date, I informed all parties of this fact via

9   email. I have further informed the parties that as a result of Dr. Hartmann's withdrawal, County

10  Defendants would not (and indeed, could not) present Dr. Hartmann or his written report in this

11  matter.

12        4.        Because the deadlines in this case became unworkable after the disclosure of experts,

13  the parties negotiated a stipulation for new trial and pretrial dates, which was filed on December 13,

14  2017. (Dkt. No. 231.) The Court approved that stipulation and entered a revised Case Management

15  Scheduling Order the very same day on December 13, 2017 (Dkt. No. 232, the "Scheduling Order").

16  The Scheduling Order moved the trial date from April 30, 2018, to January 7, 2019, and also moved

17  all prospective pre-trial dates. Those pre-trial dates had been subject to heavy and angst-filled

18  negotiations between myself and Plaintiff's counsel Michael Haddad. During those negotiations, Mr.

19  Haddad agreed to provide County Defendants only through January 22, 2018, to name a cardiologist

20  to replace Dr. Hartmann in this case, and required an additional 4 weeks to allow Plaintiff to name a

21  rebuttal expert to that replacement cardiologist, through February 19, 2018. Mr. Haddad and I

22  discussed the fact that Plaintiff's right to designate an expert witness on February 19th would be for

23  the sole purpose of disclosing an expert to rebut the opinions to be presented by any cardiologist

24  County Defendants named to replace Dr. Hartmann.

25        5.        Due to Plaintiff's failure to name a cardiologist as an initial expert in this case as well

26  as other factors (e.g., the sheer volume of experts already named, the intervening holidays and lack

27  of time, etc.), County Defendants declined to name a cardiologist to replace Dr. Hartmann. I

28

1    informed all counsel of this fact via the County Defendants' Disclosure of Supplemental/Rebuttal

2    Expert Witnesses (Exhibit G hereto).  That disclosure expressly stated as follows:

3              Further, pursuant to the scheduling Order entered on December 13, 2017 (Dkt. No. 232),
             the Court permitted County Defendants through January 22, 2018, to designate a
4              replacement medical expert witness for Dr. Joseph Hartmann, a cardiologist, who was
             compelled to withdraw from the case due to medical reasons. However, County
5              Defendants decline to designate an expert to replace Dr. Hartmann as an expert in this
             case. Barring unforeseen events requiring further action, this is the County Defendants'
6              final disclosure of expert witnesses they designate to testify in this case.

7    (*See* Exhibit G, at pp. 1-2.)

8              6.        Because two of Plaintiff's initial expert witnesses supported Plaintiff's theory that the

9    decedent died of restraint asphyxia (contrary to the findings and conclusions of the County

10   Coroner's forensic pathologist Dr. Chapman), County Defendants designated a restraint asphyxia

11   expert, Dr. Gary Vilke, to rebut that theory. Dr. Vilke is a board-certified emergency department

12   physician and is one of the few people in the country who has conducted research related to

13   Plaintiff's theory of restraint asphyxia (*see* Exhibit H). Dr. Vilke is not a cardiologist, and the

14   County Defendants thus did not name him to replace Dr. Hartmann.

15             7.        County Defendants' primary cause-of-death expert in this case is the forensic

16   pathologist who conducted the autopsy of the decedent, Dr. Jay Chapman. Plaintiff's counsel took

17   Dr. Chapman's deposition on August 29, 2017.  Portions of his deposition transcript are attached as

18   Exhibit L.  As demonstrated therein, Dr. Chapman presented cardiology opinions related to his

19   findings.  That being said, Dr. Chapman's cardiology opinions expressed at the deposition were

20   delimited by the leading style and limited scope of the questions asked by counsel; his testimony at

21   trial will not be so limited.

22             8.        After the January 16th due date for disclosing supplemental/rebuttal experts had

23   passed, I received an email from Plaintiff's counsel that was time-stamped 3:43 p.m. on February 5,

24   2018, containing a new rebuttal report by Dr. Baden dated December 14, 2017 (*see* Exhibit I).

25   Plaintiff's counsel sent this email only about 18 hours before Dr. Baden's deposition, which was

26   noticed to start on February 6, 2018, at 10:00 a.m. I engaged in email communications with

27   Plaintiff's counsel, Julia Sherwin, that afternoon, objecting to the disclosure of Dr. Baden's rebuttal

28

1    report after expiration of its due date.  Plaintiff's counsel responded that the disclosure was being

2    provided as a courtesy to enable me to ask Dr. Baden questions about his rebuttal report at his

3    deposition the next day to save costs, as Plaintiff was not required to designate a cardiology expert

4    until February 19th.  Ms. Sherwin, however, is incorrect, as there was no agreement among counsel

5    to allow Plaintiff to delay designating a rebuttal expert until February 19th to rebut any cardiology

6    opinions expressed by any expert in the case. Rather, the agreement I reached with Mr. Haddad was

7    to allow Plaintiff to designate a rebuttal expert to County Defendants' replacement cardiologist,

8    should they choose to name one.

9         9.      At his deposition on February 6, 2017, Dr. Baden testified that he wrote his new

10   rebuttal opinion on the date indicated on the report, December 14, 2017, and that he provided it to

11   Plaintiff's counsel either that day or the following day.

12        10.     Dr. Baden's new rebuttal opinion was later referenced in a brand-new "Plaintiff's

13   Rebuttal Expert Disclosures" served on February 19, 2018, which "discloses the cardiology expert

14   rebuttal report, to the County Defendants' cardiology opinions [see Exhibit J]." Plaintiff's New

15   Disclosure also disclosed a new expert to the case, Dr. Daniel Wohlgelernter, and included his

16   written report (see Exhibit K).  Dr. Wohlgelernter, a cardiologist, writes in his report that he

17   disagrees with the opinions of County Defendants' withdrawn cardiology expert Dr. Joseph

18   Hartmann, County Defendants' restraint asphyxia rebuttal expert Dr. Gary Vilke, and CFMG

19   Defendants' pathology expert Dr. Robert Bux.  Further, Dr. Wohlgelernter's report discusses a brand

20   new theory not previously disclosed by Plaintiff's other expert witnesses: that compression asphyxia

21   was the only reasonable cause of death based on the decedent's heart rate at some point. None of the

22   Defendants' current experts opine that the decedent's cause of death can be determined solely by

23   reference to the decedent's recorded heart rate (taken during CPR). Accordingly, Dr.

24   Wohlgelernter's report is not a rebuttal report at all, but a direct report opining on a new basis to

25   support Plaintiff's asphyxiation theory.

26        11.     The parties have been engaged in a very heavy schedule of witness depositions:

27   approximately 21 expert depositions have been taken or are scheduled to occur from January 19

28

1  through March 30, 2018. The costs to the parties associated with such depositions are astounding,

2  and the deposition fees charged by Plaintiff's expert witnesses are the largest I have ever

3  encountered.  For example, County Defendants were required to pay $4,000 for a ½ day deposition

4  of Dr. Freeman, and $8,500 for a deposition of Dr. Baden that lasted an estimated 5.5 hours!

5         12.     Should the Court decline to exclude the rebuttal reports of Drs. Baden and

6  Wohlgelernter and their related testimony, Defendants request the Court allow them to depose both

7  of these experts on the subjects of their rebuttal reports after the March 15th expert discovery cut-off

8  date (Plaintiff's counsel have already agreed to permit Dr. Wohlgelernter to be deposed after the

9  Court resolves this motion). Further, County Defendants request at least one additional month in

10  which to locate a replacement cardiologist and disclose his or her written report (though this is a

11  tight timeline, I believe it is workable).

12         I declare under penalty of perjury under the laws of the United States that the foregoing is

13  true and correct.

14         Executed this 7th day of March, 2018, in Santa Rosa, California.

15

16                                            ___/s/ Anne L. Keck_____
                                              Anne L. Keck

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

1   MICHAEL J. HADDAD (State Bar No. 189114)
    JULIA SHERWIN (State Bar No. 189268)
2   MAYA SORENSEN (State Bar No. 250722)
    TERESA ALLEN (State Bar No. 264865)
3   HADDAD & SHERWIN LLP
    505 Seventeenth Street
4   Oakland, California  94612
    Telephone: (510) 452-5500
5   Facsimile:  (510) 452-5510
6
7   Attorneys for Plaintiff James Neuroth
8
9                    **UNITED STATES DISTRICT COURT**
10                   **NORTHERN DISTRICT OF CALIFORNIA**
11
    JAMES NEUROTH, Individually and as        )
12  Successor in Interest of Decedent STEVEN  )    No: 3:15-cv-03226-RS
    KELLOGG NEUROTH,                          )
13                                            )
                        Plaintiff,            )    **PLAINTIFF'S EXPERT**
14           vs.                              )    **DISCLOSURES**
15                                            )
    MENDOCINO COUNTY, a public entity;        )
16  MENDOCINO COUNTY SHERIFF-                 )
    CORONER THOMAS D. ALLMAN, in his          )
17  individual and official capacities;       )
    CORRECTIONS CAPTAIN TIM PEARCE;           )
18  SERGEANT LORI KNAPP; DEPUTY               )
    FRANK MASTERSON; DEPUTY CRAIG             )
19  BERNARDI; DEPUTY MICHAEL GRANT;           )
20  DEPUTY JEANETTE HOLUM; DEPUTY             )
    ROBERT PAGE; DEPUTY CHRISTINE DE          )
21  LOS SANTOS; CITY OF WILLITS, a public     )
    entity; WILLITS POLICE CHIEF GERARDO      )
22  GONZALEZ; WILLITS POLICE OFFICER          )
    JEFF ANDRADE; WILLITS POLICE              )
23  OFFICER KEVIN LEEF; CALIFORNIA            )
    FORENSIC MEDICAL GROUP,                   )
24  INCORPORATED, a California corporation;   )
    CORRECTIONAL MEDICAL GROUP                )
25  COMPANIES, INCORPORATED, a Delaware       )
    Corporation; TAYLOR FITHIAN, M.D.;        )
26  BARBARA COTTON, R.N.; ELAINE              )
27  HUSTEDT; YVONNE MAXFIELD, R.N.;           )
28

CLAIRE TESKE, R.N.; JENNIFER L.                     )
CAUDILLO, L.V.N., and COUNTY                        )
DEPUTIES DOES 9–20, and DOES 23–35,                 )
individually, jointly, and severally,               )
                                                    )
                    Defendants.                     )
                                                    )

1

2    1.      Pursuant to Fed. Rule Civ. Proc. 26, Plaintiff, by and through his attorneys, HADDAD &

3   SHERWIN LLP, hereby discloses the following retained experts, with reports and other

4   documents required by Rule 26, attached or served by electronic means pursuant to agreement of

5

6   certain counsel:

7   Michael M. Baden, M.D. – Forensic Pathology
    15 West 53rd Street
8   New York, NY 10019
    (212) 397-2732
9

10  Grant Fredericks – Forensic Video Analysis
    Forensic Video Solutions
11  105 West Rolland Avenue
    Spokane, WA 99218
12  (509) 467-3559

13  Michael D. Freeman, Med.Dr., Ph.D., M.P.H., F.A.A.F.S. – Forensic Medicine & Epidemiology
    4500 Kruse Way, Kruse Plaza I, Suite 385
14  Lake Oswego, OR 97035
    (971) 255-1008
15

16  Richard Hayward, Ph.D. – Clinical, Correctional, and Forensic Psychology
    1296 Woodside Road
17  Redwood City, CA 94061
    (650) 556-1942
18

19  Larissa J. Mooney, M.D. – Addiction Medicine and Psychiatry
    Director, UCLA Addiction Medicine Clinic
20  UCLA Integrated Substance Abuse Programs
    Associate Clinical Professor
21  Department of Psychiatry and Biobehavioral Sciences
    David Geffen School of Medicine at UCLA
22  11075 Santa Monica Blvd., Suite 200
    Los Angeles, CA 90025
23  (310) 267-5419

24

25

26

27

28  No. 1:15-cv-03226-RS:  PLAINTIFF'S EXPERT DISCLOSURES        3

1   Denise M. Panosky, D.N.P., R.N., C.N.E., C.C.H.P., F.C.N.S. – Clinical and Forensic Nursing and
        Correctional Nursing
2   Associate Research Professor
    University of Connecticut School of Nursing
3   Storrs Hall, Room 101C
    231 Glenbrook Rd. U-4026
4   Storrs, CT 06269
    (860) 608-2585
5

6   John Ryan – Law Enforcement Practices, Procedures & Administration
    700 North Carr Road #595
7   Plainfield, IN 46168
    (317) 386-8325
8

9   Todd Randall Wilcox, M.D., M.B.A., F.A.C.C.P. – Medicine and Correctional Medicine
    4760 S. Highland Drive, # 105
10  Salt Lake City, UT 84117
    (385) 743-1744
11

12  Plaintiff also reserves the right to provide any expert opinions and a Rule 26 report by December
    29, 2017, pursuant to Court Order, from the following expert:
13

14  Erich J. Speckin – Forensic Document Analysis and Forensic Chemistry
    110 East Broward Boulevard, Suite 1700
15  Fort Lauderdale, FL 33301
    (954) 763-6134
16

17  2.      Plaintiff further reserves the right to elicit expert testimony from all Defendants, all

18  witnesses in their area(s) of expertise, all witnesses previously disclosed by any party, and all

19  experts disclosed by Defendants.  Plaintiff reserves the right to name rebuttal experts.
20

21  Dated:  November 30, 2017                    HADDAD & SHERWIN LLP
22

23

24                                              Julia Sherwin
                                                Attorneys for Plaintiff
25

26

27

28  No. 1:15-cv-03226-RS:  PLAINTIFF'S EXPERT DISCLOSURES                                        4

1
2

***PROOF OF SERVICE***
(Fed. R. Civ. P. 5 and 28 U.S.C. § 1746)

3

Re:         *Neuroth v. Mendocino County, et al.*, (No. 1:15-cv-03226-RS)

4
5

        I declare that:  I am employed in the County of Alameda, State of California.  I am over the

6

age of eighteen years and not a party to the within entitled cause; my business address is 505

7

Seventeenth Street, Oakland, California 94612.

8

        On November 30, 2017, I served the attached PLAINTIFF'S EXPERT DISCLOSURES on

9

the parties in said cause, by email pursuant to agreement of counsel where indicated, or otherwise by

10

placing a true copy thereof in a sealed envelope with postage thereon fully prepaid, VIA U.S. MAIL,

11

in Oakland, California, addressed as follows:

12
13

VIA EMAIL:  akeck@public-law.org
Anne L. Keck
Keck Law Offices

14

418 B. Street, Suite 206

15

Santa Rosa, CA 95401
*Counsel for Mendocino County Defendants*

16
17

VIA EMAIL
John W. Patton  jpatton@pattonryan.com

18

Stephen R. Niemeyer  sniemeyer@pattonryan.com
Kathleen M. Kunkle  kkunkle@pattonryan.com

19

Kathryn R. Vaughan  kvaughan@pattonryan.com
Patton & Ryan LLC

20

330 N. Wabash, Suite 3800
Chicago, IL 60611

21

*Counsel for Mendocino County Defendants*

22

Jerome M. Varanini

23

The Law Offices of Jerome M. Varanini
641 Fulton Avenue, Suite 200

24

P.O. Box 590

25

Sacramento, CA 95812
*Counsel for Defendants California Forensic Medical Group, Inc., and Jennifer Caudillo, L.V.N.*

26
27
28

No. 1:15-cv-03226-RS:  PLAINTIFF'S EXPERT DISCLOSURES                                    5

1   VIA EMAIL:  lewis@perrylaw.net
    Scott Lewis
2   Perry, Johnson, Anderson, Miller, & Moskowitz, LLP
    438 1st Street
3   Santa Rosa, CA 95401
4   *Counsel for Defendants City of Willits, Kevin Leef, Jeff Andrade, and Gerardo Gonzalez*

5   VIA EMAIL: pgb@bertling-clausen.com
    Peter Bertling
6   Bertling & Clausen LLP
    15 West Carrillo Street, Suite 100
7   Santa Barbara, CA 93101
8   *Counsel for Defendants Correctional Medical Group Companies, Inc., Taylor Fithian, M.D., Elaine Hustedt, Claire Teske, R.N.*

9

10

11        I declare under penalty of perjury that the foregoing is true and correct and that on the date

12   stated above, this declaration was executed at Oakland, California.

13

14

15                                                   _____
                                                     JULIA SHERWIN
16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT B

1 | JEROME M. VARANINI, ESQ. (State Bar No. 58531)
THE LAW OFFICES OF JEROME M. VARANINI
2 | 641 FULTON AVENUE, SUITE 200
SACRAMENTO, CALIFORNIA 95825
3 | P.O. BOX 590
SACRAMENTO, CA 95812-0590
4 | TELEPHONE: (916) 993-4868
FACSIMILE: (916) 993-6750
5

6 | Attorney for Defendants
California Forensic Medical Group, Inc.,
7 | and Jennifer L. Caudillo, L.V.N.

8

9

10 |                   UNITED STATES DISTRICT COURT

11 |                 NORTHERN DISTRICT OF CALIFORNIA

12

13 | JAMES NEUROTH and JOAN C.            CASE NO. 3-15-cv-03226-RS-RMI
NYGREN, individually and as Co-
14 | Successors in Interest of            DEFENDNAT JENNIFER CAUDILLO, LVN
Decedent STEVEN KELLOGG NEUROTH       AND CALIFORNIA FORENSIC MEDICAL
15 |                                      GROUP, INC. EXPERT WITNESS
         Plaintiff,                    DISCLOSURE
16
vs.                                      FRCP 26(A) (2)
17
MENDOCINO COUNTY, a public               Filed: 7/10/15
18 | entity, et al                        Honorable RICHARD SEEBORG
         Defendants.                   United States District Judge
19 | _____/
                                         Pretrial: 3/29/18
20 |                                      Trial: 4/30/18

21 | TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

22 |     COME NOW defendants Jennifer Caudillo, L.V.N., and California

23 | Forensic Medical Group, Inc., and submit herewith their disclosure of

24 | expert witnesses pursuant to FRCP 26 (a) (2)

25 |                        RETAINED EXPERTS

26 |     1. Robert C. Bux, M.D., 1060 Skylight View, Colorado Springs,

27 | Colorado 80906 (719) 661-9891.

28

Defendants' Expert Witness Disclosure
                                1

1    ( A ). Attached as Exhibit "A" is the expert witness report prepared
2    by Dr. Bux, as well as the c.v. and record of testimony.

3    ( B ). Dr. Bux is a medical doctor board certified in Forensic
4    Pathology, Clinical Pathology and Anatomical Pathology and is currently
5    the Coroner/Medical Examiner for the El Paso County Colorado Coroner's
6    Office. Additional details are contained in Dr. Bux's curriculum vitae.

7    ( C ). Dr. Bux's fee for review of records and consultation is $300
8    per hour. Dr. Bux's fee for deposition testimony is $400 per hour and any
9    additional portion of an hour.

10   ( D ). Dr. Bux's opinions and the facts upon which tose opinions are
11   based are set forth in his report.

12   2. Terry Fillman, R.N., MBA, CCHP, 9500 Etiwanda Avenue, Rancho
13   Cucamonga, 91739. (909)463-5007.

14   ( A ). Attached as Exhibit "B" is the expert witness report prepared
15   by Mr. Fillman, as well as his c.v. and record of testimony in deposition
16   or trial.

17   ( B ). Mr. Fillman is the Health Services Administrator for the San
18   Bernardino Sheriff's Department as well as a Certified Correctional
19   Health Professional (CCHP) and a member and educator for the American
20   Correctional Health Services Association (ACHSA), among other
21   professional affiliations set forth in his curriculum vitae.

22   ( C ). Mr. Fillman's fee for review of records is $250 per hour and
23   $250 per hour for deposition testimony with a 4 hour mininmum.

24   ( D ). Mr. Fillman's opinions with respect to the nursing practices
25   and procedures in this matter as well as the facts upon which those
26   opinions are based are set forth in his attached report.

27   /////

28

Defendants' Expert Witness Disclosure
2

1

2

## NON-RETAINED EXPERTS

3
4

The following non-retained experts are anticipated to give testimony at the trial of this case:

5

1. Kim Pearson, R.N.;

6

2. A. Jay Chapman, M.D.;

7

3. Barbara Cotton, R.N.,;

8

4. Kathryn J. Wild, R.N., M.P.A., C.C.H.P.

9
10

Defendants also reserve the right to call at trial any expert witnesses disclosed by any other party in this matter.

11

Dated: 11/30/17

12

LAW OFFICE OF JEROME M. VARANINI

13

/s/ Jerome M. Varanini

14

For Defendants Jennifer L. Caudillo, LVN, and CFMG

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants' Expert Witness Disclosure

3

<u>**PROOF OF SERVICE**</u>

I am a citizen of the United States and a resident of the County of Sacramento; I am over the age of eighteen years and not a party to the within above-entitled action; my business mailing address is P.O. Box 590, Sacramento, California 95812-0590.   I am familiar with The Law Offices of Jerome M. Varanini's practice whereby the mail is sealed, given the appropriate postage and placed in a designated mail collection.   Each day's mail is collected and deposited in a United States mailbox after the close of each day's business.

On November 30, 2017, I served on the parties in said action:
**DEFENDANT CAUDILLO AND CFMG EXPERT WITNESS DISCLOSURE**

[XX]  **Via the United States Postal Service** by causing a true copy and/or original thereof to be placed in a sealed envelope with postage thereon fully prepaid in the designated area for outgoing mail.

[ ]   **By Personal delivery** on the parties in this action by causing a true copy and/or original thereof to be delivered by hand to the addressees on January 12, 2012 by Mr. Varanini.

[ ]   **Via Facsimile** by causing such document to be served via facsimile on the parties in this action via facsimile numbers as stated on this proof of service.

[ ]   **Via UPS** by causing the original thereof to be personally delivered via the following courier service: Untied Parcel Service

[ ]   **Electronic Delivery** by causing a true copy thereof to be delivered via electronic mail and/or ECF to the following parties at the designated electronic mail addresses.

Peter G. Bertling, Esq
Bertling & Clausen, L.L.P.
15 West Carillo Street, #100
Santa Barbara, CA 93101

Julia Sherwin, Esq
HADDAD & SHERWIN
505 SEVENTEENTH STREET
OAKLAND, CA 94612

Scott A. Lewis, Esq
Perry, Johnson et al
438 First Street, Fourth Floor
Santa Rosa CA 95401

Anne L. Keck, Esq.
Keck Law Offices
418 B Street, #206
Santa Rosa, CA 95401

Kathleen Kunkle, Esq.
Patton & Ryan LLC
330 North Wabash Ave. #3800
Chicago, IL 60611

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.   Executed on November 30, 2017, at Sacramento, California.

_____/S/_____
Jerome Varanini

# EXHIBIT C

1  Peter G. Bertling #131602
   BERTLING & CLAUSEN L.L.P.
2  15 West Carrillo Street, Suite 100
   Santa Barbara, California 93101
3  Telephone: (805) 892-2100
   Facsimile: (805) 963-6044
4
   Attorney for Defendants
5  ELAINE HUSTEDT; CLAIRE TESKE, R.N.
   and CORRECTIONAL MEDICAL
6  GROUP COMPANIES, INC.

7

8              UNITED STATES DISTRICT COURT

9        FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11 JAMES NEUROTH, Individually and as          ) Case No. 3:15-cv-3226-RS-RMI
                                                )
12 Successor in Interest of Decedent STEVEN     )
                                                )
13 KELLOGG NEUROTH ,                            )
                                                )
               Plaintiff                        )  **DEFENDANTS ELAINE HUSTEDT,**
14                                              )  **CLAIRE TESKE, R.N., AND**
                                                )  **CORRECTIONAL MEDICAL**
15 v.                                           )  **GROUP COMPANIES' EXPERT**
                                                )  **WITNESS DISCLOSURE [FRCP**
16                                              )  **RULE 26(a)(2)]**
   MENDOCINO COUNTY, a public entity;           )
17 MENDOCINO COUNTY SHERIFF-                     )
                                                )
18 CORONER THOMAS D. ALLMAN,                     )
   individually; CORRECTIONS CAPTAIN            )
19 TIM PEARCE; SERGEANT LORI KNAPP;             )
                                                )
20 DEPUTY FRANK MASTERSON; DEPUTY               )
                                                )
21 CRAIG BERNARDI; DEPUTY MICHAEL               )
   GRANT; DEPUTYJEANETTE HOLUM;                 )
22 DEPUTY ROBERT PAGE; DEPUTY                   )
                                                )
23 CHRISTINE DE LOS SANTOS; CITY OF             )
                                                )
24 WILLITS, a public entity; WILLITS POLICE     )
   CHIEF GERARDO GONZALEZ; WILLITS              ) Action Filed: July 10, 2015
25 POLICE OFFICER KEVIN LEEF; WILLITS           ) Judge: Hon. Richard Seeborg
                                                ) Ctrm: 3 - 17th Floor
26 POLICE OFFICER JEFF ANDRADE;                 )
                                                ) Pretrial Conf.: March 29, 2018
27 _____      ) Trial: April 30, 2018

28

                              1                    3:15-cv-3226-RS-RMI
   _____

         DEFENDANTS ELAINE HUSTEDT, CLAIRE TESKE, R.N., AND
   CORRECTIONAL MEDICAL GROUP COMPANIES' EXPERT WITNESS
                    DISCLOSURE [FRCP RULE 26(a)(2)]

| | |
|---|---|
| 1 | CORRECTIONAL MEDICAL GROUP ) |
| 2 | COMPANIES, INC., a Delaware ) |
| | Corporation; CALIFORNIA FORENSIC ) |
| 3 | MEDICAL GROUP, INCORPORATED, a ) |
| 4 | California corporation; LOUIS E. "KIP" ) |
| | HALLMAN III; RAYMOND HERR, M.D.; ) |
| 5 | TAYLOR FITHIAN, M.D.; BARBARA ) |
| 6 | COTTON, R.N.; ELAINE HUSTEDT; ) |
| 7 | JAMES ROEMMICH, R.N.; CLAIRE ) |
| | TESKE, R.N.; JENNIFER L. CAUDILLO, ) |
| 8 | L.V.N.; and COUNTY DEPUTIES DOES ) |
| 9 | 9-20, and DOES 23-35, individually, jointly, ) |
| 10 | and severally ) |
| 11 | Defendants. ) |
| 12 | ) |
| 13 | |

TO THE PARTIES HEREIN AND TO THEIR ATTORNEYS OF RECORD:

Pursuant to Federal Rules of Civil Procedure, Rule 26(a)(2), defendants ELAINE HUSTEDT, CLAIRE TESKE, R.N., AND CORRECTIONAL MEDICAL GROUP COMPANIES, INC., hereby disclose the identity of expert witnesses said defendants intend to call at the time of Trial of the above-entitled litigation.

I.      Kimberly Pearson, R.N., 23036 Cassano Drive, Laguna Niguel, CA 92677; (951) 205-3077.

(A)     Attached hereto as Exhibit "A" is Ms. Pearson's Expert Report prepared pursuant to Federal Rule of Civil Procedure Rule 26(a)(2)(A), and her *curriculum vitae*.

(B)     Ms. Pearson is a Registered Nurse and the Deputy Agency Director for CHS Orange County Health Care Agency. She is also the former Director of Nursing for the Orange County Jail. Please refer to Ms. Pearson's *curriculum vitae* for further details of her qualifications.

///

**DEFENDANTS ELAINE HUSTEDT, CLAIRE TESKE, R.N., AND
CORRECTIONAL MEDICAL GROUP COMPANIES' EXPERT WITNESS
DISCLOSURE [FRCP RULE 26(a)(2)]**

1   (C)   Ms. Pearson's fee for review of records is $300.00 per hour. Her fee for

2   deposition is $300.00 per hour (three hour minimum).

3   (D)   For Ms. Pearson's opinions, the facts and data considered in formation of

4   her opinions and any exhibits to be used in support of her opinions, please see Ms.

5   Pearson's Expert Report, attached hereto as Exhibit "A."

6   2.   Neal Benowitz, M.D., 1001 Potrero Ave., Bldg 30, Rm 3316, San

7   Francisco, CA 94110; (415) 206-8324.

8   (A)   Attached hereto as Exhibit "B" is Dr. Benowitz's Expert Report pursuant

9   to Federal Rule of Civil Procedure Rule 26(a)(2)(A), and his *curriculum vitae.*

10   (B)   Dr. Benowitz is a Professor of Medicine and Bioengineering and

11   Therapeutic Sciences and Chief of the division of Clinical Pharmacology at UCSF. Dr.

12   Benowitz's clinical practice at San Francisco General Hospital focuses on

13   cardiovascular medicine, medical toxicology and clinical pharmacology. In addition,

14   Dr. Benowitz is a consultant to the California Poison Control Center. Please refer to Dr.

15   Benowitz's *curriculum vitae* for further details of his qualifications.

16   (C)   Dr. Benowitz's consulting fee is $650 per hour.

17   (D)   For Dr. Benowitz's opinions, the facts and data considered in formation of

18   his opinions and any exhibits to be used in support of his opinions, please see Dr.

19   Benowitz's Expert Report, attached hereto as Exhibit "B."

20   Additionally, defendants ELAINE HUSTEDT, CLAIRE TESKE, R.N., AND

21   CORRECTIONAL MEDICAL GROUP COMPANIES, INC., hereby advises they

22   intend to call the following non-retained witnesses at the time of Trial:

23   1.   Barbara L. Cotton, R.N., 939 Wigeon Way, Arroyo Grande, CA 93420.

24   2.   Kathryn J. Wild, R.N., M.P.A., C.C.H.P., 10580 N. McCarran Boulevard,

25   #115, Suite 504, Reno, NV 89503.

26   3.   Rebecca Craig, R.N., B.A., M.P.A., Address unknown.

27   4.   Timothy Frederichs, M.D., Address unknown.

28   5.   Jean Granquist, R.N., Address unknown.

**DEFENDANTS ELAINE HUSTEDT, CLAIRE TESKE, R.N., AND
CORRECTIONAL MEDICAL GROUP COMPANIES' EXPERT WITNESS
DISCLOSURE [FRCP RULE 26(a)(2)]**

6.      A. Jay Chapman, M.D., 4149 Chanate Road, Santa Rosa, CA 95404.

7.      Ann E. Shuman, M.S., R.N., Nursing Education Consultant, Board of Vocational Nursing and Psychiatric Technicians, 2535 Capitol Oaks Drive, Suite 205 Sacramento, CA  95833

8.      Any and all treating physicians of decedent, including post-mortem care providers of STEVEN KELLOGG NEUROTH, as disclosed by plaintiff, and equally known to plaintiff, through the course of discovery in this case.

9.      Any and all treating healthcare providers of decedent STEVEN KELLOGG NEUROTH from the Mendocino County Jail as identified and disclosed through the course of discovery in this case by all parties.

Finally, defendants ELAINE HUSTEDT, CLAIRE TESKE, R.N., AND CORRECTIONAL MEDICAL GROUP COMPANIES, INC., hereby reserve their right to call any expert witnesses named by any other party to this action at the time of Trial.

DATED: November 30, 2017                BERTLING & CLAUSEN, L.L.P.


                                        By:    /s/  Peter G. Bertling
                                               Peter G. Bertling
                                               Attorney for Defendants
                                               ELAINE HUSTEDT;
                                               CLAIRE TESKE, R.N. and
                                               CORRECTIONAL MEDICAL
                                               GROUP COMPANIES, INC.

**DEFENDANTS ELAINE HUSTEDT, CLAIRE TESKE, R.N., AND CORRECTIONAL MEDICAL GROUP COMPANIES' EXPERT WITNESS DISCLOSURE [FRCP RULE 26(a)(2)]**

Peter G. Bertling #131602
BERTLING & CLAUSEN L.L.P.
15 West Carrillo Street, Suite 100
Santa Barbara, California 93101
Telephone:  (805) 892-2100
Facsimile:   (805) 963-6044

Attorney for Defendants
ELAINE HUSTEDT; CLAIRE TESKE, R.N.;
CORRECTIONAL MEDICAL GROUP
COMPANIES, INC. AND TAYLOR FITHIAN, M.D.

## UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES NEUROTH, Individually and as Successor in Interest of Decedent STEVEN KELLOGG NEUROTH , <br><br>       Plaintiff <br><br> v. <br><br> MENDOCINO COUNTY, a public entity; MENDOCINO COUNTY SHERIFF-CORONER THOMAS D. ALLMAN, individually; CORRECTIONS CAPTAIN TIM PEARCE; SERGEANT LORI KNAPP; DEPUTY FRANK MASTERSON; DEPUTY CRAIG BERNARDI; DEPUTY MICHAEL GRANT; DEPUTYJEANETTE HOLUM; DEPUTY ROBERT PAGE; DEPUTY CHRISTINE DE LOS SANTOS; CITY OF WILLITS, a public entity; WILLITS POLICE CHIEF GERARDO GONZALEZ; WILLITS POLICE OFFICER KEVIN LEEF; WILLITS POLICE OFFICER JEFF ANDRADE; | Case No. 3:15-cv-3226-RS-RMI <br><br> **CERTIFICATE OF SERVICE** <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> Action Filed: July 10, 2015 <br> Judge: Hon. Richard Seeborg <br> Ctrm: 3 - 17th Floor <br><br> Pretrial Conf.: March 29, 2018 <br> Trial: April 30, 2018 |

**CERTIFICATE OF SERVICE**

CORRECTIONAL MEDICAL GROUP
COMPANIES, INC., a Delaware
Corporation; CALIFORNIA FORENSIC
MEDICAL GROUP, INCORPORATED, a
California corporation; LOUIS E. "KIP"
HALLMAN III; RAYMOND HERR, M.D.;
TAYLOR FITHIAN, M.D.; BARBARA
COTTON, R.N.; ELAINE HUSTEDT;
JAMES ROEMMICH, R.N.; CLAIRE
TESKE, R.N.; JENNIFER L. CAUDILLO,
L.V.N.; and COUNTY DEPUTIES DOES
9-20, and DOES 23-35, individually, jointly,
and severally

                    Defendants.

I am employed in the County of Santa Barbara, State of California.  I am over the age of 18 years and not a party to the within action.  My business address is 15 West Carrillo Street, Suite 100, Santa Barbara, California 93101.  My e-mail address is cgs@bertling-clausen.com.

On **November 30, 2017,** I served a true copy of the following document:

**DEFENDANTS ELAINE HUSTEDT, CLAIRE TESKE, R.N., TAYLOR FITHIAN, M.D., AND CORRECTIONAL MEDICAL GROUP COMPANIES' EXPERT WITNESS DISCLOSURE [FRCP RULE 26(a)(2)]**

☐ BY MAIL ☒ As follows:  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with U.S. Postal Service on that same day with postage thereon fully prepaid at Santa Barbara, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

CERTIFICATE OF SERVICE

1  ☒ BY E-MAIL

2      Based on a Court order or an agreement of the parties to accept service by

3      email or electronic transmission, I caused the document(s) to be sent from

4      email address cgs@bertling-clausen.com to the persons at the email addresses

5      listed in the Service List. I did not receive, within a reasonable time after the

6      transmission, any electronic message or other indication that the transmission

7      was unsuccessful.

8  ☒ FEDERAL

9      I declare under penalty of perjury under the laws of the United States of

10      America that the above is true and correct and that I am employed in the

11      office of a member of the bar of this Court at whose direction the service was

12      made.

13      Executed on **November 30, 2017,** at Santa Barbara, California.

14

15

16      Cyndi Sierra

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

# SERVICE LIST

*Neuroth v. Mendocino County, et al.*
U.S.D.C. - Northern District of California
Case No. 3:15-cv-3226-RS-RMI

**Attorneys for Plaintiff**:
Michael J. Haddad, Esq.
Julia Sherwin, Esq.
Teresa Allen, Esq.
Maya Sorensen, Esq.
HADDAD & SHERWIN LLP
505 Seventeenth Street
Oakland, CA 94612
510-452-5500 - Telephone
510-452-5510 - Facsimile
michael.julia@haddadsherwin.com
teresa@haddadsherwin.com
maya@haddadsherwin.com

**Counsel for Defendants MENDOCINO COUNTY; SHERIFF THOMAS D. ALLMAN; CORRECTIONS CAPTAIN TIM PEARCE; SERGEANT LORI KNAPP; FRANK MASTERSON; DEPUTY CRAIG BERNARDI; DEPUTY MICHAEL GRANT; DEPUTY JEANETTE HOLUM; DEPUTY ROBERT PAGE; DEPUTY CHRISTINE DE LOS SANTOS**:
Anne L. Keck, Esq.
KECK LAW OFFICES
418 B Street Suite 206
Santa Rosa, CA 95401
707-595-4185 - Telephone
707-657-7715 - Facsimile
Akeck@public-law.org

Stephen R. Niemeyer
PATTON & RYAN, LLC
330 N. Wabash Ave, Suite 3800
Chicago IL 60611
312-261-5160 - Telephone
312-261-5161 - Facsimile
sniemeyer@pattonryan.com

**Counsel for Defendants CITY OF WILLITS; WILLITS POLICE OFFICER KEVIN LEEF; CORRECTIONAL MEDICAL GROUP COMPANIES, INC.; WILLITS POLICE OFFICER JEFF ANDRADE**:
David Fernando Beach, Esq.
Scott A. Lewis, Esq.
Amy S. Winters, Esq.
PERRY JOHNSON ANDERSON MILLER & MOSKOWITZ, LLP
438 First Street 4th Floor
Santa Rosa, CA 95401
707-525-8800 - Telephone
707-545-9242 - Facsimile
beach@perrylaw.net
lewis@perrylaw.net
winters@perrylaw.net

**Counsel for Defendants CALIFORNIA FORENSIC MEDICAL GROUP, INC.; TAYLOR FITHIAN, M.D.; JENNIFER L. CAUDILLO, L.V.N.**:
Jerome M. Varanini, Esq.
LAW OFFICE OF JEROME M. VARANINI
641 Fulton Avenue, Suite 200
Sacramento, Ca 95825
P.O. Box 590
Sacramento, CA 95812-0590
916-993-4868 - Telephone
916-442-5750 - Facsimile
jvaranini@tsvlaw.com

4                    3:15-cv-3226-RS-RMI

**CERTIFICATE OF SERVICE**

# EXHIBIT D

1  Anne L. Keck, SBN 136315
   KECK LAW OFFICES
2  418 B Street, Suite 206
   Santa Rosa, California 95401
3  Telephone: (707) 595-4185
   Facsimile: (707) 657-7715
4  Email: akeck@public-law.org

5  Attorneys for Defendants the
   County of Mendocino and
6  Mendocino County Sheriff-
   Coroner Thomas Allman,
7  Capt. Timothy Pearce, Lorrie Knapp,
   Frank Masterson, Craig Bernardi,
8  Michael Grant, Jeanette Holum,
   Robert Page, & Christine De Los Santos

9

   John W. Patton, Jr., *Pro Hac Vice*
   Stephen R. Niemeyer, SBN 203162
   Kathleen M. Kunkle, SBN 222800
   Kathryn R. Vaughan, *Pro Hac Vice*
   PATTON & RYAN LLC
   330 North Wabash Ave., Suite 3800
   Chicago, Illinois 60611
   Telephone: (312) 261-5160
   Facsimile: (312) 261-5161
   Emails: jpatton@pattonryan.com
           sniemeyer@pattonryan.com
           kkunkle@pattonryan.com
           kvaughan@pattonryan.com

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12  JAMES NEUROTH,                      Case No. 3:15-CV-03226-RS (NJV)

13        Plaintiff,                    **COUNTY DEFENDANTS' DISCLOSURE OF**
                                        **EXPERT WITNESSES, FRCP RULE 26(a)(2)**
14  v.

15  MENDOCINO COUNTY, *et al.*,

16        Defendants.

17

18        Pursuant to the Federal Rules of Civil Procedure ("FRCP") Rule 26(a)(2), Defendants the

19  County of Mendocino, Mendocino County Sheriff-Coroner Thomas Allman, Sheriff's Captain

20  Timothy Pearce, and current/former Sheriff's Correctional Deputies Lorrie Knapp, Frank Masterson,

21  Craig Bernardi, Michael Grant, Jeanette Holum, Robert Page, and Christine De Los Santos

22  (collectively, "County Defendants"), hereby disclose the identities of witnesses they may use at trial

23  to present evidence under Federal Rules of Evidence 702, 703, and/or 705. Further, County

24  Defendants provide relevant information with respect to the testimonies of those witnesses who have

25  been retained (per FRCP Rule 26(a)(2)(B)) as well as those who are non-retained (per FRCP Rule

26  26(a)(2)(C)), as set forth below.

27  ///

28  ///

## I.      RETAINED EXPERT WITNESSES (FRCP RULE 26(a)(2)(B))

### A.      John G. Peters, Jr., Ph.D, CLS, CTC

John G. Peters, Jr., Ph.D, CLS, CTC, has been retained to provide expert testimony for County Defendants in this case. Pursuant to FRCP 26(a)(2)(B), attached hereto as **Exhibit A** is Dr. Peters' expert report which contains the following information: (1) a complete statement of all opinions Dr. Peters will express and the bases and reasons for them; (2) the facts or data he considered in forming his opinions; (3) exhibits that will be used to summarize or support his opinions; (4) Dr. Peters' qualifications, including a list of all publications authored in the previous 10 years; (5) a list of all other cases in which, during the previous 4 years, Dr. Peters testified as an expert at trial or by deposition; and (6) a statement of the compensation to be paid to him for the study and testimony in this case.

### B.      David Kan, M.D., D.F.A.S.A.M.

David Kan, M.D., D.F.A.S.A.M. has been retained to provide expert testimony for County Defendants in this case. Pursuant to FRCP 26(a)(2)(B), attached hereto as **Exhibit B** is Dr. Kan's expert report which contains the following information: (1) a complete statement of all opinions Dr. Kan will express and the bases and reasons for them; (2) the facts or data he considered in forming his opinions; (3) exhibits that will be used to summarize or support his opinions; (4) Dr. Kan's qualifications, including a list of all publications authored in the previous 10 years; (5) a list of all other cases in which, during the previous 4 years, Dr. Kan testified as an expert at trial or by deposition; and (6) a statement of the compensation to be paid to him for the study and testimony in this case.

### C.      Joseph Hartmann, M.D.

Joseph Hartmann, M.D. has been retained to provide expert testimony for County Defendants in this case. Pursuant to FRCP 26(a)(2)(B), attached hereto as **Exhibit C** is Dr. Hartmann's expert report which contains the following information: (1) a complete statement of all opinions Dr. Hartmann will express and the bases and reasons for them; (2) the facts or data he considered in forming his opinions; (3) exhibits that will be used to summarize or support his opinions; (4) Dr.

1    Hartmann's qualifications, including a list of all publications authored in the previous 10 years; (5) a

2    list of all other cases in which, during the previous 4 years, Dr. Hartmann testified as an expert at trial

3    or by deposition; and (6) a statement of the compensation to be paid to him for the study and

4    testimony in this case.

5    ## II.   NON-RETAINED EXPERT WITNESSES (RULE 26(a)(2)(C))

6       **A.   Anthony Jay Chapman, M.D.**

7             **1.   Subject Matter of Testimony**

8    Autopsy of Steven Neuroth and cause of his death.

9             **2.   Summary of Facts and Opinions on Which the Witness is Expected to Present Evidence**

10

11       Dr. Chapman is a forensic pathologist who will testify about the autopsy he conducted of

12   Steven Neuroth, and that his cause of death was methamphetamine toxicity associated with violent

13   struggle. Dr. Chapman will testify that Mr. Neuroth's action in taking a large amount of

14   methamphetamine was the proximate cause of his death, that restraint or positional asphyxia did not

15   play any role in Mr. Neuroth's death, and that Plaintiff's theory of the case (that the Correctional

16   Deputies' actions caused his death) is unsupportable. Dr. Chapman's opinions, and the facts on

17   which he relied in making them, are described in detail in the autopsy report he prepared (produced

18   as Bates Stamped Nos. County-173 through 184) and at his deposition taken in this case on August

19   29, 2017 (including the documents he produced at that deposition).

20       **B.   Edward Barbieri, Ph.D.**

21             **1.   Subject Matter of Testimony**

22   Forensic toxicology results of samples taken during autopsy of Steven Neuroth, and

23   interpretation of those results.

24             **2.   Summary of Facts and Opinions on Which the Witness is Expected to Present Evidence**

25       Dr. Barbieri is a forensic toxicologist who will testify about the laboratory results of samples

26   taken during the autopsy of Steven Neuroth (produced as Bates Stamped Nos. County-180 through

27   184), as well as his interpretative comments of those results. Dr. Barbieri will testify that Mr.

28

1    Neuroth had various substances in his system at the time of his death, and that laboratory results

2    showed that he had a high level of methamphetamine in his system: 1,100 ng/ML.  Further, Dr.

3    Barbieri will testify that blood levels of 200 – 600 ng/ML have been reported in methamphetamine

4    abusers who exhibited violent and irrational behavior, and high doses of methamphetamine can also

5    elicit confusion, hallucinations, and circulatory collapse.

6         **C.**     **David Eyster, Mendocino County District Attorney**

7              **1.**     **Subject Matter of Testimony**

8         Results of the investigations into the death of Steven Neuroth, the appropriate level of force

9    used by Correctional Deputies on Mr. Neuroth based on his resistance to them, and the lack of

10    evidence (and reasonable inferences from evidence) to support a finding of criminal causation.

11              **2.**     **Summary of Facts and Opinions on Which the Witness is Expected to Present Evidence**

12         David Eyster, the Mendocino County District Attorney, will testify about the results of the

13    investigations conducted into the death of Steven Neuroth by investigators with his office, the

14    Sheriff's Office, the Coroner's Unit, and the forensic pathologist Dr. Chapman, which were

15    provided to him in connection with his review of the incident to determine whether to initiate a

16    criminal prosecution. Mr. Eyster will further testify that, based on his review of all of the

17    investigatory materials, as well as consideration of all reasonable inferences that may be drawn from

18    such information, he concluded the facts did not indicate or support a finding of criminal causation.

19    Further, Mr. Eyster will testify that, while physical force was necessary to overcome Mr. Neuroth's

20    resistance, the facts and evidence led him to conclude that only that force necessary to reasonably

21    overcome Mr. Neuroth's resistance was employed by the Correctional Deputies; given Mr.

22    Neuroth's words and actions, he clearly posed a safety risk to the Correctional Deputies; the

23    Correctional Deputies acted in a reasonable manner to address the situation without putting their

24    own individual and collective safety at unnecessary risk; and no objective fact finder could conclude

25    that the actions of the Correctional Deputies caused Mr. Neuroth's death.  All of the investigatory

26    materials Mr. Eyster reviewed have been produced in this case, including documents, video

27    recordings, audio recordings, and photographs. A summary of Mr. Eyster's opinions are set forth on

28

1  documents previously produced in this case and Bates Stamped Nos. County-1 to 2.

2    **D.**  **Timothy Pearce, Captain, Mendocino County Sheriff's Office**

3      **1.**  **Subject Matter of Testimony**

4    Administration and operations of the Mendocino County Jail, its policies and procedures,

5  standards in the industry, and Correctional Deputies' compliance with such policies and standards.

6      **2.**  **Summary of Facts and Opinions on Which the Witness is Expected to**
       **Present Evidence**

7

8    Timothy Pearce is a Captain in the Detention Division of the Mendocino County Sheriff's

9  Office, and is the Jail Commander for the Mendocino County Jail. Based on his review of the

10  relevant evidence, Captain Pearce will testify that the Correctional Deputy Defendants' actions

11  during the incident complied with jail policies and procedures applicable at the time of the incident,

12  that such actions were reasonable under the totality of the circumstances, and that the Correctional

13  Deputy Defendants were not deliberately indifferent to Mr. Neuroth's medical or mental health

14  needs. Captain Pearce will also testify regarding industry standards at the time of the incident, and

15  that the relevant Mendocino County Jail's policies met or exceeded those standards.

16    **E.**  **Karen Lovato, Deputy Director Out of Class, Mendocino County Behavioral**
**Health and Recovery Services**

17

18      **1.**  **Subject Matter of Testimony**

19    Services provided to Steven Neuroth by and through the Mendocino County Behavioral

20  Health Department, including the Full Service Partnership Program, and his lack of family support.

21      **2.**  **Summary of Facts and Opinions on Which the Witness is Expected to**
       **Present Evidence**

22    Ms. Lovato is the Deputy Director Out of Class for the Mendocino County Behavioral

23  Health Department, supervised staff providing services to Mr. Steven Neuroth, and also provided

24  services herself to Mr. Neuroth. Ms. Lovato will testify that the County was not deliberately

25  indifferent to Mr. Neuroth's mental health needs, as demonstrated by the numerous types and

26  quantities of services provided to Mr. Neuroth by and through the Mendocino County Behavioral

27  Health Department (including through its Full Service Partnership Program and Wellness Recovery

28

    

Action Plan Program). Ms. Lovato will testify about the scope of individualized serves Mr. Neuroth received by and through the Department for the time period October 23, 2006 to June 9, 2014, for a total of 595 hours, including the following:

- Assessments and Evaluations

- Case Management and Targeted Case Management

- Referrals

- Supervision

- Transportation

- Case Conferences

- Individual Therapy Sessions

- Interactive/Play Sessions

- Rehabilitation Services

- Medication Management and Refills

- Plan Development

- Crisis Intervention

Ms. Lovato will also testify about the extraordinary efforts of behavioral health workers to assist Mr. Neuroth address his mental health and daily living needs, and that Mr. Neuroth lacked the support of his family to assist him with such needs.

**F.     Jenine Miller, Psy.D., Behavioral Health Director / Assistant Director Health and Human Services, Mendocino County Behavioral Health and Recovery Services**

**1.     Subject Matter of Testimony**

Steven Neuroth's mental health and related disorders, level of services provided by and through the Mendocino County Behavioral Health Department.

**2.     Summary of Facts and Opinions on Which the Witness is Expected to Present Evidence**

As the Director of the Mendocino County Behavioral Health Department, Dr. Miller oversaw the services provided to Mr. Steven Neuroth by and through the Department, and knew him personally. Dr. Miller will testify that Mr. Neuroth's mental health diagnosis was Axis I Primary, 295.10 Schizophrenia, Disorganized Type, and Secondary, Polysubstance Dependence (the latter of which was at times under a sustained partial remission). Dr. Miller will provide a description of such diagnoses and how they manifested. Dr. Miller will testify that it was well-known to mental health staff that Mr. Neuroth used methamphetamine, and how such use further affected his mental health issues.

Dr. Miller will also testify that the County was not deliberately indifferent to Mr. Neuroth's mental health needs, and that it provided him with one of the highest levels of services to assist him in his daily living. Dr. Miller will also testify that: the Department obtained mental health subsidized housing for Mr. Neuroth and assisted him in retaining such housing; Mr. Neuroth had a difficult time maintaining his housing due to several factors, and repeatedly violated housing rules; and Mr. Neuroth was evicted for failing to comply with housing rules and negatively impacting his neighbors, despite the best efforts of case workers. Dr. Miller will testify that maintaining housing was key for Mr. Neuroth, as his mental health condition, failure to take prescribed medication, use of illicit drugs, and other related factors indicated that he would not be able to survive well without housing.

Further, Dr. Miller will testify that Crisis Workers evaluated Mr. Neuroth to determine whether he should be held involuntarily for mental health treatment under California Welfare and Institutions Code § 5150 on May 18, 24, and June 9, 2014, but that such a hold was not warranted on those dates based on the totality of the facts and circumstances.

///
///
///
///

County Defendants' Disclosure of Expert
Witnesses, FRCP Rule 26(a)(2)

U.S.D.C. No. 3:15-cv-03226-RS (NJV)

1

2                                             PATTON & RYAN LLC

3

4     Dated:  November 30, 2017          By: _____
                                              Kathryn R. Vaughan
5                                             Attorneys for County Defendants

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

I, the undersigned, declare that I am over the age of eighteen years and not a party to the within cause. My business address is Patton & Ryan LLC, 330 N. Wabash Ave. Suite 3800, Chicago, IL 60611. I am readily familiar with the practice of Patton & Ryan LLC with respect to the collection and processing of pleadings, discovery documents, motions and all other documents which must be served upon opposing parties or other counsel in litigation ("correspondence"). On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid; alternatively, if correspondence is sent by an express or overnight delivery service, they are sealed in an envelope with delivery costs fully prepaid, and deposited with the identified delivery service for collection that same day. Alternatively, correspondence may be personally delivered.

On **November 30, 2017**, I served the following correspondence:

**COUNTY DEFENDANTS' DISCLOSURE OF**
**EXPERT WITNESSES, FRCP RULE(a)(2)**

on the following interested parties:

| | |
|---|---|
| Michael Haddad<br>Julia Sherwin<br>T. Kennedy Helm<br>Haddad & Sherwin LLP<br>505 Seventeenth Street<br>Oakland, CA 94612 | Counsel for Plaintiff |
| Anne Keck<br>Keck Law Offices<br>418 B Street, Suite 206,<br>Santa Rosa, CA 95401 | Counsel County Defendants |
| Jerome M. Varanini<br>The Law Offices of Jerome M. Varanini<br>641 Fulton Avenue, Suite 200<br>Sacramento, CA 95825 | Counsel for CFMG Defendants |
| Peter G. Bertling<br>Bertling & Clausen, L.L.P.<br>15 West Carrillo Street, Suite 100<br>Santa Barbara, CA 93101 | Counsel for CMGC Defendants |
| David F. Beach, Esq.<br>Scott A. Lewis, Esq.<br>Perry, Johnson, Anderson,<br>Miller & Moskowitz, LLP<br>438 First Street, Fourth Floor<br>Santa Rosa, CA 95401 | Counsel for Willits Defendants |

1

Said service was performed in the following manners:

2

● **BY U.S. POSTAL SERVICE (Mail):** I placed each such document in a sealed
envelope addressed as noted above, with first-class mail postage thereon fully
prepaid, for collection and mailing at Chicago, Illinois, following the above stated
business practice, on this date.

3

4

5

I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct. Executed **November 30, 2017** in Chicago, Illinois.

6

7

Carly Colasuono, Legal Assistant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT E

Anne L. Keck, SBN 136315
KECK LAW OFFICES
418 B Street, Suite 206
Santa Rosa, California 95401
Telephone: (707) 595-4185
Facsimile: (707) 657-7715
Email: akeck@public-law.org

Attorneys for Defendants the
County of Mendocino and
Mendocino County Sheriff-
Coroner Thomas Allman,
Capt. Timothy Pearce, Lorrie Knapp,
Frank Masterson, Craig Bernardi,
Michael Grant, Jeanette Holum,
Robert Page, & Christine De Los Santos

John W. Patton, Jr., *Pro Hac Vice*
Stephen R. Niemeyer, SBN 203162
Kathleen M. Kunkle, SBN 222800
Kathryn R. Vaughan, *Pro Hac Vice*
PATTON & RYAN LLC
330 North Wabash Ave., Suite 3800
Chicago, Illinois 60611
Telephone: (312) 261-5160
Facsimile: (312) 261-5161
Emails: jpatton@pattonryan.com
sniemeyer@pattonryan.com
kkunkle@pattonryan.com
kvaughan@pattonryan.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES NEUROTH, *et al.,*<br><br>        Plaintiffs,<br><br>    v.<br><br>MENDOCINO COUNTY, *et al.*,<br><br>        Defendants. | Case No. 3:15-CV-03226-RS<br><br>**JOINT STIPULATION TO MODIFY CASE MANAGEMENT SCHEDULING ORDER AND OTHER DATES; [~~PROPOSED~~] ORDER** |

    This Joint Stipulation to Modify Case Management Scheduling Order and Other Dates is

submitted by all parties in this action, through their respective counsel, including: Plaintiff James

Neuroth ("Plaintiff"); Defendants the County of Mendocino, Mendocino County Sheriff Thomas

Allman, Sheriff's Captain Timothy Pearce, and current/former Sheriff's Deputies Lorrie Knapp,

Frank Masterson, Craig Bernardi, Michael Grant, Jeanette Holum, Robert Page, and Christine De

Los Santos (collectively, "County Defendants"); California Forensic Medical Group, Inc., Dr. Taylor

Fithian, and LVN Jennifer Caudillo (collectively, "CFMG Defendants"); Correctional Medical

Group Companies, Inc., RN Elaine Hustedt, and RN Claire Teske (collectively, "CMGC

Defendants"); and the City of Willits, former Willits Police Chief Gerardo Gonzalez, and

current/former Willits Police Officers Kevin Leef and Jeff Andrade (collectively, the "Willits

Defendants"). Pursuant to this Stipulation, the parties jointly request the Court to modify the pretrial

and trial dates set out in its previous Case Management Scheduling Order entered on September 28, 2017 (Dkt. No. 209, the "Scheduling Order"), as well as other dates, as set forth below.

### RECITALS

A.      The course and schedule of events in this case have caused the parties to reevaluate the remaining dates set in the Court's previous Scheduling Order (Dkt. No. 209), which are presently as follows:

- December 29, 2017: disclosure of rebuttal/supplement expert witnesses (Expert Disclosures per Rule 26 completed on November 30, 2017);

- January 4, 2018: last day to file dispositive motions;

- January 31, 2018: close of expert witness discovery;

- February 8, 2018: last day for hearing on pre-trial motions;

- March 29, 2018, at 10:00 a.m.: final pre-trial conference; and

- April 30, 2018, at 9:00 a.m.: jury trial to commence.

B.      The Courtroom Deputy has indicated the Court is available for a trial starting on January 7, 2019, and the parties have agreed to this new trial date. The parties estimate that the trial in this case will take approximately 5 weeks.

C.      The parties request the Court to revise the pretrial and trial dates set out in the previous Scheduling Order for several reasons, including but not limited to the following:

1.      Lead counsel for County Defendants, Anne Keck, has informed the parties that she requires substantial additional time to provide rebuttal/supplemental expert disclosures and prepare her clients' motion for summary judgment due in part to the effects of the Tubbs Fire on her family and work schedule.

2.      On December 13, 2017, County Defendants learned that their primary retained medical expert, Dr. Joseph Hartmann, has suffered medical problems requiring him to withdraw from this case, so they will need additional time to locate and present the report of a replacement expert; Plaintiff also requires 30 days to disclose a rebuttal expert thereafter.

3.      The parties have identified 21 expert witnesses whose depositions will be taken, and additional depositions will be required for rebuttal/supplement experts.

4. Due to limitations in all counsel's schedules, the first available date for expert witness depositions is January 15, 2018, with only 8 days thereafter available in January.

5. Defendants have requested completion of expert witness depositions in sufficient time to obtain/review transcripts and prepare motions for summary judgment.

6. Plaintiff's counsel has requested an extension of the briefing schedules for Defendants' proposed four separate summary judgment motions and for motions in limine, to which Defendants do not object in concept.

7. Plaintiff needs time to complete the punitive damages discovery that Judge Vadas ordered to take place after the Court issues its order addressing Defendants' four separate motions for summary judgment (docs. 149, 198).

8. The parties are mindful of the Court's busy docket, and that it may take considerable time for the Court to issue a summary judgment order after the hearing on those motions.

9. One or more of the parties may re-evaluate their settlement positions in light of the summary judgment order and may seek a further settlement conference with Judge Beeler at that time as well.

D. Plaintiff's counsel also believes that setting an early pretrial conference would be beneficial to allow sufficient time for the court to decide motions in limine and for the possibility of a further settlement conference with Judge Beeler after motions in limine are decided. Having gone into trial in what Plaintiff believes is a very similar case jail wrongful death case with very similar parties and issues [*M.H. v. County of Alameda*, No. 11-cv-02868-JST, 62 F. Supp. 3d 1049 (N.D. Cal. 2014) – a case that settled a week into trial], Plaintiff's counsel has learned that a case like this can be very burdensome on the Court and the parties, and that summary judgment and motions in limine are likely to require substantial time and attention, and may not be fully resolved until sometime after the pretrial conference. Thus, Plaintiff's counsel believes that moving up the pretrial conference would allow time for the parties and the Court to address these issues without unnecessarily pressing up on the new trial date, and leaving time for settlement conferences before

trial.

WHEREFORE, the parties hereby agree and request entry of an order as follows:

## AGREEMENT

1.     The parties request the Court to modify the current Scheduling Order and set a dispositive motion briefing schedule as follows:

    a.  <u>January 15, 2018</u>: Last day to designate supplemental/rebuttal expert witnesses.

    b.  <u>January 22, 2018</u>: Last day for County Defendants to designate replacement medical expert witness for Dr. Joseph Hartmann.

    c.  <u>February 19, 2108</u>: Last day for Plaintiff to designate rebuttal expert to County Defendants' replacement expert.

    d.   <u>March 15, 2018</u>: Last day to complete discovery of expert witnesses.

    e.  <u>April 19, 2018</u>: Last day to file dispositive motions; briefing schedule for dispositive motions to include 28 days for oppositions, 14 days for replies.

    f.  <u>June 14, 2018</u>: Last day to hear dispositive motions.

    g.  <u>January 7, 2019</u>, 9:00 a.m.: Commencement of Jury Trial

2.     Subject to a later request to revise the following dates based on intervening events, the parties request the Court to consider modifying the scheduling guidelines set out in its Jury Trial Standing Order in this case as follows:

    a.  <u>August 30, 2018</u>: Last day to conduct meet and confer session (per the Court's Jury Trial Standing Order, Section A).

    b.  <u>September 13, 2018</u>: Last day to file Motions in Limine, and last day to file Joint Pretrial Statement and Proposed Order (per the Court's Jury Trial Standing Order, Section B).

    c.  <u>October 4, 2018</u>: Oppositions to Motions in Limine due

    d.  <u>October 18, 2018</u>, at 10:00 a.m.: Final Pretrial Conference

3.     Nothing in this Stipulation and request for order is intended to modify the other matters addressed in any Court order unless expressly identified herein, nor does it preclude the parties from seeking additional relief from this Court, to amend this stipulation and order or otherwise.

1    IT IS SO STIPULATED.

2

3                                        Keck Law Offices

4    Dated:  December 13, 2017        By:    /s/ Anne L. Keck
                                              Anne L. Keck
5                                             Attorneys for County Defendants

6                                        Law Offices of Jerome M. Varanini

7    Dated: December 13, 2017         By:    /s/ Jerome M. Varanini
                                              Jerome M. Varanini
8                                             Attorneys for CFMG Defendants

9                                        Bertling & Clausen LLP

10   Dated: December 13, 2017         By:    /s/ Peter G. Bertling
                                              Peter G. Bertling
11                                            Attorneys for CMGC Defendants

12                                       Perry, Johnson, Anders, Miller &
                                         Moskowitz LLP
13   Dated: December 13, 2017         By:    /s/ Scott A. Lewis
                                              Scott A. Lewis
14                                            Attorneys for Willits Defendants

15                                       Haddad & Sherwin LLP

16   Dated: December 13, 2017         By:    /s/ Michael J. Haddad
                                              Michael J. Haddad
17                                            Attorneys for Plaintiff

18

19   * Approval in the filing of this document has been obtained from all signatories.

20

21

22

23

24

25

26

27

28

# ORDER

Based on the parties' stipulation, and with good cause appearing therefor,

IT IS HEREBY ORDERED that the previous Case Management Scheduling Order entered on September 28, 2017 (Dkt. No. 209) is hereby modified, and that the following dates are set in the instant case:

> a. <u>January 15, 2018</u>: Last day to designate supplemental/rebuttal expert witnesses.
>
> b. <u>January 22, 2018</u>: Last day for County Defendants to designate replacement medical expert witness for Dr. Joseph Hartmann.
>
> c. <u>February 19, 2108</u>: Last day for Plaintiff to designate rebuttal expert to County Defendants' replacement expert.
>
> d. <u>March 15, 2018</u>: Last day to complete discovery of expert witnesses.
>
> e. <u>April 19, 2018</u>: Last day to file dispositive motions; briefing schedule for dispositive motions to include 28 days for oppositions, 14 days for replies.
>
> f. <u>June 14, 2018</u>: Last day to hear dispositive motions.
>
> g. <u>August 30, 2018</u>: Last day to conduct meet and confer session (per the Court's Jury Trial Standing Order, Section A).
>
> h. <u>September 13, 2018</u>: Last day to file Motions in Limine, and last day to file Joint Pretrial Statement and Proposed Order (per the Court's Jury Trial Standing Order, Section B).
>
> i. <u>October 4, 2018</u>: Oppositions to Motions in Limine due
>
> j. <u>October 18, 2018</u>, at 10:00 a.m.: Final Pretrial Conference
>
> k. <u>January 7, 2019</u>, 9:00 a.m.: Commencement of Jury Trial

IT IS SO ORDERED.

Date: _12/14/17_

_____
HONORABLE RICHARD SEEBORG
United States District Court Judge

# EXHIBIT F

1   MICHAEL J. HADDAD (State Bar No. 189114)
    JULIA SHERWIN (State Bar No. 189268)
2   MAYA SORENSEN (State Bar No. 250722)
    TERESA ALLEN (State Bar No. 264865)
3   HADDAD & SHERWIN LLP
4   505 Seventeenth Street
    Oakland, California 94612
5   Telephone: (510) 452-5500
    Facsimile:  (510) 452-5510
6
7   Attorneys for Plaintiff James Neuroth

Received On:
_____1/16/18_____
Keck Law Offices

8

                UNITED STATES DISTRICT COURT

9

                NORTHERN DISTRICT OF CALIFORNIA

10

11
    JAMES NEUROTH, Individually and as      )
12  Successor in Interest of Decedent STEVEN )   No: 3:15-cv-03226-RS
    KELLOGG NEUROTH,                         )
13                                           )
                 Plaintiff,                  )
14                                           )   **PLAINTIFF'S**
        vs.                                  )   **SUPPLEMENTAL/REBUTTAL**
15                                           )   **EXPERT DISCLOSURES**
    MENDOCINO COUNTY, a public entity;       )
16  MENDOCINO COUNTY SHERIFF-                )
    CORONER THOMAS D. ALLMAN, in his         )
17  individual and official capacities;      )
    CORRECTIONS CAPTAIN TIM PEARCE;          )
18  SERGEANT LORI KNAPP; DEPUTY              )
    FRANK MASTERSON; DEPUTY CRAIG            )
19  BERNARDI; DEPUTY MICHAEL GRANT;          )
    DEPUTY JEANETTE HOLUM; DEPUTY            )
20  ROBERT PAGE; DEPUTY CHRISTINE DE         )
    LOS SANTOS; CITY OF WILLITS, a public    )
21  entity; WILLITS POLICE CHIEF GERARDO     )
    GONZALEZ; WILLITS POLICE OFFICER         )
22  JEFF ANDRADE; WILLITS POLICE             )
    OFFICER KEVIN LEEF; CALIFORNIA           )
23  FORENSIC MEDICAL GROUP,                  )
    INCORPORATED, a California corporation;  )
24  CORRECTIONAL MEDICAL GROUP               )
    COMPANIES, INCORPORATED, a Delaware      )
25  Corporation; TAYLOR FITHIAN, M.D.;       )
26  BARBARA COTTON, R.N.; ELAINE             )
    HUSTEDT; YVONNE MAXFIELD, R.N.;          )
27

28
    No. 3:15-cv-03226-RS: PLAINTIFF'S EXPERT DISCLOSURES

1   CLAIRE TESKE, R.N.; JENNIFER L.          )
    CAUDILLO, L.V.N., and COUNTY             )
2   DEPUTIES DOES 9–20, and DOES 23–35,      )
    individually, jointly, and severally,   )
3                                            )
                                             )
4                Defendants.                 )
                                             )

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

No. 3:15-cv-03226-RS: PLAINTIFF'S EXPERT DISCLOSURES

1

2    1.      Pursuant to Fed. Rule Civ. Proc. 26, Plaintiff, by and through his attorneys, HADDAD &

3    SHERWIN LLP, hereby discloses the supplemental/rebuttal report from the following witness:

4

5    Larissa J. Mooney, M.D. – Addiction Medicine and Psychiatry
     Director, UCLA Addiction Medicine Clinic

6    UCLA Integrated Substance Abuse Programs
     Associate Clinical Professor

7    Department of Psychiatry and Biobehavioral Sciences
     David Geffen School of Medicine at UCLA

8    11075 Santa Monica Blvd., Suite 200

9    Los Angeles, CA 90025
     (310) 267-5419

10

11   Plaintiff also reserves the right, pursuant to Stipulation and Order, to provide any expert opinions

12   and Rule 26 reports in rebuttal to the County's cardiology expert(s) by February 19, 2018.

13

14

15   2.      Plaintiff further reserves the right to elicit expert testimony from all Defendants, all

16   witnesses in their area(s) of expertise, all witnesses previously disclosed by any party, and all

17   experts disclosed by Defendants.

18

19   Dated: January 12, 2018                              HADDAD & SHERWIN LLP

20

21

22                                                       Julia Sherwin
                                                         Attorneys for Plaintiff

23

24

25

26

27

28   No. 1:15-cv-03226-RS:  PLAINTIFF'S EXPERT DISCLOSURES

3

1

2

***PROOF OF SERVICE***
(Fed. R. Civ. P. 5 and 28 U.S.C. § 1746)

3

Re:        *Neuroth v. Mendocino County, et al.*, (No. 1:15-cv-03226-RS)

4

5

6

7

I declare that:  I am employed in the County of Alameda, State of California.  I am over the

age of eighteen years and not a party to the within entitled cause; my business address is 505

Seventeenth Street, Oakland, California 94612.

8

9

10

11

On January 12, 2018, I served the attached PLAINTIFF'S SUPPLEMENTAL/REBUTTAL

EXPERT DISCLOSURES on the parties in said cause, by placing a true copy thereof in a sealed

envelope with postage thereon fully prepaid, VIA U.S. MAIL, in Oakland, California, addressed as

follows:

12

13

14

15

Anne L. Keck
Keck Law Offices
418 B. Street, Suite 206
Santa Rosa, CA 95401
*Counsel for Mendocino County Defendants*

16

17

18

19

20

John W. Patton
Stephen R. Niemeyer
Kathleen M. Kunkle
Kathryn R. Vaughan
Patton & Ryan LLC
330 N. Wabash, Suite 3800
Chicago, IL 60611
*Counsel for Mendocino County Defendants*

21

22

23

24

Jerome M. Varanini
The Law Offices of Jerome M. Varanini
641 Fulton Avenue, Suite 200
P.O. Box 590
Sacramento, CA 95812
*Counsel for Defendants California Forensic Medical Group, Inc., and Jennifer Caudillo, L.V.N.*

25

26

27

28

No. 1:15-cv-03226-RS:  PLAINTIFF'S EXPERT DISCLOSURES                                              4

1

2   Scott Lewis
    Perry, Johnson, Anderson, Miller, & Moskowitz, LLP
3   438 1st Street
    Santa Rosa, CA 95401
4   *Counsel for Defendants City of Willits, Kevin Leef, Jeff Andrade, and Gerardo Gonzalez*

5   Peter Bertling
    Bertling Law Group, Inc.
6   15 West Carrillo Street, Suite 104
    Santa Barbara, CA 93101
7   *Counsel for Defendants Correctional Medical Group Companies, Inc., Taylor Fithian, M.D.,*
8   *Elaine Hustedt, Claire Teske, R.N.*

9

10

11          I declare under penalty of perjury that the foregoing is true and correct and that on the date

12   stated above, this declaration was executed at Oakland, California.

13

14

15                                                ABIGAIL HAMILTON

16

17

18

19

20

21

22

23

24

25

26

27

28   No. 1:15-cv-03226-RS:  PLAINTIFF'S EXPERT DISCLOSURES

                                                                                    5

# EXHIBIT G

Anne L. Keck, SBN 136315
KECK LAW OFFICES
418 B Street, Suite 206
Santa Rosa, California 95401
Telephone: (707) 595-4185
Facsimile: (707) 657-7715
Email: akeck@public-law.org

Attorneys for Defendants the
County of Mendocino and
Mendocino County Sheriff-
Coroner Thomas Allman,
Capt. Timothy Pearce, Lorrie Knapp,
Frank Masterson, Craig Bernardi,
Michael Grant, Jeanette Holum,
Robert Page, & Christine De Los Santos

John W. Patton, Jr., *Pro Hac Vice*
Stephen R. Niemeyer, SBN 203162
Kathleen M. Kunkle, SBN 222800
Kathryn R. Vaughan, *Pro Hac Vice*
PATTON & RYAN LLC
330 North Wabash Ave., Suite 3800
Chicago, Illinois 60611
Telephone: (312) 261-5160
Facsimile: (312) 261-5161
Emails: jpatton@pattonryan.com
        sniemeyer@pattonryan.com
        kkunckle@pattonryan.com
        kvaughan@pattonryan.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAMES NEUROTH,

      Plaintiff,

    v.

MENDOCINO COUNTY, *et al.*,

      Defendants.

Case No. 3:15-CV-03226-RS

**COUNTY DEFENDANTS' DISCLOSURE OF SUPPLEMENTAL/REBUTTAL EXPERT WITNESSES, FRCP RULE 26(a)(2)**

Pursuant to the Federal Rules of Civil Procedure ("FRCP") Rule 26(a)(2), Defendants the County of Mendocino, Mendocino County Sheriff-Coroner Thomas Allman, Sheriff's Captain Timothy Pearce, and current/former Sheriff's Correctional Deputies Lorrie Knapp, Frank Masterson, Craig Bernardi, Michael Grant, Jeanette Holum, Robert Page, and Christine De Los Santos (collectively, "County Defendants"), hereby disclose the identities of supplemental/rebuttal witnesses they may use at trial to present evidence under Federal Rules of Evidence 702, 703, and/or 705. In addition, County Defendants provide relevant information with respect to the testimonies of those witnesses who have been retained (per FRCP Rule 26(a)(2)(B)) as well as those who are non-retained (per FRCP Rule 26(a)(2)(C)), as set forth below.

Further, pursuant to the scheduling Order entered on December 13, 2017 (Dkt. No. 232), the

1   Court permitted County Defendants through January 22, 2018, to designate a replacement medical

2   expert witness for Dr. Joseph Hartmann, a cardiologist, who was compelled to withdraw from the

3   case due to medical reasons.  However, County Defendants decline to designate an expert to replace

4   Dr. Hartmann as an expert in this case.  Barring unforeseen events requiring further action, this is the

5   County Defendants' final disclosure of expert witnesses they designate to testify in this case.

6   **I.     RETAINED SUPPLEMENTAL/REBUTTAL EXPERT WITNESSES (FRCP RULE**
7   **26(a)(2)(B))**

8        **A.     John G. Peters, Jr., Ph.D, CLS, CTC**

9        John G. Peters, Jr., Ph.D, CLS, CTC has been retained to provide expert testimony for County

10  Defendants in this case, and will provide both supplemental and rebuttal expert testimony as well.

11  Pursuant to FRCP 26(a)(2)(B), a copy of Dr. Peters' supplemental/rebuttal expert report is contained

12  on the accompanying flash drive.  Dr. Peters reserves the right to utilize exhibits in connection with

13  his expert testimony in this case, including but not limited to the materials accompanying this

14  Disclosure and all documents, video and audio files produced in this case.

15       **B.     David Kan, M.D., D.F.A.S.A.M.**

16        David Kan, M.D., D.F.A.S.A.M. has been retained to provide expert testimony for County

17  Defendants in this case, and will provide both supplemental and rebuttal expert testimony as well.

18  Pursuant to FRCP 26(a)(2)(B), a copy of Dr. Kan's supplemental/rebuttal expert report is contained

19  on the accompanying flash drive. Dr. Kan reserves the right to utilize exhibits in connection with his

20  expert testimony in this case, including but not limited to the materials accompanying this Disclosure

21  and all documents, video and audio files produced in this case.

22       **C.     Gary M. Vilke, M.D., FACEP, FAAEM**

23        Gary M. Vilke, M.D., FACEP, FAAEM has been retained to provide expert testimony for

24  County Defendants in this case in the capacity of a rebuttal expert. Pursuant to FRCP 26(a)(2)(B), a

25  copy of Dr. Vilke's rebuttal expert report is contained on the accompanying flash drive.  Dr. Vilke

26  reserves the right to utilize exhibits in connection with his expert testimony in this case, including but

27  not limited to the materials accompanying this Disclosure and all documents, video and audio files

28  produced in this case.

1

### D.      Lenard Vare, Lenard Vare Consulting

Lenard Vare, Lenard Vare Consulting, has been retained to provide expert testimony for County Defendants in this case in the capacity of a rebuttal expert. Pursuant to FRCP 26(a)(2)(B), a copy of Mr. Vare's rebuttal expert report is contained on the accompanying flash drive. Mr. Vare reserves the right to utilize exhibits in connection with his expert testimony in this case, including but not limited to the materials accompanying this Disclosure and all documents, video and audio files produced in this case.

### E.      David R. Voytek, Visual Evidence Corporation

David R. Voytek, Visual Evidence Corporation, has been retained by County Defendants to create demonstrative exhibits for use in this case by attorneys, percipient witnesses, and expert witnesses, and has been asked to prepare an expert report for the purpose of authenticating his product (referred to as the "Demonstrative Video").  County Defendants also provide Mr. Voytek's report and his Demonstrative Video as a rebuttal to the video-audio files produced by Plaintiff and his expert witness, Grant Fredericks. Pursuant to FRCP 26(a)(2)(B), a copy of Mr. Voytek's expert report and the Demonstrative Video is contained on the accompanying flash drive.

### F.      Doug Jenkins, Diz Productions

Doug Jenkins, Diz Productions was retained by Visual Evidence Corporation to provide expert audio services for the purpose of enhancing and reviewing the audio recording made in this case by Willits Police Officer Kevin Leef. County Defendants also provide Mr. Jenkin's enhanced audio recordings (contained in the Demonstrative Video) and his Audio Transcript in rebuttal to statements made by Plaintiff's expert witness John Ryan. Pursuant to FRCP 26(a)(2)(B), a copy of the Audio Transcript prepared by Mr. Jenkins, and a copy of his report prepared for authentication purposes, are contained on the accompanying flash drive.

## II.      NON-RETAINED EXPERT WITNESSES (RULE 26(a)(2)(C))

### A.      Anthony Jay Chapman, M.D.

#### 1.      Subject Matter of Testimony

Autopsy of Steven Neuroth and cause of his death.

### 2. Summary of Facts and Opinions on Which the Witness is Expected to Present Evidence

Dr. Chapman is a forensic pathologist who will provide testimony to rebut the opinions of Plaintiff's expert witnesses Michael Baden and Michael Freeman with respect to his autopsy findings, related factors and findings, the cause of the death of Steven Neuroth, and the expert witnesses' assertions of conflict of interest with respect to the death investigation.

### B. Edward Barbieri, Ph.D.

#### 1. Subject Matter of Testimony

Forensic toxicology results of samples taken during autopsy of Steven Neuroth, and interpretation of those results.

### 2. Summary of Facts and Opinions on Which the Witness is Expected to Present Evidence

Dr. Barbieri is a forensic toxicologist who will provide testimony to rebut the opinions of Plaintiff's expert witnesses Michael Baden, Michael Freeman, and Richard Hayward with respect to issues related to methamphetamine, both generally and specifically with respect the toxic level found in the decedent Steven Neuroth.

### C. C. David Eyster, Mendocino County District Attorney

#### 1. Subject Matter of Testimony

The investigations into the death of Steven Neuroth, the appropriate level of force used by Correctional Deputies on Mr. Neuroth based on his resistance to them, and the lack of evidence (and reasonable inferences from evidence) to support a finding of criminal causation.

### 2. Summary of Facts and Opinions on Which the Witness is Expected to Present Evidence

C. David Eyster, the Mendocino County District Attorney, will provide testimony to rebut the opinions of Plaintiff's expert witness John Ryan regarding the investigations conducted with respect to the death of Steven Neuroth, including but not limited to the integrity of the investigation and conduct of District Attorney's Office Investigators.

**D.      Timothy Pearce, Captain, Mendocino County Sheriff's Office**

　　　**1.      Subject Matter of Testimony**

Administration and operations of the Mendocino County Jail, its policies and procedures, standards in the industry, and Correctional Deputies' compliance with such policies and standards.

　　　**2.      Summary of Facts and Opinions on Which the Witness is Expected to Present Evidence**

Timothy Pearce is a Captain in the Detention Division of the Mendocino County Sheriff's Office, and is the Jail Commander for the Mendocino County Jail. Captain Pearce will provide testimony to rebut the opinions of Plaintiff's expert witnesses Richard Hayward, Todd Wilcox, Denise Panosky, and John Ryan, regarding operations and administration of the Mendocino County Jail, acceptance of arrestees into the jail and booking processes, use of restraints and force in a jail context, review and writing of incident reports, internal policy compliance reviews, and other matters within the scope of his expertise as addressed the opinions of the expert witnesses.

**E.      Karen Lovato, Assistant Director, Mendocino County Behavioral Health**

　　　**1.      Subject Matter of Testimony**

Services provided to Steven Neuroth by and through the Mendocino County Behavioral Health Department, including the Full Service Partnership Program, and his lack of family support.

　　　**2.      Summary of Facts and Opinions on Which the Witness is Expected to Present Evidence**

Ms. Lovato is the Assistant Director of the Mendocino County Behavioral Health Department, and will provide testimony to rebut the opinions of Plaintiff's expert witness Dr. Richard Hayward with respect to his assertions that the County was deliberately indifferent to Steven Neuroth's mental health needs.

**F.      Jenine Miller, Ph.D., Director, Mendocino County Behavioral Health**

　　　**1.      Subject Matter of Testimony**

Steven Neuroth's mental health and related disorders, level of services provided by and through the Mendocino County Behavioral Health Department.

1

**2.      Summary of Facts and Opinions on Which the Witness is Expected to
Present Evidence**

2        Dr. Miller is the Director of the Mendocino County Behavioral Health Department, and will

3 provide testimony to rebut the opinions of Plaintiff's expert witness Dr. Richard Hayward with

4 respect to his assertions that the County was deliberately indifferent to Steven Neuroth's mental

5 health needs.

6 **III.      ACCOMPANYING REPORTS AND MATERIALS**

7        Accompanying this Disclosure are copies of the supplemental/rebuttal reports of the expert

8 witnesses disclosed herein pursuant to FRCP Rule 26(a)(2)(B). County Defendants also provide

9 copies of demonstrative exhibits (electronic files) which may be used by the expert witnesses in

10 connection with pre-trial motions or at trial. Due to the length of the reports and types of

11 demonstrative evidence, copies are being provided electronically on the accompanying flash drive.

12 The electronic files contained on the flash drive are as follows:

13        1.      Supplemental/Rebuttal Expert Report of John G. Peters, Jr., Ph.D, CLS, CTC

14        2.      Supplemental/Rebuttal Expert Report of David Kan, M.D., D.F.A.S.A.M.

15        3.      Supplemental/Rebuttal Expert Report of Gary M. Vilke, M.D., FACEP, FAAEM

16        4.      Supplemental/Rebuttal Expert Report of Lenard Vare, Lenard Vare Consulting

17        5.      Supplemental/Rebuttal Expert Report of David R. Voytek, Visual Evidence
Corporation

18

19        6.      Supplemental/Rebuttal Expert Report of Doug Jenkins, Diz Productions

20        7.      Demonstrative Video (.f4v file, playable in Windows Media)

21        8.      Combined Audio-Video, full screens (.mp4 file, playable in Windows Media)

22        County Defendants reserve the right to revise the videos identified as numbers 7 and 8,

23 above.  Specifically, County Defendants will likely make revisions to the Demonstrative Video with

24 respect to the hovering names of the participants, subtitles, and the banners in blue. Any revisions

25 will be provided pursuant to a supplemental disclosure, as required by FRCP Rule 26.

26                                KECK LAW OFFICES

27 Dated:  January 16, 2018              By:  _____/s/_____
                                              Anne L. Keck
28                                            Attorneys for County Defendants

**PROOF OF SERVICE**

I, the undersigned, declare that I am over the age of eighteen years and not a party to the within cause. My business address is Keck Law Offices, 418 B Street, Suite 206, Santa Rosa, California 95401. I am readily familiar with the practice of Keck Law Offices with respect to the collection and processing of pleadings, discovery documents, motions and all other documents which must be served upon opposing parties or other counsel in litigation ("correspondence"). On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid; alternatively, if correspondence is sent by an express or overnight delivery service, they are sealed in an envelope with delivery costs fully prepaid, and deposited with the identified delivery service for collection that same day. Alternatively, correspondence may be personally delivered.

On **January 16, 2018**, I served the following correspondence:

**COUNTY DEFENDANTS' DISCLOSURE OF
SUPPLEMENTAL/REBUTTAL EXPERT WITNESSES, FRCP RULE 26(a)(2)
[Plus accompanying Flash Drive]**

on the following interested parties:

Michael Haddad                                    Counsel for Plaintiff
Julia Sherwin
Haddad & Sherwin LLP
505 Seventeenth Street
Oakland, CA 94612

Jerome M. Varanini                                Counsel for CFMG Defendants
The Law Offices of Jerome M. Varanini
641 Fulton Avenue, Suite 200
Sacramento, CA 95825

Peter G. Bertling                                 Counsel for CMGC Defendants
Bertling Law Group, Inc.
15 West Carrillo Street, Suite 104
Santa Barbara, CA 93101

David F. Beach, Esq.                              Counsel for Willits Defendants
Scott A. Lewis, Esq.
Perry, Johnson, Anderson,
Miller & Moskowitz, LLP
438 First Street, Fourth Floor
Santa Rosa, CA 95401

Said service was performed in the following manner:

● **BY U.S. POSTAL SERVICE (Mail):** I placed each such document in a sealed envelope addressed as noted above, with first-class mail postage thereon fully prepaid, for collection and mailing at Santa Rosa, California, following the above-stated business practice, on this date.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed **January 16, 2018**, in Santa Rosa, California.

_____/s/_____
Michael W. Ahern

# EXHIBIT H

*Gary M. Vilke, M.D., FACEP, FAAEM*
*11582 Normanton Way*
*San Diego, California 92131*
*(619) 666-8643*

January 15, 2018

Kathleen M. Kunkle
Kathryn Vaughan
Patton & Ryan LLC
330 North Wabash Avenue, Suite 3800
Chicago, Illinois 60611

Anne L. Keck
Keck Law Offices
418 B Street, Suite 206
Santa Rosa, California  95401

RE:   James Neuroth, Individually and as Successor in Interest of Decedent Steven
        Kellogg Neuroth v. Mendocino County, et al.
        Case No.: 3:15-cv-03226

### Introduction

I am a board-certified emergency department physician with substantial experience in

sudden cardiac arrest and sudden cardiac death, including my service as the Medical Director of the

American Heart Association Training Center at the University of California, San Diego Center for

Resuscitation Science for over seven years.  I am also an independent researcher on the effects of

position and weight force on human physiology and in-custody deaths.

I have been retained as an expert to review relevant materials and provide expert opinion on

this matter, including the state of the medical and scientific literature as of the date of the incident,

June 10, 2014, and today, and to consider and render expert opinion on whether the restraining

process was contributory to Mr. Steven Neuroth's death.  After careful review, it is my opinion to a

reasonable degree of medical certainty that Mr. Neuroth's cardiac arrest was not caused by the

restraining process used by the officers.  This opinion and related opinions are set forth in the expert report.

## Materials Reviewed

I have reviewed extensive materials pertaining to the above referenced case.  This includes, but is not limited to:

### Case-Specific Materials.

1.  Plaintiff's Fourth Amended Complaint
2.   Combined audio/video of jail surveillance recordings
3.  Mendocino County District Attorney's Investigation File (County-00001-216);
4.  Coroner's Investigation documents (County-00217-319);
5.  Neuroth In-Custody Death File materials (County-00436-526)
6.  Deposition of Tom Allman
7.  Deposition of Jeffrey Andrade
8.  Deposition of Bryan Arrington
9.  Deposition of Kevin Bailey
10. Deposition of Bernardi, Craig
11. Deposition of Jennifer Caudillo
12. Deposition of Jay Chapman
13. Deposition of Christine De Los Santos
14. Deposition of Taylor Fithian
15. Deposition of Gonzalez, Gerardo
16. Deposition of Michael Grant
17. Deposition of Raymond Herr
18. Deposition of Jeannette Holum
19. Deposition of Elaine Hustedt
20. Deposition of Lorrie Ann Knapp
21. Deposition of Kevin Leef
22. Deposition of Frank Masterson
23. Deposition of Yvonne Maxfield

24. Deposition of Gary Neuroth

25. Deposition of James Neuroth

26. Deposition of Robert Page

27. Deposition of Timothy Pearce

28. Deposition of Claire Teske

29. CFMG Defendants' Expert Witness Disclosures

30. CMGC Defendants' Expert Witness Disclosures

31. Report of Neal L. Benowitz M.D.

32. County Defendants' Expert Witness Disclosures

33. Plaintiff's Expert Witness Disclosures

34. Report of Denise Panosky DNP

35. Report of Grant Fredericks

36. Report of John Ryan

37. Report of Larissa Mooney, M.D.

38. Report of Michael Baden, M.D.

39. Report of Michael Freeman, M.D.

40. Report of Richard Hayward, PhD

41. Report of Todd Wilcox, M.D.

42. DVD, containing animation / video produced by Plaintiff

43. Report of Robert Bux, M.D.

44. Report of Terry Fillman, R.N.


**Medical and Scientific Literature**

Chan TC, Vilke GM, Neuman T, Clausen JL:  Restraint position and positional asphyxia.  Ann Emerg Med 1997;30(5):578-586.

Chan TC, Vilke GM, Neuman T:  Reexamination of custody restraint position and positional asphyxia.  Am J Forensic Med Pathol 1998;19(3):201-205.

Vilke GM, Chan TC, Neuman T, Clausen JL:  Spirometry in normal subjects in sitting, prone, and supine positions.  Respir Care 2000;45(4):407-410.

Chan TC, Vilke GM, Clausen J, Clark R, Schmidt P, Snowden T, Neuman T:  The impact of oleoresin capsicum spray on respiratory function in human subjects in the sitting and prone maximal restraint positions, final report.  NCJ 182433.  Washington, DC: United States Department of Justice, National Institute of Justice, 2000, 68 pages.

Chan TC, Vilke GM, Clausen J, Clark RF, Schmidt P, Snowden T, Neuman T: The effect of oleoresin capsicum "pepper" spray inhalation on respiratory function. J Forensic Sci 2002; 47(2):299-304.

Chan TC, Neuman T, Clausen J, Eisele J, Vilke GM: Weight force during prone restraint and respiratory function. Am J Forensic Med Pathol 2004;25(3):185-189.

Michalewicz BA, Chan TC, Vilke GM, Levy SS, Neuman TS, Kolkhorst FW. Ventilatory and metabolic demands during aggressive physical restraint in healthy adults. J Forensic Sci 2007;52(1):171-175.

Reay DT, Howard JD, Fligner CL, Ward RJ. Effects of positional restraint on oxygen saturation and heart rate following exercise. Am J Forensic Med Pathol. 1988 Mar;9(1):16-8.

Schmidt P, Snowden T. The effects of positional restraint on heart rate and oxygen saturation. J Emerg Med 1999;17:777-782.

Savaser DJ, Campbell C, Castillo EM, Vilke GM, Sloane C, Neuman T, Hansen AV, Shah S, Chan TC. The effect of the prone maximal restrained position with and without weight force on cardiac output and other hemodynamic measures. J Forens Leg Med. 2013 Nov;20(8):991-5. Epub 2013 Aug 30.

Sloane C, Chan TC, Kolkhorst F, Neuman T, Castillo EM, Vilke GM. Evaluation of the Ventilatory Effects of the Prone Maximum Restraint Position (PMR) on Obese Human Subjects. Forens Sci Int 2014;237:86-9. Epub 2014;46(6):865-72. Epub 2014 Feb 14.

Cary NRB, et al: The effect of simulated restraint in the prone position on cardiorespiratory function following exercise in humans. J Physiol 1998;525:30.

Ho JD, Dawes DM, Moore JC, Caroon LV, Miner JR: Effect of position and weight force on inferior vena cava diameter--implications for arrest-related death. Forensic Sci Int. 2011 Oct 10;212(1-3):256-9.

Kroll MW, Still GK, Neuman TS, Graham MA, Griffin LV. Acute forces required for fatal compression asphyxia: A biomechanical model and historical comparisons. Med Sci and the Law. 2017 Jan 1:25802417695711. [Epub ahead of print]

## Overview of Opinions
## (all opinions within this report are to a reasonable degree of medical or scientific probability)

An overview of my opinions is as follows with more description of each below:

1. **The restraining process used by the deputies did not cause or contribute to Mr. Neuroth's cardiac arrest or death.**

2. **I disagree with plaintiff's expert, Dr. Baden, when he misleads the reader of his report as to the amount of weight being placed on Mr. Neuroth.**

3. **I disagree with plaintiff's expert, Dr. Baden, when he opines, "Deputy Grant's description that his face and mouth area were blue when he turned Mr. Neuroth over confirms that he died because he couldn't breathe."**

4. **I disagree with plaintiff's expert, Dr. Freeman, when he implies in his report as to the amount of weight being placed on Mr. Neuroth's chest region.**

5. **I agree with the medical examiner, Dr. Chapman, that more likely than not, the cause of the sudden cardiac arrest and death in Mr. Neuroth was methamphetamine and continued struggle and resistance.**

## Analysis

After reviewing the above listed materials, it appears that on June 10, 2014, Willits Police Officers had two contacts with Mr. Neuroth.  First, Officer Leef contacted Mr. Neuroth in a parking lot, and determined that he was looking for a lost check and was fine.  Second, after receiving a call for service for an individual running in traffic in the City of Willits, Officer Leef observed Mr. Neuroth running in a circle in the middle of lanes of traffic. Willits Officer Andrade also arrived on the scene and observed Mr. Neuroth's behavior.  The officers noted that Mr. Neuroth was very sweaty, very fidgety, and was clenching his feet and hands. His speech appeared irregular. The officers believed that Mr. Neuroth was under the influence of drugs and was having a drug-induced psychotic episode, and discussed whether to take him to the hospital or the jail.  Mr. Neuroth was placed in handcuffs and arrested by Officer Andrade, and transported to the Mendocino County Jail by Officer Leef.  Mr. Neuroth was 55 years old, 5'11" and weighed 185 lbs at the time.

While being booked in the jail, Mr. Neuroth was initially fairly cooperative. But when he was moved into a sobering cell, Mr. Neuroth suddenly became agitated and started resisting the deputies. He was already handcuffed when entering the sobering cell and, after struggling with deputies, Mr. Neuroth was taken to the ground and leg shackles were placed on him.  He was then

carried by the deputies from the sobering cell across the hallway into a safety cell.

Once in the safety cell, Mr. Neuroth continued to struggle with deputies. Because deputies believed Mr. Neuroth made a suicidal statement, they called for a safety smock, but had to wait for it while Mr. Neuroth continued to struggle against them. Once the safety smock arrived, the deputies placed it over him and worked to remove his shackles, clothes, and handcuffs. The deputies then exited the cell one-by-one. There was some movement by Mr. Neuroth immediately as the deputies were leaving the room, but over the next few minutes, no additional movements were seen on the video. Jail staff begin looking in on him about seven minutes after they left the cell, and then gather together and re-enter the cell to check on him. Jail staff then discovered Mr. Neuroth was not breathing, did not have a pulse, and was blue around the mouth. CPR was started by the jail staff, 911 was called, and an Automatic External Defibrillator (AED) device was employed. The AED device recorded and analyzed Mr. Neuroth's heart rhythm, but never found a shock-able rhythm and did not shock Mr. Neuroth.

EMS providers responded to the jail and found Mr. Neuroth in CPR status with a Pulseless Electrical Activity (PEA) rhythm. The paramedics provided advanced life saving measures and transported him to the emergency department where resuscitation efforts were continued, but ultimately, a pulse could not be regained and Mr. Neuroth was pronounced dead. The forensic pathologist performed an autopsy and obtained a toxicology report, and reported the probable cause of death to be "Methamphetamine toxicity associated with violent struggle (any contributory role of restraint asphyxia unascertainable)."

Given this history, there are a number of issues that need to be addressed in more detail below. All opinions given are to a reasonable, or higher, degree of medical probability based on the information currently available.

**Detailed discussion and basis of opinions**

1. ***The restraining process used by the deputies did not cause or contribute to Mr. Neuroth's cardiac arrest or death.***

   During the period that Mr. Neuroth was in the safety cell, he was maintained in a prone position with his hands cuffed behind his back and leg shackles around his ankles. There was some weight being placed on him to maintain his position in order to control his movements and remove his clothes, handcuffs and shackles.  While Mr. Neuroth was being held in position, he was continuing to struggle and resist the deputies.  Mr. Neuroth was talking continuously as noted in the audio portion of the video. And during the period when there was no audio, he was reported by the deputies present to continue to talk until they were leaving the room.  There was no evidence of respiratory or ventilatory difficulty during this time. In fact, when listening to the video, he was talking at such a frequent pace, it confirms he was clearly and easily moving air in and out of his lungs without difficulty.  Mr. Neuroth had to be breathing to talk because he needed to expel air across the vocal cords to make words.  Although the audio cuts out for the last eight minutes of time in the safety cell, the positions of the deputies did not change significantly to demonstrate any adjustment of weight being placed on Mr. Neuroth during this time period.  Additionally, the deputies report that there was no change in his talking during this time period.

   The positions of the deputies and associated weight force used on Mr. Neuroth is viewable on the video and described by the deputies as follows:  Deputy Grant was attempting to place Mr. Neuroth's legs in a figure four hold and ultimately was successful, with assistance from Deputy De Los Santos; Deputy Grant's position on the legs was relieved by Deputy De Los Santos and then Deputy Page. Deputy Bernardi did place a knee on Mr. Neuroth's back for about 5 seconds for control purposes, but Neuroth continued to loudly vocalize throughout that time. Deputy Bernardi then held Mr. Neuroth's left arm in rear wrist lock and reported lifting off the lower back rather than

placing pressure, in order to maintain control.  Deputy Masterson maintained control of Mr. Neuroth's right arm.  Deputy Page was maintaining control of the legs and, close to the time the deputies exited the cell, was also holding the arms using minimal weight.  Beyond these positions, it was reported and is evident from the video that there was no other significant contact with Mr. Neuroth during the process to get him out of his clothes and into the safety smock.

The majority of the weight force was not on Mr. Neuroth in such a position that would have created the potential to limit ventilation. The weight on the legs and arms would have no impact on ventilation.  Any weight placed on the upper back would not significantly limit ventilations enough to cause asphyxiation, particularly because the deputies were not only trying to control Mr. Neuroth, but also change his clothes and remove his handcuffs and leg shackles.  But even if there was some weight force on the upper torso, research using up to 220 lbs. of weight on a subject's back has not shown to cause physiologic changes that would imply asphyxiation is even possible with that amount of weight.

It should also be noted that during this time period, Mr. Neuroth was noted to be talking continuously and breathing air in and out.  In order to cause asphyxiation from compression, air movement into and out of the lungs must be blocked.  This was not the case with Mr. Neuroth.

Approximately 15 minutes after the deputies left the cell, the automatic external defibrillator (AED) electrodes were placed onto Mr. Neuroth, and the AED device captured a heart rhythm that was slow and agonal. Had Mr. Neuroth been asphyxiated while the deputies were in the cell with him, his heart would have stopped at that point due to the asphyxiation and been basically in an agonal rhythm at that point. Agonal rhythms are not very robust and quickly degenerate into asystole, i.e., flatline. By virtue of the fact that Mr. Neuroth had an agonal rhythm 15 minutes later implies that his cardiac arrest was not due to asphyxiation, but rather from a primary cardiac event that would have persisted longer and slowly degenerated into the agonal rhythm that they found in

Mr. Neuroth.

Finally, the end-tidal CO2 documented by paramedics within minutes of arriving was reported to be 0 mm Hg.  If Mr. Neuroth had been asphyxiated by the restriction of the chest wall movement due to weight and compression, he would not have been able to ventilate and breathe out carbon dioxide ($CO_2$).  Over the time of asphyxiation, he would have built up high levels of $CO_2$ in his blood and lungs, the earliest clinical indicator of asphyxiation.  Thus, when the paramedics measured the end tidal $CO_2$, the level would have been extremely high.  Though Mr. Neuroth was receiving some bag-valve-mask ventilations by a deputy prior to the arrival of paramedics, the rate of artificial breaths and the effectiveness of the ventilations as viewed on the video were not enough to clear out the amount of $CO_2$ that would have been built up in Mr. Neuroth had his cardiac arrest been caused by asphyxiation. The low $CO_2$ levels are consistent with a primary cardiac arrest and not consistent with ventilatory failure from asphyxiation.

Given that Mr. Neuroth was alive and resisting and talking during the time the deputies were removing his clothes, and that the change in his status occurred suddenly, the deputies' actions in holding Mr. Neuroth and removing his clothes did not cause asphyxia.  The amount of weight and the locations of the weight based on the reports as well as the video are not consistent with being able to cause asphyxiation. Nor is there any evidence that he was asphyxiated based on the reported end tidal $CO_2$ levels or the autopsy findings.  There is simply no evidence that position, restraint or body weight caused or contributed to Mr. Neuroth's death.

Consequently, I disagree with Drs. Michael Baden and Michael Freeman to the extent they opine that Mr. Neuroth died from asphyxiation and that the actions of the deputies contributed to his death.

2. ***I disagree with plaintiff's expert, Dr. Baden, when he misleads the reader of his report as to the amount of weight being placed on Mr. Neuroth.***

Dr. Baden writes in his report, "Grant continued, 'Neuroth stated, 'I just want to die.' While waiting for a modesty garment correctional staff used our combined body weight to press Neuroth to the floor.' (The combined weight of the five persons involved in that restraint was about 1000 lbs.)"  This statement is misleading in that it implies that 1000 lbs. of combined body weight were pressing Mr. Neuroth to the floor.

Based on the information in the video in conjunction with the testimony of the deputies, it is obvious that there is not 1000 pounds of weight being applied to Mr. Neuroth's body at any point in time.  If this was the case, it would have been impossible for Neuroth to talk or for the deputies to pull the clothing out from under him to get him undressed.  It is further seen on video that the officers were kneeling beside Mr. Neuroth during his time in the safety cell. Therefore, I disagree with this interpretation by Dr. Baden of the amount of weight being placed on Mr. Neuroth.

3. ***I disagree with plaintiff's expert, Dr. Baden, when he opines, "Deputy Grant's description that his face and mouth area were blue when he turned Mr. Neuroth over confirms that he died because he couldn't breathe."***

Dr. Baden wrote, "Deputy Grant's description that his face and mouth area were blue when he turned Mr. Neuroth over confirms that he died because he couldn't breathe."  I assume that Dr. Baden made this incorrect assumption because he is a pathologist and does not take care of patients who are alive or in the process of dying. Otherwise, he would have likely commented that there are many reasons why a person's face and mouth area would be blue that do not involve the inability to breathe, and that this fact alone does not confirm any medical diagnosis or conclusion.

Cyanosis occurs during cardiac arrest from non-pulmonary causes, heart attacks, sepsis and massive gastrointestinal bleeding, and can occur with any low flow state of blood where a patient

has low blood pressure or is not perfusing facial tissues well. The cyanosis that Deputy Grant described is most likely caused by the fact that Mr. Neuroth went into cardiac arrest. This is certainly not a specific finding of Mr. Neuroth being unable to breathe nor is it confirmatory.

4. *I disagree with plaintiff's expert, Dr. Freeman, when he implies in his report as to the amount of weight being placed on Mr. Neuroth's chest region.*

Dr. Freeman writes in his report that "Dr. Chapman did not provide any scientific, medical, or evidentiary foundation for his determination that the nearly 600 pounds of in jail personnel apparently kneeling on Mr. Neuroth's body in the video prior to his death could not have caused all the postmortem observations of injury and chest compression…"  This statement clearly misrepresents the reality of what was happening in the cell. Dr. Freeman uses the words "apparently kneeling," which implies to me that he did not do a thorough review of the video or the body positions reported by the deputies.

Based on the information in the video in conjunction with the testimony of the deputies, it is obvious that there is not 600 pounds of weight being applied to Mr. Neuroth's body nor were the deputies kneeling on him.  If this was the case, it would have been impossible for the deputies to pull the clothing out from under him to get him undressed. Additionally, if there were 600 pounds of weight on his chest, Mr. Neuroth would not have been speaking as clearly and frequently as he was. Therefore, I disagree with this interpretation by Dr. Freeman of the amount of weight being placed on Mr. Neuroth.

5. *I agree with the medical examiner, Dr. Chapman, that more likely than not, the cause of the sudden cardiac arrest and death in Mr. Neuroth was methamphetamine and continued struggle and resistance.*

After being admitted to the jail, Mr. Neuroth began acting in a bizarre manner consistent

with being under the influence of methamphetamine. He was easily agitated and hallucinating. And his toxicology screen was positive for methamphetamine.  Methamphetamine is a stimulant that increases the work of the heart.  It increases the heart rate and contraction strength of the cardiac muscles.  This increased heart rate will increase oxygen demand throughout the body as well as the heart muscle. Additionally, methamphetamine will cause the blood to be more acidic, caused by a metabolic acidosis.  This increased acidosis (lower pH of the blood) is irritating to the cardiac muscle, increasing the risk of an irregular heart beat (dysrhythmia) and sudden cardiac arrest.

When Mr. Neuroth was placed into the safety cell he became agitated and exerted himself by physically resisting the deputies.  This is an additional physiologic stressor on top of the methamphetamine consumed by Mr. Neuroth which increases lactic acid production of muscles and demands more oxygen.  The lactic acid production is additive to the metabolic acidosis from the methamphetamine use and worsens the irritability of the cardiac muscle, increasing the risk of sudden cardiac arrest. Therefore, I agree with Dr. Chapman where he opined that the cause of the sudden cardiac arrest and death in Mr. Neuroth was methamphetamine toxicity associated with struggle and resistance.

## Background

My background is that I am a full-time faculty member in the department of emergency medicine at the University of California, San Diego Medical Center. I am residency trained and board certified in Emergency Medicine.  I work full time as a practicing clinician in the Emergency Department of a busy urban hospital and serve as the vice chair of clinical operations for our department, overseeing clinical operations over our two emergency departments with a combined annual census of approximately 70,000 visits, urgent care and EMS division.  I currently serve as the Medical Director for Risk Management for the UC San Diego Health System.  I also serve as

the UCSD Medical Center's Medical Risk Management Committee Chair and Allocation Committee Co-Chair, as well as previously having served as the Chair of the Patient Care and Peer Review Committee, each of which are charged with the task of reviewing medical records and making determinations of standard of care. I am also the former Chief of Staff for the UCSD Health System.

I have worked for over 20 years as a faculty emergency physician at an urban-based emergency department that is contracted to receive patients who are in custody, both as field arrests and for on-going care while incarcerated.   I served as the UCSD Director of Custody Services overseeing hospital services for the San Diego County Sheriff's Department Medical Services for 16 years.   I also have worked in a jail setting for over 18 years, staffing weekly sick call clinics on site at the San Diego Sheriff's jails throughout San Diego County.  I have also served as the on-site medical director for the San Diego Sheriff's medical clinics for 16 years where I have trained staff physicians, participated in quality assurance, resource utilization, policy and protocol development and peer review.  I have also overseen the physician staffing for seven jails in San Diego County over that time.  During my career, I have evaluated thousands of patients over the last 20 years who have been under the influence of drugs or were in cardiac arrest.

My Emergency Medical Services (EMS)/prehospital background and experience includes having been a flight physician with Lifeflight of San Diego and with Mercy Air, taking care of acutely injured patients at the scene.  My EMS administrative roles include having been the Base Station Medical Director for UCSD, the Medical Director for the Palomar and Southwestern Paramedic College Training Programs, and the former Medical Director for the County of San Diego Emergency Medical Services (EMS) one of the largest EMS systems in the nation. In this role, I was responsible for protocols and quality assurance of over 1000 paramedics and 4000 EMT's.  I started the UCSD EMS/Disaster Medicine Fellowship Training Program and was the first

Fellowship Director and currently serve as the Assistant Director of the EMS/Disaster Medicine Division in the UCSD Department of Emergency Medicine and as the Medical Director for Carlsbad Fire Department, Chula Vista Fire Department, and AirLinkUSA Air Ambulance Service. I have been a paramedic base hospital physician in San Diego County for over 25 years.  Other previous roles include the Medical Director for the San Diego County Metropolitan Medical Strike Team (MMST) and serving as EMS medical back up for many SWAT operations. I was also the Principal Investigator for San Diego's Resuscitative Outcomes Consortium (ROC) site, a National Institute of Health (NIH) funded study consortium that evaluated treatment options for out of-hospital cardiac arrest and severe traumatic injury including gunshot injuries for over a decade.

I am knowledgeable about peer-reviewed medical and scientific research on the physiological effects of positional restraint and positional asphyxia conducted by others. I have also performed extensive clinical research on human subjects who have been restrained in various positions with various amounts of weight being placed on them (articles included in my curriculum vitae), which includes having directly been involved with hundreds of subjects being restrained and studied, hundreds of patients restrained during my work in the emergency department, and have personally been restrained with weights placed on me as well.   I have been invited to lecture nationally and internationally on this subject.  Given my own interests in this area, I regularly perform a complete review of the literature regarding restraints and in-custody deaths.

As per Rule 26 formatting, Appendix A is a copy of my current Curriculum Vitae, which includes a list of all publications authored by me.  Appendix B is a list of all cases in which I have testified as an expert in trial or deposition within the preceding four years.  Appendix C is my fee schedule.   The knowledge base that I utilize has been developed over time from my years of clinical practice and experience, reading and training as well as research.  Under penalty of perjury, I hereby swear that the opinions stated above are true and correct within a reasonable degree of

medical probability. I also reserve the right to review the Rule 26 Reports of other expert witnesses

retained in this case by all parties, and review other materials as they become available in the case,

and provide additional opinions as appropriate.

Respectfully submitted,

Gary M. Vilke, M.D., FACEP, FAAEM
Professor of Clinical Emergency Medicine
Vice-Chair, Clinical Operations Emergency Medicine
Medical Director, Risk Management, UC San Diego Health System
Medical Director, Carlsbad Fire, Chula Vista Fire and AirLinkUSA
Director, Clinical Research for Emergency Medicine

# EXHIBIT I



Mon 2/5/2018 3:43 PM

Haddad & Sherwin <michael.julia@haddadsherwin.com>

**Neuroth v Mendocino County**

To    Anne Keck; kvaughan@pattonryan.com; Peter Bertling; 'Jerome Varanini'; 'Scott A. Lewis'

Cc    Haddad & Sherwin LLP; Abigail Hamilton; Bre Montgomery; Maya Sorensen; Teresa Allen

 You forwarded this message on 2/22/2018 10:00 AM.

 Message    🔒 Michael Baden MD Rebuttal report.pdf (108 KB)

All, Since you are taking the deposition of Dr. Baden tomorrow, I am attaching an early courtesy copy of his rebuttal report to Defendants' cardiology opinions.  While our rebuttal reports on cardiology are not due for two more weeks, we are providing this report early so that you may ask Dr. Baden about his rebuttal opinions if you wish tomorrow.  Thanks very much, Julia

Julia Sherwin
(510) 452-5500



505 Seventeenth Street
Oakland, CA 94612
www.haddadsherwin.com

# Michael M. Baden, M.D.

15 West 53rd Street, New York, New York 10019
Telephone: (212) 397-2732 • Facsimile: (212) 397-2754 • Email: mbaden@mac.com

14 December 2017

*Via e-mail to Michael.julia@haddadsherwin.com*

Julia Sherwin, Esq.
Haddad & Sherwin
505 Seventeenth Street
Oakland, California 94612

Re:   *Steven Neuroth, deceased*

Dear Ms. Sherwin,

I have just read cardiologist Dr. Joseph Hartman's expert report relative to the cause of death of Mr. Steven Neuroth.  Dr. Hartman does not consider Mr. Neuroth's paranoid schizophrenia and methamphetamine history, the circumstances and manner of his arrest, the hog-tying, the prone back pressure, the facial cyanosis, and methamphetamine toxicology necessary to determine the cause of his death.

In my opinion, he has over-interpreted the agonal electrocardiogram, and has extended his opinion as to the cause of Mr. Neuroth's death beyond his area of expertise.

Very truly yours,

Michael M. Baden, M.D.
Former Chief Medical Examiner,
 New York City
Former Chief Forensic Pathologist,
 New York State Police

MMB:ph

# EXHIBIT J

1   MICHAEL J. HADDAD (State Bar No. 189114)
    JULIA SHERWIN (State Bar No. 189268)
2   MAYA SORENSEN (State Bar No. 250722)
    TERESA ALLEN (State Bar No. 264865)
3   HADDAD & SHERWIN LLP
    505 Seventeenth Street
4   Oakland, California 94612
    Telephone: (510) 452-5500
5   Facsimile: (510) 452-5510
6
7   Attorneys for Plaintiff James Neuroth
8
                **UNITED STATES DISTRICT COURT**
9
                **NORTHERN DISTRICT OF CALIFORNIA**
10
11  JAMES NEUROTH, Individually and as         )
12  Successor in Interest of Decedent STEVEN   )    No: 3:15-cv-03226-RS
    KELLOGG NEUROTH,                           )
13                                             )   **PLAINTIFF'S REBUTTAL EXPERT**
                        Plaintiff,             )   **DISCLOSURES**
14                                             )
             vs.                               )
15                                             )
    MENDOCINO COUNTY, a public entity;         )
16  MENDOCINO COUNTY SHERIFF-                   )
    CORONER THOMAS D. ALLMAN, in his           )
17  individual and official capacities;        )
    CORRECTIONS CAPTAIN TIM PEARCE;            )
18  SERGEANT LORI KNAPP; DEPUTY FRANK          )
    MASTERSON; DEPUTY CRAIG BERNARDI;          )
19  DEPUTY MICHAEL GRANT; DEPUTY               )
    JEANETTE HOLUM; DEPUTY ROBERT              )
20  PAGE; DEPUTY CHRISTINE DE LOS              )
    SANTOS; CITY OF WILLITS, a public entity;  )
21  WILLITS POLICE CHIEF GERARDO               )
    GONZALEZ; WILLITS POLICE OFFICER           )
22  JEFF ANDRADE; WILLITS POLICE               )
    OFFICER KEVIN LEEF; CALIFORNIA             )
23  FORENSIC MEDICAL GROUP,                    )
    INCORPORATED, a California corporation;    )
24  CORRECTIONAL MEDICAL GROUP                 )
    COMPANIES, INCORPORATED, a Delaware        )
25  Corporation; TAYLOR FITHIAN, M.D.;         )
    BARBARA COTTON, R.N.; ELAINE               )
26  HUSTEDT; YVONNE MAXFIELD, R.N.;            )
    CLAIRE TESKE, R.N.; JENNIFER L.            )
27
28

1  CAUDILLO, L.V.N., and COUNTY DEPUTIES   )
   DOES 9–20, and DOES 23–35, individually,    )
2  jointly, and severally,                                   )
                                                                    )
3                           Defendants.                       )
                                                                    )
4                                                                 )
                                                                    )
5  _____   )

1       Pursuant to Fed. Rule Civ. Proc. 26, Plaintiff, by and through his attorneys, HADDAD &

2 SHERWIN LLP, hereby discloses the cardiology expert rebuttal report, to the County Defendants'

3 cardiology opinions, from the following witnesses:

4

5 Daniel Wohlgelernter, M.D.
Cardiology Section Chief-Providence-St. John Hospital-Santa Monica

6 Cardiology Consultants of Santa Monica
1301 20th Street, Suite 590

7 Santa Monica, CA 90404
310-315-0101

8

9 Michael Baden, M.D. also provided a rebuttal report which Plaintiff disclosed on February 5, 2018.

10

11       Plaintiff reserves the right to elicit expert testimony from all Defendants, all witnesses in their

12 area(s) of expertise, all witnesses previously disclosed by any party, and all experts disclosed by

13 Defendants.

14

15 Dated: February 19, 2018            HADDAD & SHERWIN LLP

16

17

18                                  TERESA ALLEN
Attorneys for Plaintiff

19

20

21

22

23

24

25

26

27

28

1

***PROOF OF SERVICE***
(Fed. R. Civ. P. 5 and 28 U.S.C. § 1746)

2

3       Re:        *Neuroth v. Mendocino County, et al.*, (No. 15-cv-03226-RS)

4              I declare that:  I am employed in the County of Alameda, State of California.  I am over the

5       age of eighteen years and not a party to the within entitled cause; my business address is 505

6       Seventeenth Street, Oakland, California 94612.

7              On February 19, 2018, I served the attached PLAINTIFF'S REBUTTAL EXPERT

8       DISCLOSURES on the parties in said cause, by placing a true copy thereof in a sealed envelope with

9       postage thereon fully prepaid, VIA U.S. MAIL, in Oakland, California, addressed as follows:

10      Anne L. Keck
        Keck Law Offices
11      418 B. Street, Suite 206
        Santa Rosa, CA 95401
12      *Counsel for Mendocino County Defendants*

13

14      John W. Patton
        Stephen R. Niemeyer
15      Kathleen M. Kunkle
        Kathryn R. Vaughan
16      Patton & Ryan LLC
        330 N. Wabash, Suite 3800
17      Chicago, IL 60611
        *Counsel for the Mendocino County Defendants*
18

19      Jerome M. Varanini
        The Law Offices of Jerome M. Varanini
20      641 Fulton Avenue, Suite 200
        P.O. Box 590
21      Sacramento, CA 95812
        *Counsel for Defendants California Forensic Medical Group Inc., and Jennifer Caudillo, L.V.N.*
22

23      Scott Lewis
        Perry, Johnson, Anderson, Miller, & Moskowitz, LLP
24      438 1st Street
        Santa Rosa, CA 95401
25      *Counsel for Defendants City of Willits, Kevin Leef, Jeff Andrade, and Gerardo Gonzalez*

26

27

28      No. 3:15-cv-03226-RS: PLAINTIFF'S REBUTTAL EXPERT DISCLOSURES                                    4

1    Peter Bertling
     Bertling Law Group
2    15 West Carrillo Street, Suite 104
     Santa Barbara, CA 93101
3    *Counsel for Defendants Correctional Medical Group Companies, Inc. Taylor Fithian, M.D.,*
4    *Elaine Hustedt, Claire Teske, R.N.*

5              I declare under penalty of perjury that the foregoing is true and correct and that on the date

6    stated above, this declaration was executed at Oakland, California.

7

8

9                                           ABIGAIL HAMILTON

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT K

## DANIEL WOHLGELERNTER, M.D

2299 Century Hill
Los Angeles, CA.  90067

phone (310) 315-0101
Fax (310) 492-9793
Email *drdan@santamonicacardiology.com*

February 18, 2018

Julia Sherwin,  Esq.
Haddad & Sherwin
505 Seventeenth Street
Oakland, CA 94612

RE: James Neuroth, Individually and as Successor in Interest of Decedent Steven Kellogg Neuroth v.
Mendocino County, et al.

Case No.: 3:15-cv-03226

Dear Attorney Sherwin:

I am a board-certified cardiologist with substantial experience in sudden cardiac arrest and sudden
cardiac death, including my service as the director of the ICU and CCU at St. John's Hospital in Santa
Monica, CA.

I am knowledgeable about peer-reviewed medical and scientific research on the topics of
pathophysiology of cardiac arrest and the specific type of cardiac arrest known as PEA (pulseless
electrical activity).  Attached please find the following:  Attachment A : my current Curriculum Vitae,
which includes a list of all publications authored by me;  Attachment B: list of all cases in which I have
testified as an expert in trial or deposition within the preceding four year; Attachment C is my fee
schedule. The knowledge base that I utilize has been formed by my 35 years of clinical practice and
experience, review of clinical and experimental literature,  and my own clinical research.

I have been retained as an expert to review relevant materials and provide expert opinion on this
matter, date of incident, June 10, 2014, and to consider and render expert opinion on whether the
restraining process was contributory to Mr. Steven Neuroth's death.   My report is in rebuttal to the
cardiology opinions offered by defense experts, including Dr. Gary Vilke.

### Materials Reviewed

I have reviewed the following materials pertaining to the above referenced case. This includes, but is not
limited to:

Case-Specific Materials.

1. Plaintiff's Fourth Amended Complaint

1

2. Combined audio/video of jail surveillance recordings

3. Coroner's report

4. CFMG Defendants' Expert Witness Disclosures

5. County Defendants' Expert Witness Disclosures

6. Plaintiff's Expert Witness Disclosures

7. Report of Denise Panosky DNP

8. Report of Grant Fredericks

9. Report of John Ryan

10. Report of Larissa Mooney, M.D.

11. Report of Michael Baden, M.D.

12. Report of Michael Freeman, M.D.

13. Report of Richard Hayward, PhD

14. Report of Todd Wilcox, M.D.

15. Report of Robert Bux, M.D.

16. Report of Terry Fillman, R.N.

17. Defense rebuttal reports : John Peters, PhD;  Lenard Vare;  David Voytek;  Gary Vilke, MD; David Kan, MD; Doug Jenkins

18.  Report of Joseph Hartmann, MD

PERTINENT MEDICAL HISTORY:

Steven Neuroth was schizophrenic and a methamphetamine abuser.   On June 10, 2014, he was running in traffic , and was arrested and taken to jail.  The officers who apprehended Mr. Neuroth believed that he was under the influence of drugs and was having a drug-induced psychotic episode, and discussed whether to take him to the hospital or to jail. Mr. Neuroth was placed in handcuffs and arrested by Officer Andrade, and transported to the Mendocino County Jail by Officer Leef. Mr. Neuroth was 55 years old, 5'11" and weighed 156 pounds (as documented at autopsy).

While being booked in the jail, Mr. Neuroth was initially fairly cooperative. But when he was moved into a sobering cell, Mr. Neuroth suddenly became agitated and started resisting the deputies. He was already handcuffed when entering the sobering cell and, after struggling with deputies, Mr. Neuroth was taken to the ground and leg shackles were placed on him. He was then carried by the deputies from the sobering cell across the hallway into a safety cell, where multiple officers got on top of him for several minutes and repeatedly punched him while he was cuffed, shackled, and prone.  When he became unresponsive, the deputies left.

2

Jail staff then discovered Mr. Neuroth was not breathing, did not have a pulse, and was blue around the mouth. CPR was started by the jail staff, 911 was called, and an Automatic External Defibrillator (AED) device was employed. The AED device recorded and analyzed Mr. Neuroth's heart rhythm, but did not find a shock-able rhythm and did not shock Mr. Neuroth. I have reviewed the AED rhythm strips, and they demonstrate an organized rhythm at a rate of 35-40, consistent with PEA (pulseless electrical activity).

EMS providers responded to the jail and found Mr. Neuroth in CPR status with a Pulseless Electrical Activity (PEA) rhythm. The paramedics provided advanced life saving measures and transported him to the emergency department where resuscitation efforts were continued, but ultimately, a pulse could not be regained and Mr. Neuroth was pronounced dead. Autopsy disclosed widespread blunt force injuries on his body- contusions, abrasions, avulsions- and one rib fracture. They are consistent with injuries that were sustained during the physical restraint in the safety cell. The forensic pathologist, Dr. Jay Chapman, reported the probable cause of death to be "Methamphetamine toxicity associated with violent struggle (any contributory role of restraint asphyxia unascertainable)." Of note, the methamphetamine level found in Mr. Neuroth's bood – 1.1 mg/L is within the US Highway Traffic Safety recreational level, and is not consistent with lethal toxicity from methamphetamine.   Dr. Michael Baden, former Chief Medical Examiner of New York City, and a renowned forensic pathologist, has reviewed this case and has concluded : " The injuries described by Dr. Chapman in his autopsy report, the extent and manner of the physical restraint employed as described by the participants and as seen on the video, and the fact that Mr. Neuroth died while he was being physically restrained, demonstrate that Mr. Neuroth died as a result of compressive asphyxia caused by heavy pressure on his back and possibly his neck, while he was in a prone position. Deputy Grant's description that Mr. Neuroth's face and mouth area were blue when he turned him over confirms that Mr. Neuroth died because he couldn't breathe.  When breathing is interfered with and the oxygen level drops to an abnormally low level, a blue or cyanotic discoloration develops in the skin of the face."  Dr. Baden is thus attributing the cause of death to restraint/compressive asphyxia with resultant hypoxia/hypoxemia (critically low oxygen levels in the blood).

ANALYSIS AND OPINIONS:

1) It is my opinion, with a reasonable degree of medical certainty, that Mr. Neuroth's death was due to restraint/compressive asphyxia with resultant hypoxia/hypoxemia causing PEA cardiac arrest.
   Pulseless electrical activity (PEA), also known as electromechanical dissociation, refers to cardiac arrest in which the electrocardiogram shows a heart rhythm that should produce a pulse, but does not.  The AED rhythm strips obtained in the jail cell and the EKGs recorded by the EMS personnel demonstrate an organized rhythm at a rate of 35-40, consistent with PEA (pulseless electrical activity).
   The following medical literature is informative regarding PEA cardiac arrest:
   2005 American Heart Association Guidelines for Cardiopulmonary Resuscitation and Emergency Cardiovascular Care (December 2005). "Part 7.2: Management of Cardiac Arrest". Circulation. 112 (24 Suppl): IV 58–66. doi:10.1161/CIRCULATIONAHA.105.166557.

3

As is documented in the cardiology literature, PEA may be caused by many conditions, but its most frequent causes are hypovolemia and hypoxemia.
"Hypoxia secondary to respiratory failure is probably the most common cause of PEA, with respiratory insufficiency accompanying 40-50% of PEA cases."
emedicine.medscape.com/article/161080-overview#a6-  updated 11/20/17
The possible causes of PEA are remembered as the 6 Hs and the 6 Ts.
Hypovolemia
Hypoxia
Hydrogen ion (acidosis)
Hypokalemia/ hyperkalemia
Hypoglycemia
Hypothermia
Toxins
Cardiac tamponade
Tension pneumothorax
Thrombosis (coronary or pulmonary)
Trauma

In reviewing the literature and as confirmed by my extensive experience as a cardiologist, the only plausible and possible cause of PEA cardiac arrest in Mr. Neuroth was hypoxia/hypoxemia, secondary to restraint/compressive asphyxia. None of the other possible causes listed above are plausible or relevant in the case of Mr. Neuroth.

2) I totally reject the contention that the cause of the sudden cardiac arrest and death in Mr. Neuroth was methamphetamine. Aside from the fact that the methamphetamine blood level in Mr. Neuroth was not sufficiently high to be lethal, the undeniable fact that the cardiac rhythm as the time of cardiac arrest was PEA is incompatible with the theory that methamphetamine was the culprit. The hypothesis that methamphetamine caused the cardiac arrest would only be plausible if the AED at the time of the cardiac arrest showed ventricular fibrillation. Methamphetamine, even at lethal levels of intoxication, does NOT cause PEA. The only acceptable pathophysiologic explanation of the PEA in this case is hypoxia/hypoxemia due to asphyxia.

Gary M. Vilke , MD, emergency department physician, in his January 15, 2018 defense rebuttal report stated the following: "Approximately 15 minutes after the deputies left the cell, the automatic external defibrillator (AED) electrodes were placed onto Mr. Neuroth, and the AED device captured a heart rhythm that was slow and agonal. Had Mr. Neuroth been asphyxiated while the deputies were in the cell with him, his heart would have stopped at that point due to the asphyxiation and been basically in an agonal rhythm at that point. Agonal rhythms are not very robust and quickly degenerate into asystole, i.e., flatline. By virtue of the fact that Mr. Neuroth had an agonal rhythm 15 minutes later implies that his cardiac arrest was not due to asphyxiation, but rather from a primary cardiac event (due to methamphetamine) that would have persisted longer and slowly degenerated into the agonal rhythm that they found in Mr. Neuroth". Dr. Vilke's analysis is completely baseless and incorrect. A primary cardiac event, as

4

described by Dr. Vilke, would be associated with ventricular arrhythmia (eg, ventricular tachycardia or ventricular fibrillation), and ventricular arrhythmias NEVER evolve into PEA.

Dr. Joseph Hartman, cardiologist, has reviewed this case for the defendants, and in his report, dated 11/30/17, states the following: " Mr. Neuroth's use of methamphetamine put him at increased risk for cardiac arrhythmias, Specifically, methamphetamine raises blood epinephrine levels which causes stimulation of the heart and creates a milieu for subsequent ventricular tachycardia and ventricular fibrillation… This cumulative effect of epinephrine produced from Mr. Neuroth's use of methamphetamine and his fighting against the police officers produced the perfect storm to cause the cardiac arrest secondary to ventricular tachycardia/ventricular fibrillation".  Dr. Hartman's theory is utterly lacking in foundation,  as neither the AED rhythm strips nor the EMS EKG strips demonstrated ventricular tachycardia or ventricular fibrillation, but rather showed PEA,  which is incompatible with methamphetamine/epinephrine toxicity, but is entirely compatible with restraint asphyxia and hypoxia, as discussed above.  As previously mentioned,  ventricular arrhythmias never evolve or degenerate into PEA.

Dr. Robert Bux, pathology expert for the defense, opines in his report, dated 11/20/17, that "the cause of death is due to methamphetamine intoxication occurring after a physical struggle with correctional officers…. The mechanism of death is due to the consequences of a lethal cardiac arrhythmia as a consequence of the methamphetamine intoxication and not due to respiratory compromise."  Dr. Bux is completely in error in his understanding of the pathophysiology and the cardiac findings in this case.  There is absolutely no evidence of lethal cardiac arrhythmia (eg- ventricular tachycardia or ventricular fibrillation) in this matter.  The findings at the time of the cardiac arrest were PEA, which is entirely consistent with restraint asphyxia and hypoxia, and entirely inconsistent with methamphetamine intoxications.

Under penalty of perjury, I hereby swear that the opinions stated above are true and correct within a reasonable degree of medical probability. I also reserve the right to review the reports of other expert witnesses retained in this case by all parties, and review other materials as they become available in the case, and provide additional opinions as appropriate.

Sincerely yours,

DANIEL WOHLGELERNTER, MD, FACC

# EXHIBIT L

1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4    JAMES NEUROTH, Individually and as
     Successor in Interest of Decedent
5    STEVEN KELLOGG NEUROTH,

6          Plaintiff,

7      vs.                              NO. 3:15-CV-03226-RS

8    MENDOCINO COUNTY, a public entity;
     MENDOCINO COUNTY SHERIFF-CORONER
9    THOMAS D. ALLMAN, in his individual
     and official capacities; CORRECTIONS
10   CAPTAIN TIM PEARCE; SERGEANT LORI
     KNAPP; DEPUTY FRANK MASTERSON;
11   DEPUTY CRAIG BERNARDI; DEPUTY MICHAEL
     GRANT; DEPUTY JEANETTE HOLUM; DEPUTY
12   ROBERT PAGE; DEPUTY CHRISTINE DE LOS
     SANTOS; CITY OF WILLITS, a public entity;
13   WILLITS POLICE OFFICER KEVIN LEEF;
     CALIFORNIA FORENSIC MEDICAL GROUP,
14   INCORPORATED, a California corporation;
     TAYLOR FITHIAN, MD; JENNIFER L. CAUDILLO,
15   LVN, and COUNTY DEPUTIES DOES 9-20, and
     DOES 23-25, individually, jointly, and
16   severally,

17          Defendants.
     _____/

18

19        VIDEOTAPED DEPOSITION OF A. JAY CHAPMAN, M.D.

20     Taken at 38958 Cypress Way, Gualala, California,
          On Tuesday, August 29, 2017, at 11:33 a.m.
21        Reported by Anne Ramirez, C.S.R. 6186.
             Videotaped by Robert Talbot.

22

23   _____

          ADAIR, POTSWALD & HENNESSEY
24        Certified Shorthand Reporters
       212 West Perkins Street, Ukiah, California
25         (707) 462-8420 and (800) 747-3376

NEUROTH v. COUNTY OF MENDOCINO A. JAY CHAPMAN, M.D., 8/29/2017

2

1    APPEARANCES OF COUNSEL

2    For the Plaintiff:    JULIA SHERWIN
                           ATTORNEY AT LAW
3                          HADDAD & SHERWIN LLP
                           505 SEVENTEENTH STREET
4                          OAKLAND, CALIFORNIA  94612

5    For the Defendant     ANNE L. KECK
     County of Mendocino:  ATTORNEY AT LAW
6                          KECK LAW OFFICES
                           418 B STREET, STE. 206
7                          SANTA ROSA, CALIFORNIA  95401

8                                    and

9                          KATHRYN R. VAUGHAN
                           ATTORNEY AT LAW
10                         PATTON & RYAN LLC
                           330 N. WABASH AVE., STE. 3800
11                         CHICAGO, ILLINOIS  60611

12

13   For the Defendant     SCOTT A. LEWIS
     City of Willits:      ATTORNEY AT LAW
14                         PERRY, JOHNSON, ANDERSON,
                             MILLER & MOSKOWITZ LLP
15                         438 FIRST STREET, 4TH FLOOR
                           SANTA ROSA, CALIFORNIA  95401

16

17   For the Defendants    PETER BERTLING
     CMGC, Elaine Hustedt, ATTORNEY AT LAW
18   Claire Teske, RN and  BERTLING & CLAUSEN
     Yvonne Maxfield, RN:  15 WEST CARRILLO ST., STE. 100
19                         SANTA BARBARA, CALIFORNIA  93101

20

21

22

23

24

25

50

```
 1      Q    Okay.  And what about the epicardial      12:29:16

 2   petechiae?                                        12:29:19

 3      A    I believe that they resulted from the     12:29:19

 4   cardiac compressions that he received.            12:29:22

 5      Q    Epicardial petechiae can appear following 12:29:27

 6   sudden hypoxia; right?                            12:29:32

 7      A    Petechiae, they can, but they are not so  12:29:35

 8   much a function of hypoxia per se or anoxia, but  12:29:38

 9   they're a function of -- what's the word I want --12:29:45

10   pressure phenomena in the vessels combined with, or 12:29:51

11   even in the absence of asphyxia.                  12:29:56

12      Q    Okay.  Let's just talk really quickly     12:30:00

13   about asphyxia.                                   12:30:02

14          So the left ventricle of the heart pumps   12:30:14

15   oxygenated blood into the body; right?            12:30:17

16      A    That's correct.                           12:30:19

17      Q    And then the right side of the heart      12:30:20

18   receives the blood back from the body's tissues and 12:30:21

19   sends it to the lungs to get rid of carbon dioxide 12:30:24

20   and then pick up oxygen; right?                   12:30:28

21      A    I believe you've got that right.          12:30:30

22      Q    And then the right atrium of the heart    12:30:31

23   receives the blood back to send it back circulating 12:30:34

24   in the body after it's been cleared by the lungs; 12:30:36

25   right?                                            12:30:39
```

NEUROTH v. COUNTY OF MENDOCINO A. JAY CHAPMAN, M.D., 8/29/2017

51

| 1 | A    The right atrium? | 12:30:40 |

1      A    The right atrium?                          12:30:40

2      Q    Yeah.                                       12:30:41

3      A    No.  It receives --                         12:30:43

4      Q    What does the right atrium do?              12:30:44

5      A    It receives -- it receives blood from the   12:30:46

6  body to send it into the right ventricle and then   12:30:51

7  through the lungs, back to the left atrium, then to  12:30:56

8  left ventricle, and then to the body.                12:30:59

9      Q    Oh, oh, through the lungs to the left        12:31:01

10  atrium, okay.                                        12:31:04

11      And then the right atrium is located -- is       12:31:05

12  it between the vertebral column and the sternum or   12:31:05

13  chest plate, midway?                                 12:31:08

14      A    Well, it roughly is.                         12:31:10

15      Q    So if a person is constrained in a prone    12:31:11

16  position with other people using their body weight   12:31:15

17  to compress his body into the floor, that can        12:31:18

18  compress the right atrium; right?                     12:31:20

19      MS. KECK:  Objection; incomplete                 12:31:24

20  hypothetical.                                         12:31:25

21      THE WITNESS:  Well, what it does, if you         12:31:26

22  have compression of the chest, you're not only       12:31:27

23  compressing the atrium, you're compressing           12:31:30

24  everything in the chest.  So then you have pressure  12:31:33

25  phenomena that exhibit elsewhere.                    12:31:36

NEUROTH v. COUNTY OF MENDOCINO A. JAY CHAPMAN, M.D., 8/29/2017

63

| | | |
|---|---|---|
| 1 | THE WITNESS:  Vein. | 12:43:30 |
| 2 | Q    (BY MS. SHERWIN)  Where on the femoral | 12:43:30 |
| 3 | vain did you draw the blood from? | 12:43:30 |
| 4 | A    In the usual spot, which is in the groin. | 12:43:33 |
| 5 | That's where everybody gets it, as far as I know. | 12:43:36 |
| 6 | Q    And then you found -- well, strike that. | 12:43:44 |
| 7 | You found that Steven Neuroth's heart was | 12:43:50 |
| 8 | of a normal configuration; right? | 12:43:55 |
| 9 | A    That's true. | 12:43:58 |
| 10 | Q    And he did not have any clogging in his | 12:44:03 |
| 11 | coronary arteries; right? | 12:44:06 |
| 12 | A    Clogging? | 12:44:08 |
| 13 | Q    Yeah. | 12:44:08 |
| 14 | A    There was no obstruction. | 12:44:09 |
| 15 | Q    Right. | 12:44:10 |
| 16 | A    Yes. | 12:44:11 |
| 17 | Q    And his heart was -- was within normal | 12:44:13 |
| 18 | limits for an adult male? | 12:44:15 |
| 19 | A    Yes. | 12:44:17 |
| 20 | Q    He did not have cardiomyopathy; is that | 12:44:17 |
| 21 | right? | 12:44:20 |
| 22 | A    He did not. | 12:44:20 |
| 23 | Q    And you found no other anatomical medical | 12:44:21 |
| 24 | issue with Mr. Neuroth that would explain his death; | 12:44:27 |
| 25 | right? | 12:44:31 |

NEUROTH v. COUNTY OF MENDOCINO A. JAY CHAPMAN, M.D., 8/29/2017

64

| | | | |
|---|---|---|---|
| 1 | A | There was no anatomical cause of death. | 12:44:32 |
| 2 | Q | Now you stated that the, quote, "Probable | 12:44:40 |
| 3 | cause of death," end quote, was, quote, | | 12:44:44 |
| 4 | "Methamphetamine toxicity associated with violent | | 12:44:48 |
| 5 | struggle, paren, (any contributory role of restraint | | 12:44:52 |
| 6 | asphyxia unascertainable)" end paren, end quote.  Is | | 12:44:54 |
| 7 | that correct? | | 12:45:00 |
| 8 | A | That's exactly as stated, yes. | 12:45:00 |
| 9 | Q | And why did you say that the probable | 12:45:01 |
| 10 | cause of death was methamphetamine toxicity | | 12:45:04 |
| 11 | associated with violent struggle instead of the | | 12:45:08 |
| 12 | cause of death? | | 12:45:11 |
| 13 | A | Well, that's just part of the standard | 12:45:12 |
| 14 | boilerplate that's in the autopsy protocol.  It | | 12:45:17 |
| 15 | always says probable cause of death. | | 12:45:20 |
| 16 | Q | Oh, all of your autopsy reports say | 12:45:22 |
| 17 | probable cause of death? | | 12:45:25 |
| 18 | A | Yes. | 12:45:27 |
| 19 | Q | Okay.  I've seen many autopsy reports that | 12:45:28 |
| 20 | just say cause of death, so -- | | 12:45:29 |
| 21 | A | That's true. | 12:45:30 |
| 22 | Q | -- I'm asking you about that. | 12:45:31 |
| 23 | | But when you -- | 12:45:32 |
| 24 | A | But when it says -- that's what I believe | 12:45:32 |
| 25 | to be the cause of death. | | 12:45:34 |

1  that -- with the greatest medical probability.  And    14:46:36

2  it's as close to 100 percent as I can get, but I       14:46:39

3  can't give you -- certainly well more than 50          14:46:42

4  percent, but I can't give you -- I don't know how to   14:46:45

5  quantify it.                                           14:46:49

6      Q    (BY MR. BERTLING)  I think you've answered    14:46:50

7  my question.  I appreciate that.                       14:46:51

8           With regard to the comment in your           14:46:53

9  "probable cause of death" section you say, quote,      14:46:54

10 "any contributing role" -- "any contributory role of  14:46:58

11 restraint asphyxia unascertainable."  And I think      14:47:03

12 you had testified earlier that that was synonymous     14:47:07

13 with you saying that you don't believe in all          14:47:12

14 probability the restraint asphyxia caused or           14:47:14

15 contributed to this gentleman's death; is that         14:47:18

16 correct?                                               14:47:21

17     A    That's correct.                               14:47:21

18     Q    Could you please explain to me why you        14:47:21

19 hold that opinion?                                      14:47:23

20          So, for example, if you were going to be      14:47:25

21 sitting on the stand explaining to the jury why you    14:47:27

22 don't think restraint asphyxia caused or contributed   14:47:31

23 to the gentleman's death, would what would you tell    14:47:35

24 them?                                                  14:47:38

25          MS. KECK:  Objection; asked and answered.     14:47:39

NEUROTH v. COUNTY OF MENDOCINO A. JAY CHAPMAN, M.D., 8/29/2017

132

| 1 | THE WITNESS:  Do you want me to go through | 14:47:41 |
| 2 | the whole spiel? | 14:47:42 |
| 3 | MR. BERTLING:  Yeah.  No, I would like to | 14:47:44 |
| 4 | hear that because I don't think I've heard it | 14:47:45 |
| 5 | completely, and there may be other reasons that you | 14:47:47 |
| 6 | haven't already given to Ms. Sherwin.  And I just | 14:47:49 |
| 7 | want to make sure we have a complete response to | 14:47:52 |
| 8 | that question. | 14:47:55 |
| 9 | MS. SHERWIN:  Well, I -- I think it would | 14:47:56 |
| 10 | be more fair to the doctor just to ask him if he | 14:47:57 |
| 11 | left anything out.  I mean we've been at this for | 14:47:59 |
| 12 | several hours now. | 14:48:02 |
| 13 | Q    (BY MR. BERTLING)  If you could just | 14:48:04 |
| 14 | answer my question, Doctor, I'd appreciate it. | 14:48:04 |
| 15 | A    Okay.  Say your question again so I know. | 14:48:07 |
| 16 | Q    I'm just -- I just want to know what | 14:48:09 |
| 17 | you're going to explain to the jury regarding why | 14:48:11 |
| 18 | you don't believe that restraint asphyxia caused or | 14:48:13 |
| 19 | contributed to Mr. Neuroth's death. | 14:48:18 |
| 20 | A    Okay.  Specifically regarding why | 14:48:22 |
| 21 | restraint asphyxia I don't believe contributed, it's | 14:48:25 |
| 22 | shown in the literature that you can have prone | 14:48:28 |
| 23 | restraint and you do have an embarrassment, to some | 14:48:31 |
| 24 | degree, of forced expiratory volume and some | 14:48:35 |
| 25 | respiratory parameters, but force -- prone restraint | 14:48:39 |

NEUROTH v. COUNTY OF MENDOCINO A. JAY CHAPMAN, M.D., 8/29/2017

133

1  does not give that significant a reduction in          14:48:45

2  oxygenation.  And without weight on the back -- if     14:48:52

3  you have weight on the back, then you have a           14:48:55

4  significant factor.  And I -- by looking at this       14:48:57

5  video and so forth, I don't see any indication that    14:49:01

6  any restraint was given to Mr. Neuroth that would      14:49:04

7  significantly impair his respiration.                  14:49:10

8          Additionally, during this time, and           14:49:14

9  especially in the -- in the part of the video where    14:49:17

10 we have the synced audio, he is continually            14:49:19

11 verbalizing.  He never verbalized that he was having   14:49:24

12 trouble breathing or anything of that nature.          14:49:28

13         The -- additionally, one of the officers,      14:49:31

14 when he -- when they left after they had removed his   14:49:35

15 clothing and his restraint, told him to lie still or   14:49:37

16 he -- they would go through this whole thing again.    14:49:43

17 And he said, "I" -- something to the effect "I won't   14:49:45

18 move," so which indicates to me that he was still      14:49:48

19 breathing and he was still talking at that time.  So   14:49:51

20 if he had been killed by restraint asphyxia, that      14:49:55

21 would not have been a possibility.                     14:49:59

22         There are various mechanisms of death that     14:50:03

23 might be considered in this case, and they all, to     14:50:05

24 me, relate back to the methamphetamine abuse.          14:50:08

25         When we talk -- maybe I should explain         14:50:13

| | | |
|---|---|---|
| 1 | what I mean by "cause of death" versus "mechanism of | 14:50:14 |
| 2 | death."  I'll give you an example. | 14:50:17 |
| 3 | Say a man is shot in the back and he has a | 14:50:21 |
| 4 | severed spinal cord and he's paraplegic after that | 14:50:25 |
| 5 | and he was shot intentionally by someone else and | 14:50:28 |
| 6 | then he lives for another 35 or 40 years.  By that | 14:50:31 |
| 7 | time, most people have forgotten about the gunshot | 14:50:36 |
| 8 | wound initially, but he's confined to a wheelchair, | 14:50:39 |
| 9 | he's had all of the problems that paraplegics have, | 14:50:41 |
| 10 | he was renal failure, he -- as a result of repeated | 14:50:45 |
| 11 | urinary tract infections, kidney infections, and so | 14:50:49 |
| 12 | forth.  So he dies ultimately with renal failure. | 14:50:50 |
| 13 | Okay.  What is the cause of death?  The | 14:50:55 |
| 14 | cause of death or the proximate cause of death or | 14:50:58 |
| 15 | the initiating cause of death, whatever you want to | 14:51:02 |
| 16 | say, those three terms are synonymous, is the | 14:51:05 |
| 17 | gunshot wound to the back.  And so the manner of | 14:51:08 |
| 18 | death in that case would be homicide because he was | 14:51:10 |
| 19 | intentionally shot by another person, even though | 14:51:14 |
| 20 | death was delayed for 35 years. | 14:51:16 |
| 21 | The renal failure -- and this is one | 14:51:19 |
| 22 | reason why, going back to your question, death | 14:51:22 |
| 23 | certificates are so inaccurate, because most -- many | 14:51:25 |
| 24 | doctors and the medical records will have lost the | 14:51:27 |
| 25 | fact that this was due to a gunshot wound, and so on | 14:51:31 |

135

| | | |
|---|---|---|
| 1 | the death certificate goes renal failure without | 14:51:34 |
| 2 | anything else, but in fact the cause of death is the | 14:51:37 |
| 3 | gunshot wound. | 14:51:40 |
| 4 | So we have in this case a person who | 14:51:41 |
| 5 | obviously knowingly takes methamphetamine and he | 14:51:45 |
| 6 | exhibits all of the -- many of the signs and | 14:51:50 |
| 7 | symptoms of methamphetamine -- manifestations of | 14:51:55 |
| 8 | methamphetamine abuse, methamphetamine is present in | 14:51:58 |
| 9 | his system in a significant level. And so with all | 14:52:01 |
| 10 | of this going on, methamphetamine is a | 14:52:08 |
| 11 | sympathomimetic drug. That means it sensitizes the | 14:52:12 |
| 12 | heart to ephinephrine and -- epinephrine and | 14:52:15 |
| 13 | norepinephrine, a fight or flight situation exists, | 14:52:17 |
| 14 | and so this potentially could cause a cardiac | 14:52:22 |
| 15 | dysrhythmia. | 14:52:25 |
| 16 | The other thing that happens in these | 14:52:28 |
| 17 | cases is that dopamine in the brain is affected. | 14:52:30 |
| 18 | And dopamine accumulates, it's a transporter and it | 14:52:35 |
| 19 | accumulates, and it can set off a cascade of events | 14:52:38 |
| 20 | that can cause respiratory arrest and ultimately | 14:52:44 |
| 21 | cardiac arrest. | 14:52:47 |
| 22 | So the two pathways, essentially, that can | 14:52:48 |
| 23 | cause death in this case, those would be mechanisms | 14:52:51 |
| 24 | of death; but the underlying cause of death and the | 14:52:54 |
| 25 | initiating factor for this whole panoply of things | 14:52:57 |

NEUROTH v. COUNTY OF MENDOCINO A. JAY CHAPMAN, M.D., 8/29/2017

136

1    that has resulted was caused by methamphetamine    14:53:01

2    abuse.  So methamphetamine is the underlying cause    14:53:05

3    of death.    14:53:08

4        Q   Is there any other reason you believe that    14:53:09

5    restraint asphyxia didn't cause or contribute to the    14:53:13

6    death, other than what you've just articulated or in    14:53:15

7    other testimony you've already articulated?    14:53:19

8        A   Well, we have negative findings.  And    14:53:22

9    counsel has asked me about piling on of weights on    14:53:24

10    the body and so forth, and if there was significant    14:53:29

11    amount of weight on the body, I would expect that    14:53:33

12    death would have occurred at that time and not    14:53:36

13    after -- he would be able to speak after that.  But    14:53:39

14    I would also expect that one might find the    14:53:43

15    petechiae present.  I would certainly expect them if    14:53:47

16    significant pressure had been placed on the chest,    14:53:52

17    and I would not expect them in the chest, but in the    14:53:53

18    face and the eyes and -- in that case.    14:53:55

19        Q   Have you now given me every reason why you    14:54:00

20    don't believe positional asphyxia caused or    14:54:02

21    contributed to this gentleman's death?    14:54:06

22        A   Every reason?  Let me think.    14:54:08

23        Q   This is really the only time I think we're    14:54:13

24    going to have the opportunity to depose or speak    14:54:14

25    with you, so I just want to be as thorough as    14:54:16

142

1   history, and in this case we do, then I think that's   15:01:15

2   the important part that comes in.   15:01:19

3            MR. BERTLING:  Doctor, thank you for your   15:01:22

4   time.  I have no further questions.   15:01:23

5            MR. LEWIS:  No further questions.   15:01:25

6            MS. SHERWIN:  Okay.  I have some follow-up   15:01:26

7   questions then.   15:01:28

8                      - - -   15:01:29

9                   EXAMINATION   15:01:29

10       Q    (BY MS. SHERWIN)  Doctor, have you brought   15:01:29

11   with you the literature that you say states that   15:01:30

12   prone restraint does not cause or contribute to   15:01:33

13   death?   15:01:37

14            And, just for the record, what -- what   15:01:39

15   exhibit are you referring to, Doctor, down there on   15:01:41

16   the bottom, Exhibit 71?   15:01:43

17       A    Seventy-one.   15:01:44

18            Okay, so I'll put those back over there.   15:01:49

19            Okay.  Here's one that says -- and this is   15:02:37

20   an article from the National Institute of Medicine,   15:02:41

21   National Institutes of Health, from the Government.   15:02:47

22       Q    And, I'm sorry, what is the title of that   15:02:51

23   so we're able to look at it later?   15:02:53

24       A    Well, it is from the West Journal of   15:02:55

25   Emergency Medicine, 2011 February 12.   15:02:59

143

1          Q     And who is the author?                    15:03:02

2          A     Well, you may have to pronounce it.        15:03:07

3   Asis -- Asia Takeuchi, and there's Terence L.          15:03:09

4   Abram -- Ahern, and Sean Henderson.                    15:03:14

5          Q     Okay.  Thank you.                          15:03:20

6          A     So it states in this article:             15:03:23

7                "The positional asphyxia theory has       15:03:25

8          been refuted by a series of articles by         15:03:27

9          Chan et al," and there's a reference,           15:03:30

10         "exploring the effect of PRMP" -- the PRMP      15:03:33

11         is a prone maximal restraint position --        15:03:37

12         "on ventilatory capacity and arterial           15:03:42

13         blood gases."                                    15:03:46

14               And he goes here to say, "In one study of  15:03:46

15   15 healthy male volunteers, the authors" --           15:03:48

16               MS. KECK:  Slow down a little bit so she   15:03:50

17   can type.  Sorry.                                      15:03:51

18               THE WITNESS:  "The authors found a         15:03:52

19         small, but statistically significant            15:03:53

20         decline in forced vital capacity, forced        15:03:56

21         expiratory volume in one second, and            15:03:58

22         maximal minute volume comparing sitting to      15:04:01

23         restrained positions.  However, there was       15:04:04

24         no evidence of hypoxia, meaning oxygen          15:04:07

25         tension, or PO2, less than 95 millimeters       15:04:10

NEUROTH v. COUNTY OF MENDOCINO A. JAY CHAPMAN, M.D., 8/29/2017

144

| | | |
|---|---|---|
| 1 | of mercury or co-oximetry less than 96 | 15:04:14 |
| 2 | percent in either position, nor was there | 15:04:17 |
| 3 | a significant difference in the PCO2" -- | 15:04:19 |
| 4 | that's the carbon dioxide tension -- | 15:04:23 |
| 5 | "heart rate recovery or oxygen saturation. | 15:04:26 |
| 6 | In another study, the authors sought to | 15:04:29 |
| 7 | determine the effect of adding 25 and 50 | 15:04:31 |
| 8 | pounds weight force on respiratory | 15:04:34 |
| 9 | function of healthy volunteers in the | 15:04:36 |
| 10 | PRMP."  That's a prone maximal restrained | 15:04:39 |
| 11 | position.  "Validating earlier results, | 15:04:42 |
| 12 | they found the FVC/FEV was significantly | 15:04:44 |
| 13 | lowered" -- "lower in restrained positions | 15:04:48 |
| 14 | versus sitting, but not significantly | 15:04:51 |
| 15 | different between restrained positions | 15:04:53 |
| 16 | with and without weight force. | 15:04:54 |
| 17 | Furthermore, they found mean oxygen | 15:04:57 |
| 18 | saturation levels were above 95 percent | 15:04:59 |
| 19 | and mean end-tidal CO2 levels were below | 15:05:02 |
| 20 | 45 in all positions, regardless of weight | 15:05:04 |
| 21 | force.  Based on these findings, PRMP may | 15:05:07 |
| 22 | result in a transient pattern of | 15:05:12 |
| 23 | restricted pulmonary function, but the | 15:05:14 |
| 24 | lack of evidence for hypoxia or | 15:05:16 |
| 25 | hypoventilation suggests that factors | 15:05:18 |

NEUROTH v. COUNTY OF MENDOCINO A. JAY CHAPMAN, M.D., 8/29/2017

145

| | | |
|---|---|---|
| 1 | other than body positioning appear to be | 15:05:20 |
| 2 | more important determinants for sudden, | 15:05:23 |
| 3 | unexpected death." | 15:05:26 |
| 4 | And one of those major determinants is | 15:05:28 |
| 5 | whether or not the patient is obese. Certainly, if | 15:05:30 |
| 6 | you've put a person down that's obese in a -- in a | 15:05:32 |
| 7 | restrained position, you'll have more problem than | 15:05:35 |
| 8 | you will if the person is not obese. | 15:05:37 |
| 9 | The -- in the conclusions: "While | 15:05:44 |
| 10 | the contribution of restraint, struggle, | 15:05:53 |
| 11 | and the use of electrical conduction | 15:05:55 |
| 12 | devices to the cause of death raises | 15:05:57 |
| 13 | controversy, recent research points toward | 15:05:59 |
| 14 | central nervous system dysfunction of | 15:06:01 |
| 15 | dopamine signaling as a cause of the | 15:06:03 |
| 16 | delirium and fatal autonomic dysfunction." | 15:06:07 |
| 17 | And I believe that's one of the pathways | 15:06:11 |
| 18 | that is probable in this case. | 15:06:13 |
| 19 | Q   (BY MS. SHERWIN)  Okay.  Well, hold this | 15:06:17 |
| 20 | article out because I'm going to ask you more | 15:06:18 |
| 21 | questions about it. | 15:06:20 |
| 22 | Are there any other articles that you've | 15:06:21 |
| 23 | brought with you that you believe show that prone | 15:06:22 |
| 24 | restraint does not cause or contribute to death? | 15:06:26 |
| 25 | A   Okay.  This is Dr. Reay's article from | 15:06:30 |

ADAIR, POTSWALD & HENNESSEY1-800-747-DEPO