# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

———————————————————

)

JAMES NEUROTH, Individually and )
as Successor in Interest of )
Decedent STEVEN KELLOGG NEUROTH, )

)

        Plaintiff, )

)

vs. ) Case No. 3:15-cv-03226-RS

)

MENDOCINO COUNTY, a public )
entity; MENDOCINO COUNTY SHERIFF- )
CORONER THOMAS D. ALLMAN, in his )
individual and official )
capacities; CORRECTIONS CAPTAIN )
TIM PEARCE; SERGEANT LORI KNAPP; )
DEPUTY FRANK MASTERSON; DEPUTY )
CRAIG BERNARDI; DEPUTY MICHAEL )
GRANT; DEPUTY JEANETTE HOLUM; )
DEPUTY ROBERT PAGE; DEPUTY )
CHRISTINE DE LOS SANTOS; CITY OF )
WILLITS, a public entity; WILLITS )
POLICE CHIEF GERARDO GONZALEZ; )
WILLITS POLICE OFFICER JEFF )
ANDRADE; WILLITS POLICE OFFICER )
KEVIN LEEF; CALIFORNIA FORENSIC )
MEDICAL GROUP, INCORPORATED, a )
California corporation; )
CORRECTIONAL MEDICAL GROUP )
COMPANIES, INCORPORATED, a )
Delaware Corporation; TAYLOR )
FITHIAN, M.D.; BARBARA COTTON, )
R.N.; ELAINE HUSTEDT; YVONNE )
MAXFIELD, R.N.; CLAIRE TESKE, )
R.N.; JENNIFER L. CAUDILLO, )
L.V.N.; and COUNTY DEPUTIES DOES )
9-20, and DOES 23-25, )
individually, jointly, and )
severally, )

)

        Defendants. )

———————————————————)

VIDEO DEPOSITION OF GARY M. VILKE, MD, FACEP, FAAEM

San Diego, California

March 19, 2018

Reported by Gina Marie De Luca, CSR No. 6973, RMR, CRR

Page 1

**Page 2**

```
 1            UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
 2      _____
                                      )
 3   JAMES NEUROTH, Individually and  )
     as Successor in Interest of      )
 4   Decedent STEVEN KELLOGG NEUROTH, )
                                      )
 5            Plaintiff,              )
                                      )
 6      vs.                           )  Case No. 3:15-cv-03226-RS
                                      )
 7   MENDOCINO COUNTY, a public       )
     entity; MENDOCINO COUNTY SHERIFF-)
 8   CORONER THOMAS D. ALLMAN, in his )
     individual and official          )
 9   capacities; CORRECTIONS CAPTAIN  )
     TIM PEARCE; SERGEANT LORI KNAPP; )
10   DEPUTY FRANK MASTERSON; DEPUTY   )
     CRAIG BERNARDI; DEPUTY MICHAEL   )
11   GRANT; DEPUTY JEANETTE HOLUM;    )
     DEPUTY ROBERT PAGE; DEPUTY       )
12   CHRISTINE DE LOS SANTOS; CITY OF )
     WILLITS, a public entity; WILLITS)
13   POLICE CHIEF GERARDO GONZALEZ;   )
     WILLITS POLICE OFFICER JEFF      )
14   ANDRADE; WILLITS POLICE OFFICER  )
     KEVIN LEEF; CALIFORNIA FORENSIC  )
15   MEDICAL GROUP, INCORPORATED, a   )
     California corporation;          )
16   CORRECTIONAL MEDICAL GROUP       )
     COMPANIES, INCORPORATED, a       )
17   Delaware Corporation; TAYLOR     )
     FITHIAN, M.D.; BARBARA COTTON,   )
18   R.N.; ELAINE HUSTEDT; YVONNE     )
     MAXFIELD, R.N.; CLAIRE TESKE,    )
19   R.N.; JENNIFER L. CAUDILLO,      )
     L.V.N.; and COUNTY DEPUTIES DOES )
20   9-20, and DOES 23-25,            )
     individually, jointly, and      )
21   severally,                       )
                                      )
22            Defendants.             )
                                      )
23      VIDEO DEPOSITION OF GARY M. VILKE, MD, FACEP, FAAEM,
24   commencing at the hour of 10:35 a.m., on Monday,
     March 19, 2018, at 1350 Columbia Street, Suite 703,
25   San Diego, California, before Gina Marie De Luca,
     Certified Shorthand Reporter in and for the State of
```

**Page 3**

```
 1   APPEARANCES:
 2
     For Plaintiff James Neuroth
 3
     HADDAD & SHERWIN, LLP
 4   BY:  JULIA SHERWIN, ESQ.
     505 Seventeenth Street
 5   Oakland, California 94612
     510.452.5500
 6   510.452.5510 Fax
     michael.julia@haddadsherwin.com
 7
 8   For Mendocino County Defendants:
 9   PATTON & RYAN, LLC
     BY:  STEPHEN NIEMEYER, ESQ.
10   330 North Wabash Avenue, Suite 3800
     Chicago, Illinois 60611
11   312.261.5160
     312.261.5161 Fax
12   sniemeyer@pattonryan.com
13
     For Defendants Correctional Medical Group Companies,
14   Inc.; Taylor Fithian, MD; Claire Teske, RN; and Elaine
     Hustedt:
15
     BERTLING LAW GROUP
16   BY:  PETER G. BERTLING, ESQ.
     15 West Carrillo Street, Suite 104
17   Santa Barbara, California 93101
     805.879.7558
18   805.962.0722 Fax
     peter@bertlinglawgroup.com
19
20   For Defendants California Forensic Medical Group; Inc.;
     and Jennifer Caudillo, LVN:
21
     THE LAW OFFICES OF JEROME M. VARANINI
22   BY:  JEROME M. VARANINI, ESQ.
          (Telephonic Appearance)
23   641 Fulton Avenue, Suite 200
     P.O Box 590
24   Sacramento, California 95812
     916.993.4868
25   916.993.6750 Fax
```

**Page 4**

```
 1   APPEARANCES (continued):
 2   For Defendants City of Willits, Kevin Leef, Jeff
     Andrade, and Gerardo Gonzalez:
 3
     PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ, LLP
 4   BY:  AMY S. WINTERS, ESQ.
          (Telephonic Appearance)
 5   438 1st Street, Fourth Floor
     Santa Rosa, California 95401-6390
 6   707.525.8800
     707.545.8242 Fax
 7   winters@perrylaw.net
 8
     Also present:  Collette Stark, Videographer
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1                  I N D E X
 2
 3   WITNESS:  GARY M. VILKE, MD, FACEP, FAAEM
 4
 5   EXAMINATION                      PAGE
 6   By Ms. Sherwin                    7
 7   By Mr. Niemeyer                 186
 8   By Ms. Sherwin                  188
 9
10               E X H I B I T S
11   MARKED FOR IDENTIFICATION         PAGE
12   Exhibit 1  Expert report of Dr. Gary M. Vilke    8
                dated 01/15/18
13
     Exhibit 2  Curriculum Vitae, Gary Michael     11
14                Vilke, M.D., FACEP, FAAEM
15   Exhibit 3  List of deposition and trial       12
                testimony of Dr. Gary M. Vilke as an
16                expert witness
17   Exhibit 4  Invoice from Dr. Gary M. Vilke dated  18
                01/15/18
18
     Exhibit 5  Handwritten notes by Dr. Gary M.   19
19                Vilke with time sheets
20   Exhibit 6  Typewritten notes by Dr. Gary M.   19
                Vilke
21
     Exhibit 7  Report of Autopsy on Steven Kellogg  43
22                Neuroth dated 06/12/14,
                  Bates County-00235 through
23                County-00240
24
25
```

## Page 6

```
 1          E X H I B I T S  (continued)
 2   MARKED FOR IDENTIFICATION                PAGE
 3   Exhibit 8  Mendocino County Sheriff's Office      48
            Detention Facility Incident Report
 4          dated 06/11/14, Bates County-00467
            through County-00469
 5
     Exhibit 9  E-mail from Kevin Bailey to          75
 6          pigs_fly@comcast.net dated 07/10/14,
            Bates County-06432
 7
     Exhibit 10  Chart entitled "Weights of          76
 8          Defendants Involved in Restraining
            Steven Neuroth"
 9
     Exhibit 11  Screenshot of video surveillance of   78
10          Steven Kellogg Neuroth in Safety
            Cell 2 dated 06/10/14
11
     Exhibit 12  FRCP Rule 26(a)(2) Report, Forensic   86
12          Audio Analysis and Enhancement,
            prepared by Doug Jenkins dated
13          01/15/18
14   Exhibit 13  Expert Report of Dr. Gary M. Vilke    93
            in the case of Keeney vs. City of
15          New London dated 01/21/01, Exhibit
            Page 2446 through Exhibit Page 2450
16
     Exhibit 14  Journal of Forensic Sciences article  106
17          entitled "Ventilatory and Metabolic
            Demands During Aggressive Physical
18          Restraint in Healthy Adults,"
            January 2007
19
20   Exhibit 15  Sentinel Event Alert from The Joint   154
            Commission on Preventing Restraint
21          Deaths, Issue 8, dated 11/18/98
22
23
24
25
```

Page 6

## Page 7

```
 1          GARY M. VILKE, MD, FACEP, FAAEM,
 2   having been first duly sworn, testified as follows:
 3                  -oOo-
 4          EXAMINATION
 5   BY MS. SHERWIN:                    10:35:16
 6      Q.  So just for the record, we've been waiting for  10:35:16
 7   the videographer.  We're going to get -- go ahead and  10:35:19
 8   get started since Dr. Vilke has a 4:15 deadline for his  10:35:22
 9   deposition today.                  10:35:28
10      Dr. Vilke, did you -- I guess you produced  10:35:29
11   your -- your notes and your time sheet and your invoice  10:35:36
12   today; right?                     10:35:42
13      A.  Correct.  Yes.                 10:35:43
14      Q.  Okay.  So we'll have the court reporter swear  10:35:44
15   you in, and we'll mark those as exhibits along with your  10:35:46
16   report.                        10:35:49
17      MS. SHERWIN:  Ready to go.            10:35:49
18      THE REPORTER:  I swore him in.         10:35:55
19      MS. SHERWIN:  Oh, you did already.  I'm sorry.  10:35:56
20   Great.                         10:35:58
21   BY MS. SHERWIN:                    10:35:58
22      Q.  Okay.  So we'll mark as Exhibit 1 to the  10:35:58
23   deposition your report.               10:36:02
24      Do you have a copy of your report, or do you  10:36:04
25   need --                        10:36:06
```

Page 7

## Page 8

```
 1      A.  I have the copy of the non-CD portion of it,  10:36:06
 2   yes.                          10:36:09
 3      Q.  Okay.  Great.  We'll just mark as Exhibit 1  10:36:09
 4   your complete report in this case.         10:36:13
 5      (Exhibit 1 marked)               10:36:15
 6   BY MS. SHERWIN:                    10:36:16
 7      Q.  And is Exhibit 1 a complete report of all of  10:36:16
 8   your opinions in this case and the basis for your  10:36:19
 9   opinions?                       10:36:22
10      A.  Yes.                      10:36:22
11      Q.  Is it a complete and accurate statement of  10:36:23
12   everything you reviewed in forming your opinions?  10:36:25
13      A.  I think so.  And the reason I say that is when  10:36:31
14   I was reviewing my Dropbox of materials, I used -- the  10:36:33
15   list that I wrote out was what was on the cover letters  10:36:38
16   with everything that was on that list.  And it looked  10:36:41
17   like there was some things that may not have been -- or  10:36:43
18   may have been included in some of the other aspects of  10:36:47
19   it.                          10:36:50
20      There was plaintiff's discovery that was put in  10:36:51
21   there, and it's a lot of the same materials and  10:36:53
22   different versions of it.  But there's some hospital  10:36:55
23   records, some psychiatric records that I don't think  10:36:59
24   necessarily may come out in some of these portions of  10:37:00
25   it.                          10:37:03
```

Page 8

## Page 9

```
 1      Q.  Okay.  So there are records that you reviewed  10:37:03
 2   but you omitted from your report.           10:37:05
 3      That's what you're saying?            10:37:07
 4      A.  Well, this is a list that defense counsel gave  10:37:08
 5   me as what's included in that Dropbox.  I didn't omit  10:37:11
 6   anything.  I just copied the list as they gave it to me.  10:37:15
 7   So -- but the Dropbox that you should have been given  10:37:17
 8   will have all that material in it.          10:37:20
 9      Q.  Okay.  I'm just a little confused.  It sounds  10:37:21
10   like you said there's information that you reviewed that  10:37:23
11   is not included in your report because, in your report,  10:37:26
12   you copied the list that defense counsel gave you, but  10:37:28
13   there are other documents that you reviewed that aren't  10:37:32
14   in your report; is that correct?           10:37:34
15      A.  There are -- yeah, there's lists of large  10:37:36
16   groups from the Mendocino County District Attorney's  10:37:39
17   investigation file, the coroner's investigation  10:37:43
18   documents.  Those are all listed.          10:37:45
19      But there are -- there were other things -- it  10:37:46
20   says "Expert Witness Disclosures."  I don't know if  10:37:52
21   those actually -- what they're intending in those, and  10:37:55
22   when you open up the files online, there are a lot of  10:37:58
23   things in those files.                10:38:02
24      I think these cover them all, but I was just  10:38:03
25   trying to be up front that if it doesn't say -- like, it  10:38:07
```

Page 9

## Page 10

1   doesn't say specifically written out "previous       10:38:10
2   psychiatric records," but I think that's what was     10:38:11
3   included in some of these separate files that you see  10:38:13
4   listed on my report.                                 10:38:17
5       Q.  Okay.                                        10:38:18
6       A.  Since not every single document is not listed 10:38:19
7   out, some of them were actually files where it says   10:38:23
8   "Disclosures."                                       10:38:23
9       (Reporter query)                                 10:38:23
10      THE WITNESS:  Is not listed out.                 10:38:23
11      So when you see "CFMG Defendants' Expert          10:38:23
12  Witness Disclosures," I think those types of things are 10:38:27
13  included in there, but they weren't listed out        10:38:30
14  specifically.                                        10:38:32
15  BY MS. SHERWIN:                                      10:38:33
16      Q.  Okay.  And you did not omit any of your       10:38:33
17  opinions in this case from your report dated          10:38:36
18  January 15th, 2018; is that correct?                 10:38:39
19      A.  Correct.                                     10:38:42
20      Q.  Is your curriculum vitae that is produced with 10:38:42
21  your January 15th, 2018, report a complete, truthful, 10:38:47
22  and accurate CV?                                     10:38:52
23      A.  At that time, yes.                           10:38:54
24      Q.  Is it your most recent CV?                   10:38:55
25      A.  It is not.                                   10:38:58

## Page 11

1       Q.  Do you have a more recent CV?                10:38:58
2       A.  I do.                                        10:39:01
3       Q.  Do you have one with you?                    10:39:02
4       A.  Yeah.  (Proffers document.)                 10:39:05
5       Q.  Great.                                       10:39:07
6       We'll mark your most recent CV as Exhibit 2.     10:39:07
7       (Exhibit 2 marked)                               10:39:11
8   BY MS. SHERWIN:                                      10:39:12
9       Q.  And in general, what is contained on Exhibit 2 10:39:12
10  that is not contained on Exhibit 1?                  10:39:16
11      A.  Probably a couple more published papers.  I   10:39:21
12  think that's mainly it.  Maybe a couple of tasks that 10:39:25
13  have changed, but nothing should be of pertinence to  10:39:28
14  this case.                                           10:39:32
15      Q.  Has your expert testimony ever been limited or 10:39:33
16  excluded by any court?                               10:39:36
17      A.  Not to my knowledge, no.                     10:39:37
18      Q.  Has any Court ever said that you would not be 10:39:38
19  allowed to offer expert opinion on any particular issue? 10:39:44
20      A.  Same answer.  Not to my knowledge.           10:39:47
21      Q.  Does your updated CV contain any further cases 10:39:49
22  in which you've testified in deposition or at trial?  10:39:55
23      A.  It's not included in my CV, but I brought, as 10:39:59
24  requested, a list of my last four years of materials -- 10:40:02
25      Q.  Okay.                                        10:40:04

## Page 12

1       A.  -- for cases and depositions.                10:40:04
2       Q.  Great.  We'll --                             10:40:09
3       (Reporter query)                                 10:40:10
4       THE WITNESS:  Cases -- trials and depositions.    10:40:10
5       MS. SHERWIN:  Thank you.                         10:40:10
6       We'll mark that as Exhibit 3 to the deposition.   10:40:10
7       (Exhibit 3 marked)                               10:40:13
8   BY MS. SHERWIN:                                      10:40:14
9       Q.  And is it correct that all of your trial     10:40:14
10  testimony in the last four years has been on behalf of 10:40:25
11  defendants in civil cases?                           10:40:30
12      A.  I believe the only plaintiff cases were in med 10:40:32
13  mal cases, which, I think, don't count as that.  So I 10:40:35
14  believe you're correct.                              10:40:40
15      Q.  Have you testified in trial on behalf of a    10:40:40
16  plaintiff in any kind of civil case, including a medical 10:40:42
17  malpractice case, in the last four years?            10:40:45
18      A.  I've testified on medical malpractice cases,  10:40:47
19  yes, on behalf of plaintiffs.                        10:40:50
20      Q.  Are those plaintiff testimonies listed in your 10:40:53
21  case list that you provided with your report?        10:40:58
22      A.  Yes.                                         10:41:01
23      Q.  Okay.  And where are they listed?            10:41:01
24      A.  On my report I just gave you, the most recent 10:41:05
25  list over there, but they're all listed on there.  And 10:41:08

## Page 13

1   in the report, it should be Appendix B.              10:41:11
2       Q.  Okay.  I'll hand you Exhibit 1 to your       10:41:14
3   deposition.                                          10:41:18
4       And please identify for me the trial             10:41:18
5   testimonies you gave in cases on behalf of plaintiffs in 10:41:24
6   any kind of case.                                    10:41:27
7       A.  So it appears that none of my cases went to   10:41:41
8   trial on behalf of plaintiffs in the last four years. 10:41:44
9       Q.  Okay.  And can you please mark with a "P" --  10:41:49
10      Oh, you actually list on your CV the cases in     10:41:54
11  which you testified on behalf of a plaintiff; right?  10:41:57
12      A.  On my -- on my -- it's not on my CV, but on my 10:42:00
13  list of cases, yes, they're marked as either defense or 10:42:03
14  plaintiff.                                           10:42:07
15      Q.  Okay.  And is it correct that about 85 --     10:42:07
16  85 percent of the cases in which you've testified in   10:42:11
17  deposition have been on behalf of defendants in civil 10:42:14
18  cases?                                               10:42:17
19      A.  I'd have to -- to get that specific of a      10:42:18
20  number, I would have to look at it, but it's probably a 10:42:20
21  rough estimate, that is correct, yes.                10:42:24
22      Q.  And you also do a lot of defense expert work in 10:42:27
23  Taser cases; right?                                  10:42:32
24      A.  I have done work with Taser cases, yes.       10:42:33
25      Q.  Including on behalf of TASER International?    10:42:36

1    A.  I've been retained by law firms that were    10:42:39
2  representing them, yes.                  10:42:42
3    Q.  Right.  So you've worked as an expert witness  10:42:43
4  on behalf of TASER International in many cases; right?  10:42:46
5    A.  Certainly a number of cases.            10:42:50
6    Q.  And I had one of your previous depositions that 10:42:51
7  provided the percentage of cases in which you were a  10:42:57
8  defense expert in Taser cases.            10:43:00
9         What is the percentage today?         10:43:03
10    A.  For Taser cases specifically?           10:43:05
11    Q.  Right.                        10:43:07
12    A.  I haven't done a lot of Taser cases recently,  10:43:07
13  but I think the last numbers I've done have all been for 10:43:16
14  defense.  There may be one plaintiff case out there, but 10:43:20
15  as far as testimony goes, I think it's all been defense. 10:43:23
16    Q.  Okay.  And is it still accurate that about   10:43:26
17  25 percent of your expert witness work is in defense in  10:43:29
18  Taser cases?                      10:43:33
19    A.  That 25 percent of my expert witness work -- I 10:43:36
20  think it's probably -- of all my -- of all the cases I'm 10:43:39
21  involved in --                     10:43:43
22    Q.  Right.                        10:43:43
23    A.  -- I think Taser is probably about 5 percent at 10:43:43
24  this point.                       10:43:45
25    Q.  Okay.  But in the past, about 25 percent of the 10:43:46

Page 14

1  expert witness work you did was on behalf of the defense 10:43:50
2  in Taser cases; right?                 10:43:54
3         MR. NIEMEYER:  Objection; vague.        10:43:56
4         THE WITNESS:  I think that percentage may have 10:43:57
5  represented cases in which a Taser was involved, not   10:43:59
6  necessarily TASER International cases, but Taser may   10:44:02
7  have been involved in it, and that was probably of the  10:44:05
8  cases that I was doing that were non-med mal cases, but 10:44:08
9  I would have to get with the numbers.  But there was a  10:44:16
10  period of time where probably about a quarter of the   10:44:19
11  cases I was doing defense work was having a Taser     10:44:22
12  involved.                        10:44:25
13  BY MS. SHERWIN:                    10:44:25
14    Q.  And when you've worked as a retained expert in 10:44:25
15  litigation in a case involving Taser, you have always  10:44:27
16  worked on behalf of the defense; right?        10:44:30
17    A.  I have reviewed some cases for plaintiffs, but 10:44:35
18  I have not been deposed or brought to trial -- or   10:44:40
19  basically had testimony in those cases.  So all the --  10:44:44
20  all the testimony has been, I believe, on behalf of   10:44:48
21  defense.                        10:44:52
22    Q.  Okay.  And you've never written a report on   10:44:52
23  behalf of a plaintiff in a Taser-related case; is that 10:44:54
24  right?                         10:44:57
25    A.  I don't believe so.                10:44:59

Page 15

1    Q.  You believe you've never written a report;   10:44:59
2  correct?                        10:45:03
3    A.  That is correct.                  10:45:03
4    Q.  Have you ever worked as a plaintiff's expert in 10:45:09
5  any case involving positional asphyxia or restraint   10:45:11
6  asphyxia or compression asphyxia?           10:45:14
7    A.  There was a few cases I've been involved with  10:45:18
8  reviewing, one case that I recall where I've given   10:45:23
9  testimony.                       10:45:26
10    Q.  And what did that case involve?         10:45:27
11    A.  That involved a person with severe heart and  10:45:31
12  lung disease who was in his sixties that was       10:45:36
13  basically -- there was -- there was issues with regards 10:45:45
14  to pepper spraying him and weight based and then not   10:45:49
15  allowing EMS -- a delay for allowing treatment to be   10:45:54
16  initiated.                       10:45:59
17    Q.  Where was that case pending?           10:45:59
18    A.  It was in Connecticut.  It was about 15 or 20  10:46:01
19  years ago.                       10:46:05
20    Q.  Do you recall the name of the case?        10:46:05
21    A.  I don't.                      10:46:12
22    Q.  You provided both a report and deposition    10:46:12
23  testimony in that case?                 10:46:14
24    A.  I'm pretty sure I was deposed, and I can't   10:46:17
25  remember if there was a report associated with that or  10:46:20

Page 16

1  not.                          10:46:23
2    Q.  And I take it you've worked many times as a   10:46:23
3  defense expert in cases involving positional asphyxia or 10:46:38
4  restraint asphyxia or compression asphyxia; right?   10:46:43
5    A.  I've been involved in a number of cases, yes.  10:46:48
6    Q.  Are you able to estimate how many?        10:46:49
7    A.  Actually, I never thought about coming to that 10:46:53
8  number.  Probably been -- probably somewhere 40 to 50 at 10:46:56
9  least.  I mean, it could be more.  It could be a little 10:47:00
10  less.                          10:47:03
11    Q.  When were you retained in this case?       10:47:04
12    A.  I believe the initial contact was in November  10:47:08
13  of 2017.                        10:47:13
14    Q.  When in November?                 10:47:14
15    A.  Looks like a call came in November 21st.    10:47:17
16    Q.  From whom?                     10:47:22
17    A.  Kathy Kunkle.  K-u-n-k-l-e.           10:47:24
18    Q.  Had you ever worked with Ms. Kunkle or the firm 10:47:35
19  of Patton & Ryan before this case?          10:47:38
20    A.  Not that I'm aware of, no.  I know not Kathy,  10:47:41
21  but the firm -- I don't believe I've worked with them as 10:47:44
22  well.                          10:47:48
23    Q.  Have you ever worked with Anne Keck before this 10:47:48
24  case?                          10:47:51
25    A.  I don't think so.  I don't -- I don't recall   10:47:52

Page 17

```
 1   that.                               10:47:57
 2      Q.  Do you know how Ms. Kunkle came to contact you? 10:47:57
 3      A.  I don't know how she got my name, no.   10:48:03
 4      Q.  Do you know if she was referred to you by John 10:48:05
 5   Peters?                             10:48:07
 6      A.  That's a possibility.  John knows me.  So --  10:48:09
 7      Q.  Right.  You've done several studies in which  10:48:12
 8   you received payment from John Peters Institute for the 10:48:16
 9   Prevention of In-Custody Deaths; right?         10:48:20
10      A.  We were awarded grants through his institution, 10:48:23
11   yes.                                10:48:27
12      Q.  And you've worked as a defense expert in cases  10:48:27
13   in which he has also been the defense expert; right? 10:48:31
14      A.  I know he's been on a few cases that I've been  10:48:35
15   involved in, yes.                   10:48:37
16      Q.  Okay.  Now, you produced your invoice, your  10:48:38
17   handwritten notes with your time records, and then a  10:48:44
18   document that's typewritten that has your notes from  10:48:48
19   your review; correct?               10:48:51
20      A.  Correct.                     10:48:52
21      MS. SHERWIN:  So we'll mark each of those.      10:48:52
22   We'll mark your invoice as Exhibit 4.            10:48:56
23      (Exhibit 4 marked)               10:48:59
24      MS. SHERWIN:  Your notes with your time sheets  10:49:01
25   as Exhibit 5.                       10:49:03
```

Page 18

```
 1      (Exhibit 5 marked)               10:49:04
 2      MS. SHERWIN:  And your typewritten notes as   10:49:06
 3   Exhibit 6.                          10:49:10
 4      (Exhibit 6 marked)               10:49:10
 5   BY MS. SHERWIN:                     10:49:12
 6      Q.  And, Doctor, your invoice shows that you've  10:49:12
 7   billed 23.25 hours for work on this case through   10:49:19
 8   January 15th of 2018; right?        10:49:24
 9      A.  Yes.                         10:49:26
10      Q.  How much work have you done on the case since  10:49:26
11   you wrote your report?              10:49:31
12      A.  About another ten hours.       10:49:32
13      Q.  And Exhibit 5 is your handwritten notes with  10:49:40
14   your time records; is that right?   10:49:43
15      A.  Correct.                     10:49:45
16      Q.  So it looks like you spent 18 hours reviewing  10:49:45
17   the materials that you listed in your report; is that  10:49:51
18   right?                              10:49:54
19      A.  A rough -- around that, yes.   10:49:56
20      Q.  You're charging the defendants in this case  10:49:58
21   $500 an hour to review materials and write your report;  10:50:04
22   right?                              10:50:07
23      A.  Correct.                     10:50:08
24      Q.  And you're charging my client, James Neuroth, a 10:50:08
25   thousand dollars an hour to take your deposition;  10:50:13
```

Page 19

```
 1   correct?                            10:50:15
 2      A.  Correct.                     10:50:16
 3      Q.  Have you ever done an autopsy in any case?   10:50:16
 4      A.  I have not.                   10:50:25
 5      Q.  Were you informed by defense counsel that they 10:50:38
 6   had previously disclosed an expert to give cardiology  10:50:43
 7   opinions by the name of Dr. Hartman?            10:50:48
 8      A.  I believe they -- I believe there was a   10:50:50
 9   cardiologist that they were going to use originally,  10:50:51
10   yes.  I don't remember the name being Dr. Hartman, but  10:50:54
11   that would be correct.              10:50:57
12      Q.  And your assignment in this case included  10:50:58
13   giving cardiology-related opinions; right?      10:51:02
14      A.  Cardiology or the -- basically the involvement  10:51:05
15   of asphyxiation, which involves the heart and lungs.  So 10:51:09
16   it's all sort of wrapped together, but not specific as a 10:51:13
17   cardiologist, but basically as far as cause of death and 10:51:16
18   the physiologic functions.          10:51:19
19      Q.  Okay.  But the cause of death that you were  10:51:21
20   requested to opine about included providing opinions in 10:51:26
21   the area of cardiology; right?      10:51:30
22      A.  The heart was involved.  So that would be by  10:51:33
23   definition cardiology.              10:51:35
24      Q.  You've never certified a cause of death on a  10:51:40
25   death certificate, have you?        10:51:46
```

Page 20

```
 1      A.  I have, yes.                  10:51:47
 2      Q.  Have you only ever certified the cause of death 10:51:48
 3   on death certificates for natural deaths?        10:51:50
 4      A.  And I believe that would be the case, yes.   10:51:55
 5      Q.  You've never certified a cause of death in a  10:51:58
 6   case involving homicide, suicide, or accident, have you? 10:52:02
 7      A.  No.  Those would be taken by the medical   10:52:08
 8   examiner.                           10:52:10
 9      Q.  And you've never certified a cause of death in  10:52:11
10   a case involving death during the course of a police  10:52:14
11   encounter, have you?                10:52:17
12      A.  That would be correct.        10:52:19
13      Q.  A forensic pathologist would have to do an   10:52:20
14   autopsy in those cases, and then the cause of death  10:52:23
15   would be certified either by the medical examiner or the 10:52:26
16   coroner; right?                     10:52:29
17      A.  That's the typical practice, yes.         10:52:30
18      Q.  Now, you've said you're not certified in --   10:52:32
19   strike that.                        10:52:36
20      You said you're not board certified in   10:52:36
21   cardiology; right?                  10:52:38
22      A.  That is correct.              10:52:40
23      Q.  And you're not certified in forensic pathology, 10:52:44
24   are you?                            10:52:47
25      A.  Correct.                     10:52:47
```

Page 21

6

**Imagine Reporting   619.888.0297**

**Page 22**

```
 1      Q.  You're not board certified in anatomic     10:52:47
 2   pathology, are you?                   10:52:51
 3      A.  Correct.              10:52:52
 4      Q.  Or clinical pathology?          10:52:52
 5      A.  Correct.              10:52:54
 6      Q.  Or psychiatry?             10:52:54
 7      A.  I am not board certified in psychiatry, no.   10:52:55
 8      Q.  Also not board certified in addiction      10:52:58
 9   psychiatry; right?                 10:53:01
10      A.  Correct.              10:53:06
11      Q.  You're an emergency department physician;   10:53:03
12   correct?                    10:53:06
13      A.  I am, yes.             10:53:06
14      Q.  Do you have any work experience in law     10:53:14
15   enforcement?                   10:53:17
16      A.  Not employed -- not as basically being     10:53:21
17   employed.  I've worked law enforcement, but I have not  10:53:22
18   been employed as a law enforcement officer.     10:53:25
19      Q.  Do you have any training as a law enforcement  10:53:27
20   officer?                    10:53:29
21      A.  Not -- nothing official, no.          10:53:30
22      Q.  Do you have any training as a jail custody   10:53:31
23   officer?                    10:53:36
24      A.  In nothing -- nothing formal, no.        10:53:36
25      Q.  And you've never worked as a corrections deputy 10:53:39
```

**Page 23**

```
 1   or jail custody officer, have you?           10:53:44
 2      A.  Correct.              10:53:50
 3      Q.  In your report, did you state all of the    10:53:50
 4   medical literature that you reviewed to come to your  10:53:52
 5   conclusions in this case?             10:53:55
 6      A.  The medical literature that's listed there is a 10:53:56
 7   sampling of it.  I've been reviewing medical literature 10:53:59
 8   for 20 years in this area, and it's voluminous.    10:54:02
 9      THE WITNESS:  She's waving a hand there.     10:54:06
10      THE VIDEOGRAPHER:  Did you want me to go on    10:54:12
11   officially?                   10:54:14
12      MS. SHERWIN:  Are we ready?          10:54:15
13      Okay.  So we'll -- do I need to -- okay.  We'll  10:54:16
14   take a quick break and allow the videographer to give  10:54:18
15   the prefatory comments.              10:54:21
16      (Discussion off the record)           10:54:55
17      THE VIDEOGRAPHER:  We are on the record.  My    10:57:41
18   name is Colette Stark.  I'm a notary public contracted  10:57:42
19   by Imagine Court Reporting.  Today is March 19th, 2018. 10:57:46
20   The time on the video monitor is 9:58 [sic] a.m.     10:57:51
21      This video deposition is taken at 1350 Columbia  10:57:55
22   Street, Suite 703, San Diego, California.  The name of  10:58:00
23   the case is Neuroth vs. Mendocino County, filed in the  10:58:06
24   United District Court, Northern District of California,  10:58:10
25   Case No. 3:15-cv-03226-RS.  This is Volume I in the   10:58:12
```

**Page 24**

```
 1   videotaped deposition of Dr. Gary Vilke.       10:58:20
 2      Would the attorneys introduce themselves and   10:58:24
 3   state whom you represent.             10:58:26
 4      MS. SHERWIN:  This is Julia Sherwin for the   10:58:27
 5   plaintiff.                   10:58:30
 6      And the time on the recording should be an hour 10:58:30
 7   later.                    10:58:33
 8      THE VIDEOGRAPHER:  Thank you.          10:58:34
 9      MR. NIEMEYER:  Stephen Niemeyer on behalf of   10:58:35
10   the County of Mendocino, Mendocino County       10:58:37
11   Sheriff Allman, and the remaining corrections county  10:58:38
12   individually named defendants.           10:58:44
13      MR. BERTLING:  Good morning.  This is Pete    10:58:46
14   Bertling, and I represent Correctional Medical Group  10:58:48
15   Companies; Dr. Taylor Fithian; Claire Teske, RN; and   10:58:48
16   Elaine Hustedt.               10:58:54
17      MS. SHERWIN:  Jerry and Scott, are you --    10:58:58
18      MS. WINTERS:  This is Amy Winters --       10:59:00
19      MR. VERANINI:  Good morning.  Go ahead.     10:59:01
20      MS. WINTERS:  Sorry.  Amy Winters appearing for 10:59:01
21   Defendant City of Willits, Police Chief Gonzalez, and  10:59:05
22   the police officers Andrade and Leef.         10:59:09
23      MR. VERANINI:  Jerome Varanini appearing for   10:59:12
24   California Forensic Medical Group and Jennifer Caudillo. 10:59:14
25      MS. SHERWIN:  Okay.  Thank you.         10:59:19
```

**Page 25**

```
 1      THE VIDEOGRAPHER:  Would you like me to change 10:59:21
 2   the time on my camera?  It does say 9:15.      10:59:23
 3      MS. SHERWIN:  That would be great.        10:59:26
 4      THE VIDEOGRAPHER:  I apologize.         10:59:27
 5      MS. SHERWIN:  That's okay.           10:59:27
 6      THE VIDEOGRAPHER:  Off the record, please.    10:59:27
 7      MS. SHERWIN:  Sure.             10:59:27
 8      (Discussion off the record)           10:59:27
 9      THE VIDEOGRAPHER:  We're back on the record.   10:59:58
10   The time is 10:00 a.m.              10:59:59
11   BY MS. SHERWIN:                11:00:01
12      Q.  So, Doctor, I understand from your report that 11:00:01
13   you --                    11:00:05
14      MS. SHERWIN:  I'm sorry.           11:00:06
15      THE VIDEOGRAPHER:  Off the record.        11:00:08
16      MS. SHERWIN:  Okay.             11:00:10
17      THE VIDEOGRAPHER:  We're off the record.  The  11:00:10
18   time is 11:00 a.m.              11:00:12
19      (Discussion off the record)           11:01:08
20      THE VIDEOGRAPHER:  We're back on the record.   11:01:09
21   The time is 11:01 a.m.              11:01:10
22      MS. SHERWIN:  Thank you.           11:01:14
23   BY MS. SHERWIN:                11:01:15
24      Q.  Doctor, when you say that you reviewed the   11:01:15
25   depositions of the witnesses, did you review just the  11:01:17
```

**Page 26**

```
 1   deposition transcripts, or did you also review the      11:01:20
 2   exhibits?                                               11:01:22
 3       A.  Some of them had exhibits; some did not.  So    11:01:22
 4   when they had exhibits to review, I did look at them.   11:01:26
 5       Q.  Okay.  And you reviewed the jail video synced   11:01:28
 6   with Officer Leef's audio recording; correct?           11:01:32
 7       A.  Yes.                                            11:01:36
 8       Q.  But you did not review the earlier audio        11:01:36
 9   recording before the jail video starts; is that right?  11:01:40
10       A.  Base -- yeah, at the arrival to the jail is     11:01:46
11   what I heard.                                           11:01:49
12       Q.  Okay.  And were you offered the opportunity to  11:01:50
13   review the -- just the audio recording from             11:01:52
14   Officer Leef, which starts with the initial contact with 11:01:55
15   Steven Neuroth in Willits?                              11:01:59
16       A.  I don't think I was offered it, no.             11:02:01
17       Q.  Did you review any transcript of that earlier   11:02:02
18   audio recording?                                        11:02:06
19       A.  I reviewed a transcript.  I'm just trying to    11:02:09
20   remember what -- what -- at what point it started.      11:02:13
21   There was a transcribed of the audio.  I just don't know 11:02:16
22   if it started from the very beginning, because I was    11:02:21
23   more interested in what was going on at the jail side of 11:02:23
24   things, but I did review that transcript.               11:02:26
25       Q.  Okay.  But you reviewed a transcript that       11:02:28
```

**Page 27**

```
 1   started after Officer Leef got Steven to the jail;      11:02:30
 2   right?                                                  11:02:35
 3       A.  I think that's when it started.                 11:02:35
 4       Q.  Did you review any of the audio recordings of   11:02:37
 5   the interviews with the defendant deputies after the    11:02:43
 6   incident?                                               11:02:47
 7       A.  I did not.                                      11:02:47
 8       Q.  Did you review any transcripts of the           11:02:49
 9   audio-recorded interviews of the defendant deputies     11:02:51
10   after the incident?                                     11:02:54
11       A.  I did not.                                      11:02:55
12       Q.  Did you review any documents showing the        11:02:55
13   weights of the deputies involved in restraining Steven  11:02:57
14   Neuroth?                                                11:03:03
15       A.  There were some documents that had weights of   11:03:03
16   some of the deputies but not all of them.               11:03:05
17       Q.  What documents did you review that had some of  11:03:06
18   the weights but not all of them?                        11:03:09
19       A.  One of the weights was listed in one of the     11:03:11
20   depositions of one of the deputies.  So I got it from   11:03:16
21   there.  But there wasn't a list of all the weights put  11:03:19
22   together.                                               11:03:22
23       Q.  Okay.  So you did not review any e-mail showing 11:03:22
24   the weights of the deputies involved in restraining     11:03:25
25   Steven Neuroth; right?                                  11:03:28
```

**Page 28**

```
 1       A.  Correct.                                        11:03:30
 2       Q.  Did you review any federal government documents 11:03:30
 3   concerning the interpretation of blood concentrations   11:03:33
 4   methamphetamine?                                        11:03:37
 5       A.  I did not.                                      11:03:38
 6       Q.  You're also not board certified in toxicology,  11:03:38
 7   are you, Doctor?                                        11:03:44
 8       A.  Correct.                                        11:03:44
 9       Q.  Or clinical pharmacology?                       11:03:45
10       A.  Correct.                                        11:03:50
11       Q.  Now, you summarize in your report some of       11:04:09
12   the -- some of the facts in this case; correct?         11:04:12
13       A.  I did, yes.                                     11:04:14
14       Q.  In Steven's second encounter with the defendant 11:04:16
15   Willits police officers, Steven was paranoid and thought 11:04:21
16   that all of the traffics [sic] in Willits was out to get 11:04:26
17   him; right?                                             11:04:30
18       A.  I did read that, yes.                           11:04:31
19       Q.  You omitted that from your report; correct?     11:04:34
20       A.  I didn't include it in my report.  It was --    11:04:36
21   it's not an exhaustive, detailed report.  It's an       11:04:37
22   overview.                                               11:04:40
23       Q.  Officer Leef and Officer Andrade discussed the  11:04:40
24   fact that Steven might be crazy and discussed whether to 11:04:44
25   take him to the hospital; right?                        11:04:48
```

**Page 29**

```
 1       A.  There was a discussion.                         11:04:49
 2       Q.  And Steven told them he needed to go to a       11:04:50
 3   hospital; right?                                        11:04:53
 4       MR. NIEMEYER:  Objection; foundation.               11:04:54
 5       THE WITNESS:  That one I don't remember             11:04:55
 6   specifically, but it could be in there.                 11:04:56
 7   BY MS. SHERWIN:                                         11:04:58
 8       Q.  Okay.  And if you reviewed those facts, you     11:04:58
 9   also omitted those facts from your report; correct,     11:05:01
10   Doctor?                                                 11:05:03
11       A.  They weren't included in my report.            11:05:04
12       Q.  Officer Leef and Officer Andrade decided to     11:05:08
13   take Steven to jail instead of the hospital because     11:05:13
14   Officer Leef did not want to have to wait with Steven at 11:05:17
15   a hospital for a mental health evaluation; correct?     11:05:21
16       MR. NIEMEYER:  Objection; foundation, misstates     11:05:23
17   the testimony.                                          11:05:25
18       MS. WINTERS:  Objection; misstates the             11:05:27
19   testimony and evidence.                                 11:05:28
20       THE WITNESS:  Yeah, I don't remember the            11:05:30
21   specific reason why he opted not to take him to the     11:05:32
22   hospital.  So I can't answer that question.             11:05:37
23   BY MS. SHERWIN:                                         11:05:38
24       Q.  Okay.  And you omitted their discussion about   11:05:38
25   their decision not to take Steven to a hospital; right? 11:05:41
```

## Page 30

1    A.  I had something included in my report, but I   11:05:47
2  would have to look at the specific language I put in.   11:05:49
3  But there was a discussion, and then they took him to   11:05:52
4  jail.                        11:05:54
5    Q.  Do you agree, Doctor, that the presentation of   11:05:54
6  Steven when he was in Willits, afraid all of the traffic   11:05:57
7  was out to get him and hallucinating about snakes and   11:06:01
8  running in traffic, is an indication that he was   11:06:06
9  psychotic at that time?            11:06:10
10    MR. NIEMEYER:  Objection; foundation, beyond   11:06:11
11  scope, and compound.              11:06:13
12    THE WITNESS:  Paranoia can be from a psychotic   11:06:15
13  event. A lot of the hallucinations are more consistent   11:06:20
14  with a drug-induced psychosis.          11:06:24
15  BY MS. SHERWIN:                11:06:26
16    Q.  Right.  But psychosis in any event; right?   11:06:26
17    A.  A psychosis, yes.            11:06:29
18    Q.  So Steven was psychotic; right?     11:06:31
19    A.  He was exhibiting signs -- exhibiting signs of   11:06:34
20  psychosis.                    11:06:37
21    Q.  Intoxication on illegal drugs can cause a   11:06:38
22  person to be psychotic; right?          11:06:41
23    A.  Yes.                   11:06:43
24    Q.  And withdrawal from alcohol or drugs can cause   11:06:43
25  a person to be psychotic; right?        11:06:46

## Page 31

1    A.  It can have psychotic features.      11:06:48
2    Q.  Mental illness, like schizophrenia, can cause a   11:06:50
3  person to be psychotic; right?          11:06:54
4    A.  They can have certain psychotic features as   11:06:56
5  well, yes.                    11:06:59
6    Q.  And a lot of emergent medical conditions   11:06:59
7  requiring immediate medical care can also cause a person   11:07:02
8  to become psychotic; right?            11:07:06
9    A.  We usually use the term "delirium" rather than   11:07:08
10  psychotic.                    11:07:10
11    MR. NIEMEYER:  Objection; vague.      11:07:11
12  BY MS. SHERWIN:                11:07:12
13    Q.  Well, psychosis can be caused by brain tumors;   11:07:12
14  right?                      11:07:16
15    A.  Again, psychosis -- we tend to use the word   11:07:17
16  "delirium" when we're defining the altered status.   11:07:20
17  Psychosis tends to have more of a psychiatric or   11:07:25
18  drug-induced effect.  When it's a medical condition,   11:07:28
19  we're often calling it delirium.        11:07:30
20    Q.  Okay.  And a person who is delirious can be   11:07:33
21  indistinguishable from a person who is psychotic; right?   11:07:36
22    A.  There can be some -- some times where it's   11:07:39
23  difficult to tell the difference.        11:07:41
24    Q.  Okay.  So -- and a person who is psychotic can   11:07:42
25  also be agitated; correct?            11:07:48

## Page 32

1    A.  Correct.                 11:07:50
2    Q.  Doctor, you wrote a chapter entitled "Use of   11:07:50
3  Force in the Prehospital Environment" with Yuko Nakajima   11:07:59
4  in the book Diagnose -- The Diagnosis and Management of   11:08:05
5  Agitation; right?                11:08:08
6    A.  I did, yes.                11:08:09
7    Q.  And in agreeing to write that chapter in that   11:08:10
8  book, did you have an awareness of the other authors who   11:08:13
9  were going to be participating in that book project?   11:08:20
10    A.  I did not, no.              11:08:23
11    Q.  Have you read the book since it was published?   11:08:24
12    A.  I have not had the opportunity to go through   11:08:27
13  the whole book, no.              11:08:30
14    Q.  Would you agree that Steven was agitated when   11:08:34
15  the officers in Willits encountered him?   11:08:37
16    MR. NIEMEYER:  Objection; vague.      11:08:41
17    THE WITNESS:  He was experiencing some level of   11:08:42
18  agitation, yes.                  11:08:45
19  BY MS. SHERWIN:                11:08:46
20    Q.  Insulin shock in a diabetic can cause a person   11:08:46
21  to behave in a way that appears psychotic; right?   11:09:01
22    A.  Insulin shock -- you mean too much insulin or   11:09:02
23  too little insulin?              11:09:05
24    Q.  Insulin shock hypoglycemia.        11:09:06
25    A.  Hypoglycemia can cause delirium.      11:09:08

## Page 33

1    Q.  And if a diabetic person has insulin shock   11:09:11
2  hypoglycemia, that's a medical emergency; right?   11:09:15
3    A.  If they're -- if they are truly hypoglycemic,   11:09:19
4  yes.                        11:09:21
5    Q.  They could die if they don't get sugar; right?   11:09:23
6    A.  That can happen, sure.          11:09:26
7    Q.  As a physician, do you agree that someone who   11:09:28
8  is psychotic and running in traffic, paranoid that   11:09:31
9  people are out to get him, and hallucinating that there   11:09:36
10  are snakes around -- around him is a danger to himself?   11:09:39
11    MR. NIEMEYER:  Objection; compound, vague.   11:09:42
12    THE WITNESS:  There is a danger --   11:09:44
13    MS. WINTERS:  Join.              11:09:45
14    THE WITNESS:  Oh.  That would be -- that would   11:09:46
15  be a danger to their self, yes.          11:09:49
16  BY MS. SHERWIN:                11:09:51
17    Q.  And as a physician, you would want a psychotic   11:09:51
18  person who is a danger to himself to be taken to a   11:09:54
19  hospital; right?                11:09:57
20    MR. NIEMEYER:  Objection; vague.      11:09:58
21    MS. WINTERS:  Join.              11:09:59
22    THE WITNESS:  Not necessarily.        11:10:00
23  BY MS. SHERWIN:                11:10:01
24    Q.  Under what circumstances would you want a   11:10:01
25  psychotic person who is running in traffic, paranoid   11:10:05

**Page 34**

1  that people are out to get him, and hallucinating that   11:10:09
2  there are snakes around him -- would you want that   11:10:12
3  person not to be taken to a hospital?   11:10:15
4      MR. NIEMEYER:  Objection; form of the question,   11:10:17
5  compound, vague, calls for speculation.   11:10:19
6      MS. WINTERS:  Join.   11:10:21
7      THE WITNESS:  Yeah, I mean, it's a   11:10:21
8  hypothetical, but the reality is there are lots of   11:10:23
9  people who come in drug intoxicated that go right to   11:10:25
10  jail to a sobering cell to be detoxified.  There's a lot   11:10:29
11  of people who are psychotic that go right to County   11:10:33
12  Mental Health and don't need to go to an emergency   11:10:36
13  department.   11:10:39
14  BY MS. SHERWIN:   11:10:39
15      Q.  And a lot of people who are psychotic go to the   11:10:39
16  emergency room; right?   11:10:42
17      A.  Some do, yes.   11:10:43
18      Q.  A psychotic person can be having a medical   11:10:44
19  emergency that's life-threatening, like insulin shock in   11:10:47
20  a diabetic; right?   11:10:52
21      A.  Depends on the presentation, but a person with   11:10:53
22  hypoglycemia could have delirium features that would   11:10:56
23  need to be treated.   11:11:02
24      Q.  And a person who is psychotic can be in   11:11:07
25  life-threatening alcohol or opiate withdrawal; right?   11:11:11

**Page 35**

1      A.  Opiate withdrawal is not life-threatening.   11:11:16
2  Alcohol withdrawal is -- can present with psychotic --   11:11:18
3  or with delirium features as well.   11:11:26
4      Q.  Right.  And alcohol withdrawal can be   11:11:28
5  life-threatening; right?   11:11:31
6      A.  It can be, yes.   11:11:32
7      Q.  And it's your testimony, Doctor, that opiate   11:11:33
8  withdrawal, like withdrawal from heroin, is not   11:11:36
9  life-threatening?   11:11:38
10      A.  Correct.   11:11:40
11      Q.  A person who is psychotic can also be at risk   11:11:40
12  of dying of a drug overdose; right?   11:11:43
13      MR. NIEMEYER:  Objection; vague.   11:11:46
14      THE WITNESS:  I'm sorry.  Can you repeat that   11:11:49
15  one more time, please.   11:11:50
16  BY MS. SHERWIN:   11:11:51
17      Q.  Sure.   11:11:51
18      A.  Thanks.   11:11:52
19      Q.  A person who is psychotic can also be at risk   11:11:52
20  of dying of a drug overdose; right, Doctor?   11:11:55
21      MR. NIEMEYER:  Calls for speculation.   11:12:00
22      THE WITNESS:  A person who has a drug overdose   11:12:03
23  can have some delirium features, yes.   11:12:06
24  BY MS. SHERWIN:   11:12:09
25      Q.  Right.  A person who is delirious can be at   11:12:09

**Page 36**

1  risk of dying of a drug overdose if they don't receive   11:12:16
2  timely medical treatment; right?   11:12:20
3      A.  If they're having a drug overdose, sure, that   11:12:21
4  could happen.   11:12:24
5      Q.  Patients with mental illness can have serious   11:12:25
6  and life-threatening medical diseases in addition to   11:12:36
7  their mental illness; right?   11:12:39
8      A.  Sure, that's true.   11:12:41
9      Q.  You also wrote a chapter entitled "Mental   11:12:42
10  Illness and Substance Abuse" with Michael Wilson in   11:12:56
11  Cooney's EMS Medicine; right?   11:13:01
12      A.  Correct.   11:13:04
13      Q.  Do you stand by what you said in that book   11:13:04
14  chapter, Doctor?   11:13:07
15      A.  At the time I wrote it, sure.   11:13:09
16      Q.  And do you stand by it today?   11:13:10
17      A.  I haven't read it in a long time.  So I would   11:13:13
18  have to look at it again.   11:13:14
19      Q.  Do you agree that patients with odd behavior or   11:13:15
20  who are having a mental or emotional crisis are real   11:13:17
21  patients?   11:13:21
22      A.  Sure, that's real.   11:13:21
23      Q.  And you agree that those patients need capable,   11:13:22
24  caring EMS providers?   11:13:25
25      A.  Again --   11:13:29

**Page 37**

1      MR. NIEMEYER:  Objection; vague, calls for   11:13:30
2  speculation.  There's no scope here.   11:13:33
3      THE WITNESS:  If EMS providers are being called   11:13:37
4  to evaluate them, we would like them to be capable and   11:13:40
5  caring.   11:13:43
6  BY MS. SHERWIN:   11:13:43
7      Q.  Okay.  Do you agree that in encountering an   11:13:43
8  agitated or acutely psychotic patient, the practitioner   11:13:47
9  should start the conversation by stating his or her name   11:13:54
10  and asking the patient's name?   11:13:57
11      A.  When feasible, that's what you try to do as a   11:13:59
12  practitioner, sure.   11:14:02
13      Q.  And also attempt to find out why the patient is   11:14:03
14  agitated; right?   11:14:06
15      A.  It's part of our medical practice to try to   11:14:07
16  sort through that, sure.   11:14:10
17      Q.  The patient's behavior may be motivated by   11:14:11
18  fear, and calming their fears, if possible, is   11:14:15
19  preferable to escalating them; right, Doctor?   11:14:18
20      A.  We -- we try to calm people in the emergency   11:14:21
21  department so we can better evaluate them, sure.   11:14:24
22      Q.  And those calming, deescalating verbal   11:14:26
23  techniques will often be so effective that patients can   11:14:30
24  be quieted down and managed effectively; right?   11:14:32
25      A.  That can happen, sure.   11:14:36

**Page 38**

```
 1        Q.  Forceful takedowns should be the last resort   11:14:38
 2   after verbal deescalation has failed; right, Doctor?    11:14:42
 3        MR. NIEMEYER:  Objection; foundation, vague.        11:14:45
 4        THE WITNESS:  From the EMS provider book that      11:14:49
 5   we're talking about, sure, we try to stepwise up         11:14:52
 6   depending on the circumstances.                          11:14:55
 7   BY MS. SHERWIN:                                           11:14:59
 8        Q.  And the differential diagnosis for an acutely   11:14:59
 9   agitated and psychotic patient includes not only         11:15:03
10   substance intoxication, but also substance withdrawal,   11:15:07
11   electrolyte disturbance, thyroid dysfunction, brain      11:15:10
12   injury, dementia, or psychiatric disorders such as       11:15:15
13   schizophrenia; right, Doctor?                            11:15:21
14        MR. NIEMEYER:  Is there a question there?  You      11:15:22
15   just read from the book.                                 11:15:24
16   BY MS. SHERWIN:                                           11:15:25
17        Q.  Do you agree with what you wrote in the "Mental 11:15:25
18   Illness and Substance Abuse" chapter, Doctor?            11:15:28
19        A.  Those can be on a differential diagnosis of a   11:15:31
20   delirious patient.                                       11:15:35
21        Q.  If a patient is psychotic and brought to the    11:15:38
22   emergency room, what kinds of medications would the      11:15:55
23   patient typically receive?                               11:16:01
24        MR. NIEMEYER:  Objection; vague, calls for a        11:16:04
25   hypothetical.                                            11:16:05
```

**Page 39**

```
 1        THE WITNESS:  It depends on what is the             11:16:05
 2   etiology of the delirium.                                11:16:09
 3   BY MS. SHERWIN:                                           11:16:10
 4        Q.  If the physician doesn't know the etiology of   11:16:10
 5   the delirium?                                            11:16:13
 6        A.  Then it depends on how the patient clinically   11:16:14
 7   presents.                                                11:16:17
 8        Q.  Do you agree with what you wrote in your        11:16:18
 9   "Mental Illness and Substance Abuse" chapter that "In    11:16:22
10   most pre-hospital situations, the cause of the agitation 11:16:24
11   is typically not known for certain, and so              11:16:27
12   benzodiazepines are usually the first-line medications"? 11:16:30
13        A.  In somebody who needs to be medicated for       11:16:33
14   significant agitation that's undifferentiated, then,     11:16:37
15   yes, benzodiazepines would be a good first-line          11:16:41
16   treatment.                                               11:16:44
17        Q.  And in your book chapter, when you were writing 11:16:45
18   about common pitfalls and managing behaviorally          11:16:56
19   disordered patients, you said that overuse of force is   11:16:59
20   one of the common pitfalls; right?                       11:17:03
21        A.  It can be.                                      11:17:05
22        Q.  And overuse of force is never appropriate;      11:17:06
23   correct, Doctor?                                         11:17:08
24        A.  Overuse of force?                               11:17:11
25        Q.  Right.                                          11:17:12
```

**Page 40**

```
 1        A.  Meaning using more than you need is -- would be 11:17:12
 2   something you would try to avoid, sure.                  11:17:16
 3        Q.  And it's never appropriate to use force in a    11:17:18
 4   way to punish or humiliate the patient; right, Doctor?   11:17:20
 5        MR. NIEMEYER:  Objection; form, foundation,         11:17:25
 6   vague.                                                   11:17:25
 7        THE WITNESS:  Our goal is not to humiliate or       11:17:27
 8   to harm patients.                                        11:17:29
 9   BY MS. SHERWIN:                                           11:17:30
10        Q.  Right.  And do you agree with what you wrote in 11:17:30
11   your chapter on mental illness and substance abuse that  11:17:32
12   it's never appropriate to use force to punish or         11:17:36
13   humiliate a patient?                                     11:17:40
14        A.  Right.  That's --                               11:17:41
15        MR. NIEMEYER:  Same objection.                      11:17:42
16        THE WITNESS:  And that's what we wrote in our       11:17:43
17   EMS provider book, yes.                                  11:17:49
18        (Reporter query)                                    11:17:51
19        THE WITNESS:  That is what we wrote in this EMS     11:17:51
20   provider book.                                           11:17:51
21   BY MS. SHERWIN:                                           11:17:53
22        Q.  Now, during transport, Steven was hallucinating 11:17:53
23   that there were snakes in the police car.                11:18:00
24        Do you recall that?                                 11:18:03
25        MR. NIEMEYER:  Objection; foundation.               11:18:03
```

**Page 41**

```
 1        THE WITNESS:  He was hallucinating about            11:18:05
 2   snakes.  I don't know if they were in the police car,    11:18:06
 3   but he was paranoid about snakes.                        11:18:08
 4   BY MS. SHERWIN:                                           11:18:11
 5        Q.  And Officer Leef taunted Steven by yelling      11:18:11
 6   "snakes" at him.                                         11:18:13
 7        Do you recall that?                                 11:18:14
 8        A.  That --                                         11:18:15
 9        MS. WINTERS:  Objection; misstates the              11:18:16
10   testimony and evidence.                                  11:18:18
11        MR. NIEMEYER:  Join.                                11:18:19
12        THE WITNESS:  There were some references to him     11:18:20
13   referencing snakes to Mr. Neuroth.                       11:18:22
14   BY MS. SHERWIN:                                           11:18:25
15        Q.  Officer Leef said, "What I like to do is say    11:18:25
16   'snakes' very loud, and he jumps, and it freaks him."    11:18:28
17        Do you recall that?                                 11:18:32
18        A.  I recall something to that effect being brought 11:18:33
19   out, yes.                                                11:18:35
20        Q.  And you left all of those comments about snakes 11:18:35
21   in the police car out of your report; correct, Doctor?   11:18:39
22        A.  They were not in my brief overview of the case, 11:18:43
23   no.                                                      11:18:47
24        Q.  Steven, having his agitation exacerbated by     11:18:51
25   being taunted by Officer Leef, could cause an increase   11:18:55
```

**Imagine Reporting  619.888.0297**

**Page 42**

```
 1   in his need for oxygen; right, Doctor?          11:18:58
 2        MR. NIEMEYER:  Objection; form, foundation.   11:19:01
 3        MS. WINTERS:  Objection; misstates the       11:19:03
 4   testimony and the evidence.            11:19:04
 5        THE WITNESS:  It can.  If I'm understanding   11:19:07
 6   your question correctly, if we're getting somebody a  11:19:11
 7   little bit more excited or a little bit more anxious, it  11:19:13
 8   can increase your heart rate a little bit.  It will also  11:19:17
 9   increase your respiratory rate, which will bring more   11:19:21
10   oxygen in.  So the overall need's probably no different.  11:19:24
11   It's just -- it's a homeostatic balance, but it will    11:19:27
12   also be a transient balance.           11:19:31
13   BY MS. SHERWIN:                        11:19:32
14        Q.  And it can cause or contribute to tachycardia  11:19:32
15   or an elevated heart rate; right?      11:19:35
16        A.  It can raise somebody's heart rate, sure.   11:19:37
17        Q.  Steven Neuroth's vital signs were elevated when  11:19:39
18   Jennifer Caudillo took them in the jail; correct?   11:19:43
19        A.  Correct.                       11:19:45
20        Q.  His blood pressure of 151/92 is an elevated    11:19:45
21   blood pressure; right?                 11:19:50
22        A.  It is, yes.                     11:19:50
23        Q.  And his pulse of 129 is tachycardic; right?   11:19:51
24        A.  It is tachycardic, yes.          11:19:54
25        Q.  Now, on your report, you say that Steven    11:19:56
```

**Page 43**

```
 1   weighed 185 pounds.                    11:20:01
 2        Where did you get that information?    11:20:03
 3        A.  I believe I got that from the autopsy.  I'd   11:20:06
 4   have to look back and check, but that's usually where I  11:20:14
 5   get it from in the case I did it.      11:20:18
 6        MS. SHERWIN:  So we'll mark the autopsy report  11:20:31
 7   as Exhibit 7.                          11:20:34
 8        (Exhibit 7 marked)                11:20:36
 9   BY MS. SHERWIN:                        11:20:39
10        Q.  And to speed things up, Doctor, I have    11:20:39
11   highlighted Steven's weight as reflected on the autopsy.  11:20:42
12        What does that say?                11:20:46
13        A.  It says "156."                 11:20:47
14        Q.  Are you claiming that he lost almost 30 pounds  11:20:54
15   from the time he died until his autopsy 30 hours later?  11:20:55
16        A.  I am certainly not claiming that, no.   11:20:59
17        Q.  And you don't know, as you sit here today,    11:21:01
18   where you got the 185-pound weight for Steven?   11:21:03
19        A.  I would have to re-review my notes -- or not   11:21:06
20   notes, but my records to find that.  So as we're sitting  11:21:10
21   here right now, I'm not certain where I got that from.  11:21:12
22        Q.  Okay.  And do you agree, Doctor, that you were  11:21:15
23   wrong about Steven's weight in your report?    11:21:17
24        A.  I'm not admitting that, no, because I have that  11:21:19
25   number written down.  So I presume I saw it from    11:21:23
```

**Page 44**

```
 1   somewhere.  So I would have to check.   11:21:25
 2        Q.  Did you cut and paste from another report for a  11:21:26
 3   different defense firm?                11:21:30
 4        A.  I did not.                     11:21:32
 5        Q.  But do you agree that on autopsy, Steven's    11:21:33
 6   weight was 156 pounds?                 11:21:36
 7        A.  On the paper you're showing me is what I have  11:21:38
 8   there.  That one says 156 pounds.      11:21:41
 9        Q.  Now, you say in your report that when Steven   11:21:44
10   was moved into a sobering cell, he suddenly became    11:21:50
11   agitated; right?                       11:21:53
12        A.  Yes.                          11:21:55
13        Q.  What caused him to be agitated?   11:21:55
14        MR. NIEMEYER:  Objection; calls for    11:21:58
15   speculation.                           11:21:59
16        THE WITNESS:  I can't say what specifically   11:22:02
17   caused him to be agitated at that time.   11:22:03
18   BY MS. SHERWIN:                        11:22:05
19        Q.  Did you see the testimony from    11:22:05
20   Defendant Bernardi's dep that -- deposition -- that he   11:22:09
21   shoved Steven into the sobering cell?   11:22:13
22        A.  I don't remember that language specifically.  11:22:16
23   I -- I saw what occurred on the video, and there was no  11:22:18
24   evidence of any significant shoving.   11:22:23
25        Q.  Are you aware that Defendant Bernardi said, in  11:22:25
```

**Page 45**

```
 1   his recorded interview after Steven's death, that he   11:22:28
 2   gave Steven a nice shove into the sobering cell?   11:22:31
 3        A.  I don't recall that specifically.   11:22:35
 4        Q.  Why did you omit from your report    11:22:36
 5   Defendant Bernardi's deposition testimony admitting that  11:22:41
 6   he shoved Steven into the sobering cell?   11:22:44
 7        MR. NIEMEYER:  Objection; form, foundation.   11:22:48
 8        THE WITNESS:  As -- again, that was a brief   11:22:50
 9   overview of the case, not all the details.  Based on my  11:22:52
10   review of the video, I didn't see Mr. Neuroth being   11:22:55
11   shoved in or pushed in.  He was being directed in.   11:23:00
12   BY MS. SHERWIN:                        11:23:04
13        Q.  Well, after Steven was put into the sobering  11:23:04
14   cell, he began to struggle, and the deputies forced him  11:23:09
15   facedown on the ground.                11:23:13
16        You saw that; right?               11:23:14
17        A.  They did take him down to the ground, yes.  11:23:15
18        Q.  And he was handcuffed behind his back from the  11:23:17
19   time of his arrest all the way into the safety cell   11:23:20
20   where he was prone; right?             11:23:26
21        A.  Yes.                          11:23:28
22        Q.  While Steven was still in the sobering cell,   11:23:29
23   the deputies put leg shackles on him; right?    11:23:33
24        A.  Correct.                       11:23:37
25        Q.  Then they carried him facedown while he was    11:23:37
```

1 handcuffed and shackled into the safety cell; correct?   11:23:40
2    A.  That is correct.                    11:23:43
3    Q.  And put him prone on the ground; right?   11:23:44
4    A.  Correct.                          11:23:47
5    Q.  Now, multiple deputies got on top of Steven   11:23:49
6 while he was prone on the ground, handcuffed, and   11:23:53
7 shackled; right, Doctor?               11:23:55
8        MR. NIEMEYER:  Objection; form, foundation,   11:23:56
9 misstates the evidence.                11:23:57
10       THE WITNESS:  So your use of the word "got on   11:24:00
11 top of" him is vague.  There were a number of deputies   11:24:02
12 that were maintaining him in position and were holding   11:24:06
13 various parts of him, but I wouldn't say they were all   11:24:09
14 on top of him.                        11:24:11
15 BY MS. SHERWIN:                      11:24:12
16    Q.  Defendant Bernardi told the district attorney's   11:24:12
17 investigators he used all of his weight to control just   11:24:15
18 one of Steven's arms.                  11:24:18
19       Are you aware of that, Doctor?       11:24:20
20       MR. NIEMEYER:  Objection; misstates the   11:24:22
21 testimony.                           11:24:23
22       THE WITNESS:  Yeah, I don't recall that   11:24:24
23 specifically, but if he was holding one of his arms, I   11:24:24
24 could see where he would need to hold it down, sure.   11:24:27
25    ///

Page 46

1 BY MS. SHERWIN:                      11:24:31
2    Q.  How much did Defendant Bernardi weigh?   11:24:31
3    A.  I have him down as 215 pounds.       11:24:41
4    Q.  And before today, were you aware that   11:24:46
5 Defendant Bernardi used all of his 215 pounds to control   11:24:49
6 one of Steven's arms?                  11:24:54
7       MR. NIEMEYER:  Same objection.        11:24:56
8       THE WITNESS:  Well, from a -- from a physics   11:24:58
9 perspective, 215 pounds can't all be placed on the one   11:25:00
10 arm unless you're going to stand on top and balance   11:25:04
11 straight down.  So he may be using a lot of his strength   11:25:08
12 from his 215-pound frame to hold him down, but it's not   11:25:11
13 going to be 215 pounds of downward vector force.   11:25:15
14 BY MS. SHERWIN:                      11:25:18
15    Q.  Well, Defendant Bernardi said he used all of   11:25:18
16 his weight to control one of Steven's arms while Steven   11:25:22
17 was handcuffed.                       11:25:24
18       You have no reason to dispute his testimony, do   11:25:25
19 you, Doctor?                          11:25:27
20       MR. NIEMEYER:  Same objection.        11:25:28
21       THE WITNESS:  He may have said that.  I'm not   11:25:29
22 disputing what he said.  I'm talking about the physics   11:25:30
23 behind it.                            11:25:33
24 BY MS. SHERWIN:                      11:25:35
25    Q.  Defendant Deputy Grant admitted that   11:25:35

Page 47

1 correctional staff used their combined body weight to   11:25:39
2 press Steven Neuroth to the floor.       11:25:43
3       Do you recall that, Doctor?          11:25:45
4    A.  I do recall that coming out.         11:25:46
5    Q.  And Sergeant Knapp confirmed, in her   11:25:52
6 deposition, that Deputy Grant's report that deputies   11:25:54
7 used their combined body weight to press Steven to the   11:25:58
8 floor was accurate.                    11:26:01
9       Do you recall that, Doctor?          11:26:03
10   A.  I don't remember the exact wording.  You're   11:26:05
11 saying press him to the floor.  But hold him.  They were   11:26:07
12 using -- the word "combined body weight" did come out.   11:26:10
13       MS. SHERWIN:  Okay.  Let's look at Deposition   11:26:16
14 Exhibit 12, which we'll mark it as Plaintiff's   11:26:17
15 Exhibit 8.                           11:26:19
16       (Exhibit 8 marked)                 11:26:20
17 BY MS. SHERWIN:                      11:26:20
18    Q.  Have you seen this document before today,   11:26:20
19 Doctor?                             11:26:24
20    A.  It looks familiar, but I don't remember the   11:26:27
21 specifics of it.                       11:26:30
22    Q.  Okay.  Could you please read the highlighted   11:26:30
23 information on the second page.          11:26:34
24    A.  Sure.  "While waiting for CD Page to return,   11:26:35
25 Correctional Staff used our combined body weight to   11:26:39

Page 48

1 press Neuroth to the floor due to Neuroth's continued   11:26:42
2 struggles."                           11:26:46
3    Q.  Did you -- as you sit here today, do you know   11:26:47
4 whether or not you reviewed this report before you wrote   11:26:50
5 your report in this case?               11:26:52
6    A.  If it was provided to me beforehand, then I   11:26:53
7 reviewed it.  I -- it's -- I can't have -- I don't have   11:26:58
8 an independent recollection of that specifically, but I   11:27:02
9 understand the concept that people were reporting a   11:27:04
10 combined body weight holding him down.   11:27:08
11    Q.  Okay.  And you understood from the depositions   11:27:10
12 that both Sergeant Knapp and Defendant Grant agreed that   11:27:12
13 the deputies were using their combined body weight to   11:27:17
14 press Steven to the floor while he was prone,   11:27:20
15 handcuffed, and shackled; right?         11:27:23
16    A.  That's the language in there, yes.   11:27:25
17    Q.  The defendant Deputy Masterson also says,   11:27:27
18 quote, "We were all pretty much kneeling on him," end   11:27:31
19 quote.                               11:27:35
20       Are you aware of that, Doctor?       11:27:35
21    A.  Again, I'd have to look at that specifically   11:27:37
22 but -- I don't remember the exact language, but as far   11:27:39
23 as multiple people saying that they were using their   11:27:42
24 weight to hold him down, I am aware of that.   11:27:47
25    Q.  But you omitted from your report the fact that   11:27:49

Page 49

13

**Imagine Reporting 619.888.0297**

1  multiple deputies reported putting their combined body  11:27:52
2  weight on Steven; right, Doctor?  11:27:55
3       MR. NIEMEYER: Objection to your continued use  11:27:59
4  of the word "omit." He has explained that this is a  11:28:01
5  summary of his understanding of the facts multiple  11:28:04
6  times.  11:28:07
7       THE WITNESS: And in my description of Opinion  11:28:07
8  No. 1, I do go through where everybody says they were  11:28:10
9  body positioned and what they were doing. I didn't put  11:28:13
10 a combined body weight holding him down type of language 11:28:16
11 in there, but I actually go through the specifics of  11:28:20
12 each's position and what they were doing.  11:28:23
13 BY MS. SHERWIN:  11:28:25
14      Q. Right. And you omitted, when you went over the  11:28:25
15 specifics of each position, each of the defendant's  11:28:28
16 testimony in which they said that they were putting  11:28:32
17 their combined body weight on Steven or kneeling on  11:28:35
18 Steven or otherwise pressing him to the ground; right,  11:28:37
19 Doctor?  11:28:40
20      MR. NIEMEYER: Same objection.  11:28:41
21      THE WITNESS: No. I think I actually said that  11:28:41
22 they were holding him down, each individually. I didn't 11:28:43
23 try to do a summary statement because it was a dynamic  11:28:46
24 situation.  11:28:50
25 ///

Page 50

1  BY MS. SHERWIN:  11:28:50
2       Q. The Defendant Bernardi also testified that  11:28:50
3  Defendant Grant was putting weight on Steven's rear end 11:28:53
4  and put Steven into a Figure 4 restraint.  11:28:56
5       Do you recall that?  11:28:59
6       A. I believe I do re- --  11:29:00
7       MR. NIEMEYER: Objection; form.  11:29:02
8       THE WITNESS: I do believe I call -- I  11:29:03
9  recall -- make sure the name was right -- Grant holding 11:29:04
10 him in a Figure 4 position, yes.  11:29:07
11 BY MS. SHERWIN:  11:29:09
12      Q. The Figure 4 restraint is when a person's legs 11:29:09
13 are held up and crossed over their body toward their  11:29:12
14 buttocks; right?  11:29:16
15      A. They're crossed and pushed down towards to keep 11:29:17
16 them from kicking.  11:29:20
17      Q. And you omitted the Figure 4 restraint from  11:29:22
18 your report as well, didn't you, Doctor?  11:29:25
19      MR. NIEMEYER: Same objection.  11:29:28
20      THE WITNESS: It's on page 7 of my report.  11:29:39
21 BY MS. SHERWIN:  11:29:41
22      Q. Where is it?  11:29:47
23      A. It says "The positions of the deputies and  11:29:48
24 associated weight force" -- near the bottom of the  11:29:51
25 page -- "used on Mr. Neuroth is viewable on the video  11:29:54

Page 51

1  and described by the deputies as follows: Deputy Grant 11:29:57
2  was attempting to place Mr. Neuroth's legs in a figure  11:29:59
3  four hold and ultimately was successful."  11:30:02
4       Q. Oh, I see. Thank you.  11:30:05
5       A. Sure.  11:30:07
6       Q. The deputies also punched Steven multiple  11:30:07
7  times.  11:30:10
8       You saw that on the video; right?  11:30:10
9       A. Yes.  11:30:12
10      MR. NIEMEYER: Objection; form.  11:30:13
11 BY MS. SHERWIN:  11:30:14
12      Q. But you omitted all those punches from your  11:30:14
13 report, didn't you?  11:30:17
14      MR. NIEMEYER: Same objection.  11:30:18
15      THE WITNESS: I don't believe I -- actually I'm 11:30:22
16 not sure if I put those words in there anywhere.  11:30:23
17      Yeah, I don't think I said anything about any  11:30:42
18 strikes happening.  11:30:44
19 BY MS. SHERWIN:  11:30:45
20      Q. The deputies also put Steven into a -- painful 11:30:45
21 wristlocks; right?  11:30:52
22      MR. NIEMEYER: Objection to the form of the  11:30:53
23 question.  11:30:54
24      THE WITNESS: There were wristlocks being used  11:30:55
25 to help hold him in position.  11:30:56

Page 52

1  BY MS. SHERWIN:  11:30:59
2       Q. You also omitted the wristlocks from your  11:30:59
3  report; right, Doctor?  11:31:02
4       A. I did not comment on the wristlocks, no, in my 11:31:03
5  report.  11:31:06
6       Q. Now, you say once in the safety cell, Steven  11:31:06
7  continued to struggle with the deputies; right?  11:31:15
8       A. I believe I said that.  11:31:20
9       Q. And that was while he was handcuffed behind the 11:31:23
10 back, prone on the ground, and either in leg shackles or 11:31:27
11 a Figure 4 restraint; right?  11:31:30
12      A. That was part of the time he was resisting and 11:31:33
13 struggling, yes.  11:31:35
14      Q. You never saw him struggling with the deputies 11:31:36
15 on the video once the deputies forced him to the floor, 11:31:41
16 did you, Doctor?  11:31:46
17      A. As far as jumping up and moving around, I  11:31:49
18 didn't see him getting out of control and position there 11:31:55
19 because they were holding him. But all the reports -- 11:31:59
20 on the video, no, I couldn't see anything from that  11:32:02
21 perspective.  11:32:04
22      Q. You never saw Steven push the deputies off him 11:32:05
23 or even force them to move their positions, did you,  11:32:09
24 Doctor?  11:32:11
25      A. I don't recall any -- any times where Steven  11:32:14

Page 53

1  was able to push the deputies off him.          11:32:16
2      Q.  And you also never saw him move at all really  11:32:20
3  once they forced him facedown on the ground; right,  11:32:25
4  Doctor?                                         11:32:27
5      A.  Well, he did move.                       11:32:27
6      Q.  When did he move?                        11:32:29
7      A.  Right after they let go of his -- and let him  11:32:31
8  out -- when they were leaving the room.  His leg moved.  11:32:34
9  His arm moved.                                   11:32:38
10     Q.  Oh, right.  His legs that had been in the  11:32:39
11 Figure 4 restraint flapped out of the restraint  11:32:41
12 position; right?                                 11:32:44
13     A.  The leg moved, yes.                       11:32:46
14     Q.  Okay.  But before the deputies got up off of  11:32:47
15 Steven, you never saw him move at all while they were  11:32:49
16 restraining him, did you?                        11:32:52
17     A.  They could hear him yelling, which is implying  11:32:54
18 that his mouth was moving and puffing air in and out.  11:32:56
19     But from a physical arms and legs moving, I  11:32:59
20 didn't see him pushing people off or shifting positions  11:33:02
21 by struggling.                                   11:33:05
22     Q.  Now, Sheriff Allman testified that he saw on  11:33:06
23 the video there were multiple deputies on top of Steven  11:33:08
24 while he was prone on the ground.                11:33:12
25     Do you disagree with Sheriff Allman?         11:33:13

Page  54

1  not good for multiple deputies to be on top of Steven   11:34:08
2  while he was prone on the ground because it resulted in  11:34:12
3  Steven's death.                                  11:34:15
4      Do you disagree with Sheriff Allman about that?  11:34:15
5      MR. NIEMEYER:  Objection; form and to the    11:34:18
6  extent it misstates any testimony -- or testimony.  11:34:19
7      THE WITNESS:  I don't believe that the deputies  11:34:23
8  in there resulted or caused the death.  So I would have  11:34:24
9  to disagree with that statement.                 11:34:27
10 BY MS. SHERWIN:                                  11:34:29
11     Q.  Being agitated and afraid can increase a  11:34:29
12 person's heart rate; right?                      11:34:32
13     A.  It can, yes.                             11:34:34
14     Q.  And increase their need for oxygen; right?  11:34:36
15     A.  It can increase oxygen demand, yes.      11:34:39
16     Q.  And having tachycardia also increases a  11:34:43
17 person's need for oxygen; right?                 11:34:46
18     A.  Same mechanism.  That was the first question.  11:34:48
19 Making them agitated increase the heart rates, which  11:34:51
20 increases the oxygen demand.                     11:34:55
21     Q.  Being repeatedly punched can increase a  11:34:56
22 person's need for oxygen; right?                 11:34:59
23     MR. NIEMEYER:  Objection; form.              11:35:01
24     THE WITNESS:  Punching itself wouldn't affect  11:35:01
25 the oxygen need or consumption.  If there was an  11:35:03

Page  56

1      A.  That there were multiple deputies --    11:33:16
2      Q.  On top of Steven while he was prone on the  11:33:18
3  ground.                                          11:33:21
4      MR. NIEMEYER:  Objection; vague, misstates the  11:33:22
5  testimony.                                       11:33:22
6      THE WITNESS:  There were multiple deputies in  11:33:23
7  the room holding Steven.  I wouldn't use the words "on  11:33:24
8  top of him."  But as far as if that's what         11:33:28
9  Sheriff Allman said, I don't know the exact language he  11:33:31
10 used.                                            11:33:34
11 BY MS. SHERWIN:                                  11:33:35
12     Q.  You don't disagree with Sheriff Allman, do you?  11:33:35
13     A.  Well, I just said --                     11:33:37
14     MR. NIEMEYER:  Same objection.               11:33:38
15     THE WITNESS:  -- I saw multiple deputies in the  11:33:38
16 room with Steven.  I wouldn't have used the words "on  11:33:41
17 top of him," although there were times when they were  11:33:44
18 over him.  So, again, it's semantics of the words "on  11:33:48
19 top of," what Sheriff Allman's intent was with that.  So  11:33:52
20 if he's saying that they were all piled on top of him, I  11:33:56
21 would disagree.  If it's they were on him in the sense  11:33:59
22 that you looked down and you saw they were over top of  11:34:03
23 him, then I would -- I would agree with that.  11:34:05
24 BY MS. SHERWIN:                                  11:34:05
25     Q.  Sheriff Allman testified that it was obviously  11:34:05

Page  55

1  associated change in excitement, pain, or something  11:35:07
2  else, then it potentially could increase heart rate,  11:35:10
3  which would then lead to an increased oxygen need.  11:35:12
4  BY MS. SHERWIN:                                  11:35:16
5      Q.  Right.  Agitation or pain can increase the  11:35:16
6  heart rate and, therefore, increase the need for oxygen;  11:35:19
7  right?                                           11:35:21
8      A.  If it can be perceived and was basically  11:35:22
9  worsening status, it could be.                   11:35:24
10     Q.  And being restrained in a prone position with  11:35:26
11 hundreds of pounds on top of a person can also increase  11:35:29
12 his need for oxygen; right?                      11:35:32
13     MR. NIEMEYER:  Objection; form, misstates the  11:35:34
14 evidence, compound.                              11:35:36
15     THE WITNESS:  So as a hypothetical, if you're  11:35:37
16 saying that hundreds of pounds are placed on somebody  11:35:38
17 and they're anxious or nervous or could perceive that as  11:35:41
18 a new change, then that could increase one's heart rate,  11:35:46
19 increase some oxygen demand.                     11:35:49
20 BY MS. SHERWIN:                                  11:35:52
21     Q.  Now, you say, at page 6 of your report, that  11:35:52
22 the automatic external defibrillator recorded and  11:35:54
23 analyzed Steven's heart rhythm but never found a  11:35:59
24 shockable rhythm; right?                         11:36:05
25     A.  That sounds about right, yes.            11:36:06

Page  57

```
1    Q.  The AED showed pulseless electrical activity;   11:36:08
2    right?                                   11:36:12
3    A.  Correct.                             11:36:13
4    Q.  It showed an organized rhythm at a rate of   11:36:14
5    about 35 to 40; right?                   11:36:17
6    A.  We don't call that organized.  That's an escape   11:36:18
7    rhythm.                                  11:36:21
8    Q.  And pulseless electrical activity shows that   11:36:21
9    there's a cardiac arrest in which the electrocardiogram   11:36:27
10   shows a heart rhythm that should produce a pulse but   11:36:31
11   does not; correct?                       11:36:35
12   A.  It shows electrical activity that is -- has an   11:36:36
13   absent pulse.  There are certain complexes that should   11:36:40
14   produce -- produce a pulse, and there are certain   11:36:44
15   complexes that are more of an escape rhythm that would   11:36:47
16   not be expected to have a pulse, but it's considered   11:36:51
17   electrical activity.                     11:36:55
18   Q.  Pulseless electrical activity is an indication   11:36:55
19   of hypoxia; right?                       11:36:59
20   A.  Pulseless electrical activity can be caused by   11:37:01
21   hypoxia.                                 11:37:04
22   Q.  Pulseless electrical activity is not caused by   11:37:05
23   ventricular tachycardia or a ventricular fibrillation;   11:37:09
24   right?                                   11:37:13
25   A.  They're different rhythms.  So pulseless   11:37:14
```

Page 58

```
1    electrical activity, PEA, is caused by a number of   11:37:18
2    things.  It's not caused by another rhythm.   11:37:21
3    Q.  And it's not consistent -- well, strike that.   11:37:24
4    PEA, pulseless electrical activity, is not   11:37:26
5    consistent with either ventricular tachycardia or   11:37:31
6    ventricular fibrillation; right?         11:37:34
7        MR. NIEMEYER:  Objection; foundation.   11:37:37
8        THE WITNESS:  That consists -- they're totally   11:37:39
9    different heart rhythms.                 11:37:40
10   BY MS. SHERWIN:
11   Q.  And the EMS providers also found Steven had   11:37:41
12   pulseless electrical activity; right?    11:37:46
13   A.  That's what they reported, yes.      11:37:48
14   Q.  Hypoxia secondary to respiratory insufficiency   11:37:49
15   causes about 40 to 50 percent of PEA cases; right,   11:37:56
16   Doctor?                                  11:37:59
17       MR. NIEMEYER:  Objection; form, foundation,   11:38:00
18   vague.                                   11:38:01
19       THE WITNESS:  I have not heard data like that,   11:38:02
20   no.                                      11:38:08
21       (Reporter query)                    11:38:08
22       THE WITNESS:  I have not heard data like that.   11:38:08
23   BY MS. SHERWIN:                          11:38:08
24   Q.  Are you aware, Doctor, that the most common   11:38:08
25   cause of pulseless electrical activity is hypoxia caused   11:38:11
```

Page 59

```
1    by respiratory insufficiency?           11:38:16
2    A.  I am not aware of that fact either.  11:38:20
3    Q.  What are the other causes of PEA?    11:38:22
4    A.  Cardiac -- primary cardiac arrest basically is   11:38:24
5    one of the causes, mild blood clots to the lung,   11:38:30
6    electrolyte derangements, heart attacks.  They can be   11:38:34
7    caused by drugs, drug intoxication.  They could be   11:38:42
8    caused by -- there's the -- Hs and the Ls.  Those are   11:38:46
9    sort of a list of them.  I can keep thinking if you want   11:38:57
10   me to.                                   11:39:01
11   Q.  Well, there's a -- the list of causes of   11:39:03
12   pulseless electrical activity is commonly referred to as   11:39:04
13   the six Hs and six Ts; right?            11:39:08
14   A.  Correct.                             11:39:12
15   Q.  What are the six Hs?                  11:39:12
16   A.  That's a pimping question here.  Six Hs --   11:39:13
17   hypoxia is on there, hyperkalemia should be on there.   11:39:17
18   I'm trying to think of -- trying to think of the ones   11:39:26
19   that start with the Hs.  I can't remember if all the   11:39:45
20   electrolyte abnormalities are listed out specifically or   11:40:15
21   not.  Hyponatremia.  Hypocalcemia.  I can't remember   11:40:21
22   specifically the Hs there as far as what the guideline   11:40:24
23   has listed there.                        11:40:26
24   Q.  Okay.  The six Hs include hypovolemia, or   11:40:27
25   decreased blood volume; right?           11:40:29
```

Page 60

```
1    A.  Correct.                             11:40:33
2    Q.  Also hydrogen ion acidosis; right?   11:40:33
3    A.  Correct.                             11:40:36
4    Q.  The six Hs also include hypoglycemia, or low   11:40:37
5    blood sugar; right?                      11:40:41
6    A.  I think it's listed on there, yeah.  11:40:43
7    Q.  And hypothermia, or abnormally low body   11:40:44
8    temperature; correct?                    11:40:48
9    A.  True.                                11:40:49
10   Q.  What are the six Ts?                  11:40:49
11   A.  Trauma, tamponade, thrombosis either of the   11:40:51
12   heart or thrombosis of the pulmonary arteries,   11:40:56
13   toxicologic.  And I can't come up with the other one.   11:41:03
14   Q.  Tension pneumothorax?                 11:41:18
15   A.  Yes.                                 11:41:21
16   Q.  Methamphetamine intoxication is not one of the   11:41:21
17   recognized causes of PEA, is it, Doctor?   11:41:25
18   A.  As far as lists, I think it's under  11:41:28
19   toxicologic.                             11:41:31
20   Q.  What literature can you point me to that says   11:41:32
21   methamphetamine causes PEA?              11:41:35
22   A.  It's -- I mean, I guess the one that comes to   11:41:37
23   the top of my head is the Sam Stratton paper that has   11:41:42
24   some work with regards to presenting rhythms, and I   11:41:46
25   think there has been, I think -- well, I think, cases   11:41:49
```

Page 61

**Page 62**

1  with methamphetamine in which the initial rhythm with  11:41:55
2  the paramedics was PEA.  11:41:58
3  Q.  And what's the Sam Stratton paper you're  11:42:01
4  referring to?  11:42:04
5  A.  Back from the '90s when they were looking at  11:42:04
6  position and EMS providers.  I don't remember the name  11:42:08
7  of the paper itself.  11:42:13
8  Q.  And what was the journal it was in?  11:42:13
9  A.  I don't know that.  11:42:16
10  Q.  And in -- you said the mid-'90s?  11:42:16
11  A.  I think it was mid-'90s, yeah.  11:42:19
12  Q.  And it's your testimony that in the mid-'90s --  11:42:21
13  well, strike that.  11:42:22
14  Is Sam Stratton a doctor?  11:42:24
15  A.  He was, yes.  11:42:26
16  Q.  Is your testimony that in the mid-'90s,  11:42:26
17  Dr. Stratton wrote a peer-reviewed medical journal  11:42:28
18  article saying that methamphetamine intoxication causes  11:42:33
19  PEA?  11:42:36
20  A.  That's not what his intent of the article was.  11:42:36
21  Your question was where is an article that says  11:42:39
22  methamphetamine can cause PEA?  And I believe in his  11:42:42
23  paper there, he goes through a bunch of cases in which  11:42:45
24  patients presented and went into cardiac arrest while  11:42:49
25  being drug -- under the influence of drugs in the  11:42:52

**Page 63**

1  presence of EMS, and they put on a monitor and found the  11:42:55
2  first rhythms.  And I believe, if I remember correctly,  11:42:59
3  that amphetamine was one of those drugs and that most of  11:43:01
4  his cases were either asystole or PEA.  I believe that's  11:43:04
5  where it would show that there is PEA that can be caused  11:43:09
6  by methamphetamine.  11:43:12
7  Q.  And are there any other examples of medical  11:43:14
8  literature, either peer-reviewed journal articles or  11:43:17
9  textbook chapters, that say methamphetamine causes  11:43:21
10  pulseless electrical activity?  11:43:24
11  A.  That methamphetamine can cause cardiac arrest,  11:43:27
12  which leads to the pulseless electrical activity.  Off  11:43:30
13  the top of my head, I can't give you a list of papers  11:43:34
14  that -- or articles that talk about that but is a --  11:43:37
15  methamphetamine is a known cause of cardiac arrest --  11:43:40
16  (Reporter query)  11:43:44
17  THE WITNESS:  Methamphetamine is a known cause  11:43:45
18  of cardiac arrest, and presenting rhythms tend to be  11:43:45
19  asystolic or PEA.  11:43:49
20  BY MS. SHERWIN:  11:43:51
21  Q.  Well, methamphetamine causes ventricular  11:43:51
22  tachycardia or ventricular fibrillation; right?  11:43:53
23  A.  Not typically.  It can, but it's -- also causes  11:43:58
24  sudden cardiac arrest with asystole and PEA.  11:44:01
25  Q.  You're saying asystole develops into PEA?  11:44:06

**Page 64**

1  A.  I'm saying that methamphetamine will lead to  11:44:10
2  either of those rhythms.  Ventricular fibrillation and  11:44:12
3  ventricular tachycardia are typically caused by cardiac  11:44:18
4  irritability from a clot or some sort of an electrolyte  11:44:20
5  dysrhythmia, not typically from a drug-induced version  11:44:24
6  of intoxication.  11:44:29
7  Q.  Okay.  And what literature can you point me to  11:44:30
8  that says methamphetamine leads to PEA, either  11:44:33
9  methamphetamine itself or methamphetamine-caused cardiac  11:44:37
10  arrest leads to PEA?  11:44:41
11  A.  Right.  11:44:43
12  MR. NIEMEYER:  Objection; asked and answered.  11:44:43
13  But you can continue.  11:44:44
14  THE WITNESS:  I wouldn't say the  11:44:45
15  methamphetamine itself.  It's when it causes the cardiac  11:44:46
16  arrest.  The presenting rhythm is often asystole or PEA.  11:44:49
17  BY MS. SHERWIN:  11:44:55
18  Q.  And what literature can you point me to that  11:44:55
19  says that?  11:44:57
20  A.  I would have to go and pull it because this is  11:44:57
21  sort of common knowledge, not something I actually  11:45:00
22  memorize citations for.  11:45:02
23  MS. SHERWIN:  Okay.  I think now is a good time  11:45:04
24  to take a break for our court reporter.  11:45:06
25  THE VIDEOGRAPHER:  Off the record.  The time is  11:45:09

**Page 65**

1  11:45 a.m.  11:45:11
2  (Recess)  11:45:21
3  THE VIDEOGRAPHER:  We are back on the record.  11:55:48
4  The time is 11:55 a.m.  11:55:49
5  BY MS. SHERWIN:  11:55:52
6  Q.  When a person's breathing is interfered with  11:55:52
7  and the oxygen level in the blood drops to an abnormally  11:56:03
8  low level, a blue or cyanotic discoloration develops in  11:56:07
9  the lips or the skin on the face; right?  11:56:12
10  A.  So perioral cyanosis can come from hypoxia,  11:56:15
11  yes.  11:56:20
12  Q.  And cyanosis does not appear when a person dies  11:56:20
13  of a sudden cardiac death; correct?  11:56:26
14  A.  Cyanosis does appear when somebody goes into  11:56:28
15  cardiac arrest.  11:56:32
16  Q.  Well, if somebody has a sudden death from  11:56:33
17  cardiac cause, cyanosis doesn't have time to appear;  11:56:36
18  right?  11:56:39
19  A.  It does appear, yes.  11:56:39
20  Q.  How long does it take for cyanosis to develop?  11:56:41
21  A.  It happens as soon as the blood flow is  11:56:44
22  disrupted to the body.  So within five to ten seconds,  11:56:47
23  you'll see cyanosis.  11:56:50
24  Q.  Now, Steven Neuroth repeatedly begged the  11:56:53
25  defendant deputies not kill him and not to hurt him;  11:57:01

**Page 66**

```
 1    right?                        11:57:05
 2         MR. NIEMEYER:  Objection; form, misstates the  11:57:06
 3    testimony.                    11:57:07
 4         THE WITNESS:  He was, I believe, saying, "Don't  11:57:08
 5    kill me."  I don't know if he's referring to deputies or  11:57:09
 6    snakes or other hallucinatory things he was having  11:57:12
 7    there, but he did say the words "Don't kill me" or  11:57:14
 8    "Don't let them kill me" or something along those lines.  11:57:17
 9    BY MS. SHERWIN:                11:57:18
10         Q.  "Don't kill me."  "Don't hurt me."  He said  11:57:18
11    that many times; right?        11:57:21
12         A.  I do recall him saying those words, yes.  11:57:22
13         Q.  And you wrote in your report that the deputies  11:57:24
14    believed Steven made a suicidal statement; correct?  11:57:28
15         A.  I believe that's what I wrote in there,  11:57:32
16    something along those lines.    11:57:34
17         Q.  Now, after doing your report, you read the  11:57:37
18    transcript that was produced by the defendants for --  11:57:41
19    produced for the defendants by Doug Jenkins; right?  11:57:45
20         A.  I did read that, yes.   11:57:48
21         Q.  And did you see in the transcript that  11:57:52
22    Mr. Jenkins, who did an enhancement of the audio  11:57:53
23    recording, wrote that whatever Steven said before the  11:57:59
24    words, quote, "want to die," end quote, was inaudible?  11:58:04
25         A.  I would have to relook at that transcript  11:58:09
```

**Page 67**

```
 1    because I didn't look at it from that perspective.  11:58:11
 2         Q.  Okay.  Steven could have been saying, "I don't  11:58:14
 3    want to die"; right?           11:58:17
 4         MR. NIEMEYER:  Objection; speculation.  11:58:20
 5         THE WITNESS:  If it's inaudible, I guess it  11:58:21
 6    could be anything.             11:58:24
 7    BY MS. SHERWIN:                11:58:24
 8         Q.  And both before and after his reference to  11:58:24
 9    dying, he had been begging the deputies not to kill him  11:58:28
10    or hurt him; right?            11:58:31
11         A.  Well, again, I'm not sure if he was referring  11:58:33
12    to deputies or whatever the hallucinations that were  11:58:35
13    going on in his mind were.  They could have been, again,  11:58:38
14    directed towards things he's seeing or hearing, not  11:58:41
15    necessarily the deputies.       11:58:44
16         Q.  All right.  But both before and after any  11:58:45
17    statement about dying, Steven was begging not to die.  11:58:47
18         You recall that; right, Doctor?  11:58:52
19         A.  Or "Don't kill me" I think is what I think he  11:58:54
20    was saying.                    11:58:59
21         Q.  Now, you say, at page 6 of your report, that  11:59:00
22    there was some movement by Steven immediately after the  11:59:04
23    deputies left.                 11:59:07
24         And as we've discussed earlier, you were  11:59:07
25    talking about his legs coming out of the Figure 4  11:59:09
```

**Page 68**

```
 1    restraint; right?              11:59:13
 2         A.  His legs.  And it looked like his hands moved a  11:59:15
 3    little bit as well at that time.  11:59:17
 4         Q.  His hands were still on his back; correct?  11:59:18
 5         A.  Yes.  But they looked like they shifted a  11:59:20
 6    little bit and his leg moved.   11:59:23
 7         Q.  Okay.  You couldn't tell whether or not any  11:59:25
 8    shift in his hands was artifact from the video as  11:59:28
 9    opposed to any actual movement of his body, could you,  11:59:32
10    Doctor?                        11:59:34
11         MR. NIEMEYER:  Objection; calls for  11:59:35
12    speculation.                   11:59:35
13         THE WITNESS:  In looking at it, it looks like  11:59:36
14    it was different than the other artifact you see later  11:59:38
15    in the video.                  11:59:41
16    BY MS. SHERWIN:                11:59:42
17         Q.  And you can't say, as you sit here today, that  11:59:42
18    any movement that Steven's body made after the deputies  11:59:44
19    left him was voluntary movement on his part, can you,  11:59:47
20    Doctor?                        11:59:50
21         A.  It looked volitional.  I can't say 100 percent  11:59:51
22    that it was.                   11:59:54
23         Q.  And why do you say, "It looked volitional"?  11:59:56
24         A.  Because his leg was held in a position and then  12:00:00
25    it moved up, over, and then shifted to the side as well.  12:00:02
```

**Page 69**

```
 1    It didn't look like it was just a flop.  Usually if  12:00:05
 2    somebody is in cardiac arrest, that they're -- they're  12:00:08
 3    not going to do a lot of movement, that -- it's not  12:00:12
 4    going to -- so it's not a recoil.  12:00:13
 5         Q.  Well, you understand that being held in a  12:00:17
 6    Figure 4 restraint is an unnatural position for a  12:00:18
 7    person; right?                 12:00:21
 8         A.  It's a stretched position, but it's -- I mean,  12:00:22
 9    "unnatural" is sort of a unique term.  It's not  12:00:26
10    something somebody will often put themselves into.  12:00:31
11    It's -- but it's a position people will do in other  12:00:33
12    stretching type of things.     12:00:36
13         Q.  Well, the deputies actually had to hold Steven  12:00:36
14    in the Figure 4 position; right?  12:00:38
15         A.  They did hold him there, yes.  12:00:40
16         Q.  And several minutes later, the deputies and  12:00:48
17    Ms. Caudillo checked on Steven, and he was unresponsive,  12:00:53
18    pulseless, and his face and mouth were cyanotic; right?  12:00:58
19         A.  Yes.                  12:01:02
20         Q.  And then the rhythms strip and monitor placed  12:01:06
21    by the paramedics showed pulseless electrical activity  12:01:10
22    in addition to the AED rhythm; right?  12:01:14
23         A.  Yes.                  12:01:19
24         Q.  Do you agree that some amount of weight on a  12:01:19
25    person's back while they're prone, handcuffed, and in a  12:01:23
```

**Page 70**

```
 1    Figure 4 restraint can cause significant respiratory    12:01:27
 2    compromise?                                             12:01:32
 3        MR. NIEMEYER:  Objection; incomplete              12:01:32
 4    hypothetical, calls for speculation.                    12:01:33
 5        THE WITNESS:  That some amount of weight would?    12:01:34
 6    BY MS. SHERWIN:                                         12:01:36
 7        Q.  Sure.                                          12:01:36
 8        A.  I mean, if it's a thousand pounds, that's some  12:01:37
 9    amount.  So that could cause some ventilatory changes,   12:01:41
10    sure.                                                  12:01:44
11        Q.  Some amount of weight can cause a person to    12:01:45
12    asphyxiate if they're in a prone position; right?       12:01:48
13        MR. NIEMEYER:  Objection; vague.  Same            12:01:51
14    objections.                                            12:01:52
15        THE WITNESS:  Well, again, if the sum of it's a    12:01:53
16    thousand or 2,000 pounds, it doesn't matter what        12:01:53
17    position you're in.  If it's on top of your breathing    12:01:57
18    apparatus, it could cause you to asphyxiate.            12:02:00
19    BY MS. SHERWIN:                                         12:02:03
20        Q.  How much weight would need to be placed on a    12:02:03
21    person who is prone and handcuffed in a Figure 4        12:02:06
22    restraint position who was already tachycardic at the    12:02:09
23    time the restraint started?  How much weight would be    12:02:14
24    needed to asphyxiate them?                              12:02:16
25        MR. NIEMEYER:  Objection; vague, calls for        12:02:19
```

**Page 71**

```
 1    speculation.                                           12:02:19
 2        THE WITNESS:  And it's not a simple just how        12:02:20
 3    much weight unless you're trying to crush somebody.  You  12:02:21
 4    have to look at the physiologic components, constant     12:02:24
 5    weight, location of the weight.  What are they doing     12:02:29
 6    while that weight's being placed?  Is there shifting at   12:02:31
 7    moving of it?  So just -- there's not a static amount of   12:02:35
 8    weight you put on somebody in general that says "this   12:02:38
 9    will asphyxiate them" until you start getting real high  12:02:42
10    levels of weight.                                       12:02:45
11    BY MS. SHERWIN:                                         12:02:46
12        Q.  Well, in the Lundman vs. Nashville case, you   12:02:46
13    testified in a deposition on September 15th of 2008 and  12:02:52
14    said that "500 pounds on a person who was handcuffed and  12:02:57
15    prone would interfere with their ability to breathe."    12:03:02
16    Do you agree with that testimony today, Doctor?        12:03:08
17        MR. NIEMEYER:  Objection; foundation.             12:03:10
18        THE WITNESS:  Yeah, I would say that's -- it        12:03:11
19    would -- you would have measurable changes in their    12:03:11
20    ventilatory parameters if you actually measured it with   12:03:14
21    500 pounds on them.                                     12:03:17
22    BY MS. SHERWIN:                                         12:03:17
23        Q.  And then you also stated that "500 pounds on a   12:03:18
24    person's back would be a prolonged period of time if it   12:03:22
25    were ten minutes"; right?  Do you agree with that,      12:03:25
```

**Page 72**

```
 1    Doctor?                                                 12:03:28
 2        MR. NIEMEYER:  Same objection.                     12:03:29
 3        THE WITNESS:  Could you reread that,               12:03:30
 4    because that's --                                       12:03:31
 5    BY MS. SHERWIN:                                         12:03:32
 6        Q.  Sure.                                          12:03:32
 7        "Placing 500 pounds of weight on a person's        12:03:32
 8    back while he's prone, restrained, and handcuffed for    12:03:37
 9    ten minutes would be a prolonged period of time."       12:03:42
10    Do you agree with that testimony today?                12:03:45
11        A.  Ten minutes can be considered a prolonged       12:03:48
12    period of time depending on what's going on there.  So   12:03:50
13    ten minutes can be prolonged, sure.                     12:03:52
14        Q.  How much weight was on Steven Neuroth during    12:03:59
15    the restraint?                                          12:04:03
16        MR. NIEMEYER:  Objection; calls for               12:04:04
17    speculation, vague.                                     12:04:05
18        THE WITNESS:  So there was -- it depends on        12:04:08
19    what point you're talking about.  And, again, you're     12:04:10
20    saying "on Steven Neuroth."  There's weight on his arms.  12:04:14
21    There's weight on his legs and buttocks.  And then       12:04:17
22    there's weight that's -- as far as -- the part that I'm   12:04:20
23    more involved in looking at is whether it's impacting    12:04:23
24    ventilatory parameters.  So that would be weight on the  12:04:26
25    upper thorax.                                           12:04:30
```

**Page 73**

```
 1    BY MS. SHERWIN:                                         12:04:31
 2        Q.  How much weight was on him?  On his body       12:04:31
 3    anywhere.                                              12:04:35
 4        MR. NIEMEYER:  Same objection.                     12:04:35
 5        THE WITNESS:  As far as the arm, I can't           12:04:37
 6    predict exactly how much.  It's not 215 pounds because   12:04:39
 7    you can't -- unless you're leaning on, you can't get     12:04:42
 8    all the downward vectors.  But his left arm is being     12:04:45
 9    held by the one officer pushing weight down there, but   12:04:48
10    that's -- again, I can't tell you exactly how much it is  12:04:52
11    because it doesn't infect -- doesn't affect the         12:04:54
12    ventilatory process.  So it's -- not overly worried      12:04:57
13    about getting an exact calculation.  Same with the      12:05:00
14    weight on the legs and pushing down on the thighs and    12:05:04
15    lower buttocks.  It doesn't impact ventilation.  So,     12:05:07
16    again, it's a partial weight because you can't get all   12:05:09
17    your weight on somebody.  So there's no need to do an    12:05:12
18    exact calculation, from my perspective.                 12:05:15
19    BY MS. SHERWIN:                                         12:05:17
20        Q.  Okay.  And you'd -- would you agree, Doctor,   12:05:17
21    that you do not know how much weight was on Steven      12:05:18
22    Neuroth when he was being restrained?                   12:05:20
23        A.  An exact amount?  I don't think anybody can do   12:05:22
24    an exact amount count for the entire body, whether it's   12:05:24
25    causing or contributing or potentially having any       12:05:28
```

## Page 74

1    challenges with the ventilatory process or not.    12:05:31
2        Q.   And you also do not know any approximate amount 12:05:33
3    of weight that was on Steven while he was being    12:05:37
4    restrained, do you, Doctor?    12:05:40
5        MR. NIEMEYER:   And I am just going to object as 12:05:44
6    to scope of time that we're talking about here.    12:05:45
7        THE WITNESS:   Again, yeah, it's a dynamic    12:05:45
8    situation.   There's different times and intervals.   It's 12:05:48
9    also -- again, it just depends on which part you're    12:05:50
10   talking about.   If you're talking about the entire body, 12:05:53
11   then, no, I can't give you an exact amount for how much 12:05:55
12   was on the arms and on the legs at different times.    12:05:58
13   BY MS. SHERWIN:    12:06:00
14       Q.   How many pounds did each of the defendant    12:06:00
15   deputies who put any weight on Steven weigh?    12:06:03
16       A.   There is a mathematical evaluation there of    12:06:08
17   five people or something like that or somewhere around a 12:06:12
18   thousand pounds of weight was in the area in the form of 12:06:15
19   officers.   But as far as each one individually, one was 12:06:19
20   215.   One was in the mid-200s.   I don't remember the    12:06:22
21   other two.    12:06:26
22       Q.   And you never saw any e-mail with the heights 12:06:27
23   and weights of the defendant deputies, did you?    12:06:30
24       A.   I did not.    12:06:32
25       MS. SHERWIN:   Okay.   We'll mark this as    12:06:35

Page  74

## Page 75

1    Exhibit 9, which is an e-mail from Kevin Bailey to    12:06:36
2    pigs_fly@comcast.net showing the approximate weight for 12:06:37
3    the deputies involved.    12:06:37
4        (Exhibit 9 marked)    12:06:37
5    BY MS. SHERWIN:    12:06:38
6        Q.   Have you seen that document before today,    12:06:38
7    Doctor?    12:06:56
8        A.   I have not seen this, no.    12:06:57
9        Q.   So I'll represent to you that the handwritten 12:06:58
10   notation is my notation from defendant Craig Bernardi's 12:07:04
11   deposition because he was omitted from the list of    12:07:07
12   approximate weights for the deputies involved.    12:07:12
13       So if we take off Kevin Leef, who was not    12:07:16
14   actively involved on getting -- in getting on top of    12:07:21
15   Steven during the restraint, the reported weights of the 12:07:24
16   other defendant deputies involved in restraining Steven, 12:07:30
17   according to this e-mail, is 1,013 pounds; right,    12:07:32
18   Doctor?    12:07:36
19       A.   The -- if you add them all together, sure, that 12:07:37
20   sounds about right.   I haven't done it exactly myself.   12:07:40
21   But I'll assume you did it correctly.    12:07:43
22       MS. SHERWIN:   Okay.   And I actually noticed,    12:07:46
23   while I was getting ready for this deposition, that the 12:07:48
24   defendant deputies testified that -- some of them --    12:07:51
25   testified that their weights were quite a bit higher    12:07:53

Page  75

## Page 76

1    than the e-mail from Mr. Bailey.   So I did a chart just 12:07:56
2    setting forth the weights of the defendants as set forth 12:08:01
3    in their depositions.    12:08:05
4        And we'll mark that as Exhibit 10.    12:08:07
5        (Exhibit 10 marked)    12:08:14
6        MR. NIEMEYER:   Object as to form, foundation,    12:08:16
7    relevance.    12:08:17
8    BY MS. SHERWIN:    12:08:20
9        Q.   The total weights of the defendants involved in 12:08:20
10   the case, as set forth in their deposition testimony, is 12:08:29
11   1298 pounds.    12:08:32
12       Is that a fair calculation, Doctor?    12:08:36
13       A.   That's --    12:08:39
14       MR. NIEMEYER:   Same objection.    12:08:39
15       THE WITNESS:   The six people listed there,    12:08:40
16   including deputies and looks like Officer Leef, comes    12:08:41
17   out to 1,298, based on the math you put together here.   12:08:45
18   BY MS. SHERWIN:    12:08:49
19       Q.   Right.    12:08:49
20       And then when we take out Officer Leef's    12:08:49
21   245 pounds, that leaves 1,053 pounds for the remaining    12:08:52
22   defendants; right?    12:08:58
23       A.   That sounds about right, yes.    12:08:58
24       Q.   Okay.   And prior to today, you never saw any    12:09:03
25   documents setting forth all of the weights of the    12:09:10

Page  76

## Page 77

1    defendants involved in restraining Steven Neuroth; is    12:09:12
2    that right?    12:09:16
3        A.   Correct.    12:09:17
4        Q.   Now, I note from -- here, we'll take these    12:09:17
5    original exhibits.   I want to make sure we don't lose    12:09:20
6    them.   Thank you.    12:09:23
7        I note from your notes that you brought, on    12:09:28
8    page 2 of your notes --    12:09:41
9        Do you have a copy of your notes, Doctor?    12:09:44
10       A.   Yes.    12:09:46
11       Q.   Okay.   Great.   Thank you.   And we've marked    12:09:46
12   those as Exhibit 6.    12:09:48
13       You say, at 1154:02, "everybody is a way from    12:09:49
14   him."    12:09:55
15       And you've got that highlighted in yellow;    12:09:55
16   right?    12:09:58
17       A.   Correct.    12:09:59
18       Q.   And what was your reason for highlighting that? 12:09:59
19       A.   Just from a perspective of total time involved 12:10:01
20   for the case with regard to where there were weights at 12:10:04
21   any point being placed on him.   I have the initial    12:10:09
22   highlight on the first page at 1140:30, and then this    12:10:12
23   was really when everybody was completely away from him, 12:10:16
24   and that was 1154:02.    12:10:18
25       Q.   Okay.   And at 1140:30, he was placed in a    12:10:20

Page  77

## Page 78

1  safety cell, and then people started restraining him;  12:10:26
2  right?                              12:10:29
3      A.  Correct.                    12:10:29
4      Q.  And according to your review of the records, by 12:10:29
5  1154:02, everybody was away from Steven Neuroth; right? 12:10:33
6      A.  About that time -- it's a dynamic situation -- 12:10:38
7  everybody's off.  But that's the time I chose to put   12:10:41
8  down, yes.                          12:10:45
9      MS. SHERWIN:  Okay.  And I'll mark as the next 12:10:45
10  exhibit in line a screenshot from the surveillance video 12:10:47
11  as Exhibit 11.                     12:10:52
12      (Exhibit 11 marked)            12:10:54
13  BY MS. SHERWIN:                    12:10:55
14      Q.  And this screenshot is from 11:54:05.  12:10:55
15      And this screenshot shows a deputy still on top 12:11:10
16  of Steven, restraining him, holding his hands behind his 12:11:15
17  back; right?                       12:11:18
18      A.  Yes.                       12:11:19
19      Q.  And this deputy is Robert Page, who weighs 12:11:19
20  100- -- strike that.               12:11:26
21      This deputy is Robert Page, who weighs  12:11:27
22  238 pounds.                        12:11:31
23      Are you aware of that, doctor?  12:11:32
24      MR. NIEMEYER:  Form, foundation.  It's coming 12:11:35
25  off of your personal sheet.        12:11:36

## Page 79

1      THE WITNESS:  Yeah, based on the information  12:11:38
2  you shared, that's, I think, what you had him as or -- I 12:11:39
3  would have to look again, but I'm assuming you're giving 12:11:42
4  me the same numbers.               12:11:44
5  BY MS. SHERWIN:                    12:11:47
6      Q.  Okay.  And that was his sworn testimony in his 12:11:47
7  deposition, that he weighed 238 pounds; right?  12:11:50
8      A.  Okay.                      12:11:54
9      Q.  You have no reason to disagree with that? 12:11:54
10      A.  Correct.                   12:11:55
11      Q.  And you understood that Officer Page was the 12:11:55
12  last person who got off Steven Neuroth; right?  12:11:57
13      A.  Correct.                   12:12:00
14      Q.  And you can see from the photograph in  12:12:00
15  Exhibit 11 that Officer Page was on top of Steven 12:12:02
16  Neuroth and leaning forward onto his back holding his 12:12:05
17  arms; right?                       12:12:09
18      MR. NIEMEYER:  Objection; misrepresents the 12:12:10
19  photo.                             12:12:12
20      THE WITNESS:  He's leaning on -- it looks like 12:12:12
21  on his legs and has hands on his wrists.  12:12:14
22  BY MS. SHERWIN:                    12:12:16
23      Q.  Right.  He's leaning forward over Steven's 12:12:16
24  torso and holding his -- his arms or wrists down; right? 12:12:20
25      MR. NIEMEYER:  Same objection.  12:12:24

## Page 80

1      THE WITNESS:  Right.  He's got -- he's got  12:12:25
2  ahold of his wrists, and he's on his -- he's leaning on 12:12:27
3  his legs.                          12:12:29
4  BY MS. SHERWIN:                    12:12:30
5      Q.  And you noted in your notes that Deputy Michael 12:12:40
6  Grant was initially holding Steven's legs in a Figure 4 12:12:42
7  position but was relieved by Robert Page?  12:12:47
8      A.  Correct.                   12:12:50
9      Q.  And then you say in your notes on page 4  12:12:50
10  "Deputy Robert Page - maintaining legs and holding arms 12:13:01
11  using minimal weight"; right?      12:13:06
12      A.  That's what I say, yes.     12:13:09
13      Q.  But you saw he was on top of Steven's legs and 12:13:11
14  leaning forward holding his arms; right?  You saw in the 12:13:14
15  Exhibit 11?  Excuse me.            12:13:17
16      A.  I do see him leaning on the legs and holding 12:13:18
17  his arms.                          12:13:21
18      Q.  And Exhibit -- or strike that.  12:13:22
19      And Deputy Page was the last one to leave 12:13:24
20  Steven in the room by himself; right?  12:13:28
21      A.  He was the last one to get off of Steven.  I'm 12:13:32
22  not sure if he was the last one to exit the room  12:13:35
23  officially.                        12:13:37
24      Q.  Now, you say in your report that there was no 12:13:47
25  evidence of respiratory or ventilatory difficulty; 12:13:51

## Page 81

1  right, Doctor?                     12:13:57
2      A.  I believe I said that.  You're reading from my 12:14:02
3  report.  Can you tell me where you're reading from. 12:14:04
4      Q.  Right.  I'm sorry.  On page 7, you said, quote, 12:14:07
5  "There was no evidence of respiratory or ventilatory 12:14:09
6  difficulty during this time," end quote.  12:14:12
7      A.  Correct.                   12:14:22
8      Q.  And there was no evidence of respiratory or 12:14:29
9  ventilatory difficulty, according to your understanding, 12:14:33
10  at any time the deputies were restraining Steven; is 12:14:37
11  that right?                        12:14:39
12      A.  Correct.                   12:14:42
13      Q.  And ventilatory or respiratory difficulty, in 12:14:42
14  laypeople's terms like mine, would be difficulty 12:14:48
15  breathing; right?                  12:14:51
16      A.  That would be -- that would be a way of 12:14:52
17  describing it, sure.               12:14:53
18      Q.  The lack of evidence of difficulty breathing is 12:14:55
19  significant to you; right?         12:14:58
20      A.  It's a piece of information that I'm using to 12:15:00
21  create -- to evaluate and give an opinion upon, sure. 12:15:03
22      Q.  Why is it significant that, according to your 12:15:06
23  belief, there was no evidence that Steven had any  12:15:10
24  difficulty breathing?              12:15:13
25      A.  Well, it's part of the evaluation of his 12:15:16

1  ventilatory status.  So if I'm -- if I saw that he was  12:15:19
2  having difficulty breathing or there was some issues  12:15:24
3  that he couldn't catch his breath or along those lines,  12:15:27
4  then that would be part of my evaluation.  So I think  12:15:30
5  it's just the way you evaluate a case, is you're looking  12:15:32
6  at what the -- what the evidence is showing.  12:15:36
7     Q.  And what would it tell you if Steven claimed he  12:15:38
8  was having difficulty breathing?  12:15:41
9     MR. NIEMEYER:  Objection; incomplete  12:15:44
10  hypothetical, calls for speculation.  12:15:44
11     THE WITNESS:  You would have to evaluate it in  12:15:46
12  the time and course of what's going on at the time that  12:15:48
13  he's saying that.  12:15:51
14  BY MS. SHERWIN:  12:15:51
15     Q.  Right.  But a person who claims they're having  12:15:51
16  difficulty breathing while they're being restrained is  12:15:54
17  an indication that they are, in fact, having difficulty  12:15:57
18  breathing; right?  12:15:59
19     A.  It potentially could be.  12:16:00
20     Q.  And a person who is having difficulty breathing  12:16:01
21  while being restrained can become asphyxiated if that  12:16:04
22  difficulty breathing is not corrected; right, Doctor?  12:16:09
23     MR. NIEMEYER:  Objection; calls for  12:16:12
24  speculation.  12:16:12
25     THE WITNESS:  Well, if somebody -- difficulty  12:16:13

Page  82

1  breathing does not equal asphyxia.  Difficulty breathing  12:16:15
2  in conjunction with other aspects of physiology that's  12:16:19
3  being held up potentially could cause asphyxia in the  12:16:22
4  right circumstances under the right -- under the right  12:16:27
5  circumstances, but as far as -- one does not necessarily  12:16:31
6  lead to the other.  12:16:35
7  BY MS. SHERWIN:  12:16:36
8     Q.  Right.  But difficulty breathing can lead to  12:16:36
9  asphyxia; right?  12:16:39
10     A.  Again, sort of in its purest form, I guess it  12:16:40
11  could.  Does it -- but you'd have to have all the  12:16:44
12  information in order to say that the causation was  12:16:48
13  really there.  12:16:50
14     Q.  And difficulty breathing can also lead to  12:16:50
15  hypoxia; right?  12:16:52
16     A.  It potentially could.  12:16:54
17     Q.  What about if Steven claimed he was dizzy?  12:16:55
18  What significance would that have?  12:16:59
19     MR. NIEMEYER:  Objection; incomplete  12:17:01
20  hypothetical, calls for speculation.  12:17:01
21     THE WITNESS:  Again, you have to sort of put it  12:17:03
22  into the context of what's going on at the time that he  12:17:05
23  makes that statement.  12:17:07
24  BY MS. SHERWIN:  12:17:08
25     Q.  Well, a person who is having trouble breathing  12:17:08

Page  83

1  and becomes hypoxic can also become dizzy; right?  12:17:12
2     A.  Hypoxia could cause dizziness, yes.  12:17:17
3     Q.  And if a person says he is having trouble  12:17:21
4  breathing and he is dizzy, he can be suffering from  12:17:24
5  respiratory impairment; right?  12:17:28
6     A.  Could that possibly happen?  Sure, it could  12:17:31
7  possibly happen.  12:17:33
8     Q.  And a person who says he's having difficulty  12:17:34
9  breathing and he's dizzy can die from hypoxia if that  12:17:37
10  difficulty breathing isn't corrected; right, Doctor?  12:17:42
11     A.  Again, in the world of possibilities, yes, it  12:17:45
12  is possible that it could occur.  12:17:46
13     Q.  And you were never given anything to review  12:17:48
14  that informed you that Steven Neuroth was having  12:17:50
15  difficulty breathing; right?  12:17:53
16     A.  My observation --  12:17:54
17     MR. NIEMEYER:  Objection; form.  12:17:55
18     THE WITNESS:  -- observations of the video  12:17:56
19  where lots of information was available for me was stuff  12:17:59
20  that I was given to review.  12:18:03
21  BY MS. SHERWIN:  12:18:05
22     Q.  Okay.  But you were never given anything to  12:18:05
23  review that informed you that Steven Neuroth was having  12:18:07
24  any trouble breathing; is that right, Doctor?  12:18:10
25     A.  Ask me that again, please.  I'm sorry.  12:18:14

Page  84

1     Q.  Sure.  12:18:15
2     You never saw anything, in any of the  12:18:16
3  information that you reviewed, that Steven Neuroth was  12:18:20
4  having difficulty breathing; is that correct, Doctor?  12:18:24
5     A.  Oh, that said he was having difficulty  12:18:26
6  breathing?  12:18:29
7     Q.  Yeah.  12:18:29
8     A.  I don't recall anything that said he was having  12:18:29
9  difficulty breathing.  12:18:32
10     Q.  And you don't recall him saying he was having  12:18:33
11  difficulty breathing; right?  12:18:36
12     A.  I don't recall anything specific to that.  He  12:18:37
13  said the word "breathe" or "breath" in his -- during his  12:18:39
14  time that he was on the ground being restrained, but not  12:18:43
15  repeatedly "I can't breathe" or "I'm having trouble  12:18:48
16  breathing" or things like that.  12:18:51
17     Q.  Well, you noted in your -- in your notes at  12:18:52
18  1142:25 Steven said the word "breathe"; right?  12:19:01
19     A.  Correct.  12:19:08
20     Q.  And shortly after Steven mentioned the word  12:19:08
21  "breathe," a deputy punched him again more than once.  12:19:14
22  I'm just wondering why you omitted that from your  12:19:19
23  timeline.  12:19:22
24     MR. NIEMEYER:  Objection; inflammatory,  12:19:24
25  compound, and misstates the testimony.  12:19:24

Page  85

22

1    Go ahead.                              12:19:29
2        THE WITNESS:  This timeline was looking at    12:19:29
3    ventilatory parameters and what he was doing.  It wasn't   12:19:31
4    to be complete documentation of the video.        12:19:34
5    BY MS. SHERWIN:                         12:19:36
6        Q.  Okay.  And what did you do with the information   12:19:36
7    that Steven mentioned the word "breathe"?    12:19:39
8        A.  I took into consideration based on what was   12:19:42
9    going on at the time in the video and after that time   12:19:45
10   period on the video.                    12:19:48
11       Q.  Okay.  We'll mark as Exhibit 12 the report and   12:19:52
12   transcript prepared by Doug Jenkins, which I understand   12:19:56
13   you reviewed after you did your report in this case; is   12:20:02
14   that right, Doctor?                     12:20:05
15       A.  Correct.                       12:20:06
16       (Exhibit 12 marked)                  12:20:06
17   BY MS. SHERWIN:                         12:20:07
18       Q.  And just looking at page 9 of the transcript,   12:20:07
19   which I have highlighted for you, what does the     12:20:12
20   transcript from Mr. Jenkins say that Steven said with   12:20:17
21   respect to breathing?                   12:20:20
22       A.  Well, you want me to read the highlighted   12:20:23
23   portions --                          12:20:26
24       Q.  Yes.                         12:20:26
25       -- or just the words with regard to breathing?   12:20:26

Page  86

1        Q.  The highlighted portion, please.    12:20:29
2        A.  It says "Mr. Neuroth:  What the fuck.  Let me   12:20:30
3    breathe.  Fuck."                       12:20:32
4        And then the other highlighted is "Mr. Neuroth:   12:20:32
5    Stand back, I'm dizzy.  I need medical attention."   12:20:35
6        Q.  And you did not hear those statements from   12:20:41
7    Steven when you were preparing your report in this case?   12:20:43
8        A.  I did not interpret the video, but I was   12:20:47
9    watching it to say those exact words.  And I did not   12:20:49
10   have a transcript at that time with that -- with those   12:20:52
11   interpretations.                       12:20:56
12       Q.  After reviewing -- or strike that.     12:20:57
13       After receiving the Doug Jenkins report, did   12:20:59
14   you review it, including the transcript that Mr. Jenkins   12:21:03
15   prepared?                            12:21:06
16       A.  I reviewed the transcript and looked back at   12:21:06
17   the video as well.                     12:21:08
18       Q.  Did you prepare a correction to your report   12:21:09
19   where you said there was no evidence of respiratory or   12:21:13
20   ventilatory difficulty for Steven?       12:21:16
21       A.  I did not.                     12:21:20
22       Q.  Do you agree that Steven saying "Let me   12:21:20
23   breathe," "Stand back, I'm dizzy.  I need medical   12:21:25
24   attention" is evidence that he was having respiratory or   12:21:30
25   ventilatory difficulty?                 12:21:32

Page  87

1        A.  It was not evidence of that.  It could be   12:21:34
2    interpreted as such, but it also could be that he's   12:21:36
3    having a meth-induced cardiac event, which isn't --   12:21:39
4    comes in as a difficulty breathing feeling of somebody   12:21:42
5    having a heart attack.                  12:21:47
6        Q.  And the positions of the deputies did not   12:21:51
7    change significantly throughout their encounter with   12:21:54
8    Steven; is that right?                  12:21:56
9        MR. NIEMEYER:  Objection; (unintelligible).   12:21:58
10       THE WITNESS:  There were some deputies that   12:21:58
11   changed out, but the location of them were fairly --   12:22:00
12   fairly constant.                       12:22:02
13       (Reporter query)                    12:22:03
14       MR. NIEMEYER:  Scope of time.        12:22:03
15   BY MS. SHERWIN:                         12:22:09
16       Q.  Now, you state on page 8 that the majority of   12:22:09
17   the weight force was not on Steven in such a position   12:22:23
18   that would create -- would have created potential to   12:22:27
19   limit ventilation; right?               12:22:31
20       A.  I believe so, something along those lines.   12:22:35
21       Q.  And as you sit here today, you can't say how   12:22:36
22   much weight force was on Steven, can you?    12:22:40
23       A.  In exact numbers, we talked about earlier, no,   12:22:42
24   I cannot come up with an exact number.    12:22:44
25       Q.  Can you come up with an estimated range of   12:22:47

Page  88

1    potential weights?                     12:22:50
2        MR. NIEMEYER:  Objection; calls for     12:22:52
3    speculation, asked and answered.         12:22:52
4        THE WITNESS:  Yeah, again, it's different time   12:22:53
5    periods during the event.  There are different   12:22:55
6    locations.  My statement here was referring to areas in   12:22:57
7    which ventilatory processes could be impacted, and in   12:23:02
8    looking at that, the number -- the weight there is   12:23:06
9    minimal.                             12:23:08
10   BY MS. SHERWIN:                         12:23:09
11       Q.  Looking at Exhibit 11, which is the photograph   12:23:09
12   of 238-pound Robert Page on top of Steven leaning   12:23:14
13   forward on his arms, is it your testimony, Doctor, that   12:23:21
14   Defendant Page's weight on Steven is minimal?   12:23:25
15       MR. NIEMEYER:  Objection; misleading.   12:23:30
16   BY MS. SHERWIN:                         12:23:31
17       Q.  Just in this one photograph with just one   12:23:31
18   deputy on it?                          12:23:33
19       A.  In the areas that would impact ventilatory   12:23:33
20   ability, yes.                          12:23:34
21       Q.  And how much -- well, strike that.    12:23:37
22       How long was 238-pound Deputy Page on top of   12:23:39
23   Steven Neuroth?                         12:23:43
24       MR. NIEMEYER:  Objection; misstates the   12:23:43
25   testimony, the photograph, and even the weight.   12:23:45

Page  89

```
 1        THE WITNESS:  He was on his legs in the      12:23:51
 2   Figure 4 position over the lower buttocks.  That  12:23:53
 3   wouldn't impact the ability to ventilate.  It doesn't  12:23:56
 4   impact the ventilatory structure.  So as far as how long  12:24:01
 5   he was down there, I would have to go back to the video  12:24:04
 6   to get an exact time, but it didn't impact my evaluation  12:24:06
 7   of the case.                                      12:24:10
 8   BY MS. SHERWIN:                                   12:24:10
 9        Q.  Okay.  But as you sit here today, you don't  12:24:10
10   know how long 238-pound Deputy Page was on top of  12:24:12
11   Steven, do you?                                   12:24:17
12        MR. NIEMEYER:  Same objection.               12:24:18
13        THE WITNESS:  I don't have the specific      12:24:18
14   timeline, no.                                     12:24:19
15   BY MS. SHERWIN:                                   12:24:20
16        Q.  How long was 250-pound Deputy Masterson  12:24:20
17   kneeling on Steven?                               12:24:25
18        MR. NIEMEYER:  Same objection; misstates the  12:24:27
19   entire record.                                    12:24:32
20        THE WITNESS:  The exact time that he's on -- I  12:24:58
21   don't -- I didn't calculate again the exact timing of  12:25:00
22   how long each individual was on Mr. Neuroth, but going  12:25:04
23   by the video, looking at positions where they're at and  12:25:07
24   what Mr. Neuroth was doing during those times is how I  12:25:10
25   made my evaluation.                               12:25:14
```

```
 1   BY MS. SHERWIN:                                   12:25:15
 2        Q.  All right.  Well, Deputy Masterson said, "We  12:25:15
 3   were all pretty much kneeling on him."            12:25:18
 4        How long was 250-pound Deputy Masterson      12:25:20
 5   kneeling on Steven Neuroth?                       12:25:23
 6        MR. NIEMEYER:  Same objection.               12:25:25
 7        THE WITNESS:  As far as that goes, I don't know  12:25:27
 8   the exact timeline he was on -- kneeling on him.  I  12:25:29
 9   would have to go back and look at it.             12:25:32
10   BY MS. SHERWIN:                                   12:25:33
11        Q.  And 160-pound Deputy Grant says, "We put our  12:25:33
12   combined body weight on Steven to press him into the  12:25:38
13   floor."                                           12:25:41
14        How long was 160-pound Deputy Grant using his  12:25:41
15   body weight to press Steven to the floor?         12:25:45
16        MR. NIEMEYER:  Same objection.               12:25:48
17        THE WITNESS:  Same answer.  I didn't go for an  12:25:48
18   exact timeline of when or how long he was in a position  12:25:50
19   of putting pressure on him while -- because there were  12:25:53
20   different portions of the body that were being held that  12:25:58
21   didn't impact ventilations.                       12:26:01
22   BY MS. SHERWIN:                                   12:26:02
23        Q.  What about 250-pound Defendant Bernardi?  12:26:02
24        MR. NIEMEYER:  Same objection.               12:26:06
25        THE WITNESS:  And sort of the same answer.  I  12:26:07
```

```
 1   didn't go for an exact timeline of how long he was  12:26:13
 2   holding the left arm.                             12:26:15
 3   BY MS. SHERWIN:                                   12:26:17
 4        Q.  And what about 190-pound Defendant De Los  12:26:17
 5   Santos?                                           12:26:20
 6        MR. NIEMEYER:  Same objection.               12:26:22
 7        THE WITNESS:  And same response.  I don't have  12:26:24
 8   an exact timeline of how long Deputy De Los Santos was  12:26:26
 9   holding a Figure 4 restraint.                     12:26:31
10   BY MS. SHERWIN:                                   12:26:32
11        Q.  What literature can you point me to that  12:26:32
12   supports your contention, on page 8 of your report, that  12:26:37
13   "In order to cause asphyxiation from compression, air  12:26:39
14   movement into and out of the lungs must be blocked"?  12:26:43
15        A.  You have to impact the ability to get air in  12:26:48
16   and out.  So if you don't -- if you're moving air in and  12:26:51
17   out of the lungs -- you have -- you have to have the  12:26:55
18   compression there.  So --                         12:27:00
19        Q.  Right.  But what literature can you point me to  12:27:02
20   that says asphyxiation requires that air movement in and  12:27:05
21   out of the lungs must be blocked as opposed to reduced?  12:27:08
22        A.  Well, blocked can be considered reduced or  12:27:13
23   completely stopped.                               12:27:16
24        Q.  Okay.  So people can die of asphyxiation with  12:27:16
25   just inadequate air movement in and out of their lungs;  12:27:19
```

```
 1   right?                                            12:27:22
 2        A.  In a -- in certain circumstances, that could be  12:27:23
 3   feasible, yes.                                    12:27:26
 4        Q.  And, in fact, you've been a plaintiff's expert  12:27:26
 5   and testified in a case in which a schizophrenic man was  12:27:30
 6   asphyxiated during prone restraint when officers put  12:27:35
 7   weight on his back; right, Doctor?                12:27:38
 8        A.  That sounds like the elderly gentleman with the  12:27:40
 9   lung disease and heart disease.  I think he actually  12:27:43
10   died of a cardiac arrest from his heart attack but -- so  12:27:46
11   it wasn't just an asphyxiation.                   12:27:50
12        Q.  The decedent was elderly?                 12:27:53
13        A.  I believe so.                            12:27:55
14        Q.  He was 49 years old.                     12:27:55
15        Do you call that elderly?                     12:27:57
16        A.  I'm not sure which case you're referring to,  12:27:59
17   then.                                             12:28:02
18        MS. SHERWIN:  Okay.  We'll mark this as the  12:28:02
19   next in line, which will be 13.  And for the record,  12:28:04
20   Exhibit 13 is Dr. Vilke's January 21st, 2001, report in  12:28:06
21   the case of Keeney vs. City of New London.        12:28:06
22        (Exhibit 13 marked)                          12:28:06
23   BY MS. SHERWIN:                                   12:28:07
24        Q.  This is an expert report that you wrote in a  12:28:07
25   case in which you had been retained to testify on behalf  12:28:36
```

1  of the plaintiff; right?                    12:28:39
2       A.  That is correct.                    12:28:41
3       Q.  And this is a restraint asphyxia case; right?  12:28:42
4       A.  This is a case in which he was restrained and  12:28:46
5  he died.                                     12:28:49
6       Q.  Of asphyxiation; right?             12:28:50
7       A.  I would have to read my report.  It's almost  12:28:52
8  20 years old.                                12:28:54
9       Q.  Well, in the Keeney case, Edward Nolan was a  12:28:55
10  49-year-old schizophrenic man in a psychiatric crisis  12:29:00
11  who died while police officers were restraining him;  12:29:05
12  right?                                       12:29:08
13      A.  That was part of the information, yes.  12:29:08
14      Q.  And Mr. Nolan was having issues related to his  12:29:10
15  psychiatric illness and needed to be brought to a  12:29:15
16  hospital for evaluation; right?              12:29:19
17      MR. NIEMEYER:  Well, I am going to object to  12:29:22
18  the foundation here.  If you want to give him a chance  12:29:24
19  to read through this to refresh his recollection, that's  12:29:26
20  fine; but we're not going to take for granted your  12:29:28
21  interpretation of this.                      12:29:31
22  BY MS. SHERWIN:                              12:29:32
23      Q.  Okay.  Well, you can go ahead and read the  12:29:32
24  report, and I'll ask you some questions about it.  12:29:36
25      A.  Thank you.                           12:29:37

**Page 94**

1       MR. BERTLING:  Julia, while the doctor is  12:29:39
2  reading the report, what were the plans for lunch?  12:29:41
3  Because I am going to have to run up to my hotel room  12:29:43
4  and pack.                                    12:29:46
5       MS. SHERWIN:  You have to do that before we  12:29:48
6  leave at 4:15 -- we have to leave at 4:15 today.  So  12:29:49
7  if --                                        12:29:53
8       MR. BERTLING:  Yeah, because I have till 2:30.  12:29:54
9  But what I can do is I'm just going to bring my earbuds  12:29:55
10  with me so you can go on questioning.  I just didn't  12:30:00
11  know when you were going to break for lunch if the food  12:30:02
12  is there.                                    12:30:06
13      MS. SHERWIN:  Around 1:00.               12:30:07
14      MR. BERTLING:  Okay.  That's fine.       12:30:09
15      THE WITNESS:  I'm ready whenever you are.  12:33:23
16  BY MS. SHERWIN:                              12:33:25
17      Q.  Okay.  Great.                        12:33:25
18       So Mr. Edward Nolan, the decedent in the Keeney  12:33:28
19  case, was a schizophrenic man having a psychiatric  12:33:32
20  crisis; right?                               12:33:38
21      A.  That was his psychiatric disorder, yes.  12:33:39
22      Q.  And he was 49 years old, 5 feet 8 inches tall,  12:33:44
23  and weighed 188 pounds; right?               12:33:48
24      A.  Correct.                             12:33:50
25      Q.  So he was six years younger than Steven Neuroth  12:33:50

**Page 95**

1  and a little over 30 pounds heavier; right?  12:33:54
2       A.  Based on the autopsy that we looked at earlier  12:33:58
3  today.                                       12:34:00
4       Q.  And in the Keeney case, you were surprised to  12:34:00
5  see the amount of trauma involved in taking an older,  12:34:03
6  average-sized, psychotic male into protective custody  12:34:06
7  for his own safety; right?                   12:34:11
8       A.  I believe I said that, yes.          12:34:13
9       Q.  In the Keeney case, you said that you had taken  12:34:14
10  care of dozens of patients requiring full, leather,  12:34:18
11  four-point restraints while working in the emergency  12:34:22
12  department; right?                           12:34:26
13      A.  That is true.                        12:34:27
14      Q.  And you assisted two unarmed security officers  12:34:27
15  in holding down and restraining psychotic and  12:34:33
16  drug-intoxicated patients; correct?          12:34:36
17      A.  I have, yes.                         12:34:39
18      Q.  And with just a little bit of nurse or tech  12:34:40
19  support, you and your colleagues have always been able  12:34:43
20  to gain control of the patient's extremities and  12:34:46
21  restrain the patient without the need to punch or pepper  12:34:49
22  spray the patient; right?                    12:34:54
23      A.  In our ED, yes, we have been able to do that.  12:34:55
24      Q.  And you were always able to do that safe  12:34:58
25  restraint without even receiving any formal training;  12:35:02

**Page 96**

1  right, Doctor?                               12:35:04
2       A.  At that point, correct.              12:35:06
3       Q.  The defendant officers in the Keeney case  12:35:09
4  restrained Mr. Nolan facedown; correct?      12:35:15
5       A.  Yes.                                 12:35:19
6       Q.  And Mr. Nolan stopped breathing during the  12:35:19
7  course of restraint; right?                  12:35:24
8       A.  He went into cardiac arrest, yes.    12:35:26
9       Q.  And then he became bluish, or cyanotic, just  12:35:27
10  like Steven Neuroth; right?                  12:35:31
11      A.  When he went into cardiac arrest, yes.  12:35:33
12      Q.  And during the time when Mr. Nolan was facedown  12:35:36
13  on the ground with multiple officers on his back and  12:35:39
14  neck, he was noticed not to be moving; correct?  12:35:43
15      A.  Correct.                             12:35:46
16      Q.  And your opinion in the Keeney case was that  12:35:46
17  the weight on Mr. Nolan's back may have been enough to  12:35:51
18  restrict his ventilation, causing an irregular  12:35:55
19  heartbeat; right, Doctor?                    12:35:59
20      A.  That's part of my opinion, yes.      12:36:00
21      Q.  And you noted in your report, quote, "By  12:36:02
22  definition, any person put into a position that  12:36:06
23  restricts access to breathing and thus access to oxygen  12:36:10
24  is at risk for death attributable to positional  12:36:13
25  asphyxia," end quote; right, Doctor?         12:36:17

**Page 97**

1    A.  That's what it says, yes.        12:36:20
2    Q.  Mr. Nolan was on his stomach with his hands   12:36:21
3  behind his back like Steven Neuroth; right?      12:36:27
4    A.  I believe they're behind his back as well, yes. 12:36:31
5    Q.  And the added weight of officers being on his  12:36:34
6  back for at least several minutes can restrict a   12:36:42
7  person's ability to breathe; right?          12:36:46
8    A.  If there's enough weight on there, you can   12:36:47
9  impair ventilations.                   12:36:52
10    Q.  And this weight can, therefore, lower the   12:36:53
11  victim's ability to get oxygen into the lungs and into 12:36:56
12  the blood; right, Doctor?              12:36:59
13    A.  If they have underlying lung disease that can  12:37:01
14  put them at risk for that, yes, or if the amount of   12:37:04
15  weight is great enough, yes.           12:37:07
16    Q.  And the hypoxia -- the results can then induce 12:37:08
17  an irregular heartbeat that will be fatal if not    12:37:12
18  promptly treated; right?              12:37:18
19    A.  It can do that.                12:37:20
20    Q.  Yep.  Is that right, Doctor.       12:37:21
21    A.  I just said it can do that, yeah.       12:37:24
22    Q.  Okay.  And you noted in your report in the    12:37:26
23  Keeney case that, quote, "Therefore, the position with 12:37:29
24  the police officers on Mr. Nolan's back caused him to  12:37:35
25  asphyxiate (not breathe effectively) and directly led to 12:37:39

1  his demise.  This by definition is 'positional     12:37:47
2  asphyxia,'" end quote; right, Doctor?        12:37:50
3    A.  That's what it says.             12:37:53
4    Q.  Mr. Nolan's hypoxia-induced irregular heartbeat 12:37:53
5  occurred while he was facedown on the ground with the  12:38:04
6  police officers on his back; right?         12:38:06
7    A.  Correct.                 12:38:09
8    Q.  And that was "why he was cold and blue by the  12:38:09
9  time the emergency medical technicians had a chance to  12:38:15
10  evaluate him 9 minutes later"; right?        12:38:18
11    A.  That's what it says, yes.         12:38:21
12    Q.  In the Keeney case, you said that if EMTs had  12:38:23
13  promptly evaluated Mr. Nolan, he would have survived his 12:38:28
14  altercation with the police officers that night; right? 12:38:32
15    A.  I did say that, yes.  I think it's more    12:38:34
16  likely -- I can't remember exactly what I said.  "Had  12:38:37
17  the EMTs been able to assess Mr. Nolan on arrival (when 12:38:40
18  the witnesses said he was not moving and when      12:38:44
19  Officer Garcia" stated he was -- or "state he was    12:38:46
20  relaxed), they would have found him in arrest earlier,  12:38:49
21  had paramedics dispatched earlier and definitive     12:38:52
22  treatment" -- "had paramedics dispatched earlier and   12:38:55
23  definitive treatment earlier.  Had this occurred, I am  12:38:58
24  confident beyond a medical reasonable certainty that   12:39:01
25  Mr. Nolan would have survived this altercation on that  12:39:04

1  night."                         12:39:07
2    Q.  Right.  If he got a prompt assessment from   12:39:08
3  EMTs, he would have survived; right?        12:39:11
4    A.  Correct.  That's what it says there.     12:39:14
5    Q.  And you wrote in your report in the Keeney case 12:39:15
6  that "Studies show that early recognition of cardiac   12:39:23
7  arrest and prompt treatment will increase survivability 12:39:28
8  immensely"; right?                  12:39:32
9    A.  You're probably -- I'm not sure where you're  12:39:33
10  reading that.  That sounds like something that was in  12:39:38
11  this report.                    12:39:40
12    Q.  In the Keeney case, when you were the      12:39:55
13  plaintiff's expert, you were critical of the defendants' 12:39:57
14  failure to have Mr. Nolan evaluated for nine minutes;   12:40:00
15  right?                        12:40:04
16    A.  I was critical of that, yes.        12:40:04
17    Q.  And your opinion was that a nine-minute delay  12:40:06
18  contributed to Mr. Nolan's death; right?       12:40:09
19    A.  In this case, there were -- circumstances were 12:40:12
20  of that -- that, I think, the nine-minute delay in    12:40:16
21  getting EMS there to be able to defibrillate him would  12:40:19
22  have made -- could have made a difference.      12:40:24
23    Q.  He would have survived if he had gotten    12:40:26
24  evaluated earlier; right?              12:40:29
25    A.  The v-fib arrest data would be supportive of  12:40:30

1  that.                         12:40:34
2    Q.  In the Steven Neuroth case, after Deputy Page  12:40:36
3  got off Steven, nobody came back to -- into the cell to 12:40:42
4  check on him until about 12 minutes later; right?    12:40:47
5    A.  Something around that timing.        12:40:52
6    Q.  In the Keeney case, when you were paid to be  12:40:53
7  the plaintiff's expert, you testified that the      12:41:01
8  defendants caused Mr. Nolan's death by positional    12:41:04
9  asphyxia when they put him facedown on the ground and  12:41:07
10  police officers got on his back; right?       12:41:10
11    A.  A definition of positional asphyxia causing his 12:41:13
12  diseased heart to have a cardiac arrest because of    12:41:17
13  hypoxia and the fact that they did not recognize that he 12:41:23
14  was not breathing, they pepper sprayed him while he was 12:41:24
15  on the ground and unconscious, and a number of other   12:41:27
16  things that are detailed in this report.       12:41:30
17    Q.  And you provided deposition testimony in the  12:41:31
18  Keeney case on April 5th of 2001; right?       12:41:35
19    A.  It sounds good to me.  I don't remember the   12:41:41
20  date.                        12:41:45
21    Q.  And in your deposition in the Keeney case, you 12:41:45
22  discussed your experiment of putting 25-pound and     12:42:01
23  50-pound sandbags on people in between their shoulder   12:42:04
24  blades.                      12:42:09
25    Do you recall that, Doctor?          12:42:09

A.  I don't recall much of that deposition.  So I    12:42:11
would have to look at whatever you have there --    12:42:13
Q.  Okay.    12:42:15
A.  -- because I haven't seen this deposition since    12:42:16
2001.    12:42:18
Q.  Okay.  But you have done an experiment putting    12:42:18
25-pound and 50-pound sandbags on people between their    12:42:21
shoulder blades; right?    12:42:25
A.  I have done that, yes.    12:42:25
Q.  And in the Keeney case, you described that    12:42:28
study as a preliminary study and said, quote, "We don't    12:42:31
want to put 200 pounds on people and kill them," end    12:42:34
quote.    12:42:38
I'll show you your transcript from that    12:42:38
deposition.  Is that correct, Doctor?    12:42:41
A.  That does say that in that portion of the    12:42:49
deposition, yes.    12:42:53
Q.  Oh, in looking back at Exhibit 13, that is your    12:42:54
signature on page 2449 of the report; right?    12:43:00
A.  It is, yes.    12:43:03
Q.  So that is a true and accurate copy of the    12:43:03
report that you provided in the Keeney case; right?    12:43:06
MR. NIEMEYER:  Objection; foundation.    12:43:09
THE WITNESS:  I have no recall, but it seems    12:43:11
reasonable.    12:43:13

Page 102

BY MS. SHERWIN:    12:43:14
Q.  In the Keeney case, you could only say that    12:43:14
putting 25 or 50 pounds on the back of healthy    12:43:19
volunteers would not significantly decrease their    12:43:24
respiratory function; right?    12:43:29
MR. NIEMEYER:  Objection; foundation.    12:43:31
THE WITNESS:  Can you repeat that question,    12:43:32
please.    12:43:33
BY MS. SHERWIN:    12:43:33
Q.  Sure.    12:43:33
In the Keeney case, you could only say that    12:43:33
putting 25 or 50 pounds on the back of healthy    12:43:36
volunteers would not be expected to reduce their    12:43:40
respiratory function; right?    12:43:43
MR. NIEMEYER:  Same.    12:43:44
THE WITNESS:  In the Keeney case -- well, if    12:43:45
they -- 25 and 50 pounds on healthy individuals is what    12:43:46
our study showed, that it didn't have a clinically    12:43:50
significant impact.    12:43:53
BY MS. SHERWIN:    12:43:54
Q.  Right.  And you could not even say in the    12:43:54
Keeney case that 25 or 50 pounds on Edward Nolan's back    12:43:56
would not cause him significant problems breathing    12:44:01
versus someone who didn't have any underlying disease;    12:44:04
right?    12:44:08

Page 103

MR. NIEMEYER:  Objection; vague, beyond scope.    12:44:08
THE WITNESS:  I seem to recall that he had    12:44:10
significant lung disease as well as multivessel heart    12:44:11
disease.  So he wasn't a -- he was a guy who had already    12:44:16
had a bad baseline cardiovascular status.    12:44:18
BY MS. SHERWIN:    12:44:21
Q.  Right.  He wasn't a healthy volunteer; right?    12:44:21
A.  He was not, no.    12:44:24
Q.  Steven Neuroth also was not a healthy volunteer    12:44:27
in the restraint that was put on him, was it -- was he?    12:44:29
MR. NIEMEYER:  Objection; vague.    12:44:33
THE WITNESS:  Healthy volunteer in --    12:44:34
BY MS. SHERWIN:    12:44:35
Q.  To be restrained.    12:44:35
A.  I'm sorry.  I'm not sure how you're defining    12:44:36
"healthy volunteer."    12:44:38
Q.  Okay.  Well, Steven Neuroth was a schizophrenic    12:44:40
man who was psychotic and intoxicated on    12:44:42
methamphetamine; right?    12:44:46
A.  So if you're talking about that time period --    12:44:47
point in time, yeah, he could not be a -- could not be a    12:44:48
research subject.    12:44:50
Q.  And in the Keeney case, you testified at    12:44:57
page 155, quote, "By putting weight on his back, we've    12:45:02
already demonstrated that it will compromise your    12:45:07

Page 104

ventilatory ability, end quote; is that correct, Doctor?    12:45:11
A.  That's what it says, yes.    12:45:21
Q.  And in the Keeney case, it was your ability    12:45:23
that -- strike that.    12:45:28
In the Keeney case, you testified that you    12:45:29
believed putting 200 pounds on people would kill them;    12:45:32
right?    12:45:35
MR. NIEMEYER:  Objection; misstates his    12:45:35
testimony.    12:45:36
THE WITNESS:  I don't believe that's what I was    12:45:37
saying in that portion of it.  I think it was referring    12:45:38
to we just -- you don't start with a big study at the    12:45:40
very beginning.  You start with 25 and 50 because of --    12:45:45
build your way up to see how it impacts ventilatory    12:45:47
parameters.  These were the first studies of their time.    12:45:49
And so the comment there about "We don't want to kill    12:45:53
them.  We just don't know what it's going to do" -- but    12:45:55
I don't know the entire context of that portion of the    12:45:57
deposition.    12:46:00
BY MS. SHERWIN:    12:46:00
Q.  Okay.  Well, the question was "Can you    12:46:00
summarize your conclusions from the study?"    12:46:02
And you said it was more of a preliminary    12:46:03
study.  And you said, quote, "We don't want to put    12:46:05
200 pounds on people and kill them," end quote; right,    12:46:07

Page 105

Doctor?                                          12:46:10

A. I have already acknowledged that's what it says 12:46:11 in there. I'm saying I don't know the entire context of 12:46:13 the portions before or after that portion of the 12:46:16 deposition.                                        12:46:19

Q. Now, in this case, you cited to your article on 12:46:20 ventilatory and metabolic demands in people during the 12:46:26 course of restraint; right?                       12:46:32

A. In this study -- or in this case?              12:46:34

Q. In this case.                                 12:46:36

A. I have referred to some of my papers, yes.     12:46:37

MS. SHERWIN: We'll mark that article as          12:46:43 Exhibit 14.                                        12:46:44

(Exhibit 14 marked)                              12:46:45

BY MS. SHERWIN:                                  12:46:46

Q. Do you have a copy of it with you? Or I'll    12:46:46 just give you the original.                        12:46:49

A. I do not, no. Thank you.                       12:46:50

Q. In that study, you started with 30 healthy    12:46:52 volunteers, and two people dropped out because they were 12:47:10 afraid of being restrained; right?                12:47:13

A. In the restrained portion, yes.               12:47:15

Q. And you excluded current drug users, people who 12:47:16 had any acute illness or injury, or people who had any 12:47:22 illness or disability that would limit their ability to 12:47:27

Page 106

perform exercise; right?                         12:47:30

A. That sounds about right for this study, yes.   12:47:32

Q. You also did a urine drug screening and        12:47:34 excluded people if they used marijuana, antidepressants, 12:47:37 stimulants like methamphetamine or cocaine, morphine,  12:47:44 barbiturates, and benzodiazepines; right?         12:47:49

A. We excluded them if their drug screen was      12:47:53 positive, yes.                                    12:47:56

Q. And you obtained informed consent from every  12:47:57 participant; right?                               12:47:59

A. Correct.                                       12:48:01

Q. Steven Neuroth would not have qualified to     12:48:01 participate in that study; right?                 12:48:03

A. Based on his drug use, he -- if he's got       12:48:05 current drug use, then he could not qualify for the 12:48:08 study, and I don't remember the age qualification on 12:48:11 this one as well.                                 12:48:14

Q. Well, he was a 50 -- as a 55-year-old          12:48:15 schizophrenic -- as a 55-year-old schizophrenic man on 12:48:18 methamphetamine who was already tachycardic before any 12:48:23 restraint began, he would have been excluded from your 12:48:28 study; right?                                     12:48:30

A. Well, again, you're not qualifying the timing 12:48:31 at -- what I was referring to, at the time that he was 12:48:33 drug intoxicated, obviously he's not going to       12:48:36

Page 107

participate in the study. I thought you were referring 12:48:39 to him as a physical specimen, meaning that if his -- he 12:48:41 was no longer using current drugs, would he have        12:48:45 qualified or not.                                  12:48:47

Q. But what were the risks that you informed the 12:48:48 participants of in order to get their informed consent? 12:48:51

A. This study was done over ten years ago. I     12:48:54 can't give you a list of the specific risks.       12:48:57

Q. Okay. What in general are risks you would have 12:49:01 informed the participants of?                     12:49:04

A. Typically it would be the risk of being        12:49:07 uncomfortable if the restraints hurt you, being    12:49:09 uncomfortable having weight on your back, the -- you 12:49:12 know, risks of getting injured while on the treadmill, 12:49:20 sort of the basic sort of injury possibilities depending 12:49:24 what's going on. Some people may not be able to    12:49:29 tolerate it, which they would be informed that if they 12:49:32 didn't feel comfortable at any point, they can withdraw 12:49:34 from the study.                                   12:49:37

Q. Well, did you inform the participants of the  12:49:38 risk of potential respiratory or ventilatory compromise? 12:49:42

A. I don't remember specifically what the -- the 12:49:47 consent forms spelled out for us at that time.     12:49:49

Q. Did you inform the participants of the         12:49:52 potential risk of heart attack?                   12:49:54

Page 108

A. Again, I don't recall what the specific consent 12:49:58 form spelled out at that time.                    12:50:02

Q. Did you inform the participants of the risk of 12:50:03 death?                                            12:50:06

MR. NIEMEYER: Objection; asked and answered      12:50:06 twice now.                                        12:50:07

THE WITNESS: Same answer.                        12:50:09

BY MS. SHERWIN:                                  12:50:10

Q. And you only applied 102.3 kilograms, or       12:50:10 225 pounds, to people who weighed more than        12:50:16 68 kilograms, or 150 pounds; right?               12:50:22

A. That sounds right.                             12:50:24

Q. Why did you not put 225 pounds on subjects     12:50:25 weighing less than 150 pounds?                    12:50:30

A. I don't remember specifically how that got     12:50:32 adjusted. That may have come from the IRB as a     12:50:33 recommendation, but I don't remember if that was our 12:50:36 original decision or if it was a recommendation one way 12:50:40 or the other. I don't know how that came to be.   12:50:46

Q. When you say "IRB," you're talking about the  12:50:48 Institutional Review Board; right?                12:50:50

A. Correct.                                       12:50:53

Q. Did the Institutional -- well, strike that.   12:50:53 You got approval from both the San Diego State     12:50:55 and the University of California Institutional Review 12:50:58

Page 109

**Page 110**

```
1   Boards; right?                        12:51:02
2       A.  We did, yes.                   12:51:03
3       Q.  Why did you get approval from two Institutional 12:51:04
4   Review Boards instead of just one?     12:51:07
5       A.  Because the study was being done on San Diego 12:51:10
6   State University's property at the physiology lab.  So 12:51:12
7   we had to have their IRB approval.  And since I work for 12:51:16
8   the university as did my other colleagues that were 12:51:19
9   participating in the study in general, we had to have a 12:51:23
10  UCSD IRB approval as well.             12:51:28
11      Q.  And the prohibition on putting 225 pounds on 12:51:32
12  subjects weighing less than 150 pounds may have come 12:51:36
13  from one of the IRBs?                  12:51:39
14      A.  It may have.  I don't have a specific 12:51:41
15  recollection, when we were putting the protocol 12:51:43
16  together, how -- how that got done.    12:51:45
17      Q.  And I note in Figure 1 on page 172 of your 12:51:48
18  article, you put the subjects on a padded mat raised up 12:51:51
19  off the floor so their head and mouth were not touching 12:51:56
20  the floor or mattress while they were doing the 12:52:00
21  simulated struggle; right?             12:52:03
22      A.  That's correct.                12:52:05
23      Q.  And why did you use that position? 12:52:07
24      A.  Because we had to be able to measure their 12:52:10
25  breathing through the apparatus.  So they had to be not 12:52:12
```

**Page 111**

```
1   hitting the ground.  If you didn't have a raised -- 12:52:15
2   raised, elevated mat, the mouthpiece would bounce 12:52:20
3   against the ground and actually give you inaccurate 12:52:24
4   data.  So we had to raise it up to keep them off, as you 12:52:27
5   can see on the picture there.  So that's the purpose of 12:52:30
6   that.                                  12:52:32
7       Q.  Well, you also wanted to make sure that the 12:52:32
8   subject's ventilation or ability to breathe wasn't 12:52:34
9   reduced by having their face forced into the floor; 12:52:39
10  right?                                 12:52:43
11      MR. NIEMEYER:  Objection.          12:52:43
12      THE WITNESS:  That's not the reason for doing 12:52:44
13  it.  The reason is you can't measure if you can't 12:52:45
14  keep the device in their mouth.        12:52:48
15  BY MS. SHERWIN:                        12:52:49
16      Q.  And you did this study on a padded mat, not on 12:52:49
17  a floor or cement; right?              12:52:52
18      A.  Again, we had to raise it up.  So we couldn't 12:52:54
19  raise the floor up, and we couldn't raise concrete up or 12:52:56
20  cement up, as you pointed out.         12:52:58
21      Q.  Would you agree, Doctor, that having one's face 12:53:00
22  forced into the floor could restrict a person's ability 12:53:02
23  to breathe?                            12:53:06
24      MR. NIEMEYER:  Objection; vague, calls for 12:53:07
25  speculation.                           12:53:08
```

**Page 112**

```
1       THE WITNESS:  Theoretically, if your mouth was 12:53:08
2   blocked into something that it couldn't move air in and 12:53:10
3   out of, that could have some impact on ventilation. 12:53:13
4   BY MS. SHERWIN:                        12:53:17
5       Q.  And in your study that is the subject of your 12:53:17
6   article which is Exhibit 14, you only had the subjects 12:53:23
7   engage in a 60-second simulated struggle time during 12:53:28
8   which they received verbal encouragement; right? 12:53:32
9       A.  That is part -- that's this part of the 12:53:36
10  experiment, yes.                       12:53:38
11      Q.  And then after the maximum 60-second simulated 12:53:39
12  struggle, they were allowed to lie quietly and rest for 12:53:43
13  five minutes; right?                   12:53:47
14      A.  I would have to reread the protocol 12:53:48
15  specifically, but that sounds about right. 12:53:50
16      Q.  Why was it important to give them five minutes 12:53:52
17  to rest?                               12:53:54
18      A.  So that we could continue to measure their 12:53:55
19  ventilatory functions.                 12:53:57
20      Q.  Why did you limit the simulated struggle to 12:53:58
21  60 seconds?                            12:54:01
22      A.  Because we were looking for maximum oxygen 12:54:02
23  consumption.  So you're trying to see how much oxygen 12:54:05
24  they can use during that struggling period.  To make it 12:54:08
25  go five, six, seven minutes longer, you were going to 12:54:11
```

**Page 113**

```
1   actually dilute out because people typically can't keep 12:54:15
2   a strong struggle going on for a longer period.  So this 12:54:18
3   would give us the sort of worst-case scenario of oxygen 12:54:20
4   consumption in a restrained position.  12:54:23
5       Q.  Okay.  A person who is restrained and 12:54:26
6   struggling for four or five minutes is going to tire 12:54:28
7   out; right?                            12:54:32
8       A.  They might get tired and not consume as much 12:54:33
9   oxygen.  We were seeing how much people could actually 12:54:36
10  consume in this position.              12:54:39
11      Q.  During the 60-second simulated struggle, the 12:54:41
12  subjects did not have weight on their backs, did they? 12:54:44
13      A.  That is correct.               12:54:47
14      Q.  And when you put weight on the subjects' backs, 12:54:47
15  you immediately measured their maximum voluntary 12:54:50
16  ventilation and then let them sit up for 15 minutes; 12:54:54
17  right?                                 12:54:58
18      A.  That's a different phase of the study.  They're 12:54:58
19  separate.  So you're -- so you're blending them.  But 12:55:01
20  this -- that's a different part of the study. 12:55:02
21      Q.  Right.  Your Phase I study was a 60-second 12:55:04
22  maximum simulated struggle with no weight on the 12:55:07
23  subject's back; right?                 12:55:11
24      A.  Correct, to measure oxygen consumption. 12:55:13
25      Q.  And then you let them rest for five minutes; 12:55:17
```

## Page 114

```
 1  right?                        12:55:18
 2      A.  Yes.                   12:55:18
 3      Q.  Okay.  And then the Phase II part of the study  12:55:18
 4  was putting weight on the subject's back, immediately  12:55:22
 5  measuring their maximum voluntary ventilation, and then  12:55:26
 6  letting them sit up for 15 minutes; right?     12:55:29
 7      A.  There was actually repeated measures of the  12:55:33
 8  maximum ventilatory ventilation -- voluntary   12:55:35
 9  ventilation.  So there was at least three runs of that.  12:55:38
10      Q.  Right.  But you put weight on the subjects'  12:55:41
11  backs, you immediately measured their maximum voluntary  12:55:45
12  ventilation, and then you let them sit up for 15  12:55:49
13  minutes; right?               12:55:52
14      A.  That's what I'm saying.  No, it's not the case.  12:55:53
15      Q.  So how long did you leave the weight on the  12:55:55
16  subject's back before you -- you measured their maximum  12:55:57
17  voluntary ventilation?        12:56:00
18      A.  At minimum, between two and three minutes.  12:56:01
19      Q.  So you left the weight on the subject's back  12:56:04
20  for two to three minutes; is that right?       12:56:07
21      A.  At minimum, yeah.      12:56:07
22      Q.  How is -- what is the longest period of time  12:56:10
23  that you left the weight on the subject's back?  12:56:13
24      A.  It was about four to five minutes.     12:56:16
25      Q.  You did not leave weight on the subject's back  12:56:17
```

## Page 115

```
 1  for 15 minutes in any of your studies, did you?  12:56:20
 2      A.  Not this study.  And I think the 25 and  12:56:22
 3  50 pounds was only for five minutes, but I'd have to  12:56:27
 4  double-check.  And then we had the weight where we had  12:56:33
 5  the hundred pounds on -- and I thought that was for 10  12:56:35
 6  or 15 minutes.  I'd have to look at the paper exactly to  12:56:39
 7  get the exact time on it.      12:56:42
 8      Q.  In this study, you only had 13 subjects who  12:56:44
 9  weighed at least 150 pounds and were allowed to have the  12:56:47
10  225 pounds on their backs; right?     12:56:50
11      Well, Doctor, we can -- we can do it this way  12:56:54
12  to speed things up:  You started with 30 subjects, and  12:57:31
13  two of them dropped out because they were afraid of  12:57:34
14  being restrained; right?       12:57:36
15      A.  They dropped out of the part where they didn't  12:57:38
16  get the maximum oxygen consumption measurement.  They  12:57:40
17  did participate in the weight-on-the-back component.  12:57:43
18      Q.  Okay.  And you said 50 percent of the subjects  12:57:48
19  weighed less than 68 kilograms, including 12 women and  12:57:52
20  3 men?                        12:57:56
21      A.  Yes.  And that would make it 15.  12:57:56
22      Q.  Okay.  And you're saying that two subjects  12:57:58
23  who dropped out -- it says they were psychologically  12:58:02
24  unable to tolerate restraint.  You're saying that they  12:58:07
25  dropped out before doing Phase I and after doing  12:58:10
```

## Page 116

```
 1  Phase II?                      12:58:16
 2      A.  They did Phase I, which was the weight on the  12:58:17
 3  back and the -- the MVV.  And if you'll look at Table 2,  12:58:20
 4  it tells you that there are 30 subjects in there.  12:58:23
 5      And then for Phase II, when we were trying to  12:58:27
 6  restrain them to get the maximum oxygen consumption  12:58:30
 7  measurements, two of them didn't feel comfortable having  12:58:32
 8  their hands tied up and their legs tied up.  So they  12:58:35
 9  opted out at that point.       12:58:39
10      Q.  Okay.  And then all of the subjects were  12:58:40
11  healthy student athletes; right?      12:58:42
12      A.  Basically, yes.        12:58:45
13      Q.  And they were between 21 and 28 years old?  12:58:45
14      A.  I'd have to look at the details.  Sorry.  I  12:58:50
15  didn't memorize all the details of all my studies, but  12:58:52
16  that sounds about right.       12:58:56
17      Q.  And even -- when you did the simulated struggle  12:59:01
18  for 60 seconds, even with a 60-second time limit and no  12:59:05
19  weight on the student athletes' backs, you could see  12:59:09
20  their intensity of movement visibly decrease by the end  12:59:13
21  of the 60 seconds; right?      12:59:16
22      A.  If that's what I wrote in there, it sounds  12:59:18
23  about right.  They can't keep a big exertion going on  12:59:20
24  for a whole 60 sounds at their maximum pace.   12:59:24
25      Q.  You never had any of the subjects struggle  12:59:27
```

## Page 117

```
 1  while hogtied and prone with 225 pounds on their backs,  12:59:28
 2  did you?                      12:59:32
 3      A.  No.  The weight would fall off.  So we couldn't  12:59:33
 4  do that.                      12:59:35
 5      Q.  You never put 400, 600, or a thousand pounds on  12:59:36
 6  the backs of any subjects, did you?   12:59:40
 7      A.  That is correct.       12:59:42
 8      Q.  You never had anyone punch the subjects  12:59:42
 9  repeatedly while they were being restrained, did you?  12:59:45
10      MR. NIEMEYER:  Objection; relevance, beyond  12:59:47
11  scope.                        12:59:49
12      THE WITNESS:  Correct.     12:59:50
13  BY MS. SHERWIN:                12:59:50
14      Q.  And the subjects were verbally encouraged, and  12:59:50
15  they were not threatened with having their leg break if  12:59:53
16  they move it or being tased; right?   12:59:56
17      MR. NIEMEYER:  Same objection.     12:59:59
18      THE WITNESS:  They were encouraged to do the  01:00:00
19  most exercise possible in that 30 -- in that 60 seconds.  01:00:02
20  BY MS. SHERWIN:                01:00:05
21      Q.  And the subjects -- strike that.  01:00:05
22      None of the subjects were mentally ill, of  01:00:07
23  course; right?                01:00:09
24      A.  Not to our knowledge, no.      01:00:11
25      Q.  None of them were in their 50s, were they?  01:00:12
```

**Page 118**

1    A.  Correct.                            01:00:14

2    Q.  None of them were on methamphetamine or any    01:00:14

3  drugs at all; right?                       01:00:17

4    A.  Correct.                            01:00:18

5    MR. NIEMEYER:  Objection; asked and answered.    01:00:19

6    THE WITNESS:  Correct.                   01:00:20

7  BY MS. SHERWIN:                            01:00:21

8    Q.  And then you admitted in your study that the    01:00:21

9  circumstances of the prone maximum restraint    01:00:25

10  position-related sudden death cases are very different;    01:00:28

11  right?                                    01:00:32

12    A.  That they're -- that the field representations    01:00:33

13  are different than a lab representation at times, yes.    01:00:36

14    Q.  And you also admitted that your theory that    01:00:39

15  weight on the back while in the prone maximum restraint    01:00:42

16  position would be well tolerated clearly, quote,    01:00:45

17  "remains to be proven in future studies," end quote.    01:00:49

18  I'm looking at page 174.                   01:00:52

19    A.  Okay.  Do you have a highlighted section so I    01:00:57

20  can just take a -- save us some time?      01:01:02

21    Q.  Sure.  It's the last sentence --    01:01:04

22    A.  Last -- on the -- on the --         01:01:06

23    Q.  -- on the left side.                01:01:08

24    A.  Thank you.                         01:01:09

25    Was it based on these findings?  Is that what    01:01:16

**Page 119**

1  you were reading?                          01:01:18

2    Q.  "Clearly, this remains to be proven in future    01:01:19

3  studies."  Right here on the left-hand side, the last    01:01:22

4  sentence.                                  01:01:27

5    A.  Oh, okay.  Thank you.                01:01:27

6    It does say "Clearly, this remains to be proven    01:01:34

7  in future studies."                        01:01:37

8    Q.  And you also admitted that clearly your study    01:01:39

9  had a number of limitations.               01:01:41

10    A.  Yes, we always have limitations in our -- in    01:01:45

11  our peer-reviewed papers.                  01:01:48

12    Q.  Your subjects were young and generally healthy    01:01:50

13  and may not reflect the population of individuals who    01:01:53

14  are restrained in a field setting; right?    01:01:57

15    A.  That is true.                      01:01:59

16    Q.  Your subjects were also both highly motivated    01:01:59

17  and had a high aerobic fitness level; right?    01:02:03

18    A.  They did, yes.                     01:02:07

19    Q.  You also admitted you could not reproduce all    01:02:10

20  of the conditions during which this type of restraint    01:02:13

21  method is used in the field; right?        01:02:17

22    A.  That sounds right.                  01:02:19

23    Q.  You could not reproduce the psychological or    01:02:19

24  other physiologic stresses associated with a field    01:02:23

25  pursuit struggle or trauma; right?         01:02:27

**Page 120**

1    A.  That sounds correct.                01:02:29

2    Q.  It would be unethical to do an experiment in    01:02:30

3  which you subjected people to psychological trauma to    01:02:33

4  the point where they were tachycardic and then put them    01:02:40

5  prone, handcuffed in leg shackles or four-point    01:02:45

6  restraints while punching them, threatening them with    01:02:49

7  tasing, and having multiple people on their back for 14    01:02:53

8  or 15 minutes; right, Doctor?              01:02:57

9    MR. NIEMEYER:  Objection; vague, highly    01:02:58

10  compound, and calls for speculation.       01:03:00

11    THE WITNESS:  That exact scenario that you just    01:03:03

12  pointed out there would not be able to get through an    01:03:05

13  IRB with the punching.                     01:03:09

14  BY MS. SHERWIN:                            01:03:10

15    Q.  It would be unethical, wouldn't it?    01:03:10

16    A.  The pun- --                        01:03:13

17    MR. NIEMEYER:  Same objection.           01:03:14

18    THE WITNESS:  The punching part would have    01:03:14

19  difficulty getting through an IRB.         01:03:16

20  BY MS. SHERWIN:                            01:03:19

21    Q.  And you also admitted in your study that the    01:03:19

22  weight was evenly distributed across the subjects'    01:03:22

23  backs; right?                             01:03:26

24    A.  I believe that's what we said there, yes.    01:03:27

25    Q.  And you said that that was unlike a field    01:03:28

**Page 121**

1  situation in which force is applied to the back    01:03:36

2  frequently with a knee that focuses the force over a    01:03:38

3  smaller area; right?                       01:03:41

4    A.  That is difference, yes.             01:03:43

5    Q.  And, furthermore, no force was applied on any    01:03:45

6  of the subjects while they were positioned in the prone    01:03:49

7  maximum restraint position; right?          01:03:52

8    A.  No -- I'm sorry.  Say that again.    01:03:54

9    Q.  No force was applied to the subjects.    01:03:55

10    A.  While they were in the struggle phase, yes,    01:03:58

11  there was no force applied to them.        01:04:00

12    Q.  You also agreed -- strike that.      01:04:03

13    You also admitted that the exertion and    01:04:06

14  struggle of your subjects in the prone maximum restraint    01:04:09

15  position was of short duration and may not reflect a    01:04:12

16  field situation where prolonged struggles can occur;    01:04:16

17  right?                                    01:04:20

18    A.  That is true.                      01:04:21

19    Q.  And, of course, none of your subjects used    01:04:23

20  elicit drugs as we've discussed already; right?    01:04:27

21    A.  Correct.                           01:04:30

22    Q.  And then you said that it will await future    01:04:31

23  studies to determine whether the factors involved in a    01:04:38

24  real-world restraint such as being restrained on the    01:04:42

25  ground and not a gym mat and having localized force with    01:04:46

**Page 122**

1  knees in the back play any role in such deaths; right?  01:04:51
2     A.  Those limitations are usually listed, yeah.  01:04:55
3     Q.  And you've never read any study that applied  01:05:05
4  multiple police officers on the back of a prone,  01:05:10
5  handcuffed, tachycardic, 55-year-old, schizophrenic man  01:05:13
6  on methamphetamine while repeatedly punching him,  01:05:19
7  putting him in painful wristlock control holds, and  01:05:22
8  threatening to tase him; right, Doctor?  01:05:26
9     MR. NIEMEYER:  Objection; form, compound, calls 01:05:28
10  for speculation, all the rest.  01:05:30
11     THE WITNESS:  Yeah, we have not done that  01:05:31
12  study, no. I --  01:05:33
13  BY MS. SHERWIN:  01:05:34
14     Q.  And you have never done or read any study like 01:05:34
15  that; right?  01:05:37
16     A.  As a study, no, I have not.  01:05:37
17     It looks like there's five minutes on the tape 01:05:39
18  change.  01:05:44
19     Q.  We're almost done with this line of  01:05:44
20  questioning.  01:05:46
21     It would be unethical to do a human experiment 01:05:46
22  on a person under those circumstances, wouldn't it?  01:05:49
23     MR. NIEMEYER:  Objection; form.  01:05:51
24     THE WITNESS:  Could be -- as I said earlier, I 01:05:51
25  couldn't get it, the punching, through somebody in the 01:05:53

**Page 123**

1  IRB.  01:05:55
2  BY MS. SHERWIN:  01:05:57
3     Q.  Oh.  But you could do a study putting a  01:05:57
4  55-year-old, tachycardic, schizophrenic man who is on  01:05:59
5  methamphetamine in a prone position with handcuffs and  01:06:03
6  four-point restraints while having multiple officers on 01:06:06
7  their back.  01:06:10
8     Is that what you're saying, Doctor?  01:06:10
9     MR. NIEMEYER:  Same objection.  01:06:12
10     THE WITNESS:  I'm saying studies can be created 01:06:12
11  to take real-world situations and monitor them. I could 01:06:15
12  not create a study where I brought in a 55-year-old  01:06:18
13  person and gave him methamphetamine there, but there can 01:06:22
14  be studies done in other ways to evaluate processes and 01:06:25
15  subjects that are being taken into a custody situation. 01:06:29
16     MS. SHERWIN:  Okay.  Well, this is a good time 01:06:32
17  to take a break.  01:06:34
18     THE VIDEOGRAPHER:  Off the record.  The time is 01:06:36
19  1:06 p.m.  01:06:40
20     * * *  01:06:43
21     LUNCHEON RECESS  01:06:43
22     * * *  01:06:43
23     (Mr. Bertling is physically not present)  01:06:43
24     THE VIDEOGRAPHER:  We're on the record.  Here 01:06:43
25  begins Disc No. 2 in the videotaped deposition of  01:39:02

**Page 124**

1  Dr. Gary Vilke.  The time is 1:39 p.m.  01:39:05
2  BY MS. SHERWIN:  01:39:10
3     Q.  Doctor, who was the primary investigator in 01:39:10
4  your study that resulted in your article about  01:39:16
5  ventilatory and metabolic demands during your study?  01:39:20
6     A.  I think the primary investigator was Dr. Ted 01:39:25
7  Chan, that one.  01:39:28
8     Q.  Is Dr. Chan the person who would have obtained 01:39:29
9  IRB approval for that study?  01:39:32
10     A.  At UCSD, yes.  01:39:34
11     Q.  Who obtained IRB approval for the study at  01:39:36
12  San Diego State?  01:39:40
13     A.  It may have gone under Fred Kolkhorst's name. 01:39:40
14     Q.  I note that the first author is Betty  01:39:46
15  Michalewicz.  I am going to probably mispronounce that 01:39:59
16  name.  01:40:05
17     What was her involvement in the study?  01:40:05
18     A.  She was a graduate student working in Fred  01:40:07
19  Kolkhorst's lab.  So she was helping coordinate a lot of 01:40:10
20  the material in the study.  01:40:15
21     Q.  And Dr. Chan is an emergency room physician  01:40:16
22  with whom you've worked many times; right?  01:40:19
23     A.  Yes.  01:40:21
24     Q.  And I believe you met in medical school; is 01:40:21
25  that right?  01:40:25

**Page 125**

1     A.  Residency.  01:40:25
2     Q.  Residency.  01:40:26
3     A.  Um-hmm.  01:40:27
4     Q.  Who was Susan Levy?  01:40:29
5     A.  She is another professor over at San Diego  01:40:31
6  State who works with Dr. Kolkhorst.  01:40:34
7     Q.  And what is her specialty?  01:40:36
8     A.  Exercise physiology and, I think, data  01:40:39
9  analysis.  She may not be exercise physiology.  She may 01:40:42
10  just be data analysis.  01:40:46
11     Q.  And what about Tom Neuman?  01:40:47
12     A.  He is one of the ER docs over at UCSD who is 01:40:49
13  also boarded in pulmonary and critical care medicine. 01:40:52
14     Q.  And what was Fred -- well, strike that.  01:40:57
15     What is Fred Kolkhorst's specialty?  01:40:58
16     A.  He's exercise physiology.  01:41:02
17     Q.  And is he at San Diego State?  01:41:03
18     A.  Yes.  01:41:05
19     Q.  Did you have to provide any conflict of  01:41:05
20  interest statements to either UC San Diego or San Diego 01:41:13
21  State in connection with your study?  01:41:16
22     A.  I don't know if they asked for it at the time. 01:41:20
23  So I don't recall having given one, but they may have 01:41:24
24  asked on the IRB application.  01:41:28
25     Q.  Did you inform UC San Diego and San Diego State 01:41:30

```
 1    that you are a paid defense expert in cases involving   01:41:34
 2    death during the course of restraint?   01:41:37
 3        A.  I don't believe I've had to do that for our   01:41:39
 4    studies, no.   01:41:42
 5        Q.  Have you ever told UC San Diego or San Diego   01:41:43
 6    State that you plan to use the results of any study to   01:41:46
 7    defend law enforcement accused of killing people during   01:41:50
 8    the course of restraint?   01:41:54
 9        MR. NIEMEYER:  Objection.   01:41:55
10        THE WITNESS:  I don't believe we notified them   01:41:56
11    the use of the publications.   01:41:57
12    BY MS. SHERWIN:   01:41:59
13        Q.  Did you tell either UC San Diego or San Diego   01:41:59
14    State that you are a defense expert for TASER   01:42:02
15    International?   01:42:06
16        A.  I consider myself -- I've done cases for law   01:42:10
17    firms defending Taser.  I'm not a -- I'm not a defense   01:42:13
18    expert for TASER International.   01:42:17
19        Q.  Well, you understand that the party being sued,   01:42:18
20    on whose behalf you're providing expert opinion   01:42:21
21    testimony and being paid, is TASER International and not   01:42:24
22    the law firms; right?   01:42:28
23        A.  Well, it's in combination with the law   01:42:29
24    enforcement agencies also involved, not specifically   01:42:31
25    just TASER International.   01:42:34
```

Page 126

```
 1        Q.  Okay.  Have you ever informed UC San Diego or   01:42:35
 2    San Diego State University that you are a defense expert   01:42:39
 3    in cases in which TASER International is being sued and   01:42:42
 4    accused of wrongful death?   01:42:48
 5        A.  I don't think I've ever gone into that kind of   01:42:50
 6    detail with either -- either university.   01:42:54
 7        Q.  Have you told either UC San Diego or San Diego   01:42:55
 8    State that you would use the study results to provide   01:42:58
 9    defense testimony in wrongful death cases arising out of   01:43:01
10    the use of a Taser?   01:43:06
11        A.  I don't believe I've ever done that.   01:43:08
12        Q.  Have you given the University of California any   01:43:09
13    notice of outside activity to work as a defense expert?   01:43:12
14        A.  They do note that I -- they do know that I work   01:43:16
15    as a defense expert -- or as a legal consultant,   01:43:19
16    actually.   01:43:22
17        Q.  And how do they know that?   01:43:23
18        A.  We report that to them.   01:43:25
19        Q.  On how frequent of a basis?   01:43:28
20        A.  I don't know if it's every couple of years or   01:43:32
21    every year they ask if you're doing outside activities   01:43:33
22    like medical consulting, medical direction, extra   01:43:37
23    business-type things.  And so we notify them when they   01:43:40
24    request it.   01:43:43
25        Q.  And you notify them in writing?   01:43:44
```

Page 127

```
 1        A.  I think they ask -- I think there's some form   01:43:47
 2    to fill out that asks if you're doing something and list   01:43:49
 3    out what you're doing.   01:43:54
 4        Q.  If you had to ask a colleague for that form,   01:43:54
 5    how would you identify it?   01:43:58
 6        A.  I don't know what it's called.  It just comes   01:44:02
 7    up -- that they bring -- send it to our office.  You   01:44:04
 8    have to fill out these forms on an annual basis or   01:44:07
 9    every-other-year basis for re-credentialing and things   01:44:11
10    like that, but I don't know if that form is part of that   01:44:14
11    packet or where it ends up getting -- where it ends up   01:44:17
12    landing type of thing.   01:44:20
13        Q.  But you understand that the form is required in   01:44:21
14    order to inform the University of California of your   01:44:24
15    outside activity; right?   01:44:27
16        A.  The form is for outside activities, yes.   01:44:28
17    That's what they're requesting information on.   01:44:30
18        Q.  Now, in your report, you say that Steven had an   01:44:48
19    agonal rhythm 15 minutes after the deputies left the   01:44:52
20    cell; is that right?   01:44:59
21        A.  Yes.   01:45:04
22        Q.  Where is the documentation of an agonal rhythm?   01:45:05
23    Where did you see that?   01:45:10
24        A.  Oh, in the -- the -- in the -- AED download.   01:45:11
25    It's a wide complex, slow rhythm basically.  It's an   01:45:19
```

Page 128

```
 1    agonal or idioventricular escape rhythm.   01:45:24
 2        Q.  Well, the AED download showed pulseless   01:45:27
 3    electrical activity; right?   01:45:30
 4        A.  That's when you have electrical activity with   01:45:32
 5    no pulse.  This is describing the way the waveform looks   01:45:34
 6    like.   01:45:37
 7        Q.  And can you show me in your file the -- the   01:45:37
 8    place where you noted an agonal rhythm.   01:45:40
 9        A.  On the A- -- AED download, when you look at   01:45:55
10    these rhythms, these are not typical type QRS complexes.   01:45:58
11    They're widened out rhythms, and so that's where I'm   01:46:04
12    noting it from.   01:46:07
13        Q.  Okay.  What -- what pages -- what page are you   01:46:08
14    seeing an agonal rhythm?   01:46:09
15        A.  Let me just -- page 21 of the County-00021   01:46:14
16    you're seeing a sort of wide complexed --   01:46:26
17        Q.  Where are you seeing -- where on that piece of   01:46:30
18    paper do you see the agonal rhythm?   01:46:32
19        A.  Oh.  0053, 0056.   01:46:35
20        Q.  May I see that, please, just the page.   01:46:37
21        A.  (Proffers document.)   01:46:46
22        Q.  So on page 21 where it says "Start of Analysis   01:46:46
23    at 00 and 53 seconds," you're seeing an agonal rhythm   01:47:00
24    and at 00 and 56 seconds on the top of that form.   01:47:08
25        Is that what you're saying?   01:47:12
```

Page 129

**Page 130**

1   A.   That's what I'm saying, yes.        01:47:14
2        Q.   Okay.  Where else do you see an agonal rhythm?  01:47:15
3   Is it only in those two, or is it through -- from 53 to  01:47:18
4   56?                                      01:47:21
5        A.   Throughout.  These -- these wide complex  01:47:22
6   non-profusing rhythms are sort of agonal escape-type  01:47:24
7   rhythms.                                 01:47:29
8        Q.   Okay.  Well, I would like you to identify for  01:47:30
9   me, Doctor, each of the rhythm strips that you say shows  01:47:31
10  an agonal rhythm.  So we've got page 21 at 53 seconds  01:47:34
11  and at 56 seconds.                       01:47:40
12       Where do you see an agonal rhythm?  01:47:41
13       A.   A minute, 4 seconds; a minute, 37 seconds.  I  01:47:44
14  mean, any of the rhythms that look very similar there.  01:47:51
15  Those are wide complex.  213.            01:47:54
16       Q.   On which page now?             01:47:58
17       A.   I'm sorry.  On page 22, 215, 216, they're  01:48:00
18  non-widened out non-profusing rhythms.   01:48:04
19       Q.   Okay.  And how long did the -- go ahead.  Are  01:48:07
20  you seeing --                            01:48:10
21       A.   It's throughout.  On page 25, 450, 452, 428.  01:48:11
22       Q.   Okay.  Anyplace else?           01:48:23
23       A.   That's -- I mean, again, it's throughout the  01:48:26
24  timing period.  On page 24, 342, 344, 345.  You know,  01:48:29
25  it's that wide non-profusing rhythm.     01:48:35

**Page 131**

1        Q.   An agonal rhythm typically devolves into  01:48:39
2   asystole very quickly; right?            01:48:42
3        A.   It eventually will, yeah.       01:48:45
4        Q.   Within about a minute or so; right?  01:48:46
5        A.   A few minutes, yeah.           01:48:48
6        Q.   Now, on page 9 of your report, you talk about  01:48:50
7   the end-tidal carbon dioxide; right?  On page 9?  01:48:53
8        A.   What's that?                   01:48:59
9        Q.   The end-tidal carbon dioxide CO2 measurements?  01:49:00
10       A.   Yes.  Um-hmm.  Yes.            01:49:04
11       Q.   And you say that "the end-tidal CO2 documented  01:49:05
12  by the paramedics within minutes of arriving was  01:49:10
13  reported to be 0 mm Hg.                  01:49:13
14       What does that mean?               01:49:16
15       A.   Millimeters -- millimeters of mercury.  01:49:18
16       Q.   The end-tidal CO2 can be 0 because the  01:49:24
17  endotracheal tube was inserted into the esophagus;  01:49:28
18  right?                                   01:49:31
19       A.   If it's an esophageal intubation, you typically  01:49:33
20  will not get end-tidal CO2 back, yes.    01:49:36
21       Q.   And an end-tidal CO2 can be 0 because the CO2  01:49:38
22  analyzer is defective; right?            01:49:41
23       A.   Can be, yes.                   01:49:44
24       Q.   The end-tidal CO2 can also be 0 because the  01:49:44
25  person has been down with no effective CPR for a long  01:49:47

**Page 132**

1   time; right?                            01:49:53
2        A.   Once you start CPR, you'll mobilize.  It's  01:49:56
3   usually not 0.  So when you see even a -- prolonged out  01:49:59
4   to, like, an hour or so, then you might see a 0.  But  01:50:02
5   down for 10 minutes or 15 minutes, when you start  01:50:06
6   ventilating them, usually you'll see something starting  01:50:09
7   up.                                     01:50:11
8        Q.   And EMTs are trained that as soon as the heart  01:50:12
9   stops, the capnography waveform will disappear, and the  01:50:15
10  end-tidal CO2 reading will change to 0; is that right?  01:50:19
11       MR. NIEMEYER:  Objection; form, foundation.  01:50:24
12       THE WITNESS:  That when the heart rate stops,  01:50:25
13  the end-tidal CO2 will go to zero?       01:50:28
14  BY MS. SHERWIN:                          01:50:31
15       Q.   Right.                        01:50:31
16       A.   That's not the case, no.        01:50:31
17       Q.   You're not aware of that?       01:50:32
18       A.   If somebody is teaching it, they might be, but  01:50:34
19  that's not -- that's not the reality.    01:50:37
20       Q.   A low end-tidal CO2 may be caused by either  01:50:38
21  poor compression technique or low perfusion and  01:50:42
22  metabolism after a long downtime despite even good  01:50:47
23  compressions; right?                    01:50:51
24       A.   Right.  You can see low levels, yes.  01:50:52
25       Q.   Steven Neuroth was down, facedown, and not  01:50:57

**Page 133**

1   moving for at least 14 minutes after the deputies left  01:51:02
2   the cell and before anyone started CO2; right?  I'm  01:51:06
3   sorry.  Started CPR.                    01:51:11
4        A.   That's about right, yes.        01:51:13
5        Q.   And then, when the deputies started doing CPR,  01:51:14
6   they repeatedly stopped and restarted the CPR.  01:51:18
7        Do you recall that?                01:51:22
8        A.   They, I think, followed the AED prompts, and  01:51:23
9   they would stop and let it analyze, then restart it.  01:51:25
10       Q.   Compressions done during CPR can clear out CO2;  01:51:29
11  right?                                   01:51:34
12       A.   Compressions usually do not move CO2 out.  You  01:51:34
13  have to breathe it out.  You don't get it by doing just  01:51:38
14  compressions.                           01:51:41
15       Q.   End-tidal CO2 can be misread by emergency  01:51:45
16  medical technicians and paramedics; right?  01:51:49
17       MR. NIEMEYER:  Objection; foundation.  01:51:51
18       THE WITNESS:  Can be misread -- I guess  01:51:51
19  anything can be misread by somebody.     01:51:53
20  BY MS. SHERWIN:                          01:51:55
21       Q.   And you did not see any capnography wave  01:51:55
22  printout showing the actual end-tidal CO2; is that  01:51:57
23  right?                                   01:52:03
24       A.   I did not see any waveforms or printouts,  01:52:03
25  correct.                                 01:52:05

**Page 134**

1    Q.  All you saw was the report by the EMT or   01:52:06
2  paramedics; right?                     01:52:09
3    A.  That's correct.             01:52:10
4    Q.  And then throughout the EMTs doing their work  01:52:10
5  the end-tidal CO2 was 28; right?         01:52:13
6    A.  After they intubated, I believe, yes.    01:52:17
7    Q.  But the end-tidal CO2 was not taken until after 01:52:21
8  the EMTs arrived; right?             01:52:27
9    A.  It was not done by the jail staff, correct.  01:52:30
10    Q.  Okay.  So I would like for you to show me on  01:52:32
11  the video where the end-tidal CO2 was taken by the EMTs. 01:52:35
12  Can you see that?              01:52:40
13    A.  I can't see it on the video because of all the 01:52:41
14  movement around there.  I can only go by the    01:52:44
15  documentation on the record.        01:52:46
16    Q.  Do EMTs take the end-tidal CO2 while someone is 01:52:47
17  also performing CPR on the patient?      01:52:58
18    A.  They do, yes.          01:53:01
19    Q.  And how physically -- procedurally how does one 01:53:03
20  take end-tidal CO2?           01:53:08
21    A.  It's a monitor that can go on the end of the 01:53:10
22  bag valve mask while they're either bagging somebody or 01:53:13
23  after they put an airway into somebody.  It's an in-line 01:53:16
24  detector.             01:53:20
25    Q.  Did you see the MTs put an airway into Steven 01:53:21

**Page 135**

1  Neuroth on the video?           01:53:21
2    A.  It was difficult to see much the way the CPR 01:53:23
3  was going there.  So I can't say exactly when the EMTs 01:53:27
4  or the paramedics put in the endotracheal tube on the 01:53:30
5  video.              01:53:33
6    Q.  Are you aware of any studies that show that a 01:53:36
7  patient suffering from asphyxic arrest as opposed to 01:53:39
8  primary cardiac arrest has a significantly increased 01:53:43
9  end-tidal CO2 reading that comes down within a minute? 01:53:48
10    A.  Studies that show that.  I -- I don't think I 01:53:54
11  can say there's a study that shows that it would resolve 01:53:57
12  within a minute.  There's data out there with regards to 01:54:01
13  ventilatory failures and causing the rise in the  01:54:05
14  end-tidal CO2s.           01:54:09
15    Q.  Okay.  I'm referring to an article in Critical 01:54:11
16  Care from December of 2003, written by Dr. G-r-m-e-c, 01:54:14
17  that says "The patient suffering from asphyxic arrest as 01:54:18
18  opposed to primary cardiac arrest had significantly  01:54:24
19  increased end-tidal CO2 that came down within a minute." 01:54:28
20  Are you aware of that study or not, Doctor?  01:54:32
21    A.  I'm not, no.          01:54:34
22    Q.  Now, in your report on page 9, you say that the 01:54:39
23  amount and locations of weight on Steven Neuroth were 01:54:43
24  not consistent with causing affixation.    01:54:45
25  We've already talked about the fact that you  01:54:48

**Page 136**

1  don't know how much weight was on Steven Neuroth.  01:54:49
2  Where were the locations of weight on Steven  01:54:53
3  Neuroth?              01:54:57
4    A.  Sure.  There was -- I am just going to make 01:54:57
5  sure I get the names correctly here.  So Deputy Grant 01:55:05
6  was on the legs trying to push the Figure 4 and hold  01:55:13
7  that there.  De Los Santos was assisting.  They traded 01:55:17
8  out.  Deputy Grant's position on the legs was relieved 01:55:23
9  by De Los Santos and then by Deputy Page.  So the three 01:55:26
10  of them really were on the same location just at   01:55:30
11  different times.          01:55:32
12  Bernardi said he placed a knee on Mr. Neuroth's 01:55:33
13  back for about five seconds for control purposes and 01:55:37
14  then was off the back at that point.  Deputy Bernardi 01:55:40
15  then held Mr. Neuroth's left arm in a wrist -- rear  01:55:43
16  wristlock and -- before lifting off the lower back  01:55:47
17  rather than placing pressure to maintain control.  So he 01:55:50
18  wasn't pushing down.  He was actually pulling up.  01:55:54
19  Deputy Masterson made [sic] control of    01:55:56
20  Neuroth's right arm and then the --     01:55:58
21  So those are the main positions:  left arm,  01:56:00
22  right arm, and legs.         01:56:03
23    Q.  Okay.  And when Deputy Masterson says "We were 01:56:04
24  all pretty much kneeling on him," where were the   01:56:07
25  deputies kneeling on Steven Neuroth?    01:56:10

**Page 137**

1    A.  Again, the report says that they were holding 01:56:12
2  arms and legs.  So if they're putting some weight on the 01:56:14
3  arm, they could be doing that.  But as far as looking at 01:56:17
4  the video, looks like they're all kneeling to the side 01:56:19
5  of him.  But some people will use a knee to help hold an 01:56:22
6  arm down.            01:56:25
7    Q.  And when Deputy Grant wrote that "The deputies 01:56:26
8  put their combined body weight on Steven to press him 01:56:30
9  into the ground," where did they put their combined body 01:56:33
10  weight on him?          01:56:35
11  MR. NIEMEYER:  Objection; mischaracterizes the 01:56:36
12  testimony.            01:56:37
13  THE WITNESS:  Looks like two arms and the legs 01:56:38
14  based on the reports and I can see in the video.  01:56:40
15  They're holding the arms down and holding the legs down. 01:56:42
16  So --             01:56:46
17  BY MS. SHERWIN:         01:56:46
18    Q.  All right.  Well, on the video screenshot that 01:56:46
19  is Exhibit 11 to your deposition, that shows Deputy Page 01:56:48
20  on top of Steven and leaning forward onto Steven's arms; 01:56:51
21  right?             01:56:56
22    A.  He's leaning on his legs and has his hands on 01:56:57
23  his arms.           01:57:01
24    Q.  Right.  He's leaning forward on his arms;  01:57:02
25  right?             01:57:04

A. He's leaning forward on his legs. He's pushing 01:57:04
the legs down. That's where his weight is. And he's 01:57:06
got his hands on his arms. 01:57:10

Q. And you say in your report at page 10 that "the 01:57:26
officers were kneeling beside Mr. Neuroth during his 01:57:31
time in the safety cell"; right? 01:57:35

A. I did -- on page 10? 01:57:37

Q. Yes. 01:57:39

A. Certainly I noted that on the video. If I 01:57:40
wrote that down, it's probably true. 01:57:44

Q. Okay. So you're asking the jury in this case 01:57:46
to disbelieve the testimony of Defendant Deputy Grant, 01:57:48
Knapp, Masterson, and Sheriff Allman that the deputies 01:57:56
put their combined weight on Steven or were kneeling on 01:58:04
him while he was in the safety cell; right, Doctor? 01:58:07

MR. NIEMEYER: Objection; mischaracterizes the 01:58:10
deputies' testimony as well as the doctor's this 01:58:12
morning. 01:58:14

THE WITNESS: No. I'm saying they could have 01:58:14
put their combined weight together, working together, 01:58:17
combining that to hold both arms and the legs down. 01:58:19
What I'm talking about is weight on the back and torso 01:58:22
that would impact ventilations. So I'm not saying it's 01:58:25
a wrong statement. I think it's the interpretation of 01:58:28
that statement of "combined weight." 01:58:29

Page 138

BY MS. SHERWIN: 01:58:31

Q. Well, during the restraint, you can't actually 01:58:31
even see Steven because the deputies were on top of him; 01:58:34
right? 01:58:37

A. They were around him. 01:58:38

Q. Now, you say that cyanosis can occur with any 01:58:41
low flow state of blood where a patient has low blood 01:58:46
pressure or is not profusing facial tissues well. 01:58:51

And as we've discussed, cyanosis also is caused 01:58:54
by hypoxia; right? 01:58:58

A. Cyanosis can be a result of hypoxia. 01:59:01

Q. You never saw any risk factors for sudden 01:59:06
cardiac death in Steven Neuroth's medical records, did 01:59:10
you? 01:59:14

A. Use of methamphetamine is a risk factor for 01:59:15
sudden cardiac arrest. 01:59:18

Q. Okay. But he had -- his heart wasn't enlarged, 01:59:20
was it? 01:59:22

A. Oh, his heart was not enlarged, no. 01:59:23

Q. And he didn't have heart disease; right? 01:59:25

A. I do not recall any specific heart disease, no. 01:59:27

Q. And he had no coronary artery occlusion or 01:59:30
anything like that; right? 01:59:34

A. No -- no significant vessel disease, no. 01:59:35

Q. He had no anatomical abnormality in his heart; 01:59:38

Page 139

right? 01:59:48

MR. NIEMEYER: Objection; foundation. 01:59:50

THE WITNESS: Correct, nothing reported. 02:00:00

BY MS. SHERWIN: 02:00:02

Q. Now, you say that you agree with Dr. Chapman 02:00:02
that the cause of Steven's death was methamphetamine and 02:00:09
the struggle; right? 02:00:17

A. Correct. 02:00:18

Q. Do you agree that he would not have died absent 02:00:19
the struggle? 02:00:22

A. Do I agree with that? No. 02:00:24

Q. Is it your testimony that Steven Neuroth would 02:00:27
have died of methamphetamine intoxication absent the 02:00:30
struggle with the deputies? 02:00:34

A. You sort of -- if you're saying that he never 02:00:38
used methamphetamine that day, he never would have 02:00:40
died -- so I'm not sure what point of the -- of this 02:00:43
event you're talking about. 02:00:46

You mean if he just laid there in the cell and 02:00:47
did the struggle, would he have died? Is that -- 02:00:51

Q. No. 02:00:53

If he was out on the street high on 02:00:53
methamphetamine, do you agree he wouldn't have died? 02:00:55

A. Well, he's out -- 02:00:56

MR. NIEMEYER: Objection; calls for 02:00:57

Page 140

speculation. 02:00:58

THE WITNESS: He's out in traffic. He could 02:00:59
have just as well died from getting hit by a car. 02:01:00

BY MS. SHERWIN: 02:01:03

Q. Okay. But he wouldn't have dropped dead of a 02:01:03
meth intoxication if he didn't have the struggle with 02:01:05
the deputies; right? 02:01:08

A. I think his resistence and exertion was a 02:01:10
component with this. 02:01:13

Can I say it wouldn't have -- he wouldn't have 02:01:14
died that day without it? I can't say it won't -- I 02:01:15
think as far as the metabolic changes, that also 02:01:19
impacted his heart. 02:01:22

MR. NIEMEYER: Same objection. 02:01:24

BY MS. SHERWIN: 02:01:24

Q. Okay. But can we agree, Doctor, that Steven 02:01:24
Neuroth would not have died absent his contact with the 02:01:27
defendant deputies in this case? 02:01:30

A. I can't -- 02:01:32

MR. NIEMEYER: Same objection. 02:01:32

THE WITNESS: Yeah, I can't, I mean, if he's 02:01:33
out in traffic, somebody else grabbed him and held him 02:01:35
down or whether he still resisted and potentially died 02:01:38
in the hands of a public good samaritan. So I can't 02:01:40
change the whole scenario and say, "No, he wouldn't have 02:01:43

Page 141

1  died."                          02:01:47
2  BY MS. SHERWIN:                 02:01:47
3      Q.  If he were taken to the emergency room, he  02:01:47
4  wouldn't have died, would he?    02:01:49
5      A.  I can't say that --      02:01:50
6      MR. NIEMEYER:  Same objection.     02:01:51
7      THE WITNESS:  I can't say that either.   02:01:51
8  BY MS. SHERWIN:                 02:01:54
9      Q.  How much methamphetamine was in Steven's   02:01:54
10 system?                          02:01:56
11     A.  Oh, I would have to look at the autopsy report.  02:01:57
12     Methamphetamine was 1,100 nanograms per   02:01:59
13 milliliter.                      02:02:11
14     Q.  And where does --        02:02:13
15     MR. NIEMEYER:  At what time?     02:02:13
16 BY MS. SHERWIN:                 02:02:13
17     Q.  -- that blood --        02:02:13
18     (Reporter query)            02:02:13
19     MR. NIEMEYER:  I said, "At what time?"  I'm  02:02:13
20 going to object to the time scope.   02:02:17
21     MS. SHERWIN:  On the autopsy is fine.  That's  02:02:19
22 the only measurement we have.    02:02:21
23     MR. NIEMEYER:  Okay.        02:02:23
24 BY MS. SHERWIN:                 02:02:23
25     Q.  Where on the continuum of methamphetamine   02:02:23

Page 142

1  consumption is 1.1 milligrams per liter on autopsy?  02:02:28
2      A.  Yeah, I'm not going to opine on levels at  02:02:34
3  autopsy.                         02:02:37
4      Q.  Being intoxicated on methamphetamine can cause  02:02:37
5  a person to require more oxygen; right?  02:02:41
6      A.  The use of methamphetamine can increase  02:02:44
7  metabolic demands.               02:02:48
8      Q.  And can increase the heart rate, which causes  02:02:49
9  the need for more oxygen; right?   02:02:50
10     A.  It can, yes.            02:02:53
11     Q.  And a person who needs more oxygen needs to  02:02:53
12 breathe more frequently or more deeply or both in order  02:02:57
13 to get sufficient oxygen; right?   02:03:00
14     A.  If one needs more oxygen, then the respiratory  02:03:02
15 rate can be increased.           02:03:06
16     Q.  You read the deposition of Dr. Bux in this   02:03:10
17 case?                            02:03:16
18     A.  Yes.                    02:03:16
19     Q.  And you saw that Dr. Bux agreed that people can  02:03:17
20 live on 40 milligrams, 50 milligrams, and even  02:03:24
21 60 milligrams per liter of methamphetamine in their  02:03:29
22 systems?                         02:03:33
23     A.  I think the measurements were nanograms per  02:03:34
24 mil, but he was -- he was opining that there was a range  02:03:37
25 in which people die.  And so -- so as far as that goes,  02:03:41

Page 143

1  yes, a certain number doesn't always correlate with  02:03:44
2  absolute death, and a certain number is not considered  02:03:47
3  always safe.                     02:03:50
4      Q.  Okay.  But -- and when you -- well, strike  02:03:51
5  that.                            02:03:51
6      You were talking about nanograms per   02:03:52
7  milliliter.                      02:03:55
8      You understand 1,100 nanograms per milliliter  02:03:55
9  translates to 1.1 milligrams per liter; right?  02:03:59
10     A.  I do.  I didn't realize -- I didn't hear the  02:04:03
11 milligrams.  I apologize.         02:04:04
12     Q.  Okay.  So you have no reason to dispute  02:04:05
13 Dr. Bux's testimony that people can live with  02:04:07
14 40 milligrams, 50 milligrams, and even 60 milligrams per  02:04:13
15 liter of methamphetamine in their systems?  02:04:18
16     MR. NIEMEYER:  I'll object that it  02:04:20
17 mischaracterizes the testimony.    02:04:21
18     But go ahead.              02:04:22
19     THE WITNESS:  I have no reason or -- I have no  02:04:23
20 plans or reason to dispute Dr. Bux's interpretation of  02:04:26
21 levels.                          02:04:29
22 BY MS. SHERWIN:                 02:04:30
23     Q.  And you have no reason to dispute Dr. Bux's  02:04:30
24 testimony that "Frequent users of methamphetamine can  02:04:34
25 typically use significantly more methamphetamine than a  02:04:36

Page 144

1  naive user or someone who is just trying it for the  02:04:40
2  first time"?                     02:04:43
3      MR. NIEMEYER:  Objection; calls for  02:04:44
4  speculation.                     02:04:45
5      THE WITNESS:  Yeah, I wouldn't -- first part of  02:04:45
6  your question was I wouldn't counter what he's saying  02:04:49
7  there.                           02:04:52
8  BY MS. SHERWIN:                 02:04:52
9      Q.  How often did Steven Neuroth use  02:04:52
10 methamphetamine?                 02:04:56
11     A.  I don't know how frequently he used it, but he  02:04:57
12 had used it in the past.          02:04:59
13     Q.  When he used methamphetamine, how much did he  02:05:01
14 use?                             02:05:04
15     A.  I don't know what his dosing was.  02:05:04
16     Q.  How long had he been a methamphetamine user  02:05:06
17 before he died in the custody of the Mendocino County  02:05:09
18 Sheriff's Office?                02:05:11
19     A.  Well, there's a urine drug screen that was done  02:05:13
20 in January of that year.  I believe his old psychiatric  02:05:16
21 records had some reference to methamphetamine, but I  02:05:20
22 can't be certain at this moment.   02:05:25
23     Q.  Was he a meth addict?     02:05:26
24     A.  Well, I'm not going to say I'm an addiction  02:05:29
25 diagnostic person, but he was -- he used  02:05:32

Page 145

**Page 146**

1  methamphetamine.  He was a methamphetamine user.   02:05:35
2      Q.  How long before his arrest did he use meth on   02:05:38
3  the day he died?   02:05:42
4      A.  Recently enough that he had both   02:05:46
5  methamphetamine and amphetamine in his system, but I   02:05:49
6  can't give you exact timeline.   02:05:52
7      Q.  How pure was the meth that he used?   02:05:54
8      A.  I do not know.   02:05:56
9      Q.  What dose did he use?   02:05:57
10     A.  I do not know.   02:05:58
11     Q.  And Steven was diagnosed with schizophrenia and   02:05:59
12  schizoaffective disorder; right?   02:06:03
13     A.  Amongst other things, yes.   02:06:05
14     Q.  As a physician, you understand that   02:06:07
15  schizophrenics sometimes take illegal street drugs in an   02:06:09
16  attempt to feel better?   02:06:15
17     MR. NIEMEYER:  Objection; calls for   02:06:16
18  speculation.   02:06:18
19     THE WITNESS:  To feel better, I think people   02:06:19
20  take street drugs to feel better in general, but some of   02:06:21
21  them are schizophrenics.   02:06:24
22  BY MS. SHERWIN:   02:06:26
23     Q.  Right.  Mentally ill people sometimes   02:06:26
24  self-medicate with street drugs.   02:06:28
25         You're aware of that; right, Doctor?   02:06:31

**Page 147**

1      A.  Again, your definition of "feeling better" is   02:06:32
2  if you're trying to say stop the hallucinations versus   02:06:32
3  feel good, you know, feel a high.  You're not defining   02:06:36
4  that.  So I think a lot of mentally ill people do use   02:06:38
5  street drugs.   02:06:42
6      Q.  Are you aware that the United States Government   02:06:44
7  has said that the normal blood concentration for   02:06:46
8  recreational use of methamphetamine in people who are   02:06:49
9  stopped while driving and intoxicated is up to   02:06:53
10  2.5 milligrams per liter?   02:06:56
11     A.  I have read in somebody's deposition this   02:06:59
12  discussion, but I don't -- I'm not aware of the   02:07:02
13  paperwork or the specifics of the details.   02:07:04
14     Q.  What was Steven Neuroth's risk of having a   02:07:06
15  fatal reaction to methamphetamine at the time he died   02:07:16
16  without being restrained in a prone position?   02:07:19
17     A.  I don't think the restraint was any different.   02:07:25
18  It was the resistance that he kept doing that would have   02:07:27
19  increased his risk.  So the risk of being in a prone   02:07:30
20  position was no different than not being in a prone   02:07:33
21  position with the methamphetamine in his system.   02:07:36
22     Q.  Okay.  What was his risk of having a fatal   02:07:38
23  reaction to methamphetamine absent his contact with the   02:07:40
24  defendant deputies?   02:07:44
25     A.  I think --   02:07:46

**Page 148**

1      MR. NIEMEYER:  Objection; calls for   02:07:46
2  speculation.   02:07:47
3      THE WITNESS:  I answered that earlier.  I can't   02:07:48
4  predict what would happen when he's running around the   02:07:50
5  streets naked -- or not naked, but on the streets in   02:07:53
6  traffic to be -- if somebody else was going to hold him   02:07:55
7  down and wait for law enforcement to come, they could   02:07:58
8  have done the same risk.   02:08:01
9  BY MS. SHERWIN:   02:08:02
10     Q.  How many people have died of methamphetamine   02:08:02
11  intoxication when they're postmortem peripheral blood   02:08:04
12  sample showed only 1.1 milligrams per liter of meth in   02:08:08
13  their systems?   02:08:12
14     A.  I don't know.   02:08:12
15     MR. NIEMEYER:  Objection.  It's beyond scope.   02:08:13
16     THE WITNESS:  I don't know.   02:08:14
17  BY MS. SHERWIN:   02:08:14
18     Q.  How many people have died of a meth overdose   02:08:14
19  when they had a similar history of methamphetamine usage   02:08:17
20  as Steven Neuroth's?   02:08:20
21     A.  I don't know.   02:08:21
22     Q.  Are you familiar with the concept of postmortem   02:08:22
23  redistribution of methamphetamine?   02:08:29
24     A.  I'm familiar with it, yes.   02:08:31
25         (Mr. Bertling enters)   02:08:32

**Page 149**

1  BY MS. SHERWIN:   02:08:36
2      Q.  Have you been aware that methamphetamine   02:08:36
3  basically dumps from the muscles and organs into the   02:08:39
4  blood after death?  That's what redistribution is   02:08:43
5  talking about?   02:08:45
6      A.  Well, the term "dump" sounds like it's a lot,   02:08:46
7  but I know that levels can change postmortem.   02:08:47
8      Q.  And postmortem redistribution of   02:08:51
9  methamphetamine increases as the time before autopsy and   02:08:54
10  the toxicology blood draw is extended; right?   02:08:59
11     A.  I don't know the true details of timing of it   02:09:04
12  and when it happens.  I just know that there have --   02:09:06
13  there are data out there that supports that it can be   02:09:10
14  redistributed after death.   02:09:12
15     Q.  And you read the deposition of Sheriff Allman;   02:09:18
16  right?   02:09:21
17     A.  At some point, yes.   02:09:22
18     Q.  You have no reason to dispute his testimony   02:09:23
19  that the topics of restraint asphyxia, compression   02:09:26
20  asphyxia, and positional asphyxia have been discussed on   02:09:29
21  a regular basis since they became a hot topic in law   02:09:33
22  enforcement in the 1980s, do you?   02:09:36
23     A.  I assume that people discuss them, sure.   02:09:39
24     Q.  And you have no reason to dispute   02:09:41
25  Sheriff Allman's testimony that "It's very important for   02:09:44

**Page 150**

```
 1   law enforcement to be aware of positional or restraint   02:09:47
 2   asphyxia to avoid having people die during the course of 02:09:51
 3   restraint"?                              02:09:54
 4        MR. NIEMEYER:  Objection; calls for       02:09:55
 5   speculation, mischaracterizes the testimony, beyond the  02:09:56
 6   scope.                                  02:09:54
 7        THE WITNESS:  As far as awareness of the topic 02:10:00
 8   and cons-- I think it's good for them to be aware.   02:10:04
 9   I'm not sure I'd say -- it depends on how you're     02:10:06
10   defining it whether they're going to die or not.    02:10:09
11   BY MS. SHERWIN:                          02:10:13
12        Q.  You have no reason to dispute Sheriff Allman's 02:10:13
13   testimony that it's necessary to train officers about 02:10:16
14   restraint asphyxia in order to avoid death during the 02:10:18
15   course of restraint?                     02:10:22
16        MR. NIEMEYER:  Same objection.          02:10:23
17        THE WITNESS:  Sort of similar commentary.  If 02:10:24
18   you're talking about the classic positional asphyxia, 02:10:27
19   restraint asphyxia of handcuffing and hobbling and   02:10:29
20   people dying, I think that's been debunked a while ago. 02:10:32
21        I think if you're going to talk about putting 02:10:35
22   too much weight on somebody that could potentially do 02:10:38
23   that, then I think it's worth educating on.      02:10:40
24   BY MS. SHERWIN:                          02:10:43
25        Q.  Are you aware that the Ninth Circuit Court of 02:10:43
```

**Page 151**

```
 1   Appeals has acknowledged that a person died of     02:10:46
 2   compression asphyxia when he was handcuffed, agitated, 02:10:47
 3   and put into a prone position with only two officers on 02:10:51
 4   his back?                               02:10:54
 5        MR. NIEMEYER:  Objection; form, foundation.  02:10:55
 6        THE WITNESS:  I'm not aware of that.      02:10:56
 7   BY MS. SHERWIN:                          02:10:58
 8        Q.  Did you review the report and the supplemental 02:11:00
 9   report of our addiction psychiatry expert Larissa  02:11:03
10   Mooney?                                 02:11:08
11        A.  I know I certainly saw the original report.  I 02:11:09
12   believe it's in my file.  I can't remember about the 02:11:15
13   follow-up reports.                       02:11:18
14        Q.  When patients are brought to the emergency room 02:11:18
15   and require restraint, how does those restraint take 02:11:22
16   place?                                  02:11:27
17        A.  It depends on the individual and what's going 02:11:27
18   on and the emergency department and the personnel that 02:11:29
19   are available.                          02:11:32
20        Q.  Okay.  And you try to have one nurse or member 02:11:33
21   of the team on each limb; right?          02:11:37
22        A.  Depending -- again, depends where you're at and 02:11:41
23   the degree of agitation of the individual that needs to 02:11:43
24   be restrained.                          02:11:46
25        Q.  And you restrain the person on their back; 02:11:47
```

**Page 152**

```
 1   right?                       02:11:50
 2        A.  Depends on the individual.          02:11:51
 3        Q.  Now, Dr. Mooney said in her supplemental report 02:11:52
 4   that in her clinical experience at UCLA, "Agitated  02:12:04
 5   patients who require restraints in the emergency room or 02:12:09
 6   hospital setting are placed on their backs and receive 02:12:12
 7   sedating medication."                    02:12:15
 8        Do you have any reason to dispute Dr. Mooney's 02:12:16
 9   opinion in that regard?                  02:12:20
10        A.  I think it's her experience, and I have no 02:12:21
11   reason to be able to counter her experience based on 02:12:23
12   what she wrote there.                    02:12:25
13        Q.  Do you have any reason to disagree with   02:12:27
14   Dr. Mooney's opinion that "Psychiatric nurses are  02:12:28
15   trained in safe methods of restraint, including airway 02:12:32
16   protection, and work in a team manner with one nurse on 02:12:36
17   each limb to coordinate safe and efficient restraint 02:12:39
18   procedures"?                            02:12:43
19        MR. NIEMEYER:  Objection; foundation.    02:12:44
20        THE WITNESS:  I mean, I assume that she's   02:12:45
21   referring to her system there as well.  She -- you know 02:12:46
22   as far as that goes, I have no reason to disagree with 02:12:49
23   that.                                   02:12:51
24   BY MS. SHERWIN:                          02:12:52
25        Q.  And you have no reason to dispute Dr. Mooney's 02:12:52
```

**Page 153**

```
 1   opinion that "Prolonged positioning in the prone   02:12:55
 2   position is avoided in the UCLA Emergency Room in order 02:12:57
 3   to observe and evaluate patient responsiveness, protect 02:13:01
 4   the airway, and prevent asphyxiation"?        02:13:06
 5        A.  I have no reason to disagree with what she has 02:13:09
 6   said happens at UCLA.                    02:13:12
 7        Q.  And when you restrained the patient that you 02:13:15
 8   referred to in your Keeney report -- well, strike that. 02:13:21
 9        You said that you had been involved in dozens 02:13:29
10   of patients requiring full leather four-point restraints 02:13:32
11   while working in the emergency department; right?   02:13:36
12        A.  That's what I wrote in there, yes.     02:13:38
13        Q.  And what does that refer to?         02:13:39
14        A.  That refers to restraining somebody.   02:13:41
15        Q.  On their back; right?              02:13:43
16        A.  In four points with leathers.  At that time, we 02:13:45
17   were using -- when we were converting them over, we 02:13:47
18   would put them in leather restraints, and they would be 02:13:52
19   on their back, yes.                      02:13:54
20        Q.  And you have always been able to gain control 02:13:58
21   of the patients' extremities and restrain them without 02:14:00
22   the need to hit them or pepper spray them; right? 02:14:05
23        MR. NIEMEYER:  Objection.              02:14:08
24        THE WITNESS:  Yeah, we did not hit people in 02:14:10
25   the ED.  We did not pepper spray them.        02:14:11
```

Page 154:

1    MS. SHERWIN:  Okay.  Let's mark the next    02:14:15
2  exhibit in line.                    02:14:18
3    (Exhibit 15 marked)              02:14:19
4    (Reporter query)                02:14:19
5    MR. NIEMEYER:  Form.            02:14:32
6  BY MS. SHERWIN:                   02:14:34
7    Q.  Now, Exhibit 15 is a Sentinel Event Alert from  02:14:34
8  The Joint Commission.              02:14:41
9    And in your work as an emergency department  02:14:43
10  physician, you're familiar with The Joint Commission,  02:14:46
11  Doctor?                          02:14:47
12    A.  I am familiar with them, yes.    02:14:49
13    Q.  What is The Joint Commission?    02:14:50
14    A.  It's a group that goes to evaluate hospitals  02:14:52
15  for best practices and safety and sort of an overseeing  02:14:55
16  group that, I guess, signs off on hospitals.    02:15:02
17    Q.  Right.  It's a national organization that  02:15:06
18  accredits hospitals; right?          02:15:10
19    A.  Yes.                        02:15:12
20    Q.  And is the UC San Diego Medical Center    02:15:12
21  accredited by The Joint Commission?    02:15:16
22    A.  It is.                      02:15:18
23    Q.  Now, in 1998, The Joint Commission issued a  02:15:18
24  Sentinel Event Alert on Preventing Restraint Deaths.  02:15:24
25    Have you seen this document before today?  02:15:28

Page 155:

1    A.  1998?  It's possible I have come across it  02:15:30
2  some point, but I certainly don't have any recall of the  02:15:35
3  specifics of it.                    02:15:37
4    Q.  Okay.  And The Joint Commission had been    02:15:38
5  tracking sentinel events and reviewed cases related to  02:15:41
6  the deaths of patients who were being physically  02:15:47
7  restrained; right?                  02:15:51
8    A.  Again, I haven't read it, but if that's what it  02:15:51
9  says, then we can go forward from there.    02:15:54
10    Q.  Okay.  And The Joint Commission found that in  02:15:57
11  40 percent of the restraint deaths, the cause of death  02:16:00
12  was asphyxiation.                  02:16:02
13    Do you have any reason to dispute what The  02:16:05
14  Joint Commission found in its report?    02:16:07
15    MR. NIEMEYER:  Objection; foundation.    02:16:09
16    THE WITNESS:  That's what they're reporting.  02:16:11
17  I don't know the details of the cases.  So I can't dispute  02:16:13
18  it.                              02:16:15
19  BY MS. SHERWIN:                   02:16:16
20    Q.  And one of the factors that was causing the  02:16:16
21  asphyxiation was putting excessive weight on the back of  02:16:22
22  the patient in a prone position.    02:16:25
23    Do you have any reason to dispute what The  02:16:27
24  Joint Commission says about that?    02:16:29
25    MR. NIEMEYER:  Same objection.    02:16:32

Page 156:

1    THE WITNESS:  If it says in there that they've  02:16:32
2  had a case in which somebody had excessive weight, then,  02:16:38
3  I -- again, I wouldn't be able -- I wouldn't be able to  02:16:41
4  dispute it without knowing the details of the case.  02:16:43
5  BY MS. SHERWIN:                   02:16:46
6    Q.  Okay.  The Joint Commission found that  02:16:46
7  "Restraining a patient in the prone position may  02:16:48
8  predispose the patient to suffocation."    02:16:51
9    Do you have any reason to dispute The Joint  02:16:53
10  Commission's finding?              02:16:54
11    MR. NIEMEYER:  Same objection.    02:16:56
12    THE WITNESS:  That's -- that's what they're  02:16:57
13  reporting.  So it -- it is what it says here in 1998.  02:16:59
14  BY MS. SHERWIN:                   02:17:02
15    Q.  And The Joint Commission did a root cause  02:17:02
16  analysis to determine the root causes of restraint  02:17:08
17  asphyxiation in this report.          02:17:11
18    Do you see that, Doctor?            02:17:15
19    A.  There are root causes identified, yes.    02:17:16
20    Q.  And one of the root causes was incomplete  02:17:18
21  medical assessment or incomplete examination of the  02:17:20
22  patient; right?                    02:17:23
23    A.  It does say "Patient assessment, such as  02:17:27
24  incomplete medical assessment or incomplete examination  02:17:29
25  of the individual (for example, failure to identify  02:17:32

Page 157:

1  contraband, such as matches)."    02:17:35
2    Q.  And inadequate care planning was another root  02:17:37
3  cause of restraint deaths; right?    02:17:43
4    A.  It says "Inadequate care planning, such as  02:17:45
5  alternatives not fully considered, restraints used as  02:17:47
6  punishment, and inappropriate room or unit assignment."  02:17:51
7    Q.  "Lack of patient observation procedures or  02:17:55
8  practices" was also a root cause of restraint deaths;  02:17:58
9  right?                            02:18:01
10    A.  That is listed, yes.            02:18:02
11    Q.  And "Staff-related factors," including    02:18:03
12  "insufficient orientation or training," was also a root  02:18:05
13  cause of restraint death; right?    02:18:09
14    A.  Yeah.  It goes on to say "competency review or  02:18:12
15  credentialing, or insufficient staffing levels."    02:18:15
16    Q.  Right.  But "Staff-related factors," including  02:18:19
17  "insufficient orientation or training," was one of the  02:18:19
18  root causes of restraint, Doctor?    02:18:23
19    A.  Yes.  I was just being complete with that --  02:18:25
20  that whole root cause.              02:18:27
21    Q.  The Joint Commission recommended "Redoubling  02:18:29
22  efforts to reduce the use of physical restraint"; right?  02:18:33
23    A.  "Redouble efforts to reduce the use of physical  02:18:36
24  restraint and therapeutic hold through the use of risk  02:18:40
25  assessment and early intervention with less restrictive  02:18:42

**Page 158**

1  measures."                          02:18:45
2      Q.  The Joint Commission also recommended "Revising 02:18:46
3  procedures for assessing the medical condition of  02:18:49
4  psychiatric patients"; right?              02:18:52
5      A.  It does say that, yes.            02:18:53
6      Q.  The Joint Commission recommended "Enhancing   02:18:54
7  staff orientation and education regarding alternatives 02:18:58
8  to physical restraints and proper application of   02:19:01
9  restraints or therapeutic holds"; right?       02:19:04
10     A.  Holding, yes.  Um-hmm.            02:19:07
11     Q.  The Joint Commission also recommended      02:19:09
12  "Continuously observing any patient that is restrained"; 02:19:10
13  right?                              02:19:14
14     A.  It does say that, yes.            02:19:15
15     Q.  The Joint Commission also recommended "If a  02:19:16
16  patient must be restrained in the prone position, ensure 02:19:21
17  that the airway is unobstructed at all times (for  02:19:25
18  example, do not cover or 'bury' the patient's face)"; 02:19:29
19  right?                              02:19:32
20     A.  It does say that, yes.            02:19:33
21     Q.  The Joint Commission also recommended that  02:19:34
22  facilities "ensure the expansion of the patient's lungs 02:19:36
23  is not restricted by excessive pressure on the patient's 02:19:42
24  back"; right?                        02:19:46
25     A.  Correct, it does say that.          02:19:48

**Page 159**

1      Q.  Now, you, I believe, referred to one of your  02:19:56
2  studies on restraint position and positional asphyxia  02:20:00
3  that you wrote with Dr. Chan in 1997; right?      02:20:06
4      A.  It was listed on my paper there, yes.     02:20:12
5      Q.  And in that study, you did a laboratory     02:20:15
6  experiment with hogtie restraints in 15 healthy young  02:20:20
7  men aged 18 to 40 years old; right?           02:20:26
8      A.  That sounds right.               02:20:28
9      Q.  You also excluded anyone from that study if   02:20:29
10  they had any recreational drug use; right?       02:20:36
11     A.  I believe that is the case.          02:20:40
12     Q.  Including even if they were just smoking    02:20:41
13  marijuana, they had to be excluded from the study;  02:20:43
14  right?                              02:20:46
15     A.  I believe that is the case.          02:20:47
16     Q.  And that's another study that Steven Neuroth  02:20:48
17  would not qualify for; right?               02:20:52
18     A.  Based on his presentation at the jail that day, 02:20:54
19  that would be correct.                  02:20:57
20     Q.  In the study that you did, you had your     02:20:58
21  15 healthy subjects exercise on a stationary bike for  02:21:05
22  4 minutes and then sit down and rest for 15 minutes;  02:21:09
23  right?                              02:21:13
24     A.  That was one of the phases, yes.       02:21:13
25     Q.  And then you had the 15 healthy young men   02:21:17

**Page 160**

1  exercise on a stationary bike and be put into a     02:21:22
2  restraint chair for 15 minutes; right?          02:21:26
3      A.  Restraint position.              02:21:28
4      Q.  Was it in a restraint chair?          02:21:30
5      A.  That's not the 1997 paper.          02:21:34
6      Q.  Okay.  And no weight was placed on them while 02:21:37
7  they were restrained; correct?              02:21:41
8      A.  That is correct.                02:21:42
9      Q.  And even with no weight placed on the healthy 02:21:44
10  young men, you found that being restrained caused a   02:21:47
11  restriction in their pulmonary function; right?     02:21:51
12     A.  Yeah, there were measurements that you could do 02:21:53
13  with using sophisticated equipment to say there was a  02:21:55
14  slight decrease in their ventilatory function.     02:21:59
15     Q.  And you found a 23 percent decrease in the   02:22:04
16  healthy young men's maximum voluntary --        02:22:08
17         (Reporter query)               02:22:10
18         MS. SHERWIN:  Sure.            02:22:10
19  BY MS. SHERWIN:                      02:22:10
20     Q.  You found a 23 percent decrease in the healthy 02:22:10
21  young men's maximum voluntary ventilation; right?  02:22:11
22     A.  Compared with the sitting position, I believe 02:22:13
23  that is correct.                      02:22:15
24     Q.  And you admitted that stimulants like       02:22:15
25  methamphetamine may increase oxygen demand and muscle  02:22:19

**Page 161**

1  fatigue; right?                        02:22:23
2      A.  That might be in the -- in the limitations  02:22:24
3  section or the discussion section.            02:22:26
4      Q.  And you also admitted in your report that a   02:22:27
5  number of factors, such as intoxication or agitation,  02:22:36
6  may result in respiratory compromise that would not be  02:22:39
7  detected by you in your lab experiment with the     02:22:44
8  15 healthy young men; right?               02:22:48
9      A.  Again, not having the paper in front of me,  02:22:50
10  that sounds like something we would put into the    02:22:52
11  limitations section.                    02:22:54
12     Q.  Then you and Dr. Chan wrote an article on   02:22:56
13  weight force during prone restraint and respiratory  02:23:00
14  function in 2004; right?                  02:23:04
15     A.  That sounds right.               02:23:10
16     Q.  And I have a question about that article.  In  02:23:17
17  your report, you say it's with 25 and 50 pounds, but I  02:23:20
18  noted on page 186 of your report, you say that you put  02:23:31
19  40-pound sandbags on patients.  I was wondering why   02:23:35
20  there's that difference.                  02:23:39
21     A.  In the actual paper?               02:23:40
22     Q.  Right.                       02:23:41
23     A.  Yeah.  If you read throughout the paper,     02:23:41
24  everything is 50 pounds and 25 pounds.  It's -- I     02:23:43
25  noticed that too when I was reading it, that it's a typo 02:23:48

1  on that one line in the Methods section, but everything  02:23:51
2  else was 50 pounds, because they were not 20 -- they  02:23:54
3  weren't 40-pound sandbags.  02:23:57
4  Q.  Okay.  So when it says "40 pounds," it actually  02:23:59
5  should be 50 pounds?  02:24:01
6  A.  That is correct.  02:24:02
7  Q.  And you concluded in that study -- well, strike  02:24:02
8  that.  02:24:06
9      You put the 25-pound and 50-pound sandbags on  02:24:07
10  the backs of ten people restrained in a prone position  02:24:10
11  for five minutes each; right?  02:24:15
12  A.  That sounds about right.  02:24:17
13  Q.  And you and Dr. Chan concluded that both with  02:24:18
14  and without those light weights on the back, being in a  02:24:22
15  prone position restricted pulmonary function; right?  02:24:26
16  A.  With and without the weights of 25 and  02:24:30
17  50 pounds, there was a light restrictive pattern that we  02:24:33
18  saw in the earlier study.  02:24:37
19  Q.  And in that lab experiment, the ten people who  02:24:40
20  participated were, again, young, healthy people between  02:24:43
21  age 21 and 40; right?  02:24:47
22  A.  Basically, yes.  02:24:49
23  Q.  And after having the weight on their backs,  02:24:49
24  they were allowed to -- for five minutes -- they were  02:24:53
25  allowed to sit up in a chair and rest for ten minutes;  02:24:55

Page 162

1  right?  02:25:00
2  A.  That part I don't remember specifically, but if  02:25:00
3  that's in our methods, then that would be correct.  02:25:02
4  Q.  And in your study, you and Dr. Chan admitted  02:25:04
5  that it was only a lab study on ten participants and you  02:25:11
6  could not reproduce all conditions encountered in the  02:25:15
7  field; right?  02:25:18
8  A.  Yeah, we acknowledged that as far as our  02:25:19
9  limitations.  02:25:21
10  Q.  You did not stimulate trauma, struggle --  02:25:21
11  strike that.  02:25:26
12      You did not simulate trauma, struggle, drug  02:25:26
13  intoxication, or any other physiologic or psychological  02:25:29
14  stresses that commonly occur with people who are being  02:25:34
15  restrained by law enforcement in the field; right?  02:25:38
16  A.  We did not do any of those interventions,  02:25:40
17  correct.  02:25:43
18  Q.  And you intentionally chose weights that were  02:25:46
19  not so heavy as to put your research subjects at any  02:25:47
20  risk; right?  02:25:49
21  A.  As a first trial with weight on the back, that  02:25:50
22  was correct.  02:25:52
23  Q.  You also did a study in 2013 on the effect of  02:25:53
24  the prone and maximal restraint position with and  02:26:04
25  without weight force on cardiac output and other  02:26:08

Page 163

1  hemodynamic measures; right?  02:26:12
2  A.  Correct.  02:26:15
3  Q.  And in that study, you again used 25 healthy,  02:26:16
4  young, male volunteers ages 22 to 43; right?  02:26:19
5  A.  That sounds about right.  02:26:25
6  Q.  And you put 50 pounds and a hundred pounds on  02:26:26
7  them; right?  02:26:32
8  A.  Correct.  02:26:33
9  Q.  When you put 50 pounds on the subjects' backs  02:26:33
10  while they were prone, you limited it to a three-minute  02:26:41
11  period of time; right?  02:26:46
12  A.  I would have to look at the study methods, but  02:26:47
13  I -- I -- I thought it was more than that, but it could  02:26:49
14  be three minutes.  02:26:52
15  Q.  Okay.  And in your study on page 992, it says  02:26:53
16  you put 50 pounds on their backs for three minutes, then  02:26:59
17  let them rest for five minutes.  Then you put the 5- --  02:27:03
18  the hundred pounds on their back for three minutes.  02:27:07
19  A.  Okay.  I can't remember if it was three minutes  02:27:09
20  before we assessed the cardiac output or it was just on  02:27:11
21  a total of three minutes.  That's why I'm questioning  02:27:15
22  the --  02:27:17
23  Q.  And 50 pounds would not be enough to keep a  02:27:17
24  person on the ground, would it?  02:27:19
25  A.  Typically not.  02:27:22

Page 164

1  Q.  And then in this study you found that even just  02:27:23
2  prone restraint alone, with no weight added, restricted  02:27:27
3  pulmonary function; right?  02:27:32
4  A.  I don't believe we measured pulmonary function  02:27:34
5  in that test -- in that study.  It was cardiac output.  02:27:36
6      MS. SHERWIN:  Well, let's take a quick break,  02:27:46
7  and I'll get that study out, because I have pulmonary  02:27:47
8  function.  02:27:52
9      THE WITNESS:  All right.  02:27:52
10      THE VIDEOGRAPHER:  Off the record, the time is  02:27:53
11  2:27 p.m.  02:27:55
12      (Recess)  02:28:02
13      THE VIDEOGRAPHER:  We are back on the record.  02:35:54
14  The time is 2:35 p.m.  02:35:55
15  BY MS. SHERWIN:  02:35:56
16  Q.  Okay.  Doctor, during the break, I pulled up  02:35:56
17  your article, and it says "The subject remained in each  02:36:03
18  position three minutes before any measurements were  02:36:06
19  collected to allow for physiological adjustment to the  02:36:09
20  new position.  Between each trial, subjects rested at  02:36:12
21  least five minutes before being placed in a new position  02:36:16
22  for repeated study measurements."  02:36:19
23      So when you placed a person in a prone position  02:36:22
24  with 50 pounds on their back, you had them there for  02:36:25
25  three minutes before you took their heart rate and  02:36:29

Page 165

**Imagine Reporting  619.888.0297**

42

**Page 166**

```
 1   oxygen saturation and so forth; right?          02:36:33
 2        A.  And did the echocardiogram on their heart.   02:36:35
 3        Q.  How did that -- how did you do an          02:36:38
 4   echocardiogram on the person's heart while they were   02:36:40
 5   facedown?                                        02:36:42
 6        A.  That was the challenge of the study.  We ended   02:36:43
 7   up having a cutout piece of material -- looks like a   02:36:45
 8   piece of plywood basically with a hole in it -- so that   02:36:49
 9   you can get up there underneath and do the echo while   02:36:51
10   they're laying on their stomach.  So basically there was   02:36:53
11   a window to the heart that was open underneath.   02:36:59
12   Everything else --                               02:36:59
13        (Reporter query)                            02:36:59
14        THE WITNESS:  Oh, sorry.  I get excited about   02:36:59
15   this.                                            02:36:59
16        There was a window cutout on the plywood so   02:36:59
17   that you can get up there with your probe to get the   02:37:05
18   measurements, but the rest of the body was maintained   02:37:09
19   prone on that plywood.                           02:37:12
20   BY MS. SHERWIN:                                  02:37:13
21        Q.  And who did the echo?                   02:37:13
22        A.  I believe it was Dr. Campbell who was doing the   02:37:16
23   echo.                                            02:37:19
24        Q.  And how large was the cutout?           02:37:20
25        A.  It's maybe in the -- it may be in the methods   02:37:23
```

**Page 167**

```
 1   in there, but it was --                          02:37:27
 2        Q.  It wasn't in there.                     02:37:28
 3        A.  Okay.  Big enough to get the -- I'm guessing   02:37:29
 4   about -- or recalling about maybe 8 inches by 8 inches,   02:37:33
 5   enough to get the probe in to where you needed to go.   02:37:37
 6        Q.  Okay.  So about an 8-inch-by-8-inch section of   02:37:40
 7   the -- the table that the -- that the patients were   02:37:44
 8   lying on was cut out exposing their heart; correct?   02:37:49
 9        A.  Yeah.  It may not have been quite 8 inches, but   02:37:53
10   something along those lines.                     02:37:57
11        Q.  And in that study, you had young, male college   02:37:58
12   students in the hospital room; right?            02:38:21
13        A.  In that study, college students or residents.   02:38:24
14   A lot of them, I think, were residents in our program.   02:38:29
15        Q.  Okay.  And you also did not replicate all   02:38:31
16   potential conditions in the field, including physical   02:38:36
17   exertion, psychological stress, drug intoxication, and   02:38:39
18   trauma, which might impact cardiovascular function and   02:38:45
19   hemodynamic status; right?                       02:38:49
20        A.  Yes, we did not replicate those things.   02:38:52
21        Q.  What is the risk of asphyxia when compressing a   02:38:58
22   person with 600 pounds in a prone, handcuffed position?   02:39:04
23        MR. NIEMEYER:  Objection; calls for          02:39:08
24   speculation, incomplete hypothetical.            02:39:09
25        THE WITNESS:  I guess it depends on where the   02:39:13
```

**Page 168**

```
 1   600 pounds are being placed, how long they're there,   02:39:14
 2   intermittent, spread out.  A lot of, you know, pieces   02:39:18
 3   that are sort of missing in how to assess that.   02:39:23
 4   BY MS. SHERWIN:                                  02:39:25
 5        Q.  Okay.  But as you sit here today, would it be   02:39:25
 6   fair to say, Doctor, that you don't know what the risk   02:39:28
 7   of asphyxia from compression with 600 pounds in a prone   02:39:30
 8   position is because you've never seen a study that   02:39:35
 9   replicates 600 pounds?                           02:39:37
10        MR. NIEMEYER:  Same objection.              02:39:39
11        THE WITNESS:  If you're referring to 600 pounds   02:39:40
12   straight on the middle of the back, there has not been a   02:39:42
13   study of that.  If you're referring to 600 pounds with   02:39:48
14   200 pounds on one arm, 200 pounds on another arm, and   02:39:49
15   200 pounds on some legs, then I can tell you that the   02:39:51
16   risk is zero.                                    02:39:53
17   BY MS. SHERWIN:                                  02:39:54
18        Q.  What is that based on?                  02:39:54
19        A.  That putting weight on arms and legs do not   02:39:56
20   venti-- do not impact the ventilatory structures of   02:39:59
21   the physiology.                                  02:40:02
22        Q.  What medical literature can you point me to   02:40:03
23   that supports that contention?                   02:40:07
24        A.  It -- as far as medical literature, it's such   02:40:09
25   an obvious thing that people aren't going to study it to   02:40:13
```

**Page 169**

```
 1   say it doesn't have any impact.  We know that putting   02:40:17
 2   weight on somebody's arm doesn't kill them.  There's   02:40:19
 3   plenty of data out there about people having weight on   02:40:21
 4   their arms.                                      02:40:25
 5        Q.  Okay.  Well, what is the risk of asphyxiation   02:40:25
 6   when you have 238 pounds on the back of a person's leg   02:40:27
 7   leaning forward onto their torso with several hundred   02:40:31
 8   other pound deputies also putting their combined weight   02:40:36
 9   on the person?                                   02:40:40
10        MR. NIEMEYER:  Objection; incomplete          02:40:41
11   hypothetical, calls for speculation, mischaracterizes   02:40:41
12   the evidence.                                    02:40:44
13        THE WITNESS:  Basically, as I was saying      02:40:46
14   earlier, if you're putting the weight on their arms,   02:40:48
15   it's not going to have any impact on them.       02:40:49
16   BY MS. SHERWIN:                                  02:40:51
17        Q.  And if you're putting the weight on their back?   02:40:51
18        A.  Well, if it's 600 pounds in the middle of their   02:40:54
19   back, I already acknowledged that that study has not   02:40:57
20   been done.                                       02:40:59
21        Q.  And would you agree that 600 pounds in the   02:41:00
22   middle of a person's back would be likely to impact   02:41:01
23   their ability to breathe?                        02:41:05
24        A.  It would have some impact on ventilation.  I   02:41:06
25   agree with that.                                 02:41:08
```

**Page 170**

1    Q.  Even 225 pounds on a person's back has impact   02:41:09
2  on their ventilation; right?                          02:41:12
3    A.  You can measure changes, yes.                   02:41:14
4    Q.  And even 50 pounds on a person's back impacts   02:41:16
5  their ventilation, doesn't it?                        02:41:19
6    A.  I think there are very slight changes with      02:41:22
7  50 pounds compared to baseline.                       02:41:27
8    Q.  And, in fact, you found a decrease in a         02:41:29
9  person's ventilation just from prone restraint alone  02:41:33
10 with no added weight; right?                          02:41:36
11   A.  Compared to sitting in a chair, correct.        02:41:39
12   Q.  You read the deposition of the defendant        02:42:26
13 Dr. Taylor Fithian; right?                            02:42:28
14   A.  At some point, yes.                             02:42:31
15   Q.  Do you agree that -- strike that.               02:42:34
16   Do you agree with Dr. Fithian that a person         02:42:37
17 being held facedown with people putting weight on his 02:42:40
18 back impairs the ability to breathe?                  02:42:43
19   A.  I -- I agree with the idea that if you're       02:42:47
20 putting weight on somebody's back, you can have some  02:42:49
21 measurable impact on ventilation.                     02:42:52
22   Q.  Do you agree with Dr. Fithian that that's one   02:42:54
23 way a person can die of restraint asphyxia?           02:42:59
24   A.  If you put enough weight on somebody's back, I  02:43:01
25 think that we established that earlier, that if you have 02:43:03

**Page 171**

1  enough weight in the right places for a long enough   02:43:06
2  period of time, that could potentially occur.         02:43:09
3    Q.  And do you agree with Dr. Chapman that a        02:43:12
4  person's being in a prone position with people on top of 02:43:15
5  him interferes with his ability to breathe?           02:43:19
6    A.  I think that's sort of the same thing you asked 02:43:21
7  me just a moment ago, that you can have measurable     02:43:24
8  impacts on ventilation by putting weight on somebody's 02:43:26
9  back in a prone position.                             02:43:30
10   Q.  Do you agree with Dr. Chapman if someone is     02:43:31
11 compressed by any weight on his body, be it by another 02:43:35
12 body or another object -- or some object, it interferes 02:43:38
13 with respiration?                                     02:43:42
14   A.  Again, with sophisticated measuring techniques, 02:43:47
15 you can measure --                                    02:43:52
16   (Reporter query)                                   02:43:52
17   THE WITNESS:  -- sophisticated measuring           02:43:52
18 techniques, you can pick up changes in ventilatory    02:43:52
19 patterns with weight on the back.                     02:43:54
20 BY MS. SHERWIN:                                       02:43:55
21   Q.  Do you agree with Dr. Chapman that if, as       02:43:55
22 Deputy Grant reported, multiple deputies put their    02:44:01
23 combined weight on Steven Neuroth while he was prone on 02:44:04
24 the ground and they pressed him into the ground, that  02:44:07
25 could cause him to suffer restraint asphyxia?          02:44:11

**Page 172**

1    MR. NIEMEYER:  Objection; compound, calls for       02:44:15
2  speculation, asked and answered several times.         02:44:16
3    THE WITNESS:  Yeah, my definition of "combined     02:44:17
4  weight" -- again, I was meaning that they all may be  02:44:22
5  combining their weight but in different areas on the  02:44:26
6  arms and on the legs so that they could have combined 02:44:28
7  weight that certainly would not have any impact of -- on 02:44:31
8  causing positional asphyxia.                          02:44:33
9  BY MS. SHERWIN:                                       02:44:35
10   Q.  And they could have combined weight pressing    02:44:35
11 Steven into the ground that caused him to suffer       02:44:39
12 restraint asphyxia.                                   02:44:41
13   Do you agree with Dr. Chapman about that?           02:44:42
14   A.  In this case, no.                               02:44:45
15   Q.  It's impossible -- strike that.                 02:44:47
16   Is it your -- is it your opinion, Doctor, that      02:44:49
17 it is impossible that the defendant deputies put enough 02:44:51
18 combined weight on Steven Neuroth while they pressed him 02:44:58
19 into the ground to cause him to suffer restraint       02:45:02
20 asphyxia?                                             02:45:04
21   A.  Based on the data and information available,    02:45:06
22 there was no evidence they combined their weights in the 02:45:08
23 right places for a long enough period of time to cause a 02:45:12
24 compressive asphyxia.                                 02:45:17
25   Q.  Well, when Defendant Deputy Grant said they put 02:45:19

**Page 173**

1  their combined weight on Steven Neuroth and pressed him 02:45:22
2  into the ground, where did they put their combined     02:45:25
3  weight?                                              02:45:28
4    A.  I thought we went over this with regards to one 02:45:28
5  was on the left arm, one was on the right arm, and one 02:45:31
6  was doing the Figure 4 pushing down on the legs over the 02:45:34
7  posterior thighs.  Excuse me.                         02:45:40
8    Q.  Do you agree with Dr. Chapman that if Steven    02:45:42
9  were restrained and a bunch of deputies pile on top of 02:45:48
10 him and prevent him from breathing by putting their    02:45:51
11 combined weight on his back, that would be restraint   02:45:54
12 asphyxia?                                             02:45:57
13   MR. NIEMEYER:  Objection; mischaracterizes the     02:45:59
14 evidence.                                            02:46:00
15   THE WITNESS:  Yeah, if the theoretical or          02:46:00
16 hypothetical is that they put a thousand pounds straight 02:46:03
17 down on his back for a long enough period of time, you 02:46:05
18 could cause compressive asphyxia.                      02:46:08
19 BY MS. SHERWIN:                                       02:46:11
20   Q.  Do you agree with Dr. Chapman if you have a     02:46:11
21 weight on the back, then restraint asphyxia can happen? 02:46:14
22   A.  If you have a weight.  If you have a            02:46:18
23 thousand-pound weight for a long enough period of time, 02:46:19
24 I guess it could happen.                              02:46:22
25   Q.  So I'd like to ask you about some of the        02:46:33

1 statements made in The Diagnosis and Management of   02:46:38
2 Agitation book in which you've contributed a chapter.   02:46:42
3     Do you agree that "New onset agitation should   02:46:47
4 be considered of medical origin rather than psychiatric   02:46:50
5 until proven otherwise"?   02:46:54
6     A.  I think in some circumstances that -- that is   02:46:56
7 reasonable.   02:46:59
8     Q.  Do you agree that "Deescalation is the center   02:47:00
9 of the approach to the agitated patient and should be   02:47:04
10 ongoing during intervention with the patient"?   02:47:07
11     A.  I think that in the right population -- patient   02:47:10
12 population, that the escalation techniques are very   02:47:14
13 valuable and should be attempted, but they don't always   02:47:17
14 work.   02:47:21
15     Q.  Do you agree with the international guidelines   02:47:23
16 for agitation that say "Verbal deescalation and calming   02:47:26
17 techniques should be the first choice in approaching a   02:47:29
18 person with agitation, and physical restraints should   02:47:33
19 only be used as a last option"?   02:47:36
20     MR. NIEMEYER:  Objection; foundation.   02:47:38
21     THE WITNESS:  I think it depends on the   02:47:39
22 specific circumstances of the initial confrontation.   02:47:41
23 BY MS. SHERWIN:   02:47:45
24     Q.  Well, do you agree that physical restraints   02:47:45
25 should not be used until verbal escal- -- deescalation   02:47:48

Page 174

1 and calming techniques have been unsuccessful?   02:47:54
2     MR. NIEMEYER:  Same objection.   02:47:58
3     THE WITNESS:  I think that there are certain   02:47:59
4 circumstances where you don't have the opportunity to   02:48:00
5 use the deescalation techniques.  And so I think when   02:48:02
6 appropriate, they're valuable and should be used, but   02:48:06
7 you can't blanket-statement that.   02:48:08
8 BY MS. SHERWIN:   02:48:10
9     Q.  Okay.  But if there's an opportunity to use   02:48:10
10 verbal deescalation techniques, they should be used   02:48:13
11 before putting a person in restraint; right?   02:48:17
12     MR. NIEMEYER:  Objection; incomplete   02:48:21
13 hypothetical, calls for speculation.   02:48:21
14     THE WITNESS:  Again, I think it depends on the   02:48:24
15 specifics of the scenario.   02:48:26
16 BY MS. SHERWIN:   02:48:27
17     Q.  When you are treating agitated patients in the   02:48:27
18 emergency room, you start with verbal deescalation   02:48:32
19 techniques; right?   02:48:36
20     A.  It depends on the circumstances.   02:48:37
21     Q.  Do you agree that ruling out medical causes of   02:48:38
22 agitation is of utmost importance?   02:48:42
23     A.  I think it's important to -- to assess for   02:48:46
24 medical issues, if they -- if they may be present, yeah.   02:48:49
25     Q.  Do you agree that hypoxia can cause or   02:48:54

Page 175

1 exacerbate agitation in a patient?   02:49:00
2     A.  Certain degrees of hypoxia can certainly   02:49:05
3 contribute to agitation.   02:49:09
4     Q.  And hyperglycemia, or high blood sugar, in a   02:49:10
5 diabetic person can also cause agitation; right?   02:49:16
6     A.  It can.   02:49:20
7     Q.  Stroke can cause agitation; right?   02:49:20
8     A.  Yes.   02:49:22
9     Q.  Central nervous system infection can cause   02:49:23
10 agitation; right?   02:49:26
11     A.  It can.   02:49:27
12     Q.  Intracranial hemorrhaging, a brain bleed, can   02:49:28
13 cause agitation; right?   02:49:33
14     A.  It can, yes.   02:49:34
15     Q.  Seizure can cause agitation; right?   02:49:35
16     A.  It can.   02:49:38
17     Q.  Dementia can cause agitation?   02:49:38
18     A.  It can.   02:49:41
19     Q.  Hyperthyroidism can cause agitation; right?   02:49:41
20     A.  It can.   02:49:45
21     Q.  Shock can cause agitation; right?   02:49:45
22     A.  It can.   02:49:48
23     Q.  AIDS can cause agitation; right?   02:49:49
24     A.  Usually complications of AIDS but -- and so,   02:49:52
25 yeah, it can.   02:49:55

Page 176

1     Q.  And, of course, schizophrenia can cause   02:49:57
2 agitation; right?   02:50:01
3     A.  Yes.   02:50:03
4     Q.  The Diagnosis and Management of Agitation book   02:50:23
5 says that "According to the World Health Organization,   02:50:27
6 there are 185 million users of illicit drugs worldwide." 02:50:30
7     Do you have any reason to dispute that?   02:50:36
8     MR. NIEMEYER:  Objection; scope, foundation.   02:50:38
9     THE WITNESS:  Not off the top of my head, no.   02:50:40
10 BY MS. SHERWIN:   02:50:42
11     Q.  Do you agree that agitation is a symptom of   02:50:42
12 several psychiatric conditions, including schizophrenia? 02:50:48
13     A.  It can be.   02:50:52
14     Q.  Do you agree that agitation is usually brief   02:50:58
15 and self-limiting in acutely intoxicated patients?   02:51:14
16     A.  That's sort of a relative term.  You know, it   02:51:20
17 can go on for hours.   02:51:23
18     Q.  Do you agree that in most cases of central   02:51:25
19 nervous system stimulant use, such as methamphetamine,   02:51:30
20 agitation is transient and calming the patient by verbal 02:51:33
21 deescalation and providing a tranquil setting is   02:51:38
22 sufficient?   02:51:41
23     A.  Certainly in some cases, but certainly not for 02:51:42
24 all cases.   02:51:47
25     Q.  Do you agree that when vital signs are   02:51:49

Page 177

**Page 178**

```
1   abnormal, medical causes of agitation should be        02:51:53
2   considered?                                            02:51:57
3       A.  I guess they -- you know, they can be --        02:51:58
4   certainly be considered, sure.                         02:52:00
5       Q.  Do you agree that restraint and seclusion       02:52:28
6   should not be used for patients with unstable medical  02:52:31
7   conditions such as drug intoxication?                  02:52:34
8       A.  Restraint and seclusion should not be used for  02:52:37
9   drug-intoxicated patients?  Is that what you're saying? 02:52:45
10      Q.  Yes.  Unstable -- patients with unstable        02:52:48
11  medical conditions such as drug intoxication.          02:52:51
12      A.  Well, if they're unstable, I think it's --     02:52:53
13  that's a very broad statement there.  I think that we  02:52:55
14  use restraints.  We do use seclusion.  We use them in  02:53:00
15  patients who are drug intoxicated.                     02:53:03
16      If you're defining instability as a tachycardia    02:53:05
17  or a hypertensive episode, then I would have to sort of 02:53:07
18  disagree with the -- across the board on that.  But    02:53:11
19  certainly there are circumstances where you want to be  02:53:13
20  careful with patients who are truly unstable.          02:53:17
21      Q.  Are you aware that the American Psychiatric      02:53:19
22  Association warns against restraining a patient in the 02:53:21
23  prone position?                                        02:53:24
24      A.  I'm not necessarily aware of that.  I know some  02:53:25
25  places they do say "Try not to restrain prone if given 02:53:26
```

**Page 179**

```
1   the opportunity."                                      02:53:33
2       Q.  Do you agree with the author of Chapter 13 of   02:53:34
3   your book on appropriate use of restraint and seclusion 02:53:37
4   that "Patient death in restraints is commonly caused by 02:53:41
5   asphyxiation such as when excessive weight is placed on 02:53:44
6   the back in the prone position"?                       02:53:48
7       MR. NIEMEYER:  Objection; foundation.              02:53:50
8       THE WITNESS:  It sound -- it -- I'm trying to       02:53:51
9   remember the whole statement you said there, but it    02:53:57
10  was -- sounds like a lot like The Joint Commission     02:53:59
11  statement in which a lot of the deaths were asphyxiation 02:54:02
12  due to Poseys and other types of restrain processes.   02:54:04
13      So I --                                            02:54:10
14  BY MS. SHERWIN:                                        02:54:10
15      Q.  Oh.  I'm sorry.  I didn't -- go ahead.         02:54:10
16      A.  So I'm trying to remember the first part of the 02:54:11
17  statement there that you -- that asphyxia --           02:54:14
18  asphyxiation from restraints is common?  Is that what  02:54:15
19  the start -- the start --                              02:54:19
20      Q.  No.  Patient death in restraints is commonly    02:54:20
21  caused by asphyxiation such as when excessive weight is 02:54:24
22  placed on the back in the prone position.              02:54:28
23      A.  So if somebody dies in restraints, is           02:54:29
24  asphyxiation a common diagnosis?  It certainly does come 02:54:30
25  up.  I'm not sure how -- what the percentages would be. 02:54:36
```

**Page 180**

```
1       Q.  Are you familiar with the American Association  02:54:45
2   for Emergency Psychiatric Project's best practices in  02:54:48
3   the treatment of agitation?                            02:54:53
4       A.  Yeah.  That's the BETA material?               02:54:56
5       Q.  Yeah.                                          02:54:58
6       A.  I'm familiar with it.                          02:54:59
7       Q.  Okay.  Are you aware that the American          02:55:00
8   Association for Emergency Psychiatric -- Psychiatry     02:55:04
9   Project's -- the BETA Project included a recommendation 02:55:08
10  that "Unless the patient is physically violent, verbal  02:55:11
11  deescalation should be attempted first"?               02:55:15
12      A.  It wouldn't surprise me if that was in there.   02:55:18
13      Q.  Chapter 13 of the book in which you submitted a 02:55:22
14  chapter also says that "90 percent of emergency medical 02:55:27
15  departments make use of alternatives before using      02:55:32
16  physical restraints."                                  02:55:35
17      Does the UC San Diego Medical Center Emergency      02:55:37
18  Department use alternatives before physical restraints? 02:55:40
19      A.  It depends on the -- on the individual and the  02:55:44
20  circumstances, but we do use alternatives when -- when  02:55:46
21  appropriate and available.                             02:55:49
22      Q.  Do you agree with the restraint and seclusion   02:55:52
23  chapter of the book to which you contributed a chapter  02:55:58
24  that "Restraints should only be used when the patient is 02:56:02
25  presenting an imminent danger to self or others or      02:56:05
```

**Page 181**

```
1   serious destruction to the environment"?               02:56:09
2       MR. NIEMEYER:  Objection; foundation.              02:56:11
3       THE WITNESS:  Yeah, I think -- I'd have to          02:56:14
4   think -- think through it, but certainly those are three 02:56:16
5   good reasons to consider using restraints.  There are  02:56:19
6   certainly times where you have to evaluate the patient, 02:56:22
7   and to facilitate the evaluation, you would want to use 02:56:24
8   restraints as well.  So I think there's other -- other 02:56:29
9   reasons why, but those are three good ones.            02:56:31
10  BY MS. SHERWIN:                                        02:56:33
11      Q.  Do you agree that restraints should not be used 02:56:33
12  for punishment or staff convenience?                   02:56:36
13      A.  It seems reasonable.                           02:56:39
14      Q.  Do you agree that clinical staff should be      02:56:41
15  familiar with the adverse effects associated with      02:56:44
16  restraint use, including asphyxiation and suffocation?  02:56:46
17      A.  I think staff who are using restraints should   02:56:51
18  be familiar with them.                                 02:56:54
19      Q.  Okay.  Doctor, I would like to do an            02:57:03
20  experiment.  We have 200 pounds and a -- and a clean    02:57:06
21  blanket, and I would like to put the blanket down on the 02:57:11
22  floor and have you --                                  02:57:13
23      MR. NIEMEYER:  We're not going to perform           02:57:14
24  theatrics here today.                                  02:57:15
25      MS. SHERWIN:  Well, it's not --                    02:57:17
```

Imagine Reporting 619.888.0297

**Page 182**

```
1      MR. NIEMEYER:  We're here for questions and     02:57:17
2   answers.                                           02:57:17
3      MS. SHERWIN:  I'm -- I'm asking for a           02:57:18
4   demonstration.  Demonstrations are performed all the  02:57:19
5   time.  I'm going to put it in the record --        02:57:21
6      MR. NIEMEYER:  I am not going to allow --       02:57:22
7      MS. SHERWIN:  You can --                        02:57:23
8      MR. NIEMEYER:  -- you to do this to the doctor. 02:57:23
9      MS. SHERWIN:  You can have whatever objection   02:57:24
10  you want.  Okay.  I need -- I need to put my request  02:57:26
11  into the record.  All right.                       02:57:28
12     BY MS. SHERWIN:                                  02:57:29
13     Q.  So this is the demonstration I would like to  02:57:29
14  do.  And we do demonstrations in trial all the time.  02:57:31
15     So, Doctor, I would like to have you lie        02:57:34
16  facedown on the ground on a clean blanket, and I'll put  02:57:36
17  200 pounds on your back after you've clasped your hands  02:57:40
18  behind you, and we'll see how long it takes for you to  02:57:45
19  have difficulty breathing.                          02:57:49
20     MR. NIEMEYER:  Notwithstanding my objection to  02:57:51
21  counsel's unprofessional behavior today, Doctor,   02:57:54
22  certainly you're entitled to reject such a request.  02:57:56
23     THE WITNESS:  I didn't come appropriately      02:58:00
24  dressed to lay on the ground in my good suit.  So -- 02:58:02
25  ///
```

**Page 183**

```
1   BY MS. SHERWIN:                                    02:58:05
2      Q.  So your only objection to doing the experiment  02:58:05
3   is because you're wearing a good suit?             02:58:08
4      A.  To do it today and now, yeah.  That's --   02:58:10
5      Q.  Do you have any concerns that putting      02:58:13
6   200 pounds on your back while you're lying prone on the  02:58:16
7   ground might interfere with your ability to breathe?  02:58:20
8      MR. NIEMEYER:  Objection to the                02:58:24
9   unprofessionalism and line of this questioning.    02:58:25
10     THE WITNESS:  I have had more weight than that  02:58:27
11  on my back.                                        02:58:29
12  BY MS. SHERWIN:                                    02:58:29
13     Q.  How much weight have you had on your back?  02:58:29
14     A.  I've had up to 280 pounds on my back.      02:58:31
15     Q.  When?                                       02:58:34
16     A.  A couple years ago.  About -- probably four or  02:58:35
17  five years ago.                                    02:58:36
18     Q.  Where?                                      02:58:37
19     A.  On my back.                                 02:58:38
20     Q.  No.  Where were you?                        02:58:39
21     A.  I was at home.                              02:58:40
22     Q.  How long did you have 280 pounds on your back?  02:58:42
23     A.  It was about two minutes.                   02:58:45
24     Q.  Who put the 280 pounds on your back?        02:58:46
25     A.  It was a friend of mine.                    02:58:51
```

**Page 184**

```
1      Q.  Who was that?                               02:58:52
2      A.  Hmm?                                        02:58:57
3      Q.  Who participated in this experiment with you?  02:58:58
4      A.  Oh, my -- my ex-wife.                       02:59:00
5      Q.  What's your ex-wife's name?                 02:59:02
6      MR. NIEMEYER:  Okay.  I am going to object to  02:59:04
7   the further line of this questioning as it's irrelevant  02:59:05
8   towards his opinions today.                        02:59:09
9   BY MS. SHERWIN:                                    02:59:10
10     Q.  Well, I'm just asking for the name of the   02:59:10
11  witness that participated in this experiment.      02:59:12
12     A.  It was a personal experiment.  It wasn't meant  02:59:15
13  to be -- you asked me how much weight I've had on my  02:59:18
14  back, and I've told you how much I had there.      02:59:20
15     Q.  And what was your purpose in putting 280 pounds  02:59:22
16  on your back for two minutes?                      02:59:25
17     MR. NIEMEYER:  Again, object as irrelevant.    02:59:27
18     THE WITNESS:  To see if I could speak during   02:59:29
19  that time and breathe and have any difficulty.     02:59:31
20  BY MS. SHERWIN:                                    02:59:34
21     Q.  Were you intoxicated on methamphetamine when  02:59:34
22  you did that experiment?                           02:59:37
23     A.  I was not.                                  02:59:38
24     Q.  Was anyone punching you?                    02:59:39
25     A.  Nobody punched me.                          02:59:42
```

**Page 185**

```
1      Q.  And I am going to take a stab in the dark here.  02:59:43
2   You're probably not schizophrenic, are you, Doctor?  02:59:46
3      A.  Not officially.                             02:59:49
4      Q.  Do you have any concerns, as you sit here   02:59:50
5   today, that putting 200 pounds on your back for     02:59:52
6   15 minutes while you're prone and your hands are clasped  02:59:56
7   behind you might interfere with your ability to breathe?  03:00:00
8      A.  I think we've established that it would -- if  03:00:04
9   you measured my ventilatory function, there would be  03:00:06
10  some changes that would be measurable.  So it would  03:00:09
11  impair that.  Would it kill me?  No.               03:00:12
12     Q.  That's because you're healthy; right?       03:00:14
13     A.  Relatively.                                 03:00:17
14     MS. SHERWIN:  Okay.  I have no further          03:00:19
15  questions.  Thank you.                             03:00:22
16     MR. BERTLING:  I have no questions.             03:00:25
17     MR. NIEMEYER:  Jerry, you got anything?         03:00:27
18  Anybody still on the phone?                        03:00:29
19     MR. VERANINI:  Questions.  No questions.        03:00:32
20     MR. NIEMEYER:  Okay.                            03:00:33
21     MS. WINTERS:  This is Amy.  I don't have any    03:00:36
22  questions.                                         03:00:38
23     MR. NIEMEYER:  Thank you.                       03:00:38
24     MR. VERANINI:  No questions.                    03:00:38
25  ///                                                03:00:38
```

47

**Imagine Reporting 619.888.0297**

Page 186

```
 1                    -oOo-              03:00:38
 2              EXAMINATION               03:00:38
 3   BY MR. NIEMEYER:                     03:00:38
 4       Q.  I have a couple of quick follow-ups, Doctor,  03:00:38
 5   just to make sure we have a complete record.  03:00:41
 6          We went through the rhythm strips you were  03:00:42
 7   looking at earlier.                  03:00:45
 8          Do you recall that.            03:00:46
 9       A.  Yes.                         03:00:47
10       Q.  In your practice as an ER physician, how often  03:00:47
11   do you have an opportunity to review AED and rhythm  03:00:50
12   strips?                             03:00:53
13       A.  A daily basis.                03:00:54
14       Q.  Okay.  So you're familiar with the reading of  03:00:55
15   the strips; correct?                 03:00:57
16       A.  Yes.                         03:00:58
17       Q.  Okay.  And counsel reviewed several of your lab  03:00:58
18   studies that you conducted, most of them over a decade  03:01:05
19   ago.                                03:01:09
20          Did you rely on those studies as -- in part to  03:01:10
21   formulate some of your opinions today?  03:01:13
22       A.  In part, yes.                 03:01:15
23       Q.  Okay.  What else did you rely on besides those  03:01:16
24   kinds of things?                     03:01:18
25       A.  I relied on the body of evidence out there as  03:01:19
```

Page 187

```
 1   far as research in the field of restraint and restraint  03:01:22
 2   physiology by other authors and textbooks and papers  03:01:27
 3   that are published.                   03:01:30
 4       Q.  And you've been asked to do peer review of  03:01:31
 5   other studies on this subject; correct?  03:01:36
 6       A.  I am a peer reviewer on this topic.  03:01:38
 7       Q.  Okay.  And I just want to get one  03:01:41
 8   clarification, because I know in the record, counsel  03:01:43
 9   asked you about Dr. Chapman talking about -- the  03:01:45
10   language that she used was weight on body could cause -- 03:01:47
11   I'm trying to make sure I can read -- respiratory  03:01:56
12   distress, and your response was, "Yes, weight on the  03:01:59
13   back could impact respiratory functions."  So I want to  03:02:02
14   make sure that we're clear on that, the distinction in  03:02:06
15   the two lines of questioning.         03:02:09
16          Dr. Chapman -- if he asked -- if he was asked  03:02:10
17   about weight on the back, what would your response be to  03:02:14
18   that?                               03:02:17
19       A.  Weight on the back can -- can cause  03:02:18
20   measurably -- or measurable changes in ventilatory  03:02:20
21   function.  It would depend on how much weight it is, how  03:02:23
22   long, where it's located if it's going to ever cause any  03:02:26
23   distress.                           03:02:30
24       Q.  But as we've repeatedly discussed today,  03:02:30
25   certain amounts of weight and restraint on limbs,  03:02:33
```

Page 188

```
 1   appendages would not create the same respiratory  03:02:36
 2   distress; correct?                    03:02:39
 3       A.  Correct.                      03:02:41
 4          MR. NIEMEYER:  That's all I have.  03:02:42
 5          MS. SHERWIN:  Okay.  I have a follow-up  03:02:43
 6   question.                           03:02:44
 7                    -oOo-              03:02:44
 8          FURTHER EXAMINATION            03:02:44
 9   BY MS. SHERWIN:                      03:02:45
10       Q.  Doctor, you said that you relied on, quote,  03:02:46
11   "the body of evidence," I think it was, end quote.  03:02:48
12          In formulating your opinions today, under  03:02:51
13   Federal Rule of Civil Procedure 26, you're required to  03:02:56
14   tell me all medical literature that you reviewed and are  03:02:59
15   relying on in this case, and that you do have some  03:03:02
16   medical journal articles listed in your report.  03:03:05
17          Are there any other articles that you've relied  03:03:08
18   on that you did not tell me about in your Rule 26 Report  03:03:12
19   in violation of Rule 26?             03:03:13
20       A.  Well, there's certainly a lot of articles out  03:03:15
21   there on position and position breathing, literally, you  03:03:18
22   know, hundreds of articles, everything from operative  03:03:23
23   cases and people on their stomach.  These are the ones  03:03:25
24   that have a lot of these lab measurements.  In my CV,  03:03:27
25   it's also referred to.  There's a number of book  03:03:31
```

Page 189

```
 1   chapters that have a lot of references to those papers  03:03:33
 2   as well.  That's sort of referring to the body of  03:03:36
 3   literature.  I don't tend to list out a hundred-some  03:03:39
 4   papers every time I write a Rule 26 Report.  03:03:43
 5       Q.  Well, you listed 14 items of medical and  03:03:45
 6   scientific literature that you relied on, Doctor.  I'm  03:03:48
 7   entitled to know everything that you relied on in  03:03:51
 8   supporting your opinions in this case.  03:03:53
 9          Are there any medical journal articles or any  03:03:55
10   other written literature that you relied on in order to  03:04:00
11   form your opinions in this case that you omitted from  03:04:04
12   your Rule 26 Report?                 03:04:07
13       A.  I didn't omit anything.  This is -- and I think  03:04:08
14   the last paragraph of my report states that I've been  03:04:10
15   doing this form 20-some years now.  So I've read a lot  03:04:13
16   of materials.  These are the ones that have a lot of -- 03:04:16
17   have a lot of the direct impact on this case, but  03:04:19
18   there's a lot of other material out there that supports  03:04:22
19   prone position being safe.            03:04:25
20          There's a number of them in my CV that's  03:04:26
21   attached to my report as well as book chapters in there  03:04:29
22   that are referenced with those papers as well.  03:04:32
23          So as far as papers that I'm going to pull out  03:04:34
24   and use the data from to support this case specifically,  03:04:37
25   I think this -- the ones that are listed there are  03:04:42
```

1   probably the ones that would do.  I wouldn't pull a        03:04:45
2   second paper out -- another paper out that's not listed   03:04:47
3   there to say, "This supports my -- my opinion."  I think  03:04:50
4   these adequately support that.        03:04:54
5       Q.  Okay.  And you've never seen any medical          03:04:55
6   literature anywhere that says that prone restraint of a   03:04:58
7   mentally ill man in a psychiatric crisis who is high on   03:05:05
8   methamphetamine and tachycardic before the restraint     03:05:10
9   begins, has multiple officers putting their combined     03:05:13
10  weight on him also while repeatedly punching him is      03:05:17
11  safe, have you, Doctor?               03:05:21
12      MR. NIEMEYER:  Objection; compound and       03:05:23
13  mischaracterizes the facts.           03:05:24
14      THE WITNESS:  I have never seen an article with 03:05:26
15  those specific facts one way or the other.        03:05:28
16      MS. SHERWIN:  Thank -- thank you.  I have no   03:05:31
17  further questions.                    03:05:32
18      THE WITNESS:  Thank you.          03:05:33
19      MS. SHERWIN:  Okay.  I have a W-9 for you,     03:05:33
20  Doctor.                               03:05:33
21      THE REPORTER:  Are we still on the record?    03:05:36
22      MS. SHERWIN:  No.  We're done.  We can go off. 03:05:38
23      THE VIDEOGRAPHER:  Off the record, the time is 03:05:40
24  3:05 p.m.                             03:05:41
25      THE REPORTER:  And who would like a copy of the 03:05:43

Page 190

1   deposition?                           03:05:46
2       MR. BERTLING:  I would like a copy.  I don't  03:05:47
3   need the video, but just the depo.       03:05:49
4       THE REPORTER:  Counsel?           03:05:50
5       MR. NIEMEYER:  E-trans.           03:05:54
6       THE REPORTER:  E-trans only?      03:05:55
7       MR. NIEMEYER:  Yes.               03:05:56
8       MR. BERTLING:  Yeah, I'm the same way.  I don't 03:05:57
9   need the hard copy.  I definitely need the .txt.  03:05:59
10      THE REPORTER:  Thank you.          03:06:06
11      And Counsel on the phone, did either of you    03:06:06
12  need a copy of the transcript?           03:06:08
13      MS. WINTERS:  Yes.  This is Amy.  We would like 03:06:10
14  a copy of the transcript.  We don't need a copy of the 03:06:12
15  video or anything like that.             03:06:15
16      THE REPORTER:  Thank you.          03:06:17
17      MR. VERANINI:  Yeah, this is Jerry.  I don't   03:06:18
18  need a copy.                          03:06:20
19      THE REPORTER:  Thank you.          03:06:20
20      (Whereupon, the deposition concluded at 3:06 p.m.)
21              * * * * *
22
23
24
25

Page 191

1       I, Gary M. Vilke, MD, FACEP, FAAEM, do hereby
2   declare under penalty of perjury under the laws of the
3   State of California that I have read the foregoing
4   transcript; that I have made such corrections as noted
5   herein, in ink, initialed by me, or attached hereto;
6   that my testimony as contained herein, as corrected, is
7   true and correct.
8       Executed this _____ day of _____, _____,
9   at _____, _____.
10
11
12  _____
        Gary M. Vilke, MD, FACEP, FAAEM
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 192

1       ::: CERTIFICATE OF REPORTER :::
2
3       I, GINA DE LUCA, a Certified Shorthand
    Reporter, holding a valid and current license issued by
4   the State of California, CSR No. 6973, duly authorized
    to administer oaths, do hereby certify:
5       That the witness in the foregoing deposition
    was administered an oath to testify to the whole truth
6   in the within-entitled cause;
        That said deposition was taken down by me in
7   shorthand at the time and place therein stated and
    thereafter transcribed into typewriting, by computer,
8   under my direction and supervision.
        (  )  Reading and signing was requested.
9       (  )  Reading and signing was waived.
        ( X )  Reading and signing was not requested.
10      Should the signature of the witness not be
    affixed to the deposition, the witness shall not have
11  availed himself/herself of the opportunity to sign or
    the signature has been waived.
12      I further certify that I am neither counsel for
    nor related to any party in the foregoing depositions
13  and caption named nor in any way interested in the
    outcome thereof.
14
15
16
17
18  Dated:  This 30th day of March 2018
19      at San Diego, California.
20
21
22  _____
23      Gina Marie De Luca
24      CSR No. 6973, RMR, CRR
25

Page 193