DAVID F. BEACH, ESQ. (SBN 127135)
SCOTT A. LEWIS, ESQ. (SBN 149094)
PERRY, JOHNSON, ANDERSON,
MILLER & MOSKOWITZ, LLP
438 First Street, Fourth Floor
Santa Rosa, CA 95401
Telephone: (707) 525-8800
Facsimile: (707) 545-8242

Attorney for Defendants
CITY OF WILLITS, a public entity;
WILLITS POLICE CHIEF GERARDO GONZALEZ;
WILLITS POLICE OFFICER JEFF ANDRADE;
WILLITS POLICE OFFICER KEVIN LEEF

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES NEUROTH, Individually and as Successor in Interest of Decedent STEVEN KELLOGG NEUROTH,<br><br>Plaintiff(s),<br><br>vs.<br><br>MENDOCINO COUNTY, a public entity; MENDOCINO COUNTY SHERIFF-CORONER THOMAS D. ALLMAN, individually; CORRECTIONS CAPTAIN TIM PEARCE; SERGEANT LORI KNAPP; DEPUTY FRANK MASTERSON; DEPUTY CRAIG BERNARDI; DEPUTY MICHAEL GRANT; DEPUTY JEANETTE HOLUM; DEPUTY ROBERT PAGE; DEPUTY CHRISTINE DE LOS SANTOS; CITY OF WILLITS, a public entity; WILLITS POLICE CHIEF GERARDO GONZÁLEZ; WILLITS POLICE OFFICER KEVIN LEEF; WILLITS POLICE OFFICER JEFF ANDRADE; CORRECTIONAL MEDICAL GROUP COMPANIES, INC., a Delaware Corporation; CALIFORNIA FORENSIC MEDICAL GROUP, INCORPORATED, a California corporation; TAYLOR FITHIAN, M.D.; BARBARA COTTON, R.N.; ELAINE HUSTEDT; YVONNE MAXFIELD, R.N.; CLAIRE TESKE, R.N.; JENNIFER L. CAUDILLO, L.V.N., and COUNTY DEPUTIES DOES 9–20, and DOES 23–35, individually, jointly, and severally,<br><br>Defendant(s). | CASE No. 3:15-CV-03226-RS<br><br><br>**DEFENDANTS CITY OF WILLITS, WILLITS POLICE OFFICER KEVIN LEEF, WILLITS POLICE OFFICER JEFF ANDRADE, AND WILLITS POLICE CHIEF GERARDO GONZALEZ' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; OR ALTERNATIVELY SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Complaint Filed:  July 10, 2015<br>FAC Filed:  October 21, 2015<br>SAC Filed:  February 16, 2016<br>TAC Filed:  June 8, 2016<br>4th AMND Filed:  April 21, 2017<br><br>Trial Date:  January 7, 2019 |

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

1

DEFENDANTS CITY OF WILLITS, WILLITS POLICE OFFICER KEVIN LEEF, WILLITS POLICE OFFICER JEFF ANDRADE, and WILLITS POLICE CHIEF GERARDO GONZALEZ' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; OR ALTERNATIVELY SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES                3:15-CV-03226-RS

## NOTICE OF MOTION

TO PLAINTIFFS AND THEIR ATTORNEY OF RECORD:

PLEASE TAKE NOTICE that Defendants CITY OF WILLITS, a public entity; WILLITS POLICE OFFICER KEVIN LEEF, WILLITS POLICE OFFICER JEFF ANDRADE, and WILLITS POLICE CHIEF GERARDO GONZALEZ move for an order granting summary judgment under Fed. Rule Civ. P. 56 as to Plaintiffs' Complaint.  Defendant's Motion for Summary Judgment will be heard on _____, 2018 in Courtroom B of the above-referenced court, located at 450 California Street, San Francisco, California. The grounds for this motion are more fully set forth in the accompanying Memorandum of Points and Authorities and supported by the Declaration of Scott A. Lewis and the exhibits attached thereto.

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

**TABLE OF CONTENTS**

I.  OVERVIEW OF DEFENDANTS' POSITION ..................................................1

II.  STATEMENT OF FACTS ..............................................................................1

III.  OVERVIEW OF ARGUMENT ........................................................................4

IV.  ARGUMENT ....................................................................................................5

  A.  A PROBABLE CAUSE ARREST DEFEATS PLAINTIFF'S FEDERAL CLAIMS
      AGAINST THE CITY DEFENDANTS....................................................................5

  B.  DEFENDANTS ACTED PROPERLY TAKING NEUROTH TO JAIL RATHER
      THAN THE HOSPITAL. ......................................................................................8

  C.  NEUROTH WAS NOT IN DISCERNABLE PSYCHIATRIC DISTRESS .................9

  D.  THE OFFICERS' ON SCENE COMMENTS ARE NOT ACTIONABLE
      CONSTITUTIONAL VIOLATIONS ......................................................................12

  E.  OFFICER LEEF'S COMMENTS DO NOT AMOUNT TO A CONSTITUTIONAL
      VIOLATION........................................................................................................13

  F.  LEEF DID NOT USE EXCESSIVE FORCE AGAINST NEUROTH .....................15

  G.  LEEF HAS NO DUTY TO REPORT AN OBJECTIVELY REASONABLE USE OF
      FORCE................................................................................................................16

  H.  THE CITY IS NOT LIABLE TO PLAINTIFF UNDER A MONELL CLAIM
      BECAUSE CITY DEFENDANTS DID NOT PLAY A ROLE IN THE ALLEGED
      ULTIMATE INJURY ...........................................................................................17

  I.  THE WILLITS CHIEF OF POLICE IS NOT LIABLE BECAUSE HE DID NOT
      PARTICIPATE IN ANY DEPRIVATION NOR DID HE IMPLEMENT A
      DEFICIENT POLICY UNDER THE THIRD CAUSE OF ACTION .........................17

  J.  THE WILLITS DEFENDANTS ARE ENTITLED TO IMMUNITY .........................18

  K.  OFFICERS LEEF AND ANDRADE DID NOT VIOLATE DECEDENT'S
      CONSTITUTIONAL RIGHTS AND THE BANE ACT REQUIRES MORE...........19

  L.  CITY OFFICERS WERE ENFORCING THE LAW, THEY WERE NOT
      NEGLIGENT IN DOING SO UNDER COUNT FIVE ................................................20

PERRY, JOHNSON, ANDERSON,
MILLER & MOSKOWITZ LLP

M.   THE SIXTH CAUSE OF ACTION AGAINST OFFICER LEEF FAILS BECAUSE LEEF USED REASONABLE AND TEMPORARY FORCE AGAINST NEUROTH 21

N.   LEEF DID NOT CAUSE NEUROTH'S DEATH NOR WAS HE AWARE OF ANY SERIOUS MEDICAL NEED ........................................................................22

O.   LEEF IS NOT LIABLE FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BECAUSE THE EIGHTH CAUSE DOES NOT SURVIVE DEATH.....22

P.   PLAINTIFF'S NINTH CAUSE OF ACTION FAILS BECAUSE NEUROTH WAS LEGALLY DETAINED, ARRESTED AND TRANSPORTED IN ACCORDANCE WITH LAW ...............................................................................................23

V.   CONCLUSION.....................................................................................................23

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

1   **<u>TABLE OF AUTHORITIES</u>**

2   Cases

3   *Ames v. King County, Washington* 846 F.3d 340 (2017)...............................................21

4   *Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 921 (9th Cir. 2001).........................15

5   *Arrington-Bey v. City of Bedford Heights,* 858 F.3d 988 (6th Cir. 2017) .......................................19

6   *Bancroft v. City of Mount Vernon,* 672 F. Supp.2d. 391, 404 (S.D.N.Y. 2009)...........................14

7   *Barrera v. U.S. Dept. of Homeland Sec.,* No. 07–3879 (JNE/SRN), 2009 WL 825787 ..............14

8   *Borges v. City of Eureka,* No. 15-CV-00846-YGR, 2017 WL 363212 ........................................8, 9

9   *Brown v. City and County of San Francisco,* 2014 WL 1364931 .................................................15

10  *Cabrales v. County of Los Angeles,* 886 F.2d 235 (9th Cir.1989)...............................................10

11  *Chaudhry v. City of Los Angeles,* 751 F.3d 1096, 1105 (9th Cir. 2014) ......................................20

12  *Chavez v. U.S.,* 683 F.3d 1102, 1112 (9th Cir. 2012) ...............................................................18

13  *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385, (1989)........................................................17

14  *Cornell v. City and Cty. of San Francisco,* 17 Cal. App. 5th 766, 801 (2017)............................20

15  *Cunningham v. Gates,* 229 F.3d 1271, 1289 (9th Cir.2000)........................................................16

16  *Devenpeck v. Alford,* 543 U.S. 146, 153 (2004) ........................................................................6

17  *Edson v. City of Anaheim,* 63 Cal. App. 4th 1269, 1273 (1996).................................................22

18  *Estate of Adomako v. City of Fremont,* 2018 WL 587146 ...........................................................8

19  *Graham v. Connor,* 490 U.S. 386, 388 (1989) ....................................................................15, 21

20  *Hansen v. Black,* 885 F.2d 642, 646 (9th Cir.1989) ..................................................................18

21  *Harlow v. Fitzgerald,* 457 U.S. 800, 818, (1982) .....................................................................21

22  *Hayes v. County of San Diego,* 57 Cal. 4th 622, 637 (2013) .....................................................20

23  *Hughes v. Pair,* 46 Cal.4th 1035, 1050, (2009) .......................................................................23

24  *John v. City of El Monte,* 515 F.3d 936, 940 (9th Cir. 2008) .......................................................6

25  *Knapps v. City of Oakland,* 647 F.Supp.2d 1129, 1159–60 (N.D.Cal.2009)...............................16

26  *Larez v. City of Los Angeles,* 946 F.2d 630, 646 (9th Cir. 1991) ...............................................18

27  *Lewis v. McDade,* 250 F.3d 1320, 1321 (11th Cir. 2001)...........................................................14

28  *Lingo v. City of Salem,* 832 F.3d 953, 960 (9th Cir. 2016).........................................................6

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

*Mabe v. San Bernardino Cnty. Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir.2001) .................................................................................................................................17

*Mejia v. County of San Bernadino*, 2010 WL 11597883 .................................................14

*Monell v. Department of Soc. Servs.* of New York, 436 U.S. 658, 692 (1978) .................17

*Munyon v. Henson*, 2010 WL 480881 .............................................................................14

*Pearson v. Callahan*, 555 U.S. 223, 232 (2009) ............................................................18

*Pierce v. Multnomah County*, 76 F.3d 1032 (9th Cir. 1996) ...........................................15

*Ramirez v. City of Buena Park*, 560 F.3d 1012, 1023 (9th Cir. 2009) ..............................6

*Redman v. County of San Diego*, 942 F.2d 1435, 1455–46 (9th Cir. 1991) .....................18

*Reese v. Cty. of Sacramento* 888 F.3d 1030, 1040 (9th Cir. 2018) ..........................19, 20

*Scalia v. County of Kern*, 2018 WL 1726616 .................................................................20

*Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1098-99 (9th Cir. 2006) .............8

*Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) .......................................................18

*Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987) ....................................................18

*Thompson v. Union County Div. of Social Services*, No. 07–4928 (KSH), 2008 WL 2967030 ....14

*Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011) ......................................20

*United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) ........................................6

*United States v. Koon*, 34 F.3d 1416, 1447 (9th Cir.1994) .............................................16

*United States v. Oliver*, 363 F.3d 1061, 1067 (10th Cir. 2004) .......................................14

*Venegas v. County of Los Angeles*, 153 Cal. App. 4th 1230, 1242 (2007) .......................19

*Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998) .................................18

*Watson v. State*, 21 Cal.App.4th 836 (1993) .................................................................22

*Yousefian v. City of Glendale*, 779 F.3d 1010, 1014 (9th Cir. 2015) ...............................6

*Zeilman v. County of Kern*, 168 Cal. App.3d 1174 (1985) ............................................17

**Statutes**

Cal. Code Civ. Proc. §377.34 .........................................................................................23

Cal. Gov't Code §845.6 .................................................................................................22

Cal. Health and Safety Code §11550 ............................................................................1, 2

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

Cal. Veh. Code §21905(b) ........................................................................................23

Cal.Welf. & Inst. Code §5150 ..............................................................................7, 10

PERRY, JOHNSON, ANDERSON,
MILLER & MOSKOWITZ LLP

DEFENDANTS CITY OF WILLITS, WILLITS POLICE OFFICER KEVIN LEEF, WILLITS POLICE OFFICER JEFF ANDRADE, and
WILLITS POLICE CHIEF GERARDO GONZALEZ' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; OR
ALTERNATIVELY SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES          3:15-CV-03226-RS

**RELIEF REQUESTED**

City of Willits Defendants, and each of them, seek judgment as a matter of law or partial summary judgment as to the claims asserted against each City Defendant.

## I.   OVERVIEW OF DEFENDANTS' POSITION

The Civil Rights Act, codified at 42 U.S.C. § 1983 requires a causal connection or link between the actions of Defendants and the constitutional deprivations alleged to have been suffered by Plaintiff. In this case, as to each of these City Defendants, there is no such link. Members of the public called the City of Willits Police Department reporting that Steven Neuroth was running in traffic and posed a threat to himself and others. When City officers arrived, Neuroth presented with signs of methamphetamine intoxication in violation of California Health and Safety Code section 11550. With sufficient probable cause, Neuroth was arrested for being under the influence and taken to the County Jail. This was a routine arrest for public intoxication.

At the jail, Neuroth was booked and entered the facility as a pretrial detainee and therefore in the custody of the Mendocino County Sheriff's Office. As Neuroth was entering a holding cell, he began to act out. Once under control, Deputies carried Neuroth to a safety cell where he later died.

There is no affirmative act or omission by the City Defendants that caused Neuroth's death. Without a demonstrative linkage between the City Defendants and the constitutional deprivation, City Defendants are entitled to summary judgment.

## II.   STATEMENT OF FACTS

On 06/10/14, Willits Police Department Dispatch received a call from a female citizen stating, "[a] man in the Mariposa Parking Lot is running around, acting crazy." (*See* Declaration of Scott A. Lewis, hereinafter "Decl. of Lewis," Exhibit K at 00:02:33 Audio of Dispatch Call). An additional call came in from a male citizen reporting, "[h]e almost got hit 3 times, he's just running in the parking lot and screaming and I ask[ed] him, do you need help and he's like, no, I['m] like f'ing fine." (*See* Decl. of Lewis, Exhibit K at 00:04:32 Audio of Dispatch Call).

On 06/10/14, at 22:57:55, Willits Police Officers Kevin Leef and Jeff Andrade responded to the dispatch description of "[s]ubject seen by RP running around, waving his arms, acting, ah,

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

very 5150." (*See* Decl. of Lewis, Exhibit K at 00:04:08 Audio of Dispatch Call & Decl. of Lewis, Exhibit A: Willits Police Department Detail Call for Service Report).

On 06/10/14, at 22:15:00, Leef and Andrade made contact with the subject, Steven Neuroth (hereinafter "Neuroth"), and subsequently arrested him for violation of Health and Safety Code section 11550. (a), being under the influence of controlled substance. (*See* Decl. of Lewis, Exhibit B: Willits Police Department Case Report).

During the arrest, Neuroth denied using methamphetamines, but stated "somebody put something in my soda." (*See* Decl. of Lewis, Exhibit C: Deposition of Officer Andrade, 91:25, 92:1-3). Officer Andrade determined Neuroth was under the influence of a controlled substance based on Neuroth's paranoia, fidgeting hands, rapid speech, pulse beat and was warm to the touch. (*See* Decl. of Lewis, Exhibit L, Officer Leef's Audio of Arrest at 00:02:20; Decl. of Lewis, Exhibit C: Deposition of Officer Andrade, 75:5-11).

Leef transported Neuroth to the Mendocino County Jail. Officer Andrade had no further contact. (*See* Decl. of Lewis, Exhibit B: Willits Police Department Case Report).

During the transport to Mendocino County Jail, Neuroth got "kicky" and Officer Leef used the effective control tool of yelling "snakes" on more than 5 occasions to get Neuroth to calm down. (*See* Decl. of Lewis, Exhibit D: Deposition of Officer Leef, 71:5-14). At 11:24:00 p.m., Officer Leef and Neuroth arrived at the County Jail. Neuroth sat in the back seat of Officer Leef's police cruiser in the Sally Port from the time of his arrival at 11:24:05 until the time he was escorted by Mendocino County Sheriffs into the Jail at 11:35:31. (*See* Combined Audio Video, to be lodged by Mendocino County Defendants, hereinafter "CAV" at 11:35:31). During this time Neuroth was calm and cooperative while waiting to be brought into the Jail and while answering questions from the Deputy performing the intake questions. (*See* CAV at 11:29:48 – 11:35:31).

At 11:35:43 p.m., Neuroth was taken to the "intake" room by County Sheriff Deputies at the Mendocino County Jail, while Officer Leef followed behind. Neuroth was calm and cooperative.  Neuroth was effectively in the custody of the Mendocino's County Sheriff's Department. (*See* CAV at 11:35:43). Mendocino County Sheriff's Department and its employees

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

---

DEFENDANTS CITY OF WILLITS, WILLITS POLICE OFFICER KEVIN LEEF, WILLITS POLICE OFFICER JEFF ANDRADE, and WILLITS POLICE CHIEF GERARDO GONZALEZ' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; OR ALTERNATIVELY SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES                 3:15-CV-03226-RS

conducted a search of Neuroth. (*See* CAV at 11:35:50). At 11:36:50 p.m., Neuroth was escorted out of the "intake" cell and into the "intake hallway." Neuroth was still calm and was following the instructions of the Deputies. (*See* CAV at 11:36:50).

Neuroth was then escorted by Sheriff Deputies down the "intake hallway" as Officer Leef followed behind. Staff Nurse, Jennifer Caudillo, began to take Neuroth's blood pressure, at which point he began to get agitated and upset. Officer Leef stood behind the two Sheriff Deputies and nurse while they assessed Neuroth. (*See* CAV at 11:37:11).

At 11:38:02 p.m., Neuroth was escorted into the "sobering cell" by Mendocino County Sheriff Deputies and the on-staff nurse. (*See* CAV at 11:38:02). At 11:38:09 p.m., upon entering the "sobering cell" Neuroth became agitated and began to resist the Sheriff's Deputies. (*See* CAV at 11:38:09)

At 11:38:24 p.m., Sheriff's Deputies began to restrain Neuroth on the ground. Officer Leef entered the "sobering cell" to hold Neuroth's feet in an effort to assist in restraining Neuroth from kicking and assaulting the other Deputies. (*See* CAV at 11:38:24). At 11:39:54 p.m., Officer Leef was relieved from his position of restraining Neuroth's feet. (*See* CAV at 11:39:54).

At 11:40:15 p.m., Neuroth was carried out of the "sobering cell" in restraints by Sheriff Deputies. (*See* CAV 11:40:15). At 11:40:20 p.m., Neuroth was carried into a "safety cell" by Mendocino County Sheriff Deputies. Neuroth was still kicking, screaming and being aggressive. Officer Leef stood in the hallway while the Mendocino County Sheriff's Deputies attempted to control the situation. (*See* CAV at 11:40:20).

At 11:43:14 p.m., Officer Leef was called into the "safety cell" by one of the Sheriff's Deputies, Sergeant Knapp, who felt that Officer Leef had a good rapport with Neuroth and might be able to assist in calming him down. Officer Leef stayed in the room from 11:43:14 – 11:48:51 p.m., speaking to Neuroth trying to get him to calm down, relax and breathe. Officer Leef had no physical contact with Neuroth during this time. (*See* CAV 11:43:14-11:48:51 & Decl. of Lewis, Exhibit E: Deposition of Knapp, 67:4-23).

At 11:48:51 p.m., Officer Leef exited the "safety cell" and remained in the hallway waiting while the Sheriff's Deputies attempted to put Neuroth in a safety smock and were able to

DEFENDANTS CITY OF WILLITS, WILLITS POLICE OFFICER KEVIN LEEF, WILLITS POLICE OFFICER JEFF ANDRADE, and WILLITS POLICE CHIEF GERARDO GONZALEZ' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; OR ALTERNATIVELY SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES          3:15-CV-03226-RS

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

return his hand cuffs to him. (*See* CAV 11:48:51).

At 11:54:02 p.m., the Mendocino County Sheriff Deputies exited the "safety cell." (*See* CAV at 11:54:02).

## III.   OVERVIEW OF ARGUMENT

There are nine causes of action in Plaintiff's Fourth Amended Complaint. The following chart explains the distribution and defendants of the nine causes. The City Defendants are bolded for purposes of clarity as to this brief:

| CLAIM NUMBER | CLAIM | DEFENDANTS |
|---|---|---|
| ONE | Survival Claim - 42 U.S.C. section 1983 | **Leef, Andrade** Knapp, Masterson, Bernardi Grant, Holum, Page, De Los Santos, Caudillo |
| TWO | Survival Claim - *Monell*: 42 U.S.C. section 1983 | Mendocino, **Willits** CMGC and CFMG |
| THREE | Survival Claim - Supervisory Liability:  42 U.S.C. section 1983 | **Chief Gonzalez**, Allman, Pearce, Fithian, Hustedt, Maxfield, Teske |
| FOUR | Survival Claim - Bane Act (California): Civil Code section 52.1 | **Leef, Andrade**, Knapp, Masterson, Bernardi, Grant, Holum, Page, De Los Santos, Caudillo, Allman Pearce, Fithian, Hustedt, Maxfield, Teske, **Willits** CMGC, CFMG |
| FIVE | Survival and Wrongful Death Claims - Negligence | **Leef**, **Andrade**, Knapp, Masterson, Bernardi, Grant, Holum, Page, De Los Santos |
| SIX | Survival and Wrongful Death Claims - Assault and Battery | **Leef**, Knapp, Masterson, Bernardi, Grant, Holum, Page, De Los Santos |

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

| SEVEN | Survival and Wrongful Death Claims - Cal. Gov. Code section 845.6 | **Leef** Knapp, Masterson, Bernardi, Grant, Holum, Page, De Los Santos |
|---|---|---|
| EIGHT | Survival Claim - Intention Infliction of Emotion Distress | **Leef, Willits** |
| NINE | Survival and Wrongful Death Claims - False Arrest and Imprisonment | **Leef, Andrade, Willits** |

The action can be split into two separate broad events for purposes of the upcoming analysis. The first event is the arrest and transportation of Neuroth from the City of Willits to the County Jail. The second event concerns the acts that occurred in the jail. This brief will argue and explain that the arrest was made with probable cause. Therefore, summary judgment should issue in favor of Officer Andrade for the first, fourth, fifth and ninth causes of action which are related to the arrest. Similarly, the same causes should be dismissed when alleged against Officer Leef. As to Chief Gonzalez, only the third cause—supervisory liability— is alleged against him. If the officers had probable cause to arrest Neuroth, Chief Gonzalez should be dismissed because he has no supervisory authority as a matter of law in the County Jail.

The remaining City Defendant, Leef, transported Neuroth to the County Jail and remained there to get his equipment (handcuffs). His conduct can be divided further into two parts. First, his statements made to Neuroth, and second, the momentary use of force that Leef used when Neuroth first acted out. The statements made by Leef do not rise to a constitutional violation and cannot be prosecuted under the survival statutes (cause eight). The remaining acts—the momentary use of force on Neuroth in the jail to prevent him from kicking—did not lead to Neuroth's death.

## IV.   ARGUMENT

### A.   <u>A PROBABLE CAUSE ARREST DEFEATS PLAINTIFF'S FEDERAL CLAIMS AGAINST THE CITY DEFENDANTS</u>

The first cause of action describes a series of potential violations alleged under 42 U.S.C.

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

section 1983 against the Willits officers. Each of the allegations alleged in the first cause will be discussed at Section A through G of this brief. Importantly, if City officers had probable cause to arrest Neuroth, the remaining causes and state law claims fail because the City officers did not use force against Neuroth nor were they involved in the ultimate injury.

"The Fourth Amendment requires police officers to have probable cause before making a warrantless arrest." *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1023 (9th Cir. 2009). Therefore, the absence of probable cause is a necessary element to a section 1983 false arrest claim. *Yousefian v. City of Glendale*, 779 F.3d 1010, 1014 (9th Cir. 2015). "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *John v. City of El Monte*, 515 F.3d 936, 940 (9th Cir. 2008); *Lingo v. City of Salem*, 832 F.3d 953, 960 (9th Cir. 2016). "Probable cause" does not require "certainty," a "preponderance of the evidence," or even a prima facie showing, it simply requires a "fair probability." *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006). Courts look to "the totality of the circumstances known to the arresting officers, to determine if a prudent person would have concluded there was a fair probability that the defendant had committed a crime." *John, supra*, 515 F.3d at 940; *Lingo, supra*, 832 F.3d at 960. "Probable cause is an objective standard and the officer's subjective intention in exercising his discretion to arrest is immaterial to judging whether his actions were reasonable for Fourth Amendment purposes." *John, supra*, 515 F.3d at 940; see *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) ("Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause.").

On the evening of June 10, 2014 at 10:04 p.m., a citizen called the City of Willits Police Department to report that Neuroth was running in and out of heavy vehicle traffic risking great bodily injury. (*See* Decl. of Lewis, Exhibit A: Willits Detail Call for Service Report). Responding to the call, Officer Leef saw Neuroth running in front of a truck. Then, within moments, Officer Andrade arrived. They immediately recognized Neuroth because they had just spoken to him a few hours earlier when he was seen loitering around a local market in Willits. At the earlier time,

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

1   Neuroth was not committing a crime, nor was he a danger to himself or gravely disabled as a

2   result of a mental health disorder.  Cal.Welf. & Inst. Code § 5150.

3     By the time of the second contact, several factors had changed. First, Neuroth was

4   obviously acting dangerously by running in and out of traffic. (*See* Decl. of Lewis, Exhibit C:

5   Deposition of Officer Andrade, 76:25, 77:1-25, 78:1-5). Second, he claimed that an unknown

6   person was after him. (*See* Decl. of Lewis, Exhibit C: Deposition of Officer Andrade, 74:21-22).

7   Third, he claimed, though he was running in traffic, that "traffic" was after him. (*See* Decl. of

8   Lewis, Exhibit C: Deposition of Officer Andrade, 79:13-21). Fourth, he said that there were no

9   traffic lights. (*See* Decl. of Lewis, Exhibit C: Deposition of Officer Andrade, 74:24-25). Fifth, he

10  exhibited signs of rapid speech. (*See* Decl. of Lewis, Exhibit C: Deposition of Officer Andrade,

11  75:7-11). Sixth, Officer Andrade could see physical evidence of Neuroth's elevated pulse. (*See*

12  Decl. of Lewis, Exhibit C: Deposition of Officer Andrade, 75:7-11). Seventh, he had significantly

13  fidgety hands, dry mouth and dilated pupils. (*See* Decl. of Lewis, Exhibit C: Deposition of Officer

14  Andrade, 75:7-11). Eighth, he was sweating uncontrollably. (*See* Decl. of Lewis, Exhibit C:

15  Deposition of Officer Andrade, 80:21-24). Ninth, he denied using methamphetamine but claimed

16  someone put something in his drink—a partial admission. (*See* Decl. of Lewis, Exhibit C:

17  Deposition of Officer Andrade, 91:25, 92:1-3). Tenth, when Andrade tried to take his pulse, it

18  was beating too fast to count. Indeed, Neuroth could not keep his arm still. (*See* Decl. of Lewis,

19  Exhibit C: Deposition of Officer Andrade, 75:7-11, 92:6-9). Eleventh, he had disjointed thoughts

20  rapidly changing the subject. There were times when Neuroth would stop speaking and look at

21  fixed objects. (*See* Decl. of Lewis, Exhibit C: Deposition of Officer Andrade, 81:15-22). Twelfth,

22  Neuroth exhibited signs of paranoia claiming that others were out to kill him. (*See* Decl. of Lewis,

23  Exhibit C: Deposition of Officer Andrade, 75:7-11). Yet, when asked to give a urine sample

24  regarding his use of methamphetamine, he refused, demonstrating rational thought and

25  consciousness of guilt. (*See* Decl. of Lewis, Exhibit C: Deposition of Officer Andrade, 82:9-14.

26    To Officer Andrade, these twelve physiological and psychological factors indicated that

27  Neuroth was under the influence of drugs, i.e. methamphetamine. (*See* Decl. of Lewis, Exhibit C:

28  Deposition of Officer Andrade 87:5-21). Officer Andrade has significant experience with

PERRY, JOHNSON, ANDERSON,
MILLER & MOSKOWITZ LLP

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

1  methamphetamine drug users and determined that Neuroth was under the influence of

2  methamphetamine, a violation of California Health and Safety Code section 11550(a): "[a] person

3  shall not use, or be under the influence of any controlled substance…of subdivision (d) of Section

4  11054…is guilty of a misdemeanor."

5      Neuroth's observable symptoms, transformative behavior between the first and second

6  contact, and his admission that someone put something into his soda is sufficient to establish "a

7  fair probability" and therefore probable cause that Neuroth was under the influence of a

8  controlled substance—methamphetamine.[1]

9      **B.    DEFENDANTS ACTED PROPERLY TAKING NEUROTH TO JAIL**

10          **RATHER THAN THE HOSPITAL.**

11      Plaintiff's 1983 claim against the Willits Defendants also alleges, in part, the failure to

12  recognize that Neuroth was in need of medical attention. The claim is brought under the Fourth

13  and Fourteenth Amendment.  In *Estate of Adomako v. City of Fremont*, 2018 WL 587146, the

14  Court analyzed a medical needs claim in a 12(b)(6) motion to dismiss. At briefing, the defendant

15  analyzed a denial of medical care under the Fourteenth Amendment applicable to pretrial

16  detainees. Plaintiffs applied the Eighth Amendment standard "deliberate indifference to serious

17  medical needs". The Honorable Judge Donna Ryu stated that "[n]either party is correct."  "Claims

18  of denial of medical care during and immediately following an arrest are analyzed under the

19  Fourth Amendment and its "objective reasonableness" standard." *Borges v. City of Eureka*, No.

20  15-CV-00846-YGR, 2017 WL 363212, at 6 (N.D. Cal. Jan. 25, 2017) (citing *Tatum v. City &*

21  *Cty. of San Francisco*, 441 F.3d 1090, 1098-99 (9th Cir. 2006)).

22      In *Borges v. City of Eureka*, the Court, Honorable Yvonne Gonzalez Rogers presiding,

23  granted summary judgment to the officers applying the Fourth Amendment reasonableness test

24  when City of Eureka officers arrested Daren Borges for being under the influence of

---

26  [1] Officer Andrade's belief was confirmed by the many experts who have testified in this case that Neuroth was under
27  the influence of methamphetamine. The following experts testified that Neuroth was under the influence of
    methamphetamine:  Neal Benowitz, Robert Bux, Terry S. Fillman, Richard Hayward, Jeffrey Cope, Dr. David Kan,
28  Larissa Mooney, John Peters, Lenard Vare, Gary Vilke, Todd Wilcox.

methamphetamine. Borges was seen taking off his clothes in the City of Eureka at 2 p.m. on June 13, 2014. Similar to Neuroth, Borges was displaying what the arresting officer believed were signs of stimulant intoxication, namely, sweating, glassy eyes with a blank stare, uncontrollable body movements, and mumbling. Two officers on the scene agreed that Borges could go to the County Jail instead of a hospital emergency room. Borges later died in custody.

Survivors of Borges, as here, brought a Fourth and Fourteenth Amendment claim for denial of medical care. At the summary judgment hearing, the parties agreed that the Fourth Amendment governs the right to medical care during and immediately after the arrest.

The facts of *Borges* and the instant matter are astonishingly similar. Both Borges and Neuroth had similar symptoms of methamphetamine intoxication. Both Plaintiffs argue that their Decedents should have been taken to a hospital.

The *Borges* Court opined as follows:

> Drawing all reasonable inferences in favor of the non-moving party, plaintiff has not proffered sufficient evidence that the City officers failed to provide objectively reasonable post-arrest care to Borges. Even assuming that the City officers knew Borges was under the influence of a stimulant and may have had signs of an overdose, plaintiff has offered no authority to suggest that the only reasonable course of action is to take the arrestee to the hospital rather than a nearby jail, where the arrestee should receive a medical evaluation. Although taking Borges to the hospital may have been the most effective medical care for him in hindsight, this is not required by the Fourth Amendment. *Borges*, *supra*, 2017 WL 363212, at 7.

Neuroth's physical symptoms were less dramatic than those of the decedent in *Borges*. Neuroth had no signs of an overdose. In fact, officers were prepared to release Neuroth to his brother had they been able to get ahold of him. Neuroth was not in any level of medical distress. He did not have labored breathing, bulging eyes, bleeding or broken, inoperative limbs. Because the facts are identical to that of *Borges*, this Court should grant the officers summary judgment as the Court did in *Borges*.

**C.     <u>NEUROTH WAS NOT IN DISCERNABLE PSYCHIATRIC DISTRESS</u>**

Similar to Plaintiff's medical care claim, Plaintiff alleges that his brother should have been taken to the hospital due to a preexisting mental health condition.

/ / /

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

PERRY, JOHNSON, ANDERSON,
MILLER & MOSKOWITZ LLP

1    For purposes of analysis, the right to medical treatment includes the right to psychological

2  treatment. *Cabrales v. County of Los Angeles*, 886 F.2d 235 (9th Cir.1989).  Plaintiff's claim here

3  rests on a single theory-- Neuroth had a lengthy history of mental health problems. However, the

4  officers were not privy to this history. With regards to the symptoms he was exhibiting in the

5  field, Neuroth was exhibiting classic signs of being under the influence of methamphetamine.

6    Plaintiff's own expert confirms that the symptoms of methamphetamine intoxication and

7  those of schizophrenia are "clinically indistinguishable" from each other. Plaintiff's expert

8  Larissa Mooney, MD, opined that schizophrenia and methamphetamine intoxication cannot be

9  distinguished.

10    Her opinion reads as follows:

11    "Episodes of psychosis in schizophrenics may be marked by odd or bizarre
12    behaviors, disorganized speech, paranoid delusions, irritability, or hallucinations;
these symptoms may be clinically indistinguishable from methamphetamine
13    intoxication…" (*See* Decl. of Lewis, Exhibit H: Larissa Mooney, M.D. Expert
Report, Pg. 2 Ln. 3-6.)

14    If, as Doctor Mooney opines, methamphetamine intoxication and schizophrenia

15  symptoms cannot be distinguished by a professional with extensive medical training, a

16  field law enforcement officer cannot differentiate these symptoms in the raw landscape of

17  a field stop.

18    Four key factors support the officers' decision to arrest Neuroth for methamphetamine

19  intoxication tipping the scales away from a mental health emergency. First, Officers Andrade and

20  Leef encountered Neuroth at 8:08 p.m. at Community Market (*See* Decl. of Lewis, Exhibit B:

21  Willits Police Department Case Report). At the time, he was not a danger to himself, nor did he

22  exhibit symptoms sufficient to trigger the elements of Welfare and Institutions Code section

23  5150. Neuroth was not exhibiting signs of mental illness that would suggest to the officers any

24  urgent need for mental health treatment. If Neuroth was not in need of mental health care at 8:08

25  pm, it is highly unlikely that he had mentally declined when he was seen running in traffic

26  approximately 2 hours later.

27    Second, Neuroth made a critical admission that tipped the scales in favor of

28  methamphetamine intoxication. He admitted that someone put something in his soda.

DEFENDANTS CITY OF WILLITS, WILLITS POLICE OFFICER KEVIN LEEF, WILLITS POLICE OFFICER JEFF ANDRADE, and
WILLITS POLICE CHIEF GERARDO GONZALEZ' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; OR
ALTERNATIVELY SUMMARY ADJUDICATION; MEMORANDUM OF POINTS AND AUTHORITIES      3:15-CV-03226-RS

PERRY, JOHNSON, ANDERSON,
MILLER & MOSKOWITZ LLP

The colloquy between Neuroth and Officer Leef is as follows:

> OFFICER ANDRADE: Do you use meth?
>
> MR. NEUROTH: No. Not that I know of.
>
> OFFICE ANDRADE: Who gave it to you then?
>
> [INAUDIBLE]
>
> OFFICER ANDRADE: Huh?
>
> [INAUDIBLE]
>
> OFFICER ANDRADE: What?
>
> MR. NEUROTH: somebody put something in my soda.
>
> OFFICER LEEF: somebody put something in your soda? Could that somebody be you?
>
> OFFICER ANDRADE: Let me see your pulse, okay?
>
> MR. NEUROTH: [INAUDIBLE].

(*See* Decl. of Lewis, Exhibit I: Verbatim "Audio Transcription 06/10/2014 Arrest" Transcript, 4:25 & 5:1-12).

Dr. Neal Benowitz confirmed Officer Andrade's conclusion that Neuroth was under the influence of methamphetamine:

> "While his symptoms were consistent with methamphetamine intoxication, when Mr. Neuroth was examined by nurse Caudillo, he appeared calm, had mildly elevated blood pressure and moderately increased heart rate, with a normal respiratory rate. These findings do not indicate a medical emergency and a person with these findings could be observed and treated if necessary outside of an emergency room." (*See* Decl. of Lewis, Exhibit J: Benowitz Report Pg. 2, ¶6, Ln. 2-7).

Third, Larissa Mooney MD, Plaintiff's expert, attempted to argue that, based on her experience, a methamphetamine addict is better off in a hospital emergency room generally. However, under examination, Mooney admitted that the outcome is uncertain, "[a]ll sorts of scenarios could happen." (*See* Decl. of Lewis, Exhibit F: Deposition of Larissa Mooney, M.D.: 78:2-3).

Fourth, though Plaintiff argues that Neuroth was mentally ill on the night of his arrest, Neuroth could and did make well-reasoned decisions. For example, he obeyed commands to get out of the street when asked by officers, thereby recognizing their official capacity. He spoke to

PERRY, JOHNSON, ANDERSON,
MILLER & MOSKOWITZ LLP

officers and, for the most part, did what he was told and asked to do. Indeed, during the drug evaluation, Officer Andrade asked Neuroth if he would submit to a urine test. Neuroth then made a reasonably complicated analysis of his current state. He reasoned that he was not on probation and therefore was not compelled to give a urine sample. He refused to do so. In other words, he had the mental capacity to adjudge that he would incriminate himself by giving a urine sample. Finally, though Neuroth was acting dangerously, the officers felt he could be released to a caretaker—his brother, the Plaintiff in this action, a consideration they would not have taken if they believed there was a medical or mental health emergency.

Indeed, the medical care available in Mendocino County jail supports the Willits officers' decision to transport Neuroth there instead of an emergency room. When Neuroth arrived at the County Jail, before he was even removed from the car, Mendocino County Deputy Bernardi assessed whether Neuroth was physically/mentally and therefore medically in need of care. This is a relatively low bar. If Neuroth needed any medical assistance, he would have been sent to the hospital for medical clearance by Bernardi.

Within moments, Licensed Vocational Nurse Jennifer Caudillo took the vital signs of Mr. Neuroth and confirmed that Neuroth was physically appropriate for entry. In other words, both the Mendocino County Sheriff's Office and their designated medical provider assessed Neuroth and determined that he was not suffering from a medical or psychiatric emergency.

If the opinions of medical experts likewise support the officers' conclusions in the field that Neuroth was not suffering from a medical or psychiatric emergency, it is manifest that the Willits Police Department did not violate Neuroth's constitutional rights when he met and was arrested by the officers of the Department.

### D.   THE OFFICERS' ON SCENE COMMENTS ARE NOT ACTIONABLE CONSTITUTIONAL VIOLATIONS

Plaintiff contends that the Defendant officers' colloquy at the scene of the arrest is evidence that officers overlooked Decedent's mental health needs in favor of the convenience of taking him to jail. At the scene of the arrest, Officers Leef and Andrade discuss the logistical issues concerning taking Neuroth to the hospital versus incarceration.

PERRY, JOHNSON, ANDERSON,
MILLER & MOSKOWITZ LLP

1        However, as explained above, the constitutional analysis is not whether the officers

2 ruminated about their various options regarding the hospital, taking Neuroth to his relatives or

3 taking him to jail, the analysis turns on whether Neuroth was suffering from a serious

4 medical/psychiatric need. He was not and the many checks and balances support this.

5      **E.**    **OFFICER LEEF'S COMMENTS DO NOT AMOUNT TO A**

6         **CONSTITUTIONAL VIOLATION**

7        Plaintiff has claimed throughout this litigation that Officer Leef "tortured" Neuroth by

8 warning him that there were snakes in the back of the patrol car. The audio tape explains that

9 when Neuroth was being placed in the patrol car, he believed that snakes were in the car.

10        To calm Neuroth, Officer Andrade acknowledged Neuroth's fear of snakes and told him

11 to be calm so the snakes would not get him. Neuroth reacted quickly, sitting up straight and

12 sitting still. This use of Neuroth's fear of snakes is not the first-time people in his life have

13 acknowledged a fear to affect his behavior. For example, Plaintiff testified that Neuroth's doctor

14 would tell Neuroth that "the spiders are going to get ya" if Neuroth didn't take his medication.

15 (*See* Decl. of Lewis, Exhibit G: Deposition of James Neuroth, Vol. 1, 44:3-5).

16        When Officer Andrade warned Neuroth about snakes, Officer Leef, who had very limited

17 police experience thought Neuroth's reaction was humorous. At his deposition, Officer Leef

18 described his reaction to Neuroth's snake phobia as gallows humors (*See* Decl. of Lewis, Exhibit

19 D: Deposition of Officer Leef, 73: 4-7).

20        Enroute to the Willits Police Department and then several times while driving the roughly

21 22-mile trip to Ukiah and the County Jail, Leef said the words "snakes" to Neuroth approximately

22 four separate times.

23        The audio tape establishes several key facts. First, there is no violent reaction or wild

24 emotional reaction from Neuroth. Officer Leef testified that, on occasion, while Leef was taking

25 Neuroth to the jail from Willits, he would start to kick at the car. Leef described it as "getting

26 kicky." Leef testified that he said the word or yelled the word "snakes" and Neuroth would stop

27 moving; he would stop kicking. Leef described it as an effective tool in getting Neuroth to remain

28 still.

---

13

PERRY, JOHNSON, ANDERSON,
MILLER & MOSKOWITZ LLP

Second, Neuroth did not suffer any discernable emotional distress from the language Leef used. As the video depicts and experts describe, Neuroth was completely calm when he arrived at the jail, spoke to deputies in the jail and was booked at the jail. In short, the language used towards Neuroth had no ill effect.

While no one condones rude language or discourteous treatment, the language used by Officer Leef during Neuroth's transport to the jail does not rise to a constitutional violation. "Rudeness does not violate the Constitution. *United States v. Oliver*, 363 F.3d 1061, 1067 (10th Cir. 2004) ('protection against rude, officious, or intrusive police questioning is not a core concern of [the Fourth] Amendment'); *Lewis v. McDade*, 250 F.3d 1320, 1321 (11th Cir. 2001) ('[t]he Constitution does not prohibit all boorish or rude behavior'); *Munyon v. Henson*, 2010 WL 480881, at 7 (C.D. Ill. Feb. 2, 2010) ('[d]efendant's conduct, however rude and unprofessional, does not rise to the level of a Fourth Amendment violation')…; *Barrera v. U.S. Dept. of Homeland Sec.*, No. 07–3879 (JNE/SRN), 2009 WL 825787, at (D. Minn. Mar. 27, 2009) ('[u]se of a racial slur, however, does not in itself constitute a violation of the Fourth Amendment.'); *Bancroft v. City of Mount Vernon*, 672 F. Supp.2d. 391, 404 (S.D.N.Y. 2009) ('the most anyone says (in testimony) is that a police officer yelled at the child and told her to shut up. That is rude, but it does not constitute [a Fourth Amendment violation]); *Thompson v. Union County Div. of Social Services*, No. 07–4928 (KSH), 2008 WL 2967030, at 3 (D.N.J. July 31, 2008) ('[w]ithout more than accounts of 'rude' conduct and conclusions that seemingly ordinary events are discriminatory and violative of the Constitution, Thompson cannot make out the claims he advances'); *Westbrook v. Archey*, No. 1:05–cv–57, 2006 WL 3191559, at 7 n.18 (N.D. Ind. Nov. 2, 2006) ('[a]lthough Westbrook alleges rude conduct by Edris, that alone does not violate the constitution'); *Armour v. Herman*, No. 1:05–CV–315 TLS, 2006 WL 298582, at 2 (N.D. Ind. Jan. 13, 2006) ('the Constitution of the United States has no prohibitions against rude people')." *Mejia v. County of San Bernardino*, 2010 WL 11597883 at 7.

Accordingly, City of Willits Defendants should be granted summary judgment with respect to the language used by Officer Leef.

/ / /

### F.      LEEF DID NOT USE EXCESSIVE FORCE AGAINST NEUROTH

Plaintiff's broad-based complaint sweeps Officer Kevin Leef into the force claim alleged against the Mendocino Defendants. The video shows that Neuroth was being walked to the sobering cell. As he entered, he started to react and then to resist deputies just as they were releasing him to the large room. For moments, two Deputies wrestled with Neuroth and then swept his legs bringing him to the floor. Leef testified at deposition that Neuroth was attempting to kick the deputies. For this reason, he knelt down and grabbed at Neuroth's ankles to hold Neuroth. Leef testified that he held his feet for literally moments until another deputy arrived to relieve Leef. (*See* Decl. of Lewis, Exhibit D: Deposition of Officer Leef, 93: 4-23).

The Fourth Amendment to the United States Constitution protects persons against "unreasonable searches and seizures." U.S. Const. Amend. IV. It is undisputed that Neuroth was "seized" within the meaning of the Fourth Amendment. *Pierce v. Multnomah County*, 76 F.3d 1032 (9th Cir. 1996) (Fourth Amendment analysis applies to pretrial detainees). Thus, the issue before the court is whether the force used during his seizure was "objectively reasonable." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir. 2001); *Graham v. Connor*, 490 U.S. 386, 388 (1989).

Leef's momentary use of force to stop Neuroth from kicking the deputies is not an excessive use of force because Leef is not an integral participant in the allegedly excessive use of force. This conclusion is directly supported by the case of *Brown v. City and County of San Francisco*, 2014 WL 1364931.  In that case, two deputies used a leg sweep to take plaintiff Brown to the ground while he was in the San Francisco County Jail. Deputy Camarra arrived, saw the struggle and grabbed Brown's right leg to put it in shackles. *Id*. at 2. Deputies lifted Brown up and took him to an adjacent safety cell. Camarra stayed in the hallway and general area. *Id*. at 3. This is precisely the factual pattern at bar. Officer Leef held Neuroth's feet momentarily. He was quickly relieved by Sheriff's Deputies who carried him to the nearby safety cell.

The Court, Judge Laurel Beeler presiding, stated that Camarra was not an "integral participant" in the alleged use of excessive force because Camarra's fundamental involvement did not cause any alleged violation. *Id*. at 10. Camarra was dismissed on summary judgment. *Id*. at 11.

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

1   Similarly, Leef did not participate in any other use of force. Therefore, summary judgment

2   should be granted in his favor.

3   **G.      LEEF HAS NO DUTY TO REPORT AN OBJECTIVELY REASONABLE**

4   **       USE OF FORCE**

5   Pursuant to a long line of cases, police officers have a duty to intercede when their fellow

6   officers violate the constitutional rights of a suspect or other citizen." *United States v. Koon*, 34

7   F.3d 1416, 1447 (9th Cir.1994), rev'd on other grounds, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d

8   392 (1996); *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir.2000).  A law enforcement

9   officer who fails to intercede when his fellow officers deprive a victim of his Fourth Amendment

10  right to be free from an excessive use of force would, like his fellow officers, be liable for

11  depriving the victim of his Fourth Amendment rights. *Id.*  However, a law enforcement officer

12  may only be held liable for failing to intercede if he had a "realistic opportunity" to do so. *Id.* at

13  1289–90. For example, if officers are not present at the time of a constitutional violation, they

14  have no realistic opportunity to intercede. *Id.* at 1290. In addition, if a constitutional violation

15  occurs too quickly, there may no realistic opportunity to intercede to prevent the violation. See,

16  e.g., *Knapps v. City of Oakland*, 647 F.Supp.2d 1129, 1159–60 (N.D.Cal.2009).

17  It cannot be said that Leef witnessed an unconstitutional use of force while Neuroth went

18  berserk in the sobering cell. Neuroth was attempting to kick other officers and Leef helped to

19  restrain him momentarily. Plaintiff's broad-based complaint alleges that Defendants had a duty to

20  report or stop the alleged force at issue in this case. As the video depicts, Neuroth was carried by

21  Deputies into a safety cell. While struggling with Deputies, Sergeant Knapp called Leef into the

22  safety cell so that Leef could comfort Neuroth. Despite Plaintiff's claims of "torture", Sergeant

23  Knapp testified that Leef seemed to have a rapport with Neuroth. (*See* Decl. of Lewis, Exhibit E:

24  Deposition of Knapp, 67: 17-23.) Leef attempted to calm Neuroth and then stepped outside. This

25  was Leef's only opportunity to witness the incident in the safety cell. His attempts to calm

26  Neuroth lasted five minutes and 38 seconds. It appeared to Leef that Deputies were attending to

27  Neuroth and not using any level of force other than holding him. While in the safety cell, Leef did

28  not see any punching, kicking or other use of force other than holding. Leef was not a witness to

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

16

any alleged unconstitutional conduct.

**H.   THE CITY IS NOT LIABLE TO PLAINTIFF UNDER A MONELL CLAIM BECAUSE CITY DEFENDANTS DID NOT PLAY A ROLE IN THE ALLEGED ULTIMATE INJURY**

The municipal defendant, City of Willits, moves for judgment as a matter of law on Plaintiff's Monell claim because the City's policies and customs were not the moving force behind Neuroth's death. As explained above, Neuroth was arrested based on probable cause and the remaining issues do not rise to constitutionally deficient conduct.

Four elements must be established to impose liability on a local government entity under *Monell v. Department of Soc. Servs.* of New York, 436 U.S. 658, 692 (1978). A plaintiff must prove: (1) he was deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to plaintiff's constitutional right; and (4) the policy was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty. Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir.2001).

In other words, *Monell* requires evidence that the "execution of the government's policy or custom" ***causes*** or ***inflicts*** the constitutional violation. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385, (1989); *Monell*, *supra*.

From Plaintiff's perspective, the gravamen of his complaint is Neuroth's death during his relationship with the County of Mendocino. The City of Willits has no statutory responsibility when a pretrial detainee is booked into the jail. See *Zeilman v. County of Kern*, 168 Cal. App.3d 1174 (1985).

**I.   THE WILLITS CHIEF OF POLICE IS NOT LIABLE BECAUSE HE DID NOT PARTICIPATE IN ANY DEPRIVATION NOR DID HE IMPLEMENT A DEFICIENT POLICY UNDER THE THIRD CAUSE OF ACTION**

There are three separate and compelling reasons the Willits Chief of Police Gerardo Gonzalez is not liable. First, as explained above, Officer Leef and Andrade did nothing wrong. They responded to a potential emergency, resolved the emergency by a probable cause arrest of a person publicly intoxicated and transported him to the County Jail.

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

Second, supervisory liability attaches only when a supervisor personally participates in the acts in question. "A supervisor may be liable if there exists either (1) his or her personal involvement in the constitutional deprivation or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir.1989). There is no evidence that Chief Gonzalez participated in the arrest, transportation or use of force in this case.

Supervisory liability can also attach where "supervisory officials implement a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of constitutional violation." *Thompkins v. Belt,* 828 F.2d 298, 304 (5th Cir. 1987); *Redman v. County of San Diego*, 942 F.2d 1435, 1455–46 (9th Cir. 1991).  Here, as well, there is no evidence that Chief Gonzalez implemented a deficient policy. On the contrary, Chief Gonzalez has standard LexiPol policies which are generic policies used statewide.

Supervisors, such as Chief Gonzalez, are only personally liable for damages under section 1983 when the evidence shows that they participated in, directed, or knew of the alleged constitutional violations, and failed to intervene to prevent them. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998); *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991).

Finally, even if liability was possible for some unconstitutional act, qualified immunity applies to supervisorial claims unless the court finds that a reasonable supervisor would find it "clear" that the defendant's conduct was "unlawful in the situation he confronted."  *Chavez v. U.S.*, 683 F.3d 1102, 1112 (9th Cir. 2012).

## J.   THE WILLITS DEFENDANTS ARE ENTITLED TO IMMUNITY

Defendants Gonzalez, Andrade and Leef assert the affirmative defense of qualified immunity. In section 1983 constitutional tort cases like this one, qualified immunity prevents government officials from being held liable if (1) the officers did not violate any constitutional guarantees or (2) the guarantee, even if violated, was not "clearly established" at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

In a nearly identical factual case, *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988 (6th Cir. 2017), officers were called to a disturbance at a Lowe's hardware store caused by Omar Arrington-Bey.  Mr. Bey stopped taking psychotic medications when his mother drove him to Lowe's to get his last paycheck. *Id.* at 990.  At the store, Bey started a disturbance throwing paint. *Id.* at 991.  He left and was later stopped by police. It was clear he was psychotic because he was acting like it, claiming his father was Satan and he had a million-dollar cell phone. *Id.*  His mother also told police he had stopped taking his medication. *Id.* at 993.  Omar was taken to jail where he died after a scuffle with jail authorities. *Id.*

Omar's mother sued the City for the failure to provide medical and psychiatric care. The Sixth Circuit granted the City officers qualified immunity claim because taking a psychiatrically disabled person to an emergency room is not a clearly established constitutional guarantee. *Id.* at 992-993.

Even if the Court were to consider the first prong, the City Defendants, as discussed above, did not violate Decedent's constitutional rights.

**K.     OFFICERS LEEF AND ANDRADE DID NOT VIOLATE DECEDENT'S CONSTITUTIONAL RIGHTS AND THE BANE ACT REQUIRES MORE**

Plaintiffs allege that Defendant Officers Leef and Andrade violated California Civil Code section 52.1 (The Bane Act). The Tom Bane Civil Rights Act, enacted in 1987 to address hate crimes, provides civil protection to individuals from conduct aimed at interfering with rights that are secured by federal or state law where the interference is carried out "by threats, intimidation or coercion." *Reese v. Cty. of Sacramento* 888 F.3d 1030, 1040 (9th Cir. 2018); *Venegas v. County of Los Angeles*, 153 Cal. App. 4th 1230, 1242 (2007).  Claims under section 52.1 may be brought against public officials who are alleged to have interfered with protected rights, and qualified immunity is not available for those claims. *Id.* at 1245. Plaintiff alleges a Bane Act violation based upon the same facts as his Fourth Amendment claim-- a failure to obtain medical and psychiatric care, Neuroth's arrest, Leef's behavior towards Neuroth and Leef's momentary use of force when Neuroth started kicking at the Deputies.

The Ninth Circuit has held that the elements of a Bane Act claim are the same as under

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

section 1983. *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014). However, while the Bane Act does not require the "threat, intimidation or coercion" element of the claim to be "transactionally independent from the constitutional violation alleged…the Bane Act requires 'a specific intent to violate the arrestee's rights. *Reese*, *supra* at 1043, citing *Cornell v. City and Cty. of San Francisco*, 17 Cal. App. 5th 766, 801 (2017)).

In *Scalia v. County of Kern*, 2018 WL 1726616, Justice Lawrence O'Neill wrote an excellent overview of the current state of Bane Act decisions.  Justice O'Neill essentially noted that violations of constitutional rights are not actionable under the Bane Act without something more—violations plus. *Id.* at 10. In *Scalia*, the Court overviewed several decisions noting that some required "scienter" and others "specific intent." *Id.* at 10-11.

The instant case is clearly not Bane Act eligible. Neuroth was arrested based on probable cause and transported to the County Jail. There is no evidence that the City officers intended to deny Neuroth any rights under the Constitution, including medical or psychiatric care.

## L.   CITY OFFICERS WERE ENFORCING THE LAW, THEY WERE NOT NEGLIGENT IN DOING SO UNDER COUNT FIVE

The fifth cause of action alleges negligence against the two city officers and the remainder individual Deputy Sheriffs. The joining of these law enforcement defendants makes it clear that Plaintiff is attempting to confuse and conflate what happened in the safety cell with what happened in the street and holding cell.  Plaintiff alleges that, amongst the conduct of these parties, the City officers negligently failed to get appropriate medical care, and, instead, seized/arrested and then used force against Neuroth.

Negligence claims against peace officers in cases involving the use of deadly force are assessed under a reasonableness standard.  *Hayes v. County of San Diego*, 57 Cal. 4th 622, 637 (2013). "Determining the reasonableness of an officer's actions is a highly fact-intensive task for which there are no per se rules." *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011).

However, at the summary judgment stage, the facts have been developed after discovery and more so in this case, where the parties have agreed to the authenticity and admissibility of the audio/video tape that leaves very few questions about what happened. As explained earlier, the

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

initial seizure was appropriate because Officer Leef saw Neuroth running in traffic as did other Willits citizens. He was then detained and investigated for being under the influence of methamphetamine which all of the experts in this case have opined is true—Neuroth was high on drugs when he was arrested.

The only use of force was captured fully on video where Leef used momentary force to hold Neuroth's kicking feet. First, as discussed above, officers are vested with a great deal of discretion in the determination of whether or not a person has committed a crime. An officer is not charged with certainty in arrest—only the reasonable belief that a crime has occurred and the facts known to the officer link the suspect to the crime. It is helpful in this situation to know that Neuroth was arrested for public intoxication by a prohibited drug, had objective symptoms of such use and then, indeed he was under the influence as determined by a number of experts and Neuroth's own blood. There cannot be a negligent arrest if the arresting officer was correct.

Second, we know that not every push or shove amounts to a constitutional violation. *Ames v. King County, Washington* 846 F.3d 340 (2017) "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor,* 490 U.S. 386, 396 (1989). The audio and video recording, while demonstrating Plaintiff's misunderstanding of the vagaries of the street and the comfortable repose of the Court rooms, does not show negligence on the part of the City actors. Nothing the City officers did caused Neuroth's death.

The arresting officers were simply not negligent in the performance of their duties and resolution in their favor is appropriate at summary judgment. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982).

## M.   THE SIXTH CAUSE OF ACTION AGAINST OFFICER LEEF FAILS BECAUSE LEEF USED REASONABLE AND TEMPORARY FORCE AGAINST NEUROTH

Plaintiff's sixth cause of action for assault and battery is alleged against Willits Police Officer Leef. Leef did not use any form of force from the initial contact and arrest to Decedent's

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

arrival at the jail. From Decedent's arrival to the jail and his ultimate demise, Leef touched Neuroth only once when he started to fight in the sobering cell.

To assert a claim for battery against a police officer, Plaintiff must prove that the officer used unreasonable force. *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1273 (1996). Notably, Leef never hit or punched Neuroth. Leef grabbed Neuroth's kicking feet and held them. Leef's momentary stopping of Neuroth's kicking under these circumstances—the only time during his arrest and incarceration that Leef touched Neuroth--is not only objectively reasonable but it also has no causal relationship to Neuroth's death.

## N.   LEEF DID NOT CAUSE NEUROTH'S DEATH NOR WAS HE AWARE OF ANY SERIOUS MEDICAL NEED

Willits Officer Leef is not liable for Plaintiff's claim under Government Code section 845.6 (the seventh cause of action) because Officer Leef was never aware of Neuroth's need for immediate medical care. California Government Code section 845.6 provides, in relevant part:

> Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but, ... a public employee ... is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care.

In order to state a claim under Government Code section 845.6, a prisoner must establish three elements: (1) the public employee knew or had reason to know of the need (2) for immediate medical care, and (3) failed to reasonably summon such care.

"Liability under section 845.6 is limited to serious and obvious medical conditions requiring immediate care." *Watson v. State*, 21 Cal.App.4th 836 (1993). This section does not impose a duty to monitor the quality of care provided. *Id*. at 843. Leef did not violate Government Code section 845.6.

## O.   LEEF IS NOT LIABLE FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BECAUSE THE EIGHTH CAUSE DOES NOT SURVIVE DEATH

Plaintiff claims he is entitled to damages for the emotional distress suffered by his brother during his arrest and transportation to the County jail. Such claim flows through the tort of

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

intentional infliction of emotional distress. Plaintiff claims further that this tort survives decedent such that Plaintiff may recover in accordance with California's survival statute, Code of Civil Procedure Section 377.10 et seq.

In order to establish a claim for intentional infliction of emotional distress, Plaintiff must show: (1) extreme and outrageous conduct by defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) that Plaintiff suffered severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by defendant's outrageous conduct. *Hughes v. Pair*, 46 Cal.4th 1035, 1050, (2009).

However, damages cannot be recovered for "pain, suffering or disfigurement" under California's survival statutes because it is specifically excluded by California Code of Civil Procedure Section 377.34: In an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable are limited to the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and ***do not include damages for pain, suffering, or disfigurement***.

## P.   PLAINTIFF'S NINTH CAUSE OF ACTION FAILS BECAUSE NEUROTH WAS LEGALLY DETAINED, ARRESTED AND TRANSPORTED IN ACCORDANCE WITH LAW

The Ninth Cause of Action—false arrest --is directed at the Willits Defendants alone. As previously discussed earlier, Neuroth was seen by Willits community members running in and out of traffic. Officer Leef saw him do the same thing. Walking into the path of a vehicle is a reason to stop and talk to the violator—plus it is just dangerous. Cal. Veh. Code §21905(b). When the officers spoke to Neuroth, they determined he was high on methamphetamine. He was arrested. As discussed above, all Willits officers need is probable cause, and they had ample.

## V.   CONCLUSION

Summary judgment is appropriate as to the Willits Defendants because Neuroth's arrest was based on probable cause. Once Neuroth was admitted to the jail (booked), he became a pretrial detainee subject to the policies and procedures—and control—of the County of

PERRY, JOHNSON, ANDERSON, MILLER & MOSKOWITZ LLP

1 | Mendocino. There is no causal relationship between Neuroth and these City Defendants.

2 | DATED: May 24, 2018                    PERRY, JOHNSON, ANDERSON,
3 |                                        MILLER & MOSKOWITZ LLP

4 |                                        _____*/s/ Scott A. Lewis*_____
5 |                                        DAVID F. BEACH
       SCOTT A. LEWIS
6 |                                        Attorneys for Defendants
       CITY OF WILLITS, a public entity; WILLITS
7 |                                        POLICE CHIEF GERARDO GONZALEZ;
       WILLITS POLICE OFFICER JEFF ANDRADE;
8 |                                        WILLITS POLICE OFFICER KEVIN LEEF