Anne L. Keck, SBN 136315
KECK LAW OFFICES
418 B Street, Suite 206
Santa Rosa, California 95401
Telephone: (707) 595-4185
Facsimile: (707) 657-7715
Email: akeck@public-law.org

Attorneys for Defendants the
County of Mendocino and
Mendocino County Sheriff-
Coroner Thomas Allman,
Capt. Timothy Pearce, Lorrie Knapp,
Frank Masterson, Craig Bernardi,
Michael Grant, Jeanette Holum,
Robert Page, & Christine De Los Santos

John W. Patton, Jr., *Pro Hac Vice*
Stephen R. Niemeyer, SBN 203162
Kathleen M. Kunkle, SBN 222800
Kathryn R. Vaughan, *Pro Hac Vice*
PATTON & RYAN LLC
330 North Wabash Ave., Suite 3800
Chicago, Illinois 60611
Telephone: (312) 261-5160
Facsimile: (312) 261-5161
Emails: jpatton@pattonryan.com
          sniemeyer@pattonryan.com
          kkunckle@pattonryan.com
          kvaughan@pattonryan.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES NEUROTH, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>MENDOCINO COUNTY, *et al.*,<br><br>    Defendants. | Case No. 3:15-cv-03226-RS<br><br>**COUNTY DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:      August 2, 2018<br>Time:      1:30 p.m.<br>Courtroom:  3, 17th Floor<br><br>Complaint Filed:  July 10, 2015<br>Trial Date:      January 7, 2019 |

<u>**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**</u>

TO PLAINTIFF JAMES NEUROTH AND HIS COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on August 2, 2018, at 1:30 p.m., or as soon thereafter as the

matter may be heard in Courtroom 3 of the above-entitled Court, located at 450 Golden Gate

Avenue in San Francisco, California, Defendants the County of Mendocino, Mendocino County

Sheriff Thomas Allman, Sheriff's Captain Timothy Pearce, and current/former Sheriff's Deputies

Lorrie Knapp, Frank Masterson, Craig Bernardi, Michael Grant, Jeanette Holum, Robert Page, and

Christine De Los Santos (collectively, the "County Defendants") will respectfully move this Court to

award it summary judgment on all claims brought against them in this action, including but not

1  limited to the claims set forth in the operative Fourth Amended Complaint for Damages filed on

2  April 21, 2017 (Dkt. No. 164, the "4AC").

3       This Motion for Summary Judgment is brought by County Defendants jointly and severally

4  pursuant to Federal Rule of Civil Procedure 56 and applicable law, based on the following:

5      1.    Defendant the County of Mendocino (the "County") seeks summary judgment on
6             Plaintiff's federal law claims alleged in the 4AC's First Cause of Action (*Monell*
7             claims brought under the 42 U.S.C. § 1983) pursuant to Federal Rule of Civil
            Procedure 56, because there is no genuine dispute as to any material fact and the
            County is entitled to judgment on such claims as a matter of law.

8      2.    Defendants Mendocino County Sheriff Thomas Allman and Captain Timothy Pearce
9             seek summary judgment on Plaintiff's federal law claims alleged in the 4AC's
10            Second Cause of Action (supervisorial liability claims brought under the 42 U.S.C. §
            1983) pursuant to Federal Rule of Civil Procedure 56, because there is no genuine
11            dispute as to any material fact and these defendants are entitled to judgment on such
            claims as a matter of law.

12     3.    Defendants and current/former Sheriff's Deputies Lorrie Knapp, Frank Masterson,
            Craig Bernardi, Michael Grant, Jeanette Holum, Robert Page, and Christine De Los
13            Santos (collectively, the "Correctional Deputies") seek summary judgment on
            Plaintiff's federal law claims alleged in the 4AC's Second Cause of Action brought
14            under 42 U.S.C. § 1983 pursuant to Federal Rule of Civil Procedure 56, because there
            is no genuine dispute as to any material fact and these defendants are entitled to
15            judgment on such claims as a matter of law.

16     4.    The County Defendants seek summary judgment on Plaintiff's state law claims
            pursuant to Federal Rule of Civil Procedure 56, on the ground that there is no genuine
17            dispute as to any material fact and they are entitled to judgment on such claims as a
            matter of law, as follows:

18         a.    Defendants Mendocino County Sheriff Thomas Allman, Captain Timothy
19                 Pearce, and the Correctional Deputies seek summary judgment on Plaintiff's
                claims alleged in the 4AC's Fourth Cause of Action brought under
20                 California's Bane Act (California Civil Code § 52.1) because there is no
                genuine dispute as to any material fact and these defendants are entitled to
21                 judgment on such claims as a matter of law.

22         b.    The Correctional Deputies seek summary judgment on Plaintiff's claims
                alleged in the 4AC's Fifth Cause of Action for common law negligence
23                 because there is no genuine dispute as to any material fact and these
                defendants are entitled to judgment on such claims as a matter of law.

24         c.    The Correctional Deputies seek summary judgment on Plaintiff's claims
25                 alleged in the 4AC's Sixth Cause of Action for assault and battery because
                there is no genuine dispute as to any material fact and these defendants are
26                 entitled to judgment on such claims as a matter of law.

27         d.    Defendants the County of Mendocino and the Correctional Deputies seek
                summary judgment on Plaintiff's claims alleged in the 4AC's Seventh Cause
28                 of Action brought under California Government Code § 845.6 (failure to

summon medical care) because there is no genuine dispute as to any material fact and these defendants are entitled to judgment on such claims as a matter of law.

This Motion is based on this Notice and Motion, the accompanying Memorandum of Points and Authorities in support thereof, and the papers and pleadings on file herein. In addition, it is based on the accompanying Motion to File Under Seal certain confidential materials, as well as the materials submitted to the Court under seal, including but not limited to the Combined Audio/Video recording (the "CAV") which will be delivered to the Court and not filed via ECF. Further, this Motion is based on the declarations and accompanying exhibits of the following individuals:

1.  Frank Masterson (aka, "Masterson Dec.")

2.  Craig Bernardi (aka, "Bernardi Dec.")

3.  Lorrie Knapp (aka, "Knapp Dec.")

4.  Jeanette Holum (aka, "Holum Dec.")

5.  Michael Grant (aka, "Grant Dec.")

6.  Christine De Los Santos (aka, "De Los Santos Dec.")

7.  Robert Page (aka, "Page Dec.")

8.  Steven Studer (aka, "Studer Dec.")

9.  Timothy Pearce (aka, "Pearce Dec.")

10. John Barbieri, Ph.D. (aka, "Barbieri Dec.")

11. A. Jay Chapman, M.D. (aka, "Chapman Dec.")

12. Jenine Miller, Psy.D (aka, "Miller Dec.")

13. David Voytek (aka, "Voytek Dec.")

14. Kathleen Kunkle, regarding County Defendants' Expert Witnesses, attaches the following exhibits:

> Exhibit A:   John Peters' Deposition Transcript excerpts, including portions of his deposition transcript, his initial Expert Report ["Peters Report"], his Supplemental/Rebuttal Expert Report ["Peters Supp. Report"], and his curriculum vitae

> Exhibit B:   David Kan's Deposition Transcript excerpts, including portions of his

1                                       deposition transcript, his initial Expert Report ["Kan Report"], his

2                                       Supplemental/Rebuttal Report ["Kan Supp. Report"], and his

3                                       curriculum vitae

4          Exhibit C:    Gary Vilke's Deposition Transcript excerpts, including portions of his

5                                         deposition transcript, his Supplemental/Rebuttal Report ["Vilke

6                                         Report"], and his curriculum vitae

7          Exhibit D:    Leonard Vare's Deposition Transcript excerpts, including portions of

8                                         his deposition transcript, his Supplemental/Rebuttal Report ["Vare

9                                         Report"], and his curriculum vitae

10       15.     Kathleen Kunkle, regarding Plaintiff's Expert Witnesses, attaches the following

11 exhibits:

12          Exhibit F:    Michael Baden's Deposition Transcript excerpts, including portions of

13                                         his deposition transcript and his Expert Report ["Baden Report"]

14          Exhibit G:    Richard Hayward Deposition Transcript excerpts, including portions

15                                         of his deposition transcript and his Expert Report ["Hayward Report"]

16          Exhibit H:    John Ryan Deposition Transcript excerpts, including portions of his

17                                         deposition transcript and his Expert Report ["Ryan Report"]

18      County Defendants also present a proposed order, and reserve the right to submit such other

19 and further evidence and arguments prior to or at the hearing on this Motion.

20                                KECK LAW OFFICES       PATTON & RYAN

21 Dated: May 24, 2018        By: */s/ Anne L. Keck*       By: */s/ Kathleen M. Kunkle*

22                                 Anne L. Keck               Kathleen M. Kunkle
                                             Attorneys for County Defendants

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

I.      GENERAL BACKGROUND.......…………………………………………............· 1

II.     APPLICABLE CONSTITUTIONAL LAW UNDERLYING § 1983 CLAIMS .....…..…... 3

        A. Pretrial Inmate Claims for Deliberate Indifference to Medical/Mental
           Health Needs are Grounded in the Fourteenth Amendment ...…...............…...… 3

        B. Pretrial Inmate Claims for Use of Excessive Force are Grounded in the Fourteenth
           Amendment …………………………………………………….....................…... 4

III.    THE COUNTY IS ENTITLED TO SUMMARY JUDGMENT ON ALL *MONELL*
        CLAIMS BROUGHT UNDER 42 U.S.C. § 1983 …………………………………..... 5

        A. Closing the County In-Patient Psychiatric Hospital, and Admitting
           Neuroth to the Jail, Did Not Violate his Constitutional Rights ………...………. 6

        B. The County's Contract with CFMG Allowing LVNs to Conduct
           Medical Intake at Booking Did Not Violate Neuroth's Constitutional Rights...…….. 8

        C. Jail Policies on Use of Force and Restraints Were Constitutionally Sufficient .......... 10

        D. Correctional Deputy Training and Supervision Were Constitutionally Sufficient … 14

        E. No *Monell* Liability Based on Ratification ……………………………………..... 16

        F. Correctional Deputies Did Not Cause Neuroth's Injuries or Death…………........ 19

IV.     THE SUPERVISOR DEFENDANTS ARE ENTITLED TO SUMMARY
        JUDGMENT ON ALL CLAIMS BROUGHT UNDER 42 U.S.C. § 1983…………....... 20

V.      THE CORRECTIONAL DEPUTIES ARE ENTITED TO
        SUMMARY JUDGMENT ON ALL § 1983 CLAIMS BASED
        ON THEIR QUALIFIED IMMUNITY ……………………............................... 21

        A. Plaintiff's Fourteenth Amendment § 1983 Claims for Deliberate Indifference to
           Medical/Mental Health Needs Not "Clearly Established" and Was Not Violated..... 22

           1.    Actions Did Not Violate "Clearly Established" Law...................................... 22

           2.    No Violation of the Fourteenth Amendment.................................................. 24

        B. Plaintiff's Fourteenth Amendment § 1983 Claims for Use of Excessive
           Force and Restraints Was Not "Clearly Established" and Was Not Violated............ 26

           1.    Actions Did Not Violate "Clearly Established" Law...................................... 26

           2.    No Violation of the Fourteenth Amendment ................................................. 31

VI.     MOTION FOR SUMMARY JUDGMENT ON STATE LAW CLAIMS......................... 34

        CONCLUSION………………………………………………………………… 35

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Abbey v. City of Reno*
   690 F. App'x 538 (9th Cir. 2017) .................................................................. 28

4

*Allen v. City of Sacramento*
   234 Cal.App.4th 41 (2015) ........................................................................... 34

5

6

*Anderson v. Warner*
   451 F.3d 1063 (9th Cir. 2006) ...................................................................... 16

7

*Arce v. Blackwell*
   294 F. App'x 259 (9th Cir. 2008) .................................................................. 27

8

9

*Arrington-Bey v. City of Bedford Heights, Ohio*
   858 F.3d 988 (6th Cir. 2017), *cert. denied,* 138 S. Ct. 738 (2018) ................ 7

10

*Ashcroft v. al-Kidd*
   563 U.S. 731 (2011) ...................................................................................... 21

11

12

*Bates ex rel. Johns v. Chesterfield Cty., Va.*
   216 F.3d 367 (4th Cir. 2000) ........................................................................ 32

13

*Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*
   520 U.S. 397 (1997) ...................................................................................... 10

14

15

*Blankenhorn v. City of Orange*
   485 F.3d 463 (9th Cir. 2007) .................................................................. 15, 16

16

*Bougere v. Cty. of Los Angeles*
   141 Cal. App. 4th 237 (2006) ....................................................................... 11

17

18

*Brosseau v. Haugen*
   543 U.S. 194 (2004) ......................................................................... 21, 22, 27

19

*Brown v. Ransweiler*
   171 Cal.App.4th 516 (2009) ......................................................................... 35

20

21

*Burdine v. Sandusky Cty., Ohio*
   524 F. App'x 164 (6th Cir. 2013) ................................................................. 20

22

*Burns v. City of Redwood City*
   737 F. Supp. 2d 1047 (N.D. Cal. 2010), *abrogated on other grounds by*
   *Cty. of Los Angeles, Calif. v. Mendez,* 137 S. Ct. 1539 (2017) ............... 26, 30

23

24

*Castillo v. Solano Cty. Jail*
   No. 2:08-CV-3080 GEB KJN, 2011 WL 3584318 (E.D. Cal. Aug. 12, 2011), *report and*
   *recommendation adopted,* No. 2:08-CV-3080 GEB KJN, 2011
   WL 3911043 (E.D. Cal. Sept. 6, 2011) ............................................................ 9

25

26

*Christie v. Iopa*
   176 F.3d 1231 (9th Cir. 1999) ...................................................................... 16

27

28

*City of Canton, Ohio v. Harris*
   489 U.S. 378 (1989)................................................................................ 11

*City of St. Louis v. Praprotnik*
   485 U.S. 112 (1988)............................................................................ 11, 16

*Cnty. of Sacramento v. Lewis*
   523 U.S. 833 (1998)................................................................................ 26

*Connick v. Thompson*
   563 U.S. 51 (2011).......................................................................... 11, 13, 15

*Cortez v. Cty. of Los Angeles*
   294 F.3d 1186 (9th Cir. 2002) .............................................................. 11

*Cotton v. Cty. of Santa Barbara*
   286 F. App'x 402 (9th Cir. 2008)............................................................ 27

*Cunningham v. Gates*
   229 F.3d 1271 (9th Cir. 2000) .............................................................. 33

*Davidson v. City of Stafford, Tex.*
   848 F.3d 384 (5th Cir. 2017) .............................................................. 17

*Davis v. City of Ellensburg*
   869 F.2d 1230 (9th Cir. 1989) *abrogated on other grounds by Beck v. City
   of Upland,* 527 F.3d 853 (9th Cir. 2008) ............................................... 15

*Drummond ex rel. Drummond v. City of Anaheim*
   343 F.3d 1052 (9th Cir. 2003) .......................................................... 26, 28

*Estate of Abdollahi v. Cty. of Sacramento*
   405 F. Supp. 2d 1194 (E.D. Cal. 2005) ................................................ 14

*Estate of Cartwright v. Concord*
   618 F. Supp. 722 (N.D. Cal. 985), *aff'd,* 856 F.2d 1437 (9th Cir.1988)........................ 18

*Estate of Phillips v. City of Milwaukee*
   123 F.3d 586 (7th Cir. 1997) ...................................................... 25, 30, 31, 32

*Estate of Prasad ex rel. Prasad v. Cty. of Sutter*
   958 F. Supp. 2d 1101 (E.D. Cal. 2013) ................................................ 35

*Farmer v. Brennan*
   511 U.S. 825 (1994)................................................................................ 23

*Flores v. Cty. of Los Angeles*
   758 F.3d 1154 (9th Cir. 2014) ...................................................... 13, 14, 16

*Forrester v. City of San Diego*
   25 F.3d 804 (9th Cir. 1994) .................................................................. 30

*Garlick v. Cty. of Kern*
   167 F. Supp. 3d 1117 (E.D. Cal. 2016) ................................................ 28

*George v. Sonoma Cty. Sheriff's Dep't*
No. C-08-02675 EDL, 2010 WL 4117381 (N.D. Cal. Oct. 19, 2010) .......................................... 9

*Gibson v. Cty. of Washoe, Nev.*
290 F.3d 1175 (9th Cir. 2002), *overruled on other grounds by*
*Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) ................................................ passim

*Gillette v. Delmore*
979 F.2d 1342 (9th Cir.1992) ....................................................................................................... 17

*Gonzales v. Novosel*
No. C 07-04720 CRB, 2008 WL 4614665 (N.D. Cal. Oct. 16, 2008) ......................................... 30

*Gonzalez v. Cty. of Merced*
289 F. Supp. 3d 1094 (E.D. Cal. 2017) ....................................................................................... 19

*Gordon v. Cty. of Orange,*
888 F.3d 1118 (9th Cir. 2018) .............................................................................................. 3, 4, 22

*Graham v. Connor*
490 U.S. 386 (1989) ........................................................................................................................ 4

*Greer v. City of Hayward*
229 F. Supp. 3d 1091 (N.D. Cal. 2017) ....................................................................................... 28

*Gregory v. Cty. of Maui*
523 F.3d 1103 (9th Cir. 2008) ...................................................................................................... 27

*Hagan v. California Forensic Med. Grp.*
No. CIVS07-1095 LKK/DAD, 2009 WL 728465 (E.D. Cal. Mar. 5, 2009) ................................ 10

*Harmon v. Cty. of Sacramento*
No. 2:12-CV-02758 TLN, 2016 WL 319232 (E.D. Cal. Jan. 27, 2016) ....................................... 15

*Hernandez v. City of San Jose*
241 F. Supp. 3d 959 (N.D. Cal. 2017) ......................................................................................... 35

*Hickey v. City of New York*
No. 01 CIV. 6506 (GEL), 2004 WL 2724079 (S.D.N.Y. Nov. 29, 2004),
*aff'd,* 173 F. App'x 893 (2d Cir. 2006) ................................................................................... 15, 18

*Hopper v. Phil Plummer*
887 F.3d 744 (6th Cir. 2018) .......................................................................................................... 4

*Hudson v. McMillian*
503 U.S. 1 (1992) .......................................................................................................................... 32

*Isayeva v. Sacramento Sheriff's Dep't*
872 F.3d 938 (9th Cir. 2017) ........................................................................................................ 22

*Jackson v. Barnes*
749 F.3d 755 (9th Cir. 2014), *cert. denied,* 135 S. Ct. 980 (2015) .............................................. 11

*Jackson v. New York City Health & Hosps. Corp.*
419 F. Supp. 809 (S.D.N.Y. 1976) ................................................................................................ 6

*Johnson v. Cortes*
   No. C 09-3946 SI PR, 2011 WL 445921 (N.D. Cal. Feb. 4, 2011)................................. 30

*Johnson v. Duffy*
   588 F.2d 740 (9th Cir.1978) ....................................................................................... 22

*Kanae v. Hodson*
   294 F. Supp. 2d 1179 (D. Haw. 2003)........................................................................ 17

*Kingsley v. Hendrickson*
   135 S. Ct. 2466 (2015)......................................................................................... 4, 5, 31

*Kisela v. Hughes*
   138 S. Ct. 1148 (2018) ................................................................................................ 28

*Lawman v. City & Cty. of San Francisco*
   159 F. Supp. 3d 1130 (N.D. Cal. 2016).......................................................................... 7

*Leer v. Murphy*
   844 F.2d 628 (9th Cir. 1988) ...................................................................................... 22

*Lemire v. California Dep't of Corr. & Rehab.*
   726 F.3d 1062 (9th Cir. 2013) ............................................................................... 21, 23

*Lytle v. Carl*
   382 F.3d 978 (9th Cir. 2004) ................................................................................. 16, 17

*Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*
   237 F.3d 1101 (9th Cir. 2001) ...................................................................................... 5

*Maddox v. City of Los Angeles*
   792 F.2d 1408 (9th Cir. 1986) .................................................................................... 23

*Martinez v. Beggs*
   563 F.3d 1082 (10th Cir. 2009) .................................................................................. 23

*McMillian v. Monroe County Alabama*
   520 U.S. 781 (1997)................................................................................................... 11

*Mejia v. City of Sacramento*
   177 F. App'x 661 (9th Cir. 2006) ............................................................................... 19

*Monell v. New York City Dept. of Social Servs.*
   436 U.S. 658 (1978)..................................................................................................... 5

*Pankey v. City of Concord*
   No. C-06-03737 JCS, 2007 WL 2253401, (N.D. Cal. Aug. 2, 2007).......................... 14

*Pearson v. Callahan*
   555 U.S. 223 (2009).................................................................................................. 21

*Petrolino v. City & Cty. San Francisco*
   No. 16-CV-02946-RS, 2016 WL 6160181  (N.D. Cal. Oct. 24, 2016) ........................ 6, 21, 23, 27

*Price v. County of San Diego*
   990 F. Supp. 1230 (S.D. Cal.1998)............................................................................ 28

*Rascon v. Brookins*
   No. CV-14-00749-PHX-JJT, 2018 WL 783675 (D. Ariz. Feb. 8, 2018) ................................ 17, 26

*Rosales v. Cty. of Los Angeles*
   650 F. App'x 546 (9th Cir. 2016) ................................................................................................ 4

*Rose v. Cty. of Sacramento*
   163 F. Supp. 3d 787 (E.D. Cal. 2016) ...................................................................................... 18

*Ryan v. Armstrong*
   850 F.3d 419 (8th Cir. 2017) ..................................................................................................... 4

*Saucier v. Katz*
   533 U.S. 194 (2001)................................................................................................................. 21

*Scalia v. County of Kern*, __ F. Supp. 3d __,
   No. 117-CV01097LJOSKO, 2018 WL 1726616 (E.D. Cal. Apr. 10, 2018).............................. 35

*Sharp v. Cty. of Orange*
   871 F.3d 901 (9th Cir. 2017) ................................................................................................... 22

*Sheehan v. City & Cty. of San Francisco*
   743 F.3d 1211 (9th Cir. 2014), *rev'd on other grounds*, 135 S. Ct. 1765 (2015).......................... 17

*Simmons v. Navajo Cty., Ariz.*
   609 F.3d 1011 (9th Cir. 2010), *abrogated on other grounds by Castro*, 833 F.3d 1060 .............. 10

*Smith v. Almada*
   640 F.3d 931 (9th Cir. 2011) ................................................................................................... 18

*Tatum v. City & Cty. of San Francisco*
   441 F.3d 1090 (9th Cir. 2006) ........................................................................................... 25, 30

*Trevino v. Gates*
   99 F.3d 911 (9th Cir. 2008) ................................................................................................. 5, 13

*Trujillo v. Sherman*
   No. 116CV01277DADJLTPC, 2017 WL 1549937 (E.D. Cal. May 1, 2017)............................ 29

*Tsao v. Desert Palace, Inc.*
   698 F.3d 1128 (9th Cir. 2012) ................................................................................................ 6, 8

*United States v. Binder*
   769 F.2d 595 (9th Cir. 1985), *overruled on other grounds by United States v. Morales*,
   108 F.3d 1031, 1035 n.1 (9th Cir. 1997) (en banc) .................................................................. 20

*United States v. Cty. of Maricopa, Arizona*
   No. 15-17558, 2018 WL 2091242 (9th Cir. May 7, 2018)........................................................ 11

*United States v. Lanier*,
   520 U.S. 259 (1997)................................................................................................................... 4

*Venegas v. County of Los Angeles*
   32 Cal.4th 820 (2004)............................................................................................................... 11

*Watkins v. City of Oakland, Cal.*
   145 F.3d 1087 (9th Cir. 1998) ................................................................... 16

*Weiner v. San Diego Cty.*
   210 F.3d 1025 (9th Cir. 2000) ................................................................... 12

*Weisbuch v. Cty. of Los Angeles*
   119 F.3d 778 (9th Cir. 1997) .................................................................... 17

*West v. Atkins*
   487 U.S. 42 (1988) ...................................................................................... 8

*White v. Pauly*
   137 S. Ct. 548 (2017 ................................................................................. 22

*Wilhelm v. Rotman*
   680 F.3d 1113 (9th Cir. 2012) ..................................................................... 4

*Williams v. City of Las Vegas*
   34 F. App'x 297 (9th Cir. 2002) ............................................................... 22

*Zelaya v. Las Vegas Metro. Police Dep't*
   682 F. App'x 565 (9th Cir. 2017) ............................................................. 27

**Statutes**

Cal. Gov't Code § 26605 ............................................................................. 11

Cal. Gov't Code § 845.6 .............................................................................. 35

Cal. Health & Safety Code § 11550(a) ......................................................... 7

1

# I.    GENERAL BACKGROUND

2        At approximately 11:24 p.m. on the night of June 10, 2014, Willits Police Officer Kevin Leef

3  drove up to the sally port of the Mendocino County Jail with arrestee Steve Neuroth ("Neuroth") in

4  the back of his patrol car. Willits Police had arrested Neuroth on the street for being under the

5  influence of a controlled substance. Upon admission to the jail, Neuroth was pat-searched and then

6  assessed by the on-duty jail nurse, Licensed Vocational Nurse ("LVN") Jennifer Caudillo,[1] who

7  observed him and took his vitals. (Masterson Dec. ¶ 8.) Because Neuroth was extremely high on

8  methamphetamine, he was placed into the jail's Sobering Cell. (Bernardi Dec. ¶ 10.) However, upon

9  entering the cell, Neuroth quickly went from being fidgety and cooperative to combative and ranting.

10       As Neuroth shouted and threw his body sideways, the two deputies used his own momentum

11  to take him to the ground and rolled him over onto his stomach. (Masterson Dec. ¶ 10.)  Hearing the

12  commotion, other deputies responded and helped control Neuroth while he thrashed about. (Grant

13  Dec. ¶ 4.) To protect him from injury, they picked him up and carried him into a padded Safety Cell

14  across the hallway. (*Id.*, ¶ 6.) They then proceeded to remove his handcuffs and leg shackles to leave

15  him *unrestrained* in the Safety Cell. (Knapp Dec. ¶ 16.) Neuroth hampered these efforts by constantly

16  struggling, kicking and thrashing about "like a fish in a frying pan." (Grant Dec. ¶ 8; Masterson Dec.

17  ¶ 11.) During his battle against the Deputies, Neuroth prevented Deputy Grant from putting his legs

18  in a "figure four" control hold by tensing them up, and Neuroth trapped Grant's leg and foot between

19  his own legs and squeezed hard, both of which caused Grant to use distraction blows. (Grant Dec. ¶

20  7.) Deputy Masterson, concerned for Grant's safety, also delivered three distraction blows.

21  (Masterson Dec. ¶ 17.) These distraction blows succeeded in gaining Neuroth's compliance, and none

22  of them caused him any injuries. (Grant Dec. ¶ 12; Chapman Dec. ¶ 10.)

23       After Deputies had removed Neuroth's handcuffs, they heard him say, "I just wanna die,"

24  which required them to invoke the jail's Suicide Prevention policy and replace his clothes with a

25  Safety Smock. (Knapp Dec. ¶ 25.) While waiting for a Safety Smock to arrive, the Deputies removed

26  Neuroth's leg shackles, and Sgt. Knapp directed them to reapply the handcuffs to prevent Neuroth

27  _____
[1] LVN Caudillo was an employee of California Forensic Medical Group, Inc. ("CFMG"), the
County's independent contractor which provided medical and mental health services to jail inmates
28  at the time of the Neuroth incident. (Pearce Dec. ¶¶ 5-7, Exhs. ¶ and Q.) Both CFMG and its parent
company, California Medical Group Companies, Inc., will be collectively referred to as "CFMG."

_____

1    from escaping their grasp and to avoid having to use more force. (Knapp Dec. ¶ 29.) Throughout the

2    struggle, Neuroth demonstrated "Superman strength" as he resisted the deputies. (Holum Dec. ¶ 11.)

3         When the Safety Smock arrived, Neuroth's continuing combativeness caused Sgt. Knapp,

4    who was supervising the incident, to order deputies to cut off Neuroth's T-shirt without removing his

5    handcuffs, to prevent a further use of force. (Knapp Dec. ¶ 32.) Having nothing else on hand, the

6    deputies used a handcuff key to tear holes in the shirt, and then ripped it in pieces to remove it. (De

7    Los Santos ¶ 17.) As soon as the deputies removed Neuroth's handcuffs and covered him with a

8    Safety Smock, they exited the cell one-by-one, pursuant to jail protocol. (De Los Santos ¶ 18.) Before

9    leaving, Deputy De Los Santos told Neuroth not to get up, and Neuroth replied to her "I won't get

10   up." (De Los Santos Dec. ¶ 19; Knapp Dec. ¶ 34 and Exh. A p. 3; Holum Dec. ¶ 21.) Neuroth was

11   still breathing when the Deputies left him alone in the Safety Cell unrestrained, unclothed, and under

12   a Safety Smock. (Page ¶ 24; Holum ¶ 22.)

13        About seven minutes later, jail staff started checking on Neuroth, and when he did not respond

14   to them, Deputies and LVN Caudillo went in to check on him. (Grant Dec. ¶ 18.) Upon entering the

15   Safety Cell, they found Neuroth nonresponsive, they could not feel his pulse, and when they turned

16   him over they saw he was blue around the mouth. (*Id*., at ¶ 20.) They promptly started life saving

17   measures and called for an ambulance, but Neuroth did not recover. The time lapse from the time

18   Neuroth entered the jail to the time he was found unresponsive was about 30 minutes. (Pearce Dec. ¶

19   17.)

20        The events which occurred during this incident were recorded by jail surveillance cameras

21   (video only) and were partially audio recorded by Willits Officer Leef's personal recording device.

22   Experts have combined these recordings to sync with each other, and have added subtitles and other

23   descriptive information, creating a demonstrative Combined Audio/Video (the "CAV"), which is

24   being submitted for filing under seal due to the confidential information contained therein.[2] The CAV

25   provides the best evidence of what occurred during the incident in combination with the witnesses'

26   declarations describing what happened and why. County Defendants refer the Court to this evidence,

27   as they cannot do justice to it within the confines of this brief. This evidence shows that, while

28

---

[2] The CAV is submitted in connection with the Declaration of David R. Voytek. The information in the blue banners contained on the CAV is verified in the declarations of the Deputies.

1    Neuroth's death was a very unfortunate outcome, the Deputies acted reasonably and appropriately in

2    response to a combative inmate in the throes of a methamphetamine-induced psychotic state.

3            The day after Neuroth's death, the Coroner's Office's independent forensic pathologist

4    conducted an autopsy, and later obtained a toxicology screen indicating that Neuroth had a lethal

5    level of methamphetamine in his system. (Chapman Dec. ¶¶ 5-6). The pathologist concluded that the

6    cause of death was "methamphetamine toxicity associated with violent struggle," and that "there is no

7    evidence that asphyxia played a role in the death." (Chapman Dec. ¶ 9.)

8            Contrary to that finding, Plaintiff James Neuroth ("Plaintiff") is seeking money damages

9    based on a theory that Neuroth, who was his brother, was asphyxiated. His claims against the County

10   Defendants in this case should not survive summary judgment, as set forth below.

11   **II.    APPLICABLE CONSTITUTIONAL LAW UNDERLYING § 1983 CLAIMS**

12           Plaintiff's federal law claims are brought pursuant to 42 U.S.C. § 1983 ("§ 1983"), based on

13   two rights grounded in the U.S. Constitution: (1) Neuroth's right as a pretrial inmate to be free from

14   excessive force; and (2) Neuroth's right to be provided with constitutionally adequate medical and

15   mental health care as a pretrial jail inmate. The source of these rights are discussed below.

16   **A.    Pretrial Inmate Claims for Deliberate Indifference to Medical/Mental Health
           Needs are Grounded in the Fourteenth Amendment**

17

18           Last month, the Ninth Circuit declared that pretrial inmates' § 1983 claims based on jail

19   staff's failures to provide adequate medical or mental health care must be analyzed under the

20   Fourteenth Amendment's *objective* deliberate indifferent standard. *Gordon v. Cty. of Orange*, 888

21   F.3d 1118, 1124-5 (9th Cir. 2018). The *Gordon* Court held that the factors underlying such claims

22   are: "(i) the defendant made an intentional decision with respect to the conditions under which the

23   plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious

24   harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a

25   reasonable official in the circumstances would have appreciated the high degree of risk involved –

26   making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures,

27   the defendant caused the plaintiff's injuries." *Id.*, at 1125. With respect to the third element, "the

28   defendant's conduct must be objectively unreasonable, a test that will necessarily turn[ ] on the facts

     and circumstances of each particular case." *Id.* (citations and internal quotation marks omitted).

1    Under this standard, a "mere lack of due care" is insufficient, and a plaintiff must prove

2    "something akin to reckless disregard." *Id*. (citations and internal quotation marks omitted).

3    Accordingly, "[a]n *inadvertent* failure to provide adequate medical care does not, by itself, state a

4    deliberate indifference claim for § 1983 purposes." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir.

5    2012) (emphasis in original, citation and internal quotation marks omitted).

### B.    Pretrial Inmate Claims for Use of Excessive Force are Grounded in the Fourteenth Amendment

7    Pursuant to *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), the source of pretrial inmates' §

8    1983 claims for excessive force by correctional officers is the Fourteenth Amendment's substantive

9    due process clause. *Kingsley*, 135 S. Ct. at 2473 ("[T]he Due Process Clause protects a pretrial

10   detainee from the use of excessive force that amounts to punishment."). While Ninth Circuit law

11   predating *Kingsley* indicated that the Fourth Amendment was the source of this right,[3] such decisions

12   cannot stand in the wake of *Kingsley*. This is because the *Graham* Court held that the Fourteenth

13   Amendment substantive due process clause *cannot* apply to a factual scenario if the Fourth

14   Amendment *does* apply. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). Since *Kingsley* held that

15   the Fourteenth Amendment applies to pretrial inmates' claims of excessive force, then the Fourth

16   Amendment cannot apply. *See United States v. Lanier*, 520 U.S. 259, 272 (1997) ("*Graham* simply

17   requires that if a constitutional claim is covered by a specific constitutional provision, such as the

18   Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that

19   specific provision, not under the rubric of substantive due process."); *see also Ryan v. Armstrong*, 850

20   F.3d 419, 427 (8th Cir. 2017) ("We analyze the excessive force claims of pretrial detainees under an

21   objective reasonableness standard [per *Kingsley*].); *see also Hopper v. Phil Plummer,* 887 F.3d 744,

22   753 (6th Cir. 2018) (same).[4]

23   Pursuant to *Kingsley*, the *objective* deliberate indifference standard applies to excessive force

24   claims brought by a pretrial inmate such as Neuroth, which requires him to show that "the force

25   purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 135 S. Ct. at

---

[3] *See e.g., Gibson v. Cty. of Washoe, Nev.*, 290 F.3d 1175, 1197 (9th Cir. 2002), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

[4] It should be noted that the Ninth Circuit has not directly addressed this issue since *Kingsley*, but rather has avoided it by relying on both sets of standards. *See e.g., Rosales v. Cty. of Los Angeles*, 650 F. App'x 546, 548–49 (9th Cir. 2016).

2472–73. Considerations bearing on the reasonableness of the force used include the following non-exclusive factors: (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officer to temper or to limit the amount of force; (4) the severity of the security problem at issue; (5) the threat reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting. *Id.*

The Supreme Court in *Kingsley* also emphasized that courts must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer, and "must take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." *Id., at* 2474.

## III.   THE COUNTY IS ENTITLED TO SUMMARY JUDGMENT ON ALL *MONELL* CLAIMS BROUGHT UNDER 42 U.S.C. § 1983

Plaintiff's 4AC contains a litany of *Monell*[5] allegations against the County. Under *Monell*, § 1983 liability can attach to a county only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or where the action is made "pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 690–91. For this reason, single or isolated events are insufficient to satisfy *Monell*: "[l]iability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency, and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 2008).

To succeed on his § 1983 *Monell* claim against the County, Plaintiff must prove that: (1) Neuroth was deprived of a constitutional right; (2) the County had a policy or custom; (3) the policy or custom amounted to a deliberate indifference to Neuroth's constitutional right; and (4) the policy or custom was the "moving force behind the constitutional violation." *See Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001). To be considered the "moving force" of a constitutional violation, the municipal policy must have been both the "but for"

---

[5] *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978).

1    as well as the "proximate" or legal cause of the injury. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128,

2    1146 (9th Cir. 2012)

3        In the instant case, Plaintiff's 4AC alleges about 17 separate *Monell* claims against the County

4    [4AC ¶ 111], all of which fall into five categories of conduct: (a) the County's closing of its in-patient

5    psychiatric facility in 1999 and admitting him to the jail; (b) allowing CFMG licensed vocational

6    nurses to provide medical intake and monitoring services in the jail; (c) jail policies and customs on

7    use of force and restraints; (d) Correctional Deputies' training and supervision; and (e) ratification of

8    allegedly unconstitutional actions. Plaintiff further claims the County violated Neuroth's rights by

9    failing to properly "hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline" the

10   Correctional Deputies. Plaintiff cannot succeed on any of these claims, as discussed below.

11   **A.    Closing the County In-Patient Psychiatric Hospital, and Admitting Neuroth to the Jail, Did Not Violate His Constitutional Rights**

12       Plaintiff claims the County caused Neuroth's constitutional rights to be violated because it

13   closed its in-patient psychiatric facility in 1999-2000, which resulted in him being taken to jail rather

14   than a hospital. (4AC ¶ 89, 91.) This claim fails to satisfy any of the four *Monell* factors, as follows.

15       1.  *No Constitutional Right*. Neuroth did not have a constitutional right to an in-patient

16   psychiatric hospital within the geographic boundaries of the County. *See Jackson v. New York City

17   Health & Hosps. Corp.*, 419 F. Supp. 809, 812, 813 (S.D.N.Y. 1976) ("There is no constitutionally

18   protected right to [obtain]… access to medical care at a particular location."). The County provided

19   Neuroth with a substantial amount of mental health services, including in-patient psychiatric

20   hospitalization at several facilities outside the County's borders. (Miller Dec. ¶ 3.) Nothing supports

21   Plaintiff's claim that a practice of transporting mental health patients to out-of-county facilities is a

22   constitutional violation, particularly in light of the fact that only 24 of the 58 counties in California

23   have in-patient mental health facilities within their borders. (Miller Dec. ¶ 12.)

24       Nor is there any support for Plaintiff's claim that Neuroth had a constitutional right to be

25   admitted into a hospital for his mental illness rather than being admitted into the jail for his criminal

26   conduct. *See Petrolino v. City & Cty. San Francisco*, No. 16-CV-02946-RS, 2016 WL 6160181, at *3

27   (N.D. Cal. Oct. 24, 2016) (There appears no precedent to support an alleged "right of a suicidal

28   arrestee to be free from deliberate indifference by being taken to a hospital" rather than to jail when

1   arresting officers inform jail staff of the detainee's mental state.); *see also Arrington-Bey v. City of*

2   *Bedford Heights, Ohio*, 858 F.3d 988, 994 (6th Cir. 2017), *cert. denied,* 138 S. Ct. 738 (2018) (Even

3   if the jail officers knew the inmate was bipolar and delusional, no clearly established law required

4   them to do more than putting him in seclusion and waiting to complete the booking process.).

5   Because Neuroth did not have a constitutionally protected right to be taken to a hospital, Plaintiff's

6   *Monell* claim must fail. *Id.,* at 995.

7           2.   *No Actionable Policy or Custom*. Plaintiff claims that by closing its in-patient

8   psychiatric facility, the County developed a custom of accepting mentally ill inmates into the jail

9   under the guise of criminal conduct. (Ryan Report ¶ 246.) There are no facts to support the existence

10  of such an alleged policy or custom. Moreover, no authority requires the Sheriff's Office to establish

11  a policy mandating jail officials to reject an arrestee's admission to the jail merely because they have

12  a mental health disorder or are delusional.[6] More importantly, such a policy is irrelevant to Plaintiff's

13  claim because Neuroth had taken a substantial amount of methamphetamine and was therefore

14  properly arrested and booked into the jail for violating Health & Safety Code § 11550(a) (under the

15  influence of a controlled substance). (Pearce Dec., Exh. R; Chapman Dec. ¶ 5, Exh. B.)

16          3.   *No Deliberate Indifference*. Even if Plaintiff could somehow prove the County's

17  closure of its in-patient psychiatric facility compelled it to establish a custom of accepting mentally ill

18  persons into the jail rather than sending them to a hospital, there is no evidence to establish that the

19  County was "deliberately indifferent" to Neuroth's rights in this regard. The issue here is not whether

20  mentally ill persons are booked into jail on accurate criminal charges (because many are); the issue is

21  whether the County knows that persons are booked into the jail *without* probable cause to arrest and

22  merely because they have a mental illness. There is not one piece of evidence demonstrating that the

23  County knew, or should have known, that correctional staff had a practice of admitting mentally ill

24  persons into the jail without probable cause to arrest them for criminal offenses, and Neuroth's arrest

25  for and intoxication on methamphetamine makes Plaintiff's *Monell* unjustifiable.[7]

26  [6] In fact, such a policy would be contrary to the Sheriff's duty to admit arrestees into the jail. (Vare Report pp. 20-1.)

27  [7] *Cf., Lawman v. City & Cty. of San Francisco*, 159 F. Supp. 3d 1130, 1146 (N.D. Cal. 2016) (Substantial evidence, including numerous citizen complaints, testimony of a jail nurse, and failure to

28  adopt recommended policy, could lead a reasonable jury to conclude that San Francisco was deliberately indifferent to a custom of falsely arresting persons for public intoxication.).

1        4.  *Policy or Custom Not "Moving Force."* Even though Neuroth had been diagnosed

2    with a mental illness, his placement on an involuntary hold under California Welfare and Institutions

3    Code § 5150, which was required to have taken him to a hospital, would have been improper because

4    his psychotic condition was caused by methamphetamine, not a mental disability. (Miller Dec. ¶ 7;

5    Kan Supp. Report pp. 6-7.) Further, Plaintiff's alleged policy or custom in this claim could not have

6    been the "moving force" of Nueroth's unfortunate death because, while his admission into the jail

7    may possibly be a "but for" cause, it certainly was not the "proximate" cause of his death. (Chapman

8    Dec., ¶ 9; Kan Report p. 12.) To establish *Monell* liability, a plaintiff must prove both. *Tsao*, 698 F.3d

9    at 1146.

10        **B.    The County's Contract with CFMG Allowing LVNs to Conduct Medical Intake
                   at Booking Did Not Violate Neuroth's Constitutional Rights**

11        Plaintiff also alleges a *Monell* claim against the County because LVN Caudillo allegedly

12    practiced outside the scope of her LVN license, was not properly supervised, and provided inadequate

13    medical or mental health care to Neuroth. (4AC ¶ 111(b)-(d).) Despite the allegations in the 4AC that

14    CFMG was responsible for such policies and practices, Plaintiff alleges that the *County* is responsible

15    for the alleged deprivations because it "deliberately contracted for this unqualified and incompetent

16    care of its jail inmates." (4AC ¶ 87, *see also* ¶¶ 77, 88, 94, 111(b)-(d).) The facts underlying this

17    claim are undisputed, and applicable law demonstrates it is not legally viable as alleged against the

18    County and its policymakers based on the four traditional *Monell* factors.

19        1.  *No Constitutional Right*. Without question, Neuroth had a Fourteenth Amendment

20    right to the provision of adequate medical and mental health care in the jail. (*See* Section III.A,

21    above.) However, he did not have a *federal constitutional* right to require jail medical staff to comply

22    with *state* licensing requirements for LVNs. Because § 1983 mandates that *Monell* claims must be

23    based on violation of a *federal* law right, Plaintiff's claim regarding compliance with *state* regulatory

24    law is not legally cognizable. *See West v. Atkins*, 487 U.S. 42, 48 (1988) (At a minimum, to state a

25    claim under § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and

26    laws of the United States."). Moreover, as demonstrated by the medical defendants' summary

27    judgment motions, Plaintiff's state regulatory claim is not viable because LVN Caudillo was

28    practicing well within the scope of her license based MCLE policies and on-call telephone access to a

physician and registered nurse. (Caudillo Depo. TR pp. 147-8.)

      2. *No Actionable Policy or Custom*. Plaintiff's claims do not implicate a *County* policy or custom, as they solely address *CFMG's* policies and how such policies were performed by CFMG employees. It is undisputed that at all relevant times herein, the County had delegated the provision of its medical and mental health care services in the jail to CFMG, did not employ LVN Caudillo, and did not set the policies under which she and CFMG provided medical or mental health care to jail inmates. (Pearce ¶¶ 5-7.) For this reason, the County is not the operative "policymaker" for the provision of inmate medical and mental health care necessary to implicate its § 1983 liability. *See Castillo v. Solano Cty. Jail*, No. 2:08-CV-3080 GEB KJN, 2011 WL 3584318, at *10–11 (E.D. Cal. Aug. 12, 2011), *report and recommendation adopted,* No. 2:08-CV-3080 GEB KJN, 2011 WL 3911043 (E.D. Cal. Sept. 6, 2011) (When a County has delegated all medical care and decisions at its detention facilities to CFMG, then the County is not liable for the actions of CFMG or its employees if they are based on CFMG's medical policies or procedures.). Nor is there a legal basis to hold the County liable under § 1983 for the actions of CFMG or its employees absent proof that a *County* policy was the "moving force" of the constitutional violation, which is missing in this case. *See Id.*[8]

      3. *No Deliberate Indifference*. The sole County policy the Plaintiff points to for this claim is the County's contract with CFMG for medical and mental health services. (4AC ¶ 87.) The relevant contractual provision is the staffing pattern which allowed LVNs to provide medical services to inmates without the physical presence of a higher level medical provider. (Pearce Dec., Exh. P at p. 27.) However, the CFMG contract itself does not amount to a "deliberate indifference" to Neuroth's rights to adequate medical and mental health care. Indeed, Plaintiff's expert opines on numerous ways that LVN Caudillo could have provided an appropriate level of care under the contract's staffing pattern, even if she is only an LVN. (Hayward Report p. 9). Hence, in this claim, Plaintiff takes issue not with the CFMG contract or its staffing pattern, but rather with the adequacy of the medical care provided in this particular incident. Such an argument is insufficient to support a § 1983 claim for deliberate indifference to medical needs. *See Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011,

---

[8] *See also George v. Sonoma Cty. Sheriff's Dep't*, No. C-08-02675 EDL, 2010 WL 4117381, at *12 (N.D. Cal. Oct. 19, 2010) (Absent binding authority that CFMG policies, practices and manuals would impose liability on the County Defendants, plaintiffs fail to raise a triable issue of fact as to their liability based on actions by CFMG employees.).

1   1019 (9th Cir. 2010), *abrogated on other grounds by Castro*, 833 F.3d 1060 (Improper medical

2   decisions do not evidence deliberate indifference.).

3           4.  *Policy or Custom Not the "Moving Force."* To prove a *Monell* claim based on the

4   County's contract with CFMG, Plaintiff "must show that the municipal action was taken with the

5   requisite degree of culpability and must demonstrate a direct causal link between the municipal action

6   and the deprivation of federal rights." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S.

7   397, 404 (1997). The CFMG contract's staffing pattern for the jail, which allowed LVNs to work at

8   night without other medical staff physically present, is not unconstitutional on its face nor could it

9   have been the "moving force" of any failure of LVN Caudillo or CFMG to provide adequate medical

10  or mental health care to Neuroth. *See Hagan v. California Forensic Med. Grp.*, No. CIVS07-1095

11  LKK/DAD, 2009 WL 728465, at *7 (E.D. Cal. Mar. 5, 2009) (The jail's official policies and the

12  County's decision to contract with CFMG for inmate medical care fail to demonstrate that such

13  policies "were the moving force behind any interference with access to care."). While Plaintiff argues

14  that LVN Caudillo should have done things differently (e.g., reject Neuroth's admission to the jail),

15  none of these failures were *caused by* the County's contract with CFMG or its staffing pattern.

16  Accordingly, because there is no causal nexus between LVN Caudillo's allegedly deficient actions

17  and the County's medical services contract with CFMG, this claim must fail.

18          **C.     Jail Policies on Use of Force and Restraints Were Constitutionally Sufficient**

19          The 4AC's claims with respect to jail policies on use of force and restraints are overly broad,

20  but Plaintiff's experts presented a more circumspect focus for the claims.[9] Specifically, Plaintiff's

21  police expert John Ryan opined that the Sheriff's Office policies were deficient because they failed to

22  specifically refer to restraint asphyxia (among other forms of asphyxia) and failed to instruct

23  correctional officers regarding inmate positioning to prevent breathing impediments. Accordingly,

24  Plaintiff is alleging a "policy of inaction" claim under § 1983, which requires him to prove: (1)

25  [9] For example, the 4AC broadly alleges the County has inadequate policies for handling and housing
"mentally ill or emotionally disturbed persons" (4AC ¶ 111(i)-(j), (k).) However, Plaintiff's expert
26  Dr. Hayward testified at his deposition that Neuroth was properly housed in the Safety Cell because
"[t]he safety cell is the safest place in the jail. It's safe for the inmate or the arrestee…") (Hayward
27  TR at 185.) Moreover, Dr. Hayward did not review the Sheriff's Office policies on use of its Safety
Cells (Hayward Depo. TR p. 197) and his expert report pointedly fails to indicate that there are any
28  inadequacies in the Sheriff's Office's policies generally regarding the "handling" or housing of
mentally ill inmates.

1    Neuroth's constitutional rights were violated; (2) the lack of the defined policy amounted to

2    deliberate indifference to Neuroth's constitutional right, which requires a showing that the County

3    "was on actual or constructive [*City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)]," Plaintiff

4    violation;" and (2) "the policy caused the violation in the sense that the municipality could have

5    prevented the violation with an appropriate policy." *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir.

6    2014), *cert. denied,* 135 S. Ct. 980 (2015) (quotation marks and citations omitted).

7         "Deliberate indifference" is a stringent standard of fault, "requiring proof that a municipal

8    actor disregarded a known or obvious consequence of his action." *Bryan Cty.*, 520 U.S. 397, 410

9    (1997). Under the circumstances of the instant case, this standard requires Plaintiff to prove the

10   County was on actual or constructive notice through a "pattern of similar constitutional violations"

11   sufficient to demonstrate that County decisionmakers deliberately disregarded a known risk of

12   violating a plaintiff's constitutional rights. *Connick v. Thompson*, 563 U.S. 51, 62 (2011). Moreover,

13   for liability to attach to the municipal policymaker under § 1983, the alleged failure to act "must be

14   closely related to the ultimate injury." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989).

15        As discussed below, all of Plaintiff's claims relating to jail policies, customs, training, and

16   supervision of jail staff are within the exclusive authority of the Mendocino County Sheriff Thomas

17   Allman. *See* Cal. Gov't Code § 26605 ("[T]he sheriff shall take charge of and be the sole and

18   exclusive authority to keep the county jail and the prisoners in it."). The County is not liable for such

19   actions, as Sheriff Allman is the final "policymaker" for them under § 1983. *See McMillian v.*

20   *Monroe County Alabama*, 520 U.S. 781, 785 (1997).[10] Barring such a preclusion, Plaintiff's *Monell*

21   [10] Because "municipalities may be held liable under § 1983 only for acts for which the municipality
     itself is actually responsible [*City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)]," Plaintiff
22   does not have a viable § 1983 claim against Mendocino County with respect to the Sheriff's jail
     operational decisions. *See Bougere v. Cty. of Los Angeles*, 141 Cal. App. 4th 237, 247-248 (2006)
23   (Sheriff does not act as a policymaker for the county in setting and implementing policies and
     procedures concerning the assignment of inmates in the county jail.); cited with approval in *Venegas*
24   *v. County of Los Angeles*, 32 Cal.4th 820, 829 (2004) (California sheriffs do not act as county officers
     when performing state law enforcement duties such as investigating possible criminal activity.).
25   Currently, Ninth Circuit decisions reject these holdings. *See e,g*, *Jackson v. Barnes*, 749 F.3d 755,
     765 (9th Cir. 2014) (rejecting the California Supreme Court's holding in *Venegas*) and *Cortez v. Cty.*
26   *of Los Angeles*, 294 F.3d 1186 (9th Cir. 2002). Yet, the Ninth Circuit's recent decision in *United*
     *States v. Cty. of Maricopa, Arizona*, No. 15-17558, 2018 WL 2091242, at *3 (9th Cir. May 7, 2018)
27   opens the door by indicating the decisions of state courts are relevant in determining whether a
     Sheriff, rather than a County, is the operative "policymaker" for purposes of § 1983. Though
28   California law is clearly inapposite to Ninth Circuit decisions in this area, such state court decisions
     should control on this state law issue. *See Weiner v. San Diego Cty.*, 210 F.3d 1025, 1028–29 (9th

1   claims against the County are without merit, as discussed below.

2       1. *No Violation of Constitutional Rights*. Plaintiff's police expert Mr. Ryan opined

3   that the Jail's policies were defective because they did not address "positional asphyxia, compression

4   asphyxia, mechanical asphyxia, or maximal restraint." (Ryan Report ¶¶ 234, 250.)[11] Mr. Ryan's

5   opinions were based largely on his own experience and training, and he relied on only one identified

6   authority to support them: the Cincinnati Police Department Policy No. 12.600, entitled "Prisoners,

7   Securing, Handling and Transporting." (Ryan Report, p. 93, fn 2; Ryan Depo. TR p. 207, Exh. 8.)

8   However, the only relevant directives in that policy are contained in a section on handcuffing

9   procedures, which instructs that individuals should not be left handcuffed while prone on the ground,

10  should not be restrained in a manner which causes them to remain face down, and should not be hog-

11  tied. (*See* Ryan TR, Exh. 8, p. 4, § A.2.) There is nothing in the Cincinnati Police policy stating that

12  suspects should not be left prone on the ground *without* any restraints (such as handcuffs), nor does

13  the policy apply to actions inside a correctional facility.

14      At all relevant times, the Mendocino County Sheriff's Office maintained a policy to prevent

15  persons from being left in restraints while lying face down. (Pearce Dec., Exh. G.) Such policies are

16  directed at using restraints during incidents which arise in police operations *in the field*. Conversely,

17  the Jail's policies regarding restraints *in a correctional setting* prohibit persons from being left alone

18  in Sobering or Safety Cells while they are in *any* form of restraint (other than a restraint chair).

19  (Pearce Dec. ¶ 12, Exh. F, § V.B.) Specifically, the Jail's policies provide that inmates "will not be

20  left unattended in holding, sobering or safety cells while in handcuffs, leg shackles or belly chains …

21  [r]estraint devices will not be used in any manner likely to result in an injury to an inmate … [and]

22  [c]orrections personnel are not allowed to 'hog tie' inmates." (*Id.,* at §§ V.B and V.C) These policy

23  directives are thus more restrictive on use of restraints than the Cincinnati policy because they

24  prohibit any form of restraints on a person left in a Sobering or Safety Cell.

25      More to the point, there is no support for Mr. Ryan's opinion that an inmate housed in a

26  Cir. 2000) (State law determines whether an official was the policymaker for the local governing
    body for the purposes of the particular act, and "[t]he California Supreme Court is the ultimate

27  interpreter of California state law.").

    [11] Mr. Ryan testified that he had no knowledge of California regulations related to the operations of

28  jail facilities (Title 15 of the California Regulations) nor the state-mandated training requirements
    through the Standards of Training for Corrections (STC). (Ryan Depo. TR pp. 31-32.)

1  Safety Cell who is *completely unrestrained* (with no handcuffs or leg restraints, and who can move

2  without any hindrance) must be set on his side or placed in sitting position to avoid breathing

3  problems. In fact, requiring correctional deputies to continue to go "hands on" with a combative

4  inmate to set him up *after removing all restraints which protected the deputies and the inmate* would

5  put them all at further risk of injury.

6      To the extent it is Plaintiff's position that the jail policies are deficient merely because they

7  fail to use the word "asphyxia" or expressly prohibit killing an inmate by asphyxiation, such a claim

8  fails based on both logic and the law. *See Flores v. Cty. of Los Angeles*, 758 F.3d 1154, 1160 (9th Cir.

9  2014) ("If the threat of prison time does not sufficiently deter [criminal conduct by correctional

10  officers], it is not plausible to assume that a specific instruction not to commit [a criminal act] will

11  provide such deterrence, and therefore failure to include such instruction does not constitute

12  deliberate indifference absent a longstanding pattern of such criminal behavior.").

13      2.  *No Deliberate Indifference.* Assuming *arguendo* that Plaintiff could establish that

14  the constitution required the Sheriff's Office to have language in its jail policies specifically referring

15  to "asphyxia" and requiring placement of an inmate in a recovery posture *even when he was left*

16  *completely unrestrained in a Safety Cell*, Plaintiff cannot establish that the County was deliberately

17  indifferent to such constitutional rights, for three reasons.

18      First, to prove deliberate indifference in the context of this case, Plaintiff must demonstrate

19  that the County had prior notice that its "policy of inaction" would cause constitutional violations.

20  *See Connick*, 563 U.S. at 62. Yet, Plaintiff cannot produce any evidence that the County had *prior*

21  *notice* that any of its policies were defective, as this is the first time a County jail inmate had

22  suddenly died after a combative encounter with jail staff. (Pearce Dec. ¶ 20.) This is despite the fact

23  that corrections deputies admit hundreds of inmates into the jail who, like Neuroth, are high on drugs

24  and delusional, and frequently combat jail staff. (Peace Dec. ¶¶ 14-15; Knapp Dec. ¶ 9.)

25      Second, Plaintiff's excessive force claims must fail because Neuroth's one-time, isolated

26  incident is insufficient to form the basis of a *Monell* claim. *See Trevino*, 99 F.3d at 918; *see also*

27  *Meehan v. Cty. of Los Angeles*, 856 F.2d 102, 107 (9th Cir. 1988) (Affirming directed verdict on a

28  *Monell* claim because proof of two unconstitutional assaults by deputies approximately 3 months

1    apart did not support contention that County has a policy of harassment or nonintervention.); *see also*

2    *Pankey v. City of Concord*, No. C-06-03737 JCS, 2007 WL 2253401, at *23 (N.D. Cal. Aug. 2, 2007)

3    (Plaintiff's three arrests over four years, plus two prior complaints of excessive force against the

4    arresting officers, was insufficient as a matter of law to constitute a "persistent and widespread

5    practice" of constitutional violations.).

6         Third, even though experts may opine that better policies and practices could have been

7    adopted, such a "best practices" standard does not implicate deliberate indifference. *See Estate of*

8    *Abdollahi v. Cty. of Sacramento*, 405 F. Supp. 2d 1194, 1209 (E.D. Cal. 2005) (Expert Richard

9    Hayward's declaration describing better policies and practices the county could have adopted to

10   prevent inmate suicides "is insufficient to substantiate an allegation of deliberate indifference.").

11        3. *The Lack of a Policy Not the Moving Force.* To be the "moving force" behind the

12   alleged constitutional violation, the "identified deficiency" in the County's policies must be "closely

13   related to the ultimate injury." *Canton,* 489 U.S. at 391. Plaintiff thus bears the burden of establishing

14   that the injury would have been avoided if the County had more or better policies as he suggests.

15   *See Gibson v. Cty. of Washoe, Nev.*, 290 F.3d 1175, 1196 (9th Cir. 2002), *overruled on other grounds*

16   *by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

17        In light of the fact that there is no evidence to show that Neuroth died from the use of force

18   against him (*see* Section IV.F, below), any deficiencies in the County's use of force policies or

19   customs is unrelated to Neuroth's death. Further, Plaintiff's claim that language in policies saying

20   inmates should not be asphyxiated would have prevented Neuroth's death is simply insufficient for §

21   1983 purposes. *See Flores*, 758 F.3d at 1160.

22        **D.   Correctional Deputy Training and Supervision Were Constitutionally Sufficient**

23        Plaintiff's police expert, Mr. Ryan, opines that the County failed to train and supervise the

24   Deputies properly, especially with respect to avoiding asphyxia. (Ryan Report ¶¶ 234, 238-9.)

25   Plaintiff's claims based on a failure to properly train and supervise correctional deputies requires him

26   to show that: (1) Neuroth was deprived of a constitutional right; (2) the County had a training policy

27   that amounts to deliberate indifference to the constitutional rights of the persons' with whom its

28   correctional deputies are likely to come into contact; and (3) his constitutional injury would have

1    been avoided had the County properly trained those deputies. *See Blankenhorn v. City of Orange*, 485

2    F.3d 463, 484 (9th Cir. 2007).[12] To satisfy the deliberate indifference standard with respect to a

3    failure to train, evidence of the failure to train the few officers involved in the incident is insufficient;

4    instead, Plaintiff must prove a "program-wide inadequacy in training" to implicate municipal liability

5    under § 1983. *See Id.,* at 484–85. Further, Plaintiff must prove the County had prior notice of the

6    allegedly defective training program by showing a "[a] pattern of similar constitutional violations by

7    untrained employees." *Connick,* 563 U.S. at 62.

8            1. *No Constitutional Deprivation*. Indisputable evidence demonstrates that all of the

9    involved Deputies received adequate training on uses of force and medical/mental health issues in the

10   jail, including but not limited to directions on how to prevent breathing impediments. (Studer Dec. ¶

11   8.) In fact, the California Board of State and Community Corrections' division on Standards and

12   Training for Corrections ("STC") certified that the Sheriff's Office's training programs for

13   correctional deputies were legally compliant during all relevant times. (Studer Dec. ¶ 12, Exh. B;

14   Pearce Dec., Exhs. N and O.) There is no support for Plaintiff's claim that some other or different

15   training program or supervision was constitutionally required. (Vare Report pp. 30-2; Peters Report

16   pp. 8-9; Peters Supp. Report pp. 5-6.) Similarly, Deputies were properly supervised according to

17   Sheriff's Office and STC standards. (Pearce Dec. ¶ 17; Studer Dec. ¶ 12, Exh A.)

18           Mr. Ryan's opinions regarding training are improperly based solely on his review of the

19   individual Deputies' training files, not the "training program" of the Jail.[13] *See Blankenhorn,* 485

20   F.3d at 484–85. Hence, his conclusory opinions are insufficient to defeat summary judgment, as they

21   are not based on any facts which could demonstrate a specific training program or supervision

22   deficiency.[14]

---

23   [12] These same *Monell* factors apply to claims based on both inadequate training and inadequate
     supervision. *See Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989) *abrogated on other*

24   *grounds by Beck v. City of Upland,* 527 F.3d 853 (9th Cir. 2008).
     [13] Plaintiff declined to obtain discovery on the Jail's training program for all correctional deputies,

25   thereby preventing him from providing such information to his experts. (*See* Studer Dec., ¶ 3.)
     [14] In fact, courts have repeatedly rejected Mr. Ryan's baseless opinions that law enforcement

26   agencies have failed to train and supervise their staff because no factual information supported them.
     *See Harmon v. Cty. of Sacramento*, No. 2:12-CV-02758 TLN, 2016 WL 319232, at *20 (E.D. Cal.

27   Jan. 27, 2016) (The information Mr. Ryan "provided are conclusions about the officers' training
     without any factual information as to how this training is deficient," which is insufficient to defeat a

28   summary judgment motion.); *see also Hickey v. City of New York*, No. 01 CIV. 6506 (GEL), 2004
     WL 2724079, at *21 (S.D.N.Y. Nov. 29, 2004), *aff'd,* 173 F. App'x 893 (2d Cir. 2006) (Mr. Ryan's

1     2.  *No Deliberate Indifference*. Even if the particular Deputies were not trained to Mr.

2  Ryan's unidentifiable standards, there is no evidence to show the County "was faced with a pattern of

3  similar constitutional violations by untrained employees" that would put it "on notice that a course of

4  training was deficient in a particular respect." *Flores*, 758 F.3d at 1159 (citing *Connick*, 563 U.S. at

5  62). *Flores* presents an analogous situation, as the Ninth Circuit found there was no *Monell* liability

6  for failure to train or supervise deputies to prevent sexual assault because there was no "a pattern of

7  similar constitutional violations by untrained employees." *Id.*; *see also Anderson v. Warner*, 451 F.3d

8  1063, 1070 (9th Cir. 2006) (Evidence solely relating to subject officer was insufficient to show "that

9  the County's asserted deficiencies in hiring, training and supervision, if any," amounted to a policy of

10  deliberate indifference.). Hence, *even if* there was a "shortfall" in the individual Deputies' trainings,

11  that "can only be classified as negligence on the part of the municipal defendant – a much lower

12  standard of fault than deliberate indifference." *Blankenhorn*, 485 F.3d at 484–85.

13     3.  *No Causation.* Nor can Plaintiff establish that lack of training or supervision caused

14  the ultimate and unfortunate injury in this case. As demonstrated in Section III.F, below, Plaintiff's §

15  1983 claims lack the necessary causation to connect the alleged violation to the injury.

16  **E.     No *Monell* Liability Based on Ratification**

17     For § 1983 liability to attach to the County based on a ratification theory, Plaintiff must show

18  that the "authorized policymakers approved a subordinate's decision and the basis for it." *City of St.*

19  *Louis v. Praprotnik,* 485 U.S. at 127. Neither the mere failure to overrule a subordinate's actions, nor

20  the mere knowledge of an unconstitutional action, by themselves can constitute ratification. *Christie*

21  *v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999). Instead, the "policymaker must have knowledge of the

22  constitutional violation and actually approve of it." *Lytle v. Carl,* 382 F.3d 978, 987 (9th Cir. 2004).

23  This requires that the policymaker must have previously known about similar conduct yet failed to

24  take action to prevent the plaintiff's injury. *See Watkins v. City of Oakland, Cal.*, 145 F.3d 1087,

25  1093-1094 (9th Cir. 1998). Hence, a policymaker's liability under § 1983 cannot be established under

26  a theory of ratification if he first learned of the event after it occurred and after he could have acted to

---

27  "report reveals nothing about what kinds of training officers may or may not have received with
28  respect to plaintiffs' other claims; instead, the expert merely extrapolates from his analysis of the
   events that such events could have been avoided if proper training had been provided," and such
   "conclusory allegations" are insufficient to defeat summary judgment.).

prevent injury to the plaintiff. *See Gillette v. Delmore,* 979 F.2d 1342, 1348 (9th Cir.1992).

Plaintiff's ratification theory is expected to be based on his expert Mr. Ryan's opinions that County policymakers knew and approved of the conduct of the Deputies, failed to discipline them, failed to institute new procedures and policies, and failed to properly investigate the incident. The 4AC makes these same allegations against the County as well as Sheriff Allman and Captain Pearce in their individual capacities. (4AC ¶¶ 114, 111.(l), 123-4.) Plaintiff cannot, however, succeed on his ratification claims, for the following reasons.

1.  *Knowledge and Approval of Conduct Insufficient*. The County and its policymakers' knowledge of Neuroth's incident is insufficient to implicate ratification of any allegedly unconstitutional acts. *See Weisbuch v. Cty. of Los Angeles*, 119 F.3d 778, 781 (9th Cir. 1997) (A policymaker's "knowledge of an unconstitutional act does not, by itself, constitute ratification."). Indeed, for § 1983 liability to attach, "[r]atification … generally requires more than acquiescence." *Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014), *rev'd on other grounds*, 135 S. Ct. 1765 (2015); *see also Rascon v. Brookins*, No. CV-14-00749-PHX-JJT, 2018 WL 783675, at *19 (D. Ariz. Feb. 8, 2018) (Policymakers' knowledge, acquiescence, and failure to discipline are insufficient to support a ratification theory under *Monell*.). Further, policymakers' statements in defending in civil rights actions, approving of their subordinates' conduct, is insufficient to establish ratification. *See Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 395 (5th Cir. 2017) ("[G]ood faith statements made while defending complaints of constitutional violations by municipal employees do not demonstrate ratification.").

2.  *No Prior Notice*. There is no evidence that incidents similar to Neuroth's have ever occurred in the Mendocino County Jail, let alone a similar "pattern of misconduct," to put the County on prior notice that it had to take action to prevent future constitutional violations. (Pearce Dec. ¶ 20.)

3.  *Failure to Discipline Insufficient*. Failure to discipline officers for their conduct in the incident is insufficient to support *Monell* liability. *See Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1189 (D. Haw. 2003) (A single failure to discipline a subordinate is insufficient by itself to establish either a policy or ratification.); *see also Lytle v. Carl*, 382 F.3d at 987 (A mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim.).

1        4. *Investigations were Proper*. To the extent Plaintiff is alleging a constitutional claim

2   based on a failure to investigate, that claim fails as a matter of law.[15] If Plaintiff is instead arguing

3   that Neuroth's constitutional rights were violated due to an inherent conflict of interest in combining

4   the offices of the Sheriff and Coroner – which thus precluded the Coroner's Office from conducting

5   an impartial investigation into Neuroth's cause and manner of death – such a claim is untenable in

6   light of the fact that 41 out of the 58 counties in California have combined offices similar to

7   Mendocino County's.[16] Hence, while a ratification theory of liability may lie when law enforcement

8   officials conduct "an obviously flawed investigation" of an incident involving use of force [*Rascon*,

9   2018 WL 783675, at *20 (citation omitted)], no such facts are present in the instant case. Mr. Ryan's

10  conclusory opinions about an investigation on a single incident are simply insufficient to defeat

11  summary judgment on this claim. *See Hickey,* 2004 WL 2724079, at *21 (Mr. Ryan's conclusion that

12  the investigations of the ADAs and the NYPD into this incident were inadequate and biased are

13  insufficient to support *Monell* claim because "failure to investigate a single incident without more

14  does not create a genuine issue of material fact as to whether such conduct has become an 'accepted

15  custom or practice."); *see also Rose*, 163 F. Supp. 3d at 796 (Mr. Ryan's opinion that the Internal

16  Affairs unit's failure to investigate uses of force "constitutes an overall failure to investigate, is

17  simply not supported by the record."). Moreover, Mr. Ryan's opinion that the Sheriff's Office failed

18  to conduct a policy review of the incident is contrary to the facts, which demonstrate that Captain

19  Pearce conducted an appropriate administrative review. (Pearce Dec. ¶ 13; Peters Supp Report p. 7.)

20       5. *Policy Changes.* Plaintiff alleges that the County, Sheriff Allman, and Captain

21  Pearce ratified the conduct of the Deputies by failing to "institute new procedures and policy." (4AC

---

[15] Neuroth did not have a constitutional right to require an investigation because he was not subject to criminal prosecution and had no civil rights after his death. *See Smith v. Almada*, 640 F.3d 931, 939 (9th Cir. 2011) (The Fourteenth Amendment, as interpreted by *Brady* and its progeny, requires prosecutors and police to investigate and disclose exculpatory evidence to criminal defendants during a criminal case, but no violation occurs unless the defendant was prejudiced through a verdict of guilt after trial.); *see also Estate of Cartwright v. Concord*, 618 F. Supp. 722, 730 (N.D. Cal. 985), *aff'd*, 856 F.2d 1437 (9th Cir.1988)("the civil rights of a person cannot be violated after death, and therefore the scope of an investigation after death is not actionable."); *see also Rose v. Cty. of Sacramento*, 163 F. Supp. 3d 787, 796 (E.D. Cal. 2016) (Even the most thorough investigation of a death case would not have prevented the alleged constitutional violations, and thus "Plaintiffs cannot claim that Defendants' failure to investigate Johnathan's death was 'the moving force behind violations suffered by Johnathan.'").
[16] See http://www.counties.org/county-office/sheriff-coroner.

1  ¶¶ 114, 124.) Not only is this allegation undermined by the facts demonstrating changes to jail policy

2  in the wake of the incident [Pearce Dec. ¶ 19], but it is also insufficient to support a *Monell* claim

3  based on a ratification theory. *See Gonzalez v. Cty. of Merced*, 289 F. Supp. 3d 1094, 1115 (E.D. Cal.

4  2017); *see also Mejia v. City of Sacramento*, 177 F. App'x 661, 665 (9th Cir. 2006) (Evidence of

5  "post-event deliberate indifference," standing alone, is insufficient to establish a pattern and practice

6  of constitutional violations under *Monell*.).

7     **F.    Correctional Deputies Did Not Cause Neuroth's Injuries or Death**

8     Plaintiff lacks any evidence demonstrating that the actions of Correctional Deputies

9  proximately caused Mr. Neuroth's death by asphyxiation. The forensic pathologist who conducted the

10 autopsy for the Coroner's Office, Dr. Jay Chapman, concluded that there was no evidence that

11 asphyxia played a role in the death, and that the lethal amount of methamphetamine, when combined

12 with Neuroth's extended struggling against the Deputies, caused his death. (Chapman Dec. ¶ 9.)

13 Other experts concur. (Kan Report pp. 11-12; Kan Supp. Report pp. 4-5; Vilke Report pp. 7-9.)

14     Plaintiff's forensic pathologist Dr. Michael Baden contradicted Dr. Chapman and instead

15 opined that Neuroth's methamphetamine level was not lethal, and that he died of restraint asphyxia

16 which caused fatal respiratory arrest. (Baden Report p. 9.) However, at his deposition, Dr. Baden

17 undermined his own conclusions in two ways. First, he admitted that he had made a mistake in

18 calculating Neuroth's level of methamphetamine, and that the level in his system was "within a lethal

19 level." (Baden TR at 164.) Second, Dr. Baden provided testimony indicating that Neuroth could not

20 have died of asphyxia. Specifically, he stated that asphyxia required the Deputies to have placed

21 weight on Neuroth's *back* (not arms or legs) for more than 45 seconds to cause him to lose

22 consciousness, which must have occurred prior to the Deputies leaving the Safety Cell. (TR 142, 172-

23 3, 175.) Further, Dr. Baden opined that Neuroth's heart would have stopped beating about 5 to 10

24 minutes after he lost consciousness. (Baden TR 178-9.) However, the EKG printout from the

25 Automated Defibrillator Device ("AED"), which Deputies applied to Neuroth more than 15 minutes

26 later, showed that he still had a recognizable heart rhythm at that time. (*See* Pearce Exh. T.) Plaintiff

27 had not provided Dr. Baden with that EKG report, and when it was presented to him at his deposition,

28 he stated that he did "not feel competent to be discussing this EKG," or any part of it. (Baden TR at

190.) Hence, Dr. Baden was not competent to review the very information which demonstrated that Neuroth could not have been asphyxiated by the Deputies (based on his own testimony that Neuroth's heart must have stopped earlier). County Defendants' expert, Dr. Vilke confirms that "by virtue of the fact that Neuroth had an agonal rhythm 15 minutes later implied that his cardiac arrest was not due to asphyxiation, but rather from a primary cardiac event that would have persisted longer and solely degenerated into the agonal rhythm that [Deputies] found in Neuroth." (Vilke Report p. 8.)

Further, to reach his cause of death conclusion, Dr. Baden ignored undisputed evidence demonstrating that Neuroth was still talking just prior to the time the Deputies left the Safety Cell, and therefore could not possibly have lost consciousness beforehand. (Baden TR 142-9.)[17] Dr. Baden also admitted that being in a prone position was not enough to cause compression asphyxia, as weight on the neck or back was required, but that he could not see any of the Deputies placing weight on Neuroth's back long enough for him to lose consciousness. (Baden TR 172, 176-7, 180.) The Deputies are all consistent in their testimony that they did not place weight on Neuroth's back for any appreciable amount of time, and never placed weight on his neck.[18] Accordingly, Dr. Baden's conclusory and baseless opinions are insufficient to create a genuine issue of material fact for trial. *See Burdine v. Sandusky Cty., Ohio*, 524 F. App'x 164, 169 (6th Cir. 2013) (Dr. Baden's opinion that the decedent had died of severe neck compression was contrary to all eyewitness testimony indicating the decedent "was conscious, breathing and speaking [etc.]" at the relevant time, and thus his report "does not create a genuine issue of material fact" sufficient to defeat summary judgment.).

## IV.   THE SUPERVISOR DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS BROUGHT UNDER 42 U.S.C. § 1983

Plaintiff's 3rd Cause of Action for supervisor liability against Sheriff Allman and Captain Pearce in their personal capacities is based on their positions as supervisors, not their participation in the incident. Sheriff's Office supervisors may be held liable under § 1983 if they were "personally

---

[17] In fact, Dr. Baden basically admitted that he made credibility findings with respect to Sgt. Knapp and other Deputies' testimony, which is unjustifiable and renders his report non-probative. *See United States v. Binder*, 769 F.2d 595, 602 (9th Cir. 1985), *overruled on other grounds by United States v. Morales*, 108 F.3d 1031, 1035 n.1 (9th Cir. 1997) (en banc) (Expert witnesses should not be permitted on a "subject improper for expert testimony, for example, one that invades the province of the jury," such as the reliability of eyewitness testimony.).

[18] *See* Declarations of Deputies Masterson, Bernardi, Grant, Holum, Page, De Los Santos, and Knapp.

1  involved in the constitutional deprivation or a sufficient causal connection exists between [their]

2  unlawful conduct and the constitutional violation." *Lemire v. California Dep't of Corr. & Rehab.*, 726

3  F.3d 1062, 1085 (9th Cir. 2013). Yet, there is no evidence produced in this case which could show

4  that either Sheriff Allman or Captain Pearce had prior notice that their subordinates were not

5  complying with the law or policy, or had reason to know of a lapse in training leading to

6  constitutional violations. (Pearce Dec., ¶ 20.) The Ninth Circuit has affirmed summary judgment to

7  supervisors under similar circumstances. *Id.*

8      Moreover, Plaintiff's allegations in this claim are based largely on the same allegations set out

9  in his *Monell* claim against the County. Accordingly, the *Monell* arguments apply equally with

10  respect to the supervisorial liability claims against these public officials. However, unlike the *Monell*

11  claims against the County, both Sheriff Allman and Captain Pearce are entitled to invoke the doctrine

12  of qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Put bluntly, there was no

13  "clearly established law" at the time of the incident which could have warned these officials that they

14  needed to take more or different supervisory actions, which renders Plaintiff's claims unsupportable.

15  **V.    THE CORRECTIONAL DEPUTIES ARE ENTITLED TO SUMMARY JUDGMENT**
        **ON ALL § 1983 CLAIMS BASED ON THEIR QUALIFIED IMMUNITY**
16

17      This Court is well familiar with the defense of qualified immunity available to government

18  actors. *See e.g., Petrolino*, 2017 WL 67072, at *2-3. The qualified immunity analysis requires

19  consideration of two factors: (1) whether, viewing the facts in the light most favorable to Plaintiff, the

20  government actors violated Neuroth's constitutional rights; and (2) whether these constitutional rights

21  were "clearly established" at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see*

22  *also Pearson*, 555 U.S. at 236 (order of considering factors is discretionary).

23      In deciding whether a constitutional right was "clearly established" at the time of the alleged

24  violation, a court must determine "whether the violative nature *of particular conduct* is clearly

25  established." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (emphasis added). This inquiry "must be

26  undertaken in the light of the *specific context* of the case, not as a broad general proposition."

27  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier*, 533 U.S. at 201) (emphasis added,

28  quotation marks omitted). The contours of the right must have been "clearly established in a more

particularized" sense, such that "a reasonable official would understand that what he is doing violates

that right." *Id.*, at 198-9. Thus, to deny qualified immunity, courts must "identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated" a constitutional right. *White v. Pauly*, 137 S. Ct. 548, 552 (2017). Cases with "dissimilar" facts fail to meet the "clearly established" standard. *Sharp v. Cty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017).

When the underlying facts are undisputed, "the existence of a genuine dispute about the reasonableness of an officer's use of force does not preclude granting qualified immunity or eliminate any basis for an immediate appeal of denial of qualified immunity." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 945 (9th Cir. 2017).

### A.     Plaintiff's Fourteenth Amendment § 1983 Claims for Deliberate Indifference to Medical/Mental Health Needs Not "Clearly Established" and Was Not Violated

A person deprives another "of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that *causes* the deprivation of which [the plaintiff complains]." *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir.1978) (emphasis added). The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation. *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

The CAV and supporting evidence demonstrates that Plaintiff's allegations in the 4AC regarding failure to provide medical care are unsupportable against any of the Correctional Deputies. *See Williams v. City of Las Vegas*, 34 F. App'x 297, 299 (9th Cir. 2002) (Court's review of videotape demonstrated that use of force by correctional officer was not excessive given William's uncooperative behavior.). The relevant issues are briefly discussed below.

### 1.     Actions Did Not Violate "Clearly Established" Law

The Ninth Circuit has explained that "prior to our decision in *Castro* [in 2016], all conditions of confinement claims, including claims for inadequate medical care, were analyzed under a subjective deliberate indifference standard whether brought by a convicted prisoner under the Eighth Amendment or pretrial detainee under the Fourteenth Amendment." *Gordon*, 888 F.3d at 1122. Under that standard, a correctional official was not liable for § 1983 claims based on failure to provide medical care "unless the official knows of and disregards an excessive risk to inmate health

1    or safety; the official must both be aware of facts from which the inference could be drawn that a

2    substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511

3    U.S. 825, 837 (1994). Since the Neuroth event occurred in 2014, this is the applicable standard for

4    purposes of determining whether the Deputies violated "clearly established" law.

5         A review of the Correctional Deputies' declarations and the CAV demonstrates that they were

6    not deliberately indifferent to Neuroth's medical needs with respect to any of Plaintiff's claims

7    against them, as discussed below.

8         a. *Admitting Neuroth to the Jail*. Plaintiff's expert opines that the jail intake Deputies

9    Bernardi and Masterson should have turned Neuroth away at the door and directed him to be sent to a

10   hospital. (Hayward Report p. 8.) This conduct did not violate clearly established law. *See Petrolino*,

11   2016 WL 6160181, at *3; *see also* Section IV.A, above.

12        b. *Summoning and Providing Medical Care*. Well-established law demonstrates that

13   the Correctional Deputies satisfied their constitutional duties to Neuroth by ensuring that LVN

14   Caudillo medically assessed him prior to placing him in the Sobering Cell, and was present

15   throughout the struggle in the Safety Cell. *See Maddox v. City of Los Angeles,* 792 F.2d 1408, 1415

16   (9th Cir. 1986) ("Due process requires that police officers seek the necessary medical attention for a

17   detainee when he or she has been injured while being apprehended by either promptly summoning the

18   necessary medical help or by taking the injured detainee to a hospital."). The Deputies could

19   reasonably rely on LVN Caudillo to assess Neuroth's medical needs throughout the incident and

20   thereafter. *See Lemire*, 726 F.3d at 1084 (Correctional officers were not deliberately indifferent

21   because they "reasonably relied on the expertise of the prison's medical staff.").

22        In fact, there is no evidence suggesting that the Correctional Deputies should have questioned

23   LVN Caudillo's actions or inactions, or that they should have known that Neuroth's ingestion of

24   methamphetamine required immediate medical care, because: Neuroth had walked into the Jail on his

25   own power; was originally cooperative and communicating with the Deputies; was vigorously

26   resisting the Deputies; and showed no obvious signs that he was in medical distress until the Deputies

27   found him unresponsive. The law at the time of the incident did not indicate such factors could lead to

28   deliberate indifference. *See Martinez v. Beggs*, 563 F.3d 1082, 1091 (10th Cir. 2009) (Correctional

1    officers were not deliberately indifferent to inmate who died with a blood alcohol level of 0.32%,

2    because inmate "was not unconscious and showed no obvious symptoms indicating a risk of serious

3    harm," and there was no evidence to indicate that he "exhibited symptoms that would predict his

4    imminent heart attack or death."). This well-established law demonstrates the Deputies are entitled to

5    qualified immunity on Plaintiff's medical deliberate indifference claims.

6              **2.       No Violation of the Fourteenth Amendment**

7             The record demonstrates the Deputies were not deliberately indifferent to Neuroth's medical

8    or mental health needs based on the four-factor *Gordon* standard:

9                      a.   *Correctional Deputies made intentional decisions with respect to the*

10   *conditions under which Neuroth was confined*. Initially, Deputies Bernardi and Masterson

11   appropriately placed Neuroth in a Sobering Cell due to his methamphetamine intoxication (so he

12   could be monitored by jail staff). (Bernardi Dec. ¶ 10; Masterson Dec. ¶ 9.) When Neuroth shifted

13   from being compliant to combative, the Deputies appropriately placed Neuroth in a Safety Cell to

14   prevent him from injuring himself. (Knapp Dec. ¶ 11.) Deputies used only that force against Neuroth

15   which was reasonably necessary to prevent him from hurting himself and them, and to allow them to

16   remove his restraints. (Masterson Dec. ¶ 28.) When Neuroth made the statement indicating a desire to

17   die, Sgt. Knapp appropriately ordered him to be placed in a Safety Smock for his own protection, and

18   Deputies used the least amount of force necessary to remove Neuroth's clothes and provide him with

19   a Safety Smock. (Grant Dec. ¶ 16; De Los Santos Dec. ¶ 16.)

20                     b.   *The conditions under which Neuroth was confined did not put him at*

21   *substantial risk of suffering serious harm*. Plaintiff's expert, Dr. Hayward, opined that the Deputies

22   acted appropriately in placing Neuroth in the Safety Cell, as it was the safest place for him. (Hayward

23   Depo. TR p. 185.) Dr. Hayward opined that the Deputies should not have struggled with Neuroth for

24   so long, while they waited for a Safety Smock and removed his clothes, and that they should instead

25   have simply backed away and waited for him to calm down. (Hayward Report p. 11.) Dr. Hayward's

26   suggestion, however, is not supported by any case law and is contrary to generally-accepted jail

27   standards. (Vare Report pp. 29-30.)

28                     c.   *The Correctional Deputies took reasonable available measures to abate the*

1    *risk of injury in several ways, and a reasonable officer would not have appreciated the risk of*

2    *Nueroth's death.* The undisputed facts demonstrate the following: the Deputies ensured LVN

3    Caudillo was present to provide an initial medical intake assessment of Neuroth and she did so

4    [Caudillo TR 150-1, 156-7, 161]; LVN Caudillo did not direct Neuroth to be refused admittance to

5    the jail because neither his vitals nor appearance raised a red flag [*Id.*, at 176-7]; LVN Caudillo

6    observed Neuroth's behavior throughout the encounter for the purpose of determining if medical aid

7    was necessary [*Id.*, at 212, 224-5]; all witnesses believed that Neuroth was alive when the deputies

8    left the Safety Cell [*see e.g.,* Knapp Dec. ¶ 34; Page Dec. ¶ 24; De Los Santos Dec. ¶ 19]; when jail

9    staff checked on him 7 minutes later, LVN Caudillo believed that Neuroth may no longer be

10   breathing, and the Deputies went back into the cell to check on him; upon discovering that Neuroth

11   was blue around the mouth and not breathing, Deputies immediately started life saving measures,

12   including CPR and use of an AED machine.[19] Such actions are constitutionally sufficient. *See Tatum*

13   *v. City & Cty. of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006) (In a Fourth Amendment case,

14   the Court found "the officers promptly requested medical assistance, and the Constitution required

15   them to do no more."). Indeed, the Deputies could only react to Neuroth's bizarre behavior, and

16   though he displayed a dramatic shift from compliance to combativeness, there was nothing to indicate

17   that he required emergency medical care prior finding him unresponsive. *See Gibson,* 290 F.3d at

18   1197 (Even though inmate had "dramatic shifts from combativeness to compliance," deputies were

19   not deliberately indifferent because they had no reason to know that the inmate had a treatable

20   mentally illness.).

21          Further, Plaintiff's expert agrees that the seven-minute period between leaving Neuroth in the

22   Safety Cell and checking on him was compliant with all applicable laws. (Hayward Depo. TR p. 200-

23   1.) The fact that the Deputies did not identify Neuroth's lack of respiration earlier does not indicate

24   that they were deliberately indifferent to his medical needs. *See Estate of Phillips v. City of*

25   *Milwaukee*, 123 F.3d 586, 595 (7th Cir. 1997) ("That no one noticed that Phillips was not getting

26   enough oxygen cannot, standing alone, transform these officers' actions into a transgression of

27   constitutional magnitude."). Moreover, no expert takes exception to the lifesaving efforts the

28   _____

[19] *See* Caudillo TR at 230; Masterson Dec. ¶ 25; Grant Dec. ¶ 20; Knapp Dec. ¶ 45.

1    Deputies performed, and the CAV shows their thorough and earnest efforts to save his life, which

2    demonstrates their lack of deliberate indifference. *See Rascon*, 2018 WL 783675, at *15, fn 6

3    (Officers' lifesaving actions demonstrated that they were not deliberately indifferent.).

4              d. *Correctional Deputies' failure to take such measures did not "cause"*

5    *Neuroth's injuries.* Plaintiff's inability to prove causation is addressed in Section IV.F, above.

6    **B.     Plaintiff's Fourteenth Amendment § 1983 Claims for Use of Excessive Force and
         Restraints Was Not "Clearly Established" and Was Not Violated**

7

8    Plaintiff's excessive force claims for Neuroth, a pretrial detainee, are governed by the

9    Fourteenth Amendment and the *Kingsley* standards. (*See* Section II.B, above.) The Fourteenth

10   Amendment protects against the arbitrary exercise of government power which is so egregious that it

11   "shocks the conscience." *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 845–46, 851–53 (1998).

12   Plaintiff's police practices expert Mr. Ryan criticized the actions of several Correctional

13   Deputies and called them excessive, but he provided no foundation for his opinions aside from his

14   own interpretation of general standards, his training and experience. (*See* e.g. Ryan Report ¶ 227.)

15   Under such circumstances, his opinions are insufficient to defeat summary judgment. *See Burns v.*

16   *City of Redwood City*, 737 F. Supp. 2d 1047, 1061 (N.D. Cal. 2010), *abrogated on other grounds by*

17   *Cty. of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539 (2017) ("Usually, a plaintiff must do more than

18   present an expert's opinion that a particular tactic is per se unreasonable (otherwise, testimony of

19   plaintiff's expert would always decide the constitutional question).").

20   **1.     Actions Did Not Violate "Clearly Established" Law**

21   Contrary to Plaintiff's allegations and proffered expert opinions, the Deputies' conduct in

22   controlling Neuroth, who resisted and struggled against them throughout the incident, was reasonable

23   and did not violate clearly established law at the time of the 2014 incident, as follows.

24             a. *Use of Force and Restraints*. From the outset of this case, Plaintiff has

25   argued that the Ninth Circuit's decision in *Drummond ex rel. Drummond v. City of Anaheim*, 343

26   F.3d 1052 (9th Cir. 2003) presents the relevant legal standards applicable to the Deputies' actions in

27   this case. (4AC ¶ 62.) However, Plaintiff's reliance on *Drummond* is misplaced for three reasons.

28   First, *Drummond* involved an altercation on the street between police officers and a mentally

ill person who had not committed any crime. The *specific context* of the *Drummond* incident is

1    therefore dissimilar from the instant case, which involved an encounter with Neuroth within the

2    confines of the jail after he had been arrested for being high on methamphetamine. *See Brosseau*, 543

3    U.S. at 198; *see also Petrolino*, 2017 WL 67072, at *3.

4           Second, uses of force in a correctional setting require application of the *Kingsley* Fourteenth

5    Amendment standards, not the *Graham* Fourth Amendment standards applied in *Drummond*. (*See*

6    Section II.B, above.) Indeed, *Graham*'s Fourth Amendment standards are largely inapplicable to

7    determine the reasonableness of uses of force in a jail. *See Gibson*, 290 F.3d at 1197 & n. 21. "It is

8    also clear that the *Graham* factors do not adequately take into consideration the governmental

9    interests at stake when resistance occurs in a custodial setting." *Cotton v. Cty. of Santa Barbara*, 286

10   F. App'x 402, 406 (9th Cir. 2008) (J. Tallman, dissenting). Hence, reasonable uses of force in the

11   field may be unreasonable in a jail, and vice versa. (Vare Report p. 16; Peters Supp. Report p. 5.) This

12   renders *Drummond,* as well as more similar cases finding no excessive force by police in the field

13   [such as *Gregory v. Cty. of Maui*, 523 F.3d 1103 (9th Cir. 2008)], inapplicable to the circumstances of

14   the instant case.

15          Third, even if *Drummond* could be applied to the use of force in a jail setting,[20] the facts

16   presented in *Drummond* are not sufficiently similar to the instant case to have provided fair notice to

17   the Deputies that their actions violated "clearly established" law. Specifically, the factors the Ninth

18   Circuit emphasized in *Drummond* include: (a) no underlying crime was "at issue"; (b) after he was

19   handcuffed in a prone position, Drummond never resisted the officers; (c) one officer put his knees

20   and body weight into Drummond's back; (d) another officer put his knees and body weight on his

21   neck; (e) Drummond repeatedly told the officers that he could not breathe and that they were choking

22   him; and (f) it was obvious to witnesses that the officers were causing Drummond to have trouble

23   breathing, but officers "were laughing during the course of these events." *Drummond*, 343 F.3d at

24   1054, 1055, and 1059.[21]

25   _____

     [20] County Defendants can find no published Ninth Circuit decision applying *Drummond* to a use of
26   force in a correctional setting, though some unpublished opinions do so without any analysis of that
     issue. *See e.g.*, *Zelaya v. Las Vegas Metro. Police Dep't*, 682 F. App'x 565, 566–67 (9th Cir. 2017).
     [21] Per *Arce v. Blackwell*, 294 F. App'x 259, 261 (9th Cir. 2008), "*Drummond* articulated the
27   parameters of reasonableness that the officers' conduct breached: 'The officers allegedly crushed
     Drummond against the ground by pressing their weight on his neck and torso, and continuing to do
28   so despite his repeated cries for air, and despite the fact that his hands were cuffed behind his back
     and he was offering no resistance.'" Recent District Court decisions interpreting *Drummond* are not

1    None of these factors are present in the instant case, rendering *Drummond* inapplicable,

2 because Neuroth was arrested for being under the influence of methamphetamine and brought to the

3 jail; he resisted the efforts of Deputies to control him throughout the incident; Neuroth assaulted

4 Deputy Grant twice while he was prone and restrained; no Deputy placed appreciable weight on

5 Neuroth's back for more than 5 seconds; Neuroth never said that he could not breathe;[22] none of the

6 witnesses thought Neuroth was having breathing problems; the encounter was lengthened due to

7 Deputies' belief that he made a statement indicating a suicidal intent, which led them to remove his

8 clothing and provide him with a Safety Smock to protect him; and none of the Deputies laughed or

9 otherwise treated Neuroth callously or uncaringly, but rather repeatedly told him to calm down, relax,

10 and that they were trying to keep him and themselves safe. The *Drummond* Court itself distinguished

11 cases with facts similar to the Neuroth incident on the ground that such factors were dispositive.[23] *See*

12 *also Abbey v. City of Reno*, 690 F. App'x 538, 539 (9th Cir. 2017) (Distinguishing *Drummond* on the

13 ground that Drummond had "offered no resistance after being handcuffed.").

14    There is no clearly established law that would have put the Deputies on notice that their

15 actions would have violated the constitution.[24] To the contrary, the most on-point case demonstrates

16 that the Deputies' actions were objectively reasonable. *See Gibson,* 290 F.3d at 1198. The facts in

17 *Gibson* show that Gibson, who was mentally ill, was arrested and carried into the jail while he

18 repeatedly called out "Help me, Jesus." *Id.*, at 1182. Before moving Gibson from a holding cell to a

19 consistent with this standard because they state the issue too broadly for qualified immunity
20 purposes. *See Garlick v. Cty. of Kern*, 167 F. Supp. 3d 1117, 1155 (E.D. Cal. 2016); *see also Greer v. City of Hayward*, 229 F. Supp. 3d 1091, 1104 (N.D. Cal. 2017).

21 [22] Though Neuroth at one point says that he was dizzy and said "Let me breathe," even Plaintiff's expert Dr. Baden agreed that methamphetamine causes dizziness, and Neuroth continued talking for several minutes more without making a similar comment. (Baden Depo. TR pp. 200-202.)

22 [23] The *Drummond* Court emphasized that previous cases regarding relatively similar incidents, such
23 as *Price v. County of San Diego,* 990 F. Supp. 1230 (S.D. Cal.1998), were distinguishable because the pressure the officers applied to Drummond's neck and back was for a more substantial period of
24 time, there was no need for such pressure because Drummond was not resisting, and Drummond informed the officers of his respiratory distress because he repeatedly told them he could not
25 breathe. *Drummond*, 343 F.3d at 1061, fn 7; All of these distinguishing factors are also present in the instant case. Moreover, *Drummond* did not cite to or even mention *Gibson*, even though *Gibson* had
26 been published about a year earlier, demonstrating that different standards apply to officers' conduct in the street versus the jail.

27 [24] *See Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) ("Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use
28 unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness.").

special watch cell, deputies pepper sprayed him and he started screaming, at which time three officers
held Gibson down, while more deputies came to help move Gibson to the other cell. *Id.*, at 1182-3.
When they reached that cell, deputies placed Gibson face down on a bench, at which time two
deputies "climbed onto his back and legs, while the other deputies helped restrain his arms and legs."
*Id.*, at 1183. Gibson continued to struggle against the deputies with a great deal of strength despite the
number of deputies on top of him. At some point, deputies noticed that something was wrong, called
to get a pulse, and started administering CPR. Gibson was taken to the hospital but never revived. *Id.*
Based on these facts, the Ninth Circuit concluded the deputies could not be held liable for use of
excessive force because they did not know about Gibson's treatable mental illness, were permitted to
respond with force to Gibson's strange and aggressive conduct, and because "the deputies' decisions
under these difficult circumstances resulted in restraining Gibson no more forcefully than was
reasonably necessary." *Id.*, at 1198. While there are a few dissimilarities between *Gibson* and the
instant case (e.g., the Deputies did not pepper spray Neuroth and no Correctional Deputy "climbed on
his back" as occurred in *Gibson*), there is no question but that the *Gibson* Court found that restraining
an inmate in a prone position, applying body weight to his back and legs, controlling his shoulder
blades and forearms, all while the inmate continues to struggle and resist, is constitutionally
permissible.

       In addition, the length of the incident with Neuroth was extended due to his suicidal
statement, which required the Deputies to continue to restrain him to remove his clothing and provide
him with a Safety Smock. (Knapp Dec., ¶ 26.) No "clearly established" law indicates that a use of
force under such a circumstance is improper; indeed, failure to remove an inmate's clothing where
there is a reason to suspect the inmate is suicidal could itself demonstrate deliberate indifference. *See
Trujillo v. Sherman*, No. 116CV01277DADJLTPC, 2017 WL 1549937, at *4 (E.D. Cal. May 1,
2017) ("On the contrary, however, where there is basis to suspect that an inmate is suicidal, failure to
take measures for that person's safety – including removing clothing and blankets with which he
might cause himself harm – would amount to deliberate indifference.").

       b.  *Prone Position*. Maintaining Neuroth prone on his stomach during the encounter
also cannot be considered a constitutional violation. *See Tatum v. City & Cty. of San Francisco*, 441

at 1098 ("Tatum has not cited any authority to support her argument that simply laying a suspect on his stomach can constitute excessive force, and we have found none."); *see also Phillips*, 123 F.3d at 594 ("[P]lacing a person in a prone position while handcuffed on the floor does not, in and of itself, violate the Fourth Amendment…."). While two of Plaintiff's experts (Mr. Ryan and Dr. Hayward) opine that the Deputies should have put him in a restraint chair, such an action would have been a higher use of force and restraints, increased the likelihood of injury to Neuroth and themselves, and would have been against jail policy. (*See* Vare Report p. 27-9; Peters Supp. Report p. 8; Pearce Dec., Exh. F, § VI.E.1.)

c.  *Miscellaneous Minor Uses of Force*. There is no case law standing for the proposition that the Deputies' use of wrist locks and the figure four leg lock (or other "pain compliance" techniques) in their efforts to control Neuroth were unconstitutional. *See Burns*, 737 F. Supp. 2d at 1061 ("[C]ourts in this Circuit have frequently recognized that a pain control grip or device can be employed to subdue a struggling suspect."); *see also Forrester v. City of San Diego,* 25 F.3d 804, 807 (9th Cir. 1994) (Concluding that ample evidence supported a jury's verdict that the use of "pain compliance techniques" to remove anti-abortion demonstrators who were blocking access to an abortion clinic was objectively reasonable.).

While Plaintiff's expert Mr. Ryan decries Deputies Grant and Masterson's use of distraction blows, such actions were geared to prevent Neuroth from injuring Deputy Grant and to gain Neuroth's compliance, and thus did not violate clearly established law. *See Gonzales v. Novosel*, No. C 07-04720 CRB, 2008 WL 4614665, at *2 (N.D. Cal. Oct. 16, 2008) (Officer's deliverance of four to six "closed fist distraction blows" to plaintiff's face and head were objectively reasonable to prevent him from pulling the officer down to the floor by his sleeve.); *see also Johnson v. Cortes*, No. C 09-3946 SI PR, 2011 WL 445921, at *5 (N.D. Cal. Feb. 4, 2011) (Under *Graham*, deputies use of force was a reasonable and measured response to a physically resisting arrestee when they pushed him into police vehicle and struck him about ten times.).

Further, Mr. Ryan chastises Deputies' Masterson and Bernardi's uses of their knees on the back of Neuroth's shoulder blades to hold him to the ground. (Ryan Report ¶ 235.) The CAV and testimony reflects that each of these Deputies placed their knees on Neuroth's back for the purpose of

1  controlling him while he was struggling, and to prevent him from rolling over and kicking them, for

2  approximately 5 seconds each. (Masterson Dec. ¶ 11; Bernardi Dec. ¶ 16.) The law simply does not

3  condemn such a practice. *See e.g., Phillips*, 123 F.3d at 589 (Finding a reasonable use of force when

4  two officers used their knees to keep a struggling inmate from turning over and kicking for lengths of

5  time lasting 30 seconds for one officer and one minute for another.).

6  **2.    No Violation of the Fourteenth Amendment**

7  Plaintiff's expert Mr. Ryan opined that the Deputies used unnecessary force on Neuroth

8  "because Neuroth was placed on his stomach with handcuffs behind his back, shackles, figure-four

9  restraint, and possibly a hog-tie,[25] while officers used their weight leveraging him to the floor," due to

10  the danger of asphyxiation. (Ryan Report ¶ 232.) Mr. Ryan also opines on other minor uses of force

11  during the incident. (*Id.*, at ¶ 236) None of his opinions, however, are based on any identifiable law or

12  standards. (Ryan Depo. TR. pp. 29-30.) More importantly, his opinions fly in the face of applicable

13  law as well as the facts, which demonstrate that Plaintiff cannot prevail on his excessive force claims

14  pursuant to the requirements of *Kingsley*'s six factor analysis and legal causation, as follows.

15  a. *The relationship between the need for the use of force and the amount of*

16  *force used demonstrates the Correctional Deputies' actions were reasonable*. The Deputies had

17  legitimate governmental interests in restraining Neuroth due to his combativeness, to maintain order

18  and institutional security in the Jail. *See Kingsley*, 135 S. Ct. at 2474. The details of the encounter,

19  which are many, are contained in the Deputies' declarations as well as the CAV. The evidence

20  demonstrates that, while Neuroth was relatively calm and compliant when he entered the jail, his

21  behavior radically changed when entering the Sobering Cell to a combative, resistant, ranting, and

22  unpredictable inmate. The Deputies took actions to control Neuroth by placing him stomach-down on

23  the ground, and controlling his limbs, to prevent him from harming them and escaping their control.

24  When they moved Neuroth to the Safety Cell, their goal was to remove his restraints and leave

25  him alone in the cell. Neuroth's struggling against them, however, prevented them from

26  accomplishing this goal expeditiously. When Neuroth made his potentially suicidal statement,

27  Deputies acted reasonably in invoking the Jail's Suicide Prevention Policy to remove his clothes and

28  [25] All witnesses and other experts agree that Neuroth was never "hog-tied," though Plaintiff continues to raise this issue as a red herring. (*See e.g.*, Hayward Depo. TR p. 180; Knapp Dec. ¶ 14.)

provide him with a Safety Smock, though Neuroth's struggles extended the time for the Deputies to complete their actions. None of the Deputies placed any weight on Neuroth's neck, and only Deputies Masterson and Bernardi placed their knees on the back of Neuroth's shoulder blade for about 5 seconds each. In light of Neuroth's combativeness, resistance to orders of the Deputies, and unpredictable and bizarre behavior, their use of force (and the reasons for those uses of force) were objectively reasonable. *See Gibson,* 290 F.3d at 1198. Moreover, the *de minimis* uses of forces decried in Mr. Ryan's Report, such as Deputy Bernardi pushing Neuroth into the Sobering Cell, Deputies Masterson and Bernardi placing their knees on Neuroth's shoulders for about 5 seconds, or Sgt. Knapp taking out her taser, are not constitutionally significant. *Hudson v. McMillian,* 503 U.S. 1, 10 (1992) ("*[D]e minimis* uses of physical force" are excluded from constitutional recognition under the Eighth Amendment, provided they are not "repugnant to the conscience of mankind [citation omitted].").

Further, Sgt. Knapp's actions in supervising the Deputies included orders to place Neuroth in the Safety Cell as well as other actions to reduce the use of force, as described in Section IV.B.2.c, below. She also took direct actions to assist the Deputies by attempting to calm Neuroth down, using her flashlight to assist in the removal of restraints, and handing Deputy Masterson handcuffs to reapply to Neuroth, all of which demonstrate her engagement and appropriate response. (Knapp Dec. ¶¶ 10, 23, 24, and 29.)

Regardless of whether Neuroth was combative due to his use of meth or mental illness, the Deputies were entitled to protect themselves and Neuroth "when faced with threatening conduct by the disabled individual." *Bates ex rel. Johns v. Chesterfield Cty., Va.*, 216 F.3d 367, 372 (4th Cir. 2000) (Police reacted with reasonable force in grabbing Bates by the neck, forcing him to the ground, and "beating" on him after he "spun around" from the officers to face his stepfather and then struggled to get away.). Had the Deputies not controlled Neuroth in the manner they did, he could have rolled over, kicked the Deputies, and run away – making the scenario more dangerous everyone. *See Phillips*, 123 F.3d at 593 (Prone restraint on struggling inmate was reasonable to prevent inmate from getting up and becoming a danger to himself or others.) (Masterson Dec. ¶ 11.)

b. *The extent of Neuroth's injuries resulting from use of force were minimal,*

1   *though his resulting death is the ultimate loss of life.* There is no question but that Neuroth's death is

2   an unfortunate loss. The Deputies' actions did not, however, cause identifiable injuries to Neuroth,

3   nor did they cause his death. (Chapman Dec. ¶ 10; Vilke Report  p. 9.)

4           c. *Correctional Officers made efforts to temper or to limit the amount of force.*

5   The Deputies used several techniques to temper their use of force and calm Neuroth down, including

6   but not limited to the following: (i) Deputies orally reassured Neuroth and told him to calm down and

7   relax; (ii) Sgt. Knapp provided incentive for Neuroth to calm down by warning him with a taser; (iii)

8   Sgt. Knapp requested Willits Officer Leef to talk with Neuroth to calm him down; (iv) Sgt. Knapp

9   ordered handcuffs to be reapplied to Neuroth while they waited for a Safety Smock, to prevent more

10  use of force; (v) Sgt. Knapp ordered Deputies to cut-off Neuroth's T-shirt without removing his

11  handcuffs, to prevent further use of force; and (vi) Deputy De Los Santos gave Neuroth verbal

12  commands to stay still to prevent him from getting hurt. Overall, the Deputies used only the amount

13  of force necessary to control Neuroth, to prevent him from hurting himself or them, and to

14  accomplish their goals of protecting him and themselves, removing his restraints, removing his

15  clothes, providing him with a Safety Smock, and leaving him alone in the Safety Cell. Their

16  declarations and the CAV demonstrate these intentions and the reasonableness of their actions.

17          Further, while correctional officers have a duty to intercede when their fellow officers violate

18  the constitutional rights of inmates in their custody, such a duty exists only if they reasonably believe

19  a constitutional violation is occurring and they have an opportunity to intercede. *See Cunningham v.*

20  *Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000). In this case, neither of these factors apply: either the

21  Deputies had no opportunity to intercede, or what they saw did not indicate that Neuroth's

22  constitutional rights were being violated.

23          d. *The severity of the security problem at issue was significant*. There is no

24  question but that a combative inmate who is in the throes of a methamphetamine-induced psychotic

25  episode presents a dangerous security problem. The CAV and the Deputies' declarations demonstrate

26  that Neuroth was resisting their efforts to control him and remove his restraints during the entire

27  incident. The Deputies' duty to maintain control Neuroth was mandatory for their safety, the inmates'

28  safety, and general institutional security. (Vare Report pp. 24-6; Peters Report pp. 12-14.)

1          e. *The threat reasonably perceived by the Correctional Officers was*

2    *significant*. The threat Neuroth posed to himself and the Deputies was reasonably perceived by the

3    Deputies as significant. The Deputies were faced with an individual who was in a psychotic state and

4    was uncontrollable, as he was thrashing and kicking out. Neuroth assaulted CD Grant by squeezing

5    Grant's legs between his so much that it hurt, and later trapping Grant's foot between his legs.

6    Neuroth was incredibly strong, and even though several Deputies were attempting to control him, he

7    successfully resisted CD Grant's efforts to place his legs in a full figure four hold until De Los Santos

8    arrived to assist. Neuroth also acted erratically and unpredictably, which led Deputies to reasonably

9    fear for their safety if they did not control him sufficiently. They have a great deal of experience with

10   people acting out on meth, and reasonably feared for their safety due to Neuroth's strength and

11   unpredictability. (Masterson Dec. ¶ 5; Pearce Dec. ¶ 15; Knapp Dec. ¶ 9.)

12         f. *Neuroth was actively resisting*. The Deputies' declarations and the CAV

13   demonstrates that Neuroth was actively resisting the Deputies' legitimate and reasonable efforts to

14   place him in an appropriate cell and remove his restraints. This factor, in and of itself, distinguishes

15   this case from *Drummond*.

16         g. *No proximate causation*. The primary issue in this case is whether the

17   Deputies' actions in controlling and restraining Neuroth, removing his clothes, and leaving him

18   unrestrained and covered in a Safety Smock in the Safety Cell, caused his unfortunate death. As

19   discussed in Section III.F, above, there is no evidence to connect the use of such force and restraints

20   with Neuroth's death, and thus Plaintiff cannot satisfy causation requirements.

21   **VI.   MOTION FOR SUMMARY JUDGMENT ON STATE LAW CLAIMS**

22         Like his § 1983 claims, Plaintiff's state law claims are unsupportable, as set forth below.

23         A. *Bane Act Claim, California Civil Code § 52.1, against Sheriff Allman, Captain Pearce, and*

24   *the Deputies*: The Bane Act requires a plaintiff to prove (1) intentional or attempted interference with

25   a constitutional or statutory right, and (2) the interference or attempted interference was by "threats,

26   intimidation or coercion." *Allen v. City of Sacramento,* 234 Cal.App.4th 41, 67-68 (2015). Plaintiff's

27   Bane Act fails because he cannot demonstrate a violation of a constitutional right, as discussed in the

28   preceding Sections. Moreover, Sheriff Allman and Captain Pearce cannot be held liable for a Bane

1   Act violation because they were not present at the scene and therefore took no actions qualifying as

2   "threats, intimidation, or coercion" for purposes of the Bane Act. *See Hernandez v. City of San Jose*,

3   241 F. Supp. 3d 959, 983 (N.D. Cal. 2017).

4        B. *Negligence, Assault and Battery Claims, against the Deputies*: When an officer uses

5   reasonable force, a cause of action for battery fails, just as it does for an excessive force claim under §

6   1983. *See Brown v. Ransweiler*, 171 Cal.App.4th 516, 525 (2009). As discussed above, the Deputies

7   utilized objectively reasonable force in this case, and thus Plaintiff's battery claim must fail.

8        With respect to the negligence claim, an officer's duty is to use reasonable care in deciding to

9   use and in actually using force. *Id.*, at 534. Thus, if an officer uses reasonable force, based on an

10  objective standard, a cause of action for negligence must fail. *Id.* Again, as discussed above, the

11  Deputies' use of force in this case was objectively reasonable, and this negligence claim must fail.

12       C. *Government Code § 845.6 Claim, against the County and Deputies*: Government Code §

13  845.6 provides a cause of action for failure to summon medical care when the officer knows or has

14  reason to know the inmate needs immediate medical care. This claim is precluded as a matter of law

15  for two reasons. First, the Deputies summoned a medical provider, LVN Caudillo, who assessed

16  Neuroth and observed him throughout the incident. *See Estate of Prasad ex rel. Prasad v. Cty. of

17  Sutter*, 958 F. Supp. 2d 1101, 1117–18 (E.D. Cal. 2013) (Provision of medical supervision during the

18  time correctional officers observed the inmate precludes claim because "§ 845.6 does not extend to

19  'furnishing, monitoring, [or] follow-up' once care has been summoned [citation omitted]."); *see also

20  Scalia v. County of Kern*, __ F. Supp. 3d __,  No. 117-CV01097LJOSKO, 2018 WL 1726616, at *15

21  (E.D. Cal. Apr. 10, 2018) ("Care was summoned; whether [the nurse] should have exercised her

22  medical judgment differently does not allege a violation of § 845.6."). Second, Sgt. Knapp directed

23  Deputy Holum to call for an ambulance as soon as the Deputies found Neuroth unresponsive, and

24  they promptly started lifesaving measures. (Knapp Dec. ¶ 45.) These actions are all the law requires.

25       IN CONCLUSION, County Defendants request the Court grant them summary judgment on

26  all claims alleged in the 4AC pursuant to FRCP 56, and such other relief in the interests of justice.

27
            KECK LAW OFFICES          PATTON & RYAN
28  Dated: May 24, 2018   By: */s/ Anne L. Keck*     By: */s/ Kathleen M. Kunkle*
                   Anne L. Keck              Kathleen M. Kunkle
                          Attorneys for County Defendants