# EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

JAMES NEUROTH, Individually and as
Successor in Interest of Decedent
STEVEN KELLOGG NEUROTH,

          Plaintiff,               CASE NO.
                                   1:15-cv-03226-RS
     -vs-
MENDOCINO COUNTY, a pubic entity;
MENDOCINO COUNTY SHERIFF-CORONER
THOMAS D. ALLMAN, in his
individual and official
capacities; CORRECTIONS CAPTAIN
TIM PEARCE; SERGEANT LORI KNAPP;
DEPUTY FRANK MASTERSON; DEPUTY
CRAIG BERNARDI; DEPUTY MICHAEL
GRANT; DEPUTY JEANETTE HOLUM;
DEPUTY ROBERT PAGE; DEPUTY
CHRISTINE DE LOS SANTOS; CITY OF
WILLITS, a pubic entity; WILLITS
POLICE OFFICER KEVIN LEEF;
CALIFORNIA FORENSIC MEDICAL GROUP,
INCORPORATED, a California
corporation; TAYLOR FITHIAN, M.D.;
JENNIFER L. CAUDILLO, L.V.N., and
COUNTY DEPUTIES DOES 9-20, and
DOES 23-35, individually, jointly,
and severally,

          Defendants.
_____/

**CERTIFIED TRANSCRIPT**

VIDEOTAPED DEPOSITION OF KEVIN LEEF

Taken before KAREN A. CRANGLE
Certified Shorthand Reporter
State of California
C.S.R. License No. 3816

October 20, 2016

---

1    VIDEOTAPED DEPOSITION OF KEVIN LEEF
2
3        Pursuant to Notice of Taking Deposition, and on
4    Thursday, October 20, 2016, at the hour of 10:44 a.m., at
5    HADDAD & SHERWIN, 505 17th Street, Third Floor, Oakland,
6    California, before me, KAREN A. CRANGLE, Certified
7    Shorthand Reporter, personally appeared KEVIN LEEF,
8    produced as a witness in the above-entitled action, who,
9    having been first duly sworn, was thereupon examined as a
10   witness to said action.
11
12
13
14            APPEARANCES
15
16       Michael J. Haddad, Attorney at Law, and Maya
17   Sorensen, Attorney at Law, HADDAD & SHERWIN, 505 17th
18   Street, Third Floor, Oakland, California, 94612, were
19   present on behalf of the plaintiff.
20
21       Scott A. Lewis, Attorney at Law, PERRY JOHNSON
22   ANDERSON MILLER & MOSKOWITZ, 438 First Street, 4th Floor,
23   Santa Rosa California, 95401, was present on behalf of the
24   defendant City of Willits.
25

---

1
2        Anne L. Keck, Attorney at Law, KECK LAW OFFICES,
3    418 B Street, Suite 206, Santa Rosa, California, 95401,
4    was present on behalf of the defendant Mendocino County.
5
6        And there also being present Brad Lipetz,
7    Videographer, Benchmark Video, Mill Valley, California.
8
9            ---oOo---
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

1              I N D E X
2
3
4    Videotaped Deposition of KEVIN LEEF
5
6                        Page
7
8    Examination by:
9
10       MR. HADDAD                    6
11
12
13           ---oOo---
14
15       (No exhibits marked.)
16
17
18
19
20
21
22
23
24
25

1          PROCEEDINGS
2     THE VIDEOGRAPHER:  We are on the record.  The time
3 is 10:44 a.m.  Today is October 20th, 2016.  We're located
4 at 505 17th Street in Oakland, California.
5     This marks the beginning of media unit number one,
6 Volume I, in the deposition of Officer Kevin Leef in the
7 matter of Neuroth, et al. versus Mendocino County, et al.
8 in the United States District Court, Northern District of
9 California.  Case number is 1:15-cv-03226-RS.
10     Deposition is noticed on behalf of plaintiff's
11 counsel.
12     Videographer is Brad Lipetz for Benchmark Video.
13     Our court reporter is Karen Crangle for Crangle
14 Reporting.
15     Will the counsel present please identify themselves
16 for the record beginning with taking counsel.
17     MR. HADDAD:  Michael Haddad for the plaintiff.
18 I'm going to be joined shortly by Maya Sorensen.
19     MR. LEWIS:  This is Scott Lewis on behalf of
20 defendant Kevin Leef and the City of Willits.
21     MS. KECK:  And Ann Keck on behalf of the defendants
22 County of Mendocino and its current and former employees.
23     THE VIDEOGRAPHER:  Thank you.  If there are no
24 stipulations will the court reporter please swear in the
25 witness.

5

1          KEVIN LEEF,
2 sworn as a witness by the Court Reporter,
3 testified as follows:
4     EXAMINATION BY MR. HADDAD
5     MR. HADDAD:  Q.  Good morning.
6     A. Good morning.
7     Q. So this is the time and place noticed for your
8 deposition in this case.  And have you ever been deposed
9 before?
10     A. I have not.
11     Q. So I'm going to ask you some questions about
12 the case, a little bit about your training and background,
13 and if you don't understand one of my questions, let me
14 know and we'll try to come to an understanding.  Okay?
15     A. Okay.
16     Q. Your attorney or some attorneys here may object
17 to some of my questions and that's because your testimony
18 here is just as if it were in a court.  So you're under
19 oath, it has the same force and effect, but because
20 there's no judge in this office, you're still going to
21 have to answer all the questions unless your lawyer
22 specifically tells you not to answer a certain question.
23 Okay?
24     A. Okay.
25     Q. And if there's any objections the judge can

6

1 review them later.
2     Please answer verbally instead of saying things
3 like "uh-huh" or "huh-uh" or nodding your head --
4     A. Okay.
5     Q. -- so we get an accurate transcript.  Okay?
6     A. Yes.
7     Q. Have you reviewed anything in preparation for
8 this deposition?
9     A. I have.
10     Q. What have you reviewed?
11     A. The video, as well as the other recording.  The
12 D.A.'s report, and my interview with the D.A.'s
13 investigators, and a transcript of the audio.
14     Q. Transcript of which audio?
15     A. My audio, the audio I took.
16     Q. The personal recorder?
17     A. Yes.
18     Q. Have you reviewed a transcript of your D.A.
19 interview?
20     A. I have.
21     Q. Have you also listened to the audio recordings,
22 either of your interview or the personal recording that
23 you made?
24     A. The personal recording, yes.
25     Q. Have you reviewed any photos?

7

1     A. I have not.
2     Q. Have you reviewed any other reports?
3     A. I don't believe so, no.
4     Q. For instance, did you review your partner
5 Officer Andrade's report?
6     A. I have read that report, yes.
7     Q. Did I pronounce his name right?
8     A. Andrade.
9     Q. Andrade.  Okay.
10     So you remember being interviewed by the D.A.'s
11 investigator in connection with the death of Mr. Neuroth?
12     A. Yes.
13     Q. And when did that happen?  Do you remember?
14     A. It was sometime around 8:00 a.m., I believe,
15 the morning after.
16     Q. So pretty much within hours of the events?
17     A. Yes.
18     Q. And when you sat for that interview you were
19 aware that Steven Neuroth had died by then.  Right?
20     A. I did.
21     Q. And you knew that this was a very important
22 investigation by the district attorney's office.  Right?
23     A. I did.
24     Q. You knew that your interview might be reviewed
25 by the district attorney himself.  Right?

8

1    A. I did.
2    Q. And it might also be reviewed by the Willits
3 Police Chief, for instance. Right?
4    A. I did.
5    Q. Might be reviewed by the Sheriff of Mendocino
6 County. Right?
7    A. Yes.
8    Q. Could also have been reviewed by other law
9 enforcement authorities. Right?
10    A. Yes.
11    Q. So you understood that it was really important
12 to be entirely accurate in the information you provided to
13 the D.A.'s investigator at that time. Right?
14    A. Yes.
15    Q. And you knew it was obviously important to be
16 truthful. Right?
17    A. Yes.
18    Q. And to give complete answers to the questions
19 that were asked. Right?
20    A. Yes.
21    Q. Having had a chance to listen to and read the
22 transcript of that interview that you gave to the D.A.'s
23 investigator, was there anything that you noticed that you
24 said was incorrect or you felt that you inadvertently
25 omitted that was important?

9

1    A. Not that I noticed.
2    Q. Are you still employed by the Willits Police
3 Department?
4    A. I am.
5    Q. When did you start working for Willits?
6    A. September of 2012, I believe.
7    Q. Have you worked for any other law enforcement
8 agency?
9    A. No.
10    Q. So when did you go to the police academy?
11    A. I started the January prior to that.
12    Q. January of 2012?
13    A. Um-hum.
14    Q. Which academy did you go to?
15    A. Santa Rosa Junior College police academy.
16    Q. And that was POST certified. Right?
17    A. Correct.
18    Q. And considering the gap in time between when
19 you would have finished the academy and started Willits, I
20 take it that you paid for the academy on your own.
21    A. I did.
22    Q. And then you applied to various different
23 departments?
24    A. Uh, a few different departments.
25    Q. Did any police departments reject your

10

1 application?
2    A. Outright? I don't understand that question.
3    Q. Did any police department say you don't meet
4 our basic criteria; we're not going to hire you?
5    A. Yes.
6    Q. Which ones said that?
7    A. Santa Rosa Police Department.
8    Q. City of Santa Rosa?
9    A. Yes.
10    Q. And what was their rejection based on?
11    A. I didn't pass their testing.
12    Q. The testing?
13    A. Um-hum.
14    Q. What kind of testing was it?
15    A. It's called a B-PAD as well as a
16 report-writing.
17    Q. Were you rejected from hiring by any law
18 enforcement agency because of any background check?
19    A. No.
20    Q. Or because of any psychological or psychiatric
21 exam that you had to do?
22    A. No.
23    Q. Okay. So you started with Willits in September
24 of 2012 and what was your initial position? Field
25 training?

11

1    A. Yes.
2    Q. And how long did your field training last?
3    A. If I had to estimate, it was about five months.
4    Q. And did you pass your field training in the
5 normal field training timeline?
6    A. Yes.
7    Q. You didn't need an extension or anything?
8    A. I did not.
9    Q. Once you passed your field training what was
10 your position there?
11    A. Officer.
12    Q. Okay. Patrol officer basically. Right?
13    A. Yes.
14    Q. And have you had any other assignments other
15 than basic Patrol officer as long as you worked for
16 Willits?
17    A. Yes.
18    Q. What other assignments have you had?
19    A. Field training officer.
20    Q. Okay. Anything else?
21    A. None that have a title.
22    Q. When did you become a field training officer?
23    A. I couldn't give you an exact date but about two
24 years ago.
25    Q. Was that before the death of Mr. Neuroth?

12

CRANGLE
REPORTING SERVICES

1    A. I believe it was after.
2    Q. And what are your responsibilities as a Field
3 Training Officer for the Willits Police Department?
4    A. Train new officers.
5    Q. And does Willits Police Department rely on you
6 to instill the proper law enforcement ethics to those new
7 officers as well?
8    A. Yes.
9    Q. And to basically teach those new officers how
10 to do the job out in the field?
11    A. Correct.
12    Q. Other than field training the new officers for
13 Willits, have you provided any other training for the
14 Willits Police Department?
15    A. Yes.
16    Q. What training?
17    A. Evidence, Evidence Collection, Booking of
18 Evidence, as well as pretty much anything related to our
19 computer system.
20    Q. And how is it that you became the guy dealing
21 with the computers, at least training on them?
22    A. I have previous computer experience so I just
23 had the most knowledge when the last person left.
24    Q. Okay. You have an affinity for computers and
25 technology and stuff like that?

13

1    A. Not great, but a learned affinity.
2    Q. Okay. Any other areas where you've provided
3 training?
4    A. Not that I can recall.
5    Q. Have you provided any input with the policies
6 and procedures of your department?
7    A. No.
8    Q. What's your highest level of education?
9    A. Some college. Very small amount of college.
10    Q. Are you a high school graduate?
11    A. Yes.
12    Q. What high school did you graduate from?
13    A. Maria Carrillo High School in Santa Rosa.
14    Q. So you grew up in Sonoma County?
15    A. I did.
16    Q. What are some of the jobs that you held between
17 high school and when you went to the academy?
18    A. I worked for Albertson's grocery stores for
19 just short of ten years.
20    Then left there. Worked for Clark Pest Control for
21 about three years, worked there.
22    And worked IT for a small construction company.
23    And then police academy.
24    Q. IT, like information technology?
25    A. Yes.

14

1    Q. How long did you do that?
2    A. Less than a year.
3    Q. What did you do when you worked for
4 Albertson's?
5    A. I was -- pretty much everything. Started as a
6 courtesy clerk and worked up to a night manager.
7    Q. Do you have any background as a security guard
8 or security officer?
9    A. No.
10    Q. Do you have any military background?
11    A. I do not.
12    Q. Why did you decide to become a law enforcement
13 officer?
14    A. I've always wanted to be a police officer.
15    Q. How come?
16    A. I've always had an affinity for it. My
17 grandfather was a CHP officer. Grew up listening to the
18 stories. And I always wanted to help people and be like
19 my grandfather.
20    Q. What do you think are the qualities of a good
21 law enforcement officer?
22    A. Well, that's a broad question.
23    Um, you need to be truthful, honest. You have to
24 be people who go where others won't. It's very similar to
25 military.

15

1    Q. Anything else that you can think of right now?
2    A. Not off the top of my head. If you gave me
3 some time I'm sure --
4    Q. Yeah, I'm sure. Would you agree that integrity
5 is one of the qualities of a good law enforcement officer?
6    A. I would.
7    Q. Would you agree that a desire to help me is
8 another quality of a good law enforcement officer?
9    A. I would.
10    Q. Do you agree that following the rules and
11 standards of your profession is another quality of a good
12 law enforcement officer?
13    A. I would.
14    Q. And do you agree that also having compassion
15 for people is another quality of a good law enforcement
16 officer?
17    A. It is.
18    Q. What year were you born?
19    A. Excuse me. Sorry. 1981.
20    Q. I'll let you get some water.
21    How tall are you?
22    A. About six-one.
23    Q. How much did you weigh around the time of the
24 incident with Mr. Neuroth?
25    A. Probably about 245.

16

CRANGLE
REPORTING SERVICES

1    Q. Have you lost some weight since then?
2    A. It fluctuates.
3    Q. Now, when you went to your police academy,
4 you've already told me that was a POST certified academy.
5 Right?
6    A. Correct.
7    Q. And what's your understanding of what POST
8 stands for?
9    A. Police Officers Standards and Training.
10    Q. Right. And is it also your understanding that
11 California POST sets the standards and training for law
12 enforcement in the State of California?
13    A. Yes.
14    Q. And remember in the academy they taught you
15 using certain booklets or outlines on each subject that
16 you were being taught about, and these booklets were
17 called Learning Domains?
18    A. Yes.
19    Q. In fact, they gave you your own set for
20 self-study so that you could read the outlines and read
21 the descriptions of rules and standards that would apply
22 to you and learn them on your own. Right?
23    A. Yes.
24    Q. And then they would test you about those in the
25 class and give you additional teaching. Right?

17

1    A. Correct.
2    Q. Let me just show you one of these Learning
3 Domains. This is Learning Domain 20, Use of Force,
4 Version Two, and it was revised February 2006.
5    Just for example, at page 6-7 this Use of Force
6 Learning Domain teaches about The Duty to Intervene.
7    Do you remember being taught about that?
8    A. I do.
9    Q. And that's the duty to intervene if you see
10 another officer using excessive force or violating
11 somebody's rights and you have an opportunity to go in and
12 protect the person. Right?
13    A. Correct.
14    Q. And, for instance, this Learning Domain says:
15 Peace officers are required by their position to intervene
16 in any force situation they perceive as excessive. This
17 intervention may take the form of one or more of the
18 following actions:
19    Strongly caution the other officer, or physically
20 restrain the other officer, and immediately report the
21 incident. That's what I read right there.
22    Is that consistent with your training about duty to
23 intervene?
24    A. Yes.
25    Q. Couple of pages later at page 6-9 in the

18

1 Failure to Intervene chapter it talks about Lawful
2 Resistance. Do you remember being taught about that?
3    A. Um-hum.
4    Q. Yes?
5    A. Yes.
6    Q. For instance, this one says:
7    "Although Penal Code Section 834a states that the
8 person being arrested must submit to an arrest, if
9 unlawful or unreasonable force is used to effect the
10 arrest, the person being arrested may lawfully resist to
11 overcome that force."
12    Is that consistent with your training, too?
13    A. Yes.
14    Q. And then at page 6-8 it talks about the
15 necessity for intervention and it just explains using
16 bullet points why POST teaches intervention is necessary.
17    And it says intervention is necessary because: It
18 is required by law.
19    You were taught that. Right?
20    A. Yes.
21    Q. And: It is morally and ethically correct.
22    You were taught that. Right?
23    A. Yes.
24    Q. And: Personal integrity demands it.
25    You were taught that. Right?

19

1    A. Yes.
2    Q. And: It enhances officer safety.
3    You were taught that, too. Right?
4    A. Yes.
5    Q. And: It preserves professionalism and supports
6 the law enforcement mission.
7    You were taught that, right?
8    A. Yes.
9    Q. And: It strengthens public confidence in the
10 law enforcement profession and the individual agency
11 involved.
12    You were taught that. Right?
13    A. Yes.
14    Q. And it reduces personal and agency liability
15 because it results in fewer physical injuries arising from
16 unreasonable force, fewer disciplinary actions and
17 personal complaints, fewer criminal complaints filed
18 against officers, and fewer civil liability suits
19 including fewer punitive financial judgments against
20 individual officers.
21    You were taught all that, too. Right?
22    A. Yes.
23    Q. And then it explains the at the bottom of the
24 page, Note: The officer who fails to intervene for
25 whatever reason is also held accountable by the United

20

1 States code.
2     And you were taught that, too. Right?
3     A. Yes.
4     Q. Now, remember being taught in the academy about
5 persons with disabilities and issues that would relate to
6 such people?
7     A. Yes.
8     Q. So there was a Learning Domain on that, too;
9 that one was Learning Domain 37 called Persons With
10 Disabilities, Version Four. The one I have is revised
11 January 2006.
12     But in the academy you were taught about the
13 different sorts of people with different disabilities that
14 you might encounter in your job as a police officer and
15 how you might need to accommodate and deal with their
16 disabilities in your job. Right?
17     A. Yes.
18     Q. And there's the whole chapter about Mental
19 Illness. Do you remember being taught about that?
20     A. Yes.
21     Q. And your POST training taught that -- here at
22 page 4-1, the very first overview sentence says:
23     Peace officers must become familiar with the causes
24 and nature of mental illness in order to determine if an
25 individual is greatly disabled or dangerous.

21

1     And you were taught that. Right?
2     A. Yes.
3     Q. On page 4-5, this Learning Domain instructed
4 you: Officers should not attempt to diagnose mental
5 illness. A mental illness is often difficult for even the
6 trained professional to define in a given individual.
7 Officers must be able to recognize general indicators of
8 mental illness so that appropriate actions can be taken.
9     So remember being taught something like that?
10     A. Something like that, yes.
11     Q. And so in your teaching it was stressed to you
12 that as a law enforcement officer you're not expected to
13 diagnose people's mental illnesses.
14     A. Correct.
15     Q. You're just not trained for that. Right?
16     A. Correct.
17     Q. But you were trained in the academy to be able
18 to recognize general indicators of mental illness so that
19 appropriate actions can be taken. Right?
20     A. Generally.
21     Q. And then there's a lot of training about what
22 those general indicators of mental illness would look
23 like. Right?
24     A. Yes.
25     Q. So when you see somebody who exhibits things

22

1 like fearfulness or inappropriate behavior, or
2 excitability, it might ring a bell that such a person
3 could be suffering from mental illness. Right?
4     A. Yes.
5     Q. There was also a part of your training about
6 people with mental illness and disabilities.
7     That instructed you about the safe and proper
8 tactics for handling them to keep the situation calm.
9 Right?
10     A. Um-hum. Yes.
11     Q. And you were taught specific tactics that you
12 should utilize when dealing with someone who might be
13 mentally ill because you learned that, for instance, at
14 page 4-10 it says people affected by mental illness can be
15 unpredictable and sometimes violent. So you were taught
16 that, right?
17     A. Yes.
18     Q. And you were also taught: Not all people
19 affected by mental illness are dangerous. While some may
20 represent danger only under certain circumstances and
21 conditions, some may be capable of going very quickly from
22 a state of calm to being extremely agitated.
23     And you were taught that, too. Right?
24     A. Yes.
25     Q. So because people with mental illness by

23

1 definition can move very quickly from a state of calm to
2 being extremely agitated or could become unpredictable or
3 even sometimes violent, you were taught it's very
4 important to learn certain law enforcement techniques to
5 try to help them stay calm and in control of themselves.
6 Right?
7     A. Yes.
8     Q. And you were taught that that was important for
9 officer safety as well as the person's safety. Right?
10     A. Yes.
11     Q. And you were taught that if you use the wrong
12 techniques and you cause a mentally ill person to become
13 escalated and agitated and possibly even violent, that
14 that's dangerous for everybody. Right?
15     A. It can be, yes.
16     Q. And can either cause officers to use force
17 against them that they otherwise would not have had to use
18 if the person was simply kept calm following the
19 procedures you were taught. Right?
20     A. Yes.
21     Q. So starting at 4-12 of Learning Domain 37, it
22 lays out an outline of the training that you received
23 about field contacts with persons with mental illness.
24 And it says: The following table identifies appropriate
25 tactical actions officers should be aware of.

24

1    And then it says number one: First, request
2 backup.
3    Do you remember learning that?
4    A. Yes.
5    Q. And then the next thing it tells you to do is:
6 Calm the situation.
7    Do you remember that?
8    A. Yes.
9    Q. And this gives a lot of examples of how to calm
10 the situation including move slowly; and when possible
11 eliminate emergency lights and sirens; and disburse any
12 crowd that may have gathered; reduce environmental
13 distractions such as radio or television noise.
14    You were taught all those things. Right?
15    A. As possible, yes.
16    Q. Another way to calm the situation that you were
17 taught include, quote: Assume a quiet, nonthreatening
18 manner when approaching and conversing with the
19 individual.
20    You were taught that. Right?
21    A. Yes.
22    Q. And if possible, avoid physical contact if no
23 violence or destructive acts have taken place. And if
24 possible, explain intended actions before taking action.
25    You were taught those. Right?

25

1    A. I was.
2    Q. And take time to assess the situation.
3    Right?
4    A. Yes.
5    Q. And you were also told that one way to help
6 calm the situation and keep the mentally ill person calm
7 is provide reassurance that officers are there to help.
8 Right?
9    A. Yes.
10    Q. And you were taught to give the person time to
11 calm down. Right?
12    A. Yes.
13    Q. The next thing that POST taught you was how to
14 communicate with someone with a mental disturbance.
15    And they tell you: Keep your sentences short;
16 determine if the person is taking medication; talk with
17 the individual in an attempt to determine what is
18 bothering that person.
19    Those are techniques that you were taught. Right?
20    A. Yes.
21    Q. And you were taught to acknowledge the person's
22 feelings. Right?
23    A. Yes.
24    Q. And to ask the person if he or she is hearing
25 voices, and if so, what are they saying. Right?

26

1    A. Yes.
2    Q. In communicating with a mentally disturbed
3 person for your safety as well as theirs you were taught
4 to avoid topics that may agitate the person. Right?
5    A. Yes.
6    Q. You were taught to guide the conversation
7 towards subjects that will bring the individual back to
8 reality. Right?
9    A. Yes.
10    Q. You were taught to allow time for the person to
11 consider questions and be prepared to repeat them. And
12 not to mock the person or belittle his or her behavior.
13    A. Yes.
14    Q. And you were taught these were all techniques
15 not just for the person's safety but for your safety and
16 other officers' safety as well. Right?
17    A. Correct.
18    Q. You were taught: Do not make threats.
19 Remember that?
20    A. Yes.
21    Q. And specifically POST instructed you: Do not
22 threaten the individual with arrest or any other manner.
23    Remember that?
24    A. Yes.
25    Q. And POST taught you: Threats may create

27

1 additional fright, stress or potential aggression.
2    Remember that?
3    A. Yes.
4    Q. And you were taught finally to be truthful with
5 the person. And POST explained: If the individual
6 becomes aware of deception, that person may withdraw from
7 any contact in distrust, or become hypersensitive, or
8 retaliate in anger.
9    You were taught that, too. Right?
10    A. Yes.
11    MS. KECK: Excuse me, Michael. Could you give me
12 the date of that Learning Domain? You may have said it
13 but I didn't catch it.
14    MR. HADDAD: Revised January 2006.
15    MS. KECK: Thank you.
16    MR. HADDAD: Q. Now, since the academy, once you
17 joined the Willits Police Department, did you also receive
18 similar training about how to safely and appropriately
19 interact with the mentally ill?
20    A. Yes.
21    Q. And what was that other training that you got
22 from Willits? Can you describe what it was?
23    A. Mostly on-the-job training. Very little other
24 than on-the-job training.
25    Q. In your field training, for instance?

28

CRANGLE
REPORTING SERVICES

1    A. Yes.
2    Q. Now that you're a Field Training Officer do you
3 train the new Willits officers about how to appropriately
4 communicate and interact with mentally ill people?
5    A. I do.
6    Q. Do you train the new officers about how to
7 comply with the requirements of Welfare and Institutions
8 Code 5150?
9    A. Yes.
10    Q. And how to comply with your department's policy
11 concerning 5150?
12    A. Yes.
13    Q. So what is your understanding of what that law
14 5150 is?
15    A. It is the law that governs our ability to take
16 into custody for their safety or other people's safety or
17 due to their endangerment being greatly disabled to take
18 them into custody and take them to the hospital.
19    Q. So basically 5150 says that if a person is a
20 danger to themselves or others due to a mental
21 disturbance, then they fit within that law and you can
22 take them to an appropriate hospital for whatever
23 treatment or care they might need.  Right?
24    A. For a mental health disorder, yes.
25    Q. And again, go in order to carry out that law,

29

1 5150 as a law enforcement officer, it does not require you
2 to diagnose people's mental illness, does it?
3    A. Correct.
4    Q. It just requires you to recognize the signs and
5 symptoms of when somebody may be suffering from mental
6 illness.  Right?
7    A. Correct.
8    Q. In fact, it uses the term "mental disturbance"
9 in the law.  Right?
10    A. I don't recall the exact verbiage.
11    Q. Now, your police department, Willits, has a
12 written policy about mental illness commitments.  It's
13 Policy 418.  You're familiar with that.  Right?
14    A. Generally speaking, yes.
15    Q. Basically the Willits policy manual for the
16 police officers applies to all of your work as a Willits
17 police officer.  Right?
18    A. Correct.
19    Q. And there's lots of different policies about
20 different topics that Willits PD has put out.  Right?
21    A. Correct.
22    Q. And you're required to obey all those policies,
23 aren't you?
24    A. Correct.
25    Q. And in order to obey them you obvious have to

30

1 know what's in them.  Right?
2    A. Yes.
3    Q. So you have to go back and read them and review
4 them a few times.  Right?
5    A. Yes.
6    Q. Let's just take a look at your department's
7 policy about mental illness commitments, and Willits calls
8 it Policy 418.  And I only have one copy so we'll just
9 look at it together for second.
10    But in the very first paragraph under Purpose and
11 Scope, this says:
12    If an officer believes that a person falls within
13 the provisions of Welfare and Institutions Code 5150, he
14 or she shall transport that person to the designated
15 facility for evaluation and commitment.
16    A. I see that on that piece of paper, yes.
17    Q. You were aware of that before the Steve Neuroth
18 incident.  Right?
19    A. I'm aware that our policy involves that, yes.
20    Q. And that was a policy that you were required to
21 obey.  Right?
22    A. Correct.
23    Q. So this policy using the word "shall".  What's
24 your understanding of what that word "shall" means here?
25 Does it mean it's required or that it's optional?

31

1    A. Required.
2    Q. Your department's policy also says in
3 Section 418.3 that any officer responding to or handling a
4 call involving a suspected mentally disabled individual
5 should consider the following.
6    And then it talks about conflict resolution and
7 deescalation techniques and language that's appropriate
8 for interacting with a mentally disabled person.
9    You're aware of that policy?
10    A. I'm aware our policy states those things, yes.
11    Q. And so your department has provided you
12 training about deescalation techniques and proper language
13 for communicating with mentally disabled people.  Right?
14    A. Yes.
15    Q. That's consistent with the training that you
16 got in your POST academy that we've gone over today.
17 Right?
18    A. Yes.
19    Q. Section 418.4 of your department's policy says
20 that:
21    Sometimes a person may be mentally ill and may also
22 have committed some sort of crime, and it tells you how to
23 deal with that.
24    Do you remember that section?
25    A. I don't remember it word for word.

32

CRANGLE
REPORTING SERVICES

1    Q. Okay. Well, this says: When practical, any
2  person charged with a crime who also appears to be
3  mentally ill shall be booked at the Willits Police
4  Department before being transported to the authorized
5  facility.
6    Right?
7    A. We no longer book at the Willits Police
8  Department, so...
9    Q. Okay. But this said if a person needs to be
10 booked for a crime, they'll be booked first and then
11 they'll be transported to the authorized facility. Right?
12   A. If that's available, yes.
13   Q. And the authorized facility, they're talking
14 about the facility authorized to carry out the dictates of
15 5150.
16   A. Correct.
17   Q. That's the hospital or something. Right?
18   A. It would be the emergency room.
19   Q. And finally, your department's policy talks
20 about training in connection with mentally ill. And it
21 says, at Section 418.6:
22   As a part of advanced officer training programs,
23 this agency will endeavor to include POST-approved
24 training on interaction with mentally disabled persons as
25 provided by Penal Code Section 13515.25.

33

1    Do you get Advanced Officers Training at this
2  point?
3    A. I do.
4    Q. When did you start getting Advanced Officers
5  Training?
6    A. After my probationary period.
7    Q. So even well before the Steven Neuroth incident
8  you were receiving advanced officer training from your
9  department. Right?
10   A. It was about that time.
11   Q. And some of that training I presume was the
12 training that was required by your department's policy
13 about mentally ill people. Is that right?
14   A. I haven't had any advanced officer training in
15 mental health.
16   Q. You haven't.
17   A. No.
18   Q. So your department has never provided you
19 advanced officer training concerning mental health?
20   A. Merely more field training.
21   Q. Has your department ever provided you advanced
22 officer training about mental illness commitments?
23   A. Excuse me. Um, could you repeat that?
24   Q. Yes. Has your department ever provided you
25 advanced officer training about mental illness

34

1  commitments?
2    A. Just the standard training we do every year
3  that says the same thing as my POST. I don't have any
4  advanced officer training involving it.
5    By yearly, sorry. Not yearly.
6    Q. Now, at the time of the Steve Neuroth incident,
7  is it correct that there was no inpatient psychiatric
8  facility or hospital in Mendocino County?
9    A. Are you asking if there is a hospital in
10 Mendocino County?
11   Q. Yeah, inpatient psychiatric facility or
12 psychiatric hospital.
13   A. Correct. There's no inpatient psychiatric
14 hospital. At least that I know of.
15   Q. Okay. And have you heard that the county
16 closed its last psych facility in 1999?
17   A. Sounds correct.
18   Q. Long time before you started. Right?
19   A. Correct.
20   Q. So around the time of the Neuroth incident, if
21 you encountered someone in your patrol that you thought
22 was 5150, what would be the process for carrying out the
23 requirements of 5151 and your departments to take them to
24 the appropriate place?
25   A. Are you asking step by step?

35

1    Q. Yes.
2    A. Uh, take him or her into custody; place them in
3  my patrol car; take them to the emergency room, and
4  there's a specialized room for law enforcement.
5    If that's available, they would be placed in that
6  room, and I would wait for Mental Health to arrive and let
7  the hospital staff perform the physical evaluation.
8    Q. And which hospital emergency room would you be
9  able to take them to?
10   A. Typically Howard Memorial Hospital.
11   Q. Where is that?
12   A. Located in the city.
13   Q. In the City of --
14   A. -- Willits.
15   Q. -- Willits? And you'd have to wait there with
16 the person until somebody from county Mental Health showed
17 up. Right?
18   A. Sometimes much longer.
19   Q. In your experience, how long would you
20 sometimes have to wait for someone from Mental Health to
21 come and relieve you of this person in your custody?
22   A. Well, that's a loaded question. There's a lot
23 of different things that may go into that.
24   It could be -- it could just be if I'm just waiting
25 for the Mental Health person, not very long.

36

CRANGLE
REPORTING SERVICES

1    If I have to stay with someone because they're a
2  risk, it could be hours, days, up to 72 hours.
3    Q. Have you ever had to do that?
4    A. I, personally, haven't had to sit the entire
5  time, but the department has had to keep someone.
6    Q. Okay. Was the procedure that you would have to
7  wait in the emergency room with the 5150 person you
8  brought until county Mental Health could come and
9  basically take custody of them from you?
10   A. That is generally what the procedure should be
11  but not how it typically plays out.
12   Q. So how does it play out differently from that?
13   A. Mental Health comes, does their evaluation. If
14  the person is not a risk to the hospital staff, then I may
15  be released. But if they aren't, Mental Health leaves and
16  we stay.
17   Q. Who determines if the person is a risk to
18  hospital staff that might require you to stay?
19   A. Either -- well, it's kind of a joint. If any
20  one single entity believes so, then we would stay.
21   Q. Okay. And is it fair to say that given the
22  situation you've just described, it's not a pleasant part
23  of your job or a part of your job that you enjoy to have
24  to go through this process with someone that might be
25  5150?

37

1    A. It can be lengthy.
2    Q. And it's something you would prefer not to have
3  to do if you could. Right?
4    A. I would prefer to take them where they need to
5  go.
6    Q. But you'd prefer not to have to take them to an
7  emergency room and potentially wait around there for a
8  long time. Right?
9    A. It's not the most pleasant part of our job, no.
10   Q. Have you ever taken someone who would fit the
11  criteria of 5150 to jail instead of to the hospital
12  because you preferred not to go to the hospital with them?
13   A. I have not.
14   Q. You have not done that?
15   A. No.
16   Q. After Steve Neuroth died was there any change
17  in the policy or procedure in Mendocino County for how you
18  handle a 5150 person?
19   A. Are you asking me about Mendocino County code
20  or procedures, or Willits?
21   Q. Just procedures within the county that were
22  told to you.
23   A. There were slight intake changes in regards to
24  people of heightened -- what's the word I'm looking for --
25  emotional states. But that was all.

38

1    Q. So what do you mean by that?
2    A. And I couldn't tell you. I was told to just --
3  there was a piece of paper with a list of different
4  things. When you got to the intake, if they met all of
5  the items on there, then automatically you were told you
6  were going to need a medical clearance.
7    Q. Were you instructed after Steve Neuroth died
8  sometime that there's a new policy at the jail for when
9  you're allowed to take someone to the jail who may be
10  having a mental disturbance for whatever reason?
11   A. Not for a mental disturbance.
12   Q. For instance, if you arrest somebody who also
13  seems mentally disturbed, and you don't know why -- could
14  be mental illness or could be drugs -- were you told you
15  should take them to the hospital instead of to the jail?
16   A. No.
17   Q. Around the time of the Neuroth incident, based
18  on your training and experience, who decided if a prisoner
19  that you brought to the jail was medically fit to be
20  admitted to the jail? Do you know who made that decision?
21   A. For every single case or --
22   Q. Just generally.
23   A. Generally?
24   Q. What was the procedure there?
25   A. Well, there's lots of procedure. It would

39

1  start with the officer who made the arrest, then may, if
2  the officer doing the transport believes there was a
3  reason, then that would be the next step.
4    Then the intake officer at the jail, nurse, so on.
5    Q. So there is a system in the jail to decide if
6  someone is medically fit to be admitted. Correct?
7    A. Correct.
8    Q. Was there also a system at the jail to decide
9  if someone was psychiatrically fit to be admitted to the
10  jail?
11   A. I don't know what their procedure is for that.
12   Q. Did you feel you had a role in deciding whether
13  someone you were bringing to the jail was psychiatrically
14  fits to go into the jail?
15   A. I would have done some form of evaluation, yes.
16   Q. Can you describe for me what that would be?
17   A. Really depends on each and every case. Very
18  general. Depends on the whole investigation.
19   Q. So what are you saying? That you would assess
20  your arrestee to decide in your opinion if they're
21  psychiatrically fit to go to the jail?
22   A. Yes.
23   Q. And if you thought, based on your training,
24  that the person was not psychiatrically fit to be admitted
25  to the jail, then what would your option be at that point?

40

1    A. If they weren't psychiatrically fit, and I'm --
2    are you asking whether or not they have a mental health
3    disorder? Is that what you're asking?
4    Q. Yeah, I guess so.
5    A. Okay. If they have a mental health disorder, I
6    would be looking towards 5150 if they met that criteria.
7       If they didn't meet that criteria, the next place
8    to be would be to go to the jail.
9    Q. Okay. Were you permitted by law or your
10   department's policies as far as you know to find a family
11   member for someone that was mentally disturbed to let the
12   family member take care of them instead of taking them to
13   the hospital?
14   A. Am I permitted?
15   Q. Yes.
16   A. It depends on the situation.
17   Q. Okay. How does that change it? What does it
18   depend on?
19   A. Whether or not they're a risk to themselves,
20   others, and that person wouldn't be able to take care of
21   them.
22   Q. So if the person is disturbed and a risk to
23   themselves, then they're 5150, and then according to your
24   department's policy you shall take them to the hospital.
25   Right?

41

1    A. Correct.
2    Q. By the time of the Neuroth incident had you
3    received any training about how to determine if somebody
4    was intoxicated on drugs?
5    A. Yes.
6    Q. Where did you get that training?
7    A. In my POST academy.
8    Q. Did you receive any training after the academy?
9    A. Field training.
10   Q. And anything else?
11   A. After the incident, yes, but not prior.
12   Q. Okay. So you had on-the-job training from your
13   department about how to determine if someone was
14   intoxicated on drugs. And you had training in the police
15   academy. Right?
16   A. Correct.
17   Q. And that was before the Neuroth incident.
18   Right?
19   A. Correct.
20   Q. And some officers can get certified as drug
21   recognition experts. Are you familiar with that?
22   A. Yes.
23   Q. Are you a DRE?
24   A. I am not.
25   Q. Have you ever heard of the term restraint

42

1    asphyxia or positional asphyxia?
2    A. I have heard the term.
3    Q. And where have you heard of the term?
4    A. I've heard the term, multiple news outlets, as
5    well as discussions with officers, sergeants, people in
6    regards to how we deal with people in our cars and such
7    forth.
8    Q. Have you gotten some training about it, too?
9    A. Yes, some.
10   Q. And what is your understanding of what
11   restraint asphyxia is?
12   A. It is -- and it's very general; I'm not a
13   medical doctor nor do I even want to say I'm an expert at
14   this -- just to make sure that someone isn't being piled
15   on top of in a position that they physically can't
16   breathe.
17   Q. Your department has a policy about leg
18   restraints that talks about some procedures that should be
19   followed to help a person recover after they might have
20   been restrained on their stomach.
21   Do you recall that?
22   A. I don't recall it word for word, but...
23   Q. Okay. Well, have you ever been trained that to
24   avoid restraint asphyxia with someone that has been
25   secured by officers after a struggle, that once secured

43

1    the person should be placed in a seated or upright
2    position, and shall not be placed on his or her stomach
3    for an extended period as this may potentially reduce the
4    person's ability to breathe?
5    A. That sounds correct.
6    Q. And do you recall that one of your department's
7    policies says: The restrained person should be constantly
8    watched by an officer while in the restraint. The officer
9    is to ensure the person does not roll onto and remain on
10   his or her stomach.
11   Do you remember being told about that?
12   A. That sounds correct.
13   Q. And your department's policy also says that:
14   The officer should look for signs of labored
15   breathing, and where practical, take appropriate steps to
16   relieve and minimize any obvious factors contributing to
17   that condition.
18   Do you remember that, too?
19   A. That also sounds correct.
20   Q. And those are all sensible things that your
21   department has required to try to prevent injury to
22   arrestees from restrain asphyxia. Right?
23   A. Correct.
24   Q. And did you know about these restraint asphyxia
25   things we've just been talking about before the

44

CRANGLE
REPORTING SERVICES

1 Steve Neuroth incident?

2     A. Generally, yes.

3     Q. Now, at the time of the Neuroth incident did

4 your department have any policy at the time about the use

5 of audio recorders on the job?

6     A. Yes.

7     Q. What was the policy as you recall?

8     A. That if we use our recorder, and it's a

9 criminal matter, that we save the video -- not video,

10 audio -- until such time as the criminal proceeding has

11 reached its final adjudication.

12     Q. Did your department provide you with a

13 recorder?

14     A. Yes.

15     Q. And your department had a policy about those as

16 well.  Right?

17     A. Yes.

18     Q. Do you remember that?  And your department's

19 policy said something like:  These recorders are intended

20 to assist officers in the performance of their duties by

21 providing an unbiased audio record of a contact.

22     Do you remember that?

23     A. That sounds correct.

24     Q. You were told by your department's policy:

25     Prior to going into service, each uniformed officer

45

1 will be responsible for making sure that he or she is

2 equipped with a departmentally-issued audio recorder in

3 good working order.

4     So your department wanted you to make sure it

5 worked every day.  Right?

6     A. Correct.

7     Q. Did your department have any requirement that

8 you turn on your audio recorder under any circumstances?

9 Was it ever required?

10     A. It was not.

11     Q. It was optional with the officer.  Right?

12     A. Correct.

13     Q. And your department told you that you could

14 turn on your recorder any time you reasonably believed

15 that recording an on-duty contact with a member of the

16 public may be of future benefit.  Right?

17     A. That sounds correct.

18     Q. It's pretty open-ended like that.  Right?

19     A. Correct.

20     Q. And it pretty much left it up to you, the

21 officer, to decide if there should be some future benefit

22 for a recording.  Right?

23     A. Yes.

24     Q. There was another section of your department's

25 policy which talked about retention of the recording if

46

1 you decided to make a recording.

2     And it said, quote:  At any time that an officer

3 records any portion of a contact, which the officer

4 reasonably believes constitutes evidence in a criminal

5 case, the officer shall record the related case number and

6 book the recording media into evidence or download the

7 file in accordance with current procedure for stored

8 original files.

9     So basically any time you believed that your

10 recording would -- reasonably believed your recording

11 constitutes evidence in a criminal case, you were supposed

12 to preserve it.  Right?

13     A. Correct.

14     Q. To your knowledge has this policy of your

15 department concerning audio recorders changed since the

16 Neuroth incident?

17     A. Only because we've moved to video.

18     Q. Okay.  Is it still up to the officer's

19 discretion to turn on the video camera?

20     A. Yes.

21     Q. So your department still does not require you

22 to turn on the video at the beginning of any critical

23 incident or any arrest or anything like that?

24     A. It does not.

25     Q. How did the recorder that you had at the time

47

1 of the Neuroth incident work?  How would you turn it on

2 and off?

3     A. It had multiple buttons but one specific button

4 was an On, Pause, Off.

5     Q. Did you carry it on your person?

6     A. Left breast pocket.

7     Q. Around that time period were there certain

8 situations you tried to record?

9     A. I tried to record them almost every contact.

10     Q. And why was that?  Why did you have that --

11     A. You never know when it would be a future

12 assistance with a case, or in any way.

13     MR. HADDAD:  Let's take a break.

14     THE VIDEOGRAPHER:  11:39 a.m.

15     (Recess.)

16     THE VIDEOGRAPHER:  We are on the record.

17 11:50 a.m.

18     MR. HADDAD:  Q.  Okay.  So going on to the incident

19 now, on June 10th, 2014, that was the night that you

20 encountered Steve Neuroth.  Do you recall that?

21     A. Yes.

22     Q. Had you ever met him before?

23     A. That day?  I'd met him twice that day.

24     Q. But before that day did you know who he was?

25     A. No.

48

CRANGLE
REPORTING SERVICES

1    Q. Do you know whether your partner, Officer
2  Andrade, had ever met with him before?
3    A. I don't believe he did but I couldn't answer
4  for him.
5    Q. So that night on June 10th, I understand it was
6  just you and Officer Andrade on duty that night.
7    A. Correct.
8    Q. In separate cars.  Right?
9    A. I believe so, yes.
10    Q. Between the two of you you were responsible for
11  patrolling the entire City of Willits?
12    A. Correct.
13    Q. What's the population of Willits?
14    A. A little over 5,000.
15    Q. And on that night, let's see, 2014, you had
16  been a police officer for how long?
17    A. Just about a year and a half, I believe.
18    Q. Year and a half.  And the first almost half of
19  that was field training.  Right?
20    A. Correct.
21    Q. What was Officer Andrade's level of experience
22  at that time approximately?
23    A. Approximately?  Somewhere between three and
24  five years of experience.
25    Q. Okay.  Did you have a sergeant on duty at that

49

1  night?
2    A. No.
3    Q. It was just literally just the two of you for
4  the whole police department?
5    A. Correct.
6    Q. On how many other occasions before that evening
7  had you been in that situation where you were teamed up
8  with Officer Andrade to patrol the whole city?
9    A. I couldn't even possibly even venture a guess.
10    Q. That had happened several times before?
11    A. I'm sure it happened several times before.
12    Q. Kind of the normal staffing?
13    A. Yes.
14    Q. So can you describe what was your first
15  encounter with Steve Neuroth that night?
16    A. Yeah.  I encountered Steve in front of a local
17  grocery store called Mariposa Market.  I don't remember
18  why specifically I went to speak with Mr. Neuroth.  I
19  think there was a vehicle with open doors just kind of
20  sitting there.
21    Went there and Mr. Neuroth was in the general area
22  of the vehicle, started to walk away, and I spoke with
23  him.
24    Q. Okay.  And so once you started speaking with
25  him, how did he appear?

50

1    A. Fairly normal for the City of Willits.
2    Q. What do you mean by that?
3    A. The City of Willits is very diverse.  There
4  wasn't really much that screamed out at me that he was in
5  any way, shape, or form outside of the normal for a person
6  of Willits.  He was a little odd but that was about it.
7    Q. Okay.  I think in your interview you said that
8  he appeared confused.  Did he?
9    A. I don't recall specifically.
10    Q. Do you remember him moving his hands a lot
11  while he was talking to you?
12    A. That sounds probably like what he was doing.
13    Q. It looked like he was having a hard time
14  standing still?
15    A. Yes.
16    Q. And you observed him clenching his jaw?
17    A. Yes, I do remember that.
18    Q. Did he tell you he was looking for a lost
19  check?
20    A. I think so, yeah.
21    Q. Is there anything else you can recall from
22  that?
23    A. Just that he believed, I think, that the check
24  was either from Mariposa Market or in the market itself.
25    Q. As you explained to the D.A. investigator, you

51

1  thought he was showing some bizarre behavior but you
2  didn't think he was under the influence at that time?
3    A. I don't know if that's specifically what I said
4  or if I said I didn't believe he was so far under the
5  influence that he would have been considered an issue in
6  the City of Willits.
7    Q. So let me just show you the summary of your
8  interview with the D.A. investigator.  And the
9  investigator wrote:
10    "Officer Leef said during this contact they did not
11  think Neuroth was under the influence, and other than some
12  bizarre behavior, they did not think he was a danger to
13  himself or others."
14    Is that accurate?
15    A. That sounds accurate.
16    Q. And what was the bizarre behavior that you
17  observed at that time?
18    A. Clenching of hands; obviously he was in a place
19  that was a closed business.  I believe it was closed.  And
20  leaving his vehicle around, just kind of wandering the
21  parking lot.
22    Q. And I know it's been a couple of years.  The
23  D.A.'s investigator summarized your interview with him
24  saying that you told him Steve Neuroth appeared confused
25  as he was walking in front of the business.

52

1    Does that ring a bell?  Do you remember that?
2    A. Sounds accurate.
3    Q. So he's fidgety, he's clenching his hands,
4  clenching his jaw, he appears confused, but you don't
5  think he was under the influence of drugs.  Right?
6    A. At the time.
7    Q. But what I described is correct at the time.
8  Right?
9    A. Correct.
10    Q. And how did you leave that encounter?
11    A. I believe we advised him to leave that area.
12  And then we left.
13    Q. You and Officer Andrade?
14    A. Correct.
15    Q. Is there anything else about that first
16  encounter that you can remember as you sit here today?
17    A. Nothing specific.
18    Q. Okay.  So then what did you do after that
19  encounter?
20    A. I couldn't even tell you -- there are lots of
21  things I'm sure we did.
22    Q. You told the interviewer you went out and got
23  some dinner.  Do you remember that?
24    A. That sounds correct.
25    Q. And then I believe you might have gotten a call

53

1  that there was an individual in traffic?  Does that ring a
2  bell?
3    A. Yes.
4    Q. So to the best of your memory what's the next
5  thing you heard that concerned Steven Neuroth?
6    A. Pretty much the beginning of that call, that
7  the subject was running in traffic, ran in front of
8  vehicles, causing a disturbance in front of a local
9  business.
10    Q. This call that you got, did it come from your
11  dispatcher?
12    A. Correct.
13    Q. And your dispatcher was relaying basically a
14  911 call?
15    A. I don't know what the origin of the call was,
16  but yes, a call.
17    Q. Somebody was concerned for his safety, running
18  in traffic, I guess.  Is that right?
19    A. Correct.
20    Q. That's how it was relayed to you anyways.
21  Correct?
22    A. Correct.
23    Q. And it was relayed to you that this man was
24  running in traffic and possibly a danger to himself or
25  others.  Right?

54

1    A. Correct.
2    Q. And so how did you handle it when you got that
3  call?
4    A. I don't understand exactly what you're asking
5  for.
6    Q. What did you do when you got the call?
7    A. I responded to it.
8    Q. Did Officer Andrade also respond?
9    A. Yes.
10    Q. So what did you do next?
11    A. Arrived at the location.
12    Q. What did you see when you got there?
13    A. I saw a subject running in the middle of lanes
14  of traffic.
15    Q. And apparently by the time you got there he's
16  still running in traffic as it had been reported to you
17  while you were eating your dinner.  Right?
18    A. Correct.
19    Q. So that's how many minutes potentially that
20  he'd been running in traffic by that time?
21  Thirty minutes?
22    A. No.  I would say two minutes; two to three
23  minutes would be my guess.
24    Q. You got there within two minutes of the call?
25    A. It's a very small town.

55

1    Q. And how long had he been running in traffic
2  before somebody called into the dispatcher?
3    A. I don't know.  I couldn't speculate for that.
4    Q. Could have been longer; you don't know?
5    A. Could have been longer; could have been less.
6    Q. But anyways, when you get there he's still
7  running in traffic.  Correct?
8    A. Correct.
9    Q. And did you have to do anything to get him out
10  of traffic?
11    A. I believe I just had to command him out of
12  traffic.
13    Q. In fact, I think you or Andrade said at some
14  place that he almost got hit by a semi-truck.  Do you
15  remember that?
16    A. I believe that was me.
17    Q. What did that look like?
18    A. I don't know how I could possibly describe it.
19  He was in the roadway and running in pretty much a circle
20  and then stepped in front of the traffic of a semi-truck
21  coming southbound, I believe.
22    Q. Were you concerned for his safety?
23    A. I was.
24    Q. So you got him out of the street.  Right?
25    A. Um-hum.

56

CRANGLE
REPORTING SERVICES

1    Q. Yes?
2    A. Yes. Sorry.
3    Q. And so at that point you had an opportunity to
4 observe him at a closer distance. Right?
5    A. Yes.
6    Q. So what did you see at that point?
7    A. I just -- I remember him being very sweaty,
8 very fidgety, more than before, still clenching and --
9 clenching more so than before. Teeth. Hands.
10    Q. And did you know why he was sweaty?
11    A. Assuming from possible lots of different
12 things, but I couldn't tell you for sure what he was
13 sweaty because of.
14    Q. Possibly from running around for several
15 minutes?
16    A. Possibly.
17    Q. What was the night like that night? What was
18 the weather like? June.
19    A. June? I have no idea. It could be cool; it
20 could be hot.
21    Q. He was wearing, as I recall, shorts and a
22 T-shirt. Does that ring a bell?
23    A. I don't remember what he was wearing for his
24 lower extremities but I remember a T-shirt.
25    Q. Okay. So once you got him out of traffic did

57

1 you talk to him?
2    A. Yes.
3    Q. And what can you recall about that
4 conversation?
5    A. I remember pretty much having him sit out of --
6 I think it was on the side of the roadway at the time.
7 Until Officer Andrade got there.
8    Q. He was compliant with you. Right?
9    A. Yes.
10    Q. He followed your orders?
11    A. He did.
12    Q. And could you understand what Steve Neuroth was
13 saying?
14    A. I don't remember what he was saying. I believe
15 it was just very herky-jerky jumbled speech. It was words
16 but I don't remember what he was saying.
17    Q. Do you remember telling the investigator that
18 he was mumbling and you couldn't understand it?
19    A. Probably -- good possibility of that.
20    Q. Does that -- is that consistent with your
21 memory?
22    A. I don't really remember what he said, whether
23 it was mumbles or whether there were words. At some point
24 I remember he could put together words. At some point I
25 remember he couldn't.

58

1    Q. Okay. So at some point I believe by this time
2 you had your recording on, your recorder. Is that right?
3    A. Yes.
4    Q. Had you turned it on?
5    A. Yes.
6    Q. You and Officer Andrade were discussing
7 Mr. Neuroth and the situation that you were dealing with
8 and the two of you were wondering if he was crazy. Do you
9 remember that?
10    A. Yes.
11    Q. And at one point on your recording Officer
12 Andrade says something like, "Maybe he's crazy," and you
13 respond to Andrade, quote: "That's kind of the worry,"
14 unquote.
15    Do you recall that?
16    A. Sounds correct.
17    Q. What did you mean by that?
18    A. Whether or not how the rest of my day was going
19 to go pretty much.
20    Q. Because if he was crazy and running in traffic,
21 then the rest of your day could be waiting in the hospital
22 emergency room. Right?
23    A. Very much so, yes.
24    Q. And that's something you would prefer to avoid
25 if possible?

59

1    A. If possible I would hope that I don't have to
2 go there but I don't try to avoid it.
3    Q. Do you remember talking about that with
4 Officer Andrade at the time, that you preferred not to go
5 to the hospital with him and you discussed what you were
6 going to do with him?
7    A. We discussed a lot of things, yes.
8    Q. Okay. At one point you were discussing what to
9 do with him, and you told Officer Andrade: "Going south
10 is always preferable to 5150."
11    Do you remember that?
12    A. Yes.
13    Q. And going south, you meant going to the jail.
14 Right?
15    A. Correct.
16    Q. And Andrade said: "You'd rather go south than
17 sit at the hospital?"
18    And you answered, "Oh, yeah."
19    Do you remember that?
20    A. Yes.
21    Q. And so you discussed it a little longer, and
22 then Andrade said to you: "I'll write him up as a
23 psychotic state."
24    Do you remember him saying that?
25    A. That sounds correct.

60



1    Q. And the two of you had an understanding of what
2  "psychotic state" meant, and between the two of you when
3  you wrote someone up as a psychotic state, you meant that
4  to be meth intoxication. Right?
5    A. Correct. Meth psychosis.
6    Q. And you didn't have any training in determining
7  if somebody had meth psychosis, did you?
8    A. Generally speaking it's part of the 5150
9  evaluation class.
10    Q. Meth psychosis?
11    A. A little bit. Not very deep, but yes.
12    Q. But like you've agreed before, you were taught
13  that it's not your job to diagnose the cause of somebody's
14  mental disturbance. Right?
15    A. True. But it is my job to diagnose being under
16  the influence of a drug.
17    Q. And sometimes someone can be mentally disturbed
18  or mentally ill and also be under the influence of a drug.
19  Right?
20    A. Possible.
21    Q. And that gets more complicated, doesn't it.
22    A. It does.
23    Q. Did you do any testing on him to determine if
24  he was under the influence of meth or any other drug?
25    A. I did not.

61

1    Q. Did anybody?
2    A. Officer Andrade attempted to, yes.
3    Q. He attempted to?
4    A. Yes.
5    Q. What did he attempt to do?
6    A. He attempted to do an evaluation of being under
7  the influence of methamphetamine.
8    Q. What was that evaluation that you observed?
9    A. Started by trying to obtain a pulse for the
10  subject.
11    Q. And anything else?
12    A. I don't recall.
13    Q. So in your training can you diagnose meth
14  psychosis simply by taking somebody's pulse?
15    A. Meth psychosis? No. The influence of meth,
16  it's one of the parts of doing so.
17    Q. Right. Somebody's pulse can also be elevated
18  if they've been running around in the street for a while.
19  Right?
20    A. True.
21    Q. And you knew that was true. Right?
22    A. Yes.
23    Q. And, in fact, Officer Andrade on your recording
24  asked Steve Neuroth, "When did you use meth last?"
25    And Neuroth said, "I don't remember."

62

1    And Andrade said, "Have you used it recently?"
2    And he said, "Not recently."
3    Do you remember that?
4    A. I remember hearing it again when I listened to
5  the recording. I don't really remember it originally, no.
6    Q. Okay. So you and Officer Andrade decided to
7  write this up as a psychotic state due to meth
8  intoxication so you wouldn't have to take him to the
9  hospital emergency room as a 5150. Is that right?
10    A. No.
11    Q. It's not right?
12    A. No.
13    Q. So what really happened then?
14    A. Officer Andrade just performed his
15  investigation and determined him to be high, under the
16  influence of methamphetamine.
17    Q. So other than taking his pulse, which was
18  presumably elevated, and asking him if he had used meth,
19  which he denied, what else did Andrade do?
20    A. I'm sure he did a lot more just in evaluating
21  him. It was his investigation.
22    Q. Who arrested him?
23    A. Officer Andrade.
24    Q. At one point on the recording Officer Andrade
25  orders Steve Neuroth, "Come on, stand up. Where you going

63

1  to go, guy?"
2    And Neuroth says, "No where."
3    And then Andrade says, "You let me tell you
4  something, okay? Is if you run, I'm going to trip you,
5  and I'm going to push your face in the ground. Okay? All
6  right. Do guns scare you?"
7    Do you remember Andrade saying that?
8    A. I remember listening to it on the audio.
9    Q. And at the time did you think that that was an
10  appropriate way to talk to somebody who was exhibiting a
11  mental disturbance?
12    A. I don't believe he was exhibiting a mental
13  disturbance and I didn't find it particularly
14  inappropriate.
15    Q. And a few seconds later Neuroth said to him:
16  "I'm sorry, I just need to go to a hospital. I
17  went to a hospital -- " and then he gets cut off by you.
18    Do you remember him saying he just needed to go
19  to a hospital?
20    A. I remember hearing it on the audio; I don't
21  remember him saying it at the time.
22    Q. Now, do you agree that when he was running in
23  traffic he was a danger to himself or others?
24    A. Yes.
25    Q. And do you agree that he was not acting

64

CRANGLE
REPORTING SERVICES

1 rationally?
2     A. I do.
3     Q. In fact, he had some sort of mental
4 disturbance; you just don't know what the cause of it was.
5 Right?
6     A. I believe we had determined what the cause of
7 it.
8     Q. Well, but you didn't know the basis for
9 Officer Andrade believing or saying --
10     A. I didn't.
11     Q. -- it was meth, did you?
12     A. I did not.
13     Q. And you were right there the whole time,
14 weren't you?
15     A. I was.
16     Q. So whatever assessment Andrade did, he did
17 right in front of you, didn't he?
18     A. Yes.
19     Q. And we have the transcript; it would have been
20 seconds at the most from when he took his pulse until when
21 he -- strike that.
22     Do you remember listening to your recording and
23 Andrade said:  "I'll write him up as a psychotic state.  I
24 mean let me see your pulse."
25     He had already said he's going to write him up as a

65

1 psychotic state before he even tried to check his pulse.
2     Do you remember that?
3     A. I don't remember that specifically.
4     Q. And before he even asked him when he had used
5 meth.  Do you remember that?
6     A. That sounds correct.
7     Q. In fact, Andrade said:  "I'll write him up as a
8 psychotic state," right after you and he finished
9 discussing how you'd prefer not to take him to the
10 hospital but would rather take him to jail.
11     Do you remember that?
12     A. Yeah, that sounds correct.
13     Q. So did you do anything to ask questions about
14 Steve Neuroth's mental health to try to figure out if the
15 he might have a mental health problem?
16     A. Not that I remember.
17     Q. Did you do anything to check with his mental
18 health history with the county?
19     A. We don't have any ability to do so.
20     Q. Is there some way that you can check his
21 criminal history?
22     A. Yes.
23     Q. Would that show if he had a history of 5150
24 detentions?
25     A. I don't believe it shows up on his criminal

66

1 history report.
2     Q. Didn't you try calling Steve's brother at one
3 point?
4     A. Yes.
5     Q. And how did you know to call his brother?
6     A. We asked Steve for a phone number for someone
7 who he knew.
8     Q. Someone who could take care of him.  Right?
9     A. Correct.
10     Q. And he told you, "Call my brother, Jim?"
11     A. That sounds correct.
12     Q. And you tried call his brother Jim?
13     A. Correct.
14     Q. And you reached an answering machine for Jim's
15 business.  Do you remember that?
16     A. Yes, that sounds correct.
17     Q. Did you leave a message for his brother?
18     A. I don't believe so.
19     Q. Why not?
20     A. I didn't see a reason to leave a message.
21     Q. You were prepared to leave him with his brother
22 if his brother could come take care of him.  Right?
23     A. Correct.
24     Q. Whatever you were going to arrest him for, you
25 were prepared to just let him go to his brother.  Right?

67

1     A. We were willing to release him to his brother
2 and into his brother's care.
3     Q. So instead of taking Steve Neuroth to a
4 hospital as a 5150, and as Steve Neuroth requested that
5 you do, and instead of leaving him with his brother who
6 you couldn't reach, you decided to arrest him for a meth
7 crime and take him to jail.  Correct?
8     A. We believed he was under the influence of
9 methamphetamine.
10     Q. And again, based on what?
11     A. Based on Officer Andrade's observations as well
12 as my own.
13     Q. So what were your observations that led you to
14 believe he was on meth and not mentally ill?
15     A. Well, most of everything we saw.  He was
16 fidgety.  He was very aggressively fidgety.  He was unable
17 to sit still.  He wasn't -- he was all over the place.
18     It's hard to describe right now.  Everything that
19 we had seen earlier was moving forward.  He was clenching
20 more; he was doing things that were typically seen with
21 methamphetamine use.
22     Q. So I believe you've said, "We arrested him."
23     Was this a joint decision of you and
24 Officer Andrade to arrest him for meth?
25     A. I was speaking to Andrade about it, yes.

68

1    Q. Did you see any evidence of drug use on Steve's
2  body?
3    A. Not that I recall.
4    Q. So you didn't see any needle marks, did you?
5    A. That wouldn't have much to do with it. There
6  may be needle marks; there may not.
7    Q. Okay. And can I assume at some point you
8  searched him when you arrested him. Right?
9    A. I'm sure we did.
10   Q. That would have been right at the scene where
11 you were in Willits. Correct?
12   A. Correct.
13   Q. Did you find any drugs or paraphernalia on him?
14   A. I don't believe we did.
15   Q. Do you remember Steve was rambling that people
16 were out to get him?
17   A. That sounds correct.
18   Q. Is there anything else that happened at the
19 scene that you can recall now other than what you've told
20 me so far?
21   A. Not that I'm -- that specifically comes to
22 mind.
23   Q. So you and Officer Andrade decided to go south
24 to the jail with him. Right?
25   A. Correct.

1    Q. But first you had to take him to the Willits
2  Police Department. Is that correct?
3    A. Correct.
4    Q. Why was that?
5    A. We went to the Willits Police Department to
6  gather paperwork before I was to drive him to the jail.
7    Q. Okay. And so you still had two police cars.
8  Right?
9    A. Correct.
10   Q. Which one of you drove Steve?
11   A. Uh, I believe I did.
12   Q. So he's in the back of your car while you're
13 going to the jail.
14   Did you meet Officer -- strike that.
15   He's in the back of the car while you're going to
16 the police department.
17   Did Officer Andrade also go with you to the police
18 department?
19   A. He did.
20   Q. And can you recall anything about the ride with
21 Steve in the back of your car going to the police
22 department?
23   A. Yeah, he began to kick and wriggle in the back
24 seat and was starting to get unruly.
25   Q. Unruly?

1    A. Unruly.
2    Q. And did you do anything in response?
3    A. I did.
4    Q. What?
5    A. Officer Andrade had figured earlier when
6  speaking with him that when we were trying to put him into
7  my patrol car that he believed there were snakes inside
8  the patrol car.
9    And on mention of the snakes, he would stop doing
10 any of his out-of-control behavior and just kind of sit
11 there.
12   We determined that that was a good way to get him
13 to calm down and sit in the car without hurting himself or
14 my Patrol car.
15   Q. Did you ever tell him to stop kicking and stuff
16 like that?
17   A. I had.
18   Q. You told him that?
19   A. At one point.
20   Q. Does it show up on the recording anywhere?
21   A. I don't know when I did it. I do know that it
22 worked when I told him that there were snakes, that he
23 would stop kicking.
24   Q. The question is, I don't see the word "kicking"
25 appearing anywhere in your entire recording?

1    A. I know for a fact it says at some point in
2  there that he was getting kicky.
3    Q. Yeah. "Getting kicky" is different than
4  kicking your car, isn't it?
5    A. No, that is the essence of kicky.
6    Q. When you said "getting kicky" you meant he's
7  getting squirrely or weird, right?
8    A. No.
9    Q. Who was Robert Burbill? You guys, you and
10 Andrade were talking about him.
11   A. Robert Verville?
12   Q. Verville?
13   A. Verville.
14   Q. Who was that?
15   A. He was a subject who was arrested, I believe,
16 either earlier in the week or the previous week.
17   Q. And the two of you were talking about him that
18 Andrade said, "He's an idiot," and you said, "He was so
19 fucking high."
20   That's how you talked about him?
21   A. Probably.
22   Q. And the transcript records you saying about
23 Steve Neuroth, seconds after you were discussing Robert
24 Verville, about Steve, quote: "He thinks there's snakes
25 in there."

CRANGLE
REPORTING SERVICES

1     And then you said, "Snakes in a cop car."
2     Andrade says, "All right, guy."
3     And you say, "Now I want to get a rubber snake."
4     Why did you want to get a rubber snake?
5     A. It's gallows humor.
6     Q. Gallows humor?
7     A. Gallows humor.
8     Q. Gallows, like where people die?
9     A. Yes.
10    Q. So did you have to -- strike that.
11    How much time did you spend inside the Willits
12 Police Department?
13    A. Not very long.
14    Q. Just going in to get a form and come back out.
15 And I believe to look at a picture to verify that it was
16 Steve Neuroth.
17    Q. Were you talking on the phone or on the radio
18 with Andrade while you were going to the Willits Police
19 Department?
20    A. I don't believe so.
21    Q. So on the way to the Willits Police Department
22 you were scaring Steve about snakes in the back of the
23 car. Is that right?
24    A. No.
25    Q. Were you saying anything to him about snakes?

73

1     A. I did.
2     Q. On the way to the Willits PD?
3     A. I did.
4     Q. And part of your recording has you saying to
5 him, "Look out, he'll move. Don't move. Don't move.
6 Don't move. That was some funny-ass shit."
7     And then Andrade says, "What?"
8     And then you said, "I did it. Really, really high.
9 I'm going to go look at that picture to see if it's
10 actually him."
11    So that must have been just before you went into
12 the police station. Right?
13    A. Sometime in between then and then at the police
14 station.
15    Q. And you were telling Andrade the kind of stuff
16 that you had said to Steve while he was in the car.
17 Right?
18    A. Correct.
19    Q. And you thought that was some funny-ass shit?
20    A. It was funny because it worked. Once again, it
21 was gallows humor.
22    Q. So then you looked at a picture of Steve to
23 confirm who he was. Right?
24    A. Correct.
25    Q. And the picture of him looked pretty nice,

74

1 didn't it?
2     A. It looked, I believe, more normal than he was
3 currently looking.
4     Q. On your recording you actually said, quote:
5 "He looks almost normal with his fucking -- when he's not
6 high."
7     That's basically what you said. Right?
8     A. Probably.
9     Q. So then after the police station you drove him
10 on to the jail. Correct?
11    A. Yes.
12    Q. And it was just you and Steve Neuroth in your
13 car. Right. Correct?
14    Q. And several times during that ride you yelled,
15 "Snakes," at Steve. Right?
16    A. I don't know how many times.
17    Q. Several, wasn't it?
18    A. I have no idea.
19    Q. And you also said things like, "Is that
20 snakes?" To get a reaction out of him, right?
21    A. To get him to stop doing what he was doing.
22    Q. How come there's no where on your recording
23 where you're saying to him stop doing whatever you're
24 saying he's doing now?
25    A. Because I had a tool that was working, a tool

75

1 that would get him to just calm down and stop doing what
2 he was doing, and that tool was working.
3     Q. What was the tool?
4     A. He was kicking, and he was starting to wrestle
5 around in the back seat and get unruly.
6     Q. He was handcuffed, wasn't he?
7     A. He was.
8     Q. Well, how's he going to wrestle around in the
9 back seat when he's handcuffed?
10    A. I've seen it many a time people kick out my
11 windows.
12    Q. Was he seatbelted, too?
13    A. He was.
14    Q. So he's in seatbelt and handcuffed and you're
15 saying he's going to kick out your windows?
16    A. I've had it happen many times.
17    Q. Well, did you call for backup?
18    A. I wasn't in a position to call for backup.
19    Q. You could call for Andrade to come help you,
20 right?
21    A. Not on the way to the jail.
22    Q. Did you even radio any concern about that, hey,
23 you might kick out my window?
24    A. No, because my tool was working.
25    Q. What was your tool?

76

CRANGLE
REPORTING SERVICES

1    A. When I said, "Snakes," he would stop and sit
2 still.
3    Q. In fact, sometimes he would scream.  Right?
4    A. Before.  Correct.
5    Q. Because you knew that he was afraid of snakes.
6 Right?
7    A. I knew that "snakes" was getting him to calm
8 down and sit still.
9    Q. Please answer the question.  You knew he was
10 afraid of snakes because he'd screamed about them before
11 when you said, "Snakes," right?
12    A. I don't recall that at all.
13    Q. You don't hear that on the recording?
14    A. Not that I recall.
15    Q. So what I heard on the recording was at some
16 point you had a telephone call with somebody; do you
17 remember that?
18    A. Yes.
19    Q. Who were you talking to?
20    A. Justin D'Orazio.
21    Q. Who was that?
22    A. At the time he was a prospective officer.  He
23 was currently an officer.
24    Q. You had some music playing.  Do you remember
25 that?

77

1    A. Sounds correct.
2    Q. Pink Floyd maybe?
3    A. There's a lot of different things.  There's
4 only two or three different radio stations.
5    Q. At one point while you're on the phone you told
6 your friend something like, "I don't want to leave Willits
7 yet but it's probably going to happen so I don't think
8 so."
9       What did you mean by that?
10    A. Meant I was going to be applying for a
11 different position.  Or I may have already applied at that
12 point.
13    Q. And then I heard later on the recording your
14 talking with Justin, and you say, "Hello, Justin?  I can
15 hear you now.  Did your face hit the mute button?"
16       And then Steve Neuroth says something that you
17 can't really hear on the recording, and you say, "One
18 second.  'Snakes.'  Okay.  Sorry.  Did you hear that?  Uh,
19 I yelled, and he freaked out.  Yelled, because he was
20 starting to get a little kicky back there, so what I like
21 to do is say, 'Snakes' very loud, and he jumps and it
22 freaks him.  It's pretty funny."
23       Do you remember that?
24    A. That sounds fairly accurate.
25    Q. And you knew that when you yelled, "Snakes,"

78

1 very loud, he jumped and it freaks him.  Right?
2    A. That was a descriptive word.  It wasn't -- he
3 sat still.
4    Q. A few seconds after that, well, maybe a couple
5 of minutes, Steve says, "Sir?"
6       And you say, "Hold on a second."
7       And he says, "May I go now?  Get my phone call?"
8       And you say, "No, you can't go yet.  The snakes
9 will get you."
10       And Steve says, "Snakes?"
11       And you say, "There's lots of snakes back there."
12       Do you remember that?
13    A. I don't remember that specifically.
14    Q. Was what you were doing with him, saying that
15 there's snakes back there, consistent with your training?
16    A. Consistent with how we do things sometimes.
17    Q. Was it consistent with your POST training?
18    A. Wasn't inconsistent with my POST training.
19    Q. And did you think it was funny?
20    A. It was funny at the time.  I mean that's --
21 unfortunately the gallows humor that sometimes doing what
22 we do, some things have to be that way.  And otherwise
23 we're not going to make it through the day.
24    Q. You're not saying that Steve Neuroth was a
25 threat to you, are you?

79

1    A. At what point?
2    Q. Was he ever a threat to you?
3    A. I have no idea.  There's nothing that says he
4 was or wasn't.  It's very vague.
5    Q. When you got to the jail you were describing
6 for people at the jail what you had been doing about
7 saying, "Snakes," to him in the car.  Remember?
8    A. Yes.
9    Q. And so when you arrived at the jail you were
10 talking with a woman.  Was that the jail nurse?
11    A. I believe so.
12    Q. LVN Caudillo?
13    A. Yes.
14    Q. And I believe there was another man there, too.
15 Who was that?  Was that Masterson or Bernardi?  Do you
16 know?
17    A. It depends on when -- there were CHP officers,
18 and as far as Masterson and another who I don't know.
19    Q. And you told LVN Caudillo and a male who was
20 there:  "He was running in traffic and he's afraid of
21 snakes in the back of my car.  That's been really fun.
22 Walk up there and go, 'Snakes'; funniest thing you'll ever
23 see."
24       And then the nurse said to you, "You should have
25 just let him get hit by a car or something like that."

80

CRANGLE
REPORTING SERVICES

1    Do you remember that?
2    A. That sounds correct.
3    Q. And you didn't tell Nurse Caudillo or the
4 booking officer there that you had been yelling, "Snakes,"
5 for a purpose to get him to stop kicking, had you?
6    A. I don't remember what I had said specifically.
7    Q. All you told them was that it was the funniest
8 thing you'll ever see, right?
9    A. Again, it was gallows humor, and these are the
10 people who were who are dealing with the same thing I am.
11    Q. And a little bit later you're still talking
12 with members of the Sheriff's Office, and you say, "If the
13 you just walk up and do something really quick, and kind
14 of loud, and watch him freak out, it's hilarious.  Hey,
15 guy.  Oh, my God."
16    That's what you said.
17    And then a male that you were talking to said, "Can
18 you make him do that?"
19    Remember that?
20    A. Sounds correct.
21    Q. Did you know that your audio recorder was on
22 during that long ride to the jail?
23    A. Yes.
24    Q. And did you know that it was still on while you
25 were at the jail in the carport?

81

1    A. No.
2    Q. You had forgot that it was on at some point?
3    A. I think I had intended to turn it off but I
4 apparently had forgotten to do so.
5    Q. Once it's recording something, that could be
6 evidence in a criminal matter; you're supposed to preserve
7 that, right?
8    A. Can if I deem it so, yes.
9    Q. But you're supposed to deem it so or not so
10 based on a reasonable decision.  Right?
11    A. So I'm supposed to maintain it after the fact.
12 Doesn't mean I have to leave it on.
13    Q. So hypothetically, if you have your recorder
14 on, as an officer, and you actually engage in a crime, so
15 it would have evidentiary value to catch you, you're
16 saying that you had the right to just turn it off so you
17 didn't get caught?
18    A. If that was the fact.  There's nothing that
19 said I wouldn't be able to do that, that's not what
20 occurred, but that's not what the policy states.  States
21 that we have to preserve the evidence itself, not that we
22 have to keep recording.
23    Q. Did you call ahead to the jail before you
24 arrived to let them know you're bringing in a paranoid man
25 who you had been deliberately scaring on the ride over

82

1 there?
2    A. I wasn't --
3    MR. LEWIS:  I'm sorry.  Objection.
4 Mischaracterizes the evidence.
5    THE WITNESS:  I was not scaring him on the way over
6 in my opinion.
7    MR. HADDAD:  Q.  Did you let the jail know that
8 this guy was out of control and trying to kick out your
9 back windows if possible?
10    A. Sounded like that was what I was telling the
11 LVN at the time and whoever was standing there next to me
12 but I don't recall exactly what I was telling who or what.
13    Q. Wasn't there a procedure at the jail that if
14 you're bringing in a prisoner who is violent or unruly,
15 you should warn the booking staff so they can be prepared
16 to meet you at the car and handle this person?
17    A. In some cases, yes.
18    Q. Why didn't you do it here?
19    A. In this case what I was doing was working.  He
20 was calm.  He was calm at the jail.
21    Q. When you got to the jail one of the people who
22 greeted you was LVN Caudillo.  Right?
23    A. Correct.
24    Q. And I think you explained to the D.A.
25 investigator, quote:  "The nurse has actually been outside

83

1 the whole time.  She was already there to do a medical
2 clearance on the CHP so she's standing outside observing
3 the entire time we're there."
4    Do you recall that?
5    A. That sounds correct.
6    Q. And you were talking about in the carport
7 outside of the jail.  Right?
8    A. Correct.
9    Q. And then you also told the interviewer:
10 "There's also a nurse out there waiting because I had
11 already said, 'Hey, this guy is going to need it.'"
12    Do you remember that?
13    A. I don't remember it.  But that does sound
14 correct.
15    Q. And, in fact, Nurse Caudillo was present for
16 the events that happened -- unfolded afterward with Steve
17 being restrained and everything, she was there almost for
18 the entire time.  Right?
19    A. I believe she was there for nearly the entirety
20 if not the entire time.
21    Q. Okay.  Can you describe how Steve was acting
22 when he arrived at the jail with you?
23    A. At what point?
24    Q. At the jail.  When you first got to the carport
25 at the jail.

84

CRANGLE
REPORTING SERVICES

1     A. At what point?  There's multiple stages.  Are
2 you saying after I parked, or are you saying from the
3 moment I got there, or still out in the parking lot, out
4 in front, waiting for the gate?
5     Q. Once you got there and opened his door, how was
6 he acting?
7     A. Fairly calm.
8     Q. Was he agitated?
9     A. No.
10    Q. Was he oriented to his place and circumstances?
11    A. He seemed to be fairly calm.  I don't know his
12 orientation.
13    Q. Was he cooperative?
14    A. He was doing what we asked him most of the time
15 at the jail.
16    Q. Did he have any injuries on him that you saw?
17    A. Not that I saw.
18    Q. Was he bleeding anywhere?
19    A. Not that I saw.
20    Q. And you had handcuffs on him.  Right?
21    A. Right.
22    Q. Was he bleeding from his wrists?
23    A. I don't believe so.
24    Q. Did you hear one of the jail intake officers
25 asking him the questions on the intake forms?

85

1     A. I was in the general area, so for the most
2 part, yes.
3     Q. Could you hear any of his answers?
4     A. I don't know.
5     Q. Do you know if he was able to give responsive
6 answers?
7     A. I have no idea.
8     Q. And, in fact, when the jail intake officer, on
9 your recording you can hear him saying, "I've got a couple
10 key ones.  You ever try to kill yourself?  Any prescribed
11 medications?"  Things like that.
12    That would have been questions he was asking
13 Steve Neuroth.  Right?
14    A. Probably.
15    Q. And then you can't hear anything from Neuroth
16 in your recording at that point, and then your voice comes
17 on saying:  "If you just walk up and do something really
18 quick and kind of loud, and watch him freak out, it's
19 hilarious.  Hey, guy, my God."
20    So while an officer is asking him intake questions
21 about has he ever tried to kill himself or does he take
22 prescribed medications, you're talking about how hilarious
23 it was to say things and make him freak out.  Right?
24    A. I don't believe so.
25    Q. You don't believe?

86

1     A. I'm not talking to him for most of that -- if
2 any of that I'm talking to another person on the other
3 side of the car.
4     Q. Okay.  Did you let the intake officer know that
5 for whatever reason Steve had been freaking out about
6 snakes in the back of your car?
7     A. Not at this point.  He would have been calm.
8     Q. But I'm asking given what you know the intake
9 questions to be, like do you have mental problems, did you
10 let the intake officers know that minutes before he had
11 been freaking out from fear of snakes in the back of your
12 car?
13    A. Maybe when I was discussing it with the LVN.  I
14 don't recall if it was the intake officer or not who was
15 standing there with her.  I imagine so.
16    Q. So, after -- strike that.
17    Did you fill out some sort of pre-booking form?
18    A. I don't know which -- either it was myself or
19 Officer Andrade who did it, but yes, one of us did.
20    Q. Nurse practitioner?
21    MR. HADDAD:  Let's go off the record for a second.
22    THE VIDEOGRAPHER:  12:39 p.m.
23    (Discussion off the record.)
24    THE VIDEOGRAPHER:  12:40 p.m.
25    MR. HADDAD:  Q.  So this document has been marked

87

1 as an exhibit in a previous deposition, but for the record
2 it's County Bates number page 13.
3     Let me show this to you.  Is that a booking form
4 that you filled out?
5     A. That would be similar to a booking form.  It
6 does appear to have been filled out.  And by myself if
7 that is.
8     Q. Is that the booking form for Steve Neuroth's
9 arrest on that last incident we're talking about?
10    A. I couldn't say 100 percent that it is but it
11 does appear to look exactly like it.
12    Q. Yeah.  And it has a signature at the bottom.
13 Is that right?
14    A. Correct.
15    Q. And that's a signature on the line that says
16 Arresting Officer, doesn't it?
17    A. It does.
18    Q. And so you signed this as the arresting
19 officer.  Correct?
20    A. Correct.
21    Q. And it says:  Arrest Date, June 10, 2014.
22 Do you see that?
23    A. I do see that.
24    Q. So that was the date we're talking about,
25 right?

88

1    A. Correct.
2        Just for information, we sign those often for the
3    other officer for time purposes.
4        Q. So eventually Steve was moved inside the jail
5    to continue the booking process.  Right?
6        A. Correct.
7        Q. And what did you do as that was happening?  Did
8    you accompany him?
9        A. I followed.
10       Q. And why were you continuing to follow him?
11       A. I am not released by the jail booking staff
12   until, one, they tell me I'm released; and two, I receive
13   my handcuffs.
14       Q. Okay.
15       A. Or Andrade's handcuffs.  I don't know whose
16   were on him at the time.
17       Q. Yeah.  You needed to get your handcuffs back so
18   he had to be released and handled by the jail folks.
19   Correct?
20       A. Correct.
21       Q. So what did you observe once he was brought
22   inside the jail?
23       A. Inside the booking room?
24       Q. Yeah.
25       A. It was calm and mostly following direction at

89

1    that point.
2        Q. And what booking procedures did you observe
3    being done with him?
4        A. I believe it was a general search and they took
5    his shoes.
6        Q. In fact, his shoes were off and you had to
7    carry them in from the back of your car.  Remember?
8        A. That is correct.
9        Q. So in the back of your car while he's
10   handcuffed and seat belted his shoes are also off, right?
11       A. I don't believe so at some point.  I don't
12   believe they started off.
13       Q. Were you present while the nurse examined him?
14       A. I was.
15       Q. Tell me what you can recall about the LVN doing
16   whatever she did with him?
17       A. I don't recall anything of note other than her
18   taking a blood pressure and starting to move him into the
19   Sobering Cell.
20       Q. Okay.  And what's the next thing that happened
21   that stands out in your mind?
22       A. They began to move him into the Sobering Cell
23   and they went to take his handcuffs off and Mr. Neuroth
24   decided he wasn't going to go with that program.
25       Q. Okay.  So what did you see?

90

1    A. Generally, I mean I can't be super -- it's been
2    two and a half years -- or two years.  He began to
3    struggle with the deputies.  I don't know how -- or it
4    happened, but he began to turn on one of the deputies, and
5    he was taken down to the ground.
6        And as he was doing that he was kicking at the
7    deputies, and he started to kick at the back of one of the
8    deputies, so at that point there were only two deputies
9    that were trying to control his upper body and head, it
10   appeared, and his feet were free so I stepped in to
11   control his feet so he couldn't kick the deputies.
12       Q. So he's face down handcuffed the deputies are
13   onto him and you're saying he's kicking at the deputies?
14       A. Yes.
15       Q. How does somebody kick when they're face down
16   on their belly?
17       A. Very easily.  It's called a reverse kick; at
18   least that's what I've learned it to be called.  They use
19   their heal to try to strike the back of the person who is
20   behind them.
21       Q. And is the person able to do any sort of
22   forceful kick while they're laying on their stomach using
23   their heal?
24       A. Sure.
25       Q. You've experienced that?

91

1    A. Yes.
2        Q. So did he actually kick anybody?
3        A. He was -- it appeared to me, and I don't know
4    if he kicked anybody, he appeared to be attempting to
5    kick, and I believe it was Masterson who was directly kind
6    of behind and to his left and he was flailing around with
7    his feet and what appeared to me to be him attempting to
8    get at Masterson.
9        Q. What was he saying?  Was he saying things like,
10   "I'm going to kill you," or, "I'm going to kick you," or
11   anything like that?
12       A. Don't recall but I don't believe he used that
13   verbiage at all.
14       Q. No.  In fact, he was saying things like, "Don't
15   hurt me; don't kill me."  Correct?
16       A. That sounds correct.
17       Q. He was saying things that if you take them at
18   face value would indicate he was very frightened.  Right?
19       A. Very possible, yes.
20       Q. In fact, the D.A.'s investigator asked you
21   about this, and you told the investigator he never kicked
22   anybody, although he was flailing around.  Right?
23       A. Sounds about right.  But I couldn't tell you
24   for sure what I said.
25       Q. You just reviewed it before your deposition.

92

CRANGLE
REPORTING SERVICES

1 Right?
2    A. I reviewed it; doesn't mean I recall it word
3 for word.
4    Q. So when you saw his legs flailing around, you
5 got involved. Right?
6    A. Correct.
7    Q. What did you do?
8    A. I put his ankles together, one foot over the
9 other, and held his feet down.
10   Q. Did you put him in a Figure Four restraint?
11   A. I did not.
12   Q. You just kept his legs extended out, knees not
13 bent very much, just with the ankles crossed?
14   A. Correct.
15   Q. And then how long did you maintain that
16 position?
17   A. I don't know how long. Could have been
18 30 seconds; could have been minutes. I mean I know based
19 on the video it wasn't a long period of time. It felt
20 like forever, but -- until a deputy came in and said, "I
21 got it."
22   Q. And when the deputy came in what happened then?
23   A. He took over that position I had been in.
24   Q. Was he shackled at the legs?
25   A. Not at that time.

93

1    Q. When? When was it?
2    A. At some point before they moved him to another
3 room.
4    Q. So once you got relieved by a deputy what did
5 you do?
6    A. I wasn't able to leave because that's where
7 deputies and Mr. Neuroth were. So I stepped a little
8 deeper into the Sobering Cell.
9    Q. And at this time do you realize that your
10 recorder is still on?
11   A. I don't.
12   Q. So at some point in that room he had his ankles
13 shackled and the handcuffs were maintained on his wrists
14 and then he was carried out. Do you remember that?
15   A. Yes.
16   Q. And what did you see after he was carried out
17 of that cell?
18   A. He was carried into another cell.
19   Q. A Safety Cell?
20   A. Yes, that's what they were called.
21   Q. And they set him down on the ground there?
22   A. Yes.
23   Q. Did you see that?
24   A. Yes.
25   Q. And did you see that they set him on the grate

94

1 in the floor of that cell that's used as a toilet?
2    A. I don't know what it's used for and I couldn't
3 tell you where specifically they had set him at the time.
4 There was about five bodies in between me and that.
5    Q. But they set him down face down. Right?
6    A. Yes.
7    Q. And was Steve still saying things like, "Please
8 don't hurt me; please don't kill me?"
9    A. I believe so.
10   Q. Did you do anything while he was in the Safety
11 Cell?
12   A. At one point -- well, I was asked to come into
13 the Safety Cell by one of the deputies for the purposes of
14 just observing it all.
15      And at one point one of the sergeants, I don't
16 remember which one it was, I think it was Knapp, asked me
17 to speak to the -- to Mr. Neuroth because she thought I
18 had a rapport with him and that I could calm him down.
19   Q. So did you do that?
20   A. I attempted to.
21   Q. What did you say to him?
22   A. I don't remember word for word. I think I just
23 tried to get him to acknowledge me in any way.
24   Q. Did you make eye contact with him or could you?
25   A. I believe I attempted to but I don't know if I

95

1 did or not.
2    Q. Is there anything you observed Steve doing
3 other than being on the ground?
4    A. I couldn't really observe much. There was so
5 much going on.
6    Q. Did you see any deputy strike him?
7    A. At one point I believe I saw a deputy was
8 yelling like, "Let go of my hand; let go of my hand," and
9 he may have struck him, but I'm not 100 percent sure of
10 that.
11   Q. Did you see Steve Neuroth grab any deputy's
12 hand?
13   A. I could see the hands were holding one of the
14 deputy's hands. I don't know which deputy. There was
15 kind of a mass of hands around the handcuffs at that point
16 and one of them was definitely being held by the hands in
17 the handcuffs.
18   Q. How do you say definitely?
19   A. Because I could see the handcuffs circling the
20 wrists and I could see that hand holding on to another
21 hand.
22   Q. Deputies who were involved with his hands at
23 that point have testified that they were holding him in
24 wrist locks while he was handcuffed. Did you see that?
25   A. I saw a lot of different points where they were

96

CRANGLE
REPORTING SERVICES

1 holding him in wrist locks.
2     Q. So do you think it's possible that what you saw
3 was a deputy holding him in a wrist lock and Steve's hand
4 just being wherever it was maneuvered by the deputy?
5     A. Possible.
6     Q. Did you see blood from Steve's wrist at some
7 point?
8     A. I don't recall.
9     Q. On your recording at one point you can hear
10 Steve Neuroth say, "God, let me go; stop hurting me,
11 please."
12     A female says, "I got it; I got it; I got it."
13     Neuroth says, "Please let me go; please don't hurt
14 me."
15     And then you're recorded as saying, "I want to jump
16 in so bad but I'm not supposed to any more."
17     Do you remember saying that?
18     A. Yes.
19     Q. What did you mean by that, "I want to jump in
20 so bad?"
21     A. Other officers, deputies, whatever, are in a
22 struggle with someone, it's my natural inclination, it's
23 part of my training, to help them.
24     But I know in the jail at this point they have it
25 under control and it's my job to not get involved, so I

97

1 didn't.  It's fighting my every urge to do so, but...
2     Q. In fact, this guy that they're struggling with
3 has shackles on his ankles and handcuffs on his wrists and
4 he's face down and there's multiple deputies around him.
5 Right?
6     A. Correct.
7     Q. And many of them are putting their weight on
8 him.  Right?
9     A. I don't believe I ever saw them putting their
10 weight on him.
11     Q. What did you mean when you said, "...but I'm
12 not supposed to any more?"
13     A. That they were in control of it; they'll ask me
14 if they want any further assistance.
15     Q. What do you think you could have done if you
16 had been permitted to jump in at that point?
17     A. I don't know.  Because I don't know unless I
18 would have jumped in at that point.  And it's not
19 something I can speculate on.
20     Would have sought to render aid to the other
21 deputies.
22     Q. Do you remember telling Steve repeatedly to
23 breathe?
24     A. That sounds correct.
25     Q. In fact, you kept telling him to, "Just

98

1 breathe," or, "Breathe, man."
2     Why were you telling him to breathe?  Were you
3 concerned about his breathing?
4     A. I was just looking for him to do some kind of
5 calming method.
6     Q. Were you concerned that he may not be able to
7 breathe very well because of all the officers on top of
8 him?
9     A. I wasn't.
10     Q. Did you ever see Steve strike anybody with any
11 part of his body?
12     A. Other than when he was flailing?  I don't know
13 if he struck anyone or not.  I never actually saw him
14 strike anyone, no.
15     Q. Did you see him spit on anybody?
16     A. I never saw him spit on anybody.
17     Q. Or spit at all?
18     A. Not that I recall.
19     Q. Did you ever hear Steve use any profanity
20 towards officers?
21     A. Not that I recall.
22     Q. Did you ever hear Steve verbally threaten
23 anybody?
24     A. No.
25     Q. I think you said a deputy may have struck him

99

1 but you're not sure.  Did I hear that correctly?
2     A. I can't remember at this point.  I vaguely
3 recall that occurring but I couldn't tell you whether it
4 occurred or not.
5     Q. Do you recall hearing it on your recording of
6 your interview --
7     A. I believe I recall --
8     (Interruption by the court reporter.)
9     MR. HADDAD:  Let's slow down.  We need to pause a
10 little bit so the reporter can get everything.
11     THE WITNESS:  I'm sorry.
12     MR. HADDAD:  Q.  Do you recall hearing yourself say
13 that you saw deputies strike him multiple times when you
14 were interviewed by the D.A.'s investigator?
15     A. I don't recall.
16     Q. Did you ever see the need for anyone to strike
17 Steve Neuroth?
18     A. I didn't see anything that I would have
19 thought.  But that doesn't mean that those deputies
20 didn't.
21     Q. Okay.  But based on what you were seeing, you
22 didn't see any need to strike him.  Did you?
23     A. I didn't, no.  But if he was holding their
24 hands against their will to let it go, then there may have
25 been some need.  I couldn't answer for those deputies.

100

CRANGLE
REPORTING SERVICES

1    Q. Now, while this was all still going on, in the
2  Safety Cell, at some point the recording stops.
3    Why did your recording stop?
4    A. I believed I turned it off in an attempt to
5  turn it on.
6    Q. What do you mean?
7    A. I was going to turn on the audio recorder at
8  this point. It came to me that it was probably a good
9  idea to turn it on at this point; there's still a struggle
10  going on.
11    Q. Um-hum.
12    A. And in so doing I didn't really recall that it
13  was still on and I turned it off.
14    Q. Didn't you check to see if it was on?
15    A. No.
16    Q. You didn't pull it out of your pocket?
17    A. No, I very rarely pull it out of my pocket.
18    Q. You turn it on through the pocket?
19    A. Yes.
20    Q. So describe the mechanism that turns this thing
21  on and off.
22    A. It's a button. It's simply all it is; you can
23  grab it, you can feel it; and you can push the button from
24  outside your shirt.
25    Q. Okay. So what did you do in the time after you

101

1  thought that you had turned on your recording but actually
2  turned it off?
3    A. Um, more of the same as far as just attempting
4  at first to speak with -- well, actually, I don't even
5  think at that point -- I think at that point I was asked
6  to leave and I just stayed outside the room and was
7  verbally watching it -- not verbally --
8    Q. Just watching it?
9    A. Observing it.
10    Q. Okay. So at some point we know what happened
11  from other testimony and there's video and everything so
12  we don't have to go through every detail.
13    But at some point his clothes were removed and a
14  safety smock was put on top of him. Right?
15    A. That would be correct.
16    Q. At that point officers kind of filed out of the
17  cell one by one; is that right?
18    A. Correct.
19    Q. Were you still watching all that?
20    A. I was backed away a little bit so I couldn't
21  see into the cell so much because they were coming out.
22    Q. And was LVN Caudillo standing there with you
23  also watching through the window?
24    A. I don't think either of us were watching
25  through the window at that point. I think we had backed

102

1  away and were a little bit down the hall; could see part
2  of the hall but not all of it.
3    Q. So you were standing with her?
4    A. I think I was.
5    Q. And what was your last sight of Steve before
6  that cell door was closed?
7    A. They were still coming out. Because I was just
8  getting pushed further and further from the door.
9    Q. Did you hear Steve saying anything?
10    A. I don't recall anything.
11    Q. So once the door was closed, and Steve was
12  inside the cell, or just before the door was closed, did
13  you get a look at Steve's last position? Body position?
14    A. I don't recall.
15    Q. Once the door was closed what happened?
16    A. At that point I think we all stood there for a
17  minute and then we filed into the control room area of the
18  jail. So I could get my handcuffs back.
19    Q. Okay. And then what happened?
20    A. And then I left.
21    Q. So what do you believe Steve Neuroth's medical
22  status was when you left?
23    A. I knew he was under the care of the jail at
24  that point.
25    Q. Did you express any concern to anybody about

103

1  the possibility of restraint asphyxia if Steve were left
2  on his stomach?
3    A. I didn't see anything that indicated that he
4  would have had a restraint asphyxia.
5    Q. That's not the question. Did you express
6  concern to anybody about --
7    A. I wouldn't have expressed concern if I didn't
8  see anything that would have made me concern for it.
9    Q. Steve was face down the whole time, wasn't he?
10    A. He was.
11    Q. So you got your handcuffs and left the jail.
12  Right?
13    A. Correct.
14    Q. Where did you go next?
15    A. To my car.
16    Q. And then where?
17    A. Back to the Willits Police Department.
18    Q. What did you do at the police department?
19    A. Resumed patrol duties.
20    Q. So you went to the department first and then
21  you went on patrol.
22    A. Well, I went on patrol the second I reached the
23  city again but unsure of exactly what I did when I
24  returned to the city limits.
25    Q. At some point did you talk with Officer Andrade

104



1 about what had happened at the jail?
2     A. I'm sure at some point, yes.
3     Q. Probably had phone on the way back to the city,
4 right?
5     A. I think I probably did.
6     Q. And what did you and he talk about?
7     A. I have no idea. I do not recall at all.
8     Q. At some point did you try to turn your recorder
9 off because you thought it was on?
10     A. Not that I recall.
11     Q. So did anything else happen eventful for the
12 rest of your shift?
13     A. I was informed later that -- by Officer Andrade
14 who had been called by the jail, wanted to speak to the
15 Officer in Charge, that was Officer Andrade, that
16 Mr. Neuroth had passed.
17     Q. So then what happened?
18     A. Then I contacted the Chief of Police and one of
19 the sergeants who lives in the city limits. Inform them.
20     Q. And you knew that you were going to have to go
21 be interviewed in several hours by the district attorney's
22 office. Right?
23     A. I was informed of that by them.
24     Q. Yeah. So your union provided lawyers for you?
25     A. Correct.

105

1     Q. And did you do anything else between the time
2 that you learned you were going to have to be interviewed
3 and when you actually went in for the interview?
4     A. Not that I recall.
5     Q. Where did your interview take place?
6     A. In the interview room of the Willits Police
7 Department.
8     Q. And before you were interviewed you had an
9 opportunity to meet with your lawyer for about an hour.
10 Right?
11     A. Correct.
12     Q. Did you talk with Officer Andrade about what he
13 was going to include in his police report for this
14 incident?
15     A. Not that I recall.
16     Q. Did you ever review Officer Andrade's report
17 just in the course of your job?
18     A. Not until I reviewed it recently.
19     Q. When you reviewed Officer Andrade's report
20 recently did you notice anything it that you thought was
21 incorrect?
22     A. Not that I recall. Anything in it.
23     Q. Given that you had been involved in this
24 situation, and then your arrestee had eventually died in
25 the jail, why didn't you write a report about what your

106

1 involvement was?
2     A. My lawyer as well as the district attorney's
3 office informed me that no report was necessary from me as
4 that was part of their investigation.
5     Q. There was what's been referred to as a big
6 debriefing at the jail later that morning. Were you
7 present for that?
8     A. I was not.
9     Q. Did you ever have any conversations with any of
10 the jail supervising people like Commander Pierce, or
11 Lieutenant Bednar or even Sergeant Knapp after this all
12 happened about what had happened with Steve Neuroth?
13     A. Um, nothing like specific or scheduled.
14     I'm sure there was words in passing but nothing in
15 regards to policy or otherwise.
16     Q. Okay. As far as you know have you had any
17 misconduct complaints filed against you?
18     A. Yes.
19     Q. For what?
20     A. Use of force.
21     Q. How many times?
22     A. Just once, I believe.
23     Q. Okay. And when was that?
24     A. I don't even recall.
25     Q. Was it investigated by your department?

107

1     A. It was investigated by an outside agent.
2     Q. Okay. And what was the final disposition of
3 it? Do you know?
4     A. I don't -- I have yet to receive my final
5 disposition for it.
6     Q. So it seems to be ongoing?
7     A. I was informed that it was pretty much done but
8 it just -- I haven't yet to receive it.
9     Q. Have you been sued in any other matters besides
10 this?
11     A. No.
12     Q. Do you receive regular personnel evaluations
13 from the Willits PD?
14     A. I do.
15     Q. How often?
16     A. Yearly.
17     Q. Those are in writing, right?
18     A. Correct.
19     Q. Have you received any evaluations in any area
20 that have been below expectations or unsatisfactory?
21     A. Not that I recall.
22     Q. Has the Willits PD been critical of your
23 judgment in their evaluations of you?
24     A. No.
25     Q. Or of your integrity?

108



1    A. No.
2    Q. At what point did you realize that your
3  recording covered your interaction with Steve Neuroth in
4  the police car and for much of what happened at the jail?
5    A. I have no idea. Probably at some point when I
6  was back at the station but I don't recall.
7    Q. Do you think that was before or after your
8  interview?
9    A. Probably before.
10    Q. And when you realized that you had recorded
11  your interactions with him in the car, did that cause you
12  any concern?
13    A. I believed it was something to discuss with my
14  lawyer and I did so.
15    Q. I was looking at the D.A. investigator's
16  summary of your interview. And that summary includes the
17  following. I just want to ask you if it's accurate.
18    "While at the office, Officer Leef was able to
19  identify the individual as Steve Neuroth by looking him up
20  in the jail booking system and looking at a previous
21  booking photo."
22    Did that happen at the Willits PD when you stopped
23  there?
24    A. I believe so.
25    Q. And so you apparently could look him up in the

109

1  jail booking system?
2    A. Correct. They have booking photos in our
3  system.
4    Q. And do they have other booking records from
5  previous bookings there?
6    A. They may.
7    Q. So you had access to other previous jail intake
8  records concerning Steve Neuroth at that time?
9    A. I have access to it, yes.
10    Q. And did you notice that in some of those
11  previous jail intake records he had said he had a long
12  mental health history with the county?
13    A. I didn't review his booking records.
14    Q. But that was available to you to review if you
15  had any question about the origin of his irrational
16  behavior. Right?
17    A. It may be available to me. I don't know what
18  was available to me at the time.
19    Q. Okay. Going on with this D.A. interview
20  summary, it says:
21    "Officer Leef said he returned to his patrol car,
22  completed the booking paperwork out of the trunk."
23    Does that sound accurate?
24    A. It sounds accurate.
25    Q. And it goes on:

110

1    "During this time Officer Leef did not observe
2  Neuroth display any odd behavior."
3    Is that accurate?
4    A. That's probably accurate.
5    Q. And upon completing the paperwork you
6  transported Neuroth to the county jail. That's accurate,
7  right?
8    A. Correct.
9    Q. Now, why didn't you tell the D.A.'s
10  investigator that you had been yelling, "Snakes," and
11  saying about -- talking about snakes with Steve when he
12  was in your car?
13    A. Because -- I had discussed it with my lawyer
14  and we determined that it wasn't relevant and I wasn't...
15    Q. Now, today you've told us that when you said he
16  was getting kicky, you meant he was kicking in the back of
17  your car and acting out. Right?
18    A. Correct.
19    Q. Why didn't you tell that to the D.A.
20  investigator?
21    A. Once again, didn't appear to have anything to
22  do with it. He was calm when we got to the jail.
23    Q. In fact, the D.A.'s investigator asked you all
24  about your interactions with him from beginning to end.
25  Right?

111

1    A. Correct.
2    Q. Including on the ride over. Right?
3    A. Correct.
4    Q. Remember when the D.A.'s investigator asked you
5  if you had a recording?
6    A. I don't recall.
7    Q. You don't recall him asking you about the
8  recording?
9    A. I don't recall specifically the question, no.
10    Q. But in general do you remember him talking
11  about the recording?
12    A. I don't recall.
13    Q. How did the D.A. investigator learn that you
14  had a recording?
15    A. I have no idea.
16    Q. In the summary of the interview that you had
17  with the D.A.'s investigator it says -- this is at Bates
18  page County 36. The summary says:
19    "I asked Officer Leef if he had any type of
20  recording of the incident. He said he digitally recorded
21  almost the entire contact with Neuroth up to and including
22  a portion of the booking process."
23    Does that refresh your memory?
24    A. That sounds correct.
25    Q. "I asked if I could obtain a copy of the audio

112

1 and he told me I would need to speak with their evidence
2 technician, Brandy Gamble, and request a copy."
3     Do you recall that?
4     A. That sounds accurate.
5     Q. Now, when you had this conversation about your
6 video -- your audio recording with the D.A. investigator,
7 the D.A. investigator had already turned off his
8 recording. So that portion of his interview of you was
9 not recorded. Were you aware of that?
10    A. I was not.
11    Q. When the D.A. investigator asked you for a copy
12 of your recording, were you concerned that that recording
13 might get you into any trouble?
14    A. No.
15    Q. Were you ever talked to by a supervisor about
16 your conduct in this incident?
17    A. Just when I spoke to them urgently. When I
18 informed them that the incident had occurred.
19    Q. Once your supervisors had an opportunity to
20 listen to your recording, did anybody from the Willits PD
21 express any concern about your conduct in this? And I'm
22 saying out of the presence of a lawyer.
23    MR. LEWIS: Objection. That assumes facts not in
24 evidence and doesn't have a foundation.
25    MR. HADDAD: Go ahead.

113

1     THE WITNESS: Sorry. Repeat it for me?
2     MR. HADDAD: Q. Yes. Once your supervisors in the
3 Willits PD learned about your recording, and your conduct
4 in this matter with Steve Neuroth, did they talk with you
5 at all about your conduct in this?
6     A. No.
7     Q. Has anyone from the Willits PD ever expressed
8 to you that the way that you dealt with Steve Neuroth was
9 inappropriate?
10    A. Not in those words.
11    Q. In what words did they use?
12    A. Said to use it as a learning experience and
13 that sometimes we don't need to use the tools at our
14 disposal quite as much as I may have.
15    And that in retrospect obviously it didn't turn out
16 the way we would have liked it to, but to not not do my
17 job pretty much was what I was explained to by him.
18    Yes, this happened, and it was bad. But sometimes
19 bad things do occur. And unfortunately this occurred this
20 time. That was pretty much the extent of it.
21    Q. What did you think he meant when he talked to
22 you about you don't have to use all the tools you have
23 available to you or something like that?
24    A. He -- in his training and experience --
25 believed that maybe I shouldn't have used the snakes

114

1 statement.
2     Q. And did he explain to you why?
3     A. Yeah.
4     Q. What did he say?
5     A. He said that it doesn't sound good. But he
6 understands why because he said if it worked it worked,
7 and he understands why I used it.
8     Q. Your department has a policy about employee
9 speech. Do you recall that?
10    A. I don't recall it offhand.
11    Q. It's policy 1058. And it's at Bates Willits
12 page 462.
13    And it says: "This policy applies to all forms of
14 communication." And it goes on to discuss many different
15 forms of communication.
16    And it says under Prohibited Speech, Expression and
17 Conduct, it says:
18    "To meet the department's safety performance and
19 public trust needs, the following is prohibited: A,
20 speech or expression made pursuant to an official duty
21 that tends to compromise or damage the mission, function,
22 reputation, or professionalism of the Willits Police
23 Department or its employees."
24    Do you see that?
25    A. I see that.

115

1     Q. That applied to you at the time of this.
2 Right?
3     A. Yes.
4     Q. Do you think that any of your speech or
5 expression in this manner tended to compromise or damage
6 the mission, function, reputation, or professionalism of
7 the Willits PD?
8     A. No.
9     Q. This policy also prohibits any speech or
10 expression that is contrary to the canons of the Law
11 Enforcement Code of Ethics as adopted by the Willits
12 Police Department.
13    Are you familiar with the canons of Law Enforcement
14 Code of Ethics?
15    A. I'm familiar with them.
16    Q. You learned about those in the academy. Right?
17    A. I did.
18    Q. And in the academy you learned the Law
19 Enforcement Code of Ethics which says: As a law
20 enforcement officer --
21    MR. LEWIS: What are you referring to -- can I get
22 what you're referring to for the state of our record?
23    MR. HADDAD: Sure. For the record I'm going back
24 to Learning Domain One. Leadership, Professionalism and
25 Ethics.

116

1   MR. LEWIS: And that's Learning Domain number one
2 from 2006?
3   MR. HADDAD: This is from 2007. Excuse me. 2005.
4   Q. Do you recall learning that Law Enforcement
5 Code of Ethics says in part: As a law enforcement officer
6 my fundamental duty is to serve mankind, to safeguard
7 lives and property, to protect the innocent against
8 deception, the weak against oppression or intimidation,
9 and the peaceful against violence or disorder. And to
10 respect the Constitutional rights of all men to liberty,
11 equality and justice.
12   Do you remember that?
13   A. I do.
14   Q. In fact, did you ever have to take an oath to
15 uphold that code of ethics?
16   A. I did.
17   Q. And the canons of ethics that your department
18 forbids you from speaking in a way that would violate
19 include a lot of different things, but one of them is
20 Standard 2.4:
21   Peace officers shall follow the principles of
22 integrity, fairness, and impartiality in connection with
23 their duties.
24   Do you recall that?
25   A. That sounds correct.

117

1   Q. And 3.6: Peace officers with due regard for
2 compassion shall maintain an objective and impartial
3 attitude in official contacts.
4   Do you remember that?
5   A. That sounds correct.
6   Q. Do you think that any of your speech or conduct
7 with regard to Steve Neuroth violated the law enforcement
8 canons or codes of ethics?
9   A. I don't think so.
10   Q. If you had this to do over again, would you do
11 anything differently?
12   A. Knowing everything I know?
13   Q. Yes.
14   A. I would hope that I could handle this in a way
15 that wouldn't end the same way. I don't know specifically
16 how I would handle it differently.
17   A. I don't think there's anything I could have
18 done that would have changed the outcome.
19   MR. HADDAD: That's all we have.
20   Thank you.
21   THE VIDEOGRAPHER: Original media will be retained
22 by Benchmark Video at 33 Roques Moraes Court, Mill Valley,
23 California.
24   We're off the record at 1:18 p.m.
25   Thank you.

118

1   (Deposition concluded at 1:18 p.m.)
2   ---oOo---
3
4
5
6   _____
      KEVIN LEEF
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

119

1 STATE OF CALIFORNIA      )
                           )   ss
2 COUNTY OF ALAMEDA        )
3
4   I, Karen A. Crangle, hereby certify that the
  witness in the foregoing deposition named
5
6
7      KEVIN LEEF
8
9 was by me duly sworn to testify to the truth, the whole
10 truth, and nothing but the truth in the within-entitled
11 cause; that said deposition was taken at the time and
12 place herein named; that the testimony of said witness was
13 reported by me, a certified shorthand reporter and a
14 disinterested person, and thereafter transcribed into
15 typewriting.
16
17   And I further certify that I am not of counsel or
18 attorney for either or any of the parties to said
19 deposition, nor in any way interested in the outcome of
20 the cause named in said caption.
21
22 Date: October 31, 2016
23
24 *Karen A. Crangle*
   Karen A. Crangle, C.S.R.
25

120

Crangle
REPORTING SERVICES

1                October 31, 2016

2

3

4    KEVIN LEEF
       c/o Scott A. Lewis, Attorney at Law

5    PERRY JOHNSON ANDERSON MILLER & MOSKOWITZ
       438 First Street, 4th Floor

6    Santa Rosa, California 95401

7

8

       RE:  NEUROTH vs. MENDOCINO COUNTY

9

10

11   Dear Mr. Leef:

12   Your deposition transcript has been prepared and is
      available at our office for reading, correcting and

13   signing, and shall remain so available for 35 days.

14   Should you wish to review your deposition transcript,
      please contact our office for an appointment.

15

16   Sincerely,

17

18   *Karen A. Crangle*

19   Karen A. Crangle, C.S.R.

20

21

22

23

24   cc:  All counsel

25

                                          121

---

1    Errata Sheet

2

3    NAME OF CASE: JAMES NEUROTH vs. THOMAS D. ALLMAN

4    DATE OF DEPOSITION: 10/20/2016

5    NAME OF WITNESS: Kevin Leef

6    Reason Codes:

7       1. To clarify the record.

8       2. To conform to the facts.

9       3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                         _____

                                          122