# EXHIBIT 20

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3               ---oOo---

4

5   JAMES NEUROTH, Individually and
    as Successor in Interest of
6   Decedent STEVEN KELLOGG NEUROTH,

7          Plaintiff,

8   vs.                          No. 1:15-cv-03226-RS

9   MENDOCINO COUNTY, a public entity;
    MENDOCINO COUNTY SHERIFF-CORONER
10  THOMAS D. ALLMAN, in his individual
    and official capacities;
11
    (CAPTION CONTINUED)
12

13

14     VIDEOTAPED DEPOSITION OF DEPUTY JEFFREY ANDRADE

15

16

17         Taken before MICHELE J. LUCAS

18             CSR No. 4017

19           August 25, 2017

20

21

22         Aiken Welch Court Reporters
23         One Kaiser Plaza, Suite 250
           Oakland, California 94612
24     (510) 451-1580/(877) 451-1580
           Fax:  (510) 451-3797
25           www.aikenwelch.com

## Page 2

```
1   CORRECTIONS CAPTAIN TIM PEARCE;
    SERGEANT LORI KNAPP; DEPUTY FRANK
2   MASTERSON; DEPUTY CRAIG BERNARDI;
    DEPUTY MICHAEL GRANT; DEPUTY JEANETTE
3   HOLUM; DEPUTY ROBERT PAGE; DEPUTY
    CHRISTINE DE LOS SANTOS; CITY OF
4   WILLITS, a public entity; WILLITS
    POLICE CHIEF GERARDO GONZALEZ;
5   WILLITS POLICE OFFICER JEFF ANDRADE;
    WILLITS POLICE OFFICER KEVIN LEEF;
6   CALIFORNIA FORENSIC MEDICAL GROUP,
    INCORPORATED, a California corporation;
7   CORRECTIONAL MEDICAL GROUP COMPANIES,
    INCORPORATED, a Delaware Corporation;
8   TAYLOR FITHIAN, M.D.; ELAINE HUSTEDT;
    YVONNE MAXFIELD, R.N.; CLAIRE TESKE,
9   R.N.; JENNIFER L. CAUDILLO, L.V.N.,
    COUNTY DEPUTIES 9-20, and DOES 23-35,
10  individually, jointly, and severally,
11          Defendants.
12  _____/
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1              I N D E X
2                                        PAGE
3   EXAMINATION BY MR. HADDAD              7
4
5            E X H I B I T S
6   NUMBER                               PAGE
7   Exhibit 1   Detail Call For Service Report   70
                COW 000473
8
    Exhibit 2   Willits Police Department Case   82
9               Report dated 6/10/2014
                CONFIDENTIAL County-00143-145
10
    Exhibit 3   Public record information listing  122
11              compensation information for
                Jeffery Andrade
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1          DEPOSITION OF DEPUTY JEFFREY ANDRADE
2
3        BE IT REMEMBERED, that pursuant to Notice, and
4   on the 25th day of August 2017, commencing at the hour
5   of 1:44 p.m., in the offices of Haddad & Sherwin, 505
6   17th Street, Oakland, California 94612, before me,
7   MICHELE J. LUCAS, a Certified Shorthand Reporter, State
8   of California, personally appeared DEPUTY JEFFREY
9   ANDRADE, produced as a witness in said action, and
10  being by me first duly sworn, was thereupon examined as
11  a witness in said cause.
12              ---oOo---
13  APPEARANCES
14  For the Plaintiff:
15      MICHAEL HADDAD
        Haddad & Sherwin
16      505 17th Street
        Oakland, CA 94612
17      510-452-5500
        Michael.julia@haddadsherwin.com
18
19  For the Mendocino County Defendants:
20      ANNE L. KECK
        Keck Law Offices
21      418 B Street, Suite 206
        Santa Rosa, CA 95401
22      707-595-4185
        Akeck@public-law.org
23
24
25
```

## Page 5

```
1   For the Mendocino County Defendants:
2   KATHRYN R. VAUGHAN
    Patton & Ryan
3   330 North Wabash Avenue, Suite 3800
    Chicago, IL 60611
4   312-261-5160
    Kvaughan@pattonryan.com
5
6   For the Defendants City of Willits, Police Chief
    Gerardo Gonzalez, Officer Jeff Andrade, Officer
7   Kevin Leef:
8   SCOTT A. LEWIS
    Perry Johnson Anderson Miller & Moskowitz
9   438 First Street, 4th Floor
    Santa Rosa, CA 95401
10  707-525-8800
    Lewis@perrylaw.net
11
12  For the Defendants California Forensic Medical
    Group, Taylor Fithian, M.D., Jennifer L. Caudillo,
13  LVN:
14  JEROME M. VARANINI
    Law Offices of Jerome M. Varanini
15  641 Fulton Avenue, Suite 200
    Sacramento, CA 95825
16  916-993-4868
    Jvaranini@tsvlaw.com
17
18  For the Defendants Correctional Medical Group
    Companies; Elaine Hustedt; Yvonne Maxfield, RN;
19  Claire Teske, RN:
20  PETER GEORGE BERTLING (Via telephone)
    Bertling & Clausen
21  15 West Carrillo Street, Suite 100
    Santa Barbara CA 93101
22  805-892-2100
    Pgb@bertling-clausen.com
23
    ALSO PRESENT BRITTANY ROHAN, Videographer
24
25
```

Page 6

1    THE VIDEOGRAPHER:  Good afternoon.  Here
2  begins media No. 1 in the deposition of Jeff
3  Andrade.
4    The caption of this case is James Neuroth,
5  Individually and Successor in interest of decedent
6  Steven Kellogg Neuroth, vs. Mendocino County, et
7  al.
8    This case is in the United States District
9  Court, Northern District of California, case
10  No. 115-cv-032266 RS.  Today's date is August 25th,
11  2017, and the time is 1:43 p.m.
12    The deposition is taking place at 505 17th
13  Street in Oakland, California.  The videographer is
14  Brittany Rohan, and the court reporter is Michele
15  Lucas, both appearing on behalf of Aiken Welch
16  Court Reporters.
17    Would the counsel please identify
18  yourselves and state whom you represent.
19    MR. HADDAD:  Michael Haddad for the
20  plaintiff.
21    MR. LEWIS:  Scott Lewis on behalf of the
22  City of Willits.
23    MR. VARANINI:  Charles Varanini for
24  California Forensic Medical Group, Jennifer
25  Caudillo, and Dr. Taylor Fithian.

Page 7

1    MS. VAUGHAN:  Katie Vaughan for the
2  Mendocino County defendants.
3    MS. KECK:  Anne Keck for the Mendocino
4  County defendants, which include the county,
5  Sheriff Allman, Captain Pearce, and the seven
6  correctional defendants.
7    MR. BERTLING:  Peter Bertling for
8  California Medical Group Companies, Elaine Hustedt,
9  Yvonne Maxfield, and Claire Teske.
10    THE VIDEOGRAPHER:  Could the court
11  reporter please swear in the witness, and we can
12  begin.
13    DEPUTY JEFFREY ANDRADE,
14    sworn as a witness,
15    testified as follows:
16  EXAMINATION BY MR. HADDAD:
17    Q.  Good afternoon, Deputy Andrade.
18    A.  Good afternoon.
19    Q.  Have you been deposed before?
20    A.  I have.
21    Q.  How many times?
22    A.  I can think of two other times.
23    Q.  Are they other lawsuits where you have
24  been named as a defendant?
25    A.  One of them was.

Page 8

1    Q.  Okay.  Okay.
2    So deposition testimony is just like
3  courtroom testimony.  You are under oath.  It
4  counts just like as if you were testifying in
5  court.  The only thing different is there is no
6  judge here.  So if your lawyer makes an objection
7  to one of my questions, you still have to answer
8  the question unless your lawyer tells you not to
9  answer it.
10    Okay?
11    A.  Yes.
12    Q.  Just like when you are testifying in
13  court, you have to answer verbally.  Say "yes" or
14  "no" instead of saying "uh-huh" so that we get an
15  accurate transcript.
16    All right?
17    A.  Yes.
18    Q.  If you don't understand one of my
19  questions, let me know.  We will try to come to an
20  understanding.
21    Okay?
22    A.  Okay.
23    Q.  All right.  Good.
24    So before I forget then, so can you tell
25  me the other two situations where you have been

Page 9

1  deposed.
2    One was as a witness or something?
3    A.  A witness to a traffic collision.
4    Q.  Okay.  And what was the situation where
5  you were a defendant in a lawsuit?
6    A.  We came down -- I had shot a person's dog
7  in the performance of a search warrant, and that's
8  how I was deposed.
9    Q.  So it was about the death of the dog and
10  maybe about the search?
11    A.  The death of the dog.
12    Q.  Do you know what court it was in?
13    A.  No.
14    Q.  Federal court or state court?
15    A.  I have no idea.
16    Q.  When was your deposition in that case?
17    A.  I don't remember that either.
18    Q.  Approximately how many years ago was it?
19    A.  I don't remember, sir.
20    Q.  Was it within the last year?
21    A.  No.  Sometime when I was at the Willits
22  Police Department.  I cannot tell you.
23    Q.  Okay.  Do you know what ever happened to
24  that lawsuit?  What the final disposition was?
25    A.  I was unnamed in the lawsuit after my

Page 10

1  deposition.
2     Q.  So somehow you were removed from the case?
3     A.  Correct.
4     Q.  Have you reviewed anything in preparation
5  for this deposition?
6     A.  I have.
7     Q.  What have you reviewed?
8     A.  A police report.
9     Q.  The one that you wrote?
10    A.  Yes.
11    Q.  Have you reviewed anything else?
12    A.  No.
13    Q.  Have you listened to any recordings?
14    A.  No.
15    Q.  Watched any video?
16    A.  No.
17    Q.  When's the last time that you talked with
18  Officer Leef?
19    A.  I don't remember.  We are not close
20  friends.  We were coworkers at the time.
21    Q.  Okay.  Have you had any conduct, either in
22  writing, internet, or in person, or over the phone
23  with Officer Leef concerning the lawsuit since you
24  left Willits?
25    A.  No.

Page 11

1     Q.  Now, that report that you reviewed, that's
2  the one that you wrote in connection with your
3  arrest of Mr. Neuroth, right?
4     A.  Correct.
5     Q.  By the time you wrote that report, had you
6  learned that he had died in the jail?
7     A.  I had.
8     Q.  Okay.  So knowing that and knowing that
9  you had just arrested him, you knew that it was
10  very important to write a proper report, right?
11    A.  I wrote it just like I would have.
12    Q.  Okay.  And I am not saying that you would
13  do it any other way, but I do need to ask you
14  questions, and sometimes my questions might seem
15  kind of elemental, but I have reasons why I need to
16  ask them this way.
17        Okay?
18    A.  Okay.
19    Q.  So you knew that your report needed to be
20  accurate, right?
21    A.  Correct.
22    Q.  You knew that it needed to be truthful,
23  right?
24    A.  Correct.
25    Q.  You knew that whatever you were describing

Page 12

1  needed to be described thoroughly and completely,
2  right?
3     A.  Correct.
4     Q.  Especially any reasons or probable cause
5  for arresting Mr. Neuroth, right?
6     A.  Sir, I would have written the report just
7  like I would have even if Mr. Neuroth would not
8  have passed.
9     Q.  Okay.  Fair enough.
10        But you knew that whatever you are
11  describing in any report your reasons for arresting
12  somebody, it's important to document all of your
13  probable cause in the report, right?
14    A.  Correct.
15    Q.  Now, you currently work for the Mendocino
16  Sheriffs Department, right?
17    A.  I do.
18    Q.  Other than that and Willits, have you
19  worked for any other law enforcement agency?
20    A.  I have.
21    Q.  Where else have you worked?
22    A.  Ukiah Police Department.
23    Q.  When did you work for Ukiah?
24    A.  2006 to 2008.
25    Q.  And then when did you start working for

Page 13

1  Willits?
2     A.  2008.
3     Q.  Was there any significant break in time
4  between the two jobs?
5     A.  I think like a month, if not less.
6     Q.  Okay.  And you worked at Willits from 2008
7  until when?
8     A.  2014.
9     Q.  And then did you go pretty much
10  immediately, or within a fee weeks, to the sheriffs
11  office?
12    A.  Yes.  I resigned on a Saturday, and I
13  started on a Sunday.
14    Q.  I forgot.  Do they call it the sheriffs
15  office or the sheriffs department?
16    A.  We are an office, sir.
17    Q.  What is the difference?
18    A.  One's elected.  One's appointed.
19    Q.  Can you take me through your different
20  ranks and assignments when you worked for Ukiah?
21    A.  I was just a patrol officer.
22    Q.  That's it.  Okay.
23        Did you ever have any other specialized
24  duties?
25    A.  No.

1  Q. When did you go to the police academy?
2  A. 2007.
3  Q. And I assume it was POST certified?
4  A. It was.
5  Q. And please take me through your different
6  ranks and assignments with Willits.
7  A. Willits Police Department?
8  Q. Yes.
9  A. I was patrol deputy -- sorry, not deputy,
10 but patrol officer.
11 Q. Okay.
12 A. I was field training officer, and I was a
13 canine officer.
14 Q. When did you become a field training
15 officer? Can you remember?
16 A. No.
17 Q. Was it before or after the Neuroth
18 incident?
19 A. I don't remember.
20 Q. When did you become a canine officer?
21 A. 2013, 2012, 2013. I think 2013.
22 Q. And did you remain a canine officer until
23 you left Willits?
24 A. I am still a canine officer.
25 Q. So as a canine officer, did you have your

1  canine partner with you whenever you were on duty?
2  A. Yes.
3  Q. What specialized training does your canine
4  have, if any?
5     Does it have like drug sniffing ability or
6  anything like that?
7  A. He's what they consider a dual-purpose
8  dog. So he does alert to narcotics, and he is also
9  a patrol dog.
10 Q. I should have mentioned, I meant when you
11 were working at Willits.
12 A. He's the same dog.
13 Q. So are you able to use your dog to sniff a
14 person and determine if they have been in contact
15 with narcotics?
16 A. I'm sorry. Can you say that again.
17 Q. Yes. Can you use your dog to sniff a
18 person to determine whether that person has been in
19 contact with narcotics?
20 A. No.
21 Q. Is there any way that you can use your dog
22 to determine if a person might be under the
23 influence of narcotics?
24 A. No.
25 Q. Can you use your dog to find out if the

1  person might have any sort of narcotics in their
2  possession?
3  A. I'm sorry. Are you asking me if I would
4  use my dog to smell a person?
5  Q. Yes.
6  A. No.
7  Q. Why not?
8  A. I wouldn't do it.
9  Q. Perhaps my question is ignorant, but I
10 just don't understand.
11    Is there a reason why? Is it training, or
12 is there a policy behind it?
13 A. Well, it's not common practice to use a
14 dog to do that kind of thing. There is two
15 different type of alerts. My dog is what they call
16 an active alert, and that means he actively
17 scratches. There is passive dogs, which would sit
18 down or lay down or just, I'm sorry, but they point
19 like a pointer, and however the vendor or the
20 trainer decides how to train that dog is typically
21 how they go, but my dog is an active dog. I will
22 not use him on a person.
23 Q. Okay. I understand now.
24    So that could possibly cause the person to
25 get scratched or injured by the dog if the dog

1  alerted, right?
2  A. It would.
3  Q. Now, for the sheriffs office, can you take
4  me through your different ranks and assignments
5  there.
6  A. Sure. I was a patrol deputy. I was a
7  field training officer with the sheriffs office.
8     I am still -- when I left the Willits
9  Police Department, the sheriffs office purchased my
10 canine with me. So I came over as a canine handler
11 with them -- a deputy, FTO.
12    And now I work for the County of Mendocino
13 Marijuana Eradication Team. I still work for the
14 sheriffs office. I am just a specialist now.
15 Q. Are there any particular geographic
16 locations that you do that work in?
17 A. Mendocino County.
18 Q. The whole county?
19 A. The whole county.
20 Q. From your records, it looks like you left
21 Willits about a month after the incident with
22 Mr. Neuroth.
23    Is that correct?
24 A. It is.
25 Q. And was that -- was your leaving Willits

Page 18

1  already in process, or was that something that you
2  decided to do after the Neuroth incident?
3      A.  It was already in process.
4      Q.  Had you given notice to Willits before the
5  Neuroth incident?
6      A.  I had.
7      Q.  Do you have any military background?
8      A.  I do.
9      Q.  What is that?
10     A.  Can I take a drink of water real fast,
11 please?
12     Q.  Sure.
13     A.  Thank you.
14         So in 2000 to 2006, I was active duty Air
15 Force, and when I was in the Air Force, I was a
16 security forces member, which was, in all essence,
17 a police officer.
18         I joined the Reserves shortly after that,
19 Air Force Reserves.  I was stationed on Travis Air
20 Force base.  I deployed -- I got activated in
21 2011-2012 when I was still employed with Willits
22 Police Department.  I went to Afghanistan.
23         I came back and in 2000 -- yeah, so I just
24 recently got out of the military December of this
25 last year.  I went to the Army National Guard and

Page 19

1  decided it just wasn't for me.  I don't want to
2  deploy anymore.
3      Q.  When was your last deployment?  Did that
4  end in 2012?
5      A.  2012.
6      Q.  When you worked as a military police
7  officer, did you have any special training or
8  duties in connection with people having mental
9  illness?
10     A.  Yes.
11     Q.  Can you describe what that would be?
12     A.  At military bases if someone is mentally
13 ill, they have psychiatrists who would get ahold of
14 the person's first sergeant.  Military is pretty
15 structured.  The structure in the military, they
16 would do their only little standard thing.  They
17 did -- we did not place anybody on a 5150 hold,
18 anything like that.
19     Q.  Did you receive some training similar to
20 the to your POST training about basically how to
21 identify indicators that a person may have mental
22 illness?
23     A.  I don't remember, sir, if I had.
24     Q.  So other than sometimes having the
25 responsibility to get a possibly mentally ill

Page 20

1  service member, supervisor, who can help them get
2  the help they need, did you have any other duties
3  with respect to mental illness in the military?
4      A.  No, sir.
5      Q.  In any of your law enforcement jobs, have
6  you had any supervisory duties other than as a
7  field training officer?
8      A.  No.
9      Q.  While you were working in Willits, was it
10 your responsibility to supervise anybody?
11     A.  No.  I was not anybody's direct
12 supervisor.
13     Q.  Okay.  For instance, while you were
14 working night shifts with Officer Leef, were you
15 doing those shifts as equal officers?
16     A.  In all essence you are.  There is what
17 they considered like an officer in charge, but, for
18 the most, part you are beat partners.
19     Q.  And when you worked for Willits, was it
20 your job to call out your beat partner if you
21 noticed your beat partner doing something different
22 than the policy stated?
23     A.  Yes.
24     Q.  It was?
25         So if you saw -- what were you supposed to

Page 21

1  do if you saw your beat partner was doing something
2  contrary to policy?
3      A.  I think your question is a little vague.
4  If you were more specific, different circumstances
5  require different actions, sir.
6      Q.  Right.
7      A.  So I don't know exactly what you are
8  asking me.
9      Q.  Well, I don't know what your answer is.
10 So we are equal.
11     A.  Okay.
12     Q.  Okay?  I just asked you if you had any
13 responsibility to call out your beat partner.  You
14 said:  "Yes."
15         I guess my follow-up question would be:
16 When would you have had that responsibility?
17     A.  Can you give me an example?
18     Q.  No.  I am trying to understand from you:
19 What did you mean by that answer?
20     A.  If I thought he was doing something wrong,
21 I would tell him to stop.
22     Q.  That's consistent with your law
23 enforcement duty to intervene if you ever saw an
24 officer violate someone's rights, right?
25     A.  Yes.

Page 22

1   Q.  Why did you become a law enforcement
2   officer?
3   A.  I enjoy it.  I do.  I enjoy working where
4   I live.  I like making a difference in my
5   community.
6   Q.  And what do you think are the qualities of
7   a good law enforcement officer?
8   A.  There's a lot of qualities that a cop has
9   to have.  Sometimes they have to be -- you know,
10  they just have to be willing to help someone.  They
11  got to be willing to take the time to explain to a
12  kid why it's not safe to cross the road, talk to
13  people like they are humans.
14      I mean, do you want specific qualities?
15  Is that what you are asking for?
16  Q.  Sure.  I think what you are saying is
17  helpful.  That is a helpful answer.
18      What else do you think are important
19  qualities for a good cop?
20  A.  Someone who has integrity; someone who's
21  fearless because sometimes we have to face unknown
22  fears; someone who is loyal and is going to show up
23  for work and just not leave you; someone who has a
24  good command presence makes a good cop; someone who
25  is eager to learn, because I think when you are

Page 23

1   done learning you might as well retire; someone who
2   is willing to teach.
3       And I don't really know how much farther
4   you want me to go into --
5   Q.  I will just ask you a few questions then.
6       So would you agree then that one quality
7   of a good cop is to have empathy and compassion for
8   others?
9   A.  Sure.
10  Q.  And another quality of a good cop is to be
11  able to follow the rules and standards of your
12  profession?
13  A.  Yes.
14  Q.  And, of course, to help people, right?
15  A.  Correct.
16  Q.  How old were you in June 2014, around the
17  time of the Neuroth incident?
18  A.  How old was I?
19  Q.  Yes.
20  A.  Well, I am 35 now.  So 30 --
21  Q.  About 33?
22  A.  33, 32.
23      MR. LEWIS:  Don't look at me.  I would be
24  --
25      THE WITNESS:  32?

Page 24

BY MR. HADDAD:
2   Q.  What month is your birthday?
3   A.  May.
4   Q.  So I guess --
5   A.  32?
6   Q.  -- you would have been 33.
7   A.  33.
8   Q.  You would have turned that age already.
9   A.  I usually have a pen and calculator on my
10  hand.
11  Q.  That's all right.  Okay.  It's a trick
12  question.
13      How tall are you?
14  A.  I'm 5'7".
15  Q.  How much did you weigh back then?
16  A.  Probably the same as I do now, 175, 178
17  pounds.
18  Q.  Now, your law enforcement training started
19  in the military because of your work there, right?
20  A.  It's similar.  It's not the same, but it's
21  similar.
22  Q.  Okay.  But then you went to a POST
23  certified academy where your California law
24  enforcement training started, right?
25  A.  Correct.

Page 25

1   Q.  And do you remember being taught in the
2   academy from booklets called learning domains?
3   A.  I do remember learning domains.
4   Q.  Did you receive a set of them to take with
5   you and refer to when you needed?
6   A.  When I was in the academy, we did, yes.
7   Q.  One of the areas that you were taught
8   about, for which you received a learning domain,
9   was learning domain 37:  Persons with disabilities.
10      Do you remember that one?
11  A.  I don't specifically remember learning
12  domain 37.  I'm sorry.
13  Q.  But you remember learning about person's
14  with disabilities, physical or mental?
15  A.  Vaguely.
16  Q.  Let me ask you some specific things and
17  see if you remember those things.
18  A.  Okay.
19      MS. KECK:  Michael, is this the same one
20  you used before?  So it's the 2006 revision?
21      MR. HADDAD:  Yes.
22      MS. KECK:  Thank you.
23  BY MR. HADDAD:
24  Q.  So starting at Page 4-1 of learning domain
25  37, it has a chapter about mental illness.

DEPUTY JEFFREY ANDRADE    08/25/2017

Page 26

1      MR. LEWIS:  This is the eye test.
2  BY MR. HADDAD:
3      Q.  Can you read it from there?
4      A.  I can.
5      Q.  I thought you would be able to.  It says:
6  "Peace officers must become familiar with the
7  causes and nature of mental illness in order to
8  determine if an individual is gravely disabled or
9  dangerous."
10         And that's basically some of what you were
11  taught, right?
12      A.  Okay.
13      Q.  At Page 4-5 this learning domain says:
14  "Officers should not attempt to diagnose mental
15  illness.  Mental illness is often difficult for
16  even the trained professional to define in a given
17  individual.  Officers must be able to recognize
18  general indicators of mental illness so that
19  appropriate actions can be taken."
20         Is that consistent with what you were
21  trained?
22      A.  I don't remember, but if it's in the book,
23  I mean it's probably what I read, but I don't
24  recall.
25      Q.  Okay.  But let's just talk about what this

Page 27

1  is saying.
2         You didn't receive specialized training
3  like a psychologist or a doctor in how to diagnose
4  someone's mental illness, did you?
5      A.  No.  I am not a doctor.
6      Q.  Right.  But you received enough law
7  enforcement training because you are supposed to
8  recognize general indicators of mental illness so
9  you can take appropriate law enforcement actions,
10  right?
11      A.  Correct.
12      Q.  And in the academy, you were taught that
13  there are certain indicators of mental illness, and
14  some examples given at, again, Page 4-5 are:
15  "Fearfulness, inappropriate behavior, extreme
16  rigidity or inflexibility, or excitability," right?
17      A.  That's what the book says, yes.
18      Q.  That would have been what you were
19  trained, too, right?
20      A.  I don't remember, sir.
21      Q.  Page 4-10, talking about field contacts
22  with persons with mental illness, it says:  "People
23  affected by mental illness can be unpredictable and
24  sometimes violent.  Officers should never
25  compromise or jeopardize their own safety or the

Page 28

1  safety of others when dealing with individuals who
2  display symptoms of mental illness."
3         Is that consistent with your training?
4      A.  Yes.
5      Q.  And then starting at Page 4-12, talking
6  still about field contacts with persons with mental
7  illness, it says:  "The following table identifies
8  appropriate tactical actions officers should be
9  aware of.  Sometimes these are referred to as
10  de-escalation techniques, but the tactics that POST
11  recommends for handling someone with mental illness
12  include starting with request backup, if possible."
13         Is that consistent with your training?
14      A.  It's always safer to have more than just
15  you there.
16      Q.  Especially with someone who could become,
17  you know, unpredictable or their mood can change
18  quickly, right?
19      A.  Yes.
20      Q.  Another thing that POST trained --
21      A.  Sorry.  Could you tilt the book a little
22  bit more.  The glare --
23      Q.  Oh, sorry.
24         Another thing that POST trains to
25  de-escalate is to calm the situation, and it gives

Page 29

1  a number of examples how to do that.
2         You were taught that, right?
3      A.  Again, sir, I don't remember reading out
4  of this book.
5      Q.  Okay.  I am not asking necessarily about
6  this book, but weren't you trained that when
7  dealing with someone who could have mental illness,
8  it's important to try to calm the situation?
9      A.  It is.
10      Q.  And you were trained that some ways to do
11  that are to consider moving slowly and reduce
12  environmental distractions such as radio or
13  television noise?
14      A.  Sir, I am not going to say yes or no.  I
15  don't remember that specific learning domain.
16      Q.  Okay.  But, in general, were you trained
17  that when you are trying to de-escalate a situation
18  with someone who has mental illness, it's a good
19  idea to assume a quiet, nonthreatening manner when
20  approaching and conversing with the individual?
21      A.  Every situation is different, sir.
22      Q.  You can't even say that, in general, you
23  were taught it is good to maintain a quiet,
24  nonthreatening manner with a possibly mentally
25  disturbed person?

DEPUTY JEFFREY ANDRADE      08/25/2017

1     MR. LEWIS:  Objection.  Argumentative,
2  asked and answered.
3       You can answer it again if you want.
4     **THE WITNESS:  Sir, every situation is**
5  **different.**
6     **Can I see the book?**
7  BY MR. HADDAD:
8     Q.  Yeah.
9     **A.  Okay.  Okay.  Here you go.**
10    Q.  Is it consistent with the training that
11 you got to assume a quiet, nonthreatening manner
12 generally when approaching and conversing with
13 someone who has mental illness?
14    **A.  Sir, I am going to answer the question**
15 **exactly the same way.  Every situation is**
16 **different.  Every time you talk to someone who has**
17 **a mental illness, sometimes you -- it's different.**
18 **Nothing is the same exact way as a law enforcement**
19 **officer.**
20    Q.  You have been taught techniques to
21 de-escalate situations with mentally ill people?
22    **A.  I have been taught a lot of techniques to**
23 **de -- escalate any situation.  Call it a bag of**
24 **tools, and I use them a lot.**
25    Q.  You have been taught those techniques that

1  apply specifically to mentally ill people, haven't
2  you?
3     **A.  We have been taught tools that do work**
4  **with mentally ill people, yes.**
5     Q.  In fact, Willits had a policy that we went
6  over with your former chief this morning that talks
7  about Willits officers are trained about
8  de-escalation techniques.
9       Do you remember that?
10    MR. LEWIS:  About the testimony of the
11 chief?
12    MR. HADDAD:  No.  The policy.
13 BY MR. HADDAD:
14    Q.  Do you remember the policy from Willits
15 that you've been trained about it?
16    **A.  I do not remember the Willits policy, sir.**
17 **I haven't worked there in three years.**
18    Q.  Remember there was an expectation in
19 Willits that you received training about how to
20 safely handle situations with mentally ill people?
21    **A.  I did receive training when I was at**
22 **Willits, yes.**
23    Q.  Have you been trained at various points in
24 your career that when dealing with a mentally ill
25 person in trying to de-escalate the situation, it

1  is a good idea to give the person time to calm
2  down?
3     **A.  It some situations, it is.**
4     Q.  Have you been trained about certain
5  communication techniques that work better with
6  someone where they are mentally ill?
7     **A.  I have.**
8     Q.  And have you been trained that when
9  dealing -- when communicating with someone who is
10 mentally ill, it is a good idea to try to avoid
11 agitating the person if possible?
12    **A.  Sure.**
13    Q.  And it's a good idea to avoid threatening
14 the person if possible, right?
15    **A.  Every situation is different, sir.**
16    Q.  Are you saying sometimes it's a good idea
17 to threaten a menially ill person?
18    **A.  I never said that.**
19    Q.  Okay.  I am just trying to get to the root
20 of things.
21       Have you been trained that, in general, to
22 de-escalate situations with mentally ill people, it
23 is a good idea to avoid threatening them
24 unnecessarily?
25    **A.  Yes.**

1     Q.  Have you been trained that if you do
2  threaten a person who's mentally ill unnecessarily,
3  that that can create additional fright, stress, or
4  even potential aggression on the part of the
5  mentally ill person?
6     **A.  Yes.**
7     Q.  That's common sense, right?
8     **A.  It is.  Every situation is different.  I**
9  **don't know what you -- I mean if you are reading**
10 **out of the book, if you look at the learning**
11 **domains, it says -- it doesn't say:  "The officer**
12 **shall do this."**
13    Q.  Learning domains are your first
14 introduction to training about how to be a law
15 enforcement officer in California, right?
16    **A.  They are.**
17    Q.  When you were taught those learning
18 domains, you were given quizzes and tests at the
19 end of each one?
20    **A.  I am not sure if every one of them has a**
21 **test.  I can't remember.  It has been a while.**
22    Q.  Well, let's just say whenever you were
23 tested at the end of the learning domain, you had
24 to pass that test before you could move on, right?
25    **A.  You do.**

1    Q.   And in order to graduate from the police
2  academy, you are required to demonstrate that you
3  understand and can carry out the training and
4  standards that you have just been taught, right?
5    **A.   Correct.**
6    Q.   Remember being taught in the course of
7  your career that there are some medical or
8  psychological conditions that can be mistaken for a
9  person being under the influence of drugs or
10  alcohol?
11    **A.   There are, yes.**
12    Q.   And what are some of those conditions that
13  you have been taught could be mistaken for being
14  under the influence?
15    **A.   Someone that's diabetic.  They have like**
16  **-- you know, that's a perfect prime example,**
17  **someone, a diabetic, driving down the road.**
18        **I don't know offhand, sir.  There's a list**
19  **of them.**
20    Q.   Epilepsy would be another one where
21  someone could be having symptoms of epilepsy that
22  could be mistaken for being under the influence,
23  right?
24    **A.   Correct.**
25    Q.   Developmental disabilities could be

1  another example, right?
2    **A.   Yes.**
3    Q.   Mental illness could be another example
4  where a person could have mental illness but could
5  appear to be under the influence because of a
6  mental illness, right?
7    **A.   Correct.**
8    Q.   And you have been trained to be aware of
9  those situations in your law enforcement so that
10  you don't arrest people for being under the
11  influence when the real cause is some sort of
12  disability, right?
13    **A.   Are you talking about if they have a**
14  **mental illness and they are using a drug, or are**
15  **you talking about them just having a mental illness**
16  **and not using a drug?**
17    Q.   Well, I will break it up.  Okay?
18    **A.   Okay.**
19    Q.   You have been taught that it's important
20  to be aware that some medical and psychiatric
21  conditions can look similar to being under the
22  influence because you don't want to arrest someone
23  because of their medical condition, right?
24    **A.   Correct.**
25    Q.   And so when you are dealing with someone

1  on the street who has symptoms of being under the
2  influence and also symptoms of having some medical
3  or psychiatric condition, it's your job to try to
4  sort out what's the cause of those symptoms as much
5  as you can, right?
6    **A.   Sort out the cause of the symptoms?**
7        **Can you rephrase that a little bit for me?**
8    Q.   Yeah.  Before arresting someone for being
9  under the influence when you also suspect that they
10  might have a medical or psychiatric condition
11  causing those symptoms, it's your job to try to
12  differentiate between medical condition and crime
13  as much as possible, right?
14    **A.   Right.  I look to see if somebody is under**
15  **the influence.  I look to see if somebody is under**
16  **the influence.  If I believe they are, I would**
17  **arrest them for being under the influence.  If they**
18  **have a mental illness, then I would deal with the**
19  **mental illness.**
20    Q.   Sure.  What if the symptoms of the person
21  are consistent with both mental illness and under
22  the influence?  What are you supposed to then?
23        MR. LEWIS:  Objection.  Incomplete
24  hypothetical.
25        Go ahead.

1    **THE WITNESS:  Do you want me to answer?**
2    MR. LEWIS:  If you can.
3    **THE WITNESS:  Can you ask it one more**
4  **time.**
5  BY MR. HADDAD:
6    Q.   Sure.
7        What if you encounter a person on the
8  street, and they are exhibiting symptoms that are
9  consistent with being both under the influence and
10  also having a mental illness?
11    **A.   Well, the problems with drugs is they are**
12  **mind altering or -- and they also change people's**
13  **bodies.  So it's hard for me to say.  For example,**
14  **can I use you?  Do you mind?**
15    Q.   Sure.  I don't mind.
16    **A.   So, looking at you, if you were under the**
17  **influence of a stimulant and you were also doing**
18  **other things, I might think, well, the drug might**
19  **be doing this.**
20        **LSD is a prime example, you know.  LSD has**
21  **a stimulant in it, plus it has hallucinogens.  So**
22  **you don't know how the person is, and if you are**
23  **not using LSD, you may have a perfect conversation**
24  **just like we are now, but when you're on it, I**
25  **can't tell one way or the other.  That's the best**

1 answer I can give you.
2    Q. When you are on the street and you are
3 encountering a person that you think might may be
4 mentally ill or may be under the influence of
5 drugs, is there anything you are supposed to do
6 before deciding to arrest the person rather than
7 take them to a hospital?
8    **A. I look at the totality of the**
9 **circumstances. If I believe they are under the**
10 **influence of a drug, I take them to jail.**
11    Q. Okay. So what do you have to have as a
12 law enforcement officer before you can arrest
13 someone for any crime?
14    **A. Probable --**
15    MR. LEWIS: Oh, okay.
16    THE WITNESS: Should I --
17 BY MR. HADDAD:
18    Q. You were about to answer.
19    **A. Probable cause.**
20    Q. That's the right answer, probable cause.
21    MR. VARANINI: You can answer your own
22 questions.
23    MR. HADDAD: I would like to. It would be
24 a lot quicker.
25

1 BY MR. HADDAD:
2    Q. You have been trained many times about
3 what probable cause means for your work when you
4 are working out in public, right?
5    **A. Correct, sir.**
6    Q. And what's your best estimate of how many
7 times you have arrested somebody in your career?
8    **A. How many arrests I have made? Is that**
9 **what you are asking me?**
10    Q. Yeah.
11    **A. I will say no less than -- man, I don't**
12 **know. 500 people.**
13    Q. Okay. That's fair.
14    **A. I don't know. I mean --**
15    Q. That's fair enough.
16    **A. Okay.**
17    Q. It's just a rough estimate.
18    So let's say you have arrested 500 people.
19 That's 500 times that you have needed to go through
20 the probable cause analysis in your own mind,
21 right?
22    **A. Correct.**
23    Q. Because you know that you need probable
24 cause to believe the person has committed a crime
25 before you can arrest them for one, right?

1    **A. Correct.**
2    Q. What is your working definition of
3 probable cause?
4    **A. When an officer has probable cause to**
5 **believe that a crime has been committed. There's**
6 **certain elements of crimes. If those are have been**
7 **committed, then you have probable cause to arrest.**
8    Q. Okay. You have to have a certain level of
9 confidence of facts for each of those elements to
10 reach the level of probable cause, right?
11    **A. Correct.**
12    Q. For instance, there is other law
13 enforcement standards that are less than probable
14 cause, one of them being reasonable suspicion,
15 right?
16    **A. There is one, yes.**
17    Q. And in your training, have you been taught
18 to recognize certain indicators of when a person is
19 under the influence?
20    **A. I have.**
21    Q. Have you been taught how to administer a
22 sobriety test to determine if a person is under the
23 influence of drugs?
24    **A. I don't do the sobriety test. Everything**
25 **that I do is a task when I do what I do to see if**

1 someone is under the influence.
2    Q. Is a task?
3    **A. A task, not a test, because everybody gets**
4 **test in their head, and they think it is pass or**
5 **fail, but it's not pass or fail.**
6    Q. All right.
7    So have you received additional training
8 since 2014, the Neuroth incident, about how to
9 determine if someone is under the influence, or is
10 what you know now pretty much what you knew then?
11    **A. I don't necessarily think -- I learn a lot**
12 **every day I go to work. So I work with really**
13 **smart people, and every day I learn something new.**
14    So three years ago was it different? It
15 could have maybe slightly but not dramatically
16 different.
17    Q. Okay. So say as of the time of Neuroth
18 incident, based on your training and experience,
19 how would you, as an officer, determine if the
20 person was under the influence of a narcotic?
21    **A. I would try to check their pulse. I would**
22 **look at their pupils. It all depends on if it is**
23 **daylight or dark.**
24    We have a Rhomberg test, or a Rhomberg
25 **task, where someone actually stands and tilts their**

1 head back. It checks the internal clock of the
2 person.
3       I would check their pulse again after the
4 conclusion. I would try to talk to them, see if
5 their pulse drops or rises drastically, but I still
6 do that today.
7    Q. So with the Rhomberg test, you check their
8 pulse. You talk with them.
9       I assume that you observe physical
10 symptoms in them, too?
11    A. I would, yes.
12    Q. What kind of physical symptoms would you
13 be looking for?
14    A. Again, everybody is different, and certain
15 drugs make certain people do certain things.
16       Some of the symptoms I would look for,
17 sometimes people shake really bad. Sometimes they
18 have what they consider a fidget. They move their
19 hands back and forth kind of like a little kid that
20 needs to go to the bathroom. They grab their
21 pants. That is something I look for.
22       I would look for pulse beats. Part of the
23 easiest place other than the head right on, but as
24 the carotid you check right here (indicating).
25 Sometimes you could actually see people's pulses

1 beating on top of their head.
2       You look and see if someone is sweating
3 could be an indication. It's a cold night, you
4 know, not wearing any clothes, they are sweating.
5 That's a good indication. And sometimes just
6 people's demeanor.
7    Q. Are there other tests that you administer
8 other than the Rhomberg test or looking for
9 constricted pupils?
10    A. I would check their pulse.
11    Q. Anything else you can think of?
12    A. It all depends on what I think they are
13 under the -- there is -- you could do vertical
14 nystagmus. You could do horizontal nystagmus.
15       Typically, I don't do those that often
16 unless I think someone is maybe on a combination of
17 alcohol and/or drugs.
18    Q. And the nystagmus test you do by using
19 something like a pen or something or a finger to
20 have the person try to follow it with their eyes
21 and observe their pupils as they are moving back
22 and forth, right?
23    A. Correct. And sometimes it works. It's
24 easier for me to check people's pupils like that
25 because I am so short, and a lot of people are a

1 lot taller than me. So I do that so I can check
2 easier, too.
3    Q. So all these things that you are
4 describing in your training and experience could
5 indicate being under the influence, those are all
6 things that could add up to probable cause in a
7 given situation, right?
8    A. Correct, sir.
9    Q. Or it's possible that you could do these
10 tests and observations and decide you don't have
11 probable cause to arrest for under the influence,
12 right?
13    A. Correct, sir.
14    Q. But if you do make an arrest for under the
15 influence, you are required to document in your
16 report all the facts that created your probable
17 cause, right?
18    A. I do.
19    Q. And you knew that whatever individual
20 facts you had that added up in your mind to
21 probable cause that a person was under the
22 influence needed to be identified in your report,
23 right?
24    A. Yes. I put everything in there that I
25 believe to be pertinent at the time.

1    Q. And if there is information or facts that
2 you are receiving from your contact with the person
3 that could be consistent with intoxication but
4 could also be consistent with a medical or
5 psychiatric disability, that's something that you
6 also have to take into account in your probable
7 cause analysis, right?
8    A. Are you saying if I think someone -- can
9 you say that again. It is just a little confusing
10 to me.
11    Q. If you are observing symptoms and signs in
12 a person that are consistent with both intoxication
13 and also physical or mental disability, you have to
14 consider that in your probable cause analysis,
15 right?
16    A. I do. So let me break it up for you real
17 fast.
18       A physical disability is different than a
19 mental disability. A mental disability, sometime
20 it is hard to break that up especially if you are
21 going to be doing a drug or alcohol or whatever.
22       A physical disability is like I don't have
23 a toe, or I have to walk with a cane. I have a
24 limp because I had a stroke 20 years ago.
25       So there is a difference between a

1  physical and a mental disability, especially for
2  probable cause if you are going to be running
3  people through like tests.  I just wanted to make
4  that clear real fast.
5      Q.  Okay.  How often do you encounter people
6  with mental illness, or how often did you while you
7  worked in Willits?
8      A.  I don't know.
9      Q.  Can you give me an estimate of the
10  percentage of people you encountered who you
11  thought had some sort of mental illness?
12      A.  No.
13      Q.  Have you ever heard numbers in the course
14  of your law enforcement training about the
15  percentage of people with physical law enforcement
16  encounters on a regular basis that have mental
17  illness?
18      A.  If I have, I don't remember.
19      Q.  But it was fair to say it was common for
20  you to encounter people who had mental illness in
21  public while you worked for Willits, right?
22      A.  I did encounter people with mental
23  illness, but I am not going to say it's common.
24      Q.  Okay.  And if you encountered one of those
25  people who you thought possibly had mental illness

1  and then you observed symptoms that you also
2  thought were possibly consistent with intoxication,
3  you were supposed to consider the fact that what
4  you are observing could be caused by mental illness
5  instead of intoxication before arresting them,
6  right?
7      A.  Sometimes, it occurred, yes.
8      Q.  It is something you are supposed to take
9  into account in your decision about:  "Do I have
10  probable cause to arrest?"  Right?
11      A.  Correct.
12      Q.  If you see a sympton -- excuse me.
13          If you observe a symptom of drug
14  intoxication, such as the person is sweating, but
15  you also observe information that could lead to a
16  noncriminal explanation for the sweating such as
17  you know that they just engaged in strenuous
18  exercise, then that would diminish sweating as a
19  sign of intoxication, right?
20      A.  Are you saying -- can you just rephrase
21  that.
22      Q.  Yeah.
23      A.  Okay.  Go ahead.
24      Q.  Let's say you stop someone who is jogging
25  and you notice that they are sweating.

1      A.  Right.
2      Q.  You know that they have been jogging, too,
3  though, right?  So you are not going to look at the
4  sweating and say:  "Ah-ah.  That is a good sign
5  that they are probably intoxicated on some
6  methamphetamine or something," right?
7      A.  I would say because of their jogging they
8  were sweating.
9      Q.  At the time of the Neuroth incident, did
10  you have an audio recorder?
11      A.  I probably did.
12      Q.  The city -- the Willits Police Department
13  gave you an audio recorder at some point to record
14  some of your work with, right?
15      A.  Correct.
16      Q.  And the rule at the time was you had
17  discretion of whether or not to turn on your audio
18  recorder at any given time, right?
19      A.  Correct, probably.  I don't remember 100
20  percent what that policy says.
21      Q.  Okay.
22          Did you ever turn on your audio recorder
23  at any time during your interactions with Steve
24  Neuroth?
25      A.  I did not.

1      Q.  Why not?
2      A.  I don't know.
3      Q.  Did you consider turning it on at any
4  time?  Do you know?
5      A.  I will tell you how my common practice is.
6          When I worked for the City of Willits, I
7  carried my recorder in my pocket.  I would get out
8  of the car and hit the button.  Sometimes recorders
9  charged by batteries, they die.  Sometimes you
10  leave them on.  Sometimes you turn them off.  So
11  even still today, when I get out of the car, I hit
12  my pocket because it's a puzzle memory, and I don't
13  have a recorder there.
14          So did I turn it on?  I don't know.  Why
15  didn't it work?  Don't know.  I didn't have it on.
16      Q.  Okay.  But it would have been your usual
17  practice to have your recorder activated on in an
18  encounter like you had with Mr. Neuroth, right?
19      A.  Yes.
20      Q.  Did you know whether Officer Leef had his
21  recorder turned on during that encounter?
22      A.  He did.
23      Q.  Did you know at the time that he did?
24      A.  I just assumed he did.
25      Q.  Back in that time period, did your

Page 50

1  supervisors review your recordings of your work, to
2  your knowledge?
3      A.  I don't know.
4      Q.  Did they ever ask you for your recordings
5  so they could review what you did that night?
6      **A.  They have access to it.  We downloaded**
7  **the -- like, are you talking about the entire**
8  **recording, like from time A that you show up to**
9  **work until time B?  Because our recorders don't**
10 **last that long.  They only last about three hours.**
11     Q.  You didn't have any information that your
12 supervisors were monitoring your recorders, did
13 you?
14     **A.  I don't know if they were or not.**
15     Q.  Willits had a policy called:  Mental
16 illness commitment.  It started at Bates No. 239.
17 Just show you the first page to orient you what I
18 am talking about (indicating).
19     **A.  Okay.**
20     Q.  Do you remember that policy?
21     **A.  No.  I'm looking at it, but -- I'll read**
22 **it if you would like.**
23     Q.  You don't need to right now.
24     **A.  Okay.**
25     Q.  But Willits had a lot of policies that you

Page 51

1  haven't had to remember because you moved down to a
2  different department, right?
3      **A.  Correct.**
4      Q.  But when you did work for Willits, you
5  were entitled to know Willits policies and to obey
6  them, right?
7      **A.  Yes.**
8      Q.  So the first paragraph of this policy,
9  mental illness commitments, No. 418, says:  "If an
10 officer believes that a person falls within the
11 provision of Welfare and Institutions Code 5150, he
12 or she shall transport that person to the
13 designated facility for evaluation and commitment."
14     If that was the Willits policy, you were
15 required to follow that at the time, right?
16     **A.  I can't see it.**
17     Q.  It's the first highlighted part at the
18 top.
19     **A.  Thank you.**
20     **Okay.  That says:  "The purpose and**
21 **scope."**
22     Q.  Right.
23     **A.  Okay.**
24     Q.  And so just based on your memory, is that
25 consistent with what you recall the rule being?

Page 52

1      **A.  Yes.  If we thought someone was 5150, we**
2  **would take it up.**
3      Q.  That is probably a similar rule that you
4  have now in the sheriffs department, right?
5      **A.  It is.**
6      Q.  And the next highlighted part is the
7  Willits definition of 5150 being:  "Probable cause
8  to believe that the person is, as a result of
9  mental disorder, a danger to others or to himself
10 or herself or gravely disabled."
11     **A.  That's what you read.**
12     Q.  Yes.  Is that consistent with your
13 understanding of the definition of 5150?
14     **A.  Can I read the whole two paragraphs?**
15     Q.  Yes.
16     **A.  Because there is more than just that.**
17     Q.  Uh-huh.
18     **A.  Okay.**
19     Q.  Is that definition I just read consistent
20 with your understanding of what a 5150 person is?
21     **A.  Yes.**
22     Q.  This Willits policy also talks about
23 officer considerations and responsibilities for
24 your contacts with possibly 5150 people, and it
25 talks about the need to use techniques for conflict

Page 53

1  resolution and de-escalation techniques and
2  language that is appropriate for interacting with a
3  mentally disabled person.
4      I will just show that to you again.
5      **A.  Okay.**
6      Q.  But you recall that your department guided
7  you to use appropriate de-escalation techniques and
8  appropriate language when dealing with someone who
9  might have a mental disorder, right?
10     **A.  Can I finish reading this?  Thank you.**
11     **I'm sorry.  What was your question, sir?**
12     Q.  Do you recall Willits requiring you to use
13 appropriate de-escalation techniques and
14 appropriate language when interacting with a
15 mentally disabled person?
16     **A.  Yes.**
17     Q.  And that the techniques that Willits
18 Police Department expected you to use were
19 consistent with what you had been trained in the
20 academy as well, right?
21     **A.  Yes.**
22     Q.  Would you please take a look at the next
23 page, which is Page 240, the section that I have
24 highlighted entitled:  "Mentally ill person charged
25 with a crime."

1    A.  Okay.

2    Q.  Let me ask you:  Do you recall that the
3  Willits policy required that, when practical, any
4  person charged with a crime who also appears to be
5  mentally ill shall be booked at the Willits Police
6  Department before being transported to the
7  appropriate authorized facility?

8    **A.  Can I see that one more time?**

9        **Okay.  Yes.  That's what it says.**

10    Q.  And that would have applied to you, right?

11    **A.  It would have.**

12    Q.  And when they talk about authorized
13  facility, they are talking about a medical or
14  psychiatric facility, right?

15    **A.  Could I see it again?**

16    Q.  Yes.

17    **A.  I don't see where it says what facility we**
18  **are taking them to.**

19    Q.  It would be at the first page.  At the
20  very top, it talks about where do you take a person
21  who's 5150.

22    **A.  Okay.  All right.**

23    Q.  So that authorized facility referred to a
24  designated facility for evaluation and commitment,
25  right?

1    **A.  Okay.**

2    Q.  Correct?

3    **A.  It does.  That's what it says.**

4    Q.  When you worked for the Willits PD, what
5  was the facility that you would take 5150 people
6  to?

7    **A.  We would typically take them to Howard**
8  **Memorial Hospital.  We take them to the emergency**
9  **department, and a crisis worker would show up.**

10    Q.  Did you typically refer to that hospital
11  as Howard?

12    **A.  Howard Hospital.**

13    Q.  Yeah.  And if you determined that you had
14  probable cause to believe somebody was 5150 and you
15  took them to Howard Hospital, how long would that
16  usually take out of your shift?

17    **A.  Every -- it could be different.**

18    Q.  What could the range be?

19    **A.  It could be five minutes.  It could be**
20  **five hours.  I don't know.**

21    Q.  Why would it sometimes take a long time?

22    **A.  If the crisis workers weren't around.  We**
23  **can't get ahold of them.  They are on the coast.**

24        **Even though our communities aren't big, we**
25  **are a pretty big county.  We are a diverse county.**

1  So it takes a little bit longer to get from point A
2  to point B.  Nothing is a straight route.  Like
3  here, you just get on the freeway and go.  Our
4  roads are a little bit windier.  So it takes more
5  time to get from point A to point B.

6    Q.  So until the appropriate crisis worker
7  gets there, you have to wait there with the person
8  you brought in, right?

9    **A.  We do.**

10    Q.  Even after the crisis worker gets there,
11  you have to wait until it is safe enough for you to
12  leave or stable enough of a situation?

13    **A.  It all depends, I think.  I mean sometimes**
14  **we would wait.  Sometimes they would say, well, you**
15  **can leave.  It all depends what crisis worker you**
16  **would get.**

17        MR. HADDAD:  We have been going for about
18  an hour.  Let's take a break, and I will move on to
19  a different topic.

20        **THE WITNESS:  Okay.**

21        THE VIDEOGRAPHER:  We are going off the
22  record at 2:42.

23            (Recess taken)

24        THE VIDEOGRAPHER:  We are back on the
25  record of media No. 2.  The time is 2:54.

1  BY MR. HADDAD:

2    Q.  All right.

3        Let's go on to the incident of Mr. Neuroth
4  on June 10, 2014.

5        What was the time of your shift that
6  night, if you can recall?

7    **A.  I'm not sure if they were working -- or**
8  **I'm not sure if we were working 1900 to 0700 or**
9  **1800 to 0600.**

10    Q.  Your chief this morning recalled that it
11  was possibly 6 p.m. to 6 a.m.

12    **A.  Okay.**

13    Q.  So it would be either that or 7 p.m. to 5
14  a.m.  Does that --

15    **A.  No.  They work 12-hour shifts.  So it was**
16  **6 to 6.  The sheriffs office starts at 7.  Sorry.**
17  **I just got little confused.**

18    Q.  And that night you were on duty, and your
19  beat partner was Officer Leef, right?

20    **A.  He was.**

21    Q.  And each of your beats was the entire
22  city?

23    **A.  The entire city.**

24    Q.  About how many people lived in Willits at
25  the time?

1    A.   I don't know.  3,000, 4,000, 5,000.
2    Q.   Okay.  And there were no supervisors on
3  duty that night, correct?
4    A.   There was not.
5    Q.   And that was pretty normal staffing for
6  Willits Police Department around that period?
7    A.   I don't remember who was all working there
8  at the time.
9    Q.   No.  I mean the fact that you were working
10  with one other partner covering the whole city with
11  no supervision, that was pretty normal?
12    A.   It's normal to have two officers working.
13  So because I was a senior officer, I would have
14  been, I guess, the shift supervisor for the night.
15    Q.   How many years of experience as a
16  California officer did you have at that time?
17    A.   '14.  So in 2000 -- seven years.
18    Q.   And you had been partners with
19  Officer Leef on many occasions before that night,
20  right?
21    A.   I have.
22    Q.   What was your first contact with Steven
23  Neuroth?
24    A.   Our first contact that night was
25  Officer Leef had stopped and talked to him earlier

1  in the night.
2    Q.   Were you present during that first
3  interaction?
4    A.   I was.
5         I showed up seconds after he had stopped
6  him.  The City of Willits really isn't that big.
7  So, yeah, I was there pretty fast.
8    Q.   Okay.  And so what was the first thing
9  that you observed when you got there?
10    A.   I don't remember.
11    Q.   What caused you to stop?  Were you
12  requested to stop, or did you just see an
13  interaction happening?
14    A.   Any time our beat partner goes out with
15  somebody, we do our best to get there.
16    Q.   So are you saying he would have radioed
17  you, and you would have tried to get over there?
18    A.   Or, he would have radioed it out, and I
19  would have gone there.
20    Q.   So you got there.  What can you recall
21  from that interaction?
22    A.   I don't recall anything.  I don't remember
23  much other than what my report said.
24    Q.   So your report says that:  "Neuroth told
25  Officer Leef he was looking for his check, and

1  Officer Leef asked Neuroth where he was looking for
2  his check, and Neuroth stated he was going to look
3  inside Mariposa Market, which was closed at the
4  time."
5         Right?
6    A.   That's what the report says.
7    Q.   That's what you wrote.
8         Do you actually remember that as you sit
9  here?
10    A.   I do remember him saying he was looking
11  for something.  Do I remember exactly where?  No.
12  That's why I have the report.
13    Q.   Can you remember anything about
14  Mr. Neuroth's demeanor or physical appearance at
15  that time?
16    A.   I do not.
17    Q.   Officer Leef testified that in that
18  interaction Mr. Neuroth appeared confused.
19         Do you recall that?
20    A.   I don't remember him appearing to be
21  confused other than where his check was.
22    Q.   Officer Leef testified that during that
23  encounter Mr. Neuroth was moving his hands around a
24  lot.
25         Do you remember that?

1    A.   I do not.
2    Q.   Officer Leef said that during that
3  encounter Mr. Neuroth could not stand still.
4         Do you remember that?
5    A.   I do not.
6    Q.   Officer Leef said during that encounter
7  Mr. Neuroth was clinching his jaw.
8         Do you remember that?
9    A.   I do not remember Mr. Neuroth's demeanor,
10  sir.
11    Q.   I am going to ask you a few more specific
12  questions though.
13         Officer Leef said that during that
14  encounter Mr. Neuroth's speech was hard to
15  understand.
16         Do you recall that?
17    A.   I do not.
18    Q.   When Officer Leef was interviewed by a
19  member of the district attorneys office about that
20  interaction with Mr. Neuroth, he described
21  Mr. Neuroth's behavior as bizarre.
22         Would you characterize it that way?
23    A.   Are you talking about our first contact?
24    Q.   Yeah.
25    A.   No.  I don't remember.

DEPUTY JEFFREY ANDRADE     08/25/2017

1    Q.  Okay.  In your report you said:  "I asked
2  Neuroth where he received mail.  Neuroth explained
3  he received mail at the community center in Ukiah."
4        Do you remember that?
5    A.  I do because I have it in my report.
6    Q.  Well, the fact that it's in your report,
7  does that trigger a memory in your mind of the
8  actual event?
9    A.  Sir, I have taken lots of cases since
10 2014.  This one, I remember it vaguely, but not
11 like I did the night I wrote this report.
12   Q.  Fair enough.
13       But that's -- I am just asking if you
14 actually have a memory or you are just telling me
15 those are the words in your report, but you don't
16 have a memory otherwise.
17   A.  I don't remember him telling me he was
18 getting mail in Ukiah, no.
19   Q.  I am curious why you would have asked
20 where he received mail instead of where he lived.
21       Can you give us your best reason why you
22 think that was?
23   A.  No.
24   Q.  Was it your normal practice to ask people
25 where they receive their mail?

1    A.  I don't know why I asked that question,
2  sir.
3    Q.  You wrote in your report:  "At no time
4  during this contact was there any indication of
5  Neuroth being under the influence of a controlled
6  substance.  Neuroth was able to hold a conversation
7  and appeared fine."
8        Do you have an actual memory of that, or
9  is this simply just something you wrote down that
10 you no longer remember?
11   A.  I remember Mr. Neuroth was different from
12 the time -- the first time we talked to him to the
13 second time.
14   Q.  How was he different?
15   A.  He was under the influence of controlled
16 substance the second time we talked to him.
17   Q.  You don't even remember what his demeanor
18 was the first time.  So how can you say it was
19 different?
20   A.  Because the report told me, and that's how
21 I am going to remember it.  I mean those are notes
22 that we write down.  I mean, do I remember exactly
23 what happened?  No, I don't.
24   Q.  Okay.  And all I am trying to establish is
25 if this report didn't exist and you didn't have it

1  to look at, could you tell me what was in -- what
2  happened based on your own memory?
3    A.  Vaguely.  But I couldn't tell you 100
4  percent exactly what happened.
5    Q.  And if you didn't have your own report to
6  refer to, could you tell me based on your memory
7  whether there was any indication that Neuroth was
8  under the influence of a controlled substance
9  during that first encounter?
10   A.  I don't think he was, or else I believe
11 Officer Leef would have arrested him for being
12 under the influence of controlled substance.
13   Q.  Okay.  But you are not answering my
14 question.
15       I am asking you:  Based on your memory,
16 would you be able to tell me that or not?
17   A.  I can now.  I read my report, sir.
18   Q.  But you remember what your report says,
19 but does that actually bring a memory into your
20 mind or not?
21   A.  I remember being at Mariposa Market.  I
22 could not tell you the conversation like we are
23 having right now.  I could not tell it to you
24 because I don't remember that.
25   Q.  And you also don't remember Steven

1  Neuroth's demeanor, right?
2    A.  I don't remember it being bizarre or else
3  I probably would have remembered that.
4    Q.  But Officer Leef remembers it being
5  bizarre.  So that's why I am questioning you so
6  much.
7    A.  I don't know what was bizarre that
8  Officer Leef saw that I did not.
9    Q.  So other than what you have told me, is
10 there anything else that you can recall from that
11 first interaction with Mr. Neuroth?
12   A.  No.
13   Q.  Did you or Officer Leef tell Mr. Neuroth
14 to get out of town or go to Ukiah or anything like
15 that?
16   A.  I don't remember if we did.
17   Q.  Would it be appropriate to tell someone,
18 who under those circumstances where you saw
19 Mr. Neuroth, to get out of Willits and go to Ukiah?
20   A.  Why would we tell him to get out of
21 Willits and go to Ukiah?
22   Q.  I don't know.  I am asking you:  Would it
23 be appropriate to do so under the circumstances?
24   A.  Maybe he wanted to go back to Ukiah.  I
25 don't know.

Page 66

1    Q.  Would it have been appropriate to tell him
2  to move on and get out of Willits?
3    A.  Maybe he was going -- I don't understand
4  your question, sir.
5        Like am I saying:  "Time for you to go.
6  Pack your stuff and leave"?
7    Q.  Yes.
8    A.  I don't remember saying that at all.
9    Q.  Would that be appropriate to say as a law
10 enforcement officer?
11       MR. LEWIS:  Hypothetical question.
12       MR. HADDAD:  Yeah.
13       MR. LEWIS:  He can speculate, but that
14 question doesn't have enough facts to make a
15 decision.
16       THE WITNESS:  I don't -- I am not going to
17 answer that question.
18 BY MR. HADDAD:
19    Q.  Let me ask you differently.
20       As a law enforcement officer, are you
21 allowed to go to someone on the street who hasn't
22 committed a crime and tell them to get out of town?
23    A.  Um, I typically don't do that.
24    Q.  Why don't you do that?
25    A.  Because that's not my personality.  I

Page 67

1  don't do that.
2    Q.  It's not lawful, is it?  You can't tell
3  someone to get out of town for no reason, can you?
4    A.  I can tell you to get out of the office.
5  Are you going to do it?
6    Q.  Do you have lawful authority to tell
7  people to get out of town when they are not doing
8  anything wrong?
9    A.  Just relax a little bit, sir.
10       I don't do that.  So I don't know why you
11 would ask me that question.
12    Q.  You don't do that?
13    A.  I didn't do that that day, I don't
14 believe.
15    Q.  If you saw your partner do it, would you
16 have taken action?
17    A.  I don't think it's illegal to say:  "It's
18 time for you to go."  I don't think there is
19 anything illegal about it.
20       Is it right all the time?  No.  Is it
21 wrong all the time?  No.
22       I mean, if I saw someone peeing on the
23 side of a business, I would say:  "It is time for
24 you to go because it is time for you to go."  I
25 mean, my kids walk through the door.  I don't want

Page 68

1  my kids walking through urine.  If someone is going
2  poop next to the business, I would say:  "It's time
3  for you to go."
4    Q.  Was Mr. Neuroth doing anything like peeing
5  or pooping next to a business?
6    A.  I don't remember, sir.  I don't remember
7  the conversation.
8    Q.  Can you remember anything, any conduct of
9  Mr. Neuroth, that would have made it appropriate
10 for you to, as a law enforcement officer, to order
11 him to leave the City of Willits?
12    A.  I don't remember.
13    Q.  What did you do at the end of that
14 encounter with Mr. Neuroth?  What did you do next?
15       MR. LEWIS:  At the end of that
16 first encounter?
17 BY MR. HADDAD:
18    Q.  At the end of the first encounter.
19    A.  I left.
20    Q.  Where did you go?
21    A.  Patrolling.
22    Q.  All right.
23       And where were you when you learned
24 information about Mr. Neuroth that required you to
25 respond?

Page 69

1    A.  I don't remember.  I would have to refer
2  to my report.  Can I see it?
3    Q.  Yeah.  Let me just -- well, first, I want
4  to get your memory, and then I will show you your
5  report, if you don't mind, and if you do mind, I'm
6  sorry, but it is how we are going to have to do it
7  because there is some question about what's in your
8  report and what's in your brain.
9       But do you remember going to dinner with
10 Officer Leef?
11    A.  I don't remember going to dinner with him.
12    Q.  Okay.  So you were somewhere that you
13 can't recall when you received information that you
14 needed to respond to involving Mr. Neuroth?
15       Is that fair to say?
16    A.  I'm not going to answer because I don't
17 remember.
18    Q.  Okay.  Do you remember receiving any more
19 information about Mr. Neuroth that night?
20    A.  No.
21    Q.  Did you have another encounter with him?
22    A.  I did.
23    Q.  How did you get to that other encounter?
24    A.  Again, sir, I would have to see my report.
25 I saw it yesterday.

Page 70

1    Q.  But you don't remember otherwise?
2    A.  I can't remember.  I can tell where I was,
3  but I don't remember.
4    Q.  You wrote: "At approximately 2200 hours,
5  Officer Leef and I were dispatched to Village
6  Market, 289 South Main Street, regarding Neuroth
7  walking into traffic.  Officer Leef contacted
8  Neuroth in the 300 block of South Main Street."
9    A.  That's where we were.
10   Q.  Do you remember that now?
11   A.  I do.
12       MR. HADDAD:  Let's mark this as -- well,
13  we'll call it Exhibit 1, please, for
14  Officer Andrade.
15       (Exhibit 1 was marked for identification.)
16  BY MR. HADDAD:
17   Q.  Do you recognize what this is?
18   A.  I do.
19   Q.  What is it?
20   A.  It is a detail call to service report.
21   Q.  What is that?
22   A.  This is like a CAD call that you printed
23  out.  That's what we would call it, a CAD call.
24   Q.  All right.
25       Now, do you see in the substantive

Page 71

1  information about in the middle where it has time
2  entries and narratives?
3    A.  Uh-huh.
4    Q.  Yes?
5    A.  I see that.
6    Q.  And there is a second entry at 22:04 and
7  45 seconds.  Says: "Suspect running around parking
8  lot acting very strangely."
9        Do you see that?
10   A.  I see that.
11   Q.  Do you think that would likely correspond
12  to the information that you received just before
13  the second call?
14   A.  I don't remember what he said, sir.
15   Q.  Do you have any recollection of receiving
16  information that there was someone running around
17  the parking lot acting very strangely?
18   A.  I don't remember what the call was
19  specifically, sir.  I listen to the radio 24 hours
20  a day.
21   Q.  These entries -- that one says created by
22  S-T-A-I-N-B-R-M.
23       Do you know who that is?
24   A.  I do.
25   Q.  Who is that?

Page 72

1    A.  He is a dispatcher with the Willits Police
2  Department.  His name is Mike Stainbrook.
3    Q.  A few entries down at 22:45 and 22
4  seconds, it says: "Suspect 10-15 for 11550 HS."
5        What does that mean?
6    A.  It means the suspect -- if you go up to
7  the personal information the box just right above
8  it, it says: "Steven Neuroth."  And if you look to
9  the right of it, it says: "Person type" it says:
10  "Suspect."
11   Q.  Okay.
12   A.  So he, suspect, 10-15, which means under
13  arrest for 11550 Health and Safety Code section.
14   Q.  And then the next entry says: "Created by
15  Andrade."
16       That would be you, right?
17   A.  Correct.
18   Q.  And it says: "Dispatch received by unit
19  P13."
20       What does that mean?
21   A.  I don't know why it's there, but it means
22  dispatcher was received by Paul 13.  That was my
23  number.
24   Q.  What does it mean that dispatch was
25  received?

Page 73

1    A.  That's saying that I understand that there
2  is a call for service, but I don't know why my name
3  is there at that time.
4    Q.  Okay.
5    A.  We don't write those in there.  This is a
6  CAD call.  So I don't know.  I didn't even notice
7  that our names show up in there.
8    Q.  The next entry at, would be, 12:10 and 59
9  seconds a.m., it says: "Transported to CJ."
10       Would that be central jail, county jail?
11   A.  County jail.
12   Q.  "By P18."
13       Is that Officer Leef?
14   A.  It is.  He used to be Paul 18.  He is now
15  a sergeant with the Willits Police Department.
16   Q.  Officer Leef is now Sergeant Leef?
17   A.  Yes.
18   Q.  Okay.  And then the very next entry at
19  1:35 and 18 seconds a.m., it says: "Suspect 11-44
20  at county jail."
21       What does 11-44 mean?
22   A.  It means that someone is a decedent or had
23  passed.
24   Q.  And then it says: "Narrative added to
25  cleared call."

Page 74

1      Do you know what that refers to?
2      A.  I have no idea.  I don't know how to write
3  in this.  This is just dispatchers.  I don't know
4  how to type stuff in there.
5      Would you like this back?
6      Q.  No.  You can just leave it on the table.
7      A.  Okay.
8      Q.  So when you arrived to the second
9  encounter with Mr. Neuroth, what did you observe?
10     A.  I noticed that Mr. Neuroth was -- at that
11  time in Willits, we were having a lot of traffic
12  because they were doing a bypass where the city was
13  bypassing -- or now the highway bypasses through
14  the City of Willits.  And we were having, at that
15  time, lots of trucks on the road because they had
16  to move truckload and truckload and truckload and
17  truckload of dirt from one end of town to the other
18  end of town, and they were doing it at nighttime.
19     I remember Mr. Neuroth, his demeanor had
20  changed because it was -- as unique as it was that
21  night, I would have remembered the first one.  But
22  he was saying that someone was out to get him.  I
23  asked him how people are going to be out to get
24  him.  He said there's no lights on, no street
25  lights or something like that, something to that

Page 75

1  effect.
2      I noticed that he was also displaying
3  objective signs of someone under the influence of
4  controlled substance, and that's where it was.
5      Q.  So what specifically objective signs of a
6  controlled substance did you observe?
7      A.  He was paranoid.  His hands, like I said,
8  started fidgeting around a lot.  He had rapid
9  speech.  You could see his pulse beating off him,
10  and he was warmer.  He was extremely warm to the
11  touch.
12     Q.  What was the temperature outside at that
13  time?
14     A.  I don't remember.
15     Q.  Paranoid could be a symptom of mental
16  illness, right?
17     A.  It could also be a symptom of someone
18  under the influence of controlled substance.
19     Q.  Okay.  Hands fidgeting could also be a
20  symptom of mental illness?
21     A.  It could, and it also could be someone
22  under the influence of controlled substance.
23     Q.  Okay.  Fast pulse could be a symptom of
24  running around in traffic, right?
25     A.  It could.  Or someone also under the

Page 76

1  influence of controlled substance.
2      Q.  Sure.  Okay.
3      And being warm could be a symptom of
4  running around, right?
5      A.  It could.  Or also someone under the
6  influence of controlled substance.
7      Q.  Were there other signs and symptoms at
8  that time that you observed that you thought were
9  consistent with being under the influence of a
10  controlled substance?
11     A.  Just his demeanor changed drastically
12  because I believe I -- in my report I would have
13  noted something that from -- if his demeanor was
14  the same as the second contact, I wouldn't have
15  noted something, but his demeanor was totally
16  different in the first one than in the second one.
17     Q.  And a person's demeanor changing quickly
18  can also be a sign of mental illness, right?
19     A.  It could also be a sign of someone using a
20  controlled substance.
21     Q.  Just answer my question.
22     A person's demeanor changing quickly can
23  be a sign of mental illness, right?
24     A.  It could.
25     Q.  Now, given the way he was running in

Page 77

1  traffic, did you consider him to be a danger to
2  himself?
3      A.  I considered it.
4      Q.  Did you think he was?
5      A.  No.
6      Q.  Did you think he was a danger to others
7  given that he is running in traffic?
8      A.  I considered he was under the influence of
9  controlled substance when I arrested him for being
10  under the influence of controlled substance.
11     Q.  So you don't think it's dangerous to
12  himself or others to be running around in traffic
13  involving semi trucks carrying loads of dirt.
14     A.  Oh, I do, but I also think being under the
15  influence of a controlled substance might make you
16  do that.
17     Q.  Okay.  But that's not the question.  I
18  wish you would answer the question instead of
19  trying to advocate so much.
20     The question was:  Can you tell me yes or
21  no, is running in traffic dangerous to oneself?
22     A.  It is.
23     Q.  And is it dangerous to others?
24     A.  It is.
25     Q.  And so someone running in traffic would be

Page 78

1  a danger to themselves or others, right?
2      **A.  It could, yes.**
3      Q.  We don't yet know why, but there is no
4  question that that's dangerous, right?
5      **A.  It is dangerous.**
6      Q.  When you -- did you talk with Steven
7  Neuroth?
8      **A.  I did.**
9      Q.  Was he compliant with you when he was
10  talking with you?
11      **A.  He was compliant for the most part.**
12      Q.  How did you and/or Officer Leef get him
13  out of the street?
14      **A.  I don't remember if we went out there and**
15  **grabbed -- I helped him off the street or if he**
16  **came to us on the sidewalk.  I don't remember that**
17  **much.**
18      Q.  Okay.  Now, we have a recording of your
19  and Officer Leef's interaction with him.
20  Obviously, no visuals.
21          So while you are talking with him, is he
22  standing next to you, or do you have him sitting
23  down, or how is he positioned?
24      **A.  I don't remember if he was sitting on the**
25  **bumper of the car or sitting against the car.**

Page 79

1          **Usually people I try to keep them in the**
2  **front of my car and have them sit up against**
3  **something or sit down.**
4      Q.  Would you typically have a person in that
5  situation sit on the ground?
6      **A.  Yeah.**
7      Q.  And would that be for your safety as well
8  as theirs?
9      **A.  Yes.**
10      Q.  Do you remember at that time Mr. Neuroth's
11  speech being hard to understand?
12      **A.  I do remember it being a little difficult.**
13      Q.  In your report, you wrote that: "Neuroth
14  stated he believed an unknown person was after him
15  and believed all the traffic in Willits was going
16  to hurt him.  Officer Leef asked Neuroth how it was
17  going to hurt him, and Neuroth explained, 'because
18  there are no traffic lights.'"
19          So that's the kind of stuff he was saying
20  to you, right?
21      **A.  Right.**
22      Q.  And it was really irrational and didn't
23  make sense, right?
24      **A.  It didn't.**
25      Q.  You mentioned symptoms in your report that

Page 80

1  you said were consistent objective signs of being
2  under the influence of a controlled substance.
3          So one symptom you mentioned was rapid
4  speech, right?
5      **A.  Uh-huh.**
6      Q.  And rapid speech can also be a symptom of
7  mental illness, right?
8      **A.  It could.**
9      Q.  Elevated pulse could be a symptom of
10  running around in the street, right?
11      **A.  It could, yes.**
12      Q.  Fidgeting hands could be a symptom of
13  mental illness, right?
14      **A.  Yes.**
15      Q.  Dry mouth could be a symptom of mental
16  illness or running around in the street, right?
17      **A.  Yes.**
18      Q.  Dilated pupils can be a sign of mental
19  illness, right?
20      **A.  Yes.**
21      Q.  Of course, sweating uncontrollably could
22  be a symptom of running around in traffic, too,
23  right?
24      **A.  It could, yes.**
25      Q.  So as you are supposed to do, you asked

Page 81

1  him some questions about drug use, right?
2      **A.  I did.**
3      Q.  And you asked him if he had recently used
4  methamphetamine, but he did state he does not use
5  meth, but did put something in his drink, right?
6      **A.  Yes.**
7      Q.  Did he tell you that he put something in
8  his drink or someone put something in his drink?
9      **A.  I don't remember if it was someone.  I**
10  **don't remember.**
11      Q.  And you explain in your report that he was
12  unable to describe what it was or where he drank
13  it, right?
14      **A.  Correct.**
15      Q.  You wrote that:  "As Officer Leef and I
16  spoke to Neuroth, he would talk about one thing and
17  move quickly to the next.  Neuroth would stop
18  speaking with us and look at fixed objects.
19  Neuroth was extremely paranoid and thought someone
20  was out to kill him."
21          Those are all things you observed, right?
22      **A.  Yes.**
23      Q.  All those things are also consistent with
24  someone being mentally ill, right?
25      **A.  They are.**

Page 82

1  Q.  Then you wrote:  "Based on my training and
2  experience, I believe Neuroth was going through a
3  psychosis state."
4      Is that accurate?
5  **A.  It is.**
6  Q.  A psychosis state could be caused by drugs
7  or mental illness, right?
8  **A.  It could, sir.**
9  Q.  You asked him if he would provide a urine
10 sample when you told him that you were going to
11 arrest him for intoxication, and he informed you
12 that he was not on probation and, therefore, didn't
13 want to give you a urine sample, right?
14 **A.  That sounds correct.**
15     MR. HADDAD:  Let's just mark this as
16 No. 2.
17     (Exhibit 2 was marked for identification.)
18 BY MR. HADDAD:
19 Q.  So Exhibit 2 is your report you wrote,
20 right?
21 **A.  It is.**
22 Q.  Could you please turn to the last page of
23 it.
24 **A.  Page 3 of 3?**
25 Q.  Yes.

Page 83

1  **A.  Okay.**
2  Q.  The second to last paragraph, it begins:
3  "Officer Leef and I."
4  **A.  Okay.**
5  Q.  You wrote that:  "Officer Leef and I
6  walked Neuroth to the patrol vehicle.  Once Neuroth
7  was inside, he believed there were snakes on the
8  floor and started to scream."
9      Do you remember that happening?
10 **A.  I do.**
11 Q.  Can you describe what that looked like or
12 how it came out?
13 **A.  Well, I believed -- I think -- I wasn't**
14 **able to listen to the recording because I don't**
15 **work at Willits Police Department anymore.  So I**
16 **don't have access to the recordings.**
17     **But I remember him trying to go to the --**
18 **we were trying to put him in the back seat of the**
19 **car, and he started believing that there were**
20 **snakes underneath the seat.  And then I said if he**
21 **relaxes the snakes won't come out from underneath**
22 **the seat.**
23     **And he relaxed, and we were able to put**
24 **him in the car.**
25 Q.  Okay.  So what you are describing as your

Page 84

1  response to him in the situation would be
2  consistent with your training about how to talk to
3  somebody who's psychotic, right?
4  **A.  Right.  Or hallucinating.**
5  Q.  Okay.  And trying to help him calm down is
6  consistent with your training about how to handle
7  someone who is mentally disturbed for whatever
8  reason, right?
9  **A.  Sometimes talking to anybody nicely calms**
10 **them down.**
11 Q.  And that's a helpful tool to remember as a
12 law enforcement officer to deal with the public,
13 right?
14 **A.  Sometimes it doesn't work, and sometimes**
15 **it works.**
16 Q.  Did it work here?
17 **A.  It did.  I was able to put him in the car.**
18 Q.  You wrote in your report:  "Both
19 Officer Leef and I told him there were no snakes,
20 and it did calm him down," right?
21 **A.  I did put that down.**
22 Q.  Can you remember Officer Leef saying
23 anything like that to Mr. Neuroth?
24 **A.  I believe we both did.  I know when he was**
25 **in the car and he was freaking out -- so I don't**

Page 85

1  **know what the police cars look like around here,**
2  **like the Oakland Police Department, but in Willits**
3  **they didn't have bars at the time over their**
4  **windows.  So they were pretty easy to kick out.  I**
5  **mean windows are fairly easy to kick out.  I have**
6  **seen little kids kick out a window before.**
7      **So it is always nice to have someone calm**
8  **in the back of your car so they don't kick out a**
9  **window, so they don't hurt, because glass breaks,**
10 **and it comes back in.  So it worked.  Calmed him**
11 **down.**
12 Q.  But that wasn't the question.
13     The question was:  Do you specifically
14 remember Leef using calming words to try to calm
15 Neuroth down when Neuroth thought there were snakes
16 in the back of the car?
17 **A.  I don't remember that.  I haven't been**
18 **able to hear the recording, no.**
19 Q.  Whatever Leef said should be on his
20 recording, right?
21 **A.  It should be.**
22 Q.  Would it have been normal practice in the
23 Willits PD at that point to put him in your car
24 while he was handcuffed with his hands behind him
25 and also seat-belted?

1    A.  It is.
2    Q.  Now, at the time that you and -- who
3  arrested Mr. Neuroth while he was being placed in
4  the car?  Who had arrested him?
5    A.  I did.
6    Q.  And was that solely you, or did you
7  consider it a joint decision between you and
8  Officer Leef?
9    A.  I remember talking to Leef.  I don't know.
10  We are beat partners.  I mean we made a lot of
11  decisions together.  But at the end of the day, it
12  is me who arrested him.
13    Q.  The report that Officer Leef filled out to
14  book him into jail said Officer Leef was the
15  arresting officer.
16        Would that be unusual?
17    A.  It doesn't matter, really.  I mean if
18  he -- that's the jail's -- the jail, so, is
19  different than the police department.  We don't
20  work there.  So there is paperwork that has to be
21  filled out.  I don't know what the form said.  I
22  don't remember.
23    Q.  At the time that you and Officer Leef were
24  placing Mr. Neuroth in handcuffs into the back of
25  the car, at that point had you been able to rule

1  out mental illness as the cause of the symptoms
2  that you were observing?
3    A.  I did.
4    Q.  How did you rule it out?
5    A.  I believe I had enough probable cause that
6  he was under the influence of controlled substance,
7  and I arrested him for such.
8    Q.  Okay.  But how did you rule out mental
9  illness as a cause for all those symptoms and
10  decide that it was drugs instead of mental illness?
11    A.  From the time we contacted him from the
12  beginning until now, his demeanor had changed so
13  much, just my training alone, I believed that it
14  was drugs that had made him change so much, and
15  that's the reason I arrested him, sir.
16    Q.  Did you consider he could be on drugs and
17  also mentally ill?
18    A.  I did consider it.
19    Q.  What did you think about that?
20    A.  I think he was under the influence of
21  drugs.  That's why I arrested him.
22    Q.  All the symptoms that you -- on which you
23  based your arrest for being intoxicated on drugs
24  are also symptoms of mental illness though, right?
25    A.  They are.

1    Q.  Did you or Officer Leef ever use profanity
2  in your interactions with Mr. Neuroth?
3    A.  I probably did.
4    Q.  Why do you say that?
5    A.  I don't have the best mouth, if you want
6  to know the truth.
7    Q.  Is it professional conduct for an officer
8  to use profanity in their interactions with the
9  public or arrestees even?
10    A.  Sometimes we use profanity, yes.
11    Q.  So you think it can be professional
12  sometimes?
13    A.  Absolutely.
14    Q.  Is it always justified?
15    A.  No.
16    Q.  Is there anything specific that you can
17  think of involving Mr. Neuroth that would have
18  justified the use of profanity in your interaction
19  with him?
20    A.  I remember trying to put him in the car,
21  him squirming around a lot, and I remember thinking
22  maybe he is going to run.
23        And so I remember -- I probably said
24  something that I was going -- I don't remember
25  exactly what I said, but I probably did use

1  profanity, and I think, yes, I think it was
2  appropriate, and it worked.
3    Q.  Did you ever describe him as crazy?
4    A.  What do you mean crazy?
5    Q.  Did you call him crazy?
6    A.  I don't remember.
7    Q.  All right.
8        I would like to play you the recording now
9  and maybe you can help me discern at some places
10  what's being said, and sometimes it is a little
11  hard to hear.
12    A.  Okay.
13    Q.  And you might recognize your own voice
14  better than somebody else.
15        MS. KECK:  Do you mind if we take a quick
16  break?
17        MR. HADDAD:  Okay.  We will take a quick
18  break.
19        THE VIDEOGRAPHER:  We are going off the
20  record at 3:31.
21            (Recess taken)
22        THE VIDEOGRAPHER:  We are back on the
23  record at 3:38.
24  BY MR. HADDAD:
25    Q.  All right.

1        I am going to play portions of Officer
2  Leef's recording now to see if you can help us
3  discern some of the voices of what's said on it.
4        Okay?
5      **A.  Are you going to play it continuously, or**
6  **are you going to --**
7      Q.  I was planning to, because it is kind of
8  long, I was planning to not start at the beginning.
9  I was going to start at 2 minutes and 13 seconds.
10       If you think it would be helpful to start
11  at the beginning, I don't mind.
12     **A.  Do you mind?**
13     Q.  Okay.
14     **A.  I haven't been able to listen to this.**
15       MR. HADDAD:  You don't need to report it.
16       (Playing audio)
17  BY MR. HADDAD:
18     Q.  I am stopping at a minute 20.
19       So much of what we are hearing so far is
20  you and Officer Leef giving commands to Mr. Neuroth
21  to get out of the street and come over and sit
22  down, right?
23     **A.  It's mainly -- yes.**
24     Q.  It's mainly Officer Leef, but you're --
25     **A.  Yes.  Because his recording wasn't picking**

1  me up.
2      Q.  You can hear a second officer more
3  faintly.
4        Did you hear your voice at all?
5      **A.  I did.**
6      Q.  Let's keep going.
7        (Playing audio)
8  BY MR. HADDAD:
9      Q.  Was that your voice just saying:  "Hey,
10  man.  You high?"
11     **A.  That was me.**
12     Q.  For the record, that was at two minutes
13  and three seconds.
14       (Playing audio)
15  BY MR. HADDAD:
16     Q.  Did you just ask him:  "Do you use meth?"
17  And he said:  "Not that I know of"?
18     **A.  Yes.  That was me.**
19       **Can you put this thing a little closer.  I**
20  **have a hard time hearing it.**
21     Q.  Yes.  I will turn it a little bit, too.
22       (Playing audio)
23  BY MR. HADDAD:
24     Q.  Stopping it at 2:39.
25       So there is some discussion with him where

1  he apparently claims somebody put something in his
2  soda, right?
3      **A.  Correct.**
4        (Playing audio)
5  BY MR. HADDAD:
6      Q.  So did you just say something like:  "Let
7  me see your pulse," and he said something, and you
8  said:  "I don't give a fuck"?
9      **A.  I did.  That was me.**
10       (Playing audio)
11  BY MR. HADDAD:
12     Q.  Did you just hear Mr. Neuroth say
13  something:  "I didn't do anything wrong."  And you
14  said:  "Yeah.  You're crazy."  You said again:
15  "Crazy"?
16     **A.  Yes.  That was me.  I said that.**
17       **(Playing audio).**
18  BY MR. HADDAD:
19     Q.  Who was it that said that:  "Speak up,
20  man.  Okay.  You're a fucking man.  So speak up.
21  Let's go"?
22     **A.  That's me.**
23     Q.  And then you say:  "Are you trying to kill
24  yourself?"  And I think he said:  "No."
25       Is that right?

1      **A.  Yes.**
2        (Playing audio)
3  BY MR. HADDAD:
4      Q.  Did you say:  "Maybe he is crazy"?  And
5  Leef said:  "That is kind of the worry"?
6      **A.  I couldn't hear it.**
7      Q.  All right.  I will play it again.
8      **A.  All right.**
9        (Playing audio)
10  BY MR. HADDAD:
11     Q.  Did you say something like:  "Maybe he's
12  crazy"?
13     **A.  Yes, I did.**
14     Q.  And then Leef said:  "That's kind of the
15  worry."  Right?
16     **A.  Right.**
17     Q.  I want you to listen very carefully to the
18  very next part.
19     **A.  Okay.**
20       (Playing audio)
21  BY MR. HADDAD:
22     Q.  Did you just say:  "Let's take him over to
23  the Howard"?
24     **A.  Something like that, yeah.  I did say**
25  **something about Howard.**

Page 94

1    Q.  Okay.  I am going to back it up a little
2  bit so we don't miss anything.
3        This is at 5:13, starting at 5:04.
4        (Playing audio)
5  BY MR. HADDAD:
6    Q.  So it sounds like you said:  "Maybe just
7  take him up to Howard or over to Howard."  And Leef
8  said:  "Yeah.  I am going to be dealing with him
9  all night there, too."
10       Right?
11   A.  He did.
12       (Playing audio)
13 BY MR. HADDAD:
14   Q.  Was that your voice?  And what did you
15 say?
16   A.  I said:  "Or should we take him to jail
17 for 115," or something like that?
18   Q.  Okay.  115 would be what?
19   A.  11550 of the Health and Safety Code.
20   Q.  Okay.  So when you started by saying "or,"
21 are you following up on your previous statement
22 where you said something:  "We should just take him
23 to Howard"?
24   A.  Yeah.  If that's what you want to think.
25   Q.  I am asking you.

Page 95

1    A.  Can we just play it and not stop it?
2    Q.  Sure.
3    A.  Thanks.
4    Q.  I am going to go back before you made the
5  reference to Howard.
6    A.  Is the audio the thing that keeps cutting
7  out?  Is that what it is?
8    Q.  The levels go up and down.
9    A.  Oh, okay.
10       (Playing audio)
11 BY MR. HADDAD:
12   Q.  I stopped it at 5:46.
13       So can you hear yourself now saying:  "Or
14 we could take him to jail for 115"?
15   A.  Correct.
16   Q.  And then you say:  "I would write him up
17 as a psychiatric state.  We would have to book him
18 as a John Doe," right?
19   A.  I did.
20   Q.  And so it sounds like you and Officer Leef
21 are discussing what to do with him, whether to take
22 him to Howard or whether to take him to jail,
23 right?
24   A.  Correct.
25   Q.  You would take him to Howard if he were

Page 96

1  5150, and you would take him to jail if you had
2  cause to believe he was under the influence, right?
3    A.  Correct.
4    Q.  So now you and Officer Leef are discussing
5  that you could possibly have someone he knows come
6  and get him, right?
7    A.  Correct.
8    Q.  And so now there is an attempt to contact
9  his brother, right?
10   A.  Yes.
11   Q.  It sounded like a few moments earlier you
12 were ordering him to tap his head and pat his
13 stomach.
14       Is that accurate?
15   A.  It sounded that way.
16   Q.  Why would you have been telling him to do
17 that?
18   A.  Sometimes when you divide someone's
19 attention, it just relaxes them.
20       (Playing audio)
21 BY MR. HADDAD:
22   Q.  Well, it sounded like Officer Leef said:
23 "All right.  Which way do you want to run it?"  And
24 you said:  "I don't know."  And then you said:  "I
25 will write the report."

Page 97

1        Is that accurate?
2    A.  Uh-huh.
3    Q.  Yes?
4    A.  Yes.
5    Q.  And then Officer Leef said:  "This is
6  whether or not you want me to go and you be alone,
7  or going south is always preferable to a 5150."
8        Did Leef say that?
9    A.  He did.
10   Q.  And you said:  "You would rather go south
11 than sit at the hospital," right?
12   A.  Yes.
13   Q.  Leef said:  "Oh, yeah."  And you said:
14 "All right," right?
15   A.  Yes.
16   Q.  And how did you -- what did you understand
17 Leef to be saying when he said he would rather go
18 south?
19   A.  He would rather go to the county jail.
20 That's in Ukiah.
21   Q.  Than go to the hospital, right?
22   A.  Instead of Howard.
23   Q.  And did you have an understanding why Leef
24 didn't like going to the hospital?
25   A.  No.  I don't know why he doesn't like it.

1    I don't like going to the hospital either.
2  I don't know why he didn't want to go there.
3    Q.  But we are talking about:  Do you have any
4  reason why Leef wouldn't want to go and wait at the
5  hospital and wait with Mr. Neuroth?  Can you think
6  of that?
7    A.  No.
8    (Playing audio)
9  BY MR. HADDAD:
10    Q.  You just said:  "I'll write him up as a
11 psychotic state."  And you said:  "I mean, let me
12 see your pulse," right?
13    A.  Correct.
14    (Playing audio)
15 BY MR. HADDAD:
16    Q.  So it sounds like I can hear handcuffs
17 being tightened.
18    Did you hear that?
19    A.  Yes.
20    Q.  So one of you is probably putting cuffs on
21 him at that moment?
22    A.  Yes.
23    Q.  Do you know if it was your cuffs or
24 Officer Leef's cuffs?
25    A.  I don't.

1    Q.  Do you know which one handcuffed him?
2    A.  We both did it together.  I don't remember
3  if they were mine or his.
4    Q.  When you start touching him to put the
5  cuffs on him, he says things like:  "Oh, God, help
6  me.  Please don't hurt me," something like that,
7  right?
8    A.  Yes.
9    Q.  Was he doing anything to threaten you or
10 Officer Leef at that moment?
11    A.  That we put handcuffs on him?
12    Q.  Yes.
13    A.  No, sir.  He was under arrest.
14    Q.  Just before that you had asked him did he
15 use meth recently, and he said something like:
16 "No.  I don't like drugs," right?
17    A.  He did say that.
18    (Playing audio)
19 BY MR. HADDAD:
20    Q.  So it sounds like you and Leef are joking
21 around a little bit about the fact that your phone
22 touched Mr. Neuroth; is that right?
23    A.  Yeah.  It sounded that way.  I don't know
24 if it was mine or his.
25    Q.  Was there something about Mr. Neuroth that

1  made you not want to have him touch your phone?
2    A.  He was covered in sweat.
3    Q.  Okay.
4    (Playing audio)
5  BY MR. HADDAD:
6    Q.  Do you remember Officer Leef using hand
7  sanitizer after he touched Mr. Neuroth?
8    A.  No.
9    (Playing audio)
10 BY MR. HADDAD:
11    Q.  Sounded like Steve Neuroth said something:
12 "If I peak and I go," and you said:  "No.  You are
13 going to fucking jail."
14    Is that right?
15    A.  Yes.  Similar to that.  Yes, I said that.
16    (Playing audio)
17 BY MR. HADDAD:
18    Q.  Is that your voice?
19    A.  It is.
20    Q.  Did you say something like:  "Hey, let me
21 tell you something.  Okay?  If you run, I am going
22 to trip you and, I am going to push your face on
23 the ground.  Okay?  All right?  Do guns scare you?"
24    Did you say something like that?
25    A.  Yes, I did.

1    Q.  What was your reason for saying those
2  things?
3    A.  I remember he was scared of a gun, and we
4  carry guns on our belts.  People are scared of
5  things that we carry on our belts all the time.
6  Some people are scared of Tasers if they have been
7  tased before.  Some people are scared of guns.  He
8  just was not rational.
9    Q.  What was he doing just before you used
10 those words?
11    A.  I remember we were trying to pick him up,
12 and he was just really fidgety, just wanted to keep
13 going, you know.
14    Q.  Would you characterize that as passively
15 resisting you or just fidgeting?
16    A.  Someone who passively resists just sits
17 there, but he was just really squirmy, I guess,
18 fidgety, squirmy.
19    (Playing audio)
20 BY MR. HADDAD:
21    Q.  Do you remember what's happening at this
22 point?
23    A.  Yeah.  We were putting him in the car, and
24 then he started seeing snakes coming out from
25 underneath the seat.

1    Q.   Okay.
2    A.   And then I told him -- I was buckling him
3  in the seatbelt, and I told him:  "That's right."
4  I explained to him:  "If you are relaxed and you
5  are calm, no snakes will come out from underneath
6  the seat."
7    Q.   Did you hear Steve say something like:
8  "I'm sorry.  I'm sorry.  I just need to go to a
9  hospital.  I went to a hospital"?
10    A.   Yes.  He just said that right now.
11        (Playing audio)
12  BY MR. HADDAD:
13    Q.   So Leef is chuckling, and says:  "We can
14  wrap him."  And you said:  "I ain't going to wrap
15  him," something like that, right?
16    A.   Uh-huh.
17    Q.   Yes?
18    A.   Yes.
19    Q.   Are you referring to a wrap restraint
20  device?
21    A.   Yes.
22        (Playing audio)
23  BY MR. HADDAD:
24    Q.   Sounds like Leef says:  "He think there's
25  snakes in there"?

1    A.   No.  That was me.
2    Q.   Someone told him:  "You can't move."
3  Was that you, too?
4    A.   Can you replay that?
5    Q.   Yeah.
6    A.   The audio seems like it --
7    Q.   It goes up and down.  It's a little hard
8  to hear.
9    A.   Yeah.
10        (Playing audio)
11        THE WITNESS:  Oh, yeah.  I did say that.
12  I said:  "Don't move."
13        (Playing audio)
14  BY MR. HADDAD:
15    Q.   Now we hear Leef laughing and saying:
16  "Snakes in a cop car.  Now I want to go get a
17  rubber snake," right?
18    A.   He did say that.
19        (Playing audio)
20  BY MR. HADDAD:
21    Q.   So what is this discussion about where you
22  are referring to other people, Karen and Bennett
23  and Jake Barrett?
24    A.   So at the Willits Police Department, there
25  is only two people on on a nighttime shift.  So you

1  would call in somebody who has their days off, and
2  we would ask them to come in and transport someone
3  to jail for us or to cover the streets.
4        So, for instance, I would say:  "Kevin,
5  you drive down to Ukiah.  I will call somebody in
6  to cover while you are gone.  And then when you
7  come back, you can go home," because there's only
8  two of us, and sometimes at the Willits Police
9  Department there's a small amount of sheriffs
10  deputies on at the same time because there is
11  different sectors.  From the north sector is one of
12  the larger sectors in Mendocino County.  So they
13  always do have a partner.
14    Q.   If one of you had taken him to the
15  hospital instead of to jail, that could have taken
16  even longer than taking him to jail, right?
17    A.   Taking somebody to a hospital?
18    Q.   Yes.
19    A.   It could take a while.  Sometimes the jail
20  takes a while, too.
21    Q.   But if you and Officer Leef had decided to
22  take Mr. Neuroth to Howard Hospital, would you have
23  had to get -- tried to get someone to fill in for
24  you while the other one was at the hospital?
25    A.   We typically used to, yes.  I don't know

1  what their policies are now.  I can't talk about
2  those.
3    Q.   Okay.  I will keep going.
4        (Playing audio)
5  BY MR. HADDAD:
6    Q.   Was that Leef saying he would drive down
7  there and say:  "Oh, my God.  There's," blah, blah,
8  blah, and then there was some laughter?
9    A.   Yes.  We were laughing.
10    Q.   And that was about Leef joking about
11  scaring Mr. Neuroth about snakes, right?
12    A.   I don't know if it was me talking or him
13  talking.
14    Q.   One of you were joking about the idea that
15  you could say things to him that would make him
16  think there were snakes and get a reaction out of
17  him, right?
18    A.   Yes.  We were talking about that.
19        (Playing audio)
20  BY MR. HADDAD:
21    Q.   Did we just hear Leef yell "snake" and
22  then Neuroth say "ahh" in fear?
23    A.   He did yell "snake," yes.
24        (Playing audio).
25

DEPUTY JEFFREY ANDRADE     08/25/2017

Page 106

1  BY MR. HADDAD:
2     Q.  So in this last section, sounds like we
3  heard Leef at one point say:  "Look out.  Don't
4  move.  Don't move.  Don't move," probably to
5  Mr. Neuroth, correct?
6     **A.  Correct.  I don't think --**
7     Q.  Sorry.
8     **A.  Yeah.  I don't think I was there.**
9     Q.  Okay.  And then you could hear what
10 sounded like a turn signal at times that would
11 indicate he was driving, right, clicking of a turn
12 signal?
13    **A.  Yeah.  I heard the turn signal, but I**
14 **wasn't sure if we were at the -- I don't -- because**
15 **I wasn't there with him during this audio, I'm**
16 **assuming we were driving the car because that's**
17 **what it sounds like, but I don't know if he was in**
18 **the back parking lot and he left the turn signal**
19 **on.  I don't know.  It is hard to determine exactly**
20 **where he was.**
21    Q.  Did you have a separate car?
22    **A.  I did.**
23    Q.  You would have driven separately, right?
24    **A.  Yes.**
25    Q.  And eventually Officer Leef said:  "That

Page 107

1  was some funny ass shit," right?
2     **A.  He did say that.**
3        (Playing audio)
4  BY MR. HADDAD:
5     Q.  I am going to stop it for a second.  So I
6  have a transcript here of times.  There is going to
7  be some blank space for a couple minutes.  I
8  propose moving it forward, but if you want me to
9  just play it straight through, I will.
10    **A.  There is nothing in between?**
11    Q.  There is some -- a conversation about
12 what's he being arrested for.  This guy put on:
13 "Fear and loathing in Las Vegas, some discussion a
14 little bit like that," and it sounds like he's
15 eventually being driven again.
16       If you want, I can just --
17    **A.  It's okay.  You can fast forward it, or**
18 **whatever the right word.  I think fast forward is**
19 **the right word anymore.**
20    Q.  Yeah.  I know what you mean.
21       I am at 21:20.  I am going to advance it
22 to 23:15, two minutes.
23       (Playing audio)
24 BY MR. HADDAD:
25    Q.  It sounded like you and Officer Leef were

Page 108

1  discussing who is going to write the report, and
2  finally you guys decided you could write it, and
3  you said:  "I can write this one fast."  You said
4  that?
5     **A.  I said that, yeah.**
6     Q.  Next you're kind of questioning Neuroth
7  about meth use.
8        Can you hear his answers?
9     **A.  I can't hear it because of the audio is**
10 **not that great.**
11    Q.  Right.  I can't hear it either.
12    **A.  Okay.**
13       (Playing audio)
14 BY MR. HADDAD:
15    Q.  Was that your voice right there?
16    **A.  That's me talking to him.**
17    Q.  And you are asking him:  "Afraid of what?"
18 "Afraid of the traffic."  And then you said:  "Why
19 didn't you go to Ukiah like we asked you?"  Right?
20    **A.  Right.**
21    Q.  What did you mean then when you said:
22 "Why didn't you go to Ukiah like we asked you?
23    **A.  Maybe we asked him to go to Ukiah.  I**
24 **don't remember that part, or maybe at least in the**
25 **first contact.**

Page 109

1        (Playing audio)
2  BY MR. HADDAD:
3     Q.  At 25:30 we hear Leef yell "snakes" again,
4  and Neuroth say "ahh"?
5     **A.  I don't think that was him.**
6     Q.  You don't think that was Leef?
7     **A.  I don't think he was in his car.**
8     Q.  Who do you think was saying "snakes"?
9     **A.  I don't think Leef was inside of -- I**
10 **don't think Leef was inside the vehicle with**
11 **Neuroth at the time.  We were standing outside in**
12 **the parking lot.**
13    Q.  All right.  But did you hear him say
14 "snakes" again?
15    **A.  I did, but I don't know if that was**
16 **Neuroth in the background.  I wouldn't confirm**
17 **that.**
18       (Playing audio)
19    **THE WITNESS:  That's him just now getting**
20 **in the car.  I don't think he was sitting next -- I**
21 **don't think he was outside.**
22       (Playing audio)
23 BY MR. HADDAD:
24    Q.  So I am guessing, from the sound of the
25 turn signal and the Pink Floyd music playing, that

DEPUTY JEFFREY ANDRADE      08/25/2017

1    Officer Leef was driving to the jail now.
2        A.   Right.
3        Q.   So you wouldn't have had any more contact
4    with Mr. Neuroth at that time, right?
5        A.   No.
6        Q.   Correct?
7        A.   Correct.  I don't have any more contact
8    with him.
9        Q.   Why did the two of you meet at the Willits
10   Police Department before Officer Leef took
11   Mr. Neuroth to jail?
12       A.   Sometimes it's just easier.  We would go
13   there, back to the police department.  It's super
14   close.  We would go back there and fill out the
15   paperwork.  One would do one.  The other person
16   would do the other, and you would leave from there.
17       Q.   Okay.  Did you check his criminal history
18   or other history while you were at the department?
19   Did one of you?
20       A.   I did not.  So I don't know if Kevin did
21   or not, or Officer Leef.
22       Q.   Did you ever observe Steven Neuroth trying
23   to kick things in the back of the car or kick out
24   windows or anything like that?
25       A.   He was -- I don't know if he wasn't

1    kicking, but he was just moving around a lot
2    because he believed snakes were coming out from
3    underneath the seat.
4        Q.   So his fear of the snakes seemed to make
5    him move around more?
6        A.   Right.  And then if you told him to relax
7    and the snakes wouldn't come out, it worked.
8        Q.   Okay.  So when he's afraid of snakes, he's
9    moving around, and when you help him relax, he is
10   able to calm down, right?
11       A.   Yes.
12       Q.   That was your experience, right?
13       A.   It was.
14       Q.   What do you recall doing after
15   Officer Leef left to take Mr. Neuroth to jail?
16       A.   I don't remember exactly what I was doing.
17       Q.   What is the next thing that you remember
18   concerning Mr. Neuroth?
19       A.   I was writing this report, and the jail --
20   one of the members of the jail staff called me and
21   told me that Mr. Neuroth was dead.
22       Q.   Did they tell you why, or how it happened?
23       A.   No.
24       Q.   Did you ask?
25       A.   No.

1        Q.   So, any other information other than he's
2    dead?
3        A.   They said he -- I don't know if they said
4    he was dead or he coded.  I don't remember exactly
5    how it came about.  I don't even think Leef was
6    back yet.  That's all I...
7        Q.   Did they tell you to do anything, or just
8    that he's dead?
9        A.   Yeah.  I think they just told me that he
10   was dead.
11       Q.   What did you do next?
12       A.   I tried to call the chief of police at the
13   time, Gerry Gonzalez.  I don't know if I got ahold
14   of him, but I remember going to his house and
15   telling him he needed to show up to work.
16            I went to a sergeant at the time.  His
17   name is Jacob Donohue.  He was a sergeant at
18   Willits Police Department.  He no longer works
19   there.  I went to his house and told him he needed
20   to wake up and go to work.
21            And I got ahold of LDF.
22       Q.   What is LDF?
23       A.   Officers Union Defense Fund.
24       Q.   Officers Union Defense Fund?
25       A.   Yes.

1        Q.   For yourself?
2        A.   And Officer Leef.
3        Q.   What is the next thing you did?
4        A.   I don't remember.
5        Q.   Did you talk with Officer Leef about what
6    happened after you and Leef parted?
7        A.   If we did, I don't remember.
8        Q.   Weren't you interested to find out what
9    happened to Mr. Neuroth?
10       A.   I remember him saying that he -- that when
11   Leef left, I think he said he went to a safety cell
12   or something like that, but I don't know anything
13   else after that.
14       Q.   Did Leef tell you anything that happened
15   on the ride between the police department to the
16   jail?
17       A.   I don't remember.
18       Q.   Did Leef tell you anything about Neuroth's
19   behavior in the back of the car as they were
20   driving to the jail?
21       A.   I don't remember, sir.
22       Q.   Did Leef tell you that he was continuing
23   to frighten Mr. Neuroth by telling him there were
24   snakes back there?
25       A.   I'm sorry.  What?

1  Q.  Did Officer Leef tell you that he was
2  continuing to frighten Mr. Neuroth on the way to
3  the jail by making references to snakes?
4  **A.  I don't know what you are talking about.**
5  Q.  You heard him do that earlier on the tape,
6  didn't you?
7  **A.  When we were outside -- the one that you**
8  **said you could hear Mr. Neuroth scream, well,**
9  **typically when we are at the police department, we**
10 **are outside of our cars.  Our cars are parked away.**
11 **We say things amongst each other.  No one else can**
12 **hear us.**
13 **      So I don't know if he was saying "snake"**
14 **or -- I mean, he apparently -- he did say it.  I**
15 **mean we could hear it on the audio, but I don't**
16 **think Mr. Neuroth heard that.**
17 Q.  There were other times earlier in the
18 recording, though, when you could actually hear
19 Mr. Neuroth reacting; weren't there?
20 **A.  I don't know if it was him reacting or he**
21 **was moving.  I don't know.**
22 Q.  Based on your training, was it appropriate
23 law enforcement conduct under these circumstances
24 to yell "snakes" to try to create fear and anxiety
25 in Mr. Neuroth?

1       MR. LEWIS:  Objection.  Calls for
2  speculation and conclusion and instruct him not to
3  answer with regards to that issue that he wasn't
4  involved in.
5       So if you are asking him the conduct that
6  he witnessed, that's different.
7  BY MR. HADDAD:
8  Q.  Would you do something like trying to
9  deliberately frighten Mr. Neuroth by yelling
10 "snakes" when you knew he was paranoid and afraid
11 of snakes?
12      MR. LEWIS:  Objection.  Calls for
13 speculation and expert opinion.
14 BY MR. HADDAD:
15 Q.  Would you do that?
16      MR. LEWIS:  Hypothetical.
17 **     THE WITNESS:  I am not going to give you**
18 **my opinion, sir.**
19 BY MR. HADDAD:
20 Q.  You can't tell us whether or not you would
21 do that?
22 **A.  No, sir.  I am not going to give you my**
23 **opinion.**
24 Q.  So after contacting the chief and the
25 sergeant and union lawyers, what did you do next

1  concerning Mr. Neuroth?
2  **A.  I waited for -- I actually concluded my**
3  **report, and I waited for -- what happened?**
4  **      I finished writing my report, and someone**
5  **called to interview us.  I don't remember who it**
6  **was, if it was DA investigators or if it was the**
7  **investigator with the jail -- or not the jail, but**
8  **the sheriffs office, like the detective.**
9  **      I don't remember who called, but I**
10 **remember them asking if they could come up for an**
11 **interview, and I remember saying:  "You can wait**
12 **for LDF."**
13 Q.  And then what happened?
14 **A.  I went home.**
15 Q.  Were you ever interviewed?
16 **A.  No.**
17 Q.  Nobody ever asked for your interview in
18 connection with this?
19      No?
20 **A.  No.  I wrote a report.**
21 Q.  Okay.  And when did you next talk with
22 Officer Leef about what happened with Mr. Neuroth?
23 **A.  I think that same day when he came back to**
24 **Willits before the lawyers and, you know, while the**
25 **chief was getting ready and the sergeant was**

1  **getting ready to come to work, he told me he had it**
2  **recorded.**
3  **      He said:  "I have it recorded."**
4  **      And I said:  "Download your recording and**
5  **book it into evidence."**
6  **      That's why I have it written in my report**
7  **with the evidence.**
8  Q.  And what was Leef's reaction when you told
9  him to download it and save it?
10 **A.  He did it.**
11 Q.  Did he express any feelings about it?
12 **A.  No.  He just did it.**
13 Q.  And did you discuss -- did you talk about
14 what happened with Leef?
15 **A.  I don't remember, sir.  I don't remember**
16 **that part.  I remember the lawyers saying they are**
17 **on their way and just keep to ourselves.**
18 Q.  Without getting into conversations that
19 you had with your lawyers, did you have a meeting
20 with your lawyers?
21 **A.  I did.**
22 Q.  Was Officer Leef present?
23 **A.  He was in his own -- they sent -- I think**
24 **they sent two of them, and they separated us.**
25 Q.  Who else was present when you talked to

1  the lawyer?
2      A.  Just me and that lawyer.
3      Q.  Was there anything else that you did in
4  connection with the Neuroth incident or anyone else
5  you talked to about it other than your lawyers?
6      A.  No.  I don't remember.
7      Q.  Did you ever talk with Chief Gonzalez
8  about your involvement in this incident or what you
9  knew?
10     A.  I did.  I wrote a report.
11     Q.  Did you talk with him though?
12     A.  I don't -- we weren't really on talking
13 terms at that time, if you want to know the truth.
14 I was leaving for the sheriffs department.  He knew
15 about it.  I was staying until after the 4th of
16 July, and we just -- the Willits Police Department
17 is a really small agency.  So when you see people
18 leave, it is kind of hard.
19        I mean, we still talked, but it wasn't
20 like best friends like it used to be, you know,
21 because some people feel upset when you leave.
22     Q.  So you felt that he was kind of avoiding
23 talking to you since you had informed him you were
24 leaving?
25     A.  Right.  And also I had my lawyer.  So he

1  didn't ask me any questions about him.  He knew
2  that the lawyers were coming, and I wasn't going to
3  talk to him anyway until a lawyer was there.
4      Q.  Did you talk to the sergeant about what
5  happened?
6      A.  Again, I had a lawyer on my way.  I did.
7  I told him that someone, that -- what did I tell
8  him when I woke him up?
9        You got to give me a second to think about
10 that one.
11     Q.  Okay.
12     A.  I think I did tell him that he had died at
13 the jail.  I'm not sure if I told him he died at
14 the jail in the safety cell or -- but they had
15 accepted him and he had died at the jail and he
16 needed to come to work.  I don't know if I told him
17 exactly what happened.
18     Q.  Did you ever talk with the sergeant in
19 detail about your interactions with Mr. Neuroth?
20     A.  No.
21     Q.  Did anyone from the Willits Police
22 Department ever talk with you about your conduct in
23 this matter?
24     A.  What are you talking about, my conduct?
25     Q.  How you acted in these events, how you

1  handled it.
2      A.  Are you talking about like in IA or are
3  you --
4      Q.  In any way.
5      A.  No.
6      Q.  Formally or informally.
7      A.  No.
8      Q.  Did the Neuroth incident at all come up in
9  connection with your new job at the sheriffs
10 office?
11     A.  No.  They knew about it, the sheriffs
12 office did, because I had already -- I think I had
13 already been hired.  I just had a date.  So I made
14 sure I stayed with the Willits Police Department
15 until after the 4th of July festivities because it
16 is a big deal in Willits, and everybody has to work
17 for the week straight.  So they knew about it.
18     Q.  So did you talk to anybody in the sheriffs
19 office about the events that led up to
20 Mr. Neuroth's death?
21     A.  I don't know any event that led up to his
22 death.
23     Q.  Were you involved in his arrest.  That's
24 what I am talking about.
25     A.  Oh, that I arrested him?  I don't know

1  anything else that has happened.
2      Q.  Did you talk with anybody from the
3  sheriffs office about your connections or
4  involvements with Mr. Neuroth that night?
5      A.  No.
6      Q.  Knowing what you know now, if you had this
7  incident to do over again, would you do anything
8  differently?
9      A.  No.
10     Q.  Do you know whether any jail intake
11 procedures were changed as a result of what
12 happened to Mr. Neuroth?
13     A.  I don't.
14     Q.  After Mr. Neuroth died in the jail, did
15 you hear that the jail would no longer accept
16 inmates that were acting psychotic or crazy at the
17 time of admission?
18     A.  No.
19        Sorry.
20     MS. KECK:  Objection.  Mischaracterizes
21 and lack of foundation.
22     MR. LEWIS:  And it's after 4.
23     MS. KECK:  And it's after 4, after 4:30.
24     MR. HADDAD:  Would you mark this as
25 Exhibit 3, please.

1                    REPORTER'S CERTIFICATE

2

3          I, MICHELE J. LUCAS, a Shorthand Reporter,

4    State of California, do hereby certify:

5          That DEPUTY JEFFREY ANDRADE, in the

6    foregoing deposition named, was present and by me

7    sworn as a witness in the above-entitled action at

8    the time and place therein specified;

9          That said deposition was taken before me at

10   said time and place, and was taken down in

11   shorthand by me, a Certified Shorthand Reporter of

12   the State of California, and was thereafter

13   transcribed into typewriting, and that the

14   foregoing transcript constitutes a full, true and

15   correct report of said deposition and of the

16   proceedings that took place;

17         That the witness's review and signature was

18   not requested.

19         IN WITNESS WHEREOF, I have hereunder

20   subscribed my hand this 12th day of September,

21   2017.

22

23   _____

          MICHELE J. LUCAS   CSR NO. 4017

24        State of California

25