UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JAMES NEUROTH,<br><br>Plaintiff,<br><br>v.<br><br>MENDOCINO COUNTY, et al.,<br><br>Defendants. | Case No. 15-cv-03226-RS<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT** |

## I. INTRODUCTION

Plaintiff James Neuroth is the brother of Steven Neuroth[1], a 55-year old man who died while in the custody of Mendocino County on June 11, 2014. Steven was a pretrial detainee at the Mendocino County jail, where he was booked for suspected methamphetamine intoxication. At the jail, Steven became involved in a prolonged physical struggle with several Mendocino County deputies and was later found unresponsive in the safety cell where he was placed. Neuroth now brings claims for unlawful arrest, failure to summon medical care, inadequate medical care, and excessive force under 42 U.S.C. § 1983 and California state law against the City of Willits police officers who arrested Steven, the nurse on duty at the Mendocino County jail, and the Mendocino County deputies who were involved in the altercation with Steven at the jail. He also brings claims against the supervisors of these individuals, and *Monell* claims against the City of Willits, the

_____

[1] The decedent is referred to as "Steven" to distinguish from plaintiff James Neuroth.

County of Mendocino, California Forensic Medical Group ("CFMG"), a private contractor responsible for the provision of medical services at Mendocino County Jail, and its corporate parent, Correctional Medical Group Companies ("CMGC"). Defendants now seek summary judgment on all claims asserted in the operative complaint. For the reasons explained below, the motions are granted in part and denied in part.

## II. BACKGROUND

The following facts are undisputed, except where otherwise noted.

### A. Steven Neuroth's Arrest and Death in Custody

One June 10, 2014, Willits Police Officers Kevin Leef and Jeff Andrade encountered Steven in front of a local grocery store in the City of Willits. Steven appeared to be confused and behaving oddly. At the time, the officers did not believe he was under the influence or presented a danger to himself or others. They advised him to leave the area. About two hours later, Leef and Andrade received a radio call regarding an individual running in and out of traffic near the grocery store, who turned out to be Steven. After witnessing Steven nearly hit by a truck, the officers called him over and observed that he was very sweaty and fidgety, was clenching his teeth and hands, and spoke in a jumbled manner. Leef Depo. 58:7-16. This interaction was recorded on Leef's personal audio recorder. The officers attempted to take Steven's pulse and asked him if he used meth, to which he replied "No. Not that I know of." Andrade Depo. 91:6-92:3, Willits Exs. L and I. After asking Steven for his name, identifying information, and whether he was trying to kill himself, the officers discussed whether Steven was "crazy" and whether they ought to take him to the hospital or to the county jail for drug intoxication. Leef testified he did not wish to spend the rest of his day waiting outside a hospital emergency room and told Andrade as much. The officers also attempted unsuccessfully to reach his brother by telephone. Although Steven informed the officers that he needed to go to a hospital, Leef and Andrade decided to place him under arrest and transported him to the Mendocino County jail.

Upon entering the police vehicle, Steven began to have hallucinations about snakes on the floor and screamed. Both Leef and Andrade were trained on how to assess the signs and symptoms

of mental illness, and to use specific de-escalation techniques when dealing with someone who may be mentally ill. Leef's audio recording shows the two officers joking about Steven's fear of snakes. At several points during the trip to the Willits Police Station and then on to the Mendocino County jail, Leef can be heard yelling "snakes!" to Steven and laughing, while Steven whimpers in response. Leef is also recorded as telling a person on the phone with him that yelling "snakes!" at Steven causes him to "freak out," which is "pretty funny." When asked about these interactions, Leef testified that using the word "snakes" was a tool to calm Steven down when he started to act up in the backseat of the police car. Leef Depo. 75:25-76:2. Neuroth characterizes Leef's conduct as tormenting Steven for his own amusement and for no legitimate purpose.

When Leef arrived with Steven at the Mendocino County jail, Mendocino County Deputy Craig Bernardi asked Steven intake questions while he was sitting in the police vehicle. Steven had difficulty answering the questions and continually shifted around, behavior Bernardi attributed to the influence of drugs based on Leef's pre-booking report. Bernardi did not know that Steven had been previously incarcerated at the jail and had an extensive mental health history with the County of Mendocino. Licensed Vocational Nurse ("LVN") Jennifer Caudillo was also on duty that evening in the booking area of the jail. Leef told Caudillo that Neuroth was "about as high as I've ever seen," and that he had been running in and out of traffic and was hallucinating about snakes. Caudillo testified that she thought Steven was "possibly" mentally ill, but at the time he was admitted to the jail, she believed he was on methamphetamine because somebody told her that was the case. She states she did not have knowledge whether Steven was at risk of dying from a drug overdose or having a cardiac arrest from methamphetamine overdose, or whether he was in a psychiatric crisis. Caudillo Depo. 161:2-14, 171:17-172:6.

There is some dispute between the parties regarding who made the final decision to admit Steven to the jail. Caudillo says Bernardi was the medical screening deputy on duty and decided to admit Steven and place him in a sobering cell without asking her to perform a medical intake. Bernardi testifies that the decision to admit Steven was made jointly by him, Deputy Frank Masterson, and Caudillo. Leef, Bernardi, and Caudillo all recall that Steven was calm and able to

follow directions when he was inside the booking area. Bernardi wrote that Steven was a "Code 4," meaning that he was mellow. Video footage of the booking process corroborates their testimony. *See* County Defendants' Combined Audio and Visual ("CAV") at 11:36 – 11:37.[2]

Bernardi and Masterson then moved Steven into the jail hallway, where Caudillo took his vital signs, which were elevated. Steven's blood pressure was 151/92 and his heart rate was 129. Caudillo determined based on Steven's vital signs and calm behavior that it was safe for him to be put in the sobering cell and he did not need to be sent to a hospital for medical clearance. Teske Depo. 96:21-97:2, 98:8-15. She did not contact a supervising registered nurse or other medical professional for guidance regarding Steven's condition.

Once Caudillo finished taking Steven's vital signs, Bernardi and Masterson began moving him towards the sobering cell. At the threshold to the cell, Steven suddenly tensed up, prompting Bernardi to give him a shove. Bernardi Depo. 54:16-55:18. Still in handcuffs, Steven suddenly became noncompliant and began to thrash about and yell. Within seconds, Masterson and Bernardi were able to force Steven to the ground, although he continued to flail around. The deputies put both of Stevens' handcuffed wrists in a rear wrist lock, which is a pain compliance hold. Leef testified that he then came forward to help control Steven by holding his ankles together until Deputy Michael Grant relieved him from the hold. Grant described Leef as holding Steven in a "figure-four leg lock," another pain compliance hold. Upon orders by Sergeant Lori Knapp, who had entered the sobering cell, Grant and Deputy Jeanette Holum applied shackles to Steven's ankles and placed a tether on his handcuffs. The deputies then picked up Steven and moved him to the safety cell, where he was placed face down on the floor. Grant again tried to put Steven's legs

---

[2] Neuroth and Mendocino County Defendants each submitted a demonstrative CAV, combining audio from Officer Leef's personal recording device and the silent video footage from the Mendocino County jail. Neuroth's CAV covers a slightly longer period of time and includes different explanatory arrows and pop-up text from that offered by defendants. Because County Defendants' CAV includes video footage from multiple cameras, providing a more comprehensive view of the activities in the jail, all references to audio/video footage of the incident with Steven will be to that version unless otherwise noted. Time references are made in accordance to the time stamp visible in the lower corner of the video screen.

back in the figure-four hold, and delivered three or four "distraction blows" to the back of Steven's leg to accomplish that result. During the course of these interactions, Steven can be heard on Leef's audio recording saying "don't hurt me" and "don't kill me," to which Knapp and others respond by telling him they are not trying to hurt or kill him and encouraging him to calm down and cooperate with the deputies' instructions.

At this point during the confrontation, defendants claim that Steven said he wanted to die. Knapp Decl. ¶ 25; Bernardi Depo., 69:4-10; CAV at 11:45. Neuroth maintains that a reasonable jury could find that he actually said, "I *don't* wanna die." Under the belief Steven made a suicidal statement, Knapp ordered a deputy to bring a safety smock. By this time, there were several deputies in the safety cell with Steven, who continued to struggle and yell. Masterson testified that he punched Steven several times in the lower back to stop him from using his shackled legs to grab hold of Grant's leg. Masterson Depo. 83:9-17, 84:3. Grant also reported using punches to free himself from being entangled in Steven's shackles. Deputy Christine De Los Santos claimed that she was called over by Caudillo to assist Grant in the safety cell, who had one of his hands trapped between Steven's leg and the wall. De Los Santos Depo. 49:2-6. De Los Santos testified that she thought Grant's life was in danger and that she never saw anyone strike Steven. In the video of the event, Steven's body is obscured from view by the bodies of the deputies surrounding him. Neuroth contends that at 11:42 p.m., Steven said "Let me breathe, I'm dizzy" and "Stand back, I need medical attention," although none of the witnesses recalled him making that statement. During the encounter in the safety cell, multiple deputies used their body weight to press Steven to the floor in order to control his struggling. As they waited for the safety smock to arrive, the deputies began removing Steven's clothes pursuant to the jail's suicide protocol. Masterson and Bernardi testified that Steven had calmed down at that point. After the deputies removed Steven's clothes and undergarments, they covered him with the safety smock and removed his handcuffs.

Once the safety smock was on Steven, the deputies left the safety cell one by one. At approximately 11:54 p.m., when the last deputy left the cell, Steven was still on his stomach. In the video, one of Steven's legs flops to the ground and his hands remain on the small of his back.

*See* CAV at 11:54. He does not exhibit any other visible movement. De Los Santos claims that as the deputies left the cell, someone ordered Steven to stay down and she heard him say "I'll stay down." De Los Santos Depo. 70:4-6. Knapp recalls Steven saying "I won't move." Knapp Depo. 80:3-81:21. This testimony cannot be corroborated by the CAV submissions because Leef turned off his audio recorder partway through the struggle in the safety cell. Knapp did not mention this information during the DA's investigation into Steven's death and none of the other deputies recall hearing Steven say anything. Bernardi claims that Steven "didn't say anything" in response to the order to stay down. Bernardi Depo. 78:4-79:3. Neither Page nor Holum recalls hearing Steven speaking to the deputies as they left the cell. Holum, however, testified that he was wiggling his fingers and breathing. Holum Depo. 70:5-6.

Caudillo was present outside the door of the safety cell during the above-described events, but did not intervene. The video surveillance footage shows that at 12:01 a.m., around seven minutes after the last deputy exited Steven's cell, Sergeant Knapp returned and peered inside. After she walked away, Holum also stopped at the window to Steven's cell to look inside, as did Caudillo. *See* CAV at 00:03 and 00:04. Several deputies joined Holum, Knapp, and Caudillo outside the cell, and at 12:05 a.m., they entered the cell to check on him. Upon determining that Steven had no pulse, the deputies called Caudillo over. She found that Steven was not breathing and was beginning to turn blue around the mouth. Caudillo performed a sternum rub, which did not revive him. The deputies then performed first aid, including cardiopulmonary resuscitation (CPR) on Steven until the paramedics arrived. Steven was pronounced dead at the hospital emergency room at 12:46 a.m. on June 11, 2014.

Dr. Jay Chapman, the pathologist hired by Mendocino County Sheriff-Coroner Thomas Allman to perform the autopsy on Steven, found widespread blunt force injuries on his body and determined that the probable cause of death was "Methamphetamine toxicity associated with violent struggle, (any contributory role of restraint asphyxia unascertainable)." Ex. 18, Autopsy report at 1. At the time of the autopsy, the methamphetamine in Steven's system was 1.1 mg/L. Although defendants' experts all agree that it is possible for a person can die of restraint asphyxia

if there is excessive weight placed upon his back, they opine that there is no evidence that restraint asphyxia was the specific cause of Steven's death.

### B. The County Deputies' Training

Captain Timothy Pearce has been the Jail Commander for Mendocino County since 2002. He testified that he had heard of the term restraint asphyxia and was aware that putting pressure on an inmates back while he is restrained in a prone position can make it very difficult to breathe. He identified no policies that were in place before Steven's death that specifically addressed the risk of positional or restraint asphyxia. *See* Pearce Depo. 92:15-94:3.

Sheriff Allman also testified being aware of the risk of restraint asphyxia, recalled learning about the leading Supreme Court case on restraint asphyxia, and believed the topic was discussed during jail training. *See* Allman Depo. 50:23-53:11. The specific terms "compression," "restraint," or "positional asphyxia" do not appear in Mendocino County's use of force or restraints written policies.

Sergeant Knapp says she was trained about restraint asphyxia by a jail nurse but was not aware of any written policies or procedures concerning restraint asphyxia. She had never been trained on an appropriate recovery position after an inmate has been restrained face down. Deputies Bernardi, Grant, Masterson, Holum, and Page, do not recall receiving any specific training about restraint or positional asphyxia before the incident with Steven, although several deputies remembered being trained on general ways to avoid breathing complications in the context of restraining inmates. Deputy De Los Santos had been trained to avoid impairing a subject's breathing by putting body weight on the person's back while at the police academy. Officer Leef received similar training as a police officer.

### III. LEGAL STANDARD

Summary judgment is proper "if the pleadings and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v.*

*Catrett*, 477 U.S. 317, 323-24 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings and admissions on file, together with the affidavits, if any which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323 (citations and internal quotation marks omitted). If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which he bears the burden of proof at trial. *Id*. at 322-23.

The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties. To preclude the entry of summary judgment, the non-moving party must bring forth material facts, *i.e.*, "facts that might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588 (1986).

The court must draw all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence. *Masson v. New Yorker Magazine, Inc*., 501 U.S. 496 (1991) (citing *Anderson*, 477 U.S. at 255); *Matsushita*, 475 U.S. at 588 (1986). It is the court's responsibility "to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Service v. Pacific Elec. Contractors*, 809 F.2d 626, 631 (9th Cir. 1987). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

"If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . , the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order." Rule 56(e) (2010).

When evaluating civil rights claims under 42 U.S.C. § 1983, a court must also consider whether any of the individual defendants are protected by the doctrine of qualified immunity. Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (quoting *Pearson v. Callahan*, 555 U.S. 223, 229 (2009)). It "shields an officer from liability even if his or her action resulted from a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (internal quotations omitted). Analysis of qualified immunity involves a two-pronged inquiry. The court asks whether the undisputed facts show that the defendant violated the plaintiff's constitutional right. *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009); *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If no such violation is found, the court need not inquire further before ruling that the defendant is entitled to qualified immunity. Upon a showing that some constitutional right was violated, however, the court then turns to the question of whether that right is clearly established at the time of the violation. *See id.* The "clearly established" prong focuses on the critical question of "whether the contours of the right were 'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Mattos*, 661 F.3d at 442. District courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

## IV. EVIDENTIARY ISSUES

### A. Plaintiffs' evidentiary objections

All of the events at the jail were recorded by video cameras without sound. Each side had

an expert sync the audio from Officer Leef's personal recorder with the jail videos to produce a combined audio and video ("CAV"). Neuroth objects to the CAV offered by County Defendants, because that video omits six minutes at the beginning and incorporates inaccurate and hearsay descriptive comments. That objection is overruled, as both parties' CAVs contain arrows and prompts that will only be considered for demonstrative purposes. The evidence being considered is what is visible in the video and audible through Leef's recording device.

### B. Defendants' evidentiary objections

County Defendants' objection to plaintiffs' CAV is overruled for the same reasons discussed above. Their objections to Exhibits 41, 42, 46, 50, and 53 attached to the Sherwin Declaration are overruled as moot because this Order does not rely upon any evidence contained in those documents. County Defendants also object to Neuroth's introduction of evidence that the County has modified certain of its procedures in response to Steven's death. Under Federal Rule of Evidence 407, evidence of remedial measures is not admissible to prove liability, although it may be introduced to demonstrate a particular measure was feasible. Because County Defendants do not dispute the possibility of taking measures to prevent deaths like Steven's pre-incident, the only relevance of evidence concerning remedial measures is to prove liability. Therefore, the objection is sustained.

County Defendants also move to exclude the reports and testimony of plaintiff's experts Dr. Michael Baden, Dr. Michael Freeman, Dr. Richard Hayward, and John Ryan. The motion is denied without prejudice, as the disposition of this Order does not rely on any of the challenged evidentiary material.

### V. DISCUSSION[3]

---

[3] Neuroth filed his entire brief in opposition to defendants' motions for summary judgment under seal, as well as the accompanying deposition transcripts (exhibits 1-8), and moved for an order from the Court unsealing the documents on the grounds that County Defendants failed properly to designate which portions of the transcripts should be kept under seal. County Defendants do not object to the filing of Neuroth's opposition brief in the public record, nor do they object to the public filing of those portions of the transcripts cited or relied upon in the brief. They contend, however, that certain portions of the transcripts should remain under seal and object to the unsealing of exhibits 1-8 in their entirety. Specifically, County Defendants object to the public

United States District Court
Northern District of California

**A. Claims for unlawful arrest under federal and state law against Officers Leef and Andrade**

At the time Leef and Andrade arrested Steven, they observed that he was suffering from paranoid delusions, fidgeting, and exhibiting signs of rapid speech and elevated pulse. He was also sweating uncontrollably, presented disjointed thought processes, and although denying methamphetamine use, claimed somebody had put something in his drink. Neuroth contends the officers' stated rationale for arresting Steven cannot be believed because his "bizarre" behavior did not conclusively indicate methamphetamine intoxication, and because the officers were reluctant to take Steven to the hospital. Therefore, Neuroth argues, the officers arrested Steven without probable cause, in violation of the Fourth Amendment's prohibition on unlawful seizures.

"Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Rodis v. City & County of San Francisco*, 558 F.3d 964, 969 (9th Cir. 2009). That Steven's appearance and behavior could have indicated mental illness does not create a question of fact as to the reasonableness of the officers' conclusion finding a "fair probability" he was under the influence of an illegal substance. *See United States v. Ortiz-Hernandez*, 427 F.3d 567, 573 (9th Cir. 2005) ("Probable cause exists when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime."). This is particularly true because neither officer had reason to know Steven had a history of mental illness and because Steven's refusal to provide a urine sample for drug testing suggested a culpable mindset. While Leef and Andrade did discuss the possibility that Steven might be "crazy," the

---

release of information in the transcripts related to defendants' personnel files. Accordingly, Neuroth's motion to seal (Dkt. No. 304) is denied with leave to refile a redacted version of his opposition brief in accordance to the instructions in footnote 4 (which address the Willits Defendants' objections to Neuroth's sealing motion). As to exhibits 1-8, Neuroth may either (A) file in the public record excerpted versions of the deposition transcripts as identified in County Defendants' response to the motion to seal (*see* Dkt. No. 315 at 3), or (B) file a new motion to seal only those portions of the full transcripts marked for redaction. Should Neuroth elect to pursue option B, County Defendants shall file a response setting forth the basis for a sealing order.

presence of an underlying psychological condition did not rule out the possibility he was also under the influence. Similarly, evidence the officers did not want to take Steven to a hospital is not probative of whether they had a reasonable basis to conclude he was displaying a reaction to drug use. Because ingestion of any amount of methamphetamine is unlawful, the officers did not need to conduct a sobriety test to determine the degree of Steven's intoxication before performing an arrest. Under the totality of the circumstances known to Leef and Andrade, there was probable cause to place Steven under arrest for use of a controlled substance. For that reason, summary judgment on Neuroth's section 1983 claim for unlawful arrest is granted. Summary judgment is also granted with respect to Neuroth's state law false arrest claim, which is premised on the same allegedly wrongful acts that support his section 1983 claim.

**B. Fourth Amendment denial of medical care and negligence claims against Officer Leef and Andrade**

Law enforcement officers are required under the Fourth Amendment to provide objectively reasonable post-arrest care. *See Borges v. County of Eureka*, No. 15-cv-00846-YGR, 2017 WL 363212, at *6 (N.D. Cal. Jan. 25, 2017). While the nature and extent of this obligation has not been precisely defined, the Ninth Circuit requires, at a minimum, that officers summon necessary medical help or take an injured arrestee to a hospital. *See id.* (citing *Estate of Cornejo ex rel. Solis v. City of Los Angeles*, 618 Fed. App'x 917, 920 (9th Cir. 2015) and *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006)).

Here, Neuroth contends Steven's behavior fit the criteria for commitment to a mental health unit pursuant to California Welfare and Institutions Code § 5150, which meant he should have been taken immediately to a hospital pursuant to Willits Police Department ("WPD") Policy 418.3. Even crediting the officers' decision to arrest Steven for methamphetamine intoxication, Neuroth contends Leef and Andrade violated WPD Policy 418.4, which states, "When practical, any person charged with a crime who also appears to be mentally ill, shall be booked at the Willits Police Department before being transported to the authorized facility," which according to Neuroth, would have been Howard Hospital or another emergency room. The officers' decision to

transport Steven directly to the Mendocino County jail was, according to Neuroth, a violation of their duty to seek adequate post-arrest medical care. WPD Policy 418.4, however, does not define what may be considered an "authorized facility," and merely advises that a person "may" be taken directly to a hospital "[i]f the person has injuries or some other medical condition." While taking Steven to a hospital instead of the county jail might have resulted in a better outcome, the Fourth Amendment does not require officers "to provide 'what hindsight reveals to be the *most effective medical care for an arrested suspect.*'" *Borges*, 2017 WL 363212, at *7 (quoting *Tatum*, 441 F.3d at 1098-99) (emphasis in the original).

Here, the evidence proffered by Neuroth is insufficient to show that Steven's medical condition was so obviously emergent at the time he encountered the officers that taking him to the county jail constituted a failure to provide objectively reasonable post-arrest care. In other words, Neuroth does not explain what aspects of Steven's condition set him apart from the average suspected methamphetamine user that officers might encounter on the street. Here, as in *Borges*, video footage shows that Steven appeared relatively calm and compliant when he arrived at the Mendocino County jail and testimonial evidence demonstrates he was screened for emergent medical issues during the booking process. Therefore, the officers did not violate Steven's right to medical care under the Fourth Amendment. For those reasons, the motion for summary judgment as to the Fourth Amendment denial of medical care claim against Leef and Andrade is granted.

That said, a reasonable juror could find, based on the undisputed facts, the officers' conduct with respect to Steven was negligent. Under California law, a peace officer may be held liable for negligence to the same extent as other persons, except as provided by statute. Law enforcement officers have a duty "to exercise reasonable care for the safety of those persons the officer stops." *Lugtu v. California Highway Patrol*, 26 Cal. 4th 703, 715, 717-18 (2001). WPD Policy 418.3 advises officers handling a call involving a suspected mentally ill individual to use de-escalation techniques and language that is appropriate for interacting with a mentally disabled person. While Leef testified he attempted to use Steven's apparent hallucinations about snakes to stop him from moving around in the police vehicle, Leef's tone and manner of speaking about his

interactions with Steven as recorded on his audio device reasonably supports Neuroth's contention he shouted "Snakes!" to frighten Steven for his own amusement. Although the Willits defendants point out that Steven appeared calm and compliant when he exited the police vehicle and entered the Mendocino County jail booking area, a reasonable jury could conclude that Leef's alleged efforts to frighten Steven exacerbated his paranoia and made it more likely he would react violently to the deputies' subsequent efforts to constrain him and be subjected to use of force. A jury could also find that Andrade encouraged, or at least acquiesced, in Leef's inappropriate interactions with Steven. For that reason, the motion for summary judgment as to Neuroth's state law negligence claims against Leef and Andrade is denied.

### C. Intentional infliction of emotional distress claim against Officer Leef

Neuroth brings a claim of intentional infliction of emotion distress against Officer Leef based on his alleged attempts to frighten Steven by yelling "Snakes!" at him repeatedly while the officers were transporting him to the Mendocino County jail. According to Neuroth, this claim survives Steven's death pursuant to California Code of Civil Procedure § 377.20, and he may recover emotional distress damages as punitive damages under section 377.34. A plaintiff in a survivorship action, however, is precluded under the statute from seeking "damages for pain, suffering, or disfigurement," *see Berkley v. Dowds*, 152 Cal. App. 4th 518, 530 (2007). Neuroth asserts that the claim may nonetheless support an award of punitive damages, without providing any explanation or support from legal authority. For that reason, summary judgment on this claim is granted in favor of Leef.

### D. Supervisory liability claim against Willits Chief Gonzalez[4]

---

[4] Neuroth seeks an order unsealing portions of Chief Gonzalez's deposition transcript discussing the contents of a background investigation of Officer Leef before he was hired at WPD, as well as portions of the background investigation (exhibits 9 and 10 to plaintiff's combined opposition to defendants' motions for summary judgment). Because the documents in question contain inherently sensitive information about Leef's personal conduct before he became a peace officer, including information that was given by a member of Leef's family in confidence, and because that information has minimal value to the determination of this case, Neuroth's request is denied. Therefore, Neuroth's administrative motion to seal exhibits 9 and 10 to plaintiff's opposition brief is granted. Although Neuroth's motion to seal the opposition brief itself is denied (see footnote 2), he may refile the brief along with a motion to seal only those portions incorporating exhibits 9 and

Under section 1983, a supervisor may be held liable "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (citation and internal quotation marks omitted). The requisite causal connection may be shown by the supervisor's "own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id.* at 1208.

Here, it is undisputed that Chief Gonzalez was not present during Steven's arrest and did not personally participate in any of the alleged constitutional violations. Instead, Neuroth argues that Gonzalez's decision to hire Leef was "deliberately indifferent to the rights and safety of the public to be free from an officer who was 'highly likely' to lie and abuse his authority in his official duties," based on information revealed by the WPD's background check investigation. Specifically, Gonzalez knew Leef had a history of stealing, dishonesty, driving under the influence, and abuses of his authority. While there may be grounds to question Gonzalez's decision to hire Leef as a peace officer despite knowledge of problematic conduct in the past, Neuroth fails to offer a sufficient causal connection between that decision and the alleged constitutional violations of which Leef stands accused. In other words, evidence of Leef's propensity to demonstrate poor judgment does not lead to the conclusion that a violation of someone's Fourth Amendment rights would be a "plainly obvious consequence" of the decision to hire him. *See Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 411 (1997). For that reason, the motion for summary judgment on Neuroth's supervisory liability claim is granted in favor of Chief Gonzalez.

### E. *Monell* claim and vicarious liability for state law false arrest and negligence claims against City of Willits

_____

10.

A municipality may be liable under Section 1983 if the governmental body "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *Monell v. N.Y. City Dep't of Social Servs.*, 436 U.S. 658, 691-92 (1978). Because municipalities cannot be held vicariously liable under Section 1983, a *Monell* claim ordinarily requires the existence of municipal policies, customs, practices and/or procedures that violate constitutionally protected rights. *Connick v. Thompson*, 563 U.S. 51, 60-61 (2011). Absent a formal governmental policy, a plaintiff must show a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). Municipal liability for a hiring decision under *Monell* exists where the hiring decision in question reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision. *See Brown*, 520 U.S. at 411.

Here, Neuroth makes clear that his *Monell* claim against the City of Willits is based on Chief Gonzalez's decision to hire Leef. As explained above, Gonzalez was in possession of information indicating Leef was arguably a poor fit for employment as a police officer. That said, there is insufficient evidence in the record to support a finding that the municipal decision to hire him was highly likely to result in the specific violation of a third party's Fourth Amendment rights. Accordingly, summary judgment on Neuroth's *Monell* claim is granted in favor of the City of Willits.

The City may, however, be held vicariously liable for "injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment" for which the employee lacks immunity from liability. *See* Cal. Gov. Code § 815.2. Because summary judgment as to Neuroth's negligence claims against Leef and Andrade is denied, it is also denied as to the derivative claim against the City of Willits.

**F. Fourteenth Amendment claim for inadequate medical care**

Claims by pretrial detainees for violations of the right to adequate medical care under the due process clause of the Fourteenth Amendment are evaluated under an objective deliberate indifference standard. The elements of a claim against an individual defendant are: "(i) the

defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries." *Gordon v. County of Orange*, 888 F.3d 1118, 1125 (2018) (adopting an objective reasonableness standard with respect to the third prong, in light of developments in Section 1983 jurisprudence under *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015) and *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016)). A "mere lack of due care by a state official" is insufficient—a plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.*[5]

### 1. Deputy Bernardi

Neuroth asserts that Bernardi's decision to admit Steven into the jail instead of sending him to a hospital was deliberately indifferent to his serious medical needs. To prevail on a claim of deliberate indifference against an official, a plaintiff must demonstrate that: (1) he had a serious medical need, (2) the official was deliberately indifferent to that need, and (3) this indifference caused him harm. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2014). Bernardi knew from speaking to Leef that Steven had been found running in traffic, was likely high, and had been hallucinating about snakes during the car ride to the jail. Bernardi observed that Steven had trouble concentrating on the intake questions asked of him. Bernardi Depo. 40:24-41:5. Accordingly to Neuroth, it should have been obvious to Benardi that Steven was exhibiting symptoms of psychosis, a condition that courts generally construe as demonstrating a serious medical need. *See Padilla v. Beard*, No. 2:14-cv-1118 KJK-CKD, 2017 WL 1253874, at *15 (E.D. Cal. Jan. 27, 2017) (citing *Atencio v. Arpaio*, 161 F. Supp. 3d 789, 811 (D. Ariz. 2015)).

---

[5] In *Gordon*, the Ninth Circuit clarified that the inquiry under the Fourteenth Amendment differs from that under the Eighth Amendment, which requires a showing that a prison official had a subjectively culpable state of mind. *Id.* at 1125 n.4.

Bernardi has two responses. First, he asserts that his conduct is protected under the doctrine of qualified immunity because Neuroth points to no case law showing an arrestee in Steven's condition has a constitutional right to be sent to a hospital rather than jail for evaluation. Second, Bernardi argues there was nothing about Steven's answers to intake questions, past behavior, or his demeanor and appearance upon entering the jail that put him on notice emergency medical attention was needed. Bernardi testified that Steven was able to answer most of his questions either by nodding or verbal affirmations. Steven appeared calm and compliant when he exited the patrol car and walked into the jail. *See* CAV at 11:33 – 11:35; Bernardi Decl. ¶¶ 5-6; Masterson Decl. ¶¶ 5-8. He demonstrated signs of drug intoxication and was jittery, but cooperated with the deputies' pat-down search and allowed Caudillo to take his vital signs in the hallway of the jail. According to Bernardi, his knowledge that Steven had previously been running around in traffic and had experienced hallucinations of snakes was not dispositive of whether he was fit to be put in a sobering cell at the time of jail admissions. Even if he had viewed Steven's previous medical intake screening form, he would still have been required to make an assessment of Steven's condition at the time of admission. *See* Bernardi Decl. ¶ 3.

Dr. Jenine Miller, the County's Director of Behavioral health, personally knew Steven and concluded that "all evidence points to his behavior being caused by his taking methamphetamine and not by his mental health disorder." Miller Decl. ¶¶ 3, 4, 7. While the parties take different views on the relative contributing role of Steven's drug intoxication and underlying mental health issues, the undisputed evidence shows that Bernardi did not act unreasonably in concluding his behavior was due primarily to methamphetamine ingestion. That immediate hospitalization could have avoided the events that led to Steven's death is not sufficient to show Bernardi acted with deliberate indifference in admitting him to the jail, where he would have received a medical and/or mental health screening after admission. Caudillo Depo. 150; Bernardi Decl. ¶¶ 3-4; Masterson Decl. ¶ 2.

### 2. Licensed Vocational Nurse Caudillo

While Caudillo testified that it was Bernardi, not she, who made the decision to admit

Steven into the jail and place him in a sobering cell, there is no dispute Caudillo could have initiated his transfer to a hospital if she perceived or suspected there was a medical emergency. *See* Fithian Depo. 149:18 – 150:1. Plaintiffs' jail medical expert, Dr. Todd Wilcox, testified that a patient who is psychotic for unknown reasons should be evaluated at a hospital, particularly because the jail lacked staffing necessary to manage a patient of such complexity. Wilcox Depo. 38:6-39:20. CMGC/CFMG's Chief Medical Officer Dr. Herr agrees that Caudillo should have contacted an RN regarding Steven's elevated vital signs and observed symptoms. Herr Depo. 119:15-20. Neuroth argues that in light of Caudillo's knowledge that Steven was paranoid, hallucinating, and psychotic, her failure to send Steven to the Emergency Department was in reckless disregard of a substantial risk of serious harm to him.

Deliberate indifference claims, however, cannot be evaluated on the basis of 20/20 hindsight. It is undisputed that Bernardi, as the health-trained correctional staff member on duty, performed an intake on Steven and did not refer any positive findings on the screening questionnaire to Caudillo for follow-up. Caudillo's testimony, which is corroborated by video footage, shows at the time she first encountered Steven in the booking area, he was calm and compliant, and did not appear to be experiencing hallucinations. Caudillo testified that she did not believe Steven presented in a manner distinguishable from other methamphetamine users who routinely came through the jail. She noted that he was not diaphoretic (sweating heavily, usually attributable to drug use), flushed, or vomiting, and that he was able to follow verbal instructions and answer questions coherently. Caudillo Depo. 168:23 – 169:2. Based on those observations, she concluded Steven was not in crisis and did not need immediate medical attention. *Id.* 169:3. Caudillo further testified that in her experience, individuals placed in the sobering cell tend to arrive agitated but calm down after a period of time. *Id.* 169:7-12. In short, although Neuroth may argue it would have been better to send Steven to the hospital immediately, the evidence in the record tends to show that based on her few minutes of interaction with Steven, Caudillo's lack of objection to keeping him in the sobering cell for monitoring and further evaluation was not patently unreasonable.

United States District Court
Northern District of California

Causation is also undermined by the particular chain of events in this case, which distinguishes the facts of this case from those present in *M.H. v. County of Alameda*, upon which Neuroth's argument heavily relies. *See* 62 F. Supp. 3d 1049 (N.D. Cal. 2014). In that case, a LVN performed a full medical intake assessment on a man who was admitted at the Glenn Dyer Detention Facility. The nurse neglected to initiate a protocol for evaluation and treatment of severe alcohol withdrawal, despite learning that the man drank every day, that he had his last drink the day he was arrested, and that symptoms of alcohol withdrawal begin within five to six hours. The nurse was later terminated by her employer, Corizon Health, after an internal disciplinary investigation found she had demonstrated gross negligence and incompetence and failed to follow procedures and policy. *See* 62 F. Supp. 3d at 1060. The LVN's inadequate screening led to the man's deterioration over the course of two full days without medical attention or treatment, ultimately resulting in his death after an altercation with deputies at the Santa Rita jail. Here, Caudillo testified that had Steven remained in the sobering cell, she would have reviewed Bernardi's screening form and performed a more complete assessment on Steven within an hour of his arrival. *See* Caudillo Depo. 163:7-9; 169:6-12. Instead, Steven became disruptive less than a minute after Caudillo took his vital signs, as the deputies attempted to move him into the sobering cell. *See* CAV at 11:37 (Caudillo finishes taking vitals) and 11:38 (struggle with Bernardi and Masterson commences). Thus, even if she had called a supervising nurse or licensed medical provider for guidance immediately after seeing that Steven's vital signs were elevated, it is unclear what medical follow-up in that narrow period of time could have averted the ensuing struggle that followed.

That said, a reasonable factfinder could conclude that a high degree of risk to Steven presented itself as the physical confrontation between Steven and the deputies became increasingly protracted. The exact moment when the risk became obvious is somewhat unclear from the record. Caudillo testified that she was not permitted to enter the safety cell while the deputies had yet to secure the scene. Caudillo Depo. 225:3-22. She also indicated in her deposition that from her vantage point outside the door of the safety cell, she could see deputies trying to control Steven

but could not discern their body positions relative to him. *Id.* 226:16-23. While Neuroth asserts Caudillo was present when Steven allegedly said "Let me breathe, I'm dizzy" and "I need medical attention," (Plaintiff's CAV at 11:32:21), there is no evidence in the record that she actually heard him ask for medical attention. She did, however, recall that at some point during the struggle, Steven stopped talking to the deputies. Caudillo Depo. 229:11-19. At that point, Caudillo knew that Steven had arrived at the jail under the influence of methamphetamine, had demonstrated bizarre and erratic behavior, and had exhibited intense physical resistance to the deputies' efforts to restrain him for an extended period of time. A reasonable LVN in Caudillo's place should have recognized that Steven's condition was both more serious than his initial appearance led her to expect, and that it likely deteriorated as a result of his encounter with the deputies. She could have requested the deputies' assistance to take Steven's vital signs before they left the cell, or made the independent decision to call for emergency medical aid. On these facts, a jury could conclude it was objectively unreasonable for Caudillo to wait until summoned by the deputies to take any action regarding Steven's medical condition, and that prompter action could have increased his likelihood of survival. For that reason, Caudillo's motion for summary judgment on the deliberate indifference claim asserted against her is denied.

### 3. *Monell* liability of CFMG and CMGC

An independent contractor performing medical services for prisoners may be subject to the *Monell* standard for liability under section 1983 to the same extent as a government entity. *See West v. Atkins*, 487 U.S. 42, 54-56 (1988). "To impose liability against a county for its failure to act, a plaintiff must show: (1) that a county employee violated the plaintiff's constitutional rights; (2) that the county has customs or policies that amount to deliberate indifference; and (3) that these customs or policies were the moving force behind the employee's violation of constitutional rights." *Long v. County of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006), citing *Gibson v. County of Washoe*, 290 F.3d 1175, 1193-94 (9th Cir. 2002). The plaintiff bears the burden of showing "that the injury would have been avoided" had proper policies been implemented." *Gibson*, 290 F.3d at 1196.

As explained above, Neuroth has proffered sufficient evidence from which a reasonable juror could infer Caudillo may have deprived Steven of constitutionally adequate medical care. As to the second and third elements of the *Monell* inquiry, Neuroth argues that CFMG and its parent company CMGC failed to staff the Mendocino County Jail adequately, allowed LVNs to perform the work of RNs, and did not sufficiently supervise or train Caudillo to deal with Steven's situation.

CFMG moves for summary judgment for lack of causation between its alleged policy deficiencies and the violation of Steven's constitutional rights. For one thing, although Neuroth chooses to characterize Caudillo's actions leading up to Steven's death as exceeding the scope of her practice as an LVN, these assertions are not borne out by the record. According to the California Department of Correctional Health Care Services' policy manual on the LVN scope of practice in a correctional setting (chapter 5), LVNs are permitted to perform a basic assessment on patients, which includes collecting subjective and objective data and recognizing problems or abnormal conditions. *See* Sherwin Decl., Ex. 31. In Steven's case, Caudillo took his vital signs, observed his demeanor, and recorded that information on a CFMG sobering cell log. *See* Teske Decl., Ex. B. None of those activities is inconsistent with LVN scope of practice. Even assuming that Caudillo erred by failing to send Steven to the hospital or to call a supervisor for guidance, those deficiencies reflect inadequate performance of her role as an LVN, not an improper exercise of RN authority. CFMG also offers evidence that had Caudillo informed Teske, her supervising RN, of Leef's observations regarding Steven's behavior, Bernardi's and Caudillo's personal evaluation of Steven, and Steven's blood pressure of 151/92 and heart rate of 129, she would not have instructed Caudillo to send him to the Emergency Department for medical clearance. Teske states she would have approved of the decision to place him in a sobering cell and instructed Caudillo to monitor him and continue taking vital signs every 15 minutes. Teske Decl. ¶ 17.

That said, there remain triable issues of fact with respect to whether CFMG's policies and procedures were insufficient to ensure the safety of arrestees like Steven. Specifically, a jury could find that CFMG did not have appropriate policies in place to address the serious risk of harm to an

inmate resulting from a physical confrontation with deputies. Caudillo testified that CFMG policy only required her to see patients in the safety cell an hour after placement and every four hours after that, unless summoned by a deputy. Caudillo Depo. 195:14-21. She confirmed that CFMG policy did not require her to evaluate a patient immediately after he engaged in a struggle with jail staff. *Id.* at 195:22-196:7. Her testimony also reveals that she was not aware of any particular danger to Steven resulting from his continued exertions in the safety cell and was not prepared to take any action with respect to his physical wellbeing unless called upon to do so by the deputies. *Id.* In light of other testimony showing that a significant number of individuals passing through the Mendocino County Jail suffer from substance abuse issues, *see* Teske Depo. 105:19-106:17, it is highly probable that some portion of these individuals who end up in a physical altercation with jail staff are vulnerable to injury as a result. CFMG's failure to implement policies to mitigate this danger could constitute deliberate indifference. Finally, whether CFMG's inadequate polices regarding altercations in the jail were the "moving force" behind Steven's death depends upon a factual determination regarding when, in the course of being placed in the safety cell, Steven stopped breathing. Reading the record in the light most favorable to the plaintiffs, a jury could find that had some sort of emergency medical procedures been commenced before the physical altercation with Steven became excessively prolonged, he might not have reached a point where he could no longer be revived. For that reason, CFMG's motion for summary judgment on Neuroth's *Monell* claim is denied.

CMGC asserts that it cannot be held liable for intake or staffing policy decisions attributable to CFMG because it merely performs administrative functions for CFMG pursuant to a Management Services Agreement. In response, Neuroth points to evidence that CFMG and CMGC have all the same officers and counsel and that CMGC is the payor on Nurse Teske's paystubs. These facts suggest a *respondeat superior* theory of liability, which is not permitted under *Monell*. In order to demonstrate CMGC's *Monell* liability for Steven's injury, Neuroth must either proffer facts supporting corporate veil piercing, or point to a specific policy or practice that is traceable to CMGC specifically. It is not enough for Neuroth merely to assert that that CMGC

has generally issued policies, supervisory memos, and medical records forms for use in CFMG facilities, or that every challenged CFMG policy and practice was also the policy and practice of CMGC.[6] For that reason, CMGC's motion for summary judgment is granted.

### 4. Supervisory liability of Nurse Teske, Doctor Fithian, and Elaine Hustedt

Claire Teske was the on-call RN the night of Steven's death. At the time of Steven's death, Dr. Taylor Fithian was the Medical Director of all CMGC companies, overseeing medical care at CFMG facilities. Elaine Hustedt was vice-president of operations and personnel at CFMG and had responsibility over staffing at CFMG facilities. Neuroth's supervisory liability claim against Teske, Fithian, and Hustedt is premised on the theory that all three defendants originated and perpetuated the system of having LVNs work outside the scope of their practice, alone and unsupervised by RNs. As explained above, Neuroth cannot show that CFMG's LVN staffing policy was the moving force behind a violation of Steven's rights. Because Neuroth has not put forth other grounds for finding supervisory liability against Testke, Fithian, or Hustedt, their motions for summary judgment are granted.

### 5. *Monell* liability of County of Mendocino

Neuroth asserts that pursuant to its contract for services with CFMG/CMGC, Mendocino County is liable for all of the *Monell* claims attributable to CFMG/CMGC, to whom it delegated its duty to provide constitutionally adequate medical care. In asserting this theory of liability, Neuroth's reliance on *West v. Atkins*, 487 U.S. at 55-56, is misplaced. That case stands for the proposition that a private entity may assume the State's obligation to provide adequate medical care by contract, and can be held liable under section 1983 as a "state actor." There is nothing in that decision to suggest a plaintiff may also sue a municipality on the basis of policy decisions it has delegated to a private actor. For that reason, the County's motion for summary judgment on

---

[6] Neuroth relies heavily on the deposition of Claire Teske for the proposition that CFMG and CMGC policies were one and the same. The transcript of her deposition testimony, however, reveals that counsel for Neuroth repeatedly questioned Teske about the policy of "CFMG and CMGC" without actually inquiring whether she understood CMGC and CFMG to be equally responsible for protocols at CFMG facilities.

this *Monell* claim is granted.

### G. Excessive Force

An excessive force claim under the Fourth Amendment examines whether defendants' actions were "'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. In determining the reasonableness of an officer's use of force, courts consider the totality of the circumstances, including: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3), whether the suspect actively resisted arrest or attempted to escape. *Id.*

County Defendants assert that for pretrial detainees such as Steven, the right to protection from excessive force derives from the Fourteenth Amendment's Due Process Clause, rather than the Fourth Amendment, and should therefore be analyzed under *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015) rather than *Graham*. Although *Kingsley* analyzed a pretrial detainee's excessive force claim under the Fourteenth Amendment, it is not entirely clear that the Fourteenth Amendment supplants, rather than merely supplements, the Fourth Amendment's protections in the pretrial detention context. In any event, the notable development in *Kingsley* was the Supreme Court's announcement that a Fourteenth Amendment excessive force claim is evaluated under an objective standard, without requiring a plaintiff to show defendants were subjectively aware their use of force was unreasonable. The Court explicitly adopted the standards set out in *Graham*, including the instruction that objective reasonableness turns on the facts and circumstances of each particular case, and is judged from the perspective of a reasonable officer at the scene based on what he or she knew at the time of the alleged violation. *See Kingsley*, 135 S. Ct. at 2473. Thus, *Kingsley* makes clear that *Graham* continues to set the framework for what constitutes a reasonable use of force by a government official. The Court also counseled district courts to

United States District Court
Northern District of California

consider the government's legitimate interests in preserving the internal order and security of a detention facility, as one of many "objective circumstances potentially relevant to a determination of excessive force." *Id.* Neuroth argues that Bernardi, Masterson, Grant, De Los Santos, Page, Holum, Leef, and Sergeant Knapp may all be held liable on his excessive force claim by their direct participation, setting in motion violations by another individual, under an integral participation theory, or by failing to intervene in the violations of rights by each other.

### 1. Deputies Bernardi, Masterson, Grant, Page, and De Los Santos

The deputies assert that summary judgment on Neuroth's excessive force claim is warranted because the amount of force used was reasonable in light of the circumstances. They contend that *Gibson v. County of Washoe*, 290 F.3d 1175 (9th Cir. 2002) is the most applicable case on point. In that case, a manic inmate fought with deputies who were attempting to move him to a special watch cell, resulting in a struggle that led to the inmate's death. Here, the deputies testify that Steven was pulling way, actively resisting efforts to control him, using his shackled legs to entangle Deputy Grant's legs, and generally refusing to cooperate. They also assert that Neuroth's evidence is insufficient to show that Steven died of asphyxiation or that any of the correctional deputies proximately caused death by asphyxiation.

Reviewing the record as a whole, several disputed issues preclude summary judgment here. First, while there is no evidence Steven struck, spit on, or threatened any of the deputies, it is clear he was physically resisting efforts to constrain him. There is also evidence from the audio feed that at least one of the male deputies expressed the belief Steven was trying to kick out at him. Despite Steven's relatively small physical size as compared to the deputies, they uniformly described him as extremely difficult to control. Steven's behavior on the threshold of the sobering cell, when he first began moving about erratically and yelling, supports the deputies' position that some degree of force was necessary to constrain him for his own safety and for the security of the jail. Audio from the incident also shows that Sergeant Knapp and other deputies repeatedly advised Steven he should calm down, that nobody was trying to "kill" or "hurt" him, and that he was being restrained for safety reasons.

The question then becomes whether, at some point during the confrontation, Steven stopped struggling and the force being applied to him became disproportionate to the need. Video from the incident shows Steven continuing to wriggle about in the initial moments after being taken to the safety cell, as evidenced by the deputies' physical movements. After that point, Steven's body is so obscured by the figures of the deputies surrounding him that it is impossible observe whether he continued to resist. Video footage shows he was motionless from the time the deputies exited his cell and when they reentered in an attempt to resuscitate him.

Second, while it is undisputed that the deputies were either kneeling on Steven or pressing down on him at various points throughout the confrontation, it is unclear from their testimony or from the positioning of their bodies in the video footage how much weight Steven had on his body and where at any one time. Neuroth contends that each deputy pressed his or her full weight down on Steven, consistent with his theory that he died of compression or restraint asphyxia. Conversely, at least one deputy testified that when he was in a kneeling position, his weight was actually distributed between the floor of the cell and Steven. *See*, Bernardi Depo. 76:19-20 ("And I think I was not putting my full weight on this man."). Although there appears to be little support for Neuroth's conclusion that Steven had 785 pounds of weight simultaneously upon him—a number derived simply from adding up the weights of the deputies that were restraining Steven, a jury could find that there was enough downward pressure on critical parts of Steven's body to impair his breathing. Finally, with respect to Steven's actual cause of death, force is not required to be lethal to be considered excessive. A reasonable juror could, for example, find that Steven posed an insufficient threat to the deputies' safety to justify the closed fist strikes used by Grant and Masterson. In particular, Masterson's failure to mention the blows in his initial report of the incident could lead a reasonable factfinder to question his credibility. Even assuming that Dr. Chapman's assessment is correct, that Steven died of methamphetamine toxicity combined with the effects of a violent struggle, a jury could find the deputies' prolonged use of force upon Steven contributed to his death. For those reasons, defendants' motion for summary judgment on Neuroth's excessive force claim is denied with respect to Bernardi, Masterson, Grant, Page, and

1    De Los Santos.

2           Disputed issues of fact also preclude summary judgment on qualified immunity grounds.

3    The Ninth Circuit has found constitutional violations where "prone and handcuffed individuals in

4    an agitated state have suffocated under the weight of restraining officers." *Drummond ex rel.*

5    *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003). In *Drummond*, officers who took a

6    mentally ill individual into custody for his own safety leaned on the man's neck and upper torso

7    despite Drummond's claims that he could not breathe and that they were choking him. The court

8    determined that the force was severe, and likely caused Drummond's death. Considering the need

9    for force under the circumstances, the court concluded "[t]he officers—indeed, any reasonable

10   person—should have known that squeezing the breath from a compliant, prone, and handcuffed

11   individual despite his pleas for air involves a degree of force that is greater than reasonable." *Id.* at

12   1059. Here, there are triable issues with respect to whether Steven stopped resisting at some point

13   during the struggle with the deputies, whether he told them he could not breathe, and whether the

14   nature of his resistance justified the force that was applied to him. Construing disputed facts in the

15   light most favorable to the plaintiff, a reasonable factfinder could conclude the deputies' actions

16   fell within the category of conduct prohibited under *Drummond*.

17          Moreover, because this case concerns traditional forms of force such as hand strikes and

18   compliance holds, a determination on qualified immunity necessarily involves a factual

19   determination of the amount of force used and the reasonableness of that force in proportion to the

20   need for it. *See Santos v. Gates*, 287 F.3d 846, 855 (9th Cir. 2002) (quoting *Saucier v. Katz*, 533

21   U.S. 194, 205 (2001)) ("[W]hether the officers may be said to have made a 'reasonable mistake'

22   of fact or law, may depend on the jury's resolution of disputed facts and the inferences it draw

23   therefrom. Until the jury makes those decisions, we cannot know, for example, how much force

24   was used, and, thus, whether a reasonable officer could have mistakenly believed that the use of

25   that degree of force was lawful."); *see also Brown v. City & County of San Francisco*, No. 11-cv-

26   2162, 2014 WL 1364931, at *14 (N.D. Cal. Apr. 7, 2014) (denying qualified immunity on

27   summary judgment in light of disputed facts regarding use of force and the holding in

28

*Drummond*). For that additional reason, summary judgment cannot be granted on qualified immunity grounds.

Neuroth also brings battery and negligence claims against Bernardi, Masterson, Grant, Page, and De Los Santos based on their uses of force against Steven. Because a viable excessive force claim supports a claim for battery and negligence under state law, those claims also survive summary judgment. *See Robinson v. Solano County*, 278 F.3d 1007, 1016-17 (9th Cir. 2002).

### 2. Sergeant Knapp

Sergeant Knapp did not have physical contact with Steven at any point during the confrontation. She did, however, supervise the deputies' use of force upon Steven from the time Bernardi and Masterson took him to the ground in the sobering cell to the time the deputies left him alone in the safety cell. Therefore, although she did not personally use force upon Steven, she may be held liable to the same extent as the deputies who used force under her direction. Accordingly, defendants' motion for summary judgment on the excessive force claim against Knapp is denied for the same reasons explained above.[7]

### 3. Officer Leef and Deputy Holum

Once Steven was delivered into the custody of the Mendocino County jail, Officer Leef's only involvement in the ensuing altercation consisted of holding onto Steven's feet as he struggled to break free from being held by Masterson and Bernardi. He was subsequently relieved from that position by Grant. Leef testified that Steven was attempting to kick at Masterson and Bernardi as they tried to gain control of him in the safety cell. Video footage of the incident shows that at a minimum, Steven was moving his feet and body around erratically and that Leef was indeed called over to assist the deputies. Deputy Holum's only participation in the efforts to restrain Steven involved helping Grant apply shackles to Steven's ankles and a tether in his handcuffs as the

---

[7] In his opposition brief, Neuroth made clear his battery and negligence claims were directed only at Bernardi, Masterson, Grant, De Los Santos, and Page, who used direct and substantial force upon Steven. Thus to the extent Neuroth asserted such claims against Knapp, Leef, and Holum, summary judgment is granted on those claims in favor of those defendants.

1  deputies prepared to move him from the sobering cell to the safety cell. Once Steven was placed in

2  the safety cell, Leef and Holum remained outside the cell and did not have any further physical

3  contact with Steven.

4      Thus, there is insufficient evidence from which a reasonable juror could conclude that Leef

5  and Holum were involved in the allegedly unconstitutional use of force against Steven in the

6  safety cell. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007) (explaining

7  section 1983 liability requires some "fundamental involvement in the conduct that allegedly

8  caused the violation."). The conduct of Leef and Holum is comparable to that of the officer in

9  *Brown*, who was found not to have participated in a constitutional violation when he briefly

10  grabbed a detainee's ankles and then walked away once the subject had been placed in the safety

11  cell. *See* 2014 WL 1364931, at *11. Here, Leef and Holum each had a single instance of physical

12  contact with Steven when he was in the sobering cell and were not involved in the uses of force in

13  the safety cell. Their mere presence at the scene where excessive force may have been used is not

14  sufficient to establish a constitutional violation.

15      Finally, to the extent Neuroth seeks to hold Leef and Holum liable for failure to intervene

16  in the allegedly unconstitutional use of force taking place in the safety cell, the Ninth Circuit

17  instructs that "officers can be held liable for failing to intercede only if they had an opportunity to

18  intercede." *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000), as amended (Oct. 31,

19  2000). Here, even if, as Neuroth theorizes, the deputies inside the narrow safety cell were putting

20  too much pressure on Steven's back, there is no evidence that either Leef or Holum could perceive

21  how much force was being applied or the intensity of Steven's struggling. Therefore, a jury could

22  not find that Leef and Holum had a "realistic opportunity" to interfere with the deputies' actions.

23  For those reasons, defendants' motion for summary judgment on the excessive force claim is

24  granted in favor of Leef and Holum.

25              **4. Supervisory liability of Sheriff Allman and Jail Commander Pearce**

26      Neuroth advances supervisory liability claims against Sheriff Allman on the grounds that

27  he is the ultimate policymaker with respect to the policies, procedures, and training of the

28

Mendocino County Sheriff's Office. Allman Depo. 24:5-13. He also asserts claims against Captain Pierce, who is ultimately in charge of the training program of the corrections division and is tasked with making sure deputies receive current training on the law governing their work. Allman Depo. 24:9-13, 27:1-11. Both Allman and Pierce testified that they were aware of the risk of restraint asphyxia in the correctional setting. For the reasons outlined in greater detail below with respect to the County's liability for the use of force against Steven, a jury could find that Allman and Pierce were aware of the substantial risk to inmates posed by using restraint techniques and procedures that may obstruct their airflow. Accordingly, summary judgment on their liability for excessive force allegedly deployed by their subordinates is denied.

### 5. *Monell* liability of County of Mendocino

In some circumstances, "a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick*, 563 U.S. at 61. Although a failure to train claim generally requires a plaintiff to show a pattern of similar constitutional violations, such a showing is not required where a "violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Long*, 442 F.3d at 1188. Neuroth argues the County of Mendocino is liable under *Monell* for failing to have any written policies or procedures in place at the jail to prevent restraint asphyxia.

In response, the County asserts the jail had a training program that instructed deputies on how to prevent medical conditions such as restraint asphyxia and that the training program complied with all California standards as certified by the STC. Studer Decl. ¶ 8-9, 12; Pearce Decl. ¶¶ 23-24, Exs. N and O). The County also points out that some defendant deputies who were not familiar with the specific term "restraint asphyxia" were nonetheless trained in ways to avoid causing medical complications in inmates such as impaired breathing. Although fine grained detail is not required to demonstrate adequate training, defendants' evidence does not directly support an inference that the majority of the deputies involved in the altercation with Steven were aware of

any particular risks associated with putting weight on an inmate's back while he is prone for an extended period of time. Sergeant Knapp testified that she believed she had received training on restraint asphyxia as part of a Medical Issues in Jail course "more than once", but was unable to recall when she received it. Knapp Depo. 29:2-13; 30:10-12; 32:4-5. Deputy Grant also indicated he had received some training, but was likewise unclear on the timing. Grant Depo. 26:1-5. Both Masterson and Holum stated that they were trained on ways to prevent breathing problems in detainees but could not elaborate on the content of that training. Although the deputies were generally aware of the need to avoid injuring inmates through the use of restraint methods, none of them appeared to be aware of specific protocols for avoiding the type of injury Neuroth believes his brother sustained. By contrast, the deputies demonstrated knowledge of, and compliance with, jail protocol regarding suicide prevention (summoning a safety smock and removing Steven's clothing), and with protocol regarding removal of arm and leg restraints when an inmate is left alone in the safety cell.

Every witness in this case has testified that it is common for the Mendocino County jail to receive individuals who are suffering from some combination of drug intoxication and mental illness. While Steven's death was apparently an unprecedented event at the jail, a reasonable juror could conclude that inmates in Steven's condition are likely to end up in an altercation with custodial staff, and that injury to the inmate is a highly predictable result of inadequate training with respect to restraint methods that may interfere with a person's breathing. Considering all the evidence and construing the facts in the light most favorable to the plaintiff, there is a triable issue with respect to the County's liability for failure to train its deputies adequately on the risks associated with restraint asphyxia. For that reason, summary judgment on the *Monell* claim against the County of Mendocino is denied.

**H. Bane Act claim**

A Bane Act claim arises where "a person or persons . . . interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion" with an individual's state or constitutional rights, or other legal rights. Cal. Civ. Code § 52.1(a). Although the California

State Supreme Court has yet to rule on the question of whether success on a Bane Act claim requires proof of "threats, intimidation, or coercion" beyond that inherent in the constitutional violation alleged, several decisions by the California Court of Appeal and the Ninth Circuit have taken the position that such a showing is not necessary. *See Cornell v. City and County of San Francisco*, 17 Cal. App. 5th 766 (2017); *Reese v. County of Sacramento*, 888 F.3d 1030, 1043-44 (9th Cir. 2018); *Rodriguez v. Cruz*, No. 13-56292, slip op. at 39-46 (9th Cir. May 30, 2018).

As explained above, there remain viable claims for constitutionally inadequate medical care against Caudillo, and excessive force against Bernardi, Masterson, Grant, De Los Santos, Page, Knapp, Allman, and Pearce. Accordingly, summary judgment with respect to the Bane Act claim against those defendants is denied. Their employers, Mendocino County, CFMG, and the City of Willits may be held vicariously liable. Because no constitutional violation may proceed with respect to Leef, Andrade, Holum, Fithian, Hustedt, or Teske, the Bane Act claim against each of these defendants is dismissed.

**I. Failure to summon medical care in violation of California Government Code § 845.6**

Neuroth also brings state law claims against each individual defendant for violation of California Government Code § 845.6. Defendants argue that under that state law provision, a public employee is entitled to immunity for injuries caused by "the failure of the employee to furnish or obtain medical care for a prisoner in his custody." The statute also provides an exception to broad immunity: "a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care." Cal. Gov't Code § 845.6. "Liability is limited to those situations where the public entity intentionally and unjustifiably fails to furnish immediate medical care." *Watson v. State of California*, 21 Cal. App. 4th 836, 841 (1993), citing *Hart v. County of Orange*, 254 Cal. App. 2d 302, 306 (1967).

As explained in greater detail elsewhere in this order, it remains disputed whether Steven was still breathing when the deputies left him alone in the safety cell. A reasonable juror could

conclude that Steven appeared unresponsive when the deputies left his cell and that they should have taken reasonable steps to seek immediate medical assistance. For that reason, summary judgment on this claim is denied as to Bernardi, Grant, Page, De Los Santos, and Knapp. Summary judgment is also denied as to the County of Mendocino, which is vicariously liable for the violations of its employees under section 845.6. On the other hand, because Holum was not in the safety cell with Steven and thus had no opportunity to detect his physical condition, summary judgment is granted in her favor. Finally, because section 845.6 by its terms applies to an official's duty to a prisoner "in his custody," summary judgment is granted as to Leef, who relinquished custody over Steven upon his admission to the jail.

## VI. CONCLUSION

For all the reasons set forth above, summary judgment is granted in favor of defendants on the following claims:

- Federal and state claims for unlawful arrest against Officers Leef and Andrade.
- Fourth Amendment denial of medical care claim against Officers Leef and Andrade.
- Intentional infliction of emotional distress claim against Officer Leef.
- Supervisory liability claim against Chief Gonzalez.
- *Monell* claim against the City of Willits for negligent hiring.
- Fourteenth Amendment deliberate indifference claim against Deputy Bernardi.
- *Monell* claim and Bane Act claims against CMGC.
- Supervisory liability claim against Dr. Fithian, Nurse Teske, and Elaine Hustedt.
- *Monell* claim against the County of Mendocino for violations attributable to CFMG.
- Fourth Amendment excessive force claim against Deputy Holum and Officer Leef.
- Bane Act claim against Officers Leef and Andrade, Deputy Holum, Dr. Fithian, Nurse Teske, and Elaine Hustedt.
- Section 845.6 claim against Deputy Holum and Officer Leef.

Summary judgment is denied as to the following claims:

- Negligence claim against Officers Leef and Andrade, and the City of Willits.

- Fourteenth Amendment deliberate indifference claim against LVN Caudillo.
- *Monell* claim against CFMG.
- Fourth Amendment excessive force claim against Deputies Bernardi, Grant, Page, and De Los Santos, and Sergeant Knapp.
- Battery and negligence claims against Deputies Bernardi, Grant, Page, and De Los Santos.
- *Monell* claim against the County of Mendocino related to excessive force.
- Supervisory liability claim against Sheriff Allman and Commander Pearce.
- Bane Act claim against LVN Caudillo; Deputies Bernardi, Grant, Page, and De Los Santos; Sergeant Knapp; the County of Mendocino; CFMG; and the City of Willits.
- Section 845.6 claim against Deputies Bernardi, Grant, Page, De Los Santos; Sergeant Knapp; and the County of Mendocino.

**IT IS SO ORDERED**.

Dated: August 31, 2018

RICHARD SEEBORG
United States District Judge